José Granados Navedo, demandante y recurrente, v. Marcos A. Rodríguez Estrada et al., demandados y recurridos; Francisca L. González Suárez et al., demandantes y recurrentes, v. Marcos A. Rodríguez Estrada et al., demandados y recurridos.

*Números:* CE-90-389 *Resueltos:* 31 de agosto de 1990
CE-90-390
CE-90-391
CE-90-465

1

2

4

*Carlos Canals Mora* y *Antonio Montalvo Nazario,* abogados de José Granados Navedo, recurrente; *Francisco Quiñones Vizcarrondo,* abogado de Francisca Luzgarda González Suárez, recurrente; *David Rivé Rivera,* de *Vargas & Rivé,* abogado del Presidente de la

6

Comisión Estatal de Elecciones, recurrido; *Rafael Escalera Rodríguez* y *Luis Sánchez Betances*, abogados de Héctor Luis Acevedo, recurrido; *José Ángel Rey, José Luis González Castañer* y *Melva Quintana*, abogados de Eudaldo Báez Galib, recurrido; *Miguel E. Sagardía De Jesús*, abogado de Israel Hernández Tirado y Carmen Nieves Sánchez, recurridos; *Enrique Bray*, de *Domínguez & Totti*, abogado de los demandantes involuntarios y los interventores.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitío la opinión del Tribunal.

Las controversias que tenemos ante nos plantean el derecho al voto de electores calificados, la interpretación de la legislación que dispone el diseño, funcionamiento y administración del sistema electoral como instrumento para canalizar la expresión del pueblo, y la función de los tribunales para atender y resolver controversias jurídicas que surgen de un contexto social, económico y político complejo. Aun cuando dicha complejidad aumenta los conflictos sociales, y por consiguiente los litigios, los tribunales continúan con la responsabilidad y la capacidad de resolver aquellos casos y controversias justiciables generados por la sociedad. Las controversias ante nos tienen su génesis en el proceso electoral y generan un apasionamiento y una carga emotiva especial para aquellos que son parte o se ven afectados por ellas. Sin embargo, dicha carga no debe producirse en este Tribunal.

█ Las controversias jurídicas que surgen de una contienda electoral deben ser estudiadas y resueltas por los tribunales con fundamentos jurídicos sin el apasionamiento natural que implica el evento electoral, sin ataques a la capacidad e integridad de los miembros de la Judicatura, sin diatribas y estridencias, y con el decoro correspondiente. En el pasado este Tribunal así lo ha hecho. Véase *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981), entre otros. Nuevamente endosamos lo expuesto por el Decano Pound, cita que incluyéramos en el esc. 6 de nuestra opinión en *Granados v.*

*Rodríguez Estrada II*, 124 D.P.R. 593, 614 (1989), sobre opiniones disidentes:

"'Escribir una opinión disidente conlleva una responsabilidad. . . . No hay cabida en las opiniones suscritas por jueces de un tribunal estatal de última instancia para la censura desmesurada, para la extrema vituperación, acusaciones de malsanas motivaciones a la opinión mayoritaria e insinuaciones de incompetencia, negligencia, prejuicio o insensibilidad por parte de los otros jueces del tribunal. . . . Para justificar una disidente denunciatoria, la cuestión de derecho debe ser de considerable importancia. Para justificar una disidente en que se censura a un colega, si esto es al fin justificable, la cuestión de derecho debe ser excepcionalmente decisiva y los errores señalados de la más seria naturaleza. . . . [L]a opinión de un juez de última instancia debe expresar sus razones y no sus opiniones particulares.' R. Pound, *Cacoethes Dissentiendi: The Heated Judicial Dissent*, 39 A.B.A. J. 794, 795 (1953)." (Traducción nuestra y énfasis suprimido.)[1]

Hoy, manteniendo la tradicional postura de ecuanimidad judicial, procedemos a resolver las controversias que están ante nos aplicando el derecho vigente con mesura y objetividad.

▮▮ Al considerar estas controversias es importante tener presente lo que expresamos en *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 61 (1989), a los efectos de que "'*no toda irregularidad en el proceso electoral puede dar lugar a la confiscación del voto. Para que eso suceda, la irregularidad debe ser de tal naturaleza que afecte la justedad a igualdad del proceso electoral*'". (Énfasis suplido.) De lo contrario, ignoraríamos que en nuestra sociedad los electores tienen no solamente unos derechos, sino también unas obligaciones para que los eventos electorales puedan llevarse a cabo sin que socaven la confianza del pueblo en la legitimidad de los resultados. Los procesos electorales en Puerto Rico y en otros países no son perfectos. Los mismos no

---

[1] La opinión particular del compañero Juez Asociado Señor Rebollo López, en relación con la renuncia del Hon. Carlos E. Polo, es irrelevante, está carente de fundamento jurídico alguno y resulta contradictoria con su posición y la del compañero Juez Asociado Señor Negrón García, quienes abogan por que se ordene la celebración de una nueva elección. Por ello, no amerita que le prestemos mayor atención.

8

están inmunes de dificultades, fallas y problemas comunes en este tipo de evento.[2] Lo importante es determinar si la gravedad de estas fallas afecta la voluntad del pueblo y el sistema democrático de gobierno. *Rizzo v. Bizzell*, 530 So. 2d 121 (1988); *Buonanno v. Distefano*, 430 A.2d 765, 770 (R.I. 1981); *De Martini v. Power*, 262 N.E.2d 857 (1970); *Ippolito v. Power*, 241 N.E.2d 232 (1968); *In re 1984 Maple Shade General Election*, 497 A.2d 577 (N.J. 1985).

■ Al evaluar y decidir las controversias que están ante nos, lo hacemos tomando en consideración que si bien el Estado y la Comisión Estatal de Elecciones (C.E.E.) en particular tienen la obligación de asegurarse de que el sistema electoral funcione adecuadamente, no es menos cierto que también *el elector tiene la obligación de actuar como ciudadano diligente y celoso de su derecho al voto para poder participar democráticamente en los procesos electorales. De hecho, la Ley Electoral dispone que para que un elector pueda ejercer su derecho al voto tiene que inscribirse y reactivarse mediante nuevas inscripciones posteriores cuando por alguna razón ha sido eliminado de las listas electorales.* Arts. 2.002 y 2.012 de la Ley Electoral, 16 L.P.R.A. secs. 3052 y 3062.

El celo por que la voluntad democrática del pueblo quede meridianamente clara en los comicios de noviembre de 1988 en el Municipio de San Juan ha precisado nuestra intervención en repetidas ocasiones. Por tratarse de cuestiones complejas y noveles en nuestra jurisdicción, requirió incluso que devolviéramos las controversias al foro de instancia para que se dilucidasen los hechos tomando en consideración los parámetros jurídicos que

---

[2] La opinión disidente del compañero Juez Asociado Señor Negrón García, a pesar de que promulga que "nunca hay que alejar la vida de la ley, de la ley de la vida", niega esta realidad.

En su lugar, pretende exigir al organismo electoral un grado de perfección suprema en sus procedimientos que haría inadministrable el sistema electoral.

Su enfoque paternalista choca con la realidad jurídica y niega la madurez democrática de nuestro pueblo. El mismo no está avalado ni por nuestra Constitución ni por nuestra Ley Electoral. Al contrario, ambas reconocen y plasman el delicado balance de derechos y obligaciones, tanto del organismo electoral como del elector, e impone a cada cual sus responsabilidades de manera que el sistema electoral funcione adecuadamente.

indicamos. También dispusimos para que los electores pudieran acudir a dicho foro a defender sus derechos electorales.

Consideramos finalmente, pues, las controversias originadas por los resultados de la contienda electoral por la alcaldía del Municipio de San Juan.(3)

I

*Introducción y trasfondo del caso*

En esta ocasión recurren ante nos el Sr. José Granados Navedo, la Sra. Francisca Luzgarda González Suárez, el Sr. Félix Figueroa Rivera y otros, y un número de "demandantes involuntarios" de la opinión y sentencia dictada el 10 de mayo de 1990 por el Tribunal Superior de Puerto Rico, Sala de San Juan (Hon. Carlos E. Polo), que desestimó la impugnación hecha por el señor Granados Navedo a la certificación expedida por la C.E.E. al Sr. Héctor Luis Acevedo como Alcalde electo del Municipio de San Juan en las elecciones de noviembre de 1988. La sentencia también trata de la acción de *mandamus y daños y perjuicios* presentada por la Sra. Francisca Luzgarda González Suárez y sobre el derecho a votar en dichos comicios electorales de otros electores de San Juan que se unieron a ella por mandato de este Tribunal.

A los fines de evaluar los recursos presentados, oportunamente concedimos término a las partes para que expusieran sus respectivas posiciones. Contamos con el beneficio de dichas comparecencias. Además, ordenamos que se elevaran ante nos los autos originales del caso, la transcripción de evidencia a la cual se hace referencia en la sentencia y toda la prueba documental.

___

(3) Véanse nuestros dictámenes anteriores sobre estas controversias. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1 (1988); *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989); *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989); *González v. Rodríguez Estrada I*, 124 D.P.R. 749 (1989). Además, en *P.N.P. y P.I.P v. Rodríguez Estrada*, 122 D.P.R. 490 (1988), antes de celebrarse las elecciones de 8 de noviembre de 1988, validamos el procedimiento aprobado por la Comisión Estatal de Elecciones (C.E.E.) para votar añadido a mano, sujeto a determinados requisitos que siempre hemos considerado de estricto cumplimiento.

*Luego de examinar cuidadosamente todos estos documentos, confirmamos* los dictámenes del Tribunal Superior de Puerto Rico, Sala de San Juan.(4)

A los fines de ubicar en adecuada perspectiva las controversias ante este Foro, debemos tener presente las razones principales que motivaron nuestra decisión en *P.N.P. y P.I.P v. Rodríguez Estrada,* 122 D.P.R. 490 (1988), y el alcance de esos pronunciamientos. Allí, a escasamente unos días de las elecciones de noviembre de 1988 y a petición del Partido Nuevo Progresista (P.N.P.) y del Partido Independentista Puertorriqueño (P.I.P.), validamos el procedimiento especial de electores añadidos a mano aprobado por la C.E.E.

Este procedimiento especial permitió que unos diecisiete mil seiscientos dieciséis (17,616) electores en toda la isla —cuatro mil ciento diecisiete (4,117) de ellos en el Municipio de San Juan— que no aparecían en las listas electorales pero que alegaron y presentaron prueba tendente a demostrar prima facie su derecho a votar lo pudieran hacer añadiendo su nombre y firma a las listas electorales. *Granados v. Rodríguez Estrada I,* supra. *Protegimos así el derecho al voto de estos electores que de otra forma no hubieran podido votar.*

En gran medida las controversias que tenemos ante nos son consecuencia de la votación tan cerrada para la posición de Alcalde que se dio en el Municipio de San Juan y de los pequeños dislóques que causó la premura con que la C.E.E. tuvo que implantar el procedimiento especial de votación de añadidos a mano ordenado por este Tribunal.

En relación con estos electores añadidos a mano, debemos destacar lo que expresamos en *Granados v. Rodríguez Estrada I,* supra, pág. 30, en el sentido de que:

---

(4) Como complemento a esta opinión y *en aras de proveer el mayor detalle posible sobre los hechos* dilucidados en el tribunal de instancia para resolver las controversias planteadas a tenor con nuestro mandato, se une como anejo la Opinión y Sentencia (y sus apéndices) de la ilustrada sala de instancia. La misma es el producto de una tarea encomiable que resuelve una controversia compleja salvaguardando los derechos e intereses de todas las partes.

Un examen en conjunto de nuestra decisión en *P.N.P. y P.I.P v. Rodríguez Estrada*, supra, del procedimiento para votar añadido a mano, etc., promulgado por todos los partidos políticos y del acuerdo post eleccionario que creó una junta especial para dilucidar el *status* de elector de estos votantes revela que *en ningún momento se consideró concederle a estos electores la gama de derechos estatutarios y jurisprudenciales antes señalados*. En todo momento se trató y se consideró esto como un procedimiento sui géneris. (Énfasis suplido.)(5)

Cabe destacar que lo que validamos como un procedimiento *especial y por vía de excepción* para permitirle votar a un número de electores que de otra manera no lo hubieran podido hacer, no impidió el procedimiento normal y general seguido por casi dos millones (2,000,000) de electores calificados en Puerto Rico, y unos doscientos mil (200,000) de éstos del Municipio de San Juan, que ejercieron el derecho al sufragio sin dificultades. Las controversias que tenemos ante nos se circunscriben a un número reducido de electores, pero adquieren vital relevancia por lo cerrado de los resultados de esta elección para el cargo de Alcalde del Municipio de San Juan.

■ Reiteramos que en ningún momento se previó concederle a estos electores que votaron mediante el procedimiento de añadidos a mano la gama de derechos estatutarios y jurisprudenciales reconocidos a electores regulares. Además, el hecho de que se les haya permitido votar como electores añadidos a mano, *bajo normas de estricto cumplimiento*, y de que le hayamos dado acceso a los tribunales para reclamar los derechos que le asistan, no altera las normas jurídicas que rigen los procesos civiles ante nuestros tribunales, las presunciones establecidas por ley y por la

---

(5) En dicha ocasión el compañero Juez Asociado Señor Negrón García, en su opinión concurrente, expresó que el procedimiento de añadidos a mano se *limitaba* a perseguir el propósito de *que electores calificados, que "por errores humanos, técnicos o atribuibles a las limitaciones de acceso o incapacidad de actualización del sistema operado* por la C.E.E." pudieran votar. (Énfasis suplido.) *P.N.P. y P.I.P v. Rodríguez Estrada*, supra, pág. 521. Esta visión contrasta con la posición adoptada por él hoy, donde pretende que se impugne injustificadamente el procedimiento de naturaleza cuasi judicial de recusación por domicilio llevado a cabo cuatro (4) meses antes de celebrarse las elecciones de noviembre de 1988.

jurisprudencia, los procesos regulares de recusación de electores, la forma de presentar, admitir, y probar unos hechos, y de los tribunales evaluar la prueba.

Luego de analizar detalladamente toda la prueba documental y oral presentada, y las alegaciones de las partes, concluimos que estamos realmente frente a unas controversias que involucran trescientos ochenta y tres (383) electores del Municipio de San Juan, a saber: noventa y nueve (99) electores excluidos por domicilio, por inactividad y por otras razones; quince (15) papeletas de doble marca adjudicadas y treinta y nueve (39) no adjudicadas por contener las iniciales del elector al dorso; doscientas siete (207) de las papeletas denominadas "arrestadas", y veintitrés (23) llamadas "contaminantes". *Salvo la controversia de los electores excluidos por domicilio, por inactividad y por otras razones que se nos plantean por primera vez, el resto de las controversias las habíamos tenido ante nos en una u otra etapa de los procedimientos llevados en el foro de instancia.*

## II

*Sobre nuestra función revisora*

■ En *Granados v. Rodríguez Estrada I*, supra, sostuvimos que este proceso de impugnación era un *"juicio de novo"* en el cual las partes podían presentar *toda la prueba pertinente* para los motivos de la impugnación, aunque dicha prueba nunca hubiese estado en el récord administrativo. Allí expresamos:

> Lo importante es que el tribunal *oiga, considere* y *resuelva* a base de *toda la prueba admisible* que tengan a bien presentar las partes, y luego aplique el derecho teniendo en cuenta que el derecho al voto no debe ser menoscabado o desalentado. (Énfasis suplido.) *Granados v. Rodríguez Estrada I*, supra, pág. 21.

Allí no indicamos, por ser innecesario, el ámbito de *nuestra* función revisora. Nos limitamos a expresar el ámbito de la

revisión del Tribunal Superior de las determinaciones de la C.E.E.(6)

▋ Por tratarse la acción del impugnador, señor Granados Navedo, en este caso de un juicio de novo de una decisión administrativa expresamente dispuesta por ley, aplicaremos la norma de revisión judicial que tradicionalmente utilizamos en relación con las revisiones de casos civiles originados en el Tribunal Superior, a saber: en "ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto", este Tribunal no dejará sin efecto una sentencia cuyas conclusiones encuentren apoyo en la prueba desfilada. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 728 (1984). Además, por no existir razón válida alguna para variarla, aplicaremos la norma de revisión administrativa de que para que prevalezca una acción de impugnación de la certificación de la C.E.E. debe haberse rebatido en el juicio de novo la presunción de corrección de los procedimientos administrativos. *Granados v. Rodríguez Estrada I*, supra. La misma normativa es aplicable a los recursos incoados por la Sra. Francisca Luzgarda González y por los demandantes involuntarios cuyas reclamaciones son acciones civiles independientes instadas por primera vez en el Tribunal Superior, y que tienen su génesis también en adjudicaciones hechas por la C.E.E. *A.E.E. v. Las Américas Trust Co.*, 123 D.P.R. 834 (1989); *Sánchez Rodríguez v. López Jiménez*, supra.

*No nos compete autoproclamarnos una super C.E.E. para desde este estrado hacer un recuento de votos y proclamar el vencedor y el vencido.*(7)

---

(6) El compañero Juez Asociado Señor Negrón García, en su disidencia, interpreta erróneamente lo allí expuesto.

(7) La opinión disidente del compañero Juez Asociado Señor Negrón García, al declarar primero vencedor "por amplio margen, más de cien (100) votos" al señor Granados Navedo y luego proceder a sostener como el remedio apropiado *una nueva elección total o parcial,* por ser la única forma de rectificar los supuestos errores fundamentales cometidos por el foro de instancia, pierde de vista el hecho de que lo que procede es que nuestro dictamen evalúe los supuestos errores cometidos en la contienda electoral. *Después de todo, la revisión se da contra la sentencia, no contra los fundamentos.*

Con este marco conceptual y normativo sirviéndonos de norte, consideramos y resolvemos las controversias planteadas. Examinaremos primero los señalamientos de errores planteados por el señor Granados Navedo.

## III

*Las llamadas "papeletas contaminantes"*

Estas papeletas son aquellas de electores autorizados a votar como añadidos a mano que fueron depositadas en las urnas donde también se depositaban las papeletas de los electores regulares. Ambos tipos de papeletas se mezclaron. Se trata de un total de mil doscientas cincuenta (1,250) papeletas, las cuales fueron adjudicadas por la C.E.E.

Sostiene el recurrente, señor Granados Navedo, que erró el foro de instancia al confirmar la decisión de la C.E.E. que adjudica dichas papeletas.

En nuestra decisión de *Granados v. Rodríguez Estrada I*, supra, sostuvimos que sobre esta controversia el impugnador señor Granados Navedo tenía que traer prueba que demostrara que los votos así adjudicados por la C.E.E. debían anularse. En particular, señalamos que éste tenía que probar que el elector no cualificaba para votar; que el voto se había adjudicado al señor Acevedo (a esos efectos podía presentar el testimonio del elector en el tribunal), y que se trataba de suficientes votos como para cambiar el resultado de la elección municipal.

De la prueba que desfiló ante el foro de instancia surge lo siguiente:

1. De los trece (13) colegios electorales donde alegadamente hubo urnas con papeletas contaminantes, se presentó prueba sobre lo ocurrido en once (11) de ellos. De estos últimos, se demostró que en dos (2) de ellos realmente no se dió el fenómeno de la "contaminación".

2. De los restantes nueve (9) colegios, el señor Acevedo demostró, mediante prueba al efecto, que tampoco hubo contaminación en tres (3) de ellos. A esos efectos, presentó el testimonio

de los electores añadidos a mano y probó que eran electores calificados para votar.

3. De los restantes seis (6) colegios, el señor Acevedo presentó el testimonio de veinticinco (25) electores así como evidencia demostrativa de que éstos *no* estaban calificados para votar. Evaluada la prueba documental y oral que establecía la ilegalidad de estos veinticinco (25) votos, el foro de instancia les concedió inmunidad a estos electores y, finalmente, a la luz de sus declaraciones determinó que veintitrés (23) de ellos no tenían derecho a votar y que procedía se restasen estos votos de los que habían sido adjudicados al señor Granados Navedo.

Nueve (9) de los veintitrés (23) electores cuyos votos fueron anulados, así como el recurrente señor Granados Navedo, sostienen que el foro de instancia erró al anular sus votos y las veintitrés (23) papeletas contaminantes que le habían sido adjudicadas al señor Granados Navedo. No tienen razón.

■ Ya en *Granados v. Rodríguez Estrada I*, supra, con relación a las papeletas contaminantes, señalamos que lo importante era determinar que esos electores no tenían derecho al voto y que sus votos a favor del candidato impugnado debían descontarse del total que se produjo en las urnas contaminadas. Allí indicamos que ello podía probarse con el testimonio de los electores que votaron en forma ilegal, ya que a éstos no les cobijaba el privilegio de la secretividad del voto y el privilegio provisto por la Regla 29 de Evidencia, 32 L.P.R.A. Ap. IV. En *Granados v. Rodríguez Estrada I*, supra, también autorizamos expresamente al señor Acevedo a presentar prueba para defender su posición como alcalde certificado por la C.E.E.

Los veintitrés (23) electores presentados por el señor Acevedo como testigos votaron, según quedó demostrado por la prueba, sin tener derecho a ello. De estos veintitrés (23) electores sólo han recurrido ante nos nueve (9) y *ninguno cuestiona la determinación del foro de instancia de que no tenían derecho al voto.* El señalamiento de error hecho por ellos y por el señor Granados Navedo está esencialmente relacionado con el procedimiento

utilizado por el tribunal de instancia al éstos testificar sobre el contenido de sus votos. Aunque dicho planteamiento procesal no afecta el hecho de que estos electores no tenían derecho a votar, examinemos el mismo.

1. Estos electores, por haber votado añadidos a mano en las elecciones generales de 1988, tenían una presunción de ser electores no calificados. Los mismos no aparecían en el registro electoral y, por excepción, se les permitió votar mediante ese procedimiento especial. Su voto estaba sujeto al cotejo que hiciera posteriormente la C.E.E. sobre su elegibilidad como votantes. *Como señaláramos anteriormente, estos electores no tienen la gama de derechos estatutarios y jurisprudenciales que tiene un elector debidamente calificado para votar. Granados v. Rodríguez Estrada I*, supra, pág. 30. Al no tener, prima facie, derecho al sufragio, a estos electores tampoco les asistía el derecho a que su voto fuera secreto.

2. Ninguno de estos electores se negó a declarar o levantó el privilegio contra la autoincriminación ni antes ni después de que les fuera concedida la inmunidad por el foro de instancia.

3. El foro de instancia oyó a estos electores, les permitió presentar evidencia a su favor para dilucidar si su determinación preliminar de ilegalidad era incorrecta. Con esta vista se les concedió el debido proceso de ley. *Cf. Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982).

4. Los veintitrés (23) electores testificaron en calidad de *testigos* y no de partes, por lo cual no les aplica los derechos reconocidos a las partes. En *Granados v. Rodríguez Estrada I*, supra, págs. 57–58, sostuvimos que estos electores, que presumiblemente votaron de manera ilegal, podían ser utilizados como testigos y podía presentarse prueba, como aquí se hizo, sobre la legalidad y el contenido de ese voto. Su testimonio ciertamente era admisible.

5. No tiene razón el recurrente, señor Granados Navedo, al sostener que el foro de instancia no tenía facultad para concederle inmunidad a dichos testigos. A esta acción civil espe-

cial de impugnación le es aplicable el Código de Enjuiciamiento Criminal, 34 L.P.R.A. secs. 1476-1478. Estas secciones expresamente le confieren la facultad al foro de instancia para conceder inmunidad a este tipo de testigo en controversias como éstas donde se plantea y se investiga la ilegalidad de determinados votos. El magistrado está expresamente facultado para citar testigos, y si el testigo cree que puede incriminarse, el magistrado motu proprio puede concederle inmunidad. Sólo cuando el testigo se niega a declarar, aun después de concedida la inmunidad, procede que el magistrado remita el caso al Secretario de Justicia para que inicie las acciones criminales correspondientes. Ese no fue el caso en autos.

El recurrente *no presentó prueba de que los votos contaminantes de estos electores sin derecho al voto le fueron adjudicados al señor Acevedo. Sobre el particular, se cruzó de brazos. No probó, según le correspondía, sus alegaciones sobre este particular. El error imputado no se cometió.*

## IV

*Las papeletas arrestadas*

Estas son las doscientas siete (207) papeletas de electores añadidos a mano que la C.E.E. no adjudicó debido a las serias irregularidades ocurridas en seis (6) Colegios de Votación del Municipio de San Juan.

El recurrente, Señor Granados Navedo, sostiene que estos votos debieron adjudicarse, y que ese número de electores excedía la ventaja del señor Acevedo.

Sobre esta controversia ya en *Granados v. Rodríguez Estrada I,* supra, pág. 12, describimos la situación de estos colegios y expresamos:

[E]n una de las unidades había más papeletas que electores debidamente registrados. En otro colegio faltaban noventa y dos (92) papeletas para corresponder a ciento trece (113) electores añadidos a mano. En todos los colegios afectados faltaron sobres y los funcionarios mezclaron todas las papeletas, imposibilitando la

identificación de las papeletas de los electores que la investigación [de la C.E.E.] determinó que podían votar.

El foro de instancia determinó que la adjudicación de dichos votos no tendría efecto sobre el resultado de la elección celebrada en noviembre de 1988 en el Municipio de San Juan. Veamos.

Sobre estos votos anteriormente habíamos señalado que el señor Granados Navedo tenía el peso de la prueba para demostrar que el número de votos arrestados era suficiente para variar el resultado de la elección y que estos electores eran electores calificados.

El señor Granados Navedo *no presentó testimonio de elector alguno*. Se limitó a presentar el testimonio de seis (6) funcionarios electorales que trabajaron en los colegios de votos arrestados. Además, presentó el testimonio del licenciado Bauzá Escobales, Primer Vicepresidente de la C.E.E.

Sobre esta controversia el señor Acevedo presentó el testimonio de seis (6) funcionarios de seis (6) de estos colegios afectados y el de ocho (8) electores calificados que testificaron voluntariamente que habían votado por él. Esta fue toda la prueba oral que sobre este particular tuvo ante sí el foro de instancia. *En ninguno de los seis (6) colegios ocurrió fraude electoral.*

El tribunal de instancia determinó lo siguiente:

1. De los doscientos siete (207) votos arrestados, únicamente noventa y ocho (98) correspondían *a electores calificados.*

2. Adjudicó los votos del Colegio 005, ya que se demostró quiénes eran los electores que emitieron las papeletas y el *status* electoral que los calificaba para votar. De los veintiún (21) votos arrestados en ese colegio determinó que había diez (10) electores calificados y adjudicó seis (6) votos al señor Acevedo y cuatro (4) al señor Granados Navedo.

3. De los cuarenta y cuatro (44) electores capacitados del Colegio 008, no adjudicó votos de elector alguno debido a las serias irregularidades ocasionadas en el mismo por la conducta desplegada por los electores. La prueba desfilada ante el foro de instancia con relación a este colegio demostró que allí los electores se negaron a entregar sus tarjetas de identificación electoral a

pesar de habérseles solicitado por los funcionarios de colegio quienes, por la actitud amenazante de los electores, temieron por sus vidas y se vieron obligados a permitirles votar sin que entregasen su tarjeta. Ello, de por sí, justifica la anulación de sus papeletas. Este Foro no puede avalar la actuación anárquica de estos electores.

4. En los cuatro (4) colegios restantes, en los cuales se habían arrestado votos, había *sólo* treinta y ocho (38) *votos regulares de electores capacitados.* A estos electores el tribunal de instancia les aplicó una fórmula de adición proporcional de los votos calificados, adicionándoles matemáticamente 16.31 votos al señor Acevedo, 18.50 al señor Granados Navedo y 1.19 a la candidata del P.I.P. Adjudicó, además, seis (6) votos de electores de dos (2) de esos colegios que declararon que votaron por el señor Acevedo. En consecuencia, *la referida fórmula se aplicó a treinta y ocho (38) votos de los doscientos siete (207) votos arrestados.*

El foro de instancia utilizó la fórmula de adición proporcional para determinar si la anulación de las papeletas arrestadas pudo tener el efecto de cambiar el resultado de las elecciones. Concluyó en la negativa. Procedió entonces a confirmar la decisión de la C.E.E.

En nuestra opinión de *Granados v. Rodríguez Estrada I,* supra, *exhortamos* al foro de instancia a examinar las normas estatales y federales allí esbozadas —utilizadas en casos similares a éste— algunas de las cuales expresamente adoptamos en aquella ocasión.

Existen mecanismos estadísticos de validez científica que permiten a los tribunales determinar la probabilidad de si la anulación de las papeletas arrestadas pudo haber cambiado el resultado de la elección. N.O. Finkelatein y H.E. Robbins, *Mathematical Probability in Election Challenges,* 73 Col. L. Rev. 214 (1933). Véanse, además: *Rizzo v. Bizzell,* supra; *In re 1984 Mapple Shade General Election,* supra; *Buonanno v. Distefano,*

supra; *Matter of Levens*, 702 P.2d 320 (1985); *Miller v. Hill*, 698 S.W.2d 372 (1985); *Application of Murphy*, 243 A.2d 832 (1968). [8]

▌ A nivel local, en *Esteves v. Srio. Cám. de Representantes*, 110 D.P.R. 585, 590–91 (1981), establecimos la norma de medir las impugnaciones post electorales por la *probabilidad del resultado.* "Bajo esta doctrina la parte que cuestiona una elección debe demostrar prima facie que existe una *probabilidad razonable* de que pueda variar el resultado, que tal cambio es más plausible que implausible. No puede fundamentarse una impugnación en meras *conjeturas, generalidades, especulaciones o posibilidades remotas* sobre su éxito eventual." (Énfasis suplido y citas omitidas.) En *Santos v. Comisión Estatal de Elecciones*, 111 D.P.R. 351, 356 (1981), ratificamos la utilización de la norma sobre la prueba de probabilidad matemática.

Cuando en *Granados v. Rodríguez Estrada I*, supra, señalamos que el impugnador tenía que demostrar que el resultado *pudo* haber sido diferente de contarse las papeletas arrestadas, nos referíamos a que existiera una *probabilidad razonable* de alterar el resultado.

▌ Esta norma, aplicada al caso de autos, lo que implica es que para concluir que la anulación de tales papeletas afectaría el resultado de la elección, *no* es suficiente demostrar que la cantidad de electores con derecho al voto cuyas papeletas fueron arrestadas sea mayor que la ventaja del señor Acevedo. *Es necesario que, además, se demuestre que existe la probabilidad* de que el señor Granados Navedo hubiese obtenido suficientes votos entre aquellos electores calificados no adjudicados como para que éstos pudiesen alterar el resultado.

*La prueba presentada por el señor Granados Navedo ante el foro de instancia no demostró tal probabilidad.*

---

[8] La jurisprudencia a la cual hace referencia el compañero Juez Asociado Señor Negrón García como que ha sido revocada no es la citada en *esta opinión.*

■ La fórmula de adición proporcional utilizada por el foro de instancia para adjudicar treinta y ocho (38) papeletas arrestadas se fundamenta en el supuesto más razonable que puede efectuarse para analizar el comportamiento electoral de los votantes cuyas papeletas están arrestadas. La misma fue sugerida por este Tribunal al discutir la controversia sobre las urnas alegadamente contaminadas, cuando indicamos que "de cumplir el candidato impugnador con los requisitos indicados, se reducirán dichos votos en la *proporción* correspondiente". (Énfasis suplido.) *Granados v. Rodríguez Estrada I*, supra, pág. 58.

■ La utilización de esta fórmula de adición proporcional no sólo ha sido avalada por la jurisprudencia estatal, sino que es permitida por nuestra Ley Electoral. La Ley Electoral, en su Art. 6.015 (16 L.P.R.A. sec. 3275), sólo autoriza a que se convoque a una nueva elección cuando se *hayan agotado* todos los remedios disponibles para determinar un ganador en la contienda electoral. El compañero Juez Asociado Señor Negrón García, en su opinión concurrente en *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 328–329, expresó, en esa ocasión acertadamente y con claridad, el fundamento de esta norma al señalar que:

> *En cuanto a la alternativa de conceder una nueva elección, el razonamiento y motivos que animan esa recomendación, aunque loable, es contraria a la doctrina prevaleciente sobre el trasfondo circunstancial que imperativamente debe existir para tal remedio.* [K.W.] Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U.L. Rev. 1092 (1974).
> También vuelve a inyectar en el país las excitaciones, rivalidades y animosidades que caracterizan la contienda pública y tiende a perturbar la paz comunitaria, estabilidad y seguridad de las instituciones. *Es un remedio extremo que implícitamente y por unanimidad este Tribunal declinó en abono de devolver al pueblo confianza, finalidad y tranquilidad en el proceso de las urnas —ante la impugnación de la certificación del cargo de Gobernador predicada también, entre otras, en el estrecho margen electoral— aún estando todos conscientes del siguiente escenario fáctico:*
> "*No se puede debatir seriamente que el desarrollo de las recientes elecciones no estuvo a la altura deseada ni exento de*

*muchas de las fallas que tradicionalmente, en mayor o menor grado, agobian y caracterizan el proceso. El estrecho margen de votos entre los partidos principales —en un sistema cuya ley y estructura no estaban diseñadas para esa eventualidad y un país cuya ciudadanía no estaba acostumbrada a ello— ha contribuido al desasosiego y malestar. La tardanza inevitable que implica la relevancia que entonces toman las irregularidades inevitables y naturales habidas en un proceso que conlleva la movilización, participación y decisión de más de un millón y medio (1,500,000) de personas, y la importancia que a cada voto potencial determinado partido político le atribuye, forman parte del medio ambiente, premisas intangibles y otros factores en que se debaten los reclamos de las partes en estos recursos. Tomamos conocimiento judicial de que en estas elecciones hubo exclusiones indebidas de electores de las listas, dobles inscripciones, errores o faltas de procesamiento en las solicitudes de transferencia de precinto y otras más."* (Énfasis suplido y en el original.)

La Ley Electoral dispone que procede ordenar una nueva elección cuando "el Tribunal no pudiera decidir cu[á]l de ellos resultó electo. . .". Art. 6.015 de la Ley Electoral, *supra*. El uso de la fórmula de adición proporcional utilizada por el foro de instancia para adjudicar *treinta y ocho (38) votos* arrestados es uno de los remedios permitidos para no llegar a *tan drástica decisión.* Además, la aplicación de esta fórmula *no tiene el efecto de diluir el número de votos.* Se cuentan los votos de electores calificados y luego se adjudican en proporción a la tendencia de votación en la elección. Existiría la dilución si se dejara de contar votos válidamente emitidos *o si se ordenara una nueva elección con efecto anulante sobre los votos válidamente emitidos y adjudicados.*

El planteamiento sobre "uniformidad" hecho por el señor Granados Navedo no puede prevalecer. En nuestras opiniones anteriores hicimos claro que, en cuanto a las llamadas papeletas contaminadas, la prueba requerida al señor Granados Navedo era para *restar* al impugnado los electores que demostrara que no eran calificados; mientras que en el caso de las llamadas papeletas arrestadas, la prueba requerida al señor Granados Navedo era para *demostrar* que existían electores calificados que debían ser

*sumados* a los votos ya adjudicados a él. Ambas operaciones son totalmente distintas. *Granados v. Rodríguez Estrada I*, supra, págs. 49–51.(9)

Por otra parte, llama la atención el hecho de que el señor Granados Navedo *no cuestiona la utilización de la fórmula de adición proporcional cuando el foro de instancia la aplicó como mecanismo alternativo* en la controversia sobre las llamadas papeletas contaminantes.

Debemos destacar que de los treinta y ocho (38) votos a los cuales se les aplicó la fórmula de adición proporcional la cantidad de votos adjudicados al señor Granados Navedo (18.50) no puede ser ampliada, pues no guardaría proporción con el patrón general de votos obtenidos por éste y por el señor Acevedo, cuya diferencia es de menos del uno por ciento (1%). Por otro lado, aun cuando fuera aumentada, ello no afectaría el resultado de la elección.

La fórmula de adición proporcional utilizada por el foro de instancia es legal y constitucional. Primero, los electores que votaron añadidos a mano, cuyos votos fueron arrestados, no tienen la gama de derechos estatutarios y jurisprudenciales de los electores calificados. Segundo, estos electores añadidos a mano se presumen electores no calificados para votar. Tercero, no se trata de que los votos de los treinta y ocho (38) electores no se hayan contado, pues se contaron. Cuarto, la situación de estos treinta y ocho (38) electores es totalmente distinta a la que ha dado lugar a la aplicación de la doctrina constitucional de *one man one vote*. Aquí no se trata de un diseño preeleccionario para diluir o hacer inefectivo el voto de un grupo étnico minoritario con el fin de que obtengan menos representación en el Gobierno. Véanse: L.H. Tribe, *American Constitutional Law*, Nueva York, Ed. Foundation Press, 1978, pág. 737 y ss.; R. Serrano Geyls, *Derecho constitucional de Estados Unidos y de Puerto Rico*, 1ra ed., San Juan, Ed. Abo. P.R., 1988, Vol. II, págs. 1224–1234. Se trata de la

---

(9) Cabe señalar que su planteamiento, además de ser tardío, conlleva un remedio distinto al que solicitó al presentar su reclamación.

aplicación post electoral de una fórmula racional para distribuir un número limitadísimo de votos (38) dentro de un universo de unos doscientos mil (200,000) votos.

Es, en fin, una medida que responde al diseño electoral de nuestra ley, que primordialmente promueve el *recuento de votos y no la celebración de una nueva elección.*

Confirmamos la decisión del foro de instancia sobre esta controversia.

## V

*Papeletas con iniciales de electores al dorso*

Estas papeletas son aquellas en las cuales el elector, luego de doblar la mismas y antes de depositarlas en la urna, colocó sus iniciales al dorso.

El señor Granados Navedo sostiene que erró el tribunal de instancia al no adjudicar y anular trescientos cincuenta y cinco (355) de dichas papeletas, pues las instrucciones de los funcionarios de colegio a los electores fueron estereotipadas y se prestaban a confundirlos, induciéndolos a colocar sus iniciales al dorso. Sobre estas papeletas ya nos habíamos expresado en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1, 27–28 (1988):

> Si bien el voto está resguardado por una presunción de validez y de legalidad, *P.P.D. v. Admor. Gen. de Elecciones*, [supra], esa presunción no es pertinente al caso que nos ocupa. Obviamente, tal presunción se refiere a aquel voto emitido de modo regular, donde prima facie se haya acatado la ley. *Mas cuando de la propia faz de la papeleta surge que la misma contiene alguna irregularidad que contraviene la ley y los reglamentos aplicables, no es procedente invocar dicha presunción. No se puede presumir lo que la simple vista niega. En estos casos la propia papeleta evidencia la irregularidad.* Por lo tanto, es sobre el elector que recae el peso de la prueba en este caso. *Le corresponde a éste demostrar que actuó de buena fe y que fue inducido a error por la orientación confusa de los funcionarios de colegio. Ello fue precisamente lo que los peticionarios declinaron hacer en la vista de este caso en el Tribunal Superior al renunciar a presentar prueba.* (Énfasis suplido.)

Posteriormente, en *Granados v. Rodríguez Estrada I*, supra, págs. 35–36, reiteramos lo anterior al señalar:

Resolvimos, [*P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra,] en primer término, que la Comisión Estatal *tiene la facultad de anular papeletas que alegadamente contengan las iniciales del elector.* Confirmamos la sentencia, ya que el partido recurrente no presentó ni probó sus alegaciones . . . .

. . . . . . . . . .

Si bien dicha sentencia no impide, como cosa juzgada, la alegación del candidato, *los criterios allí expuestos tienen fuerza de precedente.* A ellos debe atenerse el tribunal de instancia al considerar y evaluar la prueba admisible que ofrezcan las partes.

Para concluir, en este asunto *se presume que la decisión de la Comisión Estatal es válida.* Le corresponde al afectado presentar la prueba que relata en sus alegaciones. (Énfasis suplido.)

Reiteramos una vez más que de la faz de las papeletas con iniciales al dorso surge una irregularidad que contraviene la ley y los reglamentos. La propia papeleta evidencia la irregularidad y, por ello, la C.E.E. tiene facultad para anularla. Su decisión se presume válida.

Devuelto el caso al foro de instancia, éste determinó que de las trescientas cincuenta y siete (357) papeletas con iniciales de electores al dorso, sólo dos (2) debían adjudicarse y debían anularse las restantes trescientas cincuenta y cinco (355).

El foro de instancia tuvo ante sí abundante prueba documental y oral sobre esta controversia. El señor Granados Navedo presentó el testimonio de cuarenta y un (41) funcionarios de colegios electorales y el señor Acevedo el testimonio de treinta y uno (31). También testificaron cuarentaiún (41) electores y la Prof. Marcia Rivera. Luego de ello concluyó que se trataba del tipo de error que la jurisprudencia estatal ha considerado como un *gardening variety election disputes.* Véase *Granados v. Rodríguez Estrada I*, supra, pág. 54 y ss.

Al aquilatar la prueba el tribunal de instancia determinó que los electores, al colocar sus iniciales en las papeletas, lo

hicieron de buena fe y no con la intención de identificar cómo votaron.[10]

Ahora bien, tal determinación en nada desvirtúa el hecho de que las papeletas fueron efectivamente iniciadas por el elector, lo que permitió la identificación y revelación del emitente. Ello atenta contra el principio de la secretividad del voto como pilar de nuestra democracia. Con respecto al voto secreto, expresamos en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 13:

> Si bien el voto es uno de los derechos de más preeminencia e importancia en nuestro sistema constitucional, el mismo, al igual que todo otro derecho, no es absoluto. Puede ceder ante intereses públicos apremiantes en pro del bienestar común, la sana convivencia y para salvaguardar el ejercicio mismo de ese derecho. Una de las instancias en la que debe ceder este derecho al voto es cuando se viola el postulado constitucional de la secretividad. No cabe duda que el Estado posee un interés extremadamente apremiante en preservar el principio del voto secreto.

Finalmente, concluyó que si bien el reglamento de la C.E.E. no disponía la forma en que los funcionarios electorales debían impartir las instrucciones a los electores sobre cómo doblar las papeletas, no se probó que éstos *indujeron a error* a dichos electores. A tenor con la normativa jurídica expuesta por este Tribunal, a saber, que el elector o el impugnador tenía que probar que el elector había actuado de buena fe y *que había sido inducido a error por los funcionarios electorales*, el foro de instancia actuó correctamente. El segundo requisito esencial a este reclamo no se probó *ni por los electores ni por el señor Granados Navedo*. Ante tales circunstancias, debe prevalecer el interés público en preservar el voto secreto de estos electores regulares. Se incumplió así con el deber de probar el caso sobre este particular. En *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*,

---

[10] Cuando en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, establecimos los requisitos de prueba exigidos al impugnador o al elector para validar estos votos, reconocimos que la *identificación del voto puede ser intencionalmente causada por el elector o inintencionalmente hecha por el elector a causa de la actuación de los funcionarios electorales*. En uno u otro caso, el resultado seguía siendo la violación de la secretividad del voto.

supra, págs. 23–24, reconocimos la validez de la reglamentación electoral que dispone expresamente la *nulidad* de las papeletas iniciadas o marcadas por el elector. Por otra parte, tanto la Ley Electoral —Arts. 1.003(36) y 6.004 (16 L.P.R.A. secs. 3003 y 3264)— como el Reglamento Oficial de las Elecciones Generales de 1988 (en adelante Reglamento de Elecciones de 1988) aprobado el 23 de mayo de 1988 y enmendado el 25 de agosto de ese mismo año —Reglas 71, 73 y 78— *expresamente prohíben que las papeletas sean iniciadas o marcadas por el elector. A los electores se les imputa conocimiento de dichas disposiciones legales. El desconocimiento de la ley no excusa su incumplimiento.* 31 L.P.R.A. sec. 2.

El compañero Juez Asociado Señor Negrón García, en su opinión disidente, sostiene *sua sponte* que existen doscientos setenta y seis (276) electores adicionales que colocaron sus iniciales en sus papeletas, o que las mismas fueron arrestadas, y que el foro de instancia no les notificó para que pudieran reclamar sus derechos ante éste. Los planteamientos sobre estos electores estuvieron ante nos anteriormente. Por ello, en nuestra opinión *Granados v. Rodríguez Estrada I*, supra, pág. 23 y ss., expresamente le reconocimos capacidad jurídica al impugnador, señor Granados Navedo, para que invocara los derechos de estos electores y de los terceros ausentes, aunque éstos no sean parte en el pleito. El señor Granados Navedo nunca invocó el derecho de estos electores. Tampoco estos electores solicitaron intervenir como partes en el pleito. No encontramos fundamentos para alterar la conclusión del foro de instancia sobre esta controversia. Confirmamos la misma.

## VI

*Las papeletas de doble marca*

Se trata de papeletas que contienen dos (2) marcas del elector y que era necesario determinar cuál de ellas fue la que realmente hizo y refleja su intención al emitir su voto por determinado candidato.

El foro de instancia confirmó la decisión de la C.E.E. que adjudicó las quince (15) papeletas de doble marca al candidato certificado Sr. Héctor Luis Acevedo. El peticionario, señor Granados Navedo, sostiene que de dichas quince (15) papeletas se deben anular doce (12) y adjudicarle dos (2) a él y una (1) al señor Acevedo.

Dicho foro tuvo ante sí un informe escrito y escuchó el testimonio del perito calígrafo, John McCarthy, experto en análisis de documentos dudosos o cuestionados. Además, contó con el beneficio de un estudio minucioso sobre patrones de votación en el Municipio de San Juan preparado por la Prof. Marcia Rivera. En este estudio se analizó la distribución del voto mixto y de candidaturas por precinto y por grupos socioeconómicos en el municipio en las pasadas elecciones de 1988. El foro escuchó, además, su testimonio. También escuchó el testimonio de varios funcionarios de los colegios y de funcionarios de la C.E.E., y examinó minuciosamente cada una de las quince (15) papeletas en controversia. Luego de lo cual concluyó que la prueba presentada sobre lo ocurrido en los colegios estableció que en dichos colegios electorales se dieron prácticas *fraudulentas* e *irregulares*, por uno o más de los funcionarios electorales del P.N.P., quienes realizaron en las quince (15) papeletas marcas adicionales a las realmente hechas por el elector. *Cabe señalar que, a pesar de haber sido anunciados como testigos por el demandante señor Granados Navedo y de tener conocimiento personal sobre este incidente, estos funcionarios no comparecieron a prestar testimonio en el foro de instancia.* El señor Granados Navedo tampoco los puso a la disposición de la parte contraria. Las Reglas de Evidencia exigen que se presuma que sus testimonios hubiesen sido adversos a la parte que los anunció como testigos y que no los presentó: el señor Granados Navedo. Regla 16(5) de Evidencia, 32 L.P.R.A. Ap. IV.

El foro de instancia también concluyó que las quince (15) papeletas de doble marca debían adjudicarse al señor Acevedo, pues las marcas realmente hechas por el elector reflejaban que habían votado por éste.

*Los demandantes no ofrecieron prueba de índole alguna* que sostuviera la alegación de que la C.E.E. actuó en forma arbitraria o caprichosa al adjudicar la controversia en la forma en que lo hizo.

No incidió el foro de instancia al arribar a estas conclusiones. [11] Se trata de un asunto de apreciación de prueba y no se nos han señalado razones de peso para intervenir con las mismas. Confirmamos el dictamen de instancia sobre este extremo.

## VII

*Electores excluidos por domicilio y otras razones*

Hemos agrupado aquí los planteamientos comunes del señor Granados Navedo y de los demandantes involuntarios por plantear cuestiones vinculadas entre sí. Estos demandantes involuntarios son un grupo de electores cuyos votos no fueron adjudicados por la C.E.E. ya fuera por estar excluidos de las listas electorales al haber sido recusados por domicilio (denominados ER por la C.E.E.), por aparecer inactivos en los récord de la C.E.E. (denominados I1 e I2 por la C.E.E.) o por otras razones (denominados NR por la C.E.E.).

Acuden ante nos sesenta y un (61) electores [12] que señalan que erró el foro de instancia al no adjudicar sus votos, ya que el proceso de recusación llevado en su contra —*previo a las elecciones*— era nulo, pues la C.E.E. nunca adquirió jurisdicción sobre ellos en dicho proceso. Por ello alegan que sus votos debían adjudicarse.

Acuden también ante nos treinta y ocho (38) electores que sostienen que la prueba documental y oral por ellos presentada

---

[11] No cometió error el foro de instancia al determinar, en vista del patrón de fraude observado por los funcionarios del colegio del Partido Nuevo Progresista (P.N.P.) en estos colegios, que las tres (3) papeletas sobre las cuales el perito, señor McCarthy, no expresó conclusión definitiva (Anejos V, XIII y XV de la opinión y sentencia del foro de instancia), debían adjudicarse a Acevedo. No adjudicarle las mismas sería premiar la conducta ilegal de los funcionarios que representaban al impugnador, así como anular votos válidamente emitidos.

[12] De los sesenta y un (61) electores que acuden ante nos, el foro de instancia había adjudicado el voto de la Sra. Rosa Julia Irizarry Sorrentino (*Exhibit* 262), por lo que su reclamo fue debidamente atendido. Realmente son sesenta (60) los recurrentes.

demuestra que no son electores inactivos y que su voto debe adjudicarse.[13] Veamos.

En *González v. Rodríguez Estrada I*, 124 D.P.R. 749 (1989), avalamos la determinación del foro de instancia de acumular a mil doscientos ochenta (1,280) electores, cuyos votos no fueron adjudicados por la C.E.E., al pleito de la Sra. Francisca Luzgarda González Suárez. Dispusimos allí *las alegaciones básicas pertinentes* que debía incluir la enmienda a las alegaciones de la señora González Suárez a favor de esos demandantes y permitimos que las personas así acumuladas *"que comparezcan hagan las alegaciones adicionales que estimen convenientes"*. (Énfasis suplido.) Íd., pág. 753. Lo anterior lo hicimos *"para salvaguardar el derecho al voto que puedan tener los electores cuyos votos no fueron adjudicados; para que estas personas tengan la oportunidad de ser oídas por el foro de instancia; para lograr* una determinación correcta del resultado de las elecciones del Municipio de San Juan, y para darle *finalidad vinculante* a controversias afines y similares". (Énfasis suplido.) Íd., pág. 754. Le garantizamos así su día en corte a dichos electores.

Estos electores, siguiendo el mandato de este Tribunal, fueron notificados por correo certificado con acuse de recibo de su derecho a comparecer al foro de instancia. Además, fueron *emplazados mediante edictos* que se publicaron en la prensa del país en varias ocasiones.

Luego de *escuchar sus testimonios y recibir prueba documental sobre sus reclamos*, el foro de instancia adjudicó los votos de *veintiséis (26) de estos electores*. Adjudicó quince (15) de los veinticuatro (24) que habían recurrido también al foro federal y once (11) de los ochenta y nueve (89) que acudieron sólo al foro local. Del balance de ciento cinco (105) electores sólo noventa y

---

[13] La opinión disidente del compañero Juez Asociado Señor Negrón García repite nombres de electores que fueron recusados por domicilio y por estar inactivos en el listado de nombres sobre este tema. Además, *sua sponte* toma conocimiento judicial de procedimientos judiciales sobre recusaciones llevadas a cabo en el Municipio de San Juan antes de las elecciones con el propósito de sostener que, como dichas recusaciones fueron decretadas nulas, también deben decretarse nulas las recusaciones que están ante nos. Salta a la vista que una cosa no tiene nada que ver con la otra. La anulación de una recusación hay que probarla caso a caso y no por analogía.

nueve (99) acuden a este foro, a saber, sesenta y uno (61) de los excluidos una vez recusados por domicilio y treinta y ocho (38) excluidos por inactividad u otras razones.

De los mil doscientos ochenta (1,280) electores así notificados, sólo comparecieron a defender su derecho al voto ciento treinta y uno (131) de ellos. Cuarenta y dos (42) —de un total de cincuenta y cinco (55)— de éstos habían recurrido anteriormente al Tribunal de Distrito Federal para el Distrito de Puerto Rico. Estos últimos *fueron emplazados personalmente*. Los restantes ochenta y nueve (89) comparecieron por primera vez al foro local.[14]

Estos ciento treinta y un (131) electores, junto a la Sra. Francisca Luzgarda González Suárez, presentaron una acción civil independiente para hacer valer su derecho al voto fundamentada en la carta de derechos del elector de la Ley Electoral, 16 L.P.R.A. sec. 3051(10).

■ En el caso específico de los electores que votaron añadidos a mano, en vista de sus exclusiones de las listas electorales por razón de domicilio, éstos, según lo expresamos en *González v. Rodríguez Estrada I*, supra, debían *alegar y demostrar* que:

(1) eran electores calificados;

(2) que votaron en las pasadas elecciones en el Municipio de San Juan;

(3) que su voto no fue adjudicado en contravención a la ley y a nuestra Constitución;

(4) que ello puede afectar el resultado de las elecciones en dicho municipio, y

(5) que su voto debe ser adjudicado.

## A. *Los excluidos por domicilio*

De los ciento cinco (105) electores cuyos votos no fueron adjudicados, el foro de instancia desestimó el reclamo de noventa

---

[14] Cabe destacar que desde que fueron notificados por el tribunal comenzó a correr cualquier término prescriptivo o de caducidad de las acciones de éstos y de cualesquiera otros electores en igual posición que conocieran de la determinación de su exclusión de las listas y la no adjudicación de sus votos por la C.E.E.

(90) que habían votado añadidos a mano en vista de que su exclusión de las listas electorales respondía a su recusación por razón de domicilio (ER). Razonó que el único elector excluido de las listas electorales por razón de domicilio, Art. 2.023(b) de la Ley Electoral, 16 L.P.R.A. sec. 3073(b), que podía votar mediante el procedimiento especial de añadido a mano era aquel elector que, al momento de emitir su voto, presentara una orden de un tribunal de justicia que ordenara la inclusión de su nombre en las listas electorales. Ese elector, antes de poder emitir su voto, debía presentar y entregar su Tarjeta de Identificación Electoral (T.I.E.) y la orden del tribunal. *P.N.P. y P.I.P v. Rodríguez Estrada*, 122 D.P.R. 490 (1988); Parte II del Memorando de 29 de octubre de 1988 de la Comisión Estatal de Elecciones, que establece el procedimiento para votar añadido a mano.

Determinó, además, que el mecanismo especial de añadidos a mano no era sustituto de aquellos procedimientos taxativos que oportunamente, previo a los comicios, debió agotar el elector así excluido, en especial el procedimiento de apelación de la determinación de la C.E.E. que excluye al elector recusado por domicilio provisto en la Sec. 2.15 del Reglamento de Recusaciones y Exclusiones de 11 de diciembre de 1987. Consideró que tal proceder era impermisible en vista de la masiva campaña publicitaria realizada por la C.E.E., encaminada a orientar al electorado con problemas para que visitaran las Juntas de Inscripciones Permanentes (J.I.P.). Consideró, además, la *publicación de edictos hecha los días 1, 7 y 9 de julio, y 12, 17 y 19 de septiembre de 1988, en periódicos de circulación general, los cuales alertaban al electorado de las listas de excluidos por domicilio a hacer determinadas gestiones a tiempo y los apercibía del peligro de perder su derecho al voto.*

En vista de su razonamiento, *y una vez evaluada la evidencia presentada por cada elector en apoyo de sus contenciones,* el foro de instancia confirmó la determinación de la C.E.E. de no adjudicar los votos de estos noventa (90) electores excluidos por razón de domicilio que votaron añadidos a mano y no presentaron

orden de un tribunal que les permitiera ingresar en las listas electorales.

Cabe destacar que el foro de instancia *escuchó el testimonio de cada uno de estos electores, dirimió credibilidad y examinó sus expedientes electorales y la prueba documental pertinente presentada. Testificaron un total de doscientos treinta y seis (236) electores y funcionarios.*

Para demostrar que eran electores calificados, estos demandantes alegaron que las decisiones de las Juntas Locales que los excluían por razón de domicilio eran nulas, puesto que en sus recusaciones no se siguieron los requisitos establecidos en la ley y en el Reglamento de Recusaciones y Exclusiones. En específico, que nunca se les notificó personalmente de las solicitudes de recusación, no se les citó a la vista de recusación ni se les notificó la decisión de la Comisión Local que los excluía por razón de domicilio. Adujeron, además, insuficiencia de las gestiones realizadas por los recusadores en el diligenciamiento de dichas solicitudes de recusación.

Para sustentar sus alegaciones, presentaron sus testimonios así como el récord de exclusión obrante en la C.E.E.

De entrada, debemos señalar que en *P.N.P y P.I.P. v. Rodríguez Estrada,* supra, *no se visualizó al elector excluido de las listas electorales, luego de una recusación por razón de domicilio, como acreedor a utilizar dicho procedimiento para votar en las elecciones de 1988.* Las alegadas irregularidades en los procedimientos de recusación *no fueron los "errores atribuibles al organismo electoral"* previstos para permitir que el elector votara añadido a mano. En ese sentido resulta ilustrativa la opinión concurrente y disidente del Juez Asociado Señor Ortiz, al señalar que "[l]os [electores] que han sido excluidos de las listas electorales por las causas y el procedimiento establecido para ello, Art. 2.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3073, *no pueden acogerse a dicho procedimiento para revisar las determinaciones finales".* (Énfasis suplido y escolio omitido.) Íd., págs. 529–531.

El memorando aprobado por la C.E.E. para implantar este procedimiento así lo disponía expresamente al señalar, en su Parte II, que "[p]odrán votar añadidos a mano . . . [d]isponiéndose que para poder votar tiene[n] que . . . no figurar en la lista de electores excluidos por domicilio . . .".

Por ello concluimos que estos electores, al emitir sus votos, lo hicieron de forma irregular *y en contravención a la ley*. Ello impone sobre sus hombros la obligación y el peso de probar que eran electores calificados y que sus votos deben adjudicarse según fueron emitidos.

Para demostrar que eran electores calificados, estos electores debían rebatir la presunción de que la C.E.E. cumplió con los requisitos de la ley, 16 L.P.R.A. sec. 3073, y del Reglamento de Recusaciones y Exclusiones antes de tomar la decisión de excluirlos de las listas y que, por lo tanto, las mismas son correctas. Ello pues, en ausencia de prueba en contrario, debe presumirse que la ley ha sido acatada y que los deberes de un cargo han sido cumplidos con regularidad. Regla 16(15) y (32) de Evidencia, 32 L.P.R.A. Ap. IV; *Srio. del Trabajo v. Hull Dobbs Co.*, 107 D.P.R. 441, 446 (1978).

La presunción de regularidad del trámite de recusación y corrección de las determinaciones de la C.E.E. que excluyó a estos electores está fundamentada y avalada por las garantías establecidas en el procedimiento de recusación dispuesto en la ley y el reglamento. Este procedimiento preeleccionario está diseñado para garantizar que un elector no pueda ser arbitrariamente recusado por razón de cambio de domicilio. Entre otras cosas, exige: (1) la presentación de una solicitud de recusación debidamente juramentada ante el Presidente de la Comisión Local del precinto correspondiente; (2) una vista para "oír la prueba que corresponda, debiéndose citar al elector recusado, al recusador y a cualquier otra persona que las partes solicitaren sea citada"; (3) la celebración de dicha vista ante el Presidente de la Comisión Local, que será un juez del tribunal de primera instancia (este funcionario debe cerciorarse de que el recusador ha realizado las

diligencias necesarias para notificar la solicitud de recusación al elector recusado y lo comprueba el Presidente de la Comisión Local directamente con el recusador, y puede ser tanto oral como escrita), y (4) *el recusador debe demostrar la causal de recusación aun cuando el recusado no comparezca a la vista, pues la "ausencia del elector recusado no releva al recusador de presentar prueba para sostener los méritos de la recusación"*. (Énfasis suplido.) Véanse: Arts. 2.004, 2.016, 2.023 y 2.023-A de la Ley Electoral, 16 L.P.R.A. secs. 3054, 3066, 3073 y 3073a; Secs. 1.4 a 3.4 del Reglamento de Recusaciones y Exclusiones, *supra*; Arts. 11.1 a 11.8 del Manual de Procedimientos para las Comisiones Locales y las Juntas de Inscripciones Permanentes (en adelante Manual de Procedimientos).

 Ese procedimiento goza de una naturaleza cuasijudicial que reconoce al elector recusado todas las garantías del debido proceso de ley. Por ello, quien ataque la determinación de exclusión fundada en la recusación por domicilio debe probar que el trámite de su recusación, que culminó en su exclusión de las listas electorales, fue realizado en contravención a la ley y al reglamento, y que tal incumplimiento es imputable a la C.E.E. Debe probar, además, que nunca tuvo la oportunidad de acudir al organismo electoral, previo a las elecciones, para cuestionar tal exclusión y corregir esta determinación ilegal de dicho organismo. *Adviértase que bajo la nueva ley electoral las recusaciones por domicilio sólo pueden realizarse dentro de un período de cuatro (4) meses comprendido entre el 15 de enero y el 15 de mayo en que hayan de celebrarse elecciones generales en Puerto Rico —Art. 2.023-A de la Ley Electoral, supra— y no el día de las elecciones. Ello concedía a dichos electores un término de seis (6) meses para corregir su "status" electoral una vez conocieran de la determinación que los excluía de las listas electorales por razón de domicilio emitida en contravención de la ley.* Esta situación difiere del estado de derecho imperante en *P.P.D. v. Admor. Gen. de Elecciones*, supra, *donde por disposición de la ley se podía recusar al elector por razón de domicilio hasta*

*el momento mismo de votar*. Ello incidía sobre el derecho al voto secreto, puesto que bajo ese estado de derecho al recusarse a un elector tenía que identificarse la papeleta de éste, de manera que pudiera luego descontarse su voto si a la postre se decidiese que debía anularse. Íd., pág. 228. De ahí la rigurosidad de los requisitos para la recusación y la imposición del peso de la prueba dispuesto en ese caso sobre el organismo electoral. *El estado de derecho y los hechos ante nos son totalmente distintos.*

Como colorario de la presunción de regularidad del trámite de recusar a estos electores se desprende que la jurisdicción del organismo electoral sobre el elector se presume hasta tanto se demuestre que el trámite de recusación de dicho elector no fue seguido por la Comisión Local en su caso específico. Quien impugna la jurisdicción generalmente tiene el peso de probar que la determinación del organismo fue emitida sin jurisdicción sobre su persona.

Aun cuando estos electores no tenían derecho a votar como añadidos a mano, determinaremos si los demandantes involuntarios, electores excluidos de las listas por razón de domicilio, presentaron prueba suficiente ante el foro de instancia para rebatir la presunción de jurisdicción de la C.E.E. en el trámite de sus recusaciones, de regularidad en dicho trámite y de corrección de sus determinaciones de excluirlos de las listas electorales.[15] *Luego de examinar toda la evidencia presentada por estos electores en el foro de instancia, concluimos que la misma es insuficiente para rebatir las referidas presunciones.*

En relación con las alegaciones de falta de jurisdicción, estos electores *no presentaron ante el foro de instancia ni ante nos las actas y los récord de recusación de las Juntas Locales del precinto correspondiente a cada uno de ellos.* Dichas Juntas Locales funcionaban como secretarías de la C.E.E. en el proceso

---

[15] Sólo después que estos electores establecieran su caso prima facie, y rebatieran así la presunción de regularidad, correspondía a la C.E.E. el peso de probar, mediante evidencia clara, robusta y convincente, que se cumplieron estrictamente los requisitos exigidos para la recusación. *Cf. P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981).

de recusación. Arts. 11.1, 11.2 y 11.3 del Manual de Procedimientos. *Además, no contamos con el beneficio del testimonio de los miembros de las Juntas Locales, que representaban a los tres (3) partidos políticos, de los recusadores o del Presidente de dichas juntas. Después de todo, estos son los jueces encargados inicialmente de examinar las diligencias realizadas por el recusador y tenían el deber de verificar la citación personal o mediante edicto del recusador antes de citarlo para la vista, y así poder adquirir jurisdicción sobre dicha persona.*

Adviértase que el examen del recusador sobre las diligencias para notificar al elector recusado, así como para probar los méritos de la solicitud de recusación, *era oral*. Sec. 2.9 del Reglamento de Recusaciones y Exclusiones, *supra*; Art. 11.3 del Manual de Procedimientos.

Se notará que esta prueba fue la presentada por el elector José A. González Curet ante el Tribunal de Distrito (Civil Núm. RA-88-204) para anular su recusación por domicilio. Tomamos conocimiento judicial de dicho caso. La decisión del Tribunal de Distrito en este caso estuvo avalada por "los testimonios y admisiones en sala de los miembros de la Comisión Local y la Junta de Inscripción Permanente" del Precinto 2.[16]

La prueba de estos electores fue mucho menos suficiente para rebatir, siquiera prima facie, la presunción de corrección de la determinación de la C.E.E. que los excluyó de las listas. *Luego de examinar el testimonio y el expediente electoral ante la C.E.E. de cada uno de estos electores concluimos que no erró el foro de instancia al no adjudicar los votos emitidos por éstos.*

Esa prueba lo que refleja es que, como cuestión de derecho, procedía la recusación en los méritos, puesto que el elector se había mudado de precinto sin notificar su cambio de dirección o tramitar una transferencia en la C.E.E., y que se dio cumplimiento al trámite procesal al excluirlos. *En efecto, estos electores*

---

[16] Contrario a lo que sostiene el compañero Juez Asociado Señor Negrón García en su disidencia, la Sra. Francisca Luzgarda González Suárez demostró que su caso no era de exclusión por razón de recusación por domicilio. Por el contrario, demostró que nunca había sido recusada por domicilio y que era una electora calificada.

*fueron notificados mediante edictos publicados los días 1, 7 y 9 de julio de 1988 del peligro de perder su derecho al voto al haberse presentado una solicitud de recusación ante la Comisión Local correspondiente, luego de un diligenciamiento personal negativo, y notificados de sus exclusiones de las listas en los edictos publicados los días 12, 17 y 19 de septiembre de 1988.*

Si algo queda meridianamente claro es que estos electores no presentaron prueba suficiente para rebatir las presunciones de regularidad y corrección en la determinación de la C.E.E. de excluirlos de las listas y, posteriormente, no adjudicar sus votos según emitidos. Los votos de estos electores no pueden ser adjudicados por este Foro.

Confirmamos la determinación del foro de instancia en cuanto a estos electores.

B. *Los excluidos por inactividad*

Pasemos ahora a considerar los planteamientos de treinta y ocho (38) electores que fueron excluidos por razón de su inactividad en los récord de la C.E.E. (I1 e I2) o porque carecían de récord electoral en ese organismo (NR).[17] El planteamiento común de estos electores es que la prueba documental (T.I.E.) y oral presentada por ellos es incompatible con el *status* electoral que les otorgó la C.E.E. y con su consecuente exclusión de las listas electorales en el proceso de depuración de las mismas. Argumentan, por ello, que su voto debe ser adjudicado.

Nuevamente el foro de instancia, *una vez adquirió jurisdicción sobre sus personas,* les dio audiencia y *escuchó sus testimonios.* Luego de evaluar la prueba presentada por *cada elector* a la luz del proceso de depuración administrativa de las listas electorales, legitimado por el Art. 2.012 de la Ley Electoral, *supra,* el foro de instancia declinó adjudicar sus votos.

*Hemos hecho una evaluación del testimonio y expediente electoral ante nos de cada uno de estos electores y* encontramos

---

[17] En el foro de instancia fueron noventa y nueve (99) los electores que acudieron e hicieron planteamientos similares. De éstos, sesenta y uno (61) decidieron no recurrir ante este Foro.

que el foro de instancia no incurrió en error manifiesto, pasión, prejuicio o parcialidad al no adjudicar los treinta y ocho *(38) votos* de estos electores. La prueba demostró que: (1) aparecían en las listas electorales de 1984 como que no votaron en ese año (I2); (2) se enteraron antes de las elecciones de sus exclusiones por inactividad y nada hicieron para corregir su *status* y procurar aparecer en las listas electorales de 1988 (I1); (3) aparecían sus nombres impresos en las listas de 1984, pero no aparecían sus firmas al lado de sus nombres (I2), y (4) su testimonio corroboró su *status* electoral.

 Conforme dejamos establecido anteriormente el procedimiento para votar añadido a mano, fue adoptado para las elecciones de 1988 como un mecanismo de *excepción*, esto es, para permitir que votaran aquellos electores que a la fecha de la elección sus nombres no aparecieran en las listas electorales *"por error atribuible al organismo electoral". La norma general sigue siendo que sólo pueden votar en Puerto Rico aquellos electores calificados, esto es, aquellos que a la fecha de la elección se hayan inscrito, obtengan su T.I.E. y aparezcan en el Registro General de Electores (Registro Electoral) preparado por la C.E.E.* 16 L.P.R.A. sec. 3203.

Los electores con un *status* electoral de I1 e I2, aquí recurrentes, votaron utilizando el procedimiento de añadidos a mano. La validez de tales votos sólo debía adjudicarla el foro de instancia luego de que las partes establecieran, por preponderancia de la prueba, que dichos electores estaban calificados para votar y que la decisión de la C.E.E. de no adjudicar sus votos era errónea.

El *status* de estos electores respondía al proceso de depuración de las listas electorales que de acuerdo con la ley debe realizar la C.E.E. en el Registro Electoral, de manera que éste refleje todas las inscripciones de los electores regulares de Puerto Rico. 16 L.P.R.A. secs. 3062 y 3063. Un análisis de la prueba refleja que estos son electores que votaron añadidos a mano en las elecciones de 1980 ó 1984, o que aun cuando sus nombres aparecían impresos en las listas electorales de 1984 no firmaron dichas listas al lado de sus nombres.

En el caso de los que votaron añadidos a mano en una elección, el hecho de así haber votado o de volver a votar añadidos a mano en otra elección *no tenía ni podía tener el efecto de ingresarlos en las listas electorales, de manera que se les dispensara del requisito de reinscribirse y se les convirtiera en electores regulares.* Eso sólo sucedía cuando el nombre del elector que votó añadido a mano en una elección figuraba impreso en el Registro Electoral, *e.g.*, el funcionario de colegio que votó fuera de su unidad. El fundamento de tal norma se encuentra en que el elector que votó añadido a mano, por causas no atribuibles al organismo electoral, no es un elector calificado para votar y su derecho está sujeto a ser adjudicado con posterioridad al evento electoral. De esta manera se garantiza la pureza de esos votos. Cuando el nombre del elector aparecía impreso en las listas electorales de una elección, pero no aparecía la firma, la Ley Electoral dispone que éste debe ser excluido de las listas. Ello era evidencia suficiente para probar que no votó en ese evento electoral, 16 L.P.R.A. sec. 3062, aunque tuviera derecho a ello.

El hecho de que esos electores tuvieran a su disposición la T.I.E. aun perforada, nunca les eximió de su deber de inscripción o reinscripción. La T.I.E., por sí sola, no refleja que el *status* del elector hubiese variado con posterioridad a todo evento electoral. De hecho, puede que con posterioridad a dicha fecha haya sido recusado y sacado de las listas.

Sostenemos, luego de evaluar la prueba presentada por los electores excluidos por el foro de instancia, que el voto de dichos electores no debe adjudicarse, puesto que sus nombres no figuraron en el Registro Electoral por causas atribuibles a ellos mismos y no a la C.E.E. Sus expedientes y testimonios demuestran *el incumplimiento con el requisito mínimo de inscribirse o reinscribirse para las elecciones de 1988, luego de la depuración de las listas, en claro reflejo de su inactividad electoral. La reinscripción resulta ser un requisito mínimo y razonable ante el interés del Estado de tener un Registro Electoral que refleje fielmente el conglomerado de electores regulares capacitados para votar. Esa es la carga mínima que la ley impone al elector.*

De forma alguna se desalienta o menoscaba el derecho al voto al exigir ese requisito mínimo. *Al contrario, se garantiza que el voto emitido será puro, libre de fraude y emitido por un elector regular.*

Podría argumentarse que debían adjudicarse los votos de aquellos electores con *status* de inactivo que votaron añadidos a mano en elecciones anteriores y que se les convalidó su derecho al voto en las mismas sin que le fuera notificada anomalía alguna hasta las elecciones de 1988. Pero tal argumento pierde de vista *que el hecho mismo de haber votado añadido a mano en elecciones anteriores implicaba una notificación a dicho elector de que su "status" electoral no era el de un elector regular* (su nombre no aparecía impreso en la lista electoral). Salvo los casos en que tal anomalía se debiera a error imputable a la C.E.E. —por ésta no haber tramitado algún documento justificativo de su inclusión en las listas— la notificación implícita en el hecho de haber votado añadido a mano era suficiente para alertarlo de su obligación de reactivar su *status* electoral mediante los trámites disponibles para ello. Todo elector que votó añadido a mano en una elección se le permitió votar de forma excepcional y su derecho se limitaba a permitirle votar en esa elección específica, sujeto a que su voto se adjudique con posterioridad y luego de la corroboración de su calificación. La utilización de este mecanismo especial en elecciones anteriores nunca tuvo ni podía tener el efecto de calificar al elector que así votaba. Para ello la Ley Electoral dispone la inscripción o reinscripción del elector en tal *status*.

Más aún, la C.E.E. dispuso mecanismos para reactivar sus *status* electorales, los cuales estuvieron disponibles a dichos electores incluso hasta el 31 de octubre de 1988, apenas unos días antes de las elecciones. Véase, por ejemplo, el procedimiento de inclusión por omisión en el Manual de Procedimientos.

Si el elector tramitaba una inscripción especial[18] o se demostraba que había hecho una transacción electoral durante el

---

[18] El Art. 7.3 del Manual de Procedimientos para las Comisiones Locales y las Juntas de Inscripciones Permanentes disponía que:

cuatrienio, se le garantizaba su inclusión en las listas y la adjudicación de su voto. Un examen minucioso de *los récord ante nos de los electores excluidos por el foro de instancia refleja que éstos están* huérfanos de estas gestiones.

## VIII

*El recurso de la Sra. Francisca Luzgarda González Suárez*

Por último, el foro de instancia *adjudicó el voto emitido por la recurrente Sra. Francisca Luzgarda González Suárez.*
En la parte dispositiva de su sentencia determinó:

> De igual forma, *se dicta sentencia parcial* declarando con lugar la demanda en el caso K PE89–0274 a los efectos de que *se reconoce que la Sra. Francisca Luzgarda González Suárez tenía derecho a que su voto se adjudicara en los pasados comicios. Se continuarán los procedimientos en cuanto a su reclamación de daños.* (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 126.

Acude ante nos la señora González Suárez señalando que las determinaciones de hecho del foro de instancia no encuentran apoyo en la prueba y deben ser enmendadas, y que erró dicho foro al no determinar que la C.E.E. fue temeraria y al no condenarla al pago de *costas, gastos* y honorarios de abogado. Veamos.

A. *Las determinaciones de hecho del foro de instancia*

Alega la recurrente que el foro de instancia debió determinar que su nombre fue cambiado de sitio en las listas electorales de 1988 por los funcionarios de la C.E.E., que ello ocasionó que su nombre no apareciera en las listas del colegio donde votó y que, por lo tanto, no se adjudicara su voto, todo a sabiendas de que dicha electora aparecía en tales listas.

Su contención carece de méritos. El foro de instancia determinó que esta electora aparecía en las listas de 1988, por lo que era una electora activa, pero que la discrepancia en la ubicación de

---

"Aquellos electores que no ejercieron su derecho al voto en las elecciones de 1980 pero poseen una tarjeta de identificación electoral se inscribirán utilizando el formulario de petición de inscripción especial."

su nombre con respecto a las listas del colegio correspondiente se debió a que es en dichas listas de colegio donde único están los nombres de los electores en estricto orden alfabético. No erró al así determinarlo.

B. *Concesión de costas, gastos y honorarios de abogado*

La recurrente alega que en este caso están presentes todos los elementos que justifican la imposición de honorarios de abogado por temeridad y que ésta es una "acci[ó]n extraordinaria que se sale de la protecci[ó]n ordinaria conced[í]dale al Estado" contra la imposición de los mismos. Caso Núm. CE-90-465, Solicitud de revisión, pág. 13.

Para colocar su señalamiento en su justa perspectiva debemos reiterar unos pronunciamientos con respecto a la naturaleza de la acción instada por esta electora.

En *Granados v. Rodríguez Estrada II*, supra, págs. 606–607, expresamos, con respecto a este tipo de acción, que:

> . . .[N]uestro Derecho le concede a estos electores un remedio judicial para hacer valer su "derecho a la libre emisión del voto y a que éste se cuente y se adjudique de la manera en que el elector lo emita". Art. 2.001 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. sec. 3051(10).
>
> La Ley Electoral específicamente le concede a los electores legitimación activa para defender judicialmente sus derechos: "A tal fin, se concede por este Subtítulo a los electores la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas de los Electores ante el tribunal de Primera Instancia que corresponda." 16 L.P.R.A. sec. 3051. El derecho al voto igualmente podría ser defendido a través de una acción al amparo de nuestra Constitución. (Escolio omitido.)

En el caso de la recurrente coexisten dos (2) causas de acción separadas: una sobre su derecho a la libre emisión de su voto y a que éste se cuente y se adjudique de la manera en que fue emitido en las elecciones de 8 de noviembre de 1988 (16 L.P.R.A. sec. 3051(10)), y otra sobre la reclamación de daños y perjuicios (al amparo de la Declaración de Derechos y Prerrogativas de los Electores y de nuestra Constitución (16 L.P.R.A. sec. 3051; Art.

44

II, Secs. 2 y 7, Const. E.L.A., L.P.R.A., Tomo 1), por la alegada actuación negligente de la C.E.E. al no adjudicar su voto. *Así lo reconoce esta electora.*

El foro de instancia dictó sentencia parcial que declaró con lugar su primera causa de acción. Dejó pendiente los procedimientos en cuanto a la segunda reclamación.

■ Un examen de los autos del caso refleja que la recurrente no sometió al tribunal de instancia memorando de costas. Tenía para ello el término jurisdiccional de diez (10) días desde el archivo en autos de copia de la notificación de sentencia. En vista de ello, no procede la reclamación de costas y gastos solicitada por la recurrente en dicha causa. Regla 44.1(a) y (b) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

■ En cuanto a la concesión de honorarios de abogado, no consideramos que la naturaleza de las acciones presentadas o las circunstancias presentes en el caso de autos exijan que nos apartemos de la norma general en cuanto a su no imposición contra el Estado. Véanse: Regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III; Art. 8 de la Ley de Reclamaciones y Demandas contra el Estado, 32 L.P.R.A. sec. 3083; *De León v. Sria. de Instrucción,* 116 D.P.R. 687 (1985); *Rodríguez Cancel v . A.E.E.,* 116 D.P.R. 443, 459 y 460 (1985); *Colondres Vélez v. Bayrón Vélez,* 114 D.P.R. 833 (1983); *Ramos Rivera v. E.L.A.,* 90 D.P.R. 828 (1964); *Pons v. Rivera Santos,* 85 D.P.R. 524 (1962).

IX

*Sobre una nueva elección general o parcial*

En ocasiones anteriores, y hoy, miembros de este Tribunal sostienen que este Tribunal debe ordenar una nueva elección

general o parcial para elegir el Alcalde del Municipio de San Juan.(19)

Este drástico remedio es innecesario y tendría consecuencias desastrosas e inconstitucionales, y crearía más problemas de los que pretende resolver. Veamos por qué:

1. Los procedimientos judiciales llevados a cabo en este caso *han provisto un remedio adecuado* para garantizar el derecho al voto de los electores con derecho a él y para determinar quién ganó la Alcaldía del Municipio de San Juan, luego de que la C.E.E. lo hiciera, a su vez, mediante el proceso regular de conteo de votos *y de haberse efectuado a dicho nivel un recuento de todos los votos.*

2. Ordenar una nueva elección *tendría el efecto de quitarle inconstitucionalmente el derecho al voto ejercido válidamente por más de doscientos mil (200,000) electores calificados que votaron en el evento electoral para seleccionar al Alcalde del Municipio de San Juan en noviembre de 1988.* Se afectaría el derecho al voto de aquellos que válidamente votaron en dicha fecha y que ahora no lo podrían hacer por haber fallecido, por haber cambiado de domicilio, precinto o municipio, por haberse mudado fuera de Puerto Rico, o por estar incapacitados por razones de salud o de otra naturaleza, entre otras.

3. Requeriría la actualización de las listas electorales para determinar quiénes al día de hoy son electores calificados y para proveer el tiempo y los remedios adecuados para planificar, organizar y llevar a cabo el evento electoral.

4. *Requeriría otra vez la movilización de más de doscientas mil (200,000) personas que ya ejercieron válidamente su voto e* "*inyectar[ía] en el país las excitaciones, rivalidades y animosidades que caracterizan la contienda pública y [que] tiende[n] a perturbar la paz comunitaria, estabilidad y seguridad de las instituciones*". (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elec-*

---

(19) Como señalamos anteriormente, de manera *contradictoria* el compañero Juez Asociado Señor Negrón García, al hoy sostener tal posición, también proclama victorioso al señor Granados Navedo. Véase Opinión disidente, pág. 387.

*ciones,* supra, pág. 329, opinión concurrente del Juez Asociado Señor Negrón García.

█ 5. Las circunstancias y el ambiente en que se efectuarían las elecciones *no podría ser una réplica de las existentes en noviembre de 1988.* Se ha sostenido que:

La celebración de una segunda elección podría incluso plantear dudas similares, puesto que sería imposible asegurar que los resultados serían los mismos que se hubieran producido en la primera elección si en ésta no se hubiesen cometido violaciones. Podrían incluso identificarse ciertas desigualdades en estas segundas elecciones. Los candidatos que puedan obtener acceso rápido a fuentes de financiamiento y que pertenezcan a partidos sólidos y consistentes podrán llevar a cabo una segunda campaña electoral, en el poco tiempo que les queda, de manera mucho más efectiva que sus oponentes menos aventajados. Los candidatos cuyo respaldo provenga mayormente de votantes menos activos podrían caer en desventaja durante una segunda elección si sus partidarios no acuden a votar cuando sólo quede un cargo por adjudicar. Aunque estos mismos factores podrían estar presentes en todas las elecciones y a pesar de que existen medios para limitar su efecto en los nuevos comicios, aún podrían influir potencialmente en el resultado de los mismos. Finalmente, el mecanismo de celebración de nuevas elecciones constituye un remedio extremadamente costoso. (Traducción nuestra y escolios omitidos.) Nota, *Developments in the Law: Elections,* 88 Harv. L. Rev. 1111, 1315–1316 (1975).

6. Una elección limitada en ciertos precintos electorales acarrea también problemas precisamente como resultado del pequeño número de electores que tendrían derecho a acudir a la misma. Puede válidamente sostenerse que ello impondría una inmensa presión sicológica sobre dichos electores y los expondría a presiones externas indebidas más fuertes de las que actúan cuando el número de electores es mayor.

█ 7. Por último, tomamos conocimiento judicial de lo sobrecargada que dentro de los próximos dos (2) años estará de labores la C.E.E. con probablemente cinco (5) eventos electorales que atender, sin contar la elección general o parcial que reco-

mienda la disidencia ni el hecho de que para las elecciones de 1992 se habrá hecho la redistribución electoral ordenada por nuestra Constitución. Art. III, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

## X

*Epílogo*

Los comicios electorales del pasado 4 de noviembre de 1988 se celebraron mediante el sistema de votación de colegio abierto en un ambiente caracterizado por un alto sentido de participación democrática. *Granados v. Rodríguez Estrada I*, supra, pág. 7. En toda la isla votaron alrededor de un millón ochocientos doce mil ochocientos diecinueve (1,812,819) electores para el cargo de Gobernador, que representan un 84.56% de los cerca de dos millones ciento cuarenta y seis mil seiscientos ochenta y un (2,146,681) electores inscritos. En el Municipio de San Juan, en particular, votaron alrededor de doscientos doce mil novecientos noventa (212,990) electores, un 83.22% de los electores inscritos. En toda la isla votaron cerca de diecisiete mil seiscientos dieciséis (17,616) electores añadidos a mano, de los cuales cerca de cuatro mil ciento diecisiete (4,117) pertenecían al Municipio de San Juan.

Las controversias que ahora tenemos ante nos involucran a trescientos ochenta y tres (383) electores de San Juan. Ello representa centésimas del un por ciento (1%) del electorado que votó en San Juan.

En esta ocasión y en las cuatro (4) ocasiones anteriores en que este Foro ha intervenido con las controversias surgidas con motivo del resultado de las elecciones para Alcalde del Municipio de San Juan, *lo hemos hecho para salvaguardarle el derecho al voto a los electores y para que se contaran y adjudicaran todos los votos de electores calificados para votar, y para que quede meridianamente claro cuál fue la voluntad del pueblo en dichos comicios.*

Para ello, abrimos las puertas del foro de instancia a los electores que sostenían que su voto no fue adjudicado. A estos electores se les notificó personalmente, por correo certificado y

mediante edictos, y el foro de instancia escuchó y consideró toda la prueba admisible presentada por las partes. *El señor Granados Navedo, al igual que los demandantes involuntarios y demás electores del Municipio de San Juan tuvieron amplia oportunidad de probar su caso.*

La tarea ha sido ardua y ha tomado tiempo. *Ha quedado demostrado por los procedimientos en el foro de instancia que los temores y profecías apocalípticas, planteadas anteriormente por algunos miembros de este Tribunal con relación a los procedimientos ordenados por este Foro, no se han materializado.* Estamos convencidos de que la voluntad del pueblo y los derechos de los electores han quedado *debidamente salvaguardados.*

En Puerto Rico en ocasiones anteriores hemos tenido elecciones cerradas incluso para el cargo de Gobernador. En las elecciones de noviembre de 1988, siete (7) alcaldes fueron electos por cien (100) votos o menos, a saber: Camuy (P.N.P.) por cincuenta y seis (*56*) votos; Isabela (P.N.P.) por cincuenta y dos (*52*) votos; Jayuya (P.P.D.) por cien (100) votos; Las Piedras (P.N.P.) por sesenta y dos (*62*) votos; Peñuelas (P.P.D.) por ocho (*8*) votos; Quebradillas (P.P.D.) por noventa y dos (*92*) votos; Salinas (P.N.P.) por treintaiún (*31*) votos.

El hecho de que un alcalde sea electo por un escaso margen de votos no afecta su certificación como tal. Las controversias que hemos tenido ante nos no son una excepción a dicha norma.

Examinados cuidadosamente los autos orignales, la transcripción de la prueba y los escritos de las partes, acatamos la voluntad de los electores del Municipio de San Juan según expresada en los pasados comicios electorales. Por consiguiente, confirmamos la decisión de la C.E.E. y del tribunal de instancia de que dichos electores eligieron al Lcdo. Héctor Luis Acevedo como Alcalde del Municipio de San Juan.

Por los fundamentos expuestos, *se expiden los autos, se consolidan los recursos y se dictará sentencia que confirme la opinión y sentencia del foro de instancia.*

Los Jueces Asociados Señor Negrón García y Señor Rebollo López disienten con opiniones escritas. El Juez Asociado Señor Andréu García se inhibió.

# APÉNDICE

# EN EL TRIBUNAL SUPERIOR DE PUERTO RICO
## SALA DE SAN JUAN

| | |
|---|---|
| JOSE GRANADOS NAVEDO | CIVIL NUM: K AC88-2133 (Sala 1008) |
| Demandante | |
| vs. | |
| MARCOS A. RODRIGUEZ ESTRADA Y OTROS | SOBRE: |
| Demandados | IMPUGNACION DE CERTIFICACION DE CANDIDATO A ALCALDE |

| | |
|---|---|
| FRANCISCA LUDGARDA GONZALEZ SUAREZ | CIVIL NUM: K PE89-0274 (Sala 1008) |
| Demandante | |
| vs. | SOBRE: |
| MARCOS A. RODRIGUEZ ESTRADA Y OTROS | |
| Demandados | MANDAMUS |

## OPINION Y SENTENCIA

Mediante certificación expedida el día 7 de diciembre de 1988 la Comisión Estatal de Elecciones adjudicó la elección para la Alcaldía de San Juan al Candidato Héctor Luis Acevedo por una mayoría de 29 votos. El demandante, José Granados Navedo, candidato del principal partido opositor, impugnó dentro del plazo previsto por la Ley Electoral esta certificación alegando irregularidades e incidentes ocurridos en los comicios, que unidos a un número de votos aún sin adjudicar, le concederían un margen a su favor, y por ende, su certificación como candidato victorioso.

La vista del caso comenzó el 21 de diciembre de 1988. Se suscitaron planteamientos de derecho sobre los cuales recayeron varias sentencias parciales y resoluciones interlocutorias. La sentencia final se dictó el 2 de febrero de 1989. La parte demandante recurrió al Tribunal Supremo. Mediante opinión

notificada el 23 de junio de 1989 el Tribunal Supremo revocó lo resuelto por esta sala y devolvió el caso para que se desfilara la prueba en su totalidad.

El juicio comenzó el 4 de agosto de 1989. Quedó interrumpido entre el 2 de octubre de 1989 y el 17 de diciembre de 1989 por haberse recurrido de nuevo al Tribunal Supremo. Este se reanudó el 18 de diciembre de 1989 y continu[ó] hasta el día 4 de enero de 1990. Los alegatos solicitados por el tribunal fueron radicados y la controversia quedó sometida el 23 de febrero de 1990.

La prueba consistió en el testimonio de sobre 400 testigos y 462 piezas de evidencia. La transcripción de evidencia consta de 55 volúmenes y sobre de 6,000 páginas.

Habremos de formular nuestra opinión conforme a los siguientes tópicos o controversias, siguiendo ese orden:

1. Papeletas de "doble marca",
2. Papeletas con iniciales o marcadas en su dorso,
3. Papeletas de nominación directa,
4. Votos añadidos a mano,
5. Colegios "contaminados",
6. Colegios "arrestados".

Por los fundamentos que expresamos en la siguiente opinión y sentencia resolvemos que el demandante José Granados Navedo no aportó prueba de suficiente peso y calidad para siquiera demostrar que la adjudicación de los votos legalmente emitidos a su favor y no adjudicados habrían de variar el resultado de las elecciones para Alcalde de San Juan. En consecuencia desestimamos la impugnación de epígrafe. No es función judicial en tales circunstancias sustituir la certificación impugnada por la suya propia, con cifras ligeramente distintas que no varían el resultado final. Veamos:

## I
### Incidente de papeletas con doble marca

En su demanda de 19 de diciembre de 1988, la representación legal de José Granados Navedo impugnó la Resolución 88-028 de la Comisión Estatal de Elecciones (CEE), mediante la cual se

adjudicaron 15 papeletas de doble marca (Exhibits #33 y 34) al candidato del Partido Popular Democrático (PPD), Héctor Luis Acevedo. La súplica de la demanda iba dirigida a que se anulara en su totalidad la adjudicación de estas papeletas por constituir ésta una decisión arbitraria y caprichosa y por ser contraria a derecho y a la reglamentación electoral. Previo el comienzo del desfile de la prueba y al solicitársele a la parte demandante su teoría para este evento, el Lcdo. Antonio Montalvo Nazario expresó como su teoría que se anulara la adjudicación de estos 15 votos al demandado Héctor Luis Acevedo y se adjudicaran en su totalidad al demandante José Granados Navedo.[1]

En su posterior alegato, sin embargo, la parte demandante modificó su anterior teoría y solicitó como remedio el que se anularan 12 de las 15 papeletas de doble marca adjudicadas (Apéndice 1, Anejos II–XII y XV) y que de las restantes 3 se adjudicaran 2 votos a José Granados Navedo (Apéndice I, Anejos XIII y XIV) y un voto a Héctor Luis Acevedo (Apéndice 1, Anejo I). Las partes demandadas, por su parte, sostienen la validez de la Resolución 88-028 por entender que la misma se emitió conforme a derecho.

La Resolución del 2 de diciembre de 1988 aquí impugnada fue emitida por el Presidente de la CEE, Lcdo. Marcos A. Rodríguez Estrada, luego de no lograrse unanimidad entre los Comisionados Electorales en torno a como debían adjudicarse las 15 papeletas de doble marca. El Presidente de la CEE presidió las audiencias en las cuales desfiló el testimonio de todos los funcionarios que trabajaron el 8 de noviembre de 1988 en el Precinto 004, Unidad 009, Colegio 003, lugar donde ocurrió el evento de doble marca. Fue a base de la prueba testifical allí desfilada, al examen visual que hiciera de las papeletas y al asesoramiento técnico que

---

[1] Nos sorprende la teoría de la parte demandante al requerir la adjudicación a su favor de los 15 votos en controversia ya que el Exhibit #33(6), ofrecido por la propia parte demandante, no tiene marca alguna que pueda entenderse hecha bajo la insignia del PNP o en favor de la candidatura de José Granados Navedo. Véase Apéndice 1, Anejo VI.

recibiera del Instituto de Ciencias Forenses[2] que el Lcdo. Rodríguez Estrada determinó que las marcas hechas bajo la insignia del PPD y del PNP o PIP en una misma papeleta poseían características, patrones y formas distintas entre sí. El Presidente de la CEE distinguió entre unas y otras al señalar que las marcas hechas bajo la insignia del PPD aparentaban haber sido trazadas con calma y seguridad, mostrando reflexión; mientras que las marcas hechas bajo el PNP y PIP reflejaban haber sido hechas subrepticiamente y con rapidez. Dedujo que las marcas en una y otra columna, fueron trasadas por un autor distinto, ya que bajo condiciones normales un elector haciendo dos marcas en una misma papeleta las hubiese hecho iguales o similares. Luego de un análisis del derecho electoral vigente, el Lcdo. Rodríguez Estrada razonó que la intención del votante se dio a concer al éste marcar su preferencia electoral en el cuadrante de la primera columna. Excluyó, por ende, las marcas hechas en las otras columnas por entender que las mismas no fueron trazadas por el elector. Le adjudicó la totalidad de los votos a Héctor Luis Acevedo (Exhibit #036).

La prueba presentada por la parte demandante durante el juicio se ciñó al testimonio del perito calígrafo John McCarthy, experto en análisis de documentos dudosos o cuestionados. La parte demandada presentó el testimonio de tres de los funcionarios del P004 U009 C003, a saber, Arelis Díaz Torres, Secretaria del PPD, Ricardo Morales Ruiz, Inspector en Propiedad del PPD y Presidente del Colegio en cuestión y Margarita Cordero Fernández, Inspectora en Propiedad del PIP. Testificaron, además, por la parte demandada Migdalia Rodríguez Sanz, quien trabajó en el recuento del Coliseo; Rubens Luis Pérez, Supervisor de Piso durante el recuento del Coliseo y la Dra. Marcia Rivera, consultora y analista del proceso electoral puertorriqueño.

---

[2] Al momento de emitir su Resolución el Lcdo. Rodríguez Estrada no tenía ante sí los *informes* del perito calígrafo John McCarthy con fecha del 30 de noviembre y 2 de diciembre de 1988 (Exhibits #043 y 141, respectivamente), pero se había reunido con éste y conocía su opinión pericial.

Por entender que es necesario para la adjudicación final de la controversia de doble marca determinar los hechos ocurridos en el colegio electoral donde se produjo el incidente, hacemos un recuento de lo allí acontecido basándonos en la prueba testifical antes aludida:

Una vez se cerró el colegio, los funcionarios iniciaron el conteo de las papeletas estatales (blancas) allí emitidas. Al finalizar con el conteo preliminar de esas papeletas los funcionarios se dieron cuenta de que había una discrepancia entre el número de papeletas votadas (220) y el número de firmas registradas en las listas electorales (221). Por acuerdo de los tres inspectores, representantes de cada uno de los partidos, rompieron el sello de la urna municipal, extrajeron de la misma una papeleta estatal extraviada y procedieron a restituir en la urna municipal las papeletas municipales de allí extraídas. Se selló nuevamente la urna municipal y se apartó ésta del lugar donde se estaba trabajando con las papeletas estatales. (T.E. del 4 de agosto de 1989 pp 57–59; 87–89).

Mientras se finalizaba el conteo, cotejo y cuadre de las papeletas estatales, la Sra. Rosaura Fernández Pérez, Inspectora en Propiedad del PNP, sugirió a Ricardo Morales Ruiz iniciar el conteo de las papeletas municipales para ahorrar tiempo. A ésto, el Presidente del colegio se opuso señalando que la norma escrita exigía terminar con el conteo de las papeletas estatales antes de comenzar el de las papeletas municipales. Los funcionarios acataron su orden y el Sr. Morales Ruiz prosiguió cuadrando los votos y el Acta de Escrutinio de las papeletas estatales con la Sra. Arelis Díaz Torres. Cuando estaba concluyendo esas labores el Sr. Morales Ruiz levantó la vista y se percató de que la Sra. Fernández Pérez, Sra. Sandra I. Vera Pietri, Inspectora Suplente del PNP y Sra. Margarita Cordero Fernández, habían abierto la urna municipal y estaban sacando las papeletas de la misma, siendo la primera de ellas quien las extraía y colocaba boca abajo. En ese momento habían sacado entre 45 a 50 papeletas municipales; o sea, aproximadamente una cuarta parte de las papeletas votadas. El Presidente se unió a ellas y procedió él a sacar las

papeletas de la urna y colocarlas boca abajo. (T.E. del 4 de agosto de 1989 pp 59–65; 89–94).

Pasado este incidente, se distribuyeron las papeletas municipales en pequeños grupos de modo que casi todos los funcionarios participaron en el conteo de las mismas. Se procedió a clasificar las papeletas municipales por partido y de acuerdo a si eran papeletas íntegras, mixtas, por candidatura o dañadas. Cuando se empezaron a llenar los números bases en las Actas de Escrutinio del colegio se le entregaron las papeletas dañadas a la Secretaria del PPD para que las organizara, contara e insertara en el sobre de papeletas protestadas y no adjudicadas. Fue en ese momento que esta funcionaria identificó su papeleta recusada entre el grupo de papeletas dañadas. Su papeleta había sido dañada por contener una cruz bajo el PPD y otra bajo el PNP. La funcionaria Díaz Torres paralizó el proceso en el colegio y se llamó a la Junta de Coordinadores de esa Unidad para hacer constar la irregularidad detectada. (T.E. del 4 de agosto de 1989 pp 65–73; 94–100).

La funcionaria Díaz Torres señaló entonces y testificó ante este Tribunal que hizo solamente una cruz bajo la insignia del PPD y que no fue ella quien dañó su papeleta. La Junta de Unidad se percató de que la firma de la funcionaria Rosaura Fernández Pérez en la recusación al dorso de la papeleta de Díaz Torres estaba a lápiz, contrario a las firmas de los otros funcionarios recusadores que estaban en tinta. Esta peculiaridad la había notado la funcionaria del PIP Margarita Cordero Fernández, según se desprende de su testimonio vertido en corte. (T.E. del 7 de agosto de 1989 a la página 9):

> Yo en específico, en lo que me fijo, es que la firma de una de las funcionarias, Doña Rosaura Fernández en específico está en lápiz, cuando nosotros estas fueron las papeletas que se hicieron en segunda instancia. Primero se cuadraron las estatales y los lápices se guardaron en el maletín; al momento de todo el mundo terminar de votar. O sea, que era muy peculiar que ella tuviera un lápiz en ese momento.

A la funcionaria independentista también le pareció muy peculiar el que no hubiese ocurrido ningún problema de doble

marca con las papeletas estatales. En consecuencia la papeleta de la Sra. Díaz Torres se colocó en un sobre aparte en el que se hizo constar el incidente ocurrido; las restantes ocho papeletas protestadas y no adjudicadas, dañadas por tener una cruz íntegra bajo dos partidos, el PPD y PNP o el PPD y PIP, se colocaron en otro sobre. (T.E. del 4 de agosto de 1989 pp 73–74; 100–101).

El maletín con los materiales electorales del colegio en cuestión contenía 5 lápices a ser utilizados por los funcionarios del colegio, 4 de los cuales fueron utilizados durante la votación. Cuando se recogieron estos lápices previo al escrutinio de votos, los funcionarios se percataron de que faltaba uno de los cuatro lápices. Posterior al escrutinio de las papeletas municipales los funcionarios del colegio encontraron otros lápices adicionales en el colegio, i.e., un lápiz pequeño en la canal de un pupitre escolar utilizado por la funcionaria Sandra I. Vera Pietri durante el conteo de los votos municipales y otros lápices en el borde superior de la pizarra escolar. (T.E. del 4 de agosto de 1989 pp 75–78; 101–103).

En el recuento efectuado en el Coliseo, se refirió al Sr. Rubens Luis Pérez, Supervisor de Piso, tanto la papeleta de la funcionaria Arelis Díaz Torres como las otras 8 papeletas protestadas y no adjudicadas del P004 U009 C003. Este, luego de reunirse con los otros supervisores de piso, envió las papeletas a la CEE. Al continuarse con el recuento del referido colegio, la Sra. Migdalia Rodríguez, observó varias papeletas mixtas con doble marca, a saber, una marca bajo la insignia del PPD y otra marca en el encasillado correspondiente al candidato PNP José Granados Navedo, marcas que a su entender tenían el mismo patrón y forma que las trazadas en las papeletas protestadas y no adjudicadas (Exhibit #34). Separó estas seis (6) papeletas mixtas y se las refirió al Sr. Pérez, quien por entender que todo el incidente presentaba un cuadro sospechoso, ordenó que se cerrara el paquete del colegio y se elevara el asunto a la CEE. (T.E. del 4 de agosto de 1989 pp 104–109; T.E. del 7 de agosto de 1989 pp 12–15).

El perito calígrafo John McCarthy rindió informe escrito (Exhibits #043 y 141) y testificó sobre las quince papeletas de doble marca, 9 de las cuales contienen marcas íntegras bajo la

insignia del PPD y bajo el PNP o PIP (Apéndice 1, Anejos I–IX) y 6 papeletas mixtas que contienen una marca bajo la insignia del PPD y otra bajo el candidato PNP José Granados Navedo (Apéndice 1, Anejos X–XV). El Sr. McCarthy, luego de someter a pruebas científicas las papeletas y algunos de los lápices utilizados en el proceso electoral, llegó a reveladoras conclusiones en torno a las papeletas disputadas. En cuanto a las papeletas I, III, VII, VIII, XII y XIV, el perito calígrafo concluyó que las marcas en las dos columnas de una misma papeletá eran totalmente incompatibles con el esquema utilizado para las elecciones, ya que no se esperaría encontrar características distintas en la caligrafía de un elector al emitir su voto, ni el que se utilizaren lápices con diferente composición química en sus minas para cada marca trazada en una misma papeleta. De igual manera, McCarthy señaló que las marcas de las papeletas II, IV, VI, IX, X y XI reflejaban una diferencia en forma, lo cual sugiere que no fueron hechas en el curso normal del procedimiento de votación. En estas papeletas, sin embargo, no pudo detectar que se hubiesen utilizado lápices diferentes al trazar una y otra marca. El perito calígrafo particularizó la papeleta XI entre las otras papeletas, al destacar que la marca trazada bajo el candidato Granados Navedo fue hecha estando ya la papeleta doblada. El Sr. McCarthy no pudo derivar conclusión alguna de las papeletas V, XIII y XV, ya que las marcas en una y otra columna no variaban ni en forma ni en el lápiz utilizado. Concluyó que las marcas hechas bajo la insignia del PPD en las 15 papeletas en cuestión, debido a la variación en su forma y por los lápices utilizados, mostraban ser marcas emitidas por quince electores distintos, siendo ello lo que se esperaría que ocurriese en el curso normal de una votación. Sin embargo, no pudo llegar a esa determinación en torno a las marcas trazadas bajo el encasillado del PNP y PIP. El perito McCarthy explicó que el lápiz usado por Rosaura Fernández Pérez al recusar la papeleta de la funcionaria PPD era distinto al que se utilizó en las marcas trazadas en las quince papeletas bajo las insignias del PNP y del PIP. Por último, el perito señaló que en ninguna de las quince papeletas se logró determinar que las

marcas fueran hechas en momentos distintos. (T.E. del 4 de agosto de 1989 pp 9–38).

La Dra. Marcia Rivera testificó y rindió un minucioso estudio de patrones de votación en el Municipio de San Juan (Exhibits #145 y 146) dirigido a analizar la distribución del voto mixto y de candidaturas por precinto y por grupos socioeconómicos en dicho municipio en las pasadas elecciones de 1988, analizando particularmente los patrones observados en el P004 U009 C003. Concluyó que estadísticamente, las ocho papeletas marcadas íntegras bajo dos insignias (Apéndice 1, Anejos I, II, III, IV, VI, VII, VIII, IX) quiebran la norma de errores observados para el resto de los colegios de San Juan.

La Dra. Rivera determinó, además, que el número de votos mixtos emitidos en el C003 (de sumarse las papeletas en controversia) sobrepasan significativamente el promedio de votos mixtos emitidos en colegios ubicados en la misma área socioeconómica. Para las áreas de Puerto Nuevo, Caparra Terrace y Las Lomas, áreas socioeconómicamente análogas a las del colegio 003, el promedio de voto mixto fue de 1.31%, teniendo el colegio 003 de por sí un 1.81%. (Véase la T.E. del 7 de agosto de 1989 a la página 54 y la Tabla 8 del Exhibit #145). Señaló que las otras siete (7) papeletas votadas bajo la insignia del PPD y bajo Granados Navedo quiebran la norma, ya que en ningún colegio de la muestra tomada para estudio (realmente es el "universo") hubo más de un elector que emitiera un voto similar. La Dra. Rivera señaló que las probabilidades de que en las pasadas elecciones un elector hubiese votado mixto bajo la insignia del partido PPD y por Granados Navedo eran ínfimas: de 1 en 7200 electores (o un .01389%) ya que el 99.1% de los votos emitidos bajo la insignia del PPD fueron íntegros. (T.E. del 7 de agosto de 1989 pp 41 y 39). Su estudio refleja que de 56 colegios electorales hubo sólo 10 unidades electorales que tenían cinco o más papeletas en las cuales se votó bajo el PPD y por un candidato de otro partido. (T.E. del 7 de agosto de 1989 pp 29–30). En estos 56 colegios electorales solamente en 5 casos de 5 colegios diferentes se pudo establecer claramente que los votos perdidos por Héctor Luis

Acevedo fueron ganados por Granados Navedo. (T.E. del 7 de agosto de 1989 p 39). El análisis de estas cifras la llevaron a concluir que el patrón de votación observado en el P004 U009 C003, de añadirse las papeletas en controversia, era uno altamente improbable. (T.E. del 7 de agosto de 1989 a las páginas 21–57).

La totalidad de la prueba desfilada ante el Tribunal en torno a los hechos ocurridos en el P004 U009 C003 el pasado 8 de noviembre de 1988, indica fuera de toda duda que en dicho colegio electoral se dieron prácticas fraudulentas [3] e irregulares dirigidas a subvertir la intención del electorado. La precipitada apertura de la urna municipal y la extracción de la misma de una cuarta parte de las papeletas por tres funcionarias electorales; la existencia de lápices adicionales en el colegio electoral al finalizar el conteo de las papeletas municipales; la ubicación de uno de estos lápices en la canal del pupitre escolar utilizado por una de las funcionarias del PNP durante el conteo de las papeletas municipales y sobre todo el hecho de que no se repitiese la doble marca en las papeletas estatales, apunta a la comisión de fraude electoral en dicho colegio por una o más de las funcionarias electorales del PNP que allí laboraron ese día. Es de esperarse que un elector que daña su papeleta municipal por marcar dos cruces íntegras bajo distintos partidos, seguiría el mismo patrón de comportamiento en torno a las marcas a hacerse en su papeleta estatal. Tal cosa no sucedió.

Estas actuaciones constituyen una abierta contravención al juramento que los funcionarios hicieran el día de las elecciones de cumplir con sus deberes "fiel y honradamente y con sujeción a la Ley Electoral . . . sin favoritismo ni parcialidad . . ." (Artículo 5.018, 16 LPRA ss 3221) y una crasa violación a la Ley Electoral, constitutivo ello de un delito electoral punible por nuestro orde-

---

[3] Banco Crédito v. Chico Sagastibelza, 90 D.P.R. 125; nota al calce núm. 11, 134–135 (1964); Monclova v. Financial Credit Corp., 83 D.P.R. 770; 776 (1961); Feliciano v. P. Cedeño, S. en C., 78 D.P.R. 39; 43–44 (1955); Nine v. Ortiz, 67 D.P.R. 940; 952 (1947); Serrano v. Torres, 61 D.P.R. 162; 166 (1942); González v. Rivera, 42 D.P.R. 313; 318 (1931).

namiento penal.(4) Estos actos fraudulentos no pueden pasar desapercibidos. Para erradicar esta práctica y desalentar el que intervenciones indebidas(5) cobren auge en los futuros comicios de Puerto Rico referimos este incidente al Departamento de Justicia para que se inicie la correspondiente investigación criminal. (Véase <u>Granados Navedo</u> . . . v. <u>Rodríguez Estrada</u> . . . , 89 JTS 63, a la página 6951; opinión disidente del Hon. Antonio S. Negrón García).

Ciertamente no abona a la posición de la parte demandante la incomparecencia como testigos de los funcionarios por el PNP del P004 U009 C003, personas que tenían <u>conocimiento personal de los hechos</u> acontecidos en el referido colegio y cuyo testimonio hubiere expuesto su versión de lo allí ocurrido. La parte demandante <u>anunció formalmente</u> como sus testigos a estas tres funcionarias(6) a inicios de este pleito en 1988 y nuevamente en su reinicio el verano del 1989. Sin embargo, el día 4 de agosto de 1989, fecha pautada para que éstas testificaran ante este Tribunal, se nos informó que las mismas no serían utilizadas sin brindársenos una <u>explicación o excusa razonable</u> para dicha omisión.(7) Es por todo ésto que determinamos que le aplica a la parte demandante la presunción expuesta en la Regla 16 (5) de las

---

(4) El Artículo 8.006, 16 L.P.R.A. ss 3556, dispone como sigue:

Toda persona que sin la debida autorización de ley, o teniéndola para invervenir [sic] con material electoral, violare los formularios y papeletas utilizadas o a ser utilizadas en una elección con el propósito de extraer, alterar, sustituir mutilar, destruir o traspapelar dicho material para impedir que se cuenten en dicho escrutinio, o que <u>fraudulentamente hiciere alguna raspadura o alteración en cualquier papeleta o tarjeta electoral o tarjeta de archivo</u>, Acta de Colegio de Votación o Acta de Elección Estatal, lista de votantes, o estado demostrativo de escrutinio, será sancionada con pena de reclusión por un término mínimo de un (1) año y máximo de diez (10) años. (Énfasis suplido).

(5) Nótese que prácticas indeseables, similares en su naturaleza ilegal y de carácter recurrente, han existido en Puerto Rico desde principios de siglo. <u>PSP, PPD, PIP</u> v. <u>Romero Barceló</u>, 110 D.P.R. 248; 270–277 y ss; opinión disidente de Hon. Trías Monge. Tan es así que en uno de los textos del conocido tratadista Albert S. Osborne, <u>Questioned Documents</u>, 3ra edición, Toronto, Patterson Smith, 1978, a las páginas 319–321, éste discute el fraude acontecido en papeletas (de doble marca) para unas elecciones capitalinas habidas en Puerto Rico para la década de los veinte.

(6) Rosaura Fernández Pérez, Sandra T. Vera Pietri y Cira Hernández Santana.

(7) (T.E. del 4 de agosto de 1989, p 112). Cabe señalar que las testigos anunciadas no estaban presentes en sala el día 4 de agosto de 1989. Véase la T.E. del 4 de agosto de 1989, pp 39–41, en torno a la discusión de las partes sobre la incomparecencia de estas testigos y las posibles consecuencias de ello.

de Evidencia de que: "Toda evidencia voluntariamente suprimida resultará adversa si se ofreciere". (Rivera Aguila, etc. v. K-Mart de Puerto Rico, 89 JTS 42; Cubero Vélez v. Insurance Co. of P.R., 99 D.P.R. 748; 751–752 (1971); Murcelo v. H.I. Hettinger & Co., 92 D.P.R. 411; 432 (1965); Chico de la Rosa v. Goetz, 90 D.P.R. 316; 320 (1964); Pueblo v. Torres González, 86 D.P.R. 252; 255 (1962); Pueblo v. Seda Alvarez, 82 D.P.R. 719; 733 (1961); véase, además, McCormick On Evidence, 2da edición, Minnesota, West Publishing Co., 1976; a las páginas 656–659; 2 Wigmore On Evidence, Boston, Little Brown & Co., 1979, ss 285–288).

Es base fundamental de todo sistema democrático como el que impera en este país el que la expresión de voluntad del electorado se manifieste libremente a través del voto emitido cada cuatrenio. A tenor con ésto, nuestras leyes y organismos electorales tienen como propósito primordial garantizar el libre ejercicio de la franquicia electoral y como principio rector el que el voto emitido se adjudique de la forma en que el votante lo ejerció.[8] En toda papeleta votada se respetará "al máximo la intención del elector."[9] Cónsono con estos parámetros, la declaración de propósitos de nuestra Ley Electoral[10] dispone:

. . . los propósitos de existencia de un ordenamiento electoral descansan en unas garantías de pureza procesal capaces de contar cada voto en la forma y manera en que sea emitido.

A fin de asegurar en forma cabal esa pureza tan necesaria al desarrollo de nuestra democracia y paralelamente garantizar la confianza del electorado puertorriqueño en unos procesos electorales libres de fraude y violencia, adoptamos el presente Subtítulo.

Las papeletas relacionadas con el incidente de doble marca son calificadas por la Ley Electoral como papeletas protestadas.[11] Estos votos no se cuentan en el colegio electoral sino

---

[8] Artículo 2.001 (10), L.P.R.A. ss 3051.

[9] Regla 72, Reglamento oficial para las elecciones de 1988, a la página 83, Exhibit #040; Manual ilustrado de los procedimientos en los colegios de votación y unidades electorales, a la página 8, Exhibit #191.

[10] Artículo 1.002, 16 L.P.R.A. ss 3002.

[11] Artículo 1.003, 16 L.P.R.A. ss 3003 (36); Reglas 50; 78, Reglamento oficial para las elecciones de 1988, a las páginas 48; 89: "Será protestada toda papeleta: (a) votada bajo

que se elevan a la CEE; allí se "intervendrá con las papeletas no adjudicadas y protestadas y contará o rechazará éstas, según lo que a su juicio se requiera por ley . . ." (Artículo 6.004, 6.008, 16 L.P.R.A. ss 3264 y 3268). Fue dentro de ese ámbito que el Lcdo. Marcos A. Rodríguez Estrada ejerció su facultad (Artículo 1.006(e), 16 L.P.R.A. ss 3014(e)) y emitió la Resolución 88–028 impugnada por la parte demandante.

Los inquietantes hechos ocurridos en el P004 U009 C003 reflejan que un elemento extraño y fraudulento mancilló la intención y voluntad del electorado. No podemos permitir que ésto ocurra. Bajo el marco doctrinario previamente expuesto, en aras de salvaguardar la intención del electorado[12] en este colegio y basándonos tanto en el informe que rindiera el perito calígrafo John McCarthy (Exhibits #36 y 43) como en su testimonio[13] y en el examen visual de estas papeletas[14] es que las analizamos individualmente:

Anejo I: Esta papeleta corresponde a la funcionaria Popular Arelis Díaz Torres, testigo que afirmó enérgicamente haber trazado una sola marca bajo el PPD. No existe controversia en la adjudicación de esta papeleta. Adjudicamos su papeleta a Héctor Luis Acevedo.

Anejo II: Esta papeleta tiene tres marcas, dos en la primera columna bajo la insignia del PPD y Héctor Luis Acevedo y otra colocada bajo el PNP. Ambas marcas en la primera columna tienen rasgos y características similares; reflejan haber sido trazadas con certeza y reflexión. La marca de la segunda columna es diferente en forma; es mayor en tamaño y sus ejes reflejan haber

---

dos o mas partidos políticos"; véase, además, el Manual de Procedimientos, para funcionarios de colegio, coordinadores y subcoordinadores de unidad, a la página 27, Exhibit #052.

[12] Santos v. Comisión Estatal de Elecciones, 111 D.P.R. 351; 356–358 (1981); P.P.D. v. Admor. Gen. de Elecciones, 111 D.P.R. 199; 264–267 (1981) PSP v. Com. Estatal de Elecciones, 110 D.P.R. 400; 428–433; 456; 460–461 (1980); Aldarondo Galván v. JEE, 110 D.P.R. 1083; 1087 (1972).

[13] Véase la T.E. del 4 de agosto de 1989 a las páginas 9–38.

[14] Albert S. Osborn, Questioned Documents, supra, James P. Conway, Evidential Documents, Springfield Illinois, Charles C. Thomas, 1959, a las páginas 195–197; Albert S. Osborn, The Problem of Proof, Especially as Exemplified in Disputed Document Trial, 2da edición, Newark, Nueva Jersey, The Essex Press, 1926.

sido hechos con premura. El informe rendido por el perito demostró que las marcas bajo la columna del PPD y la marca bajo la columna del PNP tienen caligrafía distinta y corresponden a lápices con minas de distinta composición química.

Anejo III: Las marcas de esta papeleta reflejan distinta forma cosa que no ocurriría en el curso normal de una votación. La marca bajo el PPD refleja haber sido hecha con seguridad, mientras que la trazada bajo el PNP fue trazada apresuradamente, con sus ejes inclinados.

Anejo IV: Ambas marcas son grandes y claras; sin embargo, son diferentes en forma. La marca hecha bajo el PPD aparenta haber sido trazada por una mano temblorosa, de forma pensada y calmada, ejerciendo mucha presión en el lápiz. No así la marca bajo el PNP que demuestra haber sido trazada con premura. El informe del perito señaló que dos marcas con tales diferencias no se hacen en el curso normal del procedimiento de votación.

Anejo VI: Las marcas reflejan distintas formas y características. Aunque ambas son grandes en tamaño la trazada bajo el PIP aparenta haber sido hecha estando la papeleta al revés.

Anejo VII: Las marcas tienen distinta caligrafía. La trazada bajo la columna del PNP aparenta haber sido hecha teniendo la papeleta al revés, mientras que la marca bajo el encasillado del PPD demuestra haber sido trazada de forma espontánea y libre. El informe pericial señaló que se usaron lápices con minas de diferente composición química.

Anejo VIII: Las marcas tienen características distintas; la trazada bajo el PNP aparenta haber sido hecha con la papeleta al revés. El perito McCarthy determinó que se usaron lápices con diferente composición química en sus minas.

Anejo IX: La marca hecha bajo el PPD demuestra certeza y reflexión, su grosor refleja que se trazó sobre ella en más de una ocasión. La marca hecha bajo el PNP tiene característica y forma distinta que refleja haber sido trazada subrepticiamente.

Anejo X: Nuevamente existe diferencia entre la forma de una y otra marca, todo ello dando lugar a la inferencia de que no fueron hechas en el curso normal de una votación.

Anejo XI: Una y otra marca tienen características distintas. El perito McCarthy destacó esta papeleta de entre las otras, al determinar que la marca hecha bajo el PNP se trazó estando la papeleta doblada. Obsérvese que los ejes inferiores de esta marca contin[ú]an en el encasillado de la papeleta titulado "c[ó]mo votar mixto". Este patrón de votación se sale del acostumbrado en el curso normal de una elección, en el cual el elector, previo a entrar a la caseta, recibe una papeleta sin doblar y se le da todo el tiempo necesario para que una vez esté dentro de la caseta vote, luego doble su papeleta y la deposite en la urna.

Anejo XII: Las marcas en una y otra columna son incompatibles entre sí. El perito calígrafo informó que se utilizaron dos lápices de diferente composición química.

Anejo XIV: Las marcas trazadas en una y otra columna tienen patrón y características distintas, lo cual sugiere que no fueron hechas en el curso normal de una votación. El informe de McCarthy refleja que se usaron lápices con minas de diferente composición química.

La totalidad de la prueba desfilada ante el Tribunal en torno a esta controversia, i.e., el testimonio de los funcionarios del P004 U009 C003; el análisis científico del perito calígrafo John McCarthy[15] y el análisis estadístico de la Dra. Marcia Rivera, el cual refleja la ínfima probabilidad estadística de que este patrón de conducta se diese en el área socioeconómica de dicho colegio, nos llevan a concluir que la totalidad de las 15 papeletas de doble marca deben adjudicarse a Héctor Luis Acevedo. No se ofreció prueba de índole alguna que sostuviera la alegación de que el Presidente de la CEE, Lic. Marcos A. Rodríguez Estrada,

---

[15] A pesar de que el Sr. McCarthy no expresó conclusión definitiva en torno a tres de las papeletas disputadas (Apéndice 1, Anejo V, XIII y XV), el hecho de que el patrón de votación observado en el colegio de doble marca es uno teñido de fraude cometido por funcionarios del PNP, le adjudicamos estos tres votos a Héctor Luis Acevedo. No debe beneficiarse el candidato Granados del fraude cometido por sus funcionarios.

Invitamos al lector a observar los Anejos I al XV y comparar las marcas trazadas en las primeras columnas con las trazadas en las segundas columnas. Obsérvese que las de la segunda columna manifiestan un patrón similar conteniendo cada una de ellas un "flying start and finish". (Véase opinión disidente del Hon. Antonio Negrón García en 89 JTS 63, pp 6950–6951).

actuara en forma arbitraria o caprichosa al adjudicar la controversia en la forma en que lo hizo.

## II
### Incidente de papeletas con iniciales de electores al dorso

La representación legal de la parte demandante impugnó una alegada determinación de la CEE que anuló un gran número de votos municipales debido a que las papeletas contenían las iniciales de electores al dorso. En su demanda, alegó que los funcionarios electorales, al no seguir las directrices específicas provistas por el Manual de Procedimiento, impartieron instrucciones "incorrectas", "confusas" y "descarriadas" al electorado, conducentes a que éstos, al emitir su voto, estamparan sus iniciales al dorso de las papeletas. Alegó, además, que la decisión de la CEE de anular estos votos en tales circunstancias, privaría a un grupo de electores de su derecho al voto, todo ello en violación de la Constitución del Estado Libre Asociado y de la Constitución de los Estados Unidos de América. Nos solicita como remedio el que se adjudiquen los votos emitidos por dichos electores.

La controversia aquí esbozada fue objeto de examen previo por nuestro m[á]s alto Tribunal en PNP v. Rodríguez Estrada y otros, 88 JTS 155. En aquel entonces, el Tribunal Supremo sostuvo la sentencia del foro de instancia que desestimara un recurso de revisión instado por el PNP, debido a que la parte recurrente no presentó prueba alguna en apoyo de las alegaciones de su demanda. A esos efectos, el Tribunal Supremo por voz del Juez Presidente, Hon. Víctor M. Pons Núñez, estableció con precisión las directrices a seguir por la parte impugnadora en torno a la naturaleza y peso de la prueba que tendría que presentar para el caso ante nos:

> Si bien el voto está resguardado por una presunción de validez y legalidad, P.P.D. v. Admor. Gen. Elecciones, 111 D.P.R. 199 (1981), esa presunción no es pertinente alcaso que nos ocupa. Obviamente, tal presunción se refiere a aquel voto emitido de modo regular, donde prima facie se haya acatado la Ley. Mas cuando de la propia

faz de la papeleta surge que la misma contiene alguna irregularidad que contraviene la ley y los reglamentos aplicables, no es procedente invocar dicha presunción. No se puede presumir lo que la simple vista niega. En estos casos la propia papeleta evidencia la irregularidad. Por tanto, es sobre el elector que recae el peso de la prueba en este caso. Le corresponde a éste demostrar que actuó de buena fe y que fue inducido a error por la orientación confusa de los funcionarios de colegio. . .

De ahí que el elector o partido que impugne dicha anulación es al que le corresponde establecer o probar lo que a bien tenga para sostener o restituir la validez de su voto . . . (Subrayado nuestro, a la página 6508; véase además, Granados Navedo v. Rodríguez Estrada y otros, 89 JTS 63; 6887–6888.

Así las cosas, este foro ofreció la oportunidad al candidato Granados Navedo de traer todos sus electores afectados por este incidente para que manifestaran individualmente las razones por las cuales pusieron sus iniciales o marcas en la papeleta municipal. Se le brindó la oportunidad de presentar toda la prueba que a bien tuvieran ofrecer para este evento. La parte impugnadora alegó en su demanda que el evento de iniciales "ocurrió en aproximadamente 357 situaciones distintas en más de 85 unidades electorales". (Véase la Demanda, a la página 7). Anunció formalmente como sus testigos a 66 electores. De éstos, testificaron 41 votantes, explicando cada uno el proceso electoral habido en el colegio en que votó y especificando las instrucciones que recibiera de los funcionarios electorales en torno al manejo de su papeleta.

Además del testimonio de los electores, y con relación a los mismos, este magistrado tuvo el beneficio de recibir el testimonio de funcionarios electorales del PNP y PPD que trabajaron en los colegios donde ocurrieron incidente(s) de iniciales al dorso y para los cuales la parte demandante produjo prueba testifical. En adición, y como parte de la prueba de refutación de los demandados, se escuchó el testimonio de 31 funcionarios del PPD que trabajaron en colegios electorales donde no hubo problema de papeletas con iniciales al dorso. Luego de observar el comportamiento de todas estas personas en la silla testifical; de hacer una correlación del testimonio de cada elector con el de los funciona-

rios de su colegio y de analizar y sopesar los mismos dándoles la credibilidad merecida, formulamos las siguientes conclusiones:

La prueba desfilada demuestra que la parte demandante no controvirtió la presunción de corrección de los actos de la CEE en torno al incidente de iniciales, ni cumplió con los requisitos probatorios que le impuso el Tribunal Supremo en PNP v. Rodríguez Estrada y otros, 88 JTS 155. El posterior alegato de derecho de la parte demandante, a su vez, no analizó ni individualizó la situación de cada elector; se limitó a concluir para cada uno que:

> Nadie pudo establecer que este elector actuara de mala fe con el propósito de identificar su voto; por el contrario, la única inferencia que se puede llegar a base del testimonio es que actuó de buena fe y que fue inducido a error por la orientación confusa de los funcionarios del colegio.

Convenimos con la parte demandante en torno al primer postulado referente a que los electores actuaran de buena fe, entendiéndose este concepto como la "creencia o persuación de que el acto realizado es lícito y justo." (Carlos E. Mascareñas, Nueva enciclopedia jurídica, Barcelona, Francisco Seix, 1951, tomo 3, página 455). Lo cierto es que el testimonio de la mayoría de los electores no demostró que éstos al estampar sus iniciales en la papeleta, actuaran de mala fe con el ánimo de violar la secretividad del voto - acto constitutivo de delito electoral.(16)

Diferimos, sin embargo, de la posición asumida por la parte demandante en torno al segundo postulado, alusivo a que los electores fueron inducidos a error por la orientación confusa de los funcionarios. Defínese inducir como:

---

(16) El artículo 8.025 de la Ley Electoral, 16 LPRA ss 3375 dispone:

Será sancionada con pena de reclusión por un término mínimo de un (1) mes y máximo de seis (6) meses, o multa mínima de cien (100) dólares y máxima de quinientos (500) dólares, toda persona que:... (f) a sabiendas intentare o lograre violar la secretividad del voto o mutilare, desfigurare especialmente, en forma ilegal, una papeleta con el propósito de identificarla, de invalidarla o de sustituirla; o divulgare el contenido de la papeleta ya marcada por él, o por otro elector, a alguna persona antes de depositarla en la urna. (Subrayado nuestro).

Tiene, a diferencia de "incitar", significado perfectivo, es decir, que la acción termina con el logro de su objeto. 1) Hacer con consejos, promesas, amenazas, etc., que alguien realice cierta acción: 'La falta de trabajo le indujo a emigrar', (V.: "Poner en el caso de, EMPUJAR, IMPELER, LLEVAR, MOVER, (GANCHO) ACONSEJAR. ACONSEJAR. AZUZAR. CONVENCER. IMPULSAR. INCITAR.) 2) Hacer incurrir a alguien en un error, engaño, pecado, tentación o cosa semejante: 'Eso puede inducir a error. (María Moliner, Diccionario de uso del Español, Madrid, Editorial Gr[e]dos, S.A., 1980, tomo 2, página 122.)

(Véase, además, Pueblo v. Cepeda Rivera, 90 JTS 6; a la pág. 7335:

"Inducir significa instigar, persuadir, mover a uno: Diccionario de la Lengua Española, Tomo II (1984), pág. 768".) (Subrayado nuestro). Aun de existir buena fe, si no se nos demuestra que el elector fue inducido a error por el funcionario no podemos adjudicar su voto. La parte demandante no probó sus alegaciones. De hecho, la totalidad de la prueba desfilada las refuta y las contradice. El Tribunal entiende que las instrucciones impartidas en este incidente fueron claras y no confusas; los errores cometidos por los electores fueron producto única y exclusivamente de problemas latentes atribuibles a cada uno de los votantes. Veamos.

La prueba demostró que hubo varias personas que por su condición o no escucharon las instrucciones impartidas o malinterpretaron las mismas. A modo de ejemplo, tomamos el testimonio del primer elector que testificó, el Sr. Luis F. Tirado. (T.E. del 8 de agosto de 1989, p 22 y ss; Exhibit #149). Previo a su testimonio, el Lcdo. Montalvo, (abogado del demandante Granados Navedo), nos hizo la siguiente salvedad: "El caballero, como verá Su Señoría, tiene unos años y yo he hablado con él y tengo que gritarle. Usted ¿me va a permitir gritarle, para que él me pueda escuchar?" (Énfasis suplido.) Procedemos a resumir su testimonio:

El Sr. Tirado declaró que votó el pasado 8 de noviembre de 1988 en la Universidad Metropolitana, Carretera de Cupey. La Sra. Mercedes Portillo, funcionaria en ese colegio, le entregó las papeletas

previo a él emitir su voto en la caseta electoral. Una vez votó y se dirigía a depositar las papeletas en las correspondientes urnas electorales, señaló que la funcionaria Portillo con voz "fina, delicada y convincente" interceptó su paso y le dijo "Don Luis, póngale las iniciales suyas al dorso". El, por no haber hecho ésto en elecciones previas, le preguntó en que parte las ponía, si arriba, abajo, o al dorso. "Me dice, al dorso, en la parte izquierda, donde hay unas iniciales, allí. Y yo entonces fui y puse mis iniciales LFT."

La Sra. Mercedes Portillo, funcionaria PPD para el colegio del Sr. Tirado, testificó ante este foro. La catedrática y letrada, con voz clara, precisa y _audible_, hizo un recuento del proceso electoral efectuado en el P005 U033 C005 el día de las elecciones. Señaló que las instrucciones impartidas por ella se circunscribían a lo siguiente: "Mire, hay una papeleta amarilla y una blanca. Una para Alcalde y otra para Gobernador, etc. Usted, tenga cuidado con la papeleta. No la vaya a dañar. Cójase su tiempo. Y, cuando termine de votar, doble esa papeleta de forma tal, que las iniciales que están ahí, por detrás, se vean en la parte de afuera." Especificó que al dar estas instrucciones, generalmente ilustraba con sus manos cómo el elector debía doblar las papeletas. Recalcó que al impartir las instrucciones le indicaba al votante que las papeletas tenían unas iniciales por detrás, no utilizaba el término al dorso para evitar confusión en el electorado (T.E. del 16 de agosto de 1989 a la página 49 y ss.)

El Sr. Orlando Ray Rivera, ingeniero civil, fue funcionario del PNP en el P005 U033 C005 y estuvo al lado de la Sra. Portillo mientras ésta daba las instrucciones. En torno a las mismas nos señaló: "No se exactamente las frases ahora, porque hace mucho tiempo, pero yo verifiqué y ella decía exactamente lo que decía el Reglamento. . . que doblara la papeleta de manera que al depositarlas en las urnas las iniciales quedaran por afuera." (T.E. 9 de agosto de 1989 a la página 160 y ss.) El testimonio del Sr. Ray Rivera no sólo confirma lo explicado por la funcionaria popular, sino que refuta lo dicho por el propio elector.

(Véase además, el Apéndice 2 (34) y (7); análisis de los electores Miguel H. Badillo Badillo y Jenny Snow Sola, respectivamente.)

De igual manera, hubo votantes que a pesar de ser personas jóvenes y atentas, por no tener completo dominio y entendimiento del idioma español, malentendieron las instrucciones impartidas y estamparon sus iniciales en la papeleta. (Véase el Apéndice 2 (28)

y (35); análisis de los electores María M. Quebec Irlandés y Raquel Adorno Lorán, respectivamente).

La prueba reflejó que hubo un grupo de personas inatentas a las instrucciones individuales o grupales que se impartieron ese día: algunos por su naturaleza distraída;[17] otros debido a circunstancias particulares – responsabilidades, preocupaciones, compromisos u obligaciones – que unidas a la prisa que tenían, desviaron su atención y concentración del proceso electoral, incurriendo por ello en error. Particularizamos a estos efectos el testimonio del elector Carlos Víctor Wheeler. (T.E. del 9 de agosto de 1989, a la página 138 y ss; Exhibit #160):

El Sr. Carlos Víctor Wheeler, doctor y profesor de Ingeniería, emitió su voto en el P003 U005 C005. Señaló haber votado previamente en tres o cuatro ocasiones. Para estas elecciones llegó temprano en el salón de votación. "Llegué creo que a eso de las siete y media de la mañana, porque quería votar temprano. Estaba esperando coger un avión a las doce y media". Iba a viajar fuera de P.R. y debido a que no había hecho su equipaje, el tiempo le apremiaba. Cuando llegó al colegio tuvo que hacer fila fuera del mismo ya que los materiales electorales no habían llegado. El colegio abrió tarde (9:30 A.M.) y una vez el Sr. Wheeler entró, se vio precisado a tomar turno por haber bastantes electores antes que él. Declaró que al entregársele las papeletas la funcionaria no le dio ningún tipo de instrucción. Fue al salir de la caseta electoral que como "no sabía como doblarla le pregunté a un señor, un señor alto, uno de los funcionarios, y estaba parado y le digo, cómo quiere que lo doble. Entonces, él me dice, la dobla en cuatro, según me parece, me dijo, me enseñó mas o menos con la mano y me dice, y ponga las iniciales por fuera". El elector señaló: "Pues yo, tontamente, puse las iniciales por fuera. Acostumbrado, estaba preocupado por el avión que salía a las doce y media y eran después de las diez. Y entonces no me di cuenta de lo que estaba haciendo, me vine a dar cuenta cuando estaba en el avión, no. Que al poner las iniciales por fuera, pues, invalidaba el concepto del voto secreto". (Subrayado nuestro).

Testificó la Sra. Gladys Mayol Arizmendi, funcionaria PNP para este colegio. Señaló que durante las horas de la mañana ella fue

---

[17] Véase el Apéndice 2 (19), análisis de Luis Marcano Valentín.

quien dio las instrucciones, las mismas se circunscribían a: "Doble la papeleta con las iniciales hacia afuera". (T.E. del 9 de agosto de 1989 a la página 148 y ss) El funcionario PPD, Jorge E. Vizcarrondo, a su vez, confirmó lo vertido por la Sra. Mayol. Señaló que él daba las mismas instrucciones y adicionó que los funcionarios al dar las instrucciones indicaban con las manos cuáles eran las iniciales que debían quedar por afuera al doblarse la papeleta. (T.E. del 16 de agosto de 1989 a la página 154 y ss).

(Véase además, el apéndice 2 (18), (22) y (32); análisis de los electores José Manuel Fernández Ramírez, Wilma Merced Centeno y Sandra Carlo Pinto, respectivamente)

Cabe señalar en este momento que es reprochable la actitud asumida por aquellos electores que ya sea por indiferencia o por la poca importancia que le otorgan al ejercicio de su derecho constitucional al voto - derecho que se ejerce cada cuatrienio - pretenden salir a toda prisa del proceso electoral sin prestarle la debida atención, respeto y tiempo a lo que acontece en el mismo, incurriendo por ello irremediablemente en errores como los que dan base a esta controversia. (Véase el Apéndice 2 (41); análisis de la electora Raquel Fanfán Román).

La alegación del demandante de que los electores fueron inducidos a error por instrucciones "confusas". . . pierde fuerza en instancias donde el votante alega que no recibió instrucción directa - individual o grupal - sobre iniciales. M[á]s, estando el elector en camino hacia la caseta electoral o ya dentro de la misma oye a sus espaldas o de lejos "voces desconocidas" mencionar algo referente a iniciales, y procede a estampar sus iniciales en la papeleta. El testimonio de todos y cada uno de estos electores fue refutado por el testimonio de los funcionarios para ese colegio. A modo de ejemplo, tomamos el caso del elector Rubén Agosto Avilés. (T.E. del 9 de agosto de 1989 a las páginas 49 y ss; Exhibit #155):

El Sr. Rubén Agosto Avilés votó en la Escuela Gustavo Adolfo Bécquer. Señaló que luego de hacer fila fuera y dentro del salón, le llegó su turno de votar. Se acercó a una mesa donde, a su entender, había alrededor de seis funcionarios. Allí se le cotejó en las listas y le entregaron ambas papeletas. Declaró que cuando le dieron las

papeletas se le dijo "que las doblara en cuatro partes". Sin embargo, es cuando está de espaldas entrando a la caseta que oyó que <u>alguien</u> dijo que "había que iniciarlas".

El testimonio de este elector fue refutado por el de su esposa, la Sra. Sylvia Cortés González, quien se desempeñara como Inspectora en Propiedad del PNP para el P003 U004 C001. Tuvo la función de entregar la papeleta municipal en ese colegio y declaró que <u>fue ella quien en todo momento instruyó a los electores de cómo manejar la papeleta municipal.</u> Señaló que las instrucciones que daba al entregar la papeleta eran: "Que le estaba entregando una papeleta municipal, en la cual podía hacer su voto por el Alcalde, su candidato a Alcalde y los asambleístas. Terminada la votación en la caseta, antes de salir doblara la papeleta con las iniciales hacia afuera". La funcionaria del PPD, Julia Ortega Arroyo, corroboró la naturaleza y el tipo de instrucción allí impartida: "doblase las papeletas y pusieran las iniciales hacia afuera . . . (o hacia arriba)"

(Véase además, el Apéndice 2 (16) y (39); análisis de los electores Josefina Olmo Domínguez y Aida L. Escalera Laureano, respectivamente.)

La parte demandante presentó ante este foro testimonios tan diversos que los mismos ni tenían base ni encontraban apoyo en la alegación de la demanda referente al incidente de iniciales. Así, desfilaron electores que no pudieron explicar el por qué estamparon sus iniciales en la papeleta;[18] declaró un elector que puso sus iniciales al anverso y reverso de la papeleta municipal;[19] testificó un votante que puso su nombre y número de seguro social en la papeleta[20] y hasta hubo un elector que luego de señalar que la instrucción fue de que "firmara aquí", firmó al anverso de su papeleta mas no hizo marca alguna de su preferencia electoral.[21] Claramente, esta prueba es indicio de que el error cometido por los electores que nos ocupan no fue a consecuencia de las instrucciones impartidas por los funcionarios electorales, sino

---

[18] Véase el Apéndice 2 (32); Víctor Díaz Roig.
[19] Véase el Apéndice 2 (10); análisis de la electora Ivette Ramírez Medina.
[20] Véase el Apéndice 2 (3); análisis del elector José A. Campos Morales.
[21] Véase la T.E. 14 de agosto de 1989 a la página 78 y ss. El testimonio del elector Jorge Nieves Cepeda constituye prueba ofrecida y no admitida por este Tribunal.

m[á]s bien causados por falta de entendimiento o sentido común inherentes a cada elector.

En los pasados comicios votaron en la ciudad capital sobre 215,000 personas hábiles, en más de un millar de colegios electorales.[22] El incidente de iniciales, por ende, representa tan s[ó]lo un grupo ínfimo del electorado que emitió su voto en las pasadas elecciones. De tomar como cierto el número alegado en la demanda (357) significaría que aproximadamente dos de cada 1,000 electores, (o un .166047%) estamparon sus iniciales al dorso de la papeleta municipal. M[á]s aún, si se utiliza como cifra representativa el número de electores que testificó en sala (42), la proporción de electores que cometió el aludido error resultaría menor: aproximadamente dos de cada 10,000 votantes, (o un .019537%). Es insostenible, en consecuencia, la alegación de la demanda de que "el número de personas que inicialaron (sic) sus papeletas de esta manera es tan numeroso que corroborara la confusión levantada." (página 7) Las proporciones expuestas son claro reflejo de que los errores cometidos son imputables únicamente al elector. (Véase, además, la prueba de refutación de la parte demandada; T.E. del 17 de agosto de 1989 a la página 197 y ss; T.E. del 18 de agosto de 1989)

A modo ilustrativo y abonando a lo previamente determinado, hacemos hincapié en la siguiente tabla que expone una correlación del número de incidentes de iniciales para los cuales la parte demandante produjo testimonio de electores, frente al número total de electores que votaron en ese colegio:

---

[22] El Exhibit #145, refleja que en San Juan votaron 215,977 personas.

## TABLA I

| Precinto-Unidad-Colegio | Testigos presentados por la parte demandante para ese Precinto-Unidad-Colegio | Total de votos emitidos para ese Precinto-Unidad-Colegio |
|---|---|---|
| 002-003-002 | 1 | 210 |
| 002-012-004 | 1 | 215 |
| 002-030-001 | 1 | 221 |
| 003-004-001 | 1 | 190 |
| 003-005-005 | 1 | 201 |
| 003-008-001 | 1 | 240 |
| 003-013-004 | 1 | 152 |
| 003-015-004 | 1 | 194 |
| 003-026-005 | 3 | 219 |
| 003-029-004 | 4 | 242 |
| 003-036-001 | 1 | 211 |
| 004-004-002 | 1 | 220 |
| 004-015-003 | 1 | 230 |
| 004-015-004 | 1 | 235 |
| 004-016-004 | 1 | 229 |
| 004-017-002 | 1 | 240 |
| 004-024-002 | 1 | 237 |
| 004-028-002 | 1 | 239 |
| 005-004-003 | 1 | 223 |
| 005-011-005 | 1 | 220 |
| 005-024-003 | 1 | 233 |
| 005-033-005 | 2 | N.D. |
| 104-004-003 | 1 | 218 |
| 104-006-002 | 2 | 242 |
| 104-008-002 | 1 | 220 |
| 104-008-003 | 1 | 225 |
| 104-009-001 | 2 | 236 |
| 104-009-004 | 1 | 241 |
| 104-013-007 | 1 | 231 |
| 104-013-010 | 1 | 251 |
| 104-014-002 | 1 | 225 |
| 104-016-001 | 1 | 239 |
| 104-021-001 | 2 | 230 |

(Cifras tomadas del Exhibit #145)

La prueba demostró que en los colegios electorales de San Juan se impartieron instrucciones individuales o generales (grupales), o ambas, dependiendo del número de votantes en los colegios en determinado momento. De haber sido las instrucciones impartidas unas "incorrectas", "confusas" y "descarriadas", ¿cómo se explica el hecho de que en instancias donde se impartieron instrucciones grupales, se diese un número tan reducido de incidentes de iniciales? Dicho de otro modo, ¿cómo se explica el que no se suscitaren más votos protestados y no adjudicados por razón de contener iniciales de electores al dorso? Nuevamente, la prueba desfilada desvirt[ú]a la posición de la parte demandante.

Se demostró que toda persona que trabajó como funcionario electoral en las pasadas elecciones recibió adiestramiento de su respectivo partido político antes de las mismas.(23) Por lo tanto, sería lógico concluir que estos funcionarios representaron y defendieron los intereses de su partido durante todo el proceso electoral -claro está- dentro de los parámetros de imparcialidad fijados por la ley y reglamentación electoral, (con la excepción ya señalada en el incidente sobre doble marca).

En relación a lo anterior, se observa que en la mayoría de los colegios electorales sobre los cuales se produjo prueba, se demostró que los Inspectores en Propiedad del PPD y PNP impartieron las instrucciones alternadamente.(24) Debido a la proximidad física entre los funcionarios que daban las instrucciones referen-

(23) Así lo requiere la reglamentación electoral. El Manual de Procedimiento, supra, dispone a la página E:

Los funcionarios de colegio deben ser conocedores del proceso electoral y tienen que haber sido adiestrados por sus respectivos partidos y la Comisión Local de Elecciones.

Son los funcionarios de colegio las personas directamente responsables de que el proceso de identificación de electores, votación y escrutinio que se efectúa a nivel de colegio se conduzca con toda seriedad, alto sentido de responsabilidad y total imparcialidad.

A la página F se reitera la importancia otorgada al adiestramiento de los funcionarios electorales, al señalar

Es esencial que antes del día de las elecciones cada funcionario de colegio, coordinadores y subcoordinadores de unidad electoral estudien cuidadosamente este manual de manera que puedan realizar sus funciones con la Ley y reglamentación vigente.

(24) Regla 36 del Reglamento General de Elecciones 1988 a la página 32; Manual de Procedimiento, a la página 9.

tes a cómo doblar las papeletas, cada uno era capaz de escuchar lo expresado por el otro. De haber sido confusas las instrucciones impartidas, como alega el demandante, el funcionario que oyese instrucciones imprecisas o incorrectas hubiese objetado las mismas y allí mismo, hubiese exigido que el funcionario que las emitió las explicase o él mismo las hubiese aclarado. No fue así. Además, por constituir cada elector un voto potencial a favor de su partido, resulta increíble que un funcionario electoral, luego de escuchar instrucciones que podrían resultar adversas a su candidato, por culminar las mismas en la anulación de la papeleta, permaneciese indiferente ante las mismas.[25] Este hecho de por sí, desvirt[ú]a tanto el testimonio de aquellos electores que declararon recibir instrucciones a los efectos de escribir sus iniciales en la papeleta,[26] como el de aquellos que testificaron haberles enseñado las papeletas con sus iniciales estampadas al funcionario y éste haberles dado su visto bueno luego de observarlas.[27]

La parte demandante alegó que el problema de iniciales se debió a que los funcionarios no siguieron las instrucciones específicas provistas por el Manual de procedimientos. La parte demandante expresó que dichos actos fueron ilegales. (T.E. del 18 de agosto de 1989 a la página 79). Veamos.

El Reglamento oficial para elecciones generales de 1988, aprobado el 23 de mayo de 1988 y enmendado el 25 de agosto de 1988, particulariza en sus Reglas 36, 37 y 38, las funciones que desempeñarán los distintos funcionarios de colegio, i.e., Inspectores de colegio, Inspectores suplentes y Secretarios, respectivamente, el día de las elecciones. (Véase además, el Manual de procedimiento, supra, a las páginas 2–4 y el Manual ilustrado, supra, a la página 17.) En torno a las instrucciones a impartir, la Regla 36 dispone:

> Los Inspectores de Colegio tendrán a su cargo, la supervisión general de los Colegios y velarán porque los procedimientos en los

---

[25] Lo aquí concluido demuestra que todo este incidente se debió a la malinterpretación que algunos electores dieran a las instrucciones impartidas.

[26] Véase el Apéndice 2 (20); análisis del elector Enrique A. Lugo Lugo.

[27] Véase el Apéndice 2 (23); análisis del elector Wilfredo Núñez González.

Colegios se conduzcan en la forma que se establece por ley y reglamento.

(a) Los Inspectores Propietarios del Partido Popular Democrático y del Partido Nuevo Progresista harán entrega de las dos papeletas de votación. El primero entregará la papeleta estatal y el segundo la municipal y <u>le leerán las siguientes instrucciones:</u>

Le estamos entregando dos (2) papeletas. <u>En la papeleta blanca aparecen los candidatos a los cargos de Gobernador, Comisionado Residente y Legisladores. En la papeleta amarilla aparecen los candidatos a Alcalde y Asambleístas Municipal.</u>

La lectura de estas instrucciones serán alternadas entre estos dos (2) funcionarios.

Además, se cerciorarán que los electores depositen sus papeletas en la urna correspondiente. (Enfasis suplido).

La Regla 41, a su vez, expone las directrices específicas que un elector debe seguir al emitir su voto el día de elecciones:

5. El elector procederá a recoger sus papeletas y <u>se le leerán las instrucciones que se disponen en la Regla 36.</u> Se prohíbe que cualquier otra persona dentro de un colegio electoral intervenga con algún elector para darle instrucciones de cómo votar.

6. El elector, entonces, irá solo a una de las casetas de votación y procederá a votar haciendo las marcas correspondientes. Salvo lo dispuesto por ley o reglamento para las personas con impedimento físico solamente podrá haber una persona a la vez dentro de una caseta de votación, y permanecerá dentro de ella solamente el tiempo razonable que necesite para votar.

<u>Una vez haya votado, pero antes de salir de la caseta de votación, el elector doblará las papeletas electorales con varios dobleces de manera que ninguna parte del frente de ellas quede expuesta a la vista, asegurándose que las iniciales de los inspectores del colegio al dorso de éstas queden visibles.</u> Inmediatamente después de terminar con esta operación, saldrá de la caseta y en presencia de los inspectores del colegio procederá a mostrar las iniciales al dorso de las papeletas y depositará la papeleta estatal y municipal en las urnas debidamente identificadas a estos fines.

Al comparar el Reglamento actual con el que rigió en las elecciones del 1984 se observa que la Regla 36 sufrió enmiendas.

En 1984, correspondía al Inspector del Partido Renovación Puertorriqueña entregar las dos papeletas e impartir las instrucciones, las cuales se circunscribían a lo siguiente:

'Le estamos entregando dos (2) papeletas. En la papeleta blanca aparecen los candidatos a los cargos de Gobernador, Comisionado Residente y Legisladores. En la papeleta amarilla aparecen los candidatos a Alcalde y Asambleísta Municipal.

Usted tiene derecho a votar en las dos (2) papeletas. Luego de votar usted deberá depositar la papeleta blanca en la urna marcada con ese color y la papeleta amarilla en la urna marcada con dicho color.

Al doblar la papeleta en la caseta de votación asegúrese que las iniciales al dorso de las mismas queden hacia fuera en forma visible.'

Esta función la harán sin menoscabo de su igual derecho a velar porque los procedimientos en los colegios se conduzcan en la forma que se establece por ley y reglamento.

La Regla 41 del 1984 es idéntica a la que existe al presente. (Véase el Exhibit #208).

La aludida Regla 36 se enmendó a los efectos de dejar vigente únicamente su primer párrafo, descartándose con ello la instrucción alusiva a doblar la papeleta asegurándose el elector de que las iniciales al dorso de las mismas quedasen hacia afuera. La enmienda tuvo la inevitable consecuencia de crear una laguna en dos reglas electorales que previamente se complementaban. Ante ésto, ¿cómo un elector debía saber cúales eran los pasos a seguir en el proceso eleccionario, i.e., doblar las papeletas, si no era porque los funcionarios de colegio así los instruían? Los funcionarios electorales, muchos de los cuales tenían la experiencia previa de haber trabajado en otros comicios, se vieron precisados a ofrecer aquellas instrucciones que a su mejor entender llenaban el vacío creado por la enmienda a la Regla 36. Cabe señalar que todos y cada uno de ellos fueron adiestrados por su partido político previo a las elecciones en torno a la Ley y reglamentación electoral.

El resultado de ello redundó en que las instrucciones impartidas no fueran un dechado de uniformidad.(28) Si bien las instrucciones pudieron haber variado dentro de un mismo colegio y para cada elector, las mismas fueron lo suficientemente claras para que cualquier persona las pudiese entender. (Véase Tabla I de este acápite). Hay que distinguir entre instrucciones que no necesariamente son idénticas en sus detalles y lo que se entiende por una instrucción confusa dirigida a inducir a error al elector. (Véase la T.E. del 17 de agosto de 1989 a la página 197 y ss y la T.E. del 18 de agosto de 1989). La prueba de refutación de la parte demandada demostró que a pesar de que se dieron instrucciones análogas en otros colegios, no hubo en éstos incidente alguno sobre iniciales al dorso de las papeletas.

M[á]s aún, las instrucciones vertidas en ningún momento aludieron a que el elector escribiese sus iniciales. Si en algún momento el elector tuvo dudas en torno a las directrices del funcionario, le era fácil pedir que se las aclararan. Los funcionarios electorales de todos los partidos estuvieron presentes en los colegios en todo momento, en consecuencia, los electores tuvieron amplia oportunidad de cuestionarles y de buscar su asesoramiento. No se hizo así.(29)

Se alegó que "ninguna instrucción fue dada en dichas unidades electorales al efecto de que el elector no debía poner sus iniciales en la papeleta, y de hecho muchos electores entendieron que las instrucciones eran al efecto de que estaban obligados a poner sus iniciales en las papeletas". Debe quedar claro que los funcionarios no venían obligados a dar esta instrucción. Lo sugerido por el demandante constituye un desvío de las instrucciones contenidas en la Regla 36. El hecho de que el elector no supiera que estampar sus iniciales en la papeleta anulaba su voto, no le exime. "La

---

(28) En instancias, la prueba vertida en sala demostró que aun cuando se dieron instrucciones alternadas, uno y otro funcionario dieron directrices similares o muy similares.

(29) A modo de ejemplo véase los testimonios de Luis F. Tirado, Ana Rosa Ramos Figueroa y Luis A. Gierbolini Cruz. (T.E. del 8 de agosto de 1989 a la página 22 y ss; T.E. del 11 de agosto de 1989 a la página 99 y 100; T.E. del 14 de agosto de 1989 a la página 113 y ss respectivamente.)

ignorancia de las leyes no excusa de su cumplimiento." Artículo 2 del Código Civil, 31 LPRA sec. 2.[30]

En el caso de autos fueron los electores y no los funcionarios de colegio los que se desviaron del cumplimiento de la Ley Electoral. Al electorado poner sus iniciales en las papeletas, sus votos fueron impugnados, resultando en papeletas protestadas y no adjudicadas. En su Artículo 1.003(36), la Ley Electoral dispone:

> (36) "Papeleta Protestada" significará aquella en que aparezca arrancada la insignia de algún partido; escrito un nombre, salvo que sea en la columna de candidatos no encasillados; o tachado el nombre de un candidato, o que contenga iniciales, palabras, marcas o figuras de cualquier clase que no fueren de las permitidas para consignar el voto. (Énfasis suplido) (Véase además, las Reglas 50, 78, del Reglamento General, *supra*; Manual de Procedimiento, a las páginas 18, 19 y 27; Manual Ilustrado, a la página 8.)

Estas papeletas eventualmente fueron rechazadas por la CEE durante el escrutinio general. (Artículos 6.004 y 6.008, 16 LPRA ss 3264 y 3268).

Las iniciales al dorso de la papeleta de un elector son marcas que le identifican y que clara y abiertamente atentan contra la secretividad del voto. Tenemos pues en esta controversia un choque entre dos derechos fundamentales recogidos en nuestra Constitución y protegidos por nuestro ordenamiento jurídico. Por un lado, la secretividad del voto y por otro lado, el propio derecho al voto.

El derecho al voto es un derecho fundamental y el ejercicio del mismo la "principal arma y piedra angular del sistema democrático". (PPD v. Admor. Gen. de Elecciones, supra, 210 (1981)). Este derecho constitucional, sin embargo, no es absoluto e inatacable. Como todo otro derecho puede ceder ante intereses apremiantes de extrema envergadura. Nuestro m[á]s alto Tribunal, en PNP v.

---

[30] A esos efectos nos ilustran los Lcdos. Bernier y Cuevas Segarra en su obra Aprobación e interpretación de las Leyes de Puerto Rico, 2da edición, Puerto Rico, Publicaciones JTS, 1987, Volumen I, Capítulo 62, a la página 389: "Esta es una regla absolutamente necesaria en una sociedad que se gobierna por las leyes, pues de otra manera el orden público y la convivencia pacífica serían imposibles, bajo el reclamo del infractor de una norma de que desconocía su existencia."

Rodríguez Estrada y otros, 88 JTS 155, al discutir la naturaleza del derecho al voto señaló lo siguiente:

> Puede ceder ante intereses públicos apremiantes en pro del bienestar común, la sana convivencia y para salvaguardar el ejercicio mismo de ese derecho. Una de las instancias en la que debe ceder este derecho al voto es cuando se viola el postulado constitucional de la secretividad. No cabe duda que el Estado posee un interés extremadamente apremiante en preservar el principio del voto secreto.

La historia electoral de nuestro país est[á] impregnada de prácticas fraudulentas, coacciones y presiones indebidas para con el sufragio electoral.[31] Afortunadamente esta lamentable experiencia ha quedado sup[e]rada; nos queda de ella únicamente su recuerdo y su lección. La evolución ha sido producto directo en gran medida debido a las continuas enmiendas electorales que década tras década tuvieron como propósito primordial erradicar estas prácticas lesivas al libre sufragio. El desarrollo socioeconómico de nuestro país; su madurez como pueblo y la conciencia política adquirida por el electorado a través de los años constituyen factores que han abonado a que esta lamentable experiencia quede en el pasado.

> No cabe duda pues que el Pueblo de Puerto Rico al plasmar en su Constitución la secretividad del voto lo hizo atendiendo un interés extremadamente apremiante de proteger al elector contra las coacciones y presiones indebidas que habían sido parte fundamental de amargas y deleznables experiencias políticas sufridas en el curso de la historia.

(PNP v. Rodríguez Estrada y otros, 88 JTS 155, a las páginas 6505–6506).

La secretividad del voto goza de tal preeminencia dentro de nuestro ordenamiento que la Constitución del Estado Libre Asociado la recoge expresamente en su Artículo II sección 2:

---

[31] Véase el minucioso análisis histórico del Hon. José Trías Monge en PSP, PPD, PIP v. Romero Barceló, supra; véase, además, PPD v. Admor Gen. de Elecciones, supra, a las páginas 210–212.

"Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral." (Enfasis suplido).

La jurisprudencia, a su vez, ha reiterado la importancia de este derecho. Así en PSP, PPD, PIP v. Romero Barceló, supra, a la página 298, en opinión concurrente y disidente el Hon. Antonio Negrón García expresó que:

. . . el objetivo del voto secreto de un ciudadano es asegurarle contra y protegerlo de las coacciones, para garantizarle la libertad de poder entrar a la caseta electoral, solo con su conciencia, y hacer allí su cruz, secretamente, sin que a nadie le importe cómo y dónde la hizo. Repetimos, es esencial que el voto sea confidencial, pues con ello se evitan coacciones y represalias que pondrían en peligro la independencia del elector y la consiguiente sinceridad de su sufragio. (Subrayado nuestro).

A esos efectos, previamente en PNP v. Tribunal Electoral, 104 DPR 741; 755 (1979) se expuso:

". . . el requisito de que el voto sea secreto, se dispuso con el propósito de '. . . asegurar la inviolabilidad del albedrío del elector'."

El interés que el Estado tiene en preservar la secretividad del voto es tan apremiante que únicamente bajo imperativos superiores como el de electores no videntes o funcionarios electorales se permite que ésta ceda. (PNP v. Rodríguez Estrada y otros, 88 JTS 155, a la página 6506). En el caso ante nos, no se ha probado razón suficiente para que se obvie la secretividad del voto. Si bien la prueba desfilada demostró que hubo "honestas discrepancias" con respecto a la interpretación que el electorado pudiera darle a las instrucciones impartidas, ello no puede dar margen a que se vaya contra uno de los pilares fundamentales de la Ley y reglamentación electoral y sobre todo, contra la pureza e integridad del proceso electoral. No podemos permitir que este derecho constitucionalmente preeminente quede a la merced de interpretaciones individuales que el electorado pueda haberle dado a unas instruc-

ciones, máxime cuando <u>no se probó</u> que los electores fueran <u>inducidos</u> por instrucciones "confusas" de funcionarios electorales. Acceder a lo que nos pide el demandante resucitaría aquel pasado funesto que tanto hemos repudiado.

Restan por considerar dos insinuaciones que arrojan dudas sobre la integridad tanto de los funcionarios electorales en los colegios como la observada por la CEE en el manejo y conteo de estas papeletas.

Durante el inicio del desfile de prueba se trató de probar que las instrucciones "confusas" fueron impartidas por funcionarios del partido PPD como parte de un plan o designio premeditado para defraudar al electorado. La prueba ofrecida demostró lo contrario. El hecho de que las instrucciones en los colegios electorales se dieron indistintamente y de forma alternada por funcionarios del PPD y PNP confirma nuestra conclusión.

En la demanda se señaló que "según nuestra mejor información y creencia, las papeletas con las iniciales del elector fueron preliminarmente contadas, descartadas y arrestadas". Este señalamiento carece de todo mérito. Contrario a las otras papeletas en controversia, i.e., doble marca, arrestadas, y añadidas a mano, que estaban identificadas y agrupadas, este magistrado tuvo que emprender la búsqueda de las papeletas con iniciales de entre decenas de maletines electorales y de entre distintos sobres sellados que de por sí contenían papeletas anuladas por diversas razones. (Véase la T.E. del 8 de agosto de 1989 a las páginas 3–4, 9–10; T.E. del 9 de agosto de 1989 a las páginas 136 y 213–215) Resulta imposible creer lo que insin[ú]a la parte demandante; no se nos ha traído prueba de ello.

Por último, debe distinguirse y dársele trato distinto al voto emitido por las electoras Carmen Socorro López Rivera (Exhibit #190) y Rosa María Márquez Rosado (Exhibit #151). (Véase el Apéndice 2 (17) y (24), respectivamente). De sus testimonios se desprende que ambas estamparon sus iniciales en la papeleta municipal y uno(s) de los funcionarios electorales se percató(aron) del error cometido. Al elector solicitar una nueva papeleta (como en Ley le corresponde–Art. 5.032, Ley Electoral, 16 LPRA 3232),

el funcionario electoral (o los funcionarios electorales), en vez de acceder a lo solicitado, optó(aron) por hacer la salvedad de lo acontecido y adjudicaron el voto de este elector en el colegio. Posteriormente, sin embargo, ambos votos fueron anulados en el Coliseo durante el escrutinio general. Este Tribunal entiende que debe adjudicarse el voto de estas dos electoras; la causa próxima de la anulación de sus votos fue a consecuencia de la negativa de los funcionarios electorales de sus respectivos colegios a proveerles nuevas papeletas.

Por todo lo previamente expuesto conclu[i]mos que la determinación de la CEE debe prevalecer, salvo en lo que a las dos electoras se refiere.

### III
Controversia de la papeleta votada por nominación directa

La parte demandante solicita el que se adjudique a su favor una papeleta municipal (Exhibit #206; Apéndice 3) votada bajo la insignia del PNP y en cuya columna de nominación directa tiene escrito en el espacio para la candidatura a Alcalde a "José Granados del Río" y en los espacios 1, 4 y 14 correspondientes a Asambleístas municipales a Ramón "Pitito" Miranda, Enrique Ferreira y Aida Avalo Collazo, respectivamente. Esta papeleta fue adjudicada por la CEE durante el escrutinio general a favor de "José Granados del Río" (Exhibit #051). Señala el demandante que de dicha papeleta se desprende la intención del elector de votar por José Granados Navedo. La parte demandada, por el contrario, sostiene la decisión de la CEE; en la alternativa, solicita que se anule el voto para la Alcaldía de San Juan por contravenir la Ley Electoral.

La Regla 72 del Reglamento oficial para las elecciones generales de 1988 dispone: "En la adjudicación de una papeleta, el criterio rector que debe prevalecer en la Comisión es respetar al máximo la intención del elector." Nuestra jurisprudencia electoral, a su vez, en innumerables ocasiones se ha hecho eco y partícipe de tal postulado. (Véase el escolio número 12 de esta

Opinión y Sentencia). La interrogante a hacernos ante esta controversia es si de un examen de esta papeleta se puede razonablemente deducir que la intención del elector fue votar por el aquí demandante. Entendemos que ello es así y por lo tanto este voto debe adjudicarse a José Granados Navedo. (Véase la opinión disidente del Hon. Antonio S. Negrón García, Juez Asociado, en Granados Navedo v. Rodríguez Estrada y otros, 89 JTS 63, a las páginas 6946–6947).

El voto en controversia fue emitido en una papeleta municipal ("color amarillo"), marcada bajo la insignia del PNP. Pensar que la intención de este elector fue a los efectos de votar por el Lic. Baltasar Corrada del Río o por Ana María (Ita) Corrada del Río o por un candidato llamado José Granados del Río no nos convence. El primero de los nombrados fue candidato a la gobernación en los pasados comicios, en campaña política que se difundió extensamente a través de todos los medios de comunicación. Los votos por este candidato se emitían en papeletas electorales distintas ("color blanco"). La segunda candidata, pertenece a sexo opuesto y a un partido cuyos ideales son radicalmente opuestos a los que se entienden por "una cruz debajo de la Palma", por lo que haría difícil creer que este elector quisiese votar por ella al escribir "José Granados del Río" en la columna de nominación directa. Por último, no existen ningún otro candidato (o persona conocida) con el nombre de "José Granados del Río".

El nombre escrito en la columna de nominación directa, por otro lado, es cónsono con el nombre y primer apellido del candidato que aquí reclama este voto. Imaginarnos, como insin[ú]a la parte demandada en su alegato, que añadir el apellido del Río en el encasillado significó que el elector quizo escoger a ambos candidatos – José Granados Navedo y Baltasar Corrada del Río – para Alcalde de San Juan, (por éste último haber sido el Alcalde incumbente) nos parece insólito.

Entendemos que el error cometido por este elector no debe invalidar su voto. Su intención y preferencia electoral quedó claramente reflejada en la papeleta. No podemos permitir que una

interpretación literal y restrictiva de los estatutos electorales prive a este votante de su franquicia electoral.

Por todo lo previamente expuesto reiteramos que debe adjudicarse este voto a José Granados Navedo.

## IV

Incidente de los votos añadidos a mano

La controversia ahora ante nos, al igual que la relativa a los incidentes subsiguientes de votos "contaminados" y "arrestados", no es sino el producto directo de la apresurada implantación del procedimiento especial de electores "añadidos a mano"; mecanismo refrendado por el Tribunal Supremo en PNP v. Rodríguez Estrada, 88 JTS 128, (el 20 de octubre de 1988), y puesto en vigor por la CEE el 29 de octubre de 1988 (Exhibit #049), a menos de dos semanas de los comicios. En el breve lapso de 10 días, ya en etapas avanzadas la campaña política y publicitaria y los procesos preparatorios electorales, la CEE y los partidos políticos se vieron precisados a movilizar a miles de funcionarios que trabajarían en el evento electoral y a adiestrarlos en torno a este novel procedimiento.[32] Era inevitable que surgiesen problemas como los que aquí enfrentamos.

Nuestra Ley Electoral señala que "tendrán derecho a votar en la elección general los electores debidamente calificados como tal, que a la fecha de la elección figuren en el Registro General de Electores". (Artículo 5.003, 16 LPRA ss 3203). Como *excepción* a esta norma estatuida, base y garantía fundamental de la puridad eleccionaria, se aprobó el Procedimiento especial de añadidos a

---

[32] Tal parece que el proponer enmiendas a leyes eleccionarias cercano el evento comicial no es ajeno a nuestra historia (PPD v. Admor. Gen. de Elecciones, 111 DPR 199, 213–214 (1981); PSP, PPD, PIP v. Romero Barceló, 110 DPR 248; 263 (1980)); m[á]s bien, ello se ha convertido en peligrosa costumbre. Aunque mediante la aprobación de estas enmiendas se abren las puertas a que un sinnúmero de votantes que de otro modo no hubiesen podido participar en los comicios tomen parte en el mismo, tanto sus propuestas como su aprobación tan próximas al evento eleccionario no deben quedar libre de crítica. Culminan las mismas en la creación de un estado de desasosiego e incertidumbre a través de todos los escalafones del proceso electoral en torno a cuál ha de ser el adecuado funcionamiento del mecanismo.

mano. Mediante dicho mecanismo se viabilizó para que electores que alegaran que tenían derecho a votar, pero que <u>no</u> figurasen en la lista oficial de votación "por error atribuible al organismo electoral" pudiesen emitir su voto. Tuvo como propósito evitar el que el derecho al sufragio de <u>electores capacitados</u> quedara coartado y abrogado a consecuencia de los trámites burocráticos internos de la CEE. Así lo expresó el Hon. Víctor M. Pons Núñez en <u>PNP</u> v. <u>Rodríguez Estrada</u>, 88 JTS 128, a la página 6334, cuando se aprobó dicho procedimiento:

> El trámite administrativo no debe ser obstáculo o barrera que impida a un elector el libre ejercicio del sufragio. Corresponde a los organismos del estado viabilizar al máximo el ejercicio del sufragio, base fundamental de la democracia, y no puede ni debe éste rehuir esa responsabilidad mediante el traslado de parte de la misma al elector. Si se pueden proveer los mecanismos para que aún los electores que no actúen con diligencia puedan votar, existe el deber de proveerlos, siempre y cuando la CEE provea las garantías necesarias para evitar que se conculque la integridad del proceso electoral. Mediante el mecanismo adoptado, a nuestro juicio, se cumple a cabalidad con esa obligación y se proveen las garantías necesarias para mantener la integridad del proceso electoral.
>
> Las especulaciones sobre posibles problemas de trámite técnico burocrático no pueden ser razón para no allanar al máximo el camino para que todos los ciudadanos, que puedan hacerlo, voten. Si se han previsto ya los posibles problemas de esa naturaleza, la responsabilidad que pesa sobre la CEE requiere que ésta tome las medidas necesarias para solucionarlos. Esa es su misión y función.[33]

Atendidas las directrices del Tribunal Supremo para esta controversia, testificaron ante este foro 236 electores que votaron añadidos a mano: 105 testigos – 58 presentados por la parte demandante y 47 por la parte demandada [–] y 131 demandantes

---

[33] Por otro lado, la CEE extendió el plazo del Procedimiento de incluisión por omisión, determinación que fuera aprobada por esa opinión mayoritaria (a la página 6334).

involuntarios(34) – 89 representados por el Lcdo. Bray, 12 por el Lcdo. Sagardía y 30 sin representación legal. Para cada categoría de electores añadidos a mano las partes han esgrimido sendos planteamientos de derecho.

El presente análisis se subdividirá en las distintas categorías de electores. Se expondrán los criterios de derecho que le son aplicables a cada grupo de forma global o particular según sea el caso y se determinará finalmente "cuántos de los electores añadidos a mano que no se les contó su voto tenían derecho a votar por haber sido excluidos por razones atribuibles a la Comisión".

Previo al análisis de cada una de las categorías de electores añadidos a mano, debemos considerar la defensa de prescripción expresada por las representaciones legales de los demandados. Estos alegan que el reclamo de los votantes añadidos a mano que fueron acumulados a este pleito en diciembre de 1989 está prescrito y por ende, este Tribunal carece de jurisdicción sobre ellos. Fundamentan su postura en la naturaleza apremiante de los términos fijados en la Ley Electoral y la finalidad que a través de ella se imprime. El Lcdo. Bray, abogado de la mayor parte de los demandantes involuntarios, se ha opuesto vehementemente a tal solicitud.

El planteamiento de los demandados es tardío y extemporáneo. La prescripción como toda defensa afirmativa debe ser planteada en la contestación a una alegación precedente porque de lo contrario se entenderá renunciada. (Regla 6.3 de Procedimiento Civil). Los demandados esperaron aproximadamente un mes y medio luego de enmendarse la demanda de Francisca L. González Suárez a los efectos de acumular a los demandantes involuntarios a su caso, para hacer tal planteamiento. El mismo no es oportuno y por lo tanto improcedente en este momento.

Además, este foro viene obligado a seguir las directrices de nuestro m[á]s alto Tribunal que nos ordenara la acumulación de

_____

(34) Estos 131 demandantes involuntarios son el producto de los 1280 electores añadidos a mano que se nos ordenara acumular a este pleito (Granados Navedo v. Rodríguez Estrada y otros, 89 JTS 78), en aras de dar a estos votantes la oportunidad de ser oídos y a su vez, evitar la proliferación de pleitos e imprimir finalidad al presente litigio.

los demandantes involuntarios y el escuchar toda la prueba que a bien tuvieran ofrecer.

## A. Electores excluidos por domicilio y otras razones (ER y ED)

De entrada debemos resolver si el mecanismo especial de añadidos a mano estaba disponible en las elecciones de 1988 para aquellas personas excluidas de las listas electorales por razón de domicilio. Por las razones que expondremos a continuación, resolvemos esta interrogante en la negativa.

El inciso II del Procedimiento especial de añadidos a mano particulariza qué electores tenían acceso a votar mediante el mismo.[35] De este inciso se desprende clara e indiscutiblemente que todo aquel elector excluido de las listas por razón de domicilio, edad, ciudadanía, doble inscripción o por no ser la persona que dice ser, *no* tenía a su alcance el procedimiento de votar añadido a mano. Como *excepción* a la *excepción*, únicamente los votantes excluidos por domicilio (ER) que presentaran orden certificada del Tribunal ordenando su inclusión a las listas oficiales, tendrían a su disposición este mecanismo, permitiéndoseles así ejercer su derecho al voto.

Es patente que nuestro m[á]s alto Tribunal nunca pretendió extender los beneficios de este procedimiento a los electores excluidos arriba mencionados. Desde la aprobación del mismo, el Hon. Peter Ortiz, en opinión concurrente y disidente (por otras razones), sintetizó que:

---

[35] Personas con derecho a votar añadidos a mano mediante este procedimiento:
Podrán votar añadidos a mano, en el último colegio de cada unidad, los electores que se presenten a votar y reclamen que no han sido incluidos en las listas electorales del precinto y unidad en que tienen su domicilio por error atribuible a la CEE. Disponiéndose que para poder votar tiene que poseer y entregar su tarjeta de identificación electoral y no figurar en la lista de electores excluidos por domicilio, edad, ciudadanía, doble inscripción, o por no ser la persona que dice ser.
Los electores excluidos por domicilio que figuren en el listado de excluidos que presenten una orden de un Tribunal de Justicia resolviendo el caso a favor del elector y ordenando la inclusión del nombre del elector en las listas de votación, serán los únicos excluidos por domicilio con derecho a votar por este procedimiento. Disponiéndose que el elector tendrá que presentar y entregar tanto la tarjeta de identificación electoral como la Orden del Tribunal debidamente sellada. (Énfasis suplido).

Los que han sido excluidos de las listas electorales por las causas y el procedimiento establecido para ello, Art. 2.023 de la Ley, 16 L.P.R.A. 3073,(36) no pueden acogerse a dicho procedimiento para revisar las determinaciones finales. (88 JTS 128, a la página 6343; subrayado nuestro).

El que electores excluidos de las listas por los motivos expuestos en el Artículo 2.023, en específico por domicilio, votaran añadidos a mano, tampoco fue la intención de los proponentes de dicho mecanismo en el seno de la CEE. A esos efectos el testimonio del Lcdo. Eudaldo Báez Galib, Comisionado del PPD, fue esclarecedor:

Lcdo. Rey: ". . .usted quiere explicarnos, qué cosa es error atribuíble a la Comisión en el contexto de esa propuesta?"

Lcdo. Báez Galib: "Eso se discutió ampliamente en la reunión donde hubo la votación, en la Comisión Estatal de Elecciones."

"Es el Comisionado Meléndez el que hace la explicación amplia, donde claramente explica qué son errores cometidos por la Comisión y da ejemplos. Como la persona que va y se inscribe en la Junta de Inscripción Permanente y esa inscripción no es procesada por la Comisión. O la persona que hace una gestión electoral y no se cumple con la gestión electoral."

P "Y le voy a pedir que nos indique, si según el Reglamento, estaban autorizados a votar añadidos a mano los electores excluidos por residencia.

R "No estaban autorizados, ni nunca se contempló.

P "Durante las deliberaciones de la Comisión para aprobar la Enmienda que luego fue refrendada por el Tribunal Supremo, se trató en

---

(36) Dispone que:

"Para que se proceda a la eliminación de un elector que aparezca en la lista de peticiones de inscripción, deberá presentarse ante el Presidente de la Comisión Local de Elecciones una solicitud de exclusión de dicho elector, por uno o más de los siguientes fundamentos:

"(a) Que el elector no es ciudadano de los Estados Unidos de América.

"(b) Que el elector no está domiciliado en la dirección señalada en su petición a la fecha de inscripción, ni en el momento de la recusación.

"(c) Que el elector no ha cumplido 18 años y no habrá de cumplirlos en o antes del día de las siguientes elecciones generales.

"(d) Que el elector haya fallecido o que no es la persona que alega ser en su petición de inscripción.

"(e) Que el elector ha sido declarado incapacitado judicialmente.

"(f) Que el elector aparece inscrito más de una vez en las listas electorales."

algún momento el caso de los electores excluidos por residencia, como un caso de electores que hubieran sido excluídos por error de la Comisión?

R "No. El excluido por residencia pertenece a un procedimiento establecido por la Comisión, sobre el cual yo podría abundar mas tarde si desea, y este procedimiento ...

P "Ese procedimiento es establecido por la Comisión o es establecido por Ley?

R "Lo establece la Ley, pero la Comisión lo reglamenta, por unos problemas que existieron en el "84 y en el "80.

"Pero en torno al añadido a mano y es claro así y se discutió y me refiero a las memorias de ese día cuando se discutió, es exclusivamente para errores que comete la Comisión en el descargo de su función de tener a los electores en las listas." (T.E. del 4 de enero de 1990, a la página 91 y ss; subrayado nuestro).

Véase también el testimonio de Gladys de Armas de González, funcionaria del Precinto 002 Unidad 009 de San Juan y la estipulación del testimonio de funcionarios de los P001 U017; P002 U008/009/014; P003 U012/031; P004 U004/017; P005 U001/020/ 022/024; P104 U006/007, que estuvieron encargados de impartir autorizaciones para votar añadido a mano mas no le expidieron las mismas a electores excluidos por domicilio, salvo aquellos que produjeran orden judicial que les permitiera votar añadidos a las listas. (TE del 4 de enero de 1990 a la página 116 y ss; véase además el testimonio de la Sra. Quiñones Pizarro, funcionaria por el PNP para el P004 U030 C008, colegio "contaminado" y "arrestado" de Nemesio Canales, quien al explicar sobre ciertas tachaduras habidas en las listas de su colegio declaró:

"porque las tachaduras de uno de los electores es que aparentemente se empezó a incluir y nos dimos cuenta de que estaba en la lista de excluido, y por esa razón, ese elector no votó..."

Ciertamente este mecanismo especial fue uno de acceso limitado y accesible únicamente a los electores en él descritos y especificados. El procedimiento no estaba disponible a la categoría de electores excluidos por residencia u otras razones. No es este mecanismo sustitutivo de aquellos procedimientos taxativos que oportunamente, previo a los comicios, debió efectuar el

elector excluido. Tampoco es éste el mecanismo mediante el cual estos electores puedan ahora "apelar" determinaciones de la CEE en torno a su derecho a votar. Para ello tenían otros procedimientos reglamentados en ley. (Véase el Reglamento de Recusaciones y Exclusiones, 2.1 y ss; Exhibit #887). Máxime cuando hubo una previa campaña publicitaria a través de los distintos medios noticiosos (radio, prensa y televisión) encaminada a orientar al electorado con problemas a visitar la Junta de Inscripción Permanente (JIP). (Exhibits # 202, 203, 205, 207 y 377). Se publicaron además edictos en periódicos de circulación general que alertaban al electorado que aparecía en esas listas de hacer determinadas gestiones a tiempo porque de lo contrario corrían el peligro de perder su derecho al voto. (Exhibits #198–201).

Se sugiere por la representación legal de los demandantes involuntarios que la autorización expedida por una Subjunta de Unidad o Colegio "establece una presunción de que el elector tiene derecho a votar utilizando el procedimiento" de añadidos a mano. Si bien los funcionarios electorales de las referidas subjuntas expidieron incorrectamente autorizaciones para votar como añadidos a mano a personas que no tenían acceso a este mecanismo y crearon por tal acto falsas expectativas en el electorado, ello no da margen a que se presuma que todo elector al que se le expidió una autorización tenía derecho a votar añadido a mano. ("Son nulos los actos ejecutados contra lo dispuesto en la ley..." Artículo 4 del Código Civil). Estos funcionarios no tenían facultad para abrogar la clara letra de este procedimiento especial.

Por los motivos previamente expuestos se determina que los votantes excluidos por residencia enumerados en el Apéndice 4(A) de esta opinión y sentencia, quienes no produjeron orden judicial, no tenían a su alcance votar mediante el mecanismo de añadidos a mano ni podían por razón del mismo cuestionar su status

electoral. Por ende, actuó correctamente la CEE al no adjudicar estos votos. Desestimamos sus reclamaciones.(37a)

Ante la preocupación(37b) de privar de su franquicia electoral a un ciudadano que a pesar de su status ER hubiese hecho gestiones afirmativas y oportunas ante la CEE en aras de advenir elector capacitado, pero que "por error atribuible al organismo electoral" no se incorporó a las listas, el tribunal cotejó <u>todos</u> los expedientes electorales de estas personas. Existen nueve electores en tales circunstancias. Todos ellos son electores hábiles y deben adjudicarse sus votos. Veamos:

Unos quedaron excluidos a consecuencia de la proximidad en fechas entre sus solicitudes ante la CEE y los procedimientos de recusación ya comenzados ante la JIP o Comisiones locales. ("Este trámite administrativo no debe ser obstáculo o barrera que impida a un elector el libre ejercicio del sufragio." ... (<u>PNP</u> v. <u>Rodríguez Estrada</u>, 88 JTS 128, a la página 6334). Otros quedaron excluidos debido a que formularon el documento incorrecto o a[u]n formulando el documento correcto, éste no se procesó en tiempo por el organismo electoral. Ello no es motivo suficiente como para que se confisque el voto de estos electores; no se les puede penalizar ni por ineficiencias en la CEE ni por errores de forma cometidos por funcionarios electorales— personas con

---

(37a) El escuchar el testimonio de estos 90 demandantes involuntarios y tener que analizar la prueba documental en torno a los mismos consumieron preciado tiempo y recursos del tribunal. La clara letra de la ley impedía el que electores ER tuvieran acceso al procedimiento de añadidos a mano. (Véase el Apéndice 4(A)). A[u]n así la representación legal de 59 de estos demandantes involuntarios obstinadamente los produjo ante este foro, reteniendo la teoría legal sobre los mismos hasta el final del presente litigio. Distínguese la naturaleza de los reclamos presentados por el Lcdo. Bray de los presentados por el Lcdo. Canals. Los actos del primero estuvieron al margen de una violación de la Regla 9 de las de Procedimiento Civil, conducta merecedora de imposiciones de sanciones al abogado.

(37b) Pregunta del Lcdo. Bray:

P. ¿Y si dentro de ese período que dice el Reglamento, un elector va a una Junta de Inscripción Permanente y lleva un documento de inscripción especial y esa inscripción no se procesa, con el resultado de que ese elector cuando va a votar no aparece en las listas, eso es un error? En el supuesto de que ocurriese como yo lo he narrado, <u>eso es un error atribuible a la Comisión?</u>

Respuesta del Comisionado Báez Galib:

R. Podría ser.

(TE del 4 de enero de 1990 a las páginas 107–108). (Véase además la cita previa del Hon. Peter Ortiz cuya posible interpretación no excluye esta postura).

conocimiento especializado de los trámites a efectuarse. (PPD v. Admor. Gen. de Elecciones, supra a las páginas 246–247). Erró la CEE al no adjudicar estos votos. Veamos los casos específicos:

Soto Soto, Sotero, Exhibit #083, status ER: Consta en su expediente electoral una Solicitud de cambios en el Registro (reubicación) fechada el 17 de mayo de 1988 y una Recusación del 10 de mayo de 1988 con diligenciamiento negativo el 19 de mayo de 1988. (Es de notar que la presentación de este testigo por la parte demandada es contraria a la postura que asumiera posteriormente en torno a los electores excluidos por residencia).

Benítez Rivera, Emilio, Exhibit #109, status ER: Fue recusado el 28 de mayo de 1988, gestionó una Solicitud de cambios en el Registro (transferencia) el 8 de julio de 1988, fecha en que se le expidió la TIE con la cual votó.

Santiago Nazario, José A., Exhibit #115, status ER: Tramitó una Solicitud de cambios en el Registro (cambio de foto y corrección de datos) el 17 de junio de 1988, fecha en la que se le expidió la TIE con la cual votó. Consta en su expediente un documento titulado "Informe de inclusiones de electores que aparecen excluidos teniendo una corrección de datos en la dirección" fechado el 19 de septiembre de 1988, que demuestra que la solicitud del Sr. Santiago fue acogida favorablemente.

González Curet, José A., Exhibit #117, status ER: Consta una Resolución del Tribunal de Distrito (Hon. José Mendoza Vidal) (Civil Núm. R.A. 88–204) del 4 de noviembre de 1988 mediante la cual se anuló el procedimiento de recusación efectuado en contra de este votante. A consecuencia de tal decisión se le cumplimentó una Petición de Inscripción como elector el 5 de noviembre de 1988 y se le expidió allí la TIE (3291104) con la cual votó. Cabe destacar que el número electoral que aparece en de la resolución al hacer referencia al Sr. González Curet no le corresponde a este votante.

Guzmán Ocasio, Enrique, Exhibit #119, status ER: Tramitó una Solicitud de cambios en el Registro (corrección de datos y cambio de foto) el 25 de junio de 1988 que fue acogida favorablemente por la CEE el 6 de octubre de 1988: Informe de inclusiones de electores que aparecen excluidos teniendo corrección de datos en la dirección. Existe, además, un impreso de computador de la CEE con fecha posterior (09-dic.-88) que cataloga al Sr. Guzmán con un status de A1.

Irizarry Sorrentini, Rosa, Exhibit #262, status ER: Tramitó una Solicitud de cambios en el Registro (corrección de nombre y datos y cambio de

foto) el 6 de febrero de 1988. Posterior a ello, fue recusada en su dirección antigua y no en la que consta en su solicitud de cambios.

Negrón Miranda, Petronila, Exhibit #269, status ER: Efectuó una Petición de inscripción el 19 de septiembre de 1988 (presumiblemente), fecha en la que se le expidió la TIE (3284693) con la cual votó.

Nazario Maldonado, Brenda., Exhibit #318, status ER: Existe una Solicitud de inclusión por omisión con fecha del 26 de octubre de 1988 y una Petición de inscripción del 4 de noviembre de 1988, fecha en que se le expidió la TIE (3257763) con la cual votó.

Díaz del Toro, Gustavo, Exhibit #888, status ER y A1: Este elector posee dos TIE; la primera (005926) perforada en el núm. 2 y expedida en fecha posterior (2 de septiembre de 1984). Tiene un status de A1. Inadvertidamente, este votante usó su tarjeta vieja (status ER) para las pasadas elecciones, en vez de usar la TIE con la cual tenía un status de elector capacitado. No le podemos sancionar por ello.[38]

De igual forma hay tres electores que quedaron excluidos de las listas electorales por razón de duplicidad a pesar de que efectuaron trámites oportunos ante la CEE en aras de advenir electores capacitados para los comicios de 1988. Conforme a la sección 2.11 del Reglamento de Recusaciones y Exclusiones (Exhibit #887):

> Si se sostiene que la recusación es procedente, el Presidente de la Comisión Local ordenará la exclusión del nombre del elector de la lista de inscripción o del Registro General de Electores, según sea el caso, excepto cuando la recusación se base en que el elector aparece inscrito más de un vez en las listas electorales de un mismo precinto, cuyo caso subsistirá el récord contra el cual se haya realizado la transacción más reciente. (Enfasis suplido).

Ello no se hizo en la situación de estos tres votantes, omisión del organismo electoral que redundó en que estas personas

---

[38] Esta situación demuestra que el expedir números diferentes al votante cada vez que hace una nueva Petición de inscripción da base para la comisión de fraude electoral.

Si bien la TIE se promulgó como salvaguarda contra el fraude, tal propósito se frust[r]a cuando a determinado elector se le expiden varias tarjetas de identificación con números distintos. Ello unido al hecho de que no se le exige al elector la entrega de su TIE vieja al expedirle una nueva conduce a situaciones como la presente. Tales incidentes se evitarían si al electorado se le asignara un número de identificación único que subsista para toda transacción electoral posterior, aun una nueva Petición de inscripción.

quedaran excluidas de las listas electorales. Erró la CEE al no adjudicar los votos de estos electores hábiles:

Medero Concepción, Wilfredo, Exhibit #067, status ED y A4: El 27 de octubre de 1988 gestionó una Solicitud de inclusión por omisión que culminó en que el 1ro de noviembre de 1988 la CEE le incluyera como elector capacitado para votar. EL 2 de noviembre gestionó una Petición de inscripción y allí se le expidió la TIE con la cual votó. Existen 2 impresos de computador, uno para el número anterior que le asigna un status de ED y otro para número con el que votó (que es el que debe subsistir) que le da un status de A4.

García Rojas, Iris M., Exhibit #097, status A4 y ED: Tiene dos números electorales. Para el primero (2181217) posee dos impresos del computador-uno (6 de septiembre de 1989) que la cataloga A4 y otro (25 de noviembre de 1988) que la cataloga I1. Para el segundo número (2108635) la Sra. García tiene un status de ED. Bajo este segundo número la electora tramitó una Petición de inscripción especial (cambio de dirección y foto) el 19 de septiembre de 1988, fecha en que se le expidió la TIE con la cual votó. Este segundo número es el que debe subsistir.

Morales Rodríguez, Angel J., Exhibit #102, status I1 y ED: Tiene dos números electorales. El primero de ellos –0978457– a nombre de Angel Javier Morales Rodríguez, fue producto de una Petición de inscripción que tramitara el 1ro de agosto de 1975; para este número posee un status ED. El segundo de los números electorales – 0978554 – a nombre de Angel J. Morales Rodríguez fue producto de una segunda Petición de inscripción que tramitara 4 días después – el 5 de agosto de 1987. El testimonio del Sr. Morales no arrojó luz en torno a por qué hizo 2 inscripciones electorales en tan breve lapso. Para este segundo número posee un status de I1. Testificó haberse mudado de Ponce a Bayamón en el 1982 y de Bayamón a su actual residencia en Río Piedras en el 1987. Fue a consecuencia de dichas mudanzas que efectuó una Solicitud de cambio en el registro (Transferencia y cambio de foto) bajo el número 0978554 (I1), en esa misma fecha le expidieron otra TIE con el mismo núm. (0978554) y con la cual votó en estas elecciones. Subsiste este segundo número electoral. No se puede penalizar al elector porque el funcionario que le atendiera en el 1987 erróneamente no le proveyera los documentos correctos, i.e., Petición de inscripción especial, para eliminar su status de inactivo. (PPD v. Admor. Gen. de Elecciones, supra, a la página 246–247).

## B. Electores no recusados o que dejaron de suscribir declaración jurada

La representación legal de los demandantes involuntarios sostiene que la omisión de los funcionarios electorales de cumplimentar la recusación en el sobre especial de añadidos a mano, al igual que la omisión del elector de suscribir la declaración jurada en el mismo, convalidan ipso facto el voto del elector. Fundamenta su postura al crear un paralelismo entre el procedimiento de recusación aquí habido y el de recusación de carácter general previsto por el Artículo 5.031 [39] de la Ley Electoral. Concluye que uno y otro son idénticos y ambos de estricto cumplimiento. Los demadados, por su parte, argumentan que las recusaciones en ambos procedimientos son distinguibles, por ser el mecanismo de añadidos a mano uno "sui generis".

En vista de lo expuesto por las partes, debemos armonizar este último procedimiento con otras disposiciones relacionadas en la Ley Electoral vigente, y comparar ambos mecanismos en aras de llegar a una interpretación lógica, justa y razonable.

La recusación comprendida en el Artículo 5.031 permite que el mismo día de las elecciones un ciudadano pueda ser recusado por

---

[39] Dispone que:

Todo elector o inspector que tuviere motivos fundados para creer que una persona que se presente a votar lo hace ilegalmente por razón de no ser la persona que dice ser, haber votado en otro colegio, estar inscrito en más de un colegio, tener una orden de exclusión en su contra, estar pendiente de adjudicación su derecho a votar en ese precinto, no ser ciudadano de los Estados Unidos de América y no tener la edad para votar, podrá recusar su voto por los motivos que lo hicieren ilegal a virtud de las disposiciones de este Subtítulo, pero dicha recusación no impedirá que el elector emita su voto. En el caso de recusación por edad, será deber del recusador traer consigo, y entregar a la Junta de Colegio, un certificado de nacimiento o acta negativa que indique la ausencia de edad para votar de dicho elector.

En el caso de la recusación por ausencia de ciudadanía será necesario que el recusador tenga consigo y entregue a la Junta de Colegio una Certificación del organismo competente indicando que el recusado no es ciudadano de los Estados Unidos de América.

Las papeletas de todo elector cuyo voto se recuse deberán marcarse al dorso con la palabra "recusado", seguida de una breve anotación firmada por la persona o el inspector del colegio que hace la misma, exponiendo la razón de tal recusación, el número de Tarjeta de Identificación Electoral de la persona afectada, el municipio, precinto y número de colegio electoral. Si el elector recusado niega su recusación, deberá hacerlo bajo su firma y juramento al dorso de las papeletas, pero si no la negare su voto no se contará y será nulo. La Comisión enviará a cada Colegio de Votación un modelo de Votación, cómo cumplimentar una recusación.

un funcionario electoral u otra persona por razón de no ser elector hábil. A este elector le prote[g]e una presunción de votante idóneo y capacitado hasta ese preciso momento en que su status es puesto en entredicho. Por la naturaleza momentánea de esta recusación se exige que ésta sea por escrito, esté firmada por el recusador y se exponga la causal por la cual se impugna al votante y se acompañe de documentación que fundamente la causal escogida. La Ley Electoral, a su vez, exige que el elector, ante ese cuadro fáctico, niegue bajo su firma y juramento lo expuesto por el recusador. La omisión de hacerlo culminaría en la nulidad de su voto. Del elector seguir los pasos indicados votaría, m[a]s perdería mediante tal acto la secretividad del voto y la validez del mismo quedaría sujeta a la adjudicación final que la CEE hiciera. Así, reiteradamente se ha dicho que:

> Considerada la naturaleza fundamental del derecho al voto y el hecho de que la recusación ha de permitir que se conozca cómo vota el elector recusado, las disposiciones de ley que permiten y reglamentan la recusación, tanto en cuanto a los fundamentos en que pueda basarse como en cuanto al procedimiento para ello, deben ser de estricto cumplimiento. Solamente así puede cumplirse la obligación constitucional de garantizar el derecho al sufragio 'universal, igual, directo y secreto', y de proteger al ciudadano 'contra toda coacción en el ejercicio de la prerrogativa electoral': Constitución, Art. II, Sec. 2".

PPD v. Admor. Gen. de Elecciones, supra, a la página 227. (Subrayado nuestro).

Al reflexionar sobre la importancia y consecuencia de la recusación en el procedimiento especial de añadidos a mano vemos que ni los propósitos ni los efectos de ésta se pueden equiparar a los subyacentes en el Artículo 5.031. Contrario a los electores previamente aludidos, las personas que votaron mediante este mecanismo especial les acompañaba una presunción de votantes no hábiles, por haber sido excluidos de las listas electorales previo al

día de las elecciones. Advinieron electores inhábiles[40] a conse-
cuencia de la depuración que se hiciera del Registro del Cuerpo
Electoral y listas de votantes posterior a los comicios de 1980 y
1984.[41] La recusación que aquí ocurre, por lo tanto, no pone en
entredicho ni controvierte la presunción de elector hábil de la
persona que iba a emitir su voto añadido a mano, ya que a ésta no
le acompañaba la presunción en ese momento. De igual modo, la
recusación mediante este mecanisno no tenía la indeseable con-
secuencia de violar la secretividad del voto como sucedía con la
recusación del Artículo 5.031; razón que a su vez contribuía a que
ese articulado exigiese un estricto cumplimiento de los pasos a
seguir. En el procedimiento especial de añadidos a mano la
secretividad del voto se salvaguardó a todo lo largo del escrutinio
general, en todo momento, y hasta sus últimas consecuencias–
fuere adjudicar o descalificar el voto emitido. El fundamento de la
recusación bajo el Artículo 5.031 se desconocía por el elector
previo al acto de votar en el colegio electoral; por ello debía de
exponerse la razón y firmarse allí por el recusador. Obsérvese, a
su vez, que el efecto de recusar viciosamente por el Artículo 5.031

---

[40] Convenimos plenamente con lo expuesto por el Hon. Antonio S. Negrón García
en su disenso:

Se imponen unas expresiones en materia probatoria. La ausencia ("no existe récord")
del nombre de un ciudadano en los impresos del terminal del computador ("printout") y
demás records de la Comisión Estatal, establece la presunción de que no es un elector
cualificado. Igualmente ocurre cuando los récords arrojan un status (elector inactivo), o
cuando no existe evidencia de que se hubiese gestionado una transferencia de precinto o
reubicación de unidad electoral. Definitivamente, el computador genera evidencia suscep-
tible de utilizarse para probar que ocurrió determinado evento, como la inscripción,
transferencia del elector, o solicitud para que se le reactivara o excluyera por recusación u
otras razones. También puede considerarse como prueba de que no ocurrió el evento.
Regla 65, (H), (F) y (Y) de Evidencia, – Records e Informes Oficiales: Records del Negocio
o Actividad, y Ausencia de Récord Público–.

Establecido así el hecho básico de no aparecer en los impresos de los terminales del
computador ("no existe récord"), o como elector inactivo o inscrito en otro lugar, sería
mandatorio inferir que no era un elector cualificado. Ahora bien, estas presunciones son
controvertibles. Puede presentarse evidencia – como se hizo en el caso de autos – para
refutar rebatir ese hecho presumido. Esa evidencia tendría el efecto de evitar que el
juzgador hiciera tal inferencia, –E. Chiesa, ob. cit., págs. 39–48– e inclusive, probar sus
cualificaciones como elector con derecho a votar. (Granados Navedo... v. Rodríguez
Estrada, supra, a la página 6935; énfasis suplido)
[41] Ello responde al principio rector en toda democracia de que tengan acceso a las
urnas electorales votantes debidamente capacitados; así se evita el fraude y se salvaguarda
la pureza electoral.

exponía al recusador a las sanciones provistas por el Artículo 8.025 de la Ley Electoral.[42] No así la provista por el procedimiento de añadidos a mano, ya que de las propias listas y documentos ante la CEE se desprendía la incapacidad del elector que pretendiera usar el mecanismo. Por todo ello, la omisión de formular dicha recusación en este procedimiento era inconsecuente y superflua.[43] Ciertamente la inhabilidad de estos electores no se subsanó con la omisión del funcionario de recursarlo, acto que era una mera formalidad.

A contrario sensu, la omisión del votante de firmar la declaración jurada al reverso del sobre especial de añadidos a mano, tuvo fatales e inevitables consecuencias para la adjudicación del voto del elector. Es la declaración jurada el primer paso que da el votante para que el mecanismo de añadidos a mano entre en vigor y le cobije. Mediante tal juramento y bajo apercibimiento de ser procesado criminalmente (condena y multa) por votar sin derecho a ello, el jurante declara que:

1. es un elector con derecho a votar.

2. su nombre ha sido excluido de las listas por error (u omisión) atribuible al organismo electoral.

3. no ha votado con anterioridad a dicho momento en estas elecciones generales ni en voto adelantado, voto ausente, ni en

---

[42] Dispone que:

Será sancionada con pena de reclusión por un término mínimo de un (1) mes y máximo de seis (6) meses, o multa mínima de cien (100) dólares y máxima de quinientos (500) dólares, toda persona que:

(a.) Por medio de violencia, intimidación, abuso de autoridad, engaño o cualquier actuación ilegal, entorpeciere o impidiere, pretendiere o influyere a variar o impedir el voto de un elector capacitado, o que ofreciere o recibiere soborno u ofrecimiento económico para abstener, entorpecer, impedir influenciar o variar ese voto.

[43] Para efectos de estos electores añadidos a mano y los derecho que a éstos le cobijan, nuestro m[á]s alto Tribunal expresó en Granados Navedo v. Rodríguez Estrada..., 89 JTS 63, a la página 6886: "en ningún momento se contempló concederle a estos electores la gama de derechos estatutarios y jurisprudenciales antes señalados. En todo momento se trató y consideró como un procedimiento sui géneris." (Subrayado nuestro) . . . "De su texto surge que nos estábamos refiriendo al derecho sustantivo aplicable. No estábamos, por no estar planteado y por ser prematuro, fijando pautas sobre el procedimiento a seguir."

Aun así, se le dieron a estos electores garantías y oportunidades procesales; la publicación de edictos en noviembre pasado les permitió acudir a este pleito para oír argumentos en favor de que eran electores hábiles y que debía adjudicarse su voto.

ningún colegio electoral en Puerto Rico ni que tampoco habrá de hacerlo con posterioridad a dicho momento para ningún cargo electivo durante el día 8 de noviembre de 1988.

De hecho, tan significativa era la declaración jurada en este procedimiento que sin tal alegación, el elector no hubiera podido emitir su voto de ningún otro modo. Al elector se le permitió votar porque mediante juramento controvertía su status de inhábil y le imputaba tal error a la CEE. Los electores a continuación no firmaron dicha declaración jurada,[44] en consecuencia, sus votos no deben adjudicarse en una forma u otra:

1. Sánchez Alicea, Hilda E. Exhibit #080
2. Otero Martínez, Gladys " #123
3. López Malavet, Hilda " #250
4. Torres Heredia, Ada N. " #254
5. Pantojas Betances, Eduardo " #298
6. Ortiz Vázquez, Gloria " #314
7. Hernández Rodríguez, Olga " #367

(Véase la opinión disidente del Hon. Antonio S. Negrón García en este aspecto; omitimos la cita precisa para no divulgar la preferencia electoral de estos ciudadanos).

## C. Electores inactivos

Al atender el reclamo de estos electores, debemos determinar a base de la prueba testifical y documental desfilada en torno a los mismos, si obró correctamente la CEE al no adjudicar sus votos o, si por el contrario, la prueba presentada ante este foro controvirtió la presunción de corrección que cobija a este organismo electoral y, en consecuencia, se trata de electores hábiles con derecho a que su voto se adjudique.

En atención al interés apremiante de que todo comicio quede libre de fraude, la Ley Electoral ha pautado requisitos mínimos con los cuales debe cumplir el ciudadano que pretenda tomar parte en el proceso eleccionario. Así, el Artículo 2.002, 16 LPRA ss

---

(44) Cabe señalar que la situación de estos electores es distinta a la de aquellos que no formularon declaración jurada porque la misma no estaba impresa en el sobre utilizado para depositar sus papeletas o no se les proveyó formulario al efecto.

3052, establece que: "Toda persona que reuna las condiciones para ser elector y que interese ejercitar sus derechos electorales tiene la obligación de inscribirse y adquirir una tarjeta de identificación electoral conforme a lo dispuesto en esta ley...". La jurisprudencia, a su vez, ha reconocido el poder inherente del Estado para imponer requisitos razonables y necesarios al electorado; su único límite ha sido el que "no impongan al elector condiciones de difícil cumplimiento o exigencias que menoscaben su derecho al voto o desalienten su ejercicio."(45) (Enfasis suplido).

A tenor con lo anterior, la CEE tiene la obligación y la encomienda de procurar que en todo momento se den "unas garantías de pureza procesal capaces de contar cada voto en forma y manera en que sea emitido." (Declaración de propósitos de la Ley Electoral). El Artículo 2.012 de la Ley Electoral(46) es una de las disposiciones que responde a tal exigencia. Conforme a dicho artículo, se da un procedimiento de depuración de las listas electorales posterior a todo evento electoral. Mediante esta depuración, posterior si el nombre de un votante estaba impreso en las listas electorales, pero el encasillado correspondiente a su firma estaba en blanco (por no haberse firmado) o tenía escrito "no votó" por el funcionario electoral, dicho nombre se excluía del Registro del Cuerpo Electoral y posteriormente el elector recibía un status de inactivo. (Véase el testimonio de la Sra. Frances Miranda Amadeo, Supervisora del área de control en la oficina de sistemas de información y procesamiento electrónico de la CEE, TE del 27 de septiembre de 1989 a la página 116 y ss). Los

---

(45) En PPD v. Admor. Gen. Elecciones, supra, a las páginas 240–241, Ortiz Angleró v. Barreto Pérez, 110 DPR 84 (1980).

(46) La Comisión organizará un Registro del Cuerpo Electoral de Puerto Rico contentivo de todas las inscripciones de los electores. Dicho Registro deberá mantenerse en forma tal que pueda determinarse, veraz y prontamente, la información consignadas en el mismo, así como toda otra información relacionada necesaria para la implementación (sic) de esta Ley.

Los datos contenidos en el Registro se mantendrán, en todo momento, actualizados en cuanto a circunstancias modificatorias de cualquier inscripción.

Todas las listas de electores con derecho a votar en una elección se preparan tomando como base tal Registro.

Si un elector dejare de votar en una elección general su nombre será excluido de las listas electorales... (Subrayado nuestro).

electores que nos ocupan caen bajo dos categorías: (1) los que tienen un status de inactivo 1 (I1) – elector inactivo antes de la depuración de listas de 1984 (no votó en 1980) y (2) los que tienen un status de inactivo 2 (I2) – elector inactivo en la depuración de listas de 1984 (no votó en 1984). (Véase el Exhibit #858 – Relación de códigos utilizados por OSIPE para identificación de datos después de la conversión de datos).

El elector excluido de las listas por razón de "inactivo" debía hacer gestiones ante la CEE previo a las subsiguientes elecciones, ya fuere para cumplimentar una Solicitud de inscripción especial o acogerse al Procedimiento de inclusión por omisión.[47] Conforme a la Regla 21 del Reglamento Oficial, el votante podía gestionar una inscripción especial hasta el 19 de septiembre de 1988 (Artículo 2.16, 16 LPRA ss 3066). El procedimiento de inclusión por omisión, a su vez, estuvo disponible al electorado hasta el 4 de noviembre de 1988. Se dio amplia oportunidad a estos votantes para reactivar su status de no hábiles. La campaña publicitaria habida antes de los pasados comicios, por otro lado, fue orientada a despertar la conciencia en la ciudadanía en torno a su status electoral y ponerles sobre aviso de las funestas consecuencias de su inacción. (Exhibits # 202, 203, 205, 207 y 377; véanse además los Exhibits # 198, 199, 200, 201 constitutivos de los edictos publicados por la CEE).

---

[47] El Exhibit #364, Manual de Procedimiento para las Comisiones Locales y Juntas de Inscripción Permanente, diciembre de 1986, define en su Artículo 1.3 estos conceptos:

15. "Inscripción Especial" significará el procedimiento para inscribir a todos aquellos electores que aparecen inactivos en el registro electoral. Esta transacción está incluida en el formulario "Solicitud de Cambios en el Registro".

29. "Solicitud de Inclusión en las Listas Electorales, o apelación" significará el formulario oficial que se utiliza para solicitar la inclusión de un persona que habiéndose inscrito, no aparece en el registro electoral o que habiendo estado debidamente inscrito, en el registro de momento no aparece, o que habiendo solicitado su transferencia o reubicación ésta no se ha efectuado. La Solicitud puede ser radicada por el propio elector o debidamente autorizada por el elector, partido político, miembro de la junta de Inscripción Permanente o miembro de la Comisión Local. También puede ser utilizada para solicitar revisión en casos de electores cuya exclusión ha sido ordenada por una Comisión Local, en cuyo caso la solicitud se convierte en una apelación ante la Comsión Estatal, o ante un Tribunal, según sea el caso.

Para ambas categorías de electores inactivos se ofreció evidencia cuyo peso y valor probatorio cubrió toda la gama de gradaciones, indistintamente de si los votantes estaban situados ante hechos y categorías similares o no. El presente análisis se subdividirá conforme a la evidencia presentada en apoyo del derecho al voto de sus testigos o representados.

Previo a este análisis, debemos hacer unos señalamientos en torno al peso evidenciario de una de las piezas ofrecidas por las partes a todo lo largo del incidente de añadidos a mano, pero que atañe en mayor grado al caso particular de los inactivos – la tarjeta de identificación electoral (TIE). Se ha intentado dar carácter de <u>prueba irrefutable</u> el que la TIE perforada para determinado evento electoral refleja <u>incontrovertidamente</u> el que el elector participó en esos comicios. Se observará que la postura asumida por las partes demandantes es una distorsión del disenso del Hon. Antonio S. Negrón García en el caso ante nos, quien señalara a la página 6936:

> ...la presentación de la tarjeta de identificación electoral, debidamente perforada en los espacios correspondientes a las elecciones de 1980 y 1984, es incompatible con una clasificación de elector inactivo I1 ó I2, basada supuestamente en no haber dicho elector votado en esos años...

> ...En síntesis, aunque la posesión de la tarjeta de identificación electoral no da necesariamente derecho a votar, sí es evidencia *prima facie* de que su poseedor goza de esa capacidad y que ha ejercido ese derecho en determinados eventos comiciales. (Énfasis suplido)

La prueba desfilada en sala refuta el valor probatorio inatacable de la TIE. La accesibilidad en el mercado de perforadores con diseños idénticos a los utilizados en pasados comicios al bajo costo de $2.50 (Exhibits #069–073; TE del 27 de septiembre de 1989 pp 100 y ss) unido al hecho de que con posterioridad a todo evento electoral <u>faltan</u> perforadores de los utilizados en los colegios electorales (TE del 28 de septiembre de 1989, pp 127 y ss), nos llevan a concluir que la TIE <u>no es la mejor evidencia</u> que acredite el que un elector votó en determinadas elecciones. En consecuen-

cia, no basta con la presentación de la TIE perforada para demostrar que el elector votó en determinadas elecciones ni para controvertir su status de elector inhábil. Al dirimir la controversia de estos electores es mejor evidencia, de carácter m[á]s confiable y contundente, las listas oficiales de votantes confeccionadas por la CEE y debe darse a éstas, por ende, mayor peso probatorio. A través del proceso eleccionario estas listas oficiales están bajo el estricto control de los funcionarios electorales; cada uno de los cuales (secretarios), a su vez, corrobora al anotar en su copia si determinado elector votó o no. Aún más, las firmas de los votantes se cuadran con el número de papeletas realmente emitidas en los colegios electorales.

1. Las partes presentaron un grupo de electores para los cuales la única prueba ofrecida en evidencia fue la tarjeta de identificación electoral perforada. ¿Constituye ésto prueba suficiente para refutar la clasificación del I1 o I2 que poseyera el votante y reivindicar así su derecho al voto? Por todo lo previamente expuesto, el tribunal resuelve que no.

Desde sus inicios la tarjeta de identificación electoral se vislumbró como un mecanismo necesario para "implementar (sic), fiscalizar y garantizar el sistema del colegio abierto," (PSP, PPD, PIP v. Romero Barceló, supra, a la página 288), evitando con su utilización el que se perpetuara el fraude de doble voto. Este instrumento vino a constituir un requisito adicional entre los ya existentes y con los cuales un ciudadano debía cumplir para ser considerado elector capacitado. Se observa que "hasta ese momento, el ciudadano ejercía su derecho al voto con simplemente figurar en las listas electorales." (PSP, PPD, PIP..., supra, a la página 289.)

Al considerar la importancia y razón de ser de la tarjeta de identificación electoral se observa que su presentación era requisito inicial para poner en marcha el procedimiento de inclusión por omisión. A esos efectos, llama nuestra atención el testimonio del Sr. Bauzá Escobales recogido en el disenso del Hon. Antonio S. Negrón García (Granados Navedo..., 89 JTS 63, a la página 6933):

Cuando los ciudadanos presentaban su tarjeta de identificación debidamente perforada en el espacio correspondiente a las elecciones del 1984, la J.I.P. buscaba en sus documentos para ver si había alguno que validara el reclamo de los ciudadanos. De no encontrar tal documento entre sus records, la J.I.P. tenía que solicitarle a la Secretaría de la Comisión Estatal en San Juan que localizara cualquier documento que así pudiera demostrarlo. Si se encontraba, una vez validado ese derecho, se le incluía como elector cualificado. La Comisión Estatal entonces notificaba a la Comisión Local, y a través de ésta, se ingresaba al elector en la lista de Inclusión preparada por la Comisión Estatal hasta el 31 de octubre.

Si bien éste era el primer paso a dar, no era el único; no sustituía ni excluía la investigación documental (y de listas electorales) que en los distintos niveles de la CEE se debía efectuar. De esta búsqueda resultar fructífera se validaba el derecho del votante y se incluía su nombre en las listas. Por el contrario, de no encontrar documentos en apoyo de su derecho, el elector permanecía excluido de las listas. Al hacer una analogía entre la prueba requerida ante el organismo electoral (para acreditar el derecho al voto de un elector) y la evidencia que las partes presentaron ante este foro para estos electores, se observa que hay insuficiencia de prueba. A[u]n cuando los tribunales pueden conferir mayores derechos que los otorgados por una "agencia administrativa", éstos están impedidos de hacerlo si no se les provee prueba suficiente con la cual puedan fundamentar tal facultad. Las partes no pusieron a este magistrado en condiciones de poder convalidar el derecho de los electores abajo expuestos; el expediente electoral de estas personas tampoco refleja que hubiesen hecho gestiones afirmativas para rehabilitar su status electoral. La presunción de corrección del organismo electoral en torno al status electoral de inactivos que la CEE le diera a estos votantes no fue controvertida. Obró correctamente la CEE al no adjudicar el voto de los siguientes electores:

| Exhibit | Elector | Status |
|---------|---------|--------|
| 068 | Batista Martínez, Jesusa | I2 |
| 082 | Reyes Sánchez, Ana Leyda | I2 |
| 087 | Santini Rivera, Luis R. | I2 |
| 088 | Díaz Meléndez, José | I1 |
| 108 | Rosario Vélez, Luis | I1 |
| 122 | Rodríguez Agosto, Nellie | I1 |
| 128 | Maysonet Díaz, Fernando | I1 |
| 212 | Chaparro Vázquez, Zaida | I2 |
| 332 | Vázquez Méndez, Juanita | I1 |
| 338 | Maldonado Espinosa, José R. | I1 |
| 912 | Colón Valderrama, Iván | I2 |

(Véase nuestro Apéndice 4(B)).

2. La situación de los siguientes electores añadidos a mano e inactivos es radicalmente opuesta a la de los previamente enumerados. Para este grupo de electores, las partes proveyeron listas electorales de 1984 que tenían el nombre del elector impreso en las mismas. En algunas de las listas el elector aparecía firmando donde le correspondía; en otras, el votante no había firmado exactamente donde debía. Al depurar las listas de 1984, la CEE erró al no detectar la firma del elector en el espacio provisto al lado izquierdo de su nombre o no se percató de que la firma de determinado elector estaba en el encasillado correspondiente a la firma de otro votante. Se la excluyó de las listas electorales y se le dio un status de inactivo. Resolvió incorrectamente la CEE al no adjudicar el voto de estas personas.

De igual forma, hubo otros casos en los que para cada elector las partes produjeron dos (2) listas electorales de 1984: la primera contenía el nombre del elector impreso y el espacio correspondiente a su firma en blanco o con anotación de "no votó" de los funcionarios electorales y la segunda que reflejaba que el elector votó añadido a mano en ese colegio o en otro. El status de elector inactivo de cada uno de ellos fue producto de la depuración que se hiciera de la primera de estas listas (Artículo 2.012, supra). Sin embargo, al ofrecerse en evidencia la lista electoral donde el elector aparecía votando añadido a mano, la parte controvirtió el status de inactivo de ese elector. Toda esta prueba, en unión a la

TIE perforada para esas elecciones, demostró que la CEE erró al inactivar al votante. En consecuencia, los votos de los siguientes electores deben adjudicarse:

| Exhibits # | Elector | Status | Exh. lista correspondiente |
|---|---|---|---|
| 064 | Alvarado Morales, Manuel | I2 | 045 |
| 065 | Díaz Burley, Marie | I2 | 046 |
| 074 | Villanueva Tirado, Silveria | I2 | 075,076 |
| 110 | Carrión Enjuto, Guillermo A. | I2 | 112,113 |
| 118 | Rodríguez Rivera, Teresa | I2 | 895 |
| 124 | Rivera Mateo, Eugenia | I2 | 125 |
| 132 | Méndez Matta, Laura | I2 | 133 |
| 215 | Rodríguez Fontanez, Jorge | I1 | 216 |
| 219 | Vázquez Orlandi, Lillian | I2 | 220 |
| 221 | Muñiz Cancel, Aida Esther | I2 | 222 |
| 225 | Hernández Canales, Sonia | I2 | 901 |
| 233 | Maduro Classen, Samuel Levy | I2 | 234 |
| 235 | Nieves Sánchez, Carmen | I2 | 236 |
| 238 | Mondríguez Hernández, Virginia | I2 | 239 |
| 241 | Rosa Díaz, Fernando | I2 | 242 |
| 243 | Hernández Tirado, Israel | I2 | 244 |
| 245 | Fuentes Ramos, Alicia | I2 | 246 |
| 247 | Acosta Morales, Almena | I2 | 248 |
| 258 | Ortiz Morales, Rubén | I2 | 259 |
| 306 | Rivera Reyes, Carmen | I2 | 307 |
| 325 | Colón Rivera, Isabel | I2 | 326 |
| 374 | Paniagua Rodríguez, Rosa | I2 | 375,376 |
| 518 | Escalera Rodríguez, Rafaela | I2 | 316 |

(Véase nuestro Apéndice 4(B))

3. Testificaron ante el tribunal varios electores que alegaron haber votado en los comicios de 1984; algunos explicaron haber tenido problemas para emitir su voto en aquella ocasión, otros declararon no haber tenido dificultades ya que sus nombres estaban impresos en las listas electorales; otros señalaron no recordar si para aquella elección votaron añadidos a mano o si habían firmado la lista electoral. Para este determinado grupo de electores la única prueba ofrecida fue la lista electoral de 1984 que contenía el nombre impreso del elector mas el encasillado corres-

pondiente a su firma tenía las palabras "no votó." En instancias, estas listas fueron presentadas por la parte adversa al elector testificante con el propósito de refutar lo vertido por éste. En otras ocasiones, la parte demandante inadvertidamente las presentó simultáneamente o con posterioridad a que declarara su testigo. Hubo casos en que los expedientes del elector inclu[í]an fotocopias de dichas listas. Entre éstos, hubo votantes para los cuales la tarjeta de identificación electoral no perforada para el evento comicial específico fue factor que abonó y corroboró la anotación de "no votó". Los testimonios de estos electores, por ende, no nos merecen crédito.[48] En ocasiones el votante testificó que firmó la lista oficial la cual tenía su nombre impreso, sin embargo, la lista ofrecida en evidencia de ese colegio ni tenía el nombre del elector impreso ni añadido a mano.[49]

Ciertamente el status de inactivo de todos estos electores fue producto de la depuración de las listas electorales que la CEE hiciera posterior a los comicios de 1984 (Artículo 2.012, supra). Ante esta prueba documental actuó correctamente la CEE al excluir a los aludidos electores del Cuerpo de Registro Electoral. Para este grupo de votantes, la representación legal de las partes, (contrario al grupo de electores enumerados en el acápite (2) anterior), al no presentar toda la evidencia necesaria demostrativa de la capacidad electoral de estas personas, incumplió con el descargo de prueba necesaria para refutar dicho status.[50] Es por ello que debe subsistir la determinación de la CEE en torno a los mismos; sus votos no deben adjudicarse:

---

[48] Maritza Gómez Figueroa, Exhibit #204 y 902, TE del 18 de diciembre de 1989 a la página 27 y ss. y Felícita Sánchez Otero, Exhibit #209 y 213, TE del 18 de diciembre de 1989 a la página 26 y ss.

[49] Iris M. Cáceres Alvarez, Exhibits #287 y 288, TE del 26 de diciembre de 1989 a la página 11 y ss. y Jesús M. Hernández Ortiz, Exhibits #309 y 310, TE del 27 de diciembre de 1988 a la página 56 y ss.

[50] Curiosamente en el alegato de la parte demandante, no se hace mención de las listas electorales que se proveyeran para cada uno de los electores del acápite 2 en aras de demostrar su capacidad electoral; equiparando mediante tal omisión la prueba ofrecida para cada una de las categorías de inactivos.

| Exhibits # | Elector | Status | Exh. lista correspondiente |
|---|---|---|---|
| 066 | Olmeda Cesani, Nydia | I2 | Exp. electoral |
| 129 | Llinás Torres, José | I2 | Exp. electoral |
| 204 | Gómez Figueroa, Martiza | I2 | 902 |
| 209 | Sánchez Otero, Felícita | I2 | 213 |
| 223 | Cantino Castelucci, Armando | I2 | 227 |
| 287 | Cáceres Alvarez, Iris N. | I2 | 288 |
| 328 | Maldonado Vélez, María | I2 | 329 |
| 359 | Pizarro Rivera, Félix | I2 | 906 |
| 641 | Soto Ortega, Crucita | I2 | 909 |
| 740 | Vilar Burke, Patricia | I2 | 907 |
| 833 | González Cruz, Miguel A. | I2 | 905 |
| 896 | Medina Pellicier, Norberto | I2 | Exp. electoral |
| 898 | Vecchini Lugo, María | I2 | " " |
| 911 | Martínez Ortega, Bienvenido | I2 | 910 |

4. Para los electores inactivos por no haber votado en 1980 (I1) las partes presentaron como prueba las listas electorales de 1984 en las cuales el votante aparecía firmando añadido a mano; todo ello en aras de demostrar su capacidad electoral para estos comicios. Por las razones que expondremos a continuación determinamos que las representaciones legales de las partes incumplieron con los requisitos probatorios necesarios para demostrar la habilidad electoral de estas personas. Actuó correctamente la CEE al no adjudicar los votos de los siguientes electores:

| Exhibits # | Elector | Status | Exh. lista correspondiente |
|---|---|---|---|
| 099 | López Hernández, María E. | I1 | 897 |
| 101 | Caraballo Reyes, Daniel | I1 | 895 |
| 105 | Salich Martínez, Francisco | I1 | 894 |
| 106 | Vera Vélez, Martha | I1 | 894 |
| 134 | Borgos León, María V. | I1 | 900 |
| 135 | Borgos León, Laura | I1 | 900 |
| 137 | González Herrera, Hilda | I1 | 894 |
| 285 | Maldonado Cotto, Jesús | I1 | 286 |
| 295 | De los Santos Rodríguez, Altagracia | I1 | id. 844 |
| 309 | Hernández Ortiz, Jesús | I1 | 310, 311 |
| 327 | Cruz Carmona, Luz E. | I1 | estipulado |
| 369 | Reyes Pastrana, Guillermo | I1 | 370 |

El elector inactivo 1 (I1) es producto de la depuración que se hiciera de las listas electorales posterior a las elecciones de 1980. Era deber de este elector excluido de las listas reinscribirse para los subsiguientes comicios mediante una Petición de inscripción especial. La omisión de este trámite redundaría en que permanecería excluido de tales listas electorales para 1984. El votar añadido a mano en aquella ocasión (1984) no era sustitutivo de lo que por ley debió hacer el votante. Votó sin derecho en el 1984 y ello no le rehabilita su status electoral para las elecciones de 1988. Los procedimientos habidos ante la CEE y el trato que se les daba a estos electores añadidos a mano(51) confirman su inhabilidad para votar en los pasados comicios, salvo que hubiesen hecho las gestiones afirmativas pertinentes en el organismo electoral. Los expedientes electorales de estas personas están desprovistos de constancias de trámites en pro de su franquicia electoral, hecho

---

(51) El elector que votaba añadido a mano no se ingresaba automáticamente al Registro del Cuerpo Electoral. Por el contrario, éstos se cotejaban frente a las listas de Alfa-Unidad para ver si su nombre aparecía impreso en las mismas. De aparecer impreso, se enviaba orden a OSIPE para eliminarlo del "no votó". (Ello porque el nombre del elector estaba impreso en las listas electorales de un colegio distinto al que votó añadido a mano y en la depuración posterior de estas listas el espacio correspondiente a la firma del elector se le pondría un "no voto".) De no aparecer impreso en las listas Alfa-Unidad de 1984 el elector recibiría el status de I1. (Véase el testimonio de la Sra. Frances Miranda Amadeo, TE del 27 de septiembre de 1989 a las páginas 118 y ss).

que refleja la inacción de estos electores entre 1984 y 1988 para reactivar su status de elector capacitado.

5. Por último, declararon votantes inactivos (I1–1980 e I2–1984) cuyos testimonios claramente reflejaron que no votaron en esos comicios y no hicieron gestión alguna para reactivar su status electoral.[52] Los expedientes electorales de dichas personas corroboraron tal declaración. Obró correctamente la CEE al no adjudicar estos votos y por ende debe prevalecer su determinación en cuanto a los mismos:

| Exhibit | Elector | Status |
|---|---|---|
| 210 | Fonseca Meléndez, Juan | I2 |
| 249 | Sostre Pastor, Javier | I2 |
| 253 | Ramos Santiago, Eneida | I1 |
| 302 | England Colón, María L. | I2 |
| 340 | Maldonado Serrano, Sigfredo | I2 |
| 358 | Wharton Ramírez, Irma Nydia | I1 |

D. Personas sin expediente electoral ante la CEE (NR)

La posición esbozada por la representación legal del demandante Granados Navedo y de los demandantes involuntarios en torno a este grupo de electores es básicamente la misma. Aducen que es imposible y contradictorio que todos estos electores posean una TIE perforada (y algunos fotocopia de documentación de trámites electorales efectuados ante la CEE) y que este organismo no mantenga un expediente electoral para ellos. Sostienen,

---

[52] Estos testimonios ocuparon tiempo y recursos de este foro. No nos explicamos por qué razón se trajeron ante nos a estas personas cuando el abogado que los produjo sabía o debió saber – previo a sentar a sus representados en la silla testifical – lo que éstos declararían. Véase la Regla 9 de las de Procedimiento Civil y el Cánon de Etica Profesional #17 que dispone:

Todo abogado debe negarse a representar a un cliente en un caso civil cuando estuviere convencido de que se pretende por medio del pleito molestar o perjudicar a la parte contraria, haciéndole víctima de opresión o daño. Su comparecencia ante un tribunal debe equivaler a una afirmación sobre su honor de que en su opinión el caso de su cliente es uno digno de la sanción judicial. La firma de un abogado en una alegación en un caso equivale a certificar que ha leído la alegación y que de acuerdo con su mejor conocimiento, información y creencia está bien fundada.

Un abogado deberá solicitar permiso del tribunal para renunciar la representación profesional de su cliente en un caso en litigio cuando se convenza durante el curso del pleito que el mismo es injustificado y que se pretende por medio del proceso molestar o perjudicar a la parte contraria, haciéndole víctima de opresión o daño.

para algunos electores, que no se les puede "invalidar su derecho por errores burocráticos" en la CEE; afirman para otros que no se les puede "atribuir responsabilidad por dicha clasificación electoral". En consecuencia, reclaman que debe adjudicarse el voto en la forma en que se emitió. Los demandados, por su parte, afirman que dichas personas poseen un status de electores inhábiles. Ello unido a la inacción en reivindicar su status previo a las elecciones de 1988; la escasez de prueba ofrecida por el demandante, i.e., listas electorales o documentos acreditativos del status de elector capacitado, los lleva a concluir que no se ha controvertido la presunción de corrección de la determinación de la CEE y por ende, que los votos de estas personas no deben adjudicarse.

El Artículo 1.003(17) de la Ley Electoral, 16 LPRA ss 3003(17), define a un "elector o elector cualificado" como "toda persona que haya cumplido con los requisitos de inscripción y de tarjeta de identificación electoral conforme a las disposiciones de este Subtítulo. Los posteriores Artículos 2.002 y 2.003 recogen tal definición y establecen los requisitos generales exigidos a un elector. Nuestra ley señala que "tendrán derecho a votar en la elección general los electores debidamente cualificados como tal, que a la fecha de elección figuren en el Registro General de Elecciones" (Artículo 5.003, 16 LPRA ss 3203). (Véase además la Regla 5 del Reglamento oficial y el Manual de procedimientos para las Comisiones Locales y las Juntas de Inscripción Permanente, a las páginas 3 y 6). Así, se ha reconocido como exigencia válida y razonable impuesta por el gobierno el que una persona calificada para ser elector se inscriba. (PPD v. Admor. Gen. de Elecciones, supra, a las páginas 241–242.)

La Petición de inscripción es el documento mediante el cual un ciudadano adquiere "legitimación activa" en el proceso eleccionario, empero, no es sino hasta que la misma se cumplimenta en su totalidad que surge la presunción de capacidad electoral (PRP v. ELA, 115 DPR 631; 633 (1984)). La inscripción de una persona exige que se cumplan con determinados requisitos de forma y se provea la información necesaria para poner en movimiento la petición. La existencia de defectos formales en este

documento o la omisión de información requerida o carencia de documentación exigida tendrá la inevitable consecuencia de que no se le dará curso a la petición suscrita (Artículo 2.007, 16 LPRA ss 3057(4)).

Afortunadamente, el peticionario en las situaciones arriba expuestas, no queda desvalido ante la ley. El Artículo 2.008, 16 LPRA ss 2058, le proporciona remedios:

> La Comisión proveerá, mediante reglamento al efecto, la forma y medios de subsanar o corregir, en la forma más expedita posible, cualquier error, omisión o discrepancia que surja de una petición de inscripción. Estableciéndose que una vez subsanada cualquier falta habida, deberá proceder a incorporar al elector en el Registro General de Electores que por este Subtítulo se establece.

> En los casos en que un peticionario no reúna los requisitos para ser elector y en que de la faz de la petición así se desprenda, la Comisión le concederá un término de quince (15) días contados a partir de la notificación de tal hecho, para que éste comparezca a mostrar causa por la cual no debe anularse su petición.

(Véase además PPD v. Admor. Gen. de Elecciones, supra, a la página 248).

De aquí que haya personas con el status NR ante la CEE. En estos casos, yerra este organismo electoral al procesar y entregar prematuramente al peticionario una TIE sin cerciorarse de que tiene ante sí toda la documentación acreditativa de su capacidad como elector calificado. Debería efectuarse este proceso en etapas sucesivas y reservarse la entrega de la TIE para el final, evitando con ello que problemas como el presente se susciten.

A tenor con lo explicado, cabe recalcar que "el derecho al sufragio no puede estar subordinado a la eficiencia o ineficiencia administrativa en la tarea de viabilizar el proceso electoral". (PPD v. Admor. Gen. de Elecciones, supra, a la página 241). Es doctrina trillada en este país que el sufragio, como derecho constitucional fundamental, no puede quedar a la merced de los trámites burocráticos habidos en la CEE.

Considerado el derecho vigente, pasemos a las situaciones particulares de estos votantes:

Vega Rivera, María Milagros, Exhibit #090, TE 6 de septiembre de 1989 a la pág. 21 y ss: El expediente electoral de la Sra. Vega Rivera refleja que posee dos números electorales. Para el primero, #1988024, suscrito mediante Petición de inscripción del 24 de junio de 1979, tiene un status electoral de I1. El testimonio de la electora corroboró dicho dato al señalar que no votó en las elecciones de 1980. El segundo número electoral, #2965184, (y con el que votó), corresponde a una Petición de inscripción del 18 de septiembre de 1983 que no se procesó por la incongruencia habida entre el nombre en el encasillado del documento (Milagros) y la firma de la peticionaria (María M. Vega). Aparentemente la Sra. Vega Rivera fue notificada de dicho error ya que se le expidió la TIE bajo ese número el 6 de noviembre de 1984, el mismo día de aquellas elecciones. La electora testificó haber votado sin tarjeta electoral para esos comicios; testimonio que nos resulta increíble. Refuta su testimonio el que su TIE no esté perforada en el número 2– correspondiente al año 1984 y el que la parte demandante no proveyó la lista oficial de votantes de 1984 que reflejara que la Sra. Vega Rivera ejerció su franquicia electoral. (Poseería pues un status de I2). Aparte y adem[ás] de ésto, el hecho de que esta electora adviniere en conocimiento previo a las elecciones de 1988 de que no estaba inscrita en las listas (por visita que hiciera a la JIP) mas no hiciera nada para subsanar su status, demuestra que de una u otra forma no era electoral hábil para participar en los pasados comicios. La CEE actuó correctamente al no adjudicar su voto.

Lorenzo Alonso, María A., Exhibit #107, TE del 5 de septiembre de 1989 a la pág. 267 y ss: Existen dos expedientes electorales bajo este nombre. El #2813643 corresponde a una Petición de inscripción del 18 de septiembre de 1983, la cual no fue procesada por falta de información. Según el testimonio de est[a] electora, dicha petición corresponde a su hermana María Altagracia Lorenzo Alonso. El otro # electoral 2813622, aparentemente corresponde a la testigo María Aracely Lorenzo Alonso. La Petición de inscripción provista por la testigo está ilegible en los encasillados correspondientes a la firma del elector y fecha de inscripción. De dicho documento se desprende que no se llenaron los encasillados referentes a la fecha y sitio de la naturalización; por lo que es lógico inferir que no se tramitó la solicitud de la peticionaria y por ello posee status NR. La demandante Lorenzo Alonso, así como su hermana son españolas de nacimiento. Señaló la Sra. Lorenzo que no votó en el 1980 y que se inscribió en el 1984. Mediante su ambivalente testimonio señaló que no le requirieron evidencia de ciudadanía americana al inscribirse, sin embargo, luego dijo que le pidieron su pasaporte "o algo así." Este magistrado entiende que la CEE le notificó a la electora la

necesidad de que le proveyera documentación acreditativa de su ciudadanía mas ella no la produjo oportunamente. Obró correctamente la CEE al excluirla del Registro General de Votantes. Esta votante testificó haber votado en los comicios del "84, instancia donde se le exigió evidencia de ciudadanía americana. Curiosamente, la TIE no está perforada en el #2 (1984) ni se nos proveyó lista de votantes. La parte demandante suplió fotocopia de algo que podría ser un pasaporte norteamericano; sin embargo, debió de presentarnos el documento original por ser su ciudadanía el factor esencial y decisivo para establecer su status de elector hábil. (Máxime cuando las fechas de nacimiento de la Sra. Lorenzo en este documento y los suscritos ante la CEE son diferentes.) Actuó correctamente la CEE al no adjudicar su voto.

Torres Valle, Marilyn, Exhibit #913, TE del 13 de septiembre de 1989 a la pág. 20 y ss: Esta electora posee una TIE #2465020 perforada en los # 1, 2, 3 expedida el 30 julio de 1980. Señaló haber votado en todas estas elecciones en la Segunda Unidad de Cupey Bajo. La parte demandante presentó en evidencia la Lista oficial de votantes de 1984 (Lista de inclusiones) del P005 U005 de San Juan, Exhibit #895, de la cual se desprende que la Sra. Torres Valle votó añadida a mano. Aparentemente la Petición de inscripción de esta persona no se tramitó para las elecciones de 1980, por lo que aparece votando añadido a mano en el 1984. Ni del expediente electoral provisto por la CEE, ni del testimonio de esta electora se demostró que ella fuera notificada de problemas existentes con su Petición de inscripción. Es por ello y por el hecho de que el voto de un elector no debe ser confiscado por errores u omisiones en los trámites ante la CEE, que determinamos que debe adjudicarse este voto. Erró la CEE al no adjudicarlo.

Giannilivigni, Omaira, Exhibit #266, TE del 21 de diciembre de 1989 a la pág. 28 y ss: La búsqueda del récord de esta votante refleja que el número electoral que le fue asignado a su TIE (#2663308) cuando suscribió su Petición de inscripción (7 de septiembre de 1984), pertenece a otra persona. La bú[s]queda alfabética en el sistema computarizado de la CEE de esta persona es negativa. Su testimonio reflejó que no votó en las elecciones de 1984. Previo a las elecciones de 1988 visitó las oficinas de la CEE y le dijeron que no estaba en las listas. A[u]n así, la Sra. Giannilivigni, consciente de su status de elector no cualificado, optó por no corregirlo. Debe prevalecer la determinación de la CEE de no adjudicar el voto de esta electora. Si bien la CEE pudo haber cometido un error al no notificarle a est[a] electora del inconveniente e incompatibilidad de números, ella advino en conocimiento de su status de incapacidad electoral previo a las elecciones mas no hizo nada a esos efectos.

Noriega Hernández, Juan, Exhibit #267, TE del 21 de diciembre de 1989 a la pág. 53 y ss: Este elector posee una TIE #0903521 que corresponde a una Petición de inscripción suscrita el 9 de septiembre de 1983. Se observa que el encasillado referente a la fecha y sitio de naturalización de dicho documento está incompleto. Ni del expediente electoral ni del testimonio del Sr. Noriega Hernández se desprende que la CEE notificara tal omisión. Es por ello que para las elecciones de 1984 tuvo que votar añadido a mano en las listas oficiales del P003 U003 de San Juan. (Exhibit #270). En esta lista, a su vez, se observa que el elector es oriundo de Cuba, lo que nos induce a concluir también que fue la falta de documentos acreditativos de su ciudadanía americana lo que causó que su Petición *no* fuera tramitada. A[u]n así, este elector se mudó previo a las elecciones sin tramitar una solicitud de transferencia o reubicación. No visitó las oficinas de la CEE entre 1984–88. Es un elector ER que no tenía a su alcance el procedimiento para votar añadido a mano en las elecciones pasadas. Actuó correctamente la CEE al no adjudicar su voto.

León Rueda, José Manuel, Exhibit #272, TE del 21 de diciembre de 1989 a la página 86 y ss: Se inscribió por primera vez el 29 de marzo de 1988, fecha en que le expidieron la TIE #3166137, con la cual votó. Aparentemente el número electoral fue entrado en el terminal de computador (3666137); ambos pertenecen a Carmen Julia Díaz Centeno. El derecho al sufragio de un ciudadano no debe quedar a merced del error que un empleado de la CEE cometa al entrar su data al ordenador. Erró la CEE al no adjudicar el voto del Sr. León Rueda.

## E. Electores que hicieron trámites ante la CEE

Los siguientes electores, hicieron gestiones afirmativas y oportunas ante la CEE Erró el organismo electoral al no adjudicar el voto emitido por ellos:

Collazo Mournier, Nidza, Exhibit #063, TIE #1720742, status I2,: Emitió su voto en el P005 U028 C012 (Colegio San Ignacio de Loyola) mediante el procedimiento de añadidos a mano. La electora identificó su firma en el sobre y su TIE perforada (en los números 2 y 3) expedida el 9 de septiembre de 1984. Testificó haber votado en ese colegio para el 1984; la fotocopia de la lista oficial de votantes de 1984 para este colegio corroboró su testimonio. De su expediente electoral se desprende que el 29 de octubre de 1988 la Sra. Collazo formuló una Solicitud de inclusión por omisión que fue acogida favorablemente por la CEE al emitir una Certificación positiva (4 de noviembre de 1988) ordenando la inclusión de

la votante a las listas electorales. La documentación presentada por la parte refutó el status de I2 de esta electora; ella estaba cualificada para votar en los pasados comicios y por lo tanto su voto debe adjudicarse.

González Rodríguez, Manuel, Exhibit #078, TIE #1700408, status I2: Votó añadido a mano en el P005 U007 C009 (Escuela La Cumbre). El elector identificó su firma y su TIE perforada en los núms. 1, 2 y 3. Testificó que previo a las elecciones de 1988 gestionó su inscripción en las listas electorales. Llenó una Petición de inscripción especial cuya ulterior consecuencia fue que la CEE lo certificara (29 de octubre de 1988) como elector cualificado para votar en esos comicios. La prueba presentada ante este foro controvirtió el status de elector inhábil del Sr. González. Erró la CEE al no adjudicar su voto.

Parrilla Castro, Ramón, Exhibit #079, TIE # 0176260, status I2: Votó en el P004 U015 (Escuela Gabriela Mistral) añadido a mano. Identificó su firma en la declaración jurada del sobre y su TIE expedida el 2 de noviembre de 1988 perforada en el núm. 3. Testificó que votó en esa misma escuela para las elecciones de 1984; la fotocopia de la Lista oficial de dicha escuela así lo refleja. Señaló que previo a las elecciones de 1988 visitó la Junta Local de Caparra Terrace y llenó unos documentos. De su expediente electoral se desprenden tales gestiones: una Solicitud de inclusión por omisión del 14 de octubre de 1988 cuya ulterior consecuencia redundó en Certificación de la CEE (29 de octubre de 1988) incluyéndole en las listas electorales. Posterior a ello, se efectuó una Petición de inscripción especial (2 de noviembre de 1988), fecha en que le expidieron la TIE con la cual votó. La prueba presentada refutó su status de elector inhábil; erró la CEE al no adjudicar su voto.

O'Farril Cartagena, Zoraida, Exhibit #081, TIE #2801892, status I2: Votó añadido a mano en el P001 U013 C008 (Escuela Brumbaugh). La electora identificó su firma en el sobre especial y su TIE duplicada expedida el 5 de noviembre de 1988 y perforada en el Núm. 3. Del expediente electoral se desprende que la Sra. O'Farril suscribió una Solicitud de inclusión por omisión el 4 de noviembre de 1988 cuya recomendación dirigida a la JIP es a los efectos de que se incluya y acredite el derecho a votar de esta persona. Posterior a ésto y como consecuencia de ello, el 5 de noviembre de 1988 se tramitó una Petición de inscripción especial y cambio de foto ante la CEE, fecha en que a su vez se le expidió la TIE con la cual votó. La Sra. O'Farril actuó oportunamente ante el organismo electoral y reivindicó su status de electora capacitada. Erró la CEE al no adjudicar su voto.

Maldonado Vélez, Georgina, Exhibit #103, TIE #1676522, status I1: Votó añadido a mano en el P005 U013 C010. Identificó su firma en el

sobre especial y su TIE perforada en los números 2 y 3. Consta en su expediente electoral una Solicitud de inclusión por omisión con fecha del 21 de octubre de 1988. Tal solicitud fue acogida favorablemente por la CEE el 29 de octubre de 1988 mediante Certificación que se emitiera para incluirla a las listas electorales. Su status de inactiva fue refutado; erró la CEE al no adjudicar su voto.

Batista García, Justo, Exhibit #130, TIE # 1742559, status I2: De su expediente electoral se desprende una "Certificación de verificación del derecho de estar incluido en las listas electorales para las elecciones generales" con fecha del 4 de noviembre de 1988 que le capacitó como elector hábil para las elecciones de 1988. Erró la CEE al no adjudicar su voto.

Torres Morales, Pedro, Exhibit #255, TIE #1863010, status I2: El elector identificó su firma en la declaración jurada del sobre especial de añadidos a mano y su TIE expedida el 5 de septiembre de 1984 está perforada en el núm. 3. Testificó que aunque se inscribió para las elecciones de 1984, no fue sino previo a las elecciones de 1988 que recogió su TIE en las oficinas de la CEE Allí llenó unos formularios y le entregaron su TIE de 1984. De su expediente electoral se desprende que el formulario que cumplimentó (6 de agosto de 1988) fue una Petición de inscripción especial. Aparentemente este trámite no fue procesado por la CEE antes del 8 de noviembre de 1988; erró el organismo electoral al no incluirlo en las listas. El Sr. Torres es elector capacitado y su voto debe adjudicarse.

Nishwitz Valencia, Patricia, Exhibit #652, TIE #1644960, status I2: Identificó su firma en el sobre de añadidos a mano y su TIE perforada en los números 1, 2 y 3. Declaró que previo a las elecciones de 1984 visitó la JIP y llenó unos documentos. Su expediente electoral refleja que tramitó una Petición de inscripción especial el 11 de Julio de 1984; sin embargo, la electora nos señaló haber tenido problemas para votar en aquella ocasión. Testificó que previo a las elecciones de 1988 (agosto o septiembre) visitó la JIP y llenó otros documentos ya que no aparecía en las listas electorales. El récord electoral de la Sra. Nishwitz, sin embargo, no contiene tal trámite. Sí consta en el mismo una "Certificación de verificación del derecho de estar incluido en las listas electorales para las elecciones de 1988 (29 de octubre de 1988). Su voto debe ser adjudicado.

La situación de aquellos electores que hicieron trámites tardíos ante la CEE no debe pasar desapercibida. Como excep-

ción a las fechas reglamentadas en la Ley Electoral, la CEE implantó a escasas semanas del evento eleccionario de 1988 el Procedimiento de inclusión por omisión. Dicho mecanismo permitió que el votante afectado exluido de las listas tramitara su inclusión en o antes del 4 de noviembre de 1988. El ciudadano tenía, a su vez, hasta el 19 de septiembre de 1988 para inscribirse como elector. Las fechas límites fijadas por el organismo electoral tienen como propósito válido garantizar la puridad del evento comicial: Aseguran que sólamente voten electores hábiles y evitan fraudes electorales como la doble votación. Tales fechas límites dan tiempo suficiente a esta agencia reguladora para organizar toda la documentación y listas electorales para el evento comicial. (Ortiz Angleró . . . , supra a las páginas 90–92); Jeffrey M. Petrash, Constitutional Standards Applicable to Voter Registration Closing Dates, 5 University of Michigan Journal of Law Reform 304; 323 (1972)). Mediante el mecanismo de inclusión por omisión la CEE fue extremadamente flexible al concederle al electorado una fecha tan próxima a las elecciones dentro de la cual éste pudiese hacer trámites afirmativos en pro de su capacidad electoral. No podemos convertir la libertad en anarquía y premiar la inacción de aquella persona que no hizo trámites oportunos. Sus votos no deben adjudicarse.[53]

---

[53] Hernández Acevedo, Providencia, Exhibit #640, status I2: Señaló que en las últimas 2 elecciones (1980 y 1984) había votado en la Escuela Gautier Benítez; no recuerda si para el 1984 firmó las listas electorales. Se presentó en evidencia el Exhibit #909 – Lista oficial de votantes (suplementaria) de 1984 para el P002 (Bo. Obrero) que refleja al lado del nombre impreso del elector un "no votó". La electora acudió una semana antes de las elecciones a "la Placita" porque aparecía como que no había votado. No la atendieron y se cansó de esperar. Señala, sin embargo, que cuando llevó dos retratos le hicieron firmar unos papeles. Consta en su expediente electoral una Solicitud de inclusión por omisión del 2 de noviembre de 1988. Debió tramitar una Petición de inscripción especial cuya fecha límite ya había pasado.

Alvarez Santiago, Ramón D., Exhibit #893: Posee un status de ER 0164621), recusado en el 1984. Consta en su expediente electoral una Petición de inscripción —del 3 de noviembre de 1988–; fecha en la cual se le expidió la TIE (3288711) con la cual votó. El Exhibit #048, documento que contiene al lado del nombre del Sr. Santiago escrita la siguiente nota: "aparece en listado inclusión a mano de la Unidad y Precinto 104 y también en listado de inclusión de secretaría". Ello de por sí no refleja nada ni nos conduce a acreditar el derecho al sufragio de este elector.

Budet Ferrer, Carlos, Exhibit #904, status I2: Como única prueba para este elector se presentó la Lista de Votantes de 1984 del P004 U022 C001 (Escuela Julio Sellés) donde

## F. Electores Activos

La mayoría de estos votantes tramitaron documentación ante la CEE en aras de habilitar su status electoral. Por haber hecho estas gestiones tan próximas al evento electoral de 1988, sus gestiones afirmativas aún no habían entrado al sistema computadorizado de la CEE al 8 de noviembre de 1988 y, en consecuencia, aparecieron algunos con su status previo de inhábiles. Posteriormente, sin embargo, reflejaron un status de elector hábil.(54) Estas personas utilizaron acertadamente el procedimiento de añadidos a mano para votar, ya que fue por error atribuible al organismo electoral que quedaron excluidos de las listas electorales. Son electores capacitados y sus votos deben adjudicarse:

Godreau Pérez, José R., Exhibit #061, status A3: tramitó una Petición de inscripción el 19 de septiembre de 1988, fecha en que se le expidió la TIE con la cual votó.

Otero Cortés, William, Exhibit #120, status A1: su expediente electoral refleja una transferencia administrativa con fecha del 13 de noviembre de 1987 de San Juan 002 U032 a P003 U006.

García Rivera, Ivonne, Exhibit #121, status A4: tramitó una Petición de Inscripción Especial el 19 de septiembre de 1988, fecha en que se le expidió la TIE con la cual votó.

Carrillo Torres, María Cristrina, Exhibit #126, status A5: por encontrarse en las listas de excluidos publicadas en la prensa, esta electora tramitó una Solicitud de cambios en el Registro (cambio de

al lado del nombre impreso del elector hay un "no votó" (Exhibit #903). Fue esta la lista que se utilizara en el proceso de depuración de 1984 conducente a que este elector posea status de I2. Tramitó una Solicitud de inclusión por omisión el 21 de octubre de 1988 que culminó en una Certificación negativa de la CEE (el 31 de octubre de 1988) a los efectos de que no se incluyera a esta persona en las listas electorales. Posterior a ello, tramitó tardíamente una Petición de inscripción especial el 5 de noviembre de 1988, tres días antes de las elecciones.

(54) Hay toda una gama de electores Activos (A) donde cada número que le acompaña al código de status tiene su significado:
Status A:
1. CONGELADO (VOTO EN NOV/1984)
3. INGRESADO POR MEDIO DE NUEVA INSCRIPCION
4. INGRESADO POR MEDIO DE INSCRIPCION ESPECIAL
5. INGRESADO POR MEDIO DE INCLUSION ADMINISTRATIVA
(Exhibit #858).

dirección) el 6 de febrero de 1988. A pesar de que esta electora debió tramitar una transferencia o reubicación, según fuere su situación, el haber llenado el formulario incorrecto no debe operar en contra de su derecho al voto. Tal solicitud fue acogida favorablemente por la CEE el 7 de octubre de 1988, razón por la cual le atribuyeron el status de electora activa.

Rodríguez Calderón, Pedro, Exhibit #127, status, A4: tramitó una petición de inscripción especial el 19 de septiembre de 1988, fecha en que se le expidió la TIE (#1644410) con la cual votó.

Rivera Nieves, Linda M. Exhibit #138, status A3: formuló una Petición de Inscripción el 19 de septiembre de 1988, fecha en que se le expidió la TIE (#3281806) con la cual votó.

Quiñones Cruz, Mayra, Exhibit #684, status A1: El día 8 de noviembre de 1988 solicitó un duplicado de su TIE. Su expediente electoral no tiene ninguna otra documentación, salvo su Petición de inscripción del 4 de septiembre de 1988.

Beltrán Berberena, Martín, Exhibit #890, status A1: tramitó una Solicitud de cambios en el registro (cambio de foto y de dirección) el 1ro de julio de 1988, fecha en que se le expidió la TIE con la cual votó. No se le puede confiscar su voto por el mero error de haberse llenado el formulario incorrecto. (PPD v. Admor. Gen. de Elecciones, supra).

Azcuy Díaz, Cirila, Exhibit #892, status A3: tramitó una Petición de inscripción el 19 de septiembre de 1988, fecha en que se le expidió la TIE (#3157407) con la cual votó.

Hay otros votantes activos para los cuales no existe razón que justifique el que no estuviesen en las listas electorales de 1988; salvo que hubiesen ido a votar en el 1988 a un colegio incorrecto y la CEE no se percatara de ello en el escrutinio que hiciere en el Coliseo de los votos añadidos a mano. Son electores hábiles y sus votos deben adjudicarse:

| Elector | Exhibit | Status |
|---|---|---|
| Hernández Rodríguez, Crucita | 062 | A1 |
| Pizarro Rivera, Catalina | 091 | A1 |
| González Suárez, Francisca L.(55) | 111 | A1 |
| Grajales Viera, Ramona | 237 | A3 |
| Rivera Torres, Eloísa | 363 | A1 |

Los siguientes electores votaron añadidos a mano mientras estaban ingresados en una institución penal del país. Sus testimonios revelaron que en dichas instituciones se siguió el procedimiento de votación conforme al "Memorando de la CEE dirigido a la Administración de Corrección" del 27 de octubre de 1988. (Exhibit #886) A tenor con el mismo (inciso 3d a la página 4):(55)

d. Si el elector no figura en ninguna lista su nombre y demás circunstancias serán añadidas a mano y se les permitirá votar: independientemente que tenga o no tarjeta. Dicho voto será recusado y depositado en un sobre preimpreso preparado para estos propósitos. El elector tendrá que contradeclarar bajo juramento; de lo contrario su voto será anulado en el escrutinio. Estos votos se adjudican en el escrutinio luego de ser debidamente investigados. (Enfasis suplido).

---

(55) Votó añadida a mano en el P004 U023 C005 (Escuela Sellés). La electora identificó su firma en la declaración jurada del sobre y su TIE perforada en los núm. 1, 2 y 3. De su testimonio se desprende que siempre ha votado en esa escuela y que reside en jardines Metropolitanos hace 28 años. Previo a las elecciones de 1988 cotejó su status electoral y se le informó que todo estaba bien. No recibió notificación de la CEE de estar excluida de las listas; no se cotejó en los periódicos a esos efectos. Recibió notificación por correo de los partidos políticos señalándole el colegio donde habría de votar. El 6 de noviembre de 1988 esta electora tenía un status electoral de ER en los impresos del computador de la CEE. El expediente electoral de la Sra. González no contiene evidencia alguna que sostenga dicho status electoral. Consta sin embargo un impreso del computador de la CEE con fecha posterior –26 de septiembre de 1989– a nombre de Francisca Ludgarda Gonzáles que la cataloga con un status electoral de A1. Acompaña el memorando de esta electora el Exhibit #D1, copia Certificada de la Lista oficial de 1988 de la Escuela Julio Sellés del P004 U023 C002 de San Juan, en la cual aparece el nombre de Francisca Gonzáles Suárez impreso en la misma y el espacio correspondiente a su firma en blanco. alega la representación legal de la Sra. González que [e]esta fue excluida intencionalmente de las listas electorales. Es improcedente tal señalamiento. El nombre de la votante estuvo en todo momento en las computadoras del organismo electoral. La prueba documental aportada por la parte así lo demuestra, i.e., la Lista Alfa-Municipal de junio de 1987 y la Lista Alfa-Precinto de julio de 1988. Discrepa la ubicación del nombre de la electora en esas listas del lugar donde está en la lista de votantes del colegio (P004 U023 C002), porque es en esta última donde único están los nombres de electores en estricto orden alfabético. Véase además las tarjetas remitidas por los partidos en las cuales aparece como Gonzáles.

Ninguno de los testificantes votó con TIE. No se les puede confiscar su derecho al voto por razón de que este procedimiento en los penales sea distinto del procedimiento de añadidos a mano, el cual exige la presentación de la TIE al momento de votar. Este mecanismo especializado dirigido a facilitar la emisión del voto en los penales, se adaptó a las necesidades y circunstancias particulares de estas instituciones. Son electores hábiles y sus votos deben adjudicarse:

| Elector | Exhibit | Status |
|---|---|---|
| Viruet Luna, Salvador | 093 | A1 |
| Hernández Batista, José R.* | 098 | A3 |
| Cruz Quiles, José A. | 136 | A3 |
| Almezquita Pizarro, Felix M.* | 139 | A1 |
| Coss Velázquez, Carlos Luis* | 140 | A1 |
| Romero Rivera, José | 395 | A1 |
| Ayuso Walker, Luis* | 891 | A1 |

Cada uno de estos votantes marcado con asterisco (*) tramitó oportunamente documentos ante la CEE en aras de reivindicar sus status como elector capacitado. Este organismo así se lo reconoció.

El Sr. Fundador Morales Montañez (Exhibit #089) debe distinguirse de los votantes arriba mencionados. Al momento del evento eleccionario se hallaba en libertad, mas se le había explicado que debía ir a determinado lugar en determinado día para poder emitir su voto. Testificó que se le pasó la fecha, que estaba trabajando y que tenía "problemas en la calle". Ello no justifica el haber usado el procedimiento de añadido a mano; éste no estaba disponible para situaciones como la de este elector. Actuó correctamente la CEE al no adjudicar su voto

## G. Electores residentes de otros municipios que votaron en San Juan

Las siguientes personas residen en otros municipios, sus votos, por ende, no deben adjudicarse a ninguno de los candidatos a la alcaldía de San Juan. Tanto el testimonio de estos votantes como la prueba documental aportada en torno a ellos confirmó

este dato. Nuestra Ley Electoral exige a toda persona que cambia de domicilio el solicitar ante la CEE una transferencia de su inscripción al nuevo precinto. (Artículo 1.003(53) y 2.014, 16 LPRA ss 3003(53) y 3064). A esos efectos la jurisprudencia ha pautado que el gobierno:

> . . . puede exigir que un elector debidamente inscrito que mude su residencia para otro lugar gestione una transferencia para el nuevo barrio o precinto. El Estado puede exigir que el elector acuda a inscribirse o gestionar su transferencia al lugar y en la fecha que determine, siempre que conceda una oportunidad razonable para ello. (Cita omitida). También puede requerir que el elector brinde toda aquella información que sea indispensable o necesaria para completar el proceso de inscripción o transferencia.
>
> . . .Todos estos son requisitos razonables y hasta necesarios que el Estado puede imponer por su carácter apremiante para evitar el engaño, garantizar la certeza del escrutinio y establecer la voluntad del pueblo expresada libremente en las urnas. En su aplicación estos requisitos deben implantarse de tal forma que no impongan al elector condiciones de difícil cumplimiento o exigencias que menoscaben su derecho al voto o desalienten su ejercio.

(PPD v. Admor. Gen. de Elecciones, supra, a las páginas 241–242)

Ninguno de los electores ante nos efectuó trámite alguno previo a los comicios de 1988; sus expedientes electorales así lo corroboran. Los votos de estas personas no deben ni pueden adjudicarse en el municipio de San Juan, permitir lo contrario resultaría en la dilución del voto de los legítimos residentes del municipio de San Juan. Resulta inconsecuente e irrevelante para el caso de autos si el status electoral que le diera la CEE a estas personas fue controvertido por la evidencia; la cuestión es que no son residentes de San Juan y no pueden votar candidaturas en ese municipio:

> Defilló Nassar, Heidi, Exhibit #100, TIE núm. 0098459, status I1: Tanto de la declaración jurada del sobre especial de añadidos a mano como de la que hiciera el 5 de diciembre de 1988 (Exhibit #041) y de su testimonio en sala se desprende que la Sra. Defilló reside en la Calle 2 #5 Garden Hills States, urbanización que pertenece al municipio de Guaynabo.

Ramos Arzuaga, Felícita, Exhibit #899, TIE núm. 0045479, status ER: Existe una Certificación de la CEE del 14 de septiembre de 1989 que señala que la localidad donde esta electora reside pertenece a la Unidad Electoral 025 del Precinto 100 de Carolina.

Figueroa Colón, Marlon Luis, Exhibit #908, TIE núm. 1871120, status ER: Testificó que reside en Guaynabo y que previo a ello vivió en Alturas de Borinquen Gardens en Río Piedras. Al ser contrainterrogado, reveló que vivió en la dirección antigua hasta el 30 de enero de 1988, significando ello que al momento de los comicios ya era residente del municipio de Guaynabo.

La primera electora no controvirtió la determinación de la CEE al clasificarla I1. Los otros dos no tenían a su disposición el mecanismo de votar añadidos a mano por razón de sus status de ER.

## V
### Incidente de papeletas contaminadas y arrestadas

A inicios del pleito, la súplica de la demanda del candidato Granados Navedo en torno a este incidente iba dirigida a que se "anularan 2557 votos" emitidos y adjudicados por la CEE (denominados aquí como votos "contaminados"). (Véase la demanda a las páginas 5 y 9).[56] Al presente, sin embargo, bajo el manto de la doctrina de uniformidad, la parte demandante impugna la Resolución 88-030 emitida por el Presidente de la CEE (Exhibit #038) y mediante la cual se determinó no adjudicar 207 votos de electores añadidos a mano (denominados aquí como votos "arrestados"). Solicita como remedio el que se cuenten todas las papeletas "arrestadas".

Los demandados, por su parte, sostienen la validez de la determinación de la CEE de las papeletas "contaminadas". En su alegato, aducen que el demandante incumplió con los requisitos

_____

[56] Entonces, la posición asumida por la parte demandante difería de la del codemandado Francisco González, Jr., quien desde su contestación a la demanda adujo que "debía aplicarse una norma uniforme en cuanto a la adjudicación de las papeletas o se cuenten todos los votos de los llamados contaminados, o no se cuenten (sic) ninguno." La súplica del Comisionado PNP iba dirigida a "adjudicar todos los votos emitidos de forma uniforme o sea las 207 papeletas llamadas arrestadas." (contestación a la demanda, a las páginas 1 y 2).

probatorios que le impusiera el Tribunal Supremo para este grupo de electores. Están acordes con la decisión de la CEE relacionada con las papeletas "arrestadas". Establecen mediante cómputos matemáticos la poca probabilidad de que el resultado de la elección se hubiese visto afectado de adjudicarse las papeletas "arrestadas". En la alternativa de que este foro optase por adjudicar las papeletas "arrestadas", sugieren como remedio judicial aplicar la reducción proporcional de los votos ilegales de entre ese grupo.

El demandante Granados Navedo no alegó que ocurriese fraude en estos dos eventos. La prueba desfilada ante este foro tampoco lo demostró. Las irregularidades acontecidas que culminaron en los llamados votos "contaminados" y "arrestados" fueron producto de la festinada implantación del "Procedimiento para votar añadido a mano".

Mediante este procedimiento de añadidos a mano se le permitió al elector debidamente identificado con su tarjeta de identificación electoral (T.I.E.), pero excluido de las listas electorales por error atribuible a la C.E.E., votar cumpliendo con determinados pasos:

1. El elector debía reclamar su derecho al voto ante la junta de Unidad Electoral;

2. Se le buscaba en todas las listas disponibles, primero en la lista de Alfa-Unidad, luego en la lista de Alfa-Precinto y por último en las listas de exclusiones Alfa-Isla;

3. Si se determinaba que el elector tenía derecho a votar añadido a mano, se le entregaba un boleto de autorización (firmado por todos los miembros de la Subjunta de Unidad) para votar en el último colegio de cada unidad añadiendo a mano en una lista especial su nombre y circunstancias personales;

4. Se inspeccionaba con la lámpara especial de rayos ultravioleta que el elector no hubiese votado previamente;

5. Se cumplimentaba el sobre especial de añadido a mano, firmando el elector la declaración jurada y formulando los funcionarios la recusación; ambas impresas en el sobre;

6. Se añadía a mano a la Lista Principal de votantes el nombre y circunstancias personales del elector quien firmaba las listas;

7. Se le entintaba el dedo;

8. Se perforaba y retenía la T.I.E. del votante;

9. Se le entregaban las dos papeletas y se hacía la salvedad de que una vez votara debía volver donde el funcionario electoral para depositar ambas papeletas junto con su T.I.E., boleto de autorización para votar y alguna orden judicial o cualquier otro documento de elegibilidad para votar dentro del sobre especial. El sobre se sellaba en presencia del elector y se le decía que sus papeletas se adjudicarían en el Coliseo una vez la C.E.E. investigara en los expedientes y archivos su status electoral y determinara que era elector capacitado para votar en esas elecciones. Por el contrario, de ser elector inhábil su voto no sería adjudicado.

Los Comisionados Electorales de los tres partidos, acordaron enviar 50 sobres impresos a cada colegio electoral para permitir que aquel elector que se encontrara en las situaciones expuestas por el procedimiento de añadidos a mano votara usando el mismo. Cabe señalar que este acuerdo se tomó sin poder razonablemente anticipar el número de personas que comparecerían a votar añadidos a mano.

A pesar de que tanto las papeletas "contaminadas" como las "arrestadas" provienen de electores que votaron mediante el mecanismo especial de añadir a mano sus nombres a las listas electorales, cabe distinguir estas dos controversias particulares (la controversia de añadidos a mano propiamente) y precisar en torno a cada uno de ellos.

## A. Contaminados

La llamada "contaminación" surgió cuando se acabaron los sobres impresos en determinados colegios electorales y se les permitió a personas que de otra forma hubiesen depositado sus papeletas en dichos sobres, echar las mismas en las urnas. La prueba desfilada, a su vez, en instancias demostró que a pesar de que se le cumplimentó el sobre especial de añadidos a mano al elector, por inobservancia de los funcionarios por descuido del

electorado en ese colegio, el votante depositó sus papeletas directamente en las urnas. La contaminación existe en la medida en que se depositaran en las urnas electorales papeletas de votantes inhábiles, entremezclándose las mismas con papeletas de electores hábiles para votar.

En Granados Navedo v. Rodríguez Estrada y otros, supra, a la página 6896, nuestro Tribunal Supremo fijó las pautas específicas a seguir por el demandante en torno al desfile de prueba a darse ante el foro de instancia. Además, expuso los requisitos evidenciarios con los que éste debía cumplir para prevalecer en su reclamo de este evento, derrotando acertadamente con ellos la adjudicación de alegados votos ilegales hecha por la CEE. Por voz del Hon. Peter Ortiz se dijo:

> En estos casos, en ausencia de fraude, no es suficiente que el candidato derrotado demuestre que se adjudicaron votos emitidos ilegalmente sino que se requiere que pruebe afirmativamente a favor de quién fueron adjudicados, demostrando así que la anulación de estos cambiaría el resultado de la elección. Ello podría probarse con el testimonio de los electores que votaron de forma ilegal. Estos, contrario a lo que sucede con los electores plenamente capacitados, no les cobija el derecho a mantener en secreto su voto. De no cumplirse con lo anterior la impugnación no procede aun cuando se haya establecido que en la elección se adjudicaron votos emitidos ilegalmente. A contrario sensu, de cumplir el candidato impugnador con los requisitos indicados se reducirán dichos votos en la proporción correspondiente. (Granados Navedo v. Rodríguez Estrada, supra, a la página 6896.

Teniendo en mente lo previamente citado y atendidas las directrices esbozadas por nuestro m[á]s alto Tribunal y luego de examinar la prueba testifical desfilada dándole su debido peso y credibilidad y de analizar los alegatos de derecho de las partes, concluímos que la adjudicación hecha por la CEE de los votos "contaminados" debe prevalecer. La parte demandante no cumplió con los requisitos y peso de prueba impuéstole por el Tribunal Supremo. Veamos.

 El demandante Granados Navedo alegó "contaminación" en 14 colegios electorales. Anunció formalmente 13 colegios(57) y desfiló prueba testifical únicamente de 11 de ellos, renunciando en corte abierta al Precinto 001 Unidad 017 Colegio 002 y al Precinto 002 Unidad 013 Colegio 006.(58) La prueba presentada por la parte demandante para este evento, se limitó al testimonio de once (11) funcionarios electorales PNP, cada uno de los cuales trabajó en un alegado colegio "contaminado". (Véase el Apéndice 5(A): Análisis del testimonio de funcionarios electorales en colegios "contaminados"). El testimonio de dos de estos funcionarios demostró a claras luces que no ocurrió "contaminación" de tipo alguna en el Precinto 001 Unidad 020 Colegio 004 y en el Precinto 003 Unidad 002 Colegio 006. La prueba documental presentada así lo confirma.(59) El testimonio de estos funcionarios reflejó que en esos dos colegios, al acabarse los sobres impresos para votar añadidos a mano, prudentemente se improvisaron métodos mediante los cuales las papeletas e información particular de cada elector se mantuvo individualizada. Ello hizo posible que poste-

---

(57)

| Precinto | Unidad | Colegio |
|----------|--------|---------|
| 001 | 010 | 008 |
| 001 | 013 | 005 |
| 001 | 017 | 002 |
| 001 | 020 | 004 |
| 002 | 007 | 007 |
| 002 | 013 | 006 |
| 002 | 025 | 010 |
| 002 | 027 | 004 |
| 003 | 002 | 006 |
| 003 | 020 | 008 |
| 005 | 002 | 010 |
| 005 | 031 | 006 |
| 104 | 015 | 002 |

(58) Es conducta censurable el que en su alegato esta parte obvie la renuncia que hizo en sala de estos dos colegios (TE del 21 de agosto de 1989 a las páginas 85–86; TE del 28 de agosto de 1989 a las páginas 31–32). Más aún, resulta reprobable el que se ignore el requisito testifical de los funcionarios electorales impuesto en Granados Navedo v. Rodríguez Estrada y otros, supra, a la página 6892, y se trate de sustituir el mismo por prueba documental cuya confiabilidad es cuestionable.

(59) Exhibits #004 y 009.

riormente se evaluara en la CEE la capacidad electoral de cada votante y, en consecuencia, se adjudicara o rechazara el voto de la persona conforme a su status electoral.

Mediante el testimonio de los restantes nueve funcionarios PNP, se explicó la irregularidad acontecida, de porqué ciertas papeletas que debieron depositarse en sobres especiales de añadidos a mano se echaron en las urnas electorales (Véase el Apéndice 5(A)). Si bien mediante la declaración de éstos se intentó precisar el número de casos en que esta anomalía ocurrió, la prueba documental ofrecida en evidencia para esos colegios, (en ocasiones) controvirtió los números inciertos declarados por el funcionario.[60] Lo previamente expuesto constituyó la única prueba testifical presentada por la parte impugnadora en este incidente.

La parte demandada demostró que en el Precinto 001 Unidad 010 Colegio 008; Precinto 005 Unidad 002 Colegio 010 y Precinto 005 Unidad 031 Colegio 006 no se dio la alegada "contaminación". (Véase el Apéndice 5(A)). A pesar de que papeletas que debieron echarse en sobres de añadidos a mano fueron depositadas indebidamente en las urnas electorales, esta parte probó que dichas papeletas correspondían a electores capacitados para votar en los pasados comicios.[61] Para ello, trajo al funcionario PPD del colegio alegadamente contaminado quien explicó lo allí acontecido; produjo al elector quien testificó haber añadido su nombre a las listas electorales y cumplimentado el sobre especial, identificó ambos documentos y declaró haber echado sus papeletas en la urna; y presentó al Lic. Sigfredo Pons Fontana, Subsecretario de la CEE por el PIP, quien haciendo referencia a las listas Alfa Unidad del precinto correspondiente a cada elector, concluyó que los mismos eran votantes hábiles en las elecciones pasadas. Esta

---

[60] A modo de ejemplo, véase el Exhibit #008 frente al testimonio del funcionario Angel Antonio Santiago Torres, Precinto 002, Unidad 027, Colegio 004, del Apéndice 5(A).

[61] Se demostró que hubo "mezcla" de votos mas no "contaminación". Distínguese un concepto del otro en que "contaminación" es mezcla de papeletas correspondientes a personas con derecho a votar y de papeletas correspondientes a personas sin derecho a votar.

prueba de fácil acceso a ambas partes y de lógica y concatenada presentación, demostró la no "contaminación" de dichas urnas.

En aras de depurar los colegios "contaminados", reduciendo el número de votos ilegales adjudicados en los mismos, el Tribunal Supremo señaló en Granados Navedo v. Rodríguez Estrada, la disponibilidad de la Regla 29 de las de Evidencia para el caso ante nos.(62) Cabe señalar que estas directrices dadas al demandante para esclarecer (entre otras) si éste había sido perjudicado por la adjudicación de votos ilegales (PPD), fueron obviadas por el candidato impugnador. La parte demandada, por el contrario, utilizando el mecanismo de citación (Regla 40.1 de las de Procedimiento Civil), trajo ante este foro a 25 votantes con el propósito de descontarle votos al impugnador.(63) Una vez examinada la prueba documental (Exhibits #835 y 858) y escuchada la prueba testifical (Lic. Sigfredo Pons Fontana y Alfredo Méndez Nazario) en torno a estos electores,(64) prueba suficiente que estableciera la naturaleza ilegal de sus votos,(este Magistrado) determinó la ilegalidad de los mismos.

Previo a que cada elector testificara, este juez, teniendo en mente el inter[é]s público envuelto, la importancia que reviste para la ciudad de San Juan llegar a un resultado final representativo de la voluntad del electorado, la necesidad de purgar todo voto ilegal de la adjudicación hecha de los colegios contaminados, (evitando con ello la injusticia de que votantes ilegales definan quién es victorioso en este sufragio), y ante la posibilidad de que dicho acto fuese punible por el ordenamiento penal(65) , concedió

---

(62) "Toda persona tiene el privilegio de no divulgar la forma en que votó en una elección política, a menos que se determinare que hubiera votado ilegalmente". Si bien este privilegio emana de nuestra Constitución (Artículo II, Sección 2), la misma no cobija al elector que votó ilegalmente. Esta doctrina impera a través del foro federal. (Véase Weinstein On Evidence ss 507 [04], Nueva York, Matthew Bender Company, 1976–77; 8 Wigmore On Evidence ss 2214, Boston, Little Brown & Co., 1979, y jurisprudencia citada en Granados Navedo v. Rodríguez Estrada, supra, a la página 6896).

(63) El Tribunal Supremo simplificó aún m[á]s la tarea de las partes, al intimar que se podría utilizar prueba circunstancial para demostrar cómo había votado determinado elector ilegal.

(64) Véase el Apéndice 5(B).

(65) Artículo 8.026, 16 LPRA ss 3376: "Toda persona que sin derecho a votar lograre hacerlo o que, aun teniendo derecho a votar, lo hiciere más de una vez, incurrirá en delito

inmunidad a estos electores. De este modo, el votante no se cohibiría de testificar ante el temor de ser encausado criminalmente por haber votado siendo elector no capacitado y se obtendría un testimonio m[á]s espontáneo y veraz.

De los 25 votantes presentados, descontamos 23 votos al candidato Granados Navedo.[66] Véase el Apéndice 5(B).

Las directrices pautadas por el Tribunal Supremo, claramente advirtieron al demandante de las graves consecuencias de no traer ante el foro de instancia el testimonio de los electores inhábiles: "De no cumplirse con lo anterior la impugnación no procede aun cuando se haya establecido que en la elección se adjudicaron votos emitidos ilegalmente". Este tribunal a su vez, recalcó al demandante que esa no era la forma de probar su caso. A pesar de ello, la representación legal del demandante[67] decidió "probar su caso" mediante prueba documental con la cual, si algo logró demostrar fue el que se adjudicaron votos ilegales en ciertos colegios electorales. Como expusimos previamente, ello no cumple con el peso de la prueba que le exigió el Tribunal Supremo; por ende, debe subsistir la adjudicación de estos votos hecha por la CEE.

Así, presentó el Exhibit #835, constitutivo de varios juegos de libros o mamotretos amarillos, los cuales están divididos por

---

grave y convicta que fuere [sic] será sancionada con pena de reclusión por un término mínimo de un (1) año y máximo de tres (3) años."

[66] Consideramos al Sr. Aureo Pérez Alvarez testigo mendaz (Exhibit #876). Coincidentalmente su esposa, Ada Luz Santana Arroyo, testificó un día previo a él en torno al mismo evento; al inquirirle al Sr. Pérez(en más de una ocasión) por quién votó, primero contestó no recordar, mas luego súbita y nerviosamente señaló que por Acevedo. Su comportamiento desafiante y hostil y la forma de declarar nos llevan a no dar crédito alguno a su testimonio.

La electora María J. Marrero Sierra intervino posteriormente representada por el Lcdo. Bray, quien ofreció prueba documental (Exhibit #877) acreditativa de su derecho a votar. Por ser electora capacitada en las pasadas elecciones su voto no contaminó las urnas y por ello no debe descontársele ese voto a José Granados Navedo.

[67] Resulta inexplicable la obstinación de la representación legal del candidato Granados en resistirse a seguir las directrices establecidas por el Tribunal Supremo; máxime cuando un abogado tiene como guía la Regla 10(A) y 10(B) de las de Evidencia y sobre todo el Código de Etica Profesional, uno de cuyos criterios generales le señala al letrado que "le debe a sus clientes un trato profesional caracterizado por la mayor capacidad, la más devota lealtad y la más completa honradez. . ." (Véase además el Cánon 18.)

Precinto–Unidad–Colegio y contienen una relación del status electoral de las personas que votaron añadidos a mano en los colegios contaminados. Presentó además el Exhibit #837, mamotreto blanco, que alegadamente es copia del registro que levantase la CEE de los sobres de aquellos electores que votaron añadidos a mano el 8 de noviembre de 1988 y que pasaron por el crisol de la Junta especial de añadidos a mano. Tras arduo debate sobre la admisibilidad y alcance probatorio de estas dos piezas, hubo estipulación de partes a los efectos de su contenido. (TE del 28 de agosto de 1989 a las páginas 50 y 51). De las listas electorales donde votantes adicionaron sus nombres a mano junto al Exhibit #835 debemos concluir cuántos y cuáles de las personas que votaron añadidos a mano en estos colegios contaminados son votantes capacitados e incapacitados. De éstos, el tribunal debe hacer una correlación con aquellos nombres de electores que aparecen en el Exhibit #837, documento que induce a este magistrado a una búsqueda incierta ya que carece de certeza y confiabilidad:[68] hay ausencia de apellidos, nombres y números electorales y espacios correspondientes a supuestos electores totalmente en blanco. De tal búsqueda debemos inferir que las papeletas de las personas cuyos nombres no están en el Exnibit #837 presumiblemente fueron a parar a las urnas.[69]

A pesar de que mediante esta opinión y sentencia confirmamos la determinación que hiciere la CEE en torno a este grupo de votos "contaminados" el tribunal está inclinado a adoptar (en la alternativa) como remedio judicial para este incidente la distribu-

---

[68] HON. JUEZ: ¿Qué es lo que contiene ese mamotreto [blanco]?
LCDO. CANALS: Contiene el registro que compiló la Junta de Añadidos a Mano, con los propósitos de evaluar estos electores. O sea, lo que aquí no está, no se evaluó como añadido a mano.
Obviamente, no es que se establezca de una forma absoluta, pero el Tribunal puede tomar este documento, y con lo que nosotros lo identifiquemos, decir definitivamente, y los compañeros podrán refutar eso, tales electores, treinta y pico y veinte y pico, que son este caso, del Precinto 1, Unidad 20, Colegio 4, si mal no recuerdo, y eso hay una moción radicada a esos efectos. . . creo que es ese o es el del tres, me parece. (Subrayado nuestro) (TE, 28 de agosto, págs. 34–35.)
[69] HON. JUEZ: ¿Pero entonces habría que examinar el mamotreto completo para concluir que ese no se examinó? O sea, que lo que usted llama el mamotreto no es prueba de que se examinó, sino que es ausencia de examen. (TE 28 de agosto, pág. 35.)

ción o reducción proporcional de los votos ilegales ya adjudicados de entre este grupo. (Véase la Tabla del Apéndice 5 (C)).

Jurisprudencia norteamericana ha pautado cuatro diversos remedios judiciales[70] para casos en los cuales ha habido mezcla de votos legales e ilegales y no hay forma de identificar unos y otros.[71]

1. El primero de los remedios propone que no se cuenten los votos de los precintos "contaminados". Esta fue la solicitud que inicialmente hiciera José Granados Navedo en su demanda. Acceder a ello significaría privar de su franquicia electoral a más de 2500 electores cualificados por razón de un ínfimo número de votos ilegales. Este magistrado está renuente a tal proceder. Privar de su franquicia electoral a un número tan significativo de votantes arrojaría dudas en torno a cuál fue la verdadera voluntad e intención del electorado y por ende, el resultado cierto de la elección.

2. El segundo los remedios apunta a que se ignore la "contaminación" y se adjudique la totalidad de los votos (legales e ilegales). Esto fue lo que inadvertidamente se hizo en este incidente y lo que ha dado margen al problema ante nos. Permitir que algo así suceda redundaría, en determinadas situaciones, el que electores no cualificados pudiesen determinar el resultado de unas elecciones. Ello no sólo sería injusto para uno y otro candidato, sino que resultaría en una mayor injusticia para el

---

(70) Para un análisis general de los mismos, véase: Treatment of excess or illegal ballots when it is not known for which candidate or on which side of a proposition they were cast, 155 ALR 677.

(71) Desde la reanudación de este pleito en agosto de 1989 se le requirió a las partes la discusión en sus alegatos de los diversos remedios adoptados jurisprudencialmente en los E.U. (TE del 28 de agosto de 1989 a la página 136). La parte demandante no cumplió con dicho requerimiento.

Además, en aras de apresurar la adjudicación del presente litigio, se solicitó de las partes que adelantaron una relación de la jurisprudencia a ser citada en sus alegatos de los eventos "contaminados" y "arrestados". La labor investigativa de este tribunal se afectó adversamente debido a la lista de casos que sometiera el demandante, tendente a solicitar como remedio judicial una nueva elección. Estos casos no fueron citados posteriormente en el memorando. Es reprochable esta conducta y desconocemos su razón de ser: 1) o se actuó con ausencia de buena fe, consumiendo con ello preciado tiempo de este foro y posponiendo así la finalidad del caso o, 2) sencillamente la parte impugnadora cambió su teoría del caso a escasos días de radicar su alegato final, lo que a su vez, restaría peso y fortaleza a su reclamo. (Regla 9 de las de Procedimiento Civil).

electorado capacitado que votó en esas elecciones, ya que su voluntad se vería inconstitucionalmente diluída ante tal adjudicación.

3. El tercero de los remedios conlleva declarar la elección nula y ordenar una nueva elección (ya sea total o parcial – limitada a los precintos o unidades donde hubo mezcla de votos legales e ilegales).

Se ha dicho que los tribunales deberán de hacer todo lo posible para que prevalezca la validez de una elección y recurrir a este remedio heroico únicamente cuando no quede otra alternativa viable para salvaguardar la voluntad e intención del electorado.[72] Factores de gran interés público, i.e., la carga económica que un nuevo proceso eleccionario impone a la ciudadanía; la indebida presión sicológica (y de otra índole) que recibiría el electorado de los precintos y/o unidades "contaminadas" en los que se celebraría una nueva elección; el impacto inestabilizador de nuevos comicios en el proceso político y social de la ciudad capital; y los cambios sufridos en la composición, movilidad e intereses del electorado, abogan po[r q]ue en ocasiones el bienestar público prevalezca sobre los intereses particulares del candidato impugnador.

4. Por último, existe el remedio de aplicar la distribución o reducción proporcional de los votos ilegales ya adjudicados. Dicho remedio, aceptado y adoptado por numerosas jurisdicciones estadounidenses desde antaño,[73] no hace injusticia a ninguno de los

---

[72] Kenneth W. Starr, Federal Judicial Invalidation as a Remedy for Irregularities in State Elections, 49 New York Law Review 1092 (1974); Rizzo v. Bizzell, 530 S2d 121; 128 (Miss. 1988); Lambeth v. Levens, 702 P2d 320; 326 (Kansas 1985). Véase además, la opinión concurrente del Hon. Antonio S. Negrón García en PPD v. Admor. Gen. de Elecciones, supra, a la página 329:

En cuanto a la alternativa de conceder una nueva elección, el razonamiento y motivos que animan esa recomendación, aunque loable, es contraria a la doctrina prevaleciente sobre el trasfondo circunstancial que imperativamente debe existir para tal remedio. . . También vuelve a inyectar en el país las excitaciones, rivalidades y animosidades que caracterizan la contienda pública y tiende a perturbar la paz comunitaria, estabilidad y seguridad de las instituciones.

[73] Jordan v. Officer, 525 N.E. 2d. 1067 (Illinois, 1988); Fischer v. Stout, 741 P2d 217 (Alaska, 1987); Frese v. Camferdam, 394 N.E. 2d 845 (Illinois, 1979); Hammond v. Hickel, 588 P2d 256 (Alaska, 1978); Webb v. Benton Consolidated High Sch. Dist. No. 103, 264 NE 2d 415 (Illinois, 1970); Drolet v. Stenztz, 227 NE 2d 114 (Illinois, 1967); Singlelary v. Kelley,

138

candidatos y es el que con mayor certeza, precisión y lógica reflejaría c[uá]l fue la verdadera voluntad del electorado en esos determinados colegios contaminados. A su vez, esta distribución prorrata nos serviría de índice para determinar si el resultado de la elección se vio afectado por la adjudicación de tales votos ilegales.

En ánimo de aplicar este remedio judicial (en la alternativa), al tomar como cierta la inferencia de los Exhibits #835 y 837 y asumir como ciertas las conclusiones expuestas en el alegato de derecho del demandante (a la página 10 y ss), se observa:

P001 U013 C005* – Hay 4 votos ilegales en las urnas. Luego de que uno de estos votantes (Hilario Rodríguez Marrero) testificara ante este foro, quedarían 3 votos ilegales adjudicados.

P002 U007 C007* – Hay 12 votos ilegales en las urnas. Luego de que uno de estos votantes (Félix Figueroa Rivera) testificara ante este foro, quedarían 11 votos ilegales adjudicados.

P002 U025 C010* – Hay 1 voto ilegal en las urnas que fue adjudicado.

P002 U027 C004* – Hay 12 votos ilegales en las urnas. Luego de que 4 de estos votantes (Lydia Candelaria González, Juana Carmona Sierra, Marcia Flores Fuentes, Salvador Santos Fernández) testificaran ante este foro, quedarían 8 votos ilegales adjudicados.

---

51 Ca Rptr 682 (1er Dist. 1966) Thornton v. Gardner, 195 NE 2d 723 (Illinois, 1964); Ingram v. Burnette, 316 SW 2d 31 (Tennessee, 1958); Grounds v. Lawe, 193 P 2d 447 (Arizona 1948); People v. Birdsong, 76 NE 2d 185 (Illinois, 1947); Mc Master v. Wilkinson, 15 NW 2d 348 (Nebraska, 1944); Boland v. City of La Salle, 19 NE 2d 177 (Illinois 1938); Attorney General v. Miller, 253 NW 241 (Michigan, 1934); Mc Nab v. Hamilton, 181 NE 646 (Illinois, 1932); Hamilton v. Marshall, 282 P 1058 (Wyoming, 1929); Flowers v. Kellar, 153 NE 351 (Illinois 1926); Briggs v. Ghrist, 134 NW 821 (South Dakota, 1912); Choisser v. York, 71 NE 940 (Illinois, 1904); Ellis v. May, 58 NW 483 (Michigan, 1894); Russell v. Mc Dowell, 23 P 183 (California, 1890).

\* La parte demandante pudo traer ante este foro (mas optó por no hacerlo) evidencia documental y testifical tendente a demostrar que votantes añadidos a mano con status electoral de incapacitados – I1 o I2, eran personas hábiles para votar en los pasados comicios y por ende, no contaminaron las urnas. Merece, a su vez, hacer el señalamiento de la posición ambivalente asumida por el demandante en torno a que electores activos en otros municipios son contaminantes e inhábiles para votar en San Juan. Esta posición es contraria a la que asumiere para este grupo de electores en el incidente de añadidos a mano.

P003 U020 C008* – Hay 4 votos ilegales en las urnas. Luego de que uno de estos votantes (Sylvia Acosta Ureña) testificara ante este foro, quedarían 3 votos ilegales adjudicados.

P104 U015 C002* – Hay 4 votos ilegales en las urnas. Luego de que uno de estos votantes (Reyes Padín Cuevas) testificara ante este foro, quedarían 3 votos ilegales adjudicados.

Todo ello conduciría a conclu[i]r que al presente hay 29 votos ilegales, entre unas alegadas 2557 papeletas adjudicadas en este incidente. Luego de aplicar la reducción prorrata se le descontarían 14.54 votos a Héctor Luis Acevedo, 13.68 votos a José Granados Navedo y .78 votos a otros partidos. Cifras claras demostrativas de que resultado de la elección capitalina no se vio afectado ni alterado por la adjudicación de los mismos.[74]

---

En esta etapa de nuestra sentencia, el análisis de los eventos atendidos arroja el siguiente resultado:

| Evento | Héctor Luis Acevedo | José Granados Navedo | Otros |
|---|---|---|---|
| Certificación | 100,525 | 100,496 | 8,334 |
| Iniciales* | 1 | 1 | — |
| Write–In | — | 1 | — |
| Añadidos a mano** | 31 | 33 | 2 |
| Contaminados | — | (-23) | — |
| Total | 100,557 | 100,508 | 8,336 |

* Asumimos que cada una de estas electoras votó por la parte que las produjo como testigos.

** Las cifras para este incidente fueron incorporadas a esta Opinión y Sentencia luego de que se efectuara el escrutinio ordenado de los votos añadidos a mano pertenecientes a electores capacitados. (Véase el Apéndice 4(C)). Las cifras que utilizáramos previo al escrutinio en sala para llegar a la decisión que hoy emitimos se basaron en la presunción de que las partes produjeron en sala a testigos que favorecían a los candidatos que ellos representan. Por ende, se tomaron como números temporeros representativos de la intención del electorado los siguientes:

---

[74] "De minimis non curat lex".

| Votos que favorecen a Héctor Luis Acevedo | | Votos que favorecen a José Granados Navedo | |
|---|---|---|---|
| Testigos de los demandados | 23 | Testigos de los demandantes | 22 |
| Partes identificadas con los demandados | 9 | Partes identificadas con los demandantes | 12 |
| | 32 | | 34 |

## B. Arrestadas

El alegado "arresto", por su parte, surgió cuando en algunos colegios electorales se terminaron los sobres especiales para votar añadidos a mano y los funcionarios, a pesar de que retuvieron las papeletas electorales, TIE, boleto de autorización para votar y documentos de elegibilidad para cada elector, procedieron a colocar todo lo relativo al votante sin grapar o separar individualmente en un sobre común, que contenía a su vez, las papeletas y documentos de otros electores añadidos a mano para los cuales tampoco hubo sobre individual. En otros colegios, los sobres especiales para votar añadidos a mano no estaban en el maletín de materiales electorales, por lo que funcionarios se vieron obligados a improvisar métodos alternos al pautado y cometieron irremediablemente el mismo error que los funcionarios previamente aludidos. En la mayoría de estos colegios no hay modo de correlacionar las papeletas de un determinado elector con su documentación, están entremezcladas las papeletas y documentos de electores capacitados y electores no capacitados. Estos votos no se han adjudicado.

La contención que la representación legal de Granados Navedo hiciere en corte abierta en torno a los votos arrestados fue de que:

> ...hay una serie de electores que se les anuló y se les confiscó su derecho al voto en una forma arbitraria y caprichosa por la Comisión Estatal de Elecciones, y que en última instancia, ese número de electores de esos 6 colegios de votación, Vuestro Honor, exceden la ventaja del candidato Acevedo, certificado hasta este momento. (TE del 28 de agosto de 1989 a la página 25).

Para este grupo de electores el Tribunal Supremo pautó las siguientes directrices:

...en circunstancias en las que se han anulado votos de electores debidamente cualificados la norma general esbozada por diferentes tribunales estatales exige un criterio de prueba menos riguroso. En estas situaciones sólo se exige que el candidato derrotado demuestre que el número de votos anulados es suficiente para variar el resultado de la elección, de haberse emitido éstos a su favor. Es decir, cuando de estos casos se trata no es necesario que el candidato impugnador demuestre afirmativamente a favor de quién dichos votos fueron emitidos. Sólo se requiere que pruebe que de haberse adjudicado los mismos el resultado pudo haber sido diferente. Obviamente ello presupone que dichos votos fueron indebidamente anulados. (Énfasis suplido).

La parte demandante alegó que existen 207 papeletas arrestadas y no adjudicadas a través de 6 colegios electorales entre los cientos de colegios participantes en los pasados comicios:

| Precinto | Unidad | Colegio | Núm. votos arrestados |
|---|---|---|---|
| 001 | 026 | 008 | 27 |
| 002 | 006 | 004 | 25 |
| 002 | 029 | 005 | 21 |
| 003 | 020 | 008 | 02 |
| 003 | 033 | 004 | 15 |
| 004 | 003 | 008 | 117 |

A esos efectos presentó como testigos suyos a seis funcionarios electorales, cada uno de los cuales trabajó en un alegado colegio "arrestado" el pasado 8 de noviembre de 1988. El testimonio de estas personas versó sobre los acontecimientos e irregularidades habidas en el proceso eleccionario (i.e., procedimiento especial de añadido a mano) en su colegio que desembocaron en los votos arrestados ante nos. Veamos:

Precinto 001, Unidad 026, Colegio 008
El Sr. David Maysonet Castro, quien se desempeñó como Inspector en propiedad por el PNP para este colegio, señaló que una vez se

terminaron los sobres especiales de añadidos a mano los funcionarios utilizaron entre 10–15 sobres en blanco como sustitutos. Sin embargo, cuando éstos se terminaron los Inspectores de colegio –debido a que no había grapadoras, clipes ni sobres adicionales– acordaron depositar los subsiguientes votos añadidos a mano en unión a la TIE y documentos acreditativos de cada votante en una bolsa plástica (TE del 21 de agosto de 1989 a la página 118 y ss). No hay forma de correlacionar las papeletas de determinado elector con su TIE y documentación.

### Precinto 002 Unidad 066 Colegio 004

La Sra. Rina D. Pérez Díaz, quien se desempeñara como Inspectora alterna por el PNP para este colegio, declaró que de 4–5 papeletas correspondientes a electores añadidos a mano se depositaron en las urnas. El resto de las papeletas emitidas añadidas a mano se depositaron todas, en unión a la TIE y documentación del elector, en un sobre común. (TE del 21 de agosto de 1989 a la página 102 y ss).

### Precinto 002 Unidad 029 Colegio 005

La Sra. Regalada Rivera Santiago, quien se desempeñara como Secretaria por el PNP para este colegio, declaró que votaron alrededor de 121 personas en este colegio, la mayoría de las cuales fueron añadidas a mano a las listas electorales. Señaló que instruyeron al electorado a los efectos de que depositaran las papeletas en la urna electoral. No se recibió entre los materiales ningún sobre especial para votar añadido a mano. Las últimas 21 papeletas emitidas añadidas a mano se colocaron todas en unión a las TIEs y documentación de los electores en un sobre que les trajo el coordinador del PIP. (TE del 21 de agosto de 1989 a la página 123 y ss).

### Precinto 003 Unidad 020 Colegio 008

Testificó la Sra. Nereida Oyola Morales, Secretaria PNP para este colegio. Declaró que por error atribuible de la Inspectora PPD no se impartieron instrucciones al electorado en torno a cómo seguir el procedimiento especial de añadido a mano. En consecuencia, no se le retuvo la TIE a las primeras seis personas que utilizaron dicho mecanismo y sus papeletas se depositaron directamente en la urna. Estos seis votos se discutieron previamente en la página 108 de esta Opinión y Sentencia; son votos contaminados. Luego de que la Junta electoral visitara este colegio y corrigiera el error, se siguió el procedimiento correcto para los próximos 20 electores que votaron añadidos a mano. Para los últimos 5 electores que votaron añadidos a mano no hubo sobre; toda la información del elector, i.e., papeletas, TIE y tarjeta de autorización se individualizó con un clipe para cada elector. Estos cinco

paquetes, unidos a las 6 tarjetas de autorización (de aquellas papeletas que fueron a las urnas) se pusieron en un sobre. (TE del 21 de agosto de 1989 a la página 82 y ss). Nótese que los números de electores afectados en este incidente según el testimonio de esta funcionaria no concuerdan con la prueba documental ante nos.

Precinto 003 Unidad 033 Colegio 005

Testificó el Sr. Pablo Navarro Pérez, quien se desempeñara como Inspector PNP para ese colegio. Declaró que votaron "cincuenta y pico" de personas añadidas a mano de las cuales no se pudo seguir el procedimiento con rigurosidad con 15, debido a que se terminaron los sobres especiales. Luego de consultar a la Junta electoral, las papeletas e información particular de estos 15 electores –TIE y tarjeta amarilla– se colocó en un sobre común. Señaló el testigo que a pesar de que las 15 papeletas se colocaron juntas, estaban separadas, ya que se utilizó la papeleta electoral como sobre con toda la información adicional del elector adentro. (TE del 21 de agosto de 1989 a la página 141 y ss).

Precinto 004 Unidad 003 Colegio 008

Testificó la Sra. Laura Quiñones Pizarro, quien se desempeñó como Coordinadora de unidad por el PNP del P004 U003, Nemesio R. Canales. Declaró que el número de personas que acudieron a votar añadidos a mano fue tal que los coordinadores, por consenso, optaron por abrir un colegio adicional (C008) para facilitar el proceso eleccionario que allí se estaba llevando a cabo. Este nuevo colegio lo constituyeron los Coordinadores de Unidad de los tres partidos en unión a otros dos funcionarios (uno del PPD y otro del PNP). Todos los electores que votaron en este nuevo colegio votaron añadidos a mano a las listas electorales (Exhibit #058 y 840); hay 117 electores en total, de los cuales ninguno depositó sus papeletas en las urnas electorales. (TE del 28 de agosto de 1989 a la página 92 y ss).

Testificó además por la parte demandante el Lcdo. Bauzá Escobales, Primer Vice Presidente de la CEE por el PNP y miembro de la Junta Especial de Añadidos a Mano en el recuento del Coliseo. Explicó todo lo relativo a la "Tablita" (Exhibit #042). (TE del 28 de agosto de 1989 a la página 107 y ss). Su testimonio corroboró y amplió lo explicado por los funcionarios electorales de los colegios arrestados. Todo ello tendente a demostrar que en ninguno de estos colegios ocurrió fraude electoral.

En aras de reducir la interrogante en torno a la idoneidad y preferencia electoral de este grupo de votantes, la parte deman-

dada produjo como testigos a 8 electores, cada uno de los cuales declaró haber votado añadido a mano en los pasados comicios, explicó este procedimiento y señaló dónde se colocó su papeleta luego de entregársela al funcionario del colegio. Luego de que los demandados establecieran la capacidad electoral de estas personas mediante la presentación de un impreso del computador que les calificara como elector activo, el tribunal les advirtió sobre el carácter secreto del voto y sobre la voluntariedad del testimonio a vertir. Cada uno de estos testigos voluntariamente declaró haber votado por Héctor Luis Acevedo en las elecciones de 1988.[75]

En corte abierta la parte demandante objetó la admisibilidad de estos testimonios. Mediante su alegato arguye que la acción tomada por la parte demandada al presentar a estos electores es "constitucional y jurídicamente insostenible". Señala que:

El efecto real es de permitirle a un elector que identifique su voto premeditadamente y establezca un procedimiento el cual los que detentan el poder político puedan ejercer presiones y coacciones indebidas para que un elector cualificado testifique que votó por uno u otro candidato en particular en casos como el de autos de 'impugnación' de elecciones.

La jurisprudencia[76] citada por esta parte en apoyo de su contención no aplica ni es relevante a la situación ante nos.

---

[75]

| Precinto | Unidad | Colegio | Elector | Exhibits | Status | TE/P |
|---|---|---|---|---|---|---|
| 001 | 026 | 008 | Ruiz Torres, Daniel | 94,848 | A1 | 28-9-163 |
| | | | Meléndez Vega, Linda | 95,848 | A1 | 28-9-190 |
| | | | Benítez Jiménez, Edwin | 96,848 | A3 | 28-9-196 |
| | | | Esperanza Verdejo, José | 114,848 | A4 | 28-9-207 |
| 002 | 006 | 004 | Ortiz Martínez, Antonia | 143,847 | A4 | 29-9-49 |
| | | | Pagán Navarro, Eliezer | 147,847 | A4 | 29-9-56 |
| 004 | 003 | 008 | Cora Garrafa, Aida | 84,840 | A4 | 29-9-76 |
| | | | Benítez Cora, Luz W. | 148,840 | A3 | 29-9-68 |

[76] Pennington v. Hare, 62 NW 116 (Minnesota 1895); Stubbe v. Moursund, 222 SW 632 (Texas 1920); Duncan v. Willis, 302 SW 2d 635 (Texas 1957) y Trout v. Loe, 325 SW 2d 191 (Texas 1959).

Un votante capacitado no puede ser obligado a revelar por quién votó en determinado evento electoral debido a que le cobija el privilegio de voto secreto. Este privilegio, sin embargo, por ser de carácter personal puede renunciarse siempre y cuando sea de forma voluntaria. ( Kiehne v. Atwood, 604 P2d 123 (Nuevo Méjico 1979); Boardman v. Esteva, 323 So. 2d 259 (Florida 1976); Kaufmann v. La Crosse City Board of Canvassers, 98 NW 2d 422 (Wisconsin 1959); Wehrung v. Ideal School District No. 10, 78 NW 2d 68 (Dakota del Norte 1956). Esto fue lo que ocurrió con los 8 electores ("arrestados") arriba expuestos. Tan es así, que uno de ellos –Sra. Basilisa Colón Candelaria (P002 U006 C004; Exhibits #116 y 847; TE del 28 de septiembre de 1989 a la página 212 y ss) — al ser advertida de la naturaleza voluntaria de su testimonio optó por no contestar y su deseo fue respetado.

Esta constituyó toda la prueba testifical que las partes ofrecieran para el incidente de arrestados. Estipularon el Exhibit #836, conjunto de libros o "mamotretos" verdes, que contiene una relación de los electores que según la CEE votaron añadidos a mano en los colegios arrestados. Mediante un análisis de las listas electorales de colegios arrestados en que electores votaron añadidos a mano y documentación en torno a los mismos [77] en unión al Exhibit #836 arriba expuesto, las partes han circunscrito en sus alegatos de derecho: a qué votantes no se les ha adjudicado su voto por estar arrestada su papeleta y cuál es el status electoral de estas personas, i.e., capacitados o no capacitados. Luego de estudiar la evidencia sometida y analizados los alegatos, se determina que el número de electores afectados por este incidente se desglosa de la siguiente manera:

---

[77]

| Precinto | Unidad | Colegio | Exhibits correspondientes a estos colegios |
|---|---|---|---|
| 001 | 026 | 008 | 027, 882, 378, 379, 848, 849 |
| 002 | 006 | 004 | 028, 846, 847 |
| 002 | 029 | 005 | 031, 053, 054, 055, 056, 841, 842 |
| 003 | 020 | 008 | 032, 843, 844 |
| 003 | 033 | 005 | 029, 845 |
| 004 | 003 | 008 | 030, 057, 058, 059, 838, 840 |

| Precinto | Unidad | Colegio | Total Electores | Capacitados | No Capacitados |
|----------|--------|---------|-----------------|-------------|----------------|
| 001 | 026 | 008 | 27 | 18 | 9 |
| 002 | 006 | 004* | 25 | 19 | 6 |
| 002 | 029 | 005 | 21 | 10 | 11 |
| 003 | 020 | 008* | 2 | 2 | 0 |
| 003 | 033 | 005 | 15 | 5 | 10 |
| 004 | 003 | 008* | 117 | 44 | 73 |
| | | | 207 | 98 | 109 |

\* 002/006/004 Hay en evidencia 25 papeletas, pero hay información electoral (i.e., autorizaciones para votar, documentación acreditativa) de m[á]s de 25 electores. Asumimos la posición m[á]s favorable a la parte impugnadora y acogemos las cifras expuestas en su alegato (página 19) para el número afectado de electores capacitados. Cabe señalar que éste es el mismo número que los demandados aluden se han visto afectados (19).

\* 003/020/008 Hay dos papeletas "arrestadas" (Exhibit #843), pero debido a la escasa prueba sometida no se puede determinar a qué personas corresponden. Sería mera especulación el concluir que estas papeletas corresponden a los dos electores escogidos por la parte demandante en su alegato. Siguiendo este mismo razonamiento se puede concluir que esas dos papeletas corresponden a dos personas que no son electores hábiles. Sin embargo, en aras de darle el beneficio de la duda al candidato impugnador y de definir el número de electores capacitados afectados por este incidente, asumimos que estos 2 votos arrestados pertenecen a electores capacitados. (La posición de los demandados es a los efectos de que debe inferirse que un voto corresponde un elector capacitado y otro voto a un elector no capacitado.)

\* 004/003/008 El demandante aduce que de estas 117 papeletas arrestadas, 48 pertenecen a electores capacitados; los demandados señalan que 47. La discrepancia de una papeleta entre una y otra parte se debe al elector Rivas Rondón, José P. (al folio 25 del Exhibit #836 para el P004 U003 C008). Este fue tachado de las listas electorales del P004 U003 C008 por estar excluido, pero inadvertidamente fue incluido por la CEE en dicho Exhibit previo a someterlo en evidencia. (Véase este folio 25 frente a la TE del 28 de agosto de 1989 a las páginas 99–100). Las partes, sin embargo, no excluyeron a tres electores que a pesar de estar activos, pertenecen a otros precintos electorales. No debieron votar en el P004. Ellos son:

Verdejo Canales, Jesús, A1 en el P001
Pabón Vega, José De., A4 en el P003
Marrero Pérez, Cristobal, A4 en el P003

Entre los colegios arriba enumerados, cabe señalar y destacar que la prueba testifical y documental presentada en sala nos obliga a que demos un trato distinto a dos de los seis colegios arrestados. Veamos:

1. El Precinto 002 Unidad 029 Colegio 005, para el cual declarara la Sra. Rivera, (testigo del demandante), contiene 21 juegos de papeletas que están identificadas al dorso con el nombre y número electoral de su votante. La letra de estas anotaciones coincide tanto con las iniciales C.G.P. al dorso de las papeletas como con la firma de este funcionario –Cándido García Pomales– en las Actas de Incidencias para ese colegio (Exhibit #031). El testimonio del Sr. Bauzá Escobales, quien participara en el recuento del Coliseo en la Junta especial de añadidos a mano arrojó luz en torno a que fue en el colegio electoral donde se escribieron los nombres y número de estos electores al dorso de las papeletas:

P (Lcdo. Canals) ¿Y no hay forma de determinar, obviamente, a quién corresponden esas papeletas?

R (Bauzá Escobales) No, porque no... Por lo menos, nosotros como no bregamos con las papeletas, dejamos las papeletas a un lado. Teníamos órdenes claras de la Comisión en cuanto a no bregar con las papeletas. Lo que hacíamos en estos casos era que al abrir el sobre, buscábamos y vaciábamos...

HON. JUEZ: El problema es que él no examinó las papeletas. ¿En ninguno de los 6 colegios arrestados usted examinó las papeletas?

TESTIGO (Bauzá Escobales): No, no las examinamos en ningún momento. (TE del 28 de agosto de 1989 a página 117 y ss). (Subrayado nuestro).

No hay razón por la cual estas papeletas deban permanecer arrestadas ya que se sabe qui[é]nes fueron los electores que las emitieron y sus status. Podemos determinar que una de las papeletas corresponde a la funcionaria electoral Lissette Cortés Larregui, debido a que su firma consta en varias de las tarjetas (amarillas) de autorización para votar añadida a mano que se le expidieran a los votantes de ese colegio. En ánimo de minimizar los votos no adjudicados en esta controversia y de llegar a una conclusión que refleje la voluntad del electorado capacitado, al cotejar el Exhibit #841 se desprende que de estos 21 votos, 11 corresponden a electores inhábiles y 10 a votantes hábiles. De [e]stos diez, seis fueron emitidos a favor de Héctor Luis Acevedo y 4 a José Granados Navedo. Deben adjudicarse en esa forma.(78)

2. P004 U003 C008: Este fue el colegio que se creó a consecuencia del ascendente número de electores que se presentaron a votar añadidos a mano ese día en el residencial público Nemesio R. Canales. Las decenas de votantes fueron trasladados a este nuevo colegio para efectuar allí el proceso eleccionario. En dicho colegio había sobres especiales de añadidos a mano, sin embargo, los funcionarios estuvieron dispuestos a improvisar métodos alternos al mismo. El tumulto de electores que iba a votar se negó rotundamente a entregar sus TIEs a pesar de requerírseles. La actitud amenazante de los mismos llegó a tal extremo que los

---

(78) Distínguese esta situación de la acontecida en el caso de las iniciales. En aquel incidente fue a instancia propia del elector que se violó la secretividad de su voto. Aquí es el funcionario electoral quien comete tal acto por no haber sobres de añadidos a mano en el colegio. (Estos sobres nunca se recibieron). Los funcionarios sustituyeron el uso del sobre, i.e., recusación y declaración jurada, por la identificación del elector al dorso de su papeleta. No puede castigarse al electorado por deficiencias en la implantación de este nuevo mecanismo aprobado en fecha tan próxima a las elecciones.

funcionarios temieron por sus vidas(79) y se vieron precisados a permitirles votar sin que entregasen su TIE.

Si bien es cierto que hubo irregularidades con el procedimiento especial de añadidos a mano en este colegio, ello no es razón para que el elector pautara el mecanismo a seguir. Como excepción, a los electores excluidos de las listas electorales se les permitía votar siempre y cuando establecieren que su condición de excluidos era por error atribuible a la CEE. Debían presentar su TIE, la cual se retenía en el colegio y se enviaba junto a las papeletas y documentación del elector a la CEE para investigarse la capacidad electoral de la persona frente a la otra documentación allí habida. Todo en aras de reconocerle al elector capacitado su derecho al sufragio. Al oponerse obstinadamente a dejar su TIE con los funcionarios electorales, personas que vienen obligadas por la Ley Electoral a "desempeñarse fiel y honradamente" en sus deberes, estos votantes cerraron las puertas a que su derecho al voto tan siquiera se considerara. Sus votos, por ende, no deben adjudicarse; a[u]n el de aquellos dos electores que testificaron haber votado por Héctor Luis Acevedo. Las leyes existen para ser obedecidas. Su cumplimiento no puede quedar al arbitrio de quienes vienen obligados a seguirla. Permitirse ello nos llevaría a la total anarquía y caos.

Conforme a lo previamente determinado, se reduce la controversia a cuatro colegios para los cuales la distribución de votos

---

(79) TE del 21 de agosto de 1989, Sección Vespertina, a las páginas 137–138:

Pregunta (Juez Polo): Usted dice que no se le retuvo la tarjeta a los electores. ¿Por qué razón?

TESTIGO: Bueno, ningún elector estaba de acuerdo en dejar su tarjeta, porque ellos entendían, señor, que debían de haber aparecido en lista.

Se cotejaban las listas de excluidos, a nivel de toda la isla y no aparecían excluidos y por esa razón, todos los coordinadores estuvimos de acuerdo, quien presidía era el coordinador del Partido Popular, que se realizara en esa situación y el ámbito y las personas allí congregadas, que llegaban a ciento y pico de electores, estaban en unas posiciones demasiado de desafiantes y peligraba nuestra vida.

Nosotros estábamos allí ejerciendo un derecho y ellos entendían que tenían ese derecho a su voto secreto. Entonces, no estaban de acuerdo a dejar su tarjeta.

Además, no había suficiente material para asegurarle la privacidad a cada uno de los electores. (Subrayado nuestro).

arrestados para uno y otro candidato[80] es la siguiente:

| P. U. C.(*) | Total votos | Hábiles | No Hábiles | Exh. | Acevedo | Granados | Otros | Dañados |
|---|---|---|---|---|---|---|---|---|
| 001/026/008 | 27 | 18 | 9 | 849 | 13 | 14 | 0 | 0 |
| 002/006/004 | 25 | 19 | 6 | 846 | 9 | 16 | 0 | 0 |
| 003/020/008 | 2 | 2 | 0 | 843 | 0 | 2 | 0 | 0 |
| 003/033/005 | 15 | 5 | 10 | 845 | 5 | 9 | 0 | 1 |
| | 69 | 44 | 25 | | 27 | 41 | 0 | 1 |

Ante un cuadro como el presente el magistrado entiende que el remedio judicial más certero y justo, representativo de la voluntad del electorado, lo es la distribución prorrata (que expusiéramos en la alternativa en el incidente de contaminados).

La reducción prorrata de votos ilegales aplica a situaciones donde se ha dado contaminación de votos y los mismos ya se han adjudicado. La situación ante nos es distinta. A pesar de que existe la contaminación, los votos están arrestados y no adjudicados. Sin embargo, de seguir la misma lógica de este remedio judicial, procedería aplicar a este grupo de votos arrestados la adición o suma prorrata de los votos de electores hábiles. El hecho de que esta situación (de adición prorrata) no se haya suscitado en otros foros (por no haberse dado una situación de votos arrestados) no impide el que en Puerto Rico se aplique este remedio.

Al aplicar este remedio se observa que el número de votos a adjudicarse a uno otro candidato no afecta el resultado final de la elección capitalina:

---

[80] Véase el desglose que de estos votos hiciere el Hon. Antonio S. Negrón García, Opinión disidente, Granados Navedo v. Rodríguez Estrada..., 88 JTS 63, a las páginas 6965–6966. Coincidimos con las cifras expuestas por el Honorable Juez Asociado, salvo aquellas correspondientes al P003 U033 C005; donde inexplicablemente le adjudicó una papeleta nula por contener doble marca al candidato José Granados Navedo. (Exhibit #845).
*

| P. U. C. | Total votos | Hábiles | Inhábiles | Exh. | Acevedo | Granados | Otros | Dañados | Papeleta Sobrante |
|---|---|---|---|---|---|---|---|---|---|
| 004/008/003 | 117 | 44 | 93 | 838 | 44 | 62 | 3 | 8 | 1 |

## TABLA DE ADICION PROPORCIONAL
## COLEGIOS "ARRESTADOS"

| PRECINTO UNIDAD | TOTAL VOTOS LEGALES A SER ADJUDICADOS | TOTAL VOTOS ADJUDICADOS PREVIAMENTE | VOTOS POR ACEVEDO | ADICION PROPORCIONAL DE VOTOS ACEVEDO | VOTOS POR GRANADOS | ADICION PROPORCIONAL DE VOTOS GRANADOS | VOTOS POR OTROS CANDIDATOS | ADICION PROPORCIONAL DE VOTOS OTROS CANDIDATOS |
|---|---|---|---|---|---|---|---|---|
| 001/26 | 14 | 1599 | 617 | 5.40 | 944 | 8.27 | 38 | 0.33 |
| 002/06 | 17 | 673 | 324 | 8.18 | 321 | 8.11 | 28 | 0.71 |
| 003/33 | 5 | 992 | 542 | 2.73 | 421 . | 2.12 | 29 | 0.15 |
| TOTALES | 36 | 3264 | 1483 | 16.31 | 1686 | 18.50 | 95 | 1.19 |

1) 001/26/08 Hay 27 papeletas arrestadas. De estas, 18 corresponden a electores hábiles, 4 de los cuales comparecieron y voluntariamente testificaron que habían votado por H[é]ctor Luis Acevedo. Por ello se adjudican sólo 14 papeletas a prorrata.

2) 002/06/04 Hay 25 papeletas arrestadas. De estas, 19 corresponden a electores hábiles, 2 de los cuale declararon voluntariamente haber votado por H[é]ctor Luis Acevedo. Por ende, solamente quedan 17 votos de electores hábiles por adjudicar a prorrata.

| PRECINTO UNIDAD | TOTAL VOTOS LEGALES A SER ADJUDICADOS | TOTAL VOTOS ADJUDICADOS PREVIAMENTE | VOTOS POR ACEVEDO | ADICION PROPORCIONAL DE VOTOS ACEVEDO | VOTOS POR GRANADOS | ADICION PROPORCIONAL DE VOTOS GRANADOS | VOTOS POR OTROS CANDIDATOS | ADICION PROPORCIONAL DE VOTOS OTROS |
|---|---|---|---|---|---|---|---|---|
| 004/03 | 42 | 1374 | 554 | 16.93 | 789 | 24.12 | 31 | 0.95 |

004/03/08 Se arrestaron 117 papeletas. De estas, 44 corresponden a electores hábiles, 2 de los cuales declararon voluntariamente haber votado por H[é]ctor Luis Acevedo. Por ende, solamente quedan 42 votos de electores hábiles por adjudicar a prorrata.

La parte demandante solicita como remedio el que se adjudiquen la totalidad de estas papeletas "arrestadas". (Alegato a las páginas 32 y 34). Fundamenta su postura en la doctrina de uniformidad: debe dársele igual trato a las papeletas "contaminadas" (que ya fueron adjudicadas) y a las "arrestadas". Los demandados, por el contrario, sostienen que el principio de uniformidad solicitado es improcedente, ya que éste no permite "que se trate de igual forma situaciones que por su naturaleza son diferentes." Distinguen uno y otro incidente al hacer hincapié tanto en el ascendente número de electores inhábiles que votaron en los colegios "arrestados" (más del 50%) como en la naturaleza

de las violaciones al procedimiento especial de añadidos a mano habidas en estos colegios. Señalan que irregularidades como el no mantener individualizadas las papeletas y el que el electorado no prestara declaración jurada van contra los requisitos esenciales del procedimiento especial de añadidos a mano.

Las directrices del Tribunal Supremo, particularmente las referentes al incidente de arrestados señalan a la página 6893:

> ...cuántos de los denominados votos arrestados pertenecen a electores que no tenían derecho al voto. A los fines de atender el reclamo de uniformidad del impugnador, el tribunal deberá determinar las circunstancias y las raz[o]nes por las cuales se tomaron las decisiones sobre las papeletas arrestadas y contaminadas, que de su faz, se apartan de las claras instrucciones y reglas adoptadas para regir el procedimiento de electores añadidos a mano. Una vez determine el número de electores afectados por la decisión de adjudicar o no los votos arrestados o contaminados, podrá resolver si los mismos son suficientes para cambiar el resultado de la elección. (Enfasis suplido).

Analizado este incidente y aun accediendo al reclamo del candidato impugnador José Granados Navedo de que se adjudiquen todos los votos arrestados, éstos no cambiarían el resultado de las elecciones de San Juan.

Es por todo lo previamente expuesto que se determina que prevalece la determinación que hiciere la CEE el pasado diciembre de 1988.

Conclusión:

No debemos concluir esta Opinión y Sentencia sin hacer unos señalamientos particulares sobre los pasados comicios capitalinos, el procedimiento eleccionario propiamente y la naturaleza del presente litigio.

La reñida campaña política de los candidatos a la Alcaldía de San Juan culminó en la marcada polarización del electorado al emitir sus votos el pasado 8 de noviembre de 1988. El estrecho margen de victoria (29 votos) del candidato Héctor Luis Acevedo, Alcalde de San Juan, es factor que ha contribuido al desasosiego y malestar a través de este litigio. Se ha creado un ambiente

cargado de ánimos negativos y de ataques personales a través de todos los medios comunicativos contra la integridad de personas, instituciones y funcionarios del país. Ello en nada ha contribuido a restablecer la tranquilidad deseada por toda la ciudadanía capitalina y la estabilidad necesaria para el eficiente funcionamiento del gobierno municipal. [81]

Se ha querido socavar la rectitud del proceso eleccionario tanto en los colegios electorales como en el seno de la Comisión Estatal de Elecciones. Se ha dicho que las decisiones tomadas por ese organismo electoral en torno a los testigos y partes en este caso han sido arbitrarias y caprichosas y que la situación de este electorado es reflejo del "latifundio de violaciones constitucionales al derecho al voto" que ocurrió en las elecciones capitalinas de 1988.

Tal sentir no encuentra apoyo en la prueba que ha desfilado ante este foro. Las pasadas elecciones en el municipio de San Juan estuvieron a la altura e integridad deseada y esperada y sus resultados reflejaron la voluntad e intención del electorado. No podemos pasar por alto, sin embargo, inevitables irregularidades de naturaleza similar a las acontecidas en todos los comicios de este país, i.e., errores en las listas electorales, dobles inscripciones, omisiones en el trámite expedito de solicitudes...PSP, PPD, PIP v. Romero Barceló, supra, a la página 299. PSP v. Comisión Estatal de Elecciones, supra, a la página 423. [82] A pesar de que se diseñaron procedimientos para subsanar las deficiencias del organismo electoral y para proteger el derecho al sufragio, la aprobación de tales mecanismos en fecha próxima al evento eleccionario y el permitir trámites tan cercanos al incidente

---

[81] Igual sentir ha sido recogido por previa jurisprudencia: PPD v. Admor. Gen. de Elecciones, supra; P.S.P., P.P.D., P.I.P. v. Romero Barceló, supra; P.S.P. v. Com. Estatal de Elecciones, supra.

[82] Se ha causado un revuelo innecesario en torno a tales irregularidades. Muestra de ello ha sido el testimonio de un gran número de testigos que si bien señalaron no haber tenido problemas al votar en elecciones previas y declararon ser ésta la única ocasión en que han enfrentado inconvenientes, la prueba documental que se presentó demostró que en aquellas elecciones también tuvieron los mismos problemas.

comicial,(83) si bien contribuyeron a que miles de electores votasen, dieron lugar a las circunstancias atendidas en el caso de autos. Estas, como señaláramos antes son meramente irregularidades(84) que han sido subsanadas y no constituyen violaciones fundamentales al derecho al voto. La naturaleza y la ferocidad de las alegaciones en contraste con la endeblez de la prueba nos hace recordar la expresión latina "mole ruit sua".(85)

Por los fundamentos anteriormente expuestos en la opinión se dicta sentencia desestimando la demanda en el caso K AC88–2133 por no haberse probado que la adjudicación de los votos en controversia varía la Certificación emitida por la CEE a favor del demandado Héctor Luis Acevedo.

De igual forma, se dicta sentencia parcial declarando con lugar la demanda en el caso K PE89–0274 a los efectos de que se reconoce que la Sra. Francisca Lu[z]garda González Suárez tenía derecho a que su voto se adjudicara en los pasados comicios. Se continuarán los procedimientos en cuanto a su reclamación de daños.

A pesar de las determinaciones específicas en cuanto a temeridad, la presente sentencia se dicta sin especial condena de honorarios de abogado.

REGISTRESE Y NOTIFIQUESE

Dada en San Juan, Puerto Rico, a 10 de mayo de 1990.

[*Fdo.*] CARLOS E. POLO
JUEZ SUPERIOR

---

(83) Procedimiento de añadidos a mano y Solicitud de inclusión por omisión.

(84) El caso de autos representa lo que en los foros federales se conoce como un "garden variety election irregularity" y no el tipo de "patent and fundamental unfairness" que las partes demandantes insin[ú]an.

(85) A tenor con lo expuesto, cabe hacer mención de los demandantes involuntarios que el Lcdo. Bray representó en la segunda fase de este caso. De los 182 demandantes por él representados y anunciados, declararon ante este foro 89 personas, de los cuales solamente 12 son electores capacitados. De los 55 electores ante el foro federal, únicamente 7 votantes que pertenecen al evento de añadidos a mano eran hábiles para votar en las elecciones de 1988.

EN EL TRIBUNAL SUPERIOR DE PUERTO RICO
SALA DE SAN JUAN

| | |
|---|---|
| JOSE GRANADOS NAVEDO<br><br>Demandante<br>Vs.<br><br>MARCOS A. RODRIGUEZ ESTRADA Y OTROS<br>Demandados | CIVIL NUM: K AC88-2133<br>(Sala 1008)<br><br>SOBRE:<br>IMPUGNACION DE CER-<br>TIFICACION<br><br>DE CANDIDATO A AL-<br>CALDE |
| FRANCISCA LUDGARDA GONZALEZ SUAREZ<br>Demandante<br>Vs.<br><br>MARCOS A. RODRIGUEZ ESTRADA Y OTROS<br>Demandados | CIVIL NUM: K PE89-0274<br>(Sala 1008)<br><br>SOBRE:<br><br><br>MANDAMUS |

APENDICES

APENDICE 1 COPIAS DE PAPELETAS INCIDENTE DE DOBLE MARCA

APENDICE 2 RESUMEN DE TESTIMONIO DE ELECTORES Y FUNCIONARIOS INCIDENTE DE PAPELETAS CON INICIALES O MARCAS AL DORSO

APENDICE 3 FOTOCOPIA DE PAPELETA CON NOMINACION DIRECTA

APENDICE 4(A) TABLA DE ELECTORES EXCLUIDOS POR RAZON DE DOMICILIO (ER)

APENDICE 4(B) RESUMEN DE TESTIMONIO ELECTORES AÑADIDOS A MANO (CASOS ATIPICOS)

APENDICE 4(C) CERTIFICACION DEL RESULTADO DE ESCRUTINIO AÑADIDOS A MANO

APENDICE 5(A) RESUMEN DE TESTIMONIO DE FUN-
CIONARIOS EN COLEGIOS CONTAMI-
NADOS

APENDICE 5(B) CORRELACION DEL TESTIMONIO DE
ELECTORES EN EL INCIDENTE DE
"CONTAMINADOS" CON EL TESTIMO-
NIO DE LOS FUNCIONARIOS DE LA
CEE: LIC. SIGFREDO PONS FONTANA Y
ALFREDO MENDEZ

APENDICE 5(C) TABLA DE REDUCCION PROPORCIO-
NAL EN LOS COLEGIOS CONTAMINA-
DOS

## EN EL TRIBUNAL SUPERIOR DE PUERTO RICO
## SALA DE SAN JUAN

| | |
|---|---|
| JOSE GRANADOS NAVEDO<br><br>Demandante<br>Vs.<br><br>MARCOS A. RODRIGUEZ ESTRADA Y OTROS<br>Demandados | CIVIL NUM: K AC88-2133<br>(Sala 1008)<br><br><br>SOBRE:<br><br>IMPUGNACION DE CER-<br>TIFICACION<br>DE CANDIDATO A AL-<br>CALDE<br>Orden Número 113 |
| FRANCISCA LUDGARDA GONZALEZ SUAREZ<br>Demandante<br>Vs.<br><br>MARCOS A. RODRIGUEZ ESTRADA Y OTROS<br>Demandados | CIVIL NUM: K PE89-0274<br>(Sala 1008)<br><br><br>SOBRE:<br><br><br>MANDAMUS |

## RESOLUCION ENMENDANDO SENTENCIA "NUNC PRO TUNC"

A base de las disposiciones de la Regla 49.1 de Procedimiento Civil, se enmienda "nunc pro tunc" la opinión y sentencia dictada en este caso el 10 de mayo de 1990. Dicha enmienda es con el único propósito de incluir la palabra no que por omisión no se escribió en la línea sexta de la página 119 luego de la frase "En dicho colegio . . . ."

La referida oración se enmienda para que exprese: En dicho colegio no había sobres especiales de añadidos a mano, sin embargo, los funcionarios estuvieron dispuestos a improvisar métodos alternos al mismo.

El resto de la opinión y sentencia queda inalterada.

REGISTRESE Y NOTIFIQUESE.

Dada en San Juan, Puerto Rico, a 23 de mayo de 1990.

[*Fdo.*] Carlos E. Polo
Juez Superior

# APENDICE 1

## COPIAS DE PAPELETAS INCIDENTE DE DOBLE MARCA

ANEJO I

APENDICE 1

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para que elector anote en ella el nombre de cualquier candidato que desee acumular, fuera de los que aparecen en las columnas anteriores

Artículo 5.011
Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | NOMINACION DIRECTA | |
|---|---|---|---|---|---|---|---|
| **ALCALDE** | | **ALCALDE** Jose Granados Navedo | | **ALCALDE** Ana María (Ita) Corrada del Río | | **ALCALDE** | |
| Héctor Luis Acevedo | | | | | | | |
| *Miembros de la Asamblea Municipal* | | *Miembros de la Asamblea Municipal* | | *Miembros de la Asamblea Municipal* | | *Miembros de la Asamblea Municipal* | |
| Thilda Alvarado | | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | | 1 |
| Manuel E. Andreu García | | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | | 2 |
| Can...o Betancourt Calo | | Miguel A. "Tito" González Ríos | 3 | José Cruz | 3 | | 3 |
| Eric Colón Rodríguez | | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | | 4 |
| Amadís Cruz Cáceres | | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | | 5 |
| John Fucile | | Samuel Méndez Cuesta | 6 | Jesús Márquez | 6 | | 6 |
| Conrado González | | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | | 7 |
| Roberto Pérez Santoni | | Myriam Herdman Barreto | 8 | Gladys Cosme | 8 | | 8 |
| Francisco (Paco) Luis Rivera | | George McDougall | 9 | Victor Andino | 9 | | 9 |
| Día...Rodríguez | | Rafael Ubarri Acosta | 10 | Pablo Ortiz | 10 | | 10 |
| Dafne Bajo | | Sonia Pabón de Sotomayor | 11 | Diego Gerbea | 11 | | 11 |
| Awilda Saldaña | | Luis Rivera Brenes | 12 | Domingo Elías Velázquez | 12 | | 12 |
| Arturo Silvagnoli | | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | | 13 |
| Zandra Vergne Colón | | Aída Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y ninguno otro.

Para votar íntegro usted hace una X cruz "X" o marca válida en el recío en blanco bajo la insignia del partido de su preferencia. Esa marca sola vale para todos los candidatos de la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una marca al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
**8 DE NOVIEMBRE DE 1988**

municipio de **SAN JUAN**

161

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | APENDICE 1 |
|---|---|---|---|

iDATE A RESPETAR!

APENDICE 1

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para electar anote en ella el nombre de cualquier candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores.

Artículo 6.011 Ley Electoral

ALCALDE

**PARTIDO POPULAR DEMOCRATICO** — ALCALDE — Héctor Luis Acevedo
**PARTIDO NUEVO PROGRESISTA** — ALCALDE — José Granados Navedo
**PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO** — ALCALDE — Ana María (Ita) Corrada del Río

ANEJO III

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para electar anote en ella el nombre de cualquier candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores.

Artículo 6.011 Ley Electoral

ALCALDE

**PARTIDO POPULAR DEMOCRATICO** — Héctor Luis Acevedo
**PARTIDO NUEVO PROGRESISTA** — José Granados Navedo
**PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO** — Ana María (Ita) Corrada del Río

ANEJO IV

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para electar anote en ella el nombre de cualquier candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores.

Artículo 6.011 Ley Electoral

ALCALDE

**PARTIDO POPULAR DEMOCRATICO** — Héctor Luis Acevedo
**PARTIDO NUEVO PROGRESISTA** — José Granados Navedo
**PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO** — Ana María (Ita) Corrada del Río

ANEJO V

NOMINACION DIRECTA

(WRITE IN)

Se provee esta columna en blanco para electar anote en ella el nombre de cualquier candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores.

Artículo 6.011 Ley Electoral

ALCALDE

**PARTIDO POPULAR DEMOCRATICO** — Héctor Luis Acevedo
**PARTIDO NUEVO PROGRESISTA** — José Granados Navedo
**PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO** — Ana María (Ita) Corrada del Río

162

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | APENDICE 1 |
|---|---|---|---|
| | | ¡DATE A RESPETAR! | NOMINACION DIRECTA (WRITE IN) |
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana Maria (Ita) Corrada del Rio | ANEJO VII NOMINACION DIRECTA (WRITE IN) |
| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana Maria (Ita) Corrada del Rio | ANEJO VIII NOMINACION DIRECTA (WRITE IN) |
| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana Maria (Ita) Corrada del Rio | ANEJO IX NOMINACION DIRECTA (WRITE IN) |
| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | |
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana Maria (Ita) Corrada del Rio | |

ANEJO XI

APENDICE 1

NOMINACION DIRECT

(WRITE IN)

Se prevee esta columna en blanco par elector anote en ella el nombre de cu otro candidato que desee encasillar. I los que aparecen en las columnas ant

Artículo 8.011 Ley Electoral

| PARTIDO POPULAR DEMOCRATICO | | PARTIDO NUEVO PROGRESISTA | | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | | |
|---|---|---|---|---|---|---|
| **ALCALDE** Héctor Luis Acevedo | | **ALCALDE** José Granados Navedo | | **ALCALDE** Ana Maria (Ita) Corrada del Rio | | **ALCALDE** |
| **Miembros de la Asamblea Municipal** | | **Miembros de la Asamblea Municipal** | | **Miembros de la Asamblea Municipal** | | **Miembros de la Asamblea Nueva** |
| Thilda Alvarado | | Ramón "Pitito" Miranda Marzán | 1 | Carlos Fronteras | 1 | 1 |
| Manuel E. Andreu García | | Dámaris Sifuentes Reyes | 2 | Héctor Villarini | 2 | 2 |
| urmelo Betancourt Calo | | Miguel A. "Tito" González Rios | 3 | José Cruz | 3 | 3 |
| Eric Colón Rodríguez | | Enrique Ferreira Vélez | 4 | Otilio Rosado | 4 | 4 |
| Amadis Cruz Cáceres | | Nicolás Crespo Kortright | 5 | Angel Ortega | 5 | 5 |
| John Fucile | | Samuel Méndez Caseta | 6 | Jesús Márquez | 6 | 6 |
| Conrado González | | Isidra Albino Serrano | 7 | José T. Quiñones | 7 | 7 |
| Roberto Pérez Santaní | | Myriam Herdman Barreas | 8 | Gladys Cosme | 8 | 8 |
| Francisco (Paco) Luis Rivera | | George McDougall | 9 | Victor Andino | 9 | 9 |
| Iasa Rodríguez | | Rafael Ubarri Assta | 10 | Pablo Ortiz | 10 | 10 |
| Daíne Rojo | | Sonia Pabón de Sotomayor | 11 | Diego Gorbea | 11 | 11 |
| Awilda Saldaña | | Luis Rivera Brenes | 12 | Domingo Elias Velázquez | 12 | 12 |
| Arturo Silvagnoli | | Héctor L. Schmidt Figueroa | 13 | Digna L. Ocasio Rosario | 13 | 13 |
| Zandra Vergne Colón | | Aida Avalo Collazo | 14 | Felipe (Pipo) Rivera | 14 | 14 |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo. Cada voto así marcado contará solamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desee votar exclusivam por uno o más candidatos y no tiene interés en v bajo la insignia de ningún partido, hará una ma al lado de los candidatos de su preferencia.

También puede votar por otras personas d preferencia que no aparecen como candid escribiendo su nombre bajo el cargo correspondi en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por candidato para cada cargo.

## COMISION ESTATAL DE ELECCIONES
# ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
### 8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

ANEJO X

APENDICE 1

NOMINACION DIRECTA

(WRITE IN)

ANEJO XII

NOMINACION DIRECTA

(WRITE IN)

ANEJO XIII

NOMINACION DIRECTA

(WRITE IN)

**PARTIDO POPULAR DEMOCRATICO**

**PARTIDO NUEVO PROGRESISTA**

**PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO**

¡DATE A RESPETAR!

ANEJO XIV

APENDICE 1

NOMINACION DIRECTA

(WRITE IN)

Se proveo esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores

Artículo 8.011
Ley Electoral

ALCALDE

ALCALDE — Héctor Luis Acevedo

ALCALDE — José Granados Navedo

ALCALDE — Ana María (Ita) Corrada del Río

---

**PARTIDO POPULAR DEMOCRATICO**

**PARTIDO NUEVO PROGRESISTA**

**PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO**

¡DATE A RESPETAR!

ANEJO XV

NOMINACION DIRECTA

(WRITE IN)

Se proveo esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee encasillar, fuera de los que aparecen en las columnas anteriores

Artículo 8.011
Ley Electoral

ALCALDE

ALCALDE — Héctor Luis Acevedo

ALCALDE — José Granados Navedo

ALCALDE — Ana María (Ita) Corrada del Río

# APENDICE 2

RESUMEN DE TESTIMONIO DE ELECTORES Y
FUNCIONARIOS
INCIDENTE DE PAPELETAS CON INICIALES O
MARCAS AL DORSO

APENDICE 2

INCIDENTE DE INICIALES O MARCAS AL DORSO

| Precinto | Unidad | Colegio | Elector y Funcionario de Colegio | Página |
|---|---|---|---|---|
| 1. 002 | 003 | 002 | Luis A. Gierbolini Cruz-Elector<br>Pedro Santiago-Funcionario PNP<br>Manuel Claveli-Funcionario PPD | 1-2 |
| 2. 002 | 012 | 004 | Luz M. Ramos Hernández-Electora<br>Nydia Soto-Funcionaria PNP<br>Margarita Ojeda-Funcionaria PPD | 3-4 |
| 3. 002 | 030 | 001 | José Campos Morales-Elector<br>Nydia Román-Funcionaria PNP<br>Nahílda Cruz-Funcionaria PPD | 5 |
| 4. 003 | 004 | 001 | Rubén Agosto Avilés-Elector<br>Sylvia Cortés-Funcionaria PNP<br>Julia Ortega-Funcionaria PPD | 6-7 |
| 5. 003 | 005 | 005 | Carlos V. Wheeler-Elector<br>Gladys Mayol-Funcionaria PNP<br>Jorge Vizcarrondo-Funcionario PPD | 8-9 |
| 6. 003 | 008 | 001 | Carlos A. Calo Barreto-Elector<br>Edgardo Cruz-Funcionario PNP<br>Ana H. González-Funcionaria PPD | 10-11 |
| 7. 003 | 013 | 004 | Jenny Snow Solá-Electora<br>Irma Meléndez-Funcionaria PPD | 12-13 |
| 8. 003 | 015 | 004 | Luz M. Silva Claudio-Electora<br>Edna Sáez-Funcionaria PPD | 14 |
| 9. 003 | 026 | 005 | Delvis Rivera Laureano-Electora<br>Carmen Colón-Funcionaria PPD | 15 |
| 10. 003 | 029 | 004 | Ivette S. Ramírez-Electora<br>Frances Cruz-Funcionaria PNP<br>María Pérez-Funcionaria PPD | 16 |
| 11. 003 | 029 | 004 | Daisy Raldiris Robles-Electora<br>Véase Elector Anterior | 17-18 |
| 12. 003 | 036 | 001 | William Alemán Noriega-Elector<br>María Vega Cubero-Funcionaria PNP<br>Nilda Verdeguez-Funcionaria PPD | 19-20 |
| 13. 003 | 036 | 001 | Francisca Carmona-Electora<br>Véase elector anterior | 21 |
| 14. 003 | 036 | 001 | Georgina Carmona-Electora<br>Véase elector anterior | 22 |
| 15. 003 | 036 | 001 | Vicente Altorán Ruiz-Elector<br>Véase elector número 12 de este<br>apéndice | 23 |
| 16. 004 | 004 | 002 | Josefina Olmo Domínguez-Electora<br>Myriam Contreras-Funcionaria PNP<br>Noelia Jiménez-Funcionaria PPD | 24-25 |

168

| Precinto | Unidad | Colegio | Elector y Funcionario de Colegio | Página |
|----------|--------|---------|----------------------------------|--------|
| 17. 004 | 015 | 003 | José M. Fernández Ramírez-Elector<br>José Rivera-Funcionario PNP<br>Nilsa N. López-Funcionaria PPD | 26-27 |
| 18. 004 | 015 | 004 | Luis Marcano Valentín-Elector<br>Yolanda Ordoñez-Funcionaria PNP<br>Sylvia Toledo-Funcionaria PPD | 28-29 |
| 19. 004 | 016 | 004 | Enrique A. Lugo Lugo-Elector<br>Marylina Lanza-Funcionaria PPD | 30 |
| 20. 004 | 017 | 002 | Daniel Martínez González-Elector<br>Lydia E. Centeno-Funcionaria PNP<br>Angel Aponte-Funcionario PPD | 31-32 |
| 21. 004 | 024 | 002 | Wilma I. Merced Centero-Electora<br>Ana E. Figueroa-Funcionaria PNP<br>Rafael Delgado-Funcionario PPD | 33-34 |
| 22. 004 | 028 | 002 | Wilfredo Núñez González-Elector<br>Norma Soto-Funcionaria PNP<br>Félix Yamil Bravo-Funcionario PPD | 35-36 |
| 23. 005 | 004 | 003 | Rosa M. Márquez Rosado-Electora<br>Jorge Navarro-Funcionario PNP<br>Edgardo R. Martínez-Funcionario PPD | 37-38 |
| 24. 005 | 011 | 005 | José A. Pabón Ruiz-Elector<br>José E. Jiménez-Funcionario PPD | 39 |
| 25. 005 | 024 | 003 | Paulino Ibarra Resto-Elector<br>Isaac Rivera-Funcionario PNP<br>Carmen M. Rivera-Funcionaria PPD | 40 |
| 26. 005 | 033 | 005 | Luis F. Tirado Tirado-Elector<br>Orlando Ray-Funcionario PNP<br>Mercedes Portillo-Funcionaria PPD | 41-42 |
| 27. 005 | 033 | 005 | María M. Quebec Irlandés-Electora<br>Véase elector anterior | 43 |
| 28. 104 | 004 | 003 | Eugenio Peña Aquino-Elector<br>Francisco Román-Funcionario PNP | 44 |
| 29. 104 | 006 | 002 | Edwin Ramos Hernández-Elector<br>Véase los próximos dos electores | 45 |
| 30. 104 | 006 | 002 | Alfonso Ramos Vázquez-Elector<br>Ana E. Domínguez-Funcionaria PPD | 46 |
| 31. 104 | 006 | 002 | Carmen S. López Rivera-Electora<br>Véase el número 29 y 30 de este<br>Apéndice | 47-48 |
| 32. 104 | 008 | 002 | Sandra Carlo Pinto-Elector<br>Luis Matos-Funcionario PPD | 49 |
| 33. 104 | 008 | 003 | Víctor M. Díaz Roig-Elector<br>Concepción Pérez-Funcionario PPD | 50 |
| 34. 104 | 009 | 001 | Raquel Adorno Lorán-Electora<br>Véase próximo elector | 51 |

| rrecinto | Unidad | Colegio | Elector y Funcionario de Colegio | Página |
|----------|--------|---------|----------------------------------|--------|
| 35. 104 | 009 | 001 | Miguel H. Badillo-Elector<br>Angel Alverio-Funcionario PNP<br>Genaro Baquero-Funcionario PPD | 52 |
| 36. 104 | 009 | 004 | Erohílda Nieves Nieves-Electora<br>José A. Molina-Funcionario PPD | 53 |
| 37. 104 | 013 | 007 | Ana R. Ramos Figueroa-Electora<br>Lesbia Rey-Funcionaria PNP<br>Marisel Méndez-Funcionaria PPD | 5- |
| 38. 104 | 013 | 010 | Antonio Vélez Cabrera-Elector<br>Luis García-Funcionario PNP<br>Cándido Rivera-Funcionario PPD | 55-56 |
| 39. 104 | 014 | 002 | Aida L. Escalera-Electora<br>María Massanet-Funcionaria PNP | 5⁷ |
| 40. 104 | 016 | 001 | Carmen Báez Rosado-Electora<br>Jorge Astacio-Funcionario PNP<br>Dairén Ramírez-Funcionario PPD | 58 |
| 41. 104 | 021 | 001 | Raquel Fanfán Román-Electora<br>Enitza Figueroa-Funcionaria PNP | 59 |
| 42. 104 | 021 | 001 | Elsie Bermúdez Almena-Electora<br>Véase próximo elector | 6C |

# APENDICE 2

## INCIDENTE DE INICIALES O MARCAS AL DORSO

Precinto 002, Unidad 003, Colegio 002

1. <u>Luis A. Gierbolini Cruz</u> (Exhibit 183–Papeleta con LAGC al dorso) (TE 14 de agosto de 1989; pp 113 y ss).

Este elector dio varias versiones de las instrucciones que recibiera del funcionario del colegio de votación. Primero señaló que la instrucción era a los efectos de que "doblara la papeleta y que las iniciara por fuera". Luego, declaró que le instruyeron que las "Doblara y le pusiera las iniciales por detrás, así, por la parte de afuera. Que se vieran por fuera." Posteriormente, testificó "Que doblara la papeleta y pusiera las iniciales mirando hacia afuera, que se vieran por fuera." Atestiguó que se dieron instrucciones generales y que se mostraba la papeleta al dar las mismas. Su testimonio fue un tanto contradictorio y poco confiable. Declaró que se le entregó una sola papeleta, m[a]s no recuerda su color.

La parte demandante trajo como testigo a <u>Pedro González Santiago</u>, Funcionario del PNP en el colegio en cuestión. (TE del 15 de agosto de 1989; pp 50 y ss). Declaró que él y el funcionario del PPD se alternaron tanto entregando las papeletas estatales y municipales, como impartiendo las instrucciones a los electores. A preguntas de este juez, el funcionario del PNP indicó que al dar las instrucciones se hacía referencia a doblar las papeletas para que las iniciales de los funcionarios se vieran. Señaló que las instrucciones que él impartía eran iguales a las que daba el funcionario del PPD.

La parte demandada presentó el testimonio de <u>Manuel Clavell Spitche</u>, quien actuó como Inspector por el PPD en ese colegio. (TE del 17 de agosto de 1989; pp 8 y ss). Señaló que aunque dio instrucciones a la mayor parte de los electores, el inspector del PNP también dio instrucciones. Al impartir las instrucciones demostraba cómo doblar la papeleta y hacía referencia a las iniciales, señalando con el dedo las de los funcionarios del colegio. Luego de dar instrucciones grupales, se dieron individuales.

De la prueba desfilada para este colegio, no podemos conclu[i]r que los funcionarios indujeran a Luis A. Gierbolini Cruz a escribir sus iniciales al dorso de la papeleta municipal; por lo que no podemos adjudicar su voto. En el colegio votaron de 200 a 230 personas; sólo apareció una papeleta con iniciales del elector al dorso.

Precinto 002, Unidad 012, Colegio 004

2. <u>Luz María Ramos Hernández</u> (Exhibit 161–Papeleta con LMRH al dorso).

Esta hermana de la Caridad, declaró que fue a votar junto a varias (de 5 a 9) monjas. Señaló no recordar quién fue el funcionario que le dio las instrucciones. Sin embargo, testificó que las mismas fueron grupales e individuales. No oyó las instrucciones que le dieron a los demás electores. En torno a las que le impartieron a ella señaló: "Yo recuerdo que dijeron de escribir las iniciales en la papeleta". . . "Dejarla con el nombre para afuera. Con las iniciales para fuera". . . Posteriormente, al contrainterrogarle el licenciado Rey, la electora afirmó que las instrucciones fueron: "que doblara la papeleta con las iniciales para afuera." El ambivalente y variado testimonio de esta electora arroja dudas en torno a su credibilidad. De las monjas que le acompañaron a votar, ninguna otra dañó su papeleta.

Por la parte demandante declaró <u>Nydia E. Soto Burgos</u>, Inspectora por el PNP en ese colegio; testimonio que a su vez nos resultó increíble. (TE del 9 de agosto de 1989, pp 192 y ss). Señaló que asistió a todas las clases de adiestramiento que diera la Presidenta de barrio de su partido. En dichos cursos, le indicaron que había que instruir a los electores de escribir sus iniciales al dorso de las papeletas. Declaró haber impartido siempre esta instrucción y recalcó que tanto ella como su compañera, se aseguraron que <u>todos</u> los electores del colegio escribieran sus iniciales al dorso. Curiosamente, se observa que a pesar de que la señora Burgos fue tan rigurosa en la labor que desempeñara en el colegio y cotejara las 430 papeletas de las 215 personas que allí votaron para cerciorarse de que los electores siguieron sus

instrucciones, sólo hubo una persona que le obedeció: Luz María Ramos Hernández.

La parte demandada presentó el testimonio de Margarita Ojeda Colón. (TE del 16 de agosto de 1989, pp 77 y ss). Esta declaró que al comienzo de los trabajos se dieron instrucciones grupales y luego al entregarse las papeletas, los funcionarios repetían individualmente las instrucciones de cómo doblar las papeletas. Testificó además, que al ella dar las instrucciones mostraba la papeleta y las iniciales de los funcionarios al dorso, diciendo que se doblaran "con las iniciales de los funcionarios hacia afuera." Señaló que podía oír las instrucciones que dio la señora Burgos; fueron las mismas que ella dio.

Ante el conflicto de la prueba en que parte del testimonio de la votante fue refutado tanto por otro testigo de la parte demandante como por el de la parte demandada y, por lo poco confiable del testimonio de la funcionaria del PNP conclu[i]mos que no debe adjudicarse este voto. No se probó que se hubiera inducido a la votante a escribir sus iniciales al dorso de las papeletas.

Precinto 002, Unidad 030, Colegio 001

3. José M. Campos Morales (Exhibit 178–Papeleta con nombre y seguro social al dorso). (TE del 14 de agosto de 1989 a las pp 38 y ss).

Este elector emitió su voto en la Escuela José Gándara. Relató que no tuvo que hacer fila alguna; de hecho, era el único elector en el colegio en ese momento. Testificó que luego de entintarse el dedo, la muchacha que le entregó las papeletas, (quien a su vez estaba sola), le dijo: "Ve allí y coge la papeleta. Por detrás si puede, escríbele el nombre o las iniciales."

Testificaron, además, la Inspectora en propiedad por el PNP, Nydia A. Román Rivera, (TE del 14 de agosto de 1989 a las pp 219 y ss) y la Inspectora en propiedad por el PPD, Nahílda Cruz López (TE del 16 de agosto a las pp 271 y ss). Ambas señalaron haber dado instrucciones grupales e individuales al electorado, mostrando la papeleta y diciendo: "doblarla en cuatro partes que quedaran las iniciales hacia arriba o en la parte de afuera de la

papeleta". (TE del 14 de agosto de 1989 a la página 224). La funcionaria popular especificó que cuando se impartían estas instrucciones se señalaban las iniciales de los funcionarios al dorso. Ambas estuvieron muy cerca la una de la otra, pudiendo oír las instrucciones dadas. Estas nunca fueron objetadas y para todos los efectos fueron básicamente las mismas.

El testimonio del señor Campos Morales fue refutado por el de ambas funcionarias. La prueba demostró que <u>no</u> se dio instrucción alguna en cuanto a que el elector escribiese su nombre. Más aún, fue a instancias del propio elector que éste decidió ponerle su número de seguro social. La prueba desfilada no sustenta la alegación del demandante de que el electorado fue inducido a error (estampar sus iniciales) por las instrucciones impartidas por los funcionarios.

Precinto 003, Unidad 004, Colegio 001

4. <u>Rubén Agosto Avilés</u> (Exhibit 155–Papeleta con RA al dorso). (TE del 9 de agosto de 1989 a las pp 49 y ss).

El Sr. Rubén Agosto Avilés votó en la Escuela Gustavo Adolfo Bécquer. Señaló que luego de hacer fila fuera y dentro del salón, le llegó su turno de votar. Se acercó a una mesa donde, a su entender, había alrededor de seis funcionarios. Allí, luego de cotejado en las listas, le entregaron ambas papeletas y le dijeron: "que las doblara en cuatro partes". Sin embargo, cuando está de espaldas entrando a la caseta oyó que <u>alguien</u> dijo que "había que iniciarlas".

El testimonio de este elector fue refutado por el de su esposa, la Sra. <u>Sylvia Cortés González</u>, quien se desempeñara como Inspectora en propiedad del PNP para el Precinto 003, Unidad 004, Colegio 001. (TE del 9 de agosto de 1989 a las pp 61 y ss). Esta tuvo la función de entregar la papeleta municipal y declaró que fue ella quien en todo momento instruyó a los electores de cómo manejar la papeleta municipal. Señaló que las instrucciones que daba al entregar la papeleta eran: "Que le estaba entregando una papeleta municipal, en la cual podía hacer su voto por el Alcalde, su candidato a Alcalde y los asambleístas. Terminada la

votación en la caseta, antes de salir doblara la papeleta con las iniciales hacia afuera".

La funcionaria del PPD, Julia Ortega Arroyo, (TE del 16 de agosto de 1989 a las pp. 104 y ss), corroboró la naturaleza y el tipo de instrucción allá impartida: "doblase las papeletas y pusieran las iniciales hacia afuera. . . (o hacia arriba)" Testificó que cuando ella daba la instrucción enseñaba la papeleta, que a su vez, contenía las iniciales de los funcionarios ya estampadas.

El testimonio de este elector fue refutado por ambas funcionarias, toda vez que siempre se impartieron instrucciones y nunca se hizo alusión a que había que escribir iniciales al dorso de la papeleta. No se probó que el elector fuera inducido a estampar sus iniciales.

Precinto 003, Unidad 005, Colegio 005

5. Carlos Víctor Wheeler (Exhibit 160–Papeleta con CW al dorso). (TE del 9 de agosto de 1989 a las pp 138 y ss).

El Sr. Carlos Víctor Wheeler, doctor y profesor de Ingeniería, emitió su voto en el Precinto 003, Unidad 005, Colegio 005. Señaló haber votado previamente en tres o cuatro ocasiones. Para estas elecciones se presenció temprano en el salón de votación. "Llegué creo que a eso de las siete y media de la mañana, porque quería votar temprano. Estaba esperando coger un avión a las doce y media". Iba a viajar fuera de P.R. y debido a que no había hecho su equipaje, el tiempo le apremiaba. Cuando llegó al colegio tuvo que hacer fila fuera del mismo ya que los materiales electorales no habían llegado. El colegio abrió tarde (9:30 a.m.) y una vez el señor Wheeler entró, se vió precisado a tomar turno por haber bastantes electores antes que él. Declaró que al entregársele las papeletas la funcionaria no le dio ningún tipo de instrucción. Fue al salir de la caseta electoral que "como no sabía como doblarla le pregunté a un señor, un señor alto, uno de los funcionarios, y estaba parado y le digo, cómo quiere que lo doble. Entonces, él me dice, la dobla en cuatro, según me parece, me dijo, me enseñó más o menos con la mano y me dice, y ponga las iniciales por fuera". El elector señaló: "pues yo, tontamente, puse las iniciales por fuera.

Acostumbrado, estaba preocupado por el avión que salía a las doce y media y eran después de las diez. Y entonces "no me di cuenta de lo que estaba haciendo, me vine a dar cuenta cuando estaba en el avión, no, que el poner las iniciales por fuera, pues invalidaba el concepto del voto secreto."

Testificó la Sra. Gladys Mayol Arizmendi, funcionaria PNP para este Colegio. Señaló que durante las horas de la mañana ella fue quien dio las instrucciones. Las mismas se circunscribían a: "Doble la papeleta con las iniciales hacia afuera". (TE del 9 de agosto de 1989 a la página 148 y ss).

El funcionario PPD Jorge E. Vizcarrondo, a su vez, confirmó lo vertido por la señora Mayol. Señaló que él daba las mismas instrucciones y adicionó que los funcionarios al dar las instrucciones indicaban con las manos cuáles eran las iniciales que debían quedar por afuera al doblarse la papeleta. (TE del 16 de agosto de 1989 a la página 154 y ss).

Precinto 003, Unidad 008, Colegio 001

6. Carlos A. Calo Barreto (Exhibit 156–Papeleta con CACB al dorso). (TE del 9 de agosto de 1989 a las pp 77 y ss).

Señaló que en las pasadas elecciones votó en el "Junior College". Testificó que luego de hacer fila dentro del salón, una funcionaria del PPD impartió instrucciones, grupales a las 20–25 personas que se encontraban allí de pie. El elector estaba al final de la fila. Las instrucciones fueron: "que la papeleta se doblara en cuatro y se endosara con las iniciales al final, en la parte superior. Al dorso." Al este magistrado pedir que repitiera la instrucción señaló: "que las papeletas se cerraban en cuatro y se iniciaba al dorso con las iniciales de cada persona." Posteriormente, en el contrainterrogatorio del licenciado Rey, el señor Calo dijo que las instrucciones fueron de "que se doblara en cuatro y se iniciara con las iniciales del elector al dorso." Finalmente, a solicitud de este Juez, trató de recordar las instrucciones que recibiera: "tenga las papeletas, favor de doblarla en cuatro partes y ponga las iniciales al dorso." Testificó que al entregársele las papeletas no se le dio ninguna instrucción individual.

Por el PNP testificó el Inspector Alterno, Sr. Edgardo Cruz Reyes; quien tuvo como única función alumbrar y entintar el dedo de los electores. (TE del 10 de agosto de 1989 a la página 22 y ss). No impartió instrucción de tipo alguna; de modo, que su testimonio no añade nada significativo a lo declarado por el señor Calo Barreto. Recuerda que hubo tumulto en el salón y por ello, los electores permanecieron en todo momento en fila y de pie. No recuerda, sin embargo, quién daba la(s) papeleta(s) ni que se dieran instrucciones al electorado.

La Sra. Ana H. González Medina, actuó como Inspectora en propiedad por el PPD para este colegio. (TE del 16 de agosto de 1989 a la página 5 y ss). Testificó que a ella le correspondió entregar la papeleta estatal y al Inspector en propiedad del PNP la municipal. Las instrucciones se impartieron alternadamente. Debido a que estos Inspectores habían acordado las instrucciones que darían, ambos dieron la misma: "indicarle al elector que debía doblar la papeleta en cuatro partes, con las iniciales hacia afuera y las urnas que debía utilizar para depositar cada una de ellas." Hubo instancias en que debido al cúmulo de electores en ese colegio, los inspectores se vieron precisados a entregar las papeletas conjuntamente.

Cabe hacer dos señalamientos en torno a este elector: (1) de todo el grupo que recibió esta instrucción, el señor Calo Barreto fue el único que escribió sus iniciales; (2) las instrucciones que impartió la Funcionaria popular no fueron protestadas ni objetadas por ninguno de los tres funcionarios que estaban próximos a ella.

Precinto 003, Unidad 013, Colegio 004

7. Jenny Snow Solá (Exhibit 176–Papeleta con JSS al dorso). (TE del 14 de agosto de 1989 a la página 16 y ss).

Señaló haber ido sola a votar al Colegio de Lourdes. Había gente en el colegio. Se dirigió donde una de las funcionarias electorales, (de 30–40 años), quien le entregó ambas papeletas y le dio la siguiente instrucción: "que las iniciara, que pusiera las iniciales del colegio y qué se yo ni qué que son las que vienen ya

en la papeleta y entonces que la doblara con eso hacia el frente."
Cuando el licenciado Montalvo le inquirió si las instrucciones
habían sido en ese sentido, la señora Snow Solá especificó: "O sea,
que la doblara con las iniciales hacia el frente, no las mías sino las
del colegio." Vemos que a pesar de estas instrucciones tan claras,
esta electora procedió a estampar sus iniciales en la papeleta.
Pensó el inquirirle a la funcionaria sobre lo de las iniciales, pero
creyendo que era alguna enmienda a la Ley Electoral, optó por no
preguntar. Durante el contrainterrogatorio, el licenciado Rey le
preguntó si su hija o algún hermano suyo había puesto sus
iniciales en las papeletas, a lo que la señora Snow Solá contestó
que no. En torno a su hija dijo: "Ahora, la hija mía es mucho más
joven que yo. Ahí es que viene la confusión. quizás ella (la
Funcionaria) me las dio bien y yo no las entendí pero que yo no
tuve la oportunidad de decirle explícamelas". Este Tribunal
entiende que las instrucciones fueron claras, mas el elector las
malentendió.

La parte demandante no presentó funcionario electoral al-
guno del PNP que trabajase en este colegio.

La parte demandada, por su parte, presentó como testigo a la
Inspectora en propiedad por el PPD, la Lic. Irma Meléndez
Collazo. (TE del 17 de agosto de 1989 a la página 88 y ss). Su
testimonio fue a los efectos de que en ese colegio se dieron
instrucciones grupales e individuales, dependiendo del cúmulo de
electores en determinado momento. Las instrucciones fueron
alternadas. Las mismas se daban mostrando una papeleta electo-
ral e indicando con el dedo las iniciales (de los funcionarios que
estaban estampadas). Uno y otro funcionario dio la misma ins-
trucción: "Que las doblaran de forma tal que no se vieran por
donde había votado, y que hicieran posible que estas iniciales
quedaran hacia afuera."

Precinto 003, Unidad 015, Colegio 004

8. Luz María Silva Claudio (Exhibit 157–Papeleta con LMSC al
dorso) (TE del 9 de agosto de 1989 a la página 99 y ss).

Esta votante testificó que no tuvo que hacer fila en el colegio electoral. Por no haber electores en ese momento, entró directo al salón y se dirigió a una mesa donde había tres funcionarios. Señaló que cree que allí le entregaron dos papeletas, mas no le dieron ningún tipo de instrucción. La señora Silva Claudio declaró que una vez en la caseta electoral inició la papeleta y la dobló. A preguntas del licenciado Montalvo de por qué puso sus iniciales al dorso de las mismas, la testigo contestó: "Mire, no podría explicarle por qué razón lo escribí. Porque no sé si fue que otros años lo había hecho, pero después que vi el comentario en los periódicos fue que me enteré que no se podía hacer. Yo lo hice, como si hubiese hecho una cosa". No pudo dar razones de por qué escribió sus iniciales.

La parte demandante no presentó ningún funcionario PNP para este colegio.

La parte demandada presentó como testigo a la Inspectora en propiedad por el PPD, la Sra. Edna Sáez Sánchez. (TE del 17 de agosto de 1989 a la página 59 y ss). Debido a que el desfile de electores en ese colegio fue uno lento, ella y el Funcionario PNP tuvieron la oportunidad de dar instrucciones individuales y de forma alternada al electorado. Uno y otro daban la misma instrucción, la cual se circunscribía a: "que antes de salir de las casetas doblaran sus papeletas en cuatro pedazos con las iniciales que previamente tenían, pues, hacia el lado de afuera." El testimonio de esta funcionaria controvierte y refuta el de la electora.

Precinto 003, Unidad 026, Colegio 005

9. Delvis Rivera Laureano (Exhibit 177–Papeleta con DRL al dorso). (TE del 14 de agosto de 1989 a la página 30 y ss).

Este testigo señaló que luego de entregársele la papeleta y votar, fue que la funcionaria le instruyó a los efectos de que: "Doblara la papeleta en cuatro y con las iniciales hacia arriba". Sin embargo, testificó que puso sus iniciales estando dentro de la caseta y una vez salió de la misma y recibió las instrucciones

procedió a doblar la papeleta y echarla en la urna. No hay cronología lógica en la versión dada por este elector.

La parte demandante no produjo funcionario PNP para este colegio.

La parte demandada presentó como testigo a <u>Carmen Iris Colón Lebrón</u>, quien se desempeñara como Inspectora por el PPD para ese colegio. (TE del 16 de agosto de 1989 a la página 141 y ss). A ella le correspondió entregar las dos papeletas e impartir las instrucciones individuales en el colegio. Señaló que las instrucciones fueron las mismas en todo momento y que se circunscribían a: "Yo les explicaba que la blanca, que la papeleta blanca era la estatal, donde se debía votar por el Gobernador; y la amarilla era para elegir al Alcalde." Que luego de votar, tenían que doblarla en cuatro partes con las iniciales de nosotros, los funcionarios hacia arriba y echarlas ellos mismos en las urnas." Testificó que mientras daba las instrucciones le mostraba al electorado las iniciales de los funcionarios en la papeleta.

Precinto 003, Unidad 029, Colegio 004

10. <u>Ivette Sailé Ramírez Medina</u> (Exhibit 171–Papeleta con IRM al dorso). (TE del 11 de agosto de 1989 a la página 49 y ss).

Esta electora fue acompañada al colegio electoral. Luego de hacer bastante fila, entró al colegio y se sentó a esperar que llamaran su turno. Testificó que una muchacha joven le entregó las dos papeletas y le dijo que "iniciara las papeletas por la parte de atrás, que las doblara en cuatro y las depositara en la urna al salir". La señora Ramírez votó en la caseta electoral, al salir de la misma, la funcionaria interceptó su paso y: "Me preguntó otra vez que si la había iniciado y yo le dije que no, que se me había olvidado. Entonces, me dijo que tenía que entrar y poner las iniciales otra vez. Entré otra vez a la caseta, le puse las iniciales, la doblé con ellas hacia afuera y las deposité y me fui". Posteriormente, en el contrainterrogatorio del licenciado Rey, señaló que la funcionaria le dijo: "Pues entra y pónselas.

El testimonio de esta electora es uno inverosímil. Resulta increíble el que se diese este tipo de instrucción en voz audible

frente a otros funcionarios y que éstos no objetaran las mismas. Esta electora puso sus iniciales al reverso de la papeleta–IRM. En la columna correspondiente a los votos por candidatura, a su vez, aparecen las iniciales ISRM, cuya caligrafía es idéntica a las iniciales del reverso. La señora Ramírez, sin embargo, testificó que no puso estas iniciales ISRM) y que no se explica cómo llegaron ahí. Cabe señalar que la papeleta de esta votante se anuló por tener iniciales en la columna de "Write–In" y no por tener las iniciales del elector escritas al reverso.

Véase el número once (11) de este Apéndice

Precinto 003, Unidad 029, Colegio 004

11. Daisy Raldiris Robles (Exhibit 154–Papeleta con DRR al dorso). (TE del 9 de agosto de 1989 a la página 7 y ss).

Esta electora llegó temprano (8:00 a.m.) al colegio electoral; tuvo que hacer fila por varias horas debido a que el material electoral llegó tarde. Votó a eso de las 11:15 A.M.; había como quince personas antes que ella en la fila. Una funcionaria joven cotejó su nombre en las listas electorales, le entregó las dos papeletas y le dio la siguiente instrucción: "Ella me entregó dos papeletas y me dijo claramente, que una vez la llenara, la doblara en cuatro dobleces y pusiera mis iniciales por fuera." La señora Raldiris testificó que luego de doblar las papeletas, a pesar de que vio las iniciales de los funcionarios allí, procedió a escribir las suyas.

Por la parte demandante testificó la Sra. Frances M. Cruz Rosado, quien se desempeñó como Inspectora en propiedad del PNP para el aludido colegio. (TE del 9 de agosto de 1989 a la página 25 y ss). De su ambivalente testimonio se desprende que la funcionaria Popular fue quien en todo momento impartió las instrucciones mientras entregaba las dos papeletas al elector. La función de la señora Cruz se limitó a entregar papeletas en un momento dado (alega no haber dado instrucciones) y el resto del tiempo cotejando las listas electorales (función que sabía le correspondía al Secretario). Testificó que las instrucciones impar-

tidas por la funcionaria Popular fueron: "doble la papeleta en cuatro y ponga las iniciales para afuera o afuera, ponga las iniciales afuera, ponga las iniciales para afuera o para afuera." Al inquirírsele posteriormente por el licenciado Rey en torno a las mismas dijo: "que se doblara la papeleta en cuatro y que se pusieran las iniciales para afuera." "En unas ocasiones decía afuera y en otras ocasiones decía para afuera." Esta funcionaria se abstuvo de dar instrucciones y no objetó o impugnó las mismas. Señaló que las instrucciones no hacían referencia alguna a que el elector pusiera sus iniciales.

Testificó por la parte demandada la Sra. María Pérez Dorta, quien se desempeñara como Secretaria del PPD para ese colegio. (TE del 17 de agosto de 1989 a la página 47 y ss). El testimonio de esta funcionaria no tan sólo refuta lo vertido por los electores, sino que contradice lo aseverado por la Sra. Frances M. Cruz Rosado. Señaló que las instrucciones impartidas fueron alternadas por los funcionarios del PNP y PPD. Señaló que "se fue bien claro que la papeleta no podía estar iniciada, que solamente las iniciales que iban a tener eran las iniciales de los inspectores". A esos efectos, especificó que las instrucciones fueron de que "una vez el elector votaba, doblaba la papeleta y que las iniciales de los inspectores quedaran en la parte de arriba y se metiera la papeleta en la urna."

Precinto 003, Unidad 036, Colegio 001

12. William Alemán Noriega (Exhibit 164–Papeleta con WA al dorso). (TE del 10 de agosto de 1989 a la página 43 y ss).

Testificó que tuvo que hacer fila fuera del salón por una hora y media; entró al mismo a eso de las 10:30 a.m. Señaló que se entraba al salón en grupos de seis a siete personas, se sentaban y luego los procesaban y votaban. El se dirigió a una mesa donde uno de los tres funcionarios le entregó ambas papeletas y le dio una instrucción individual a los efectos de que "luego de hacer la marca, luego de votar, que doblara la papeleta con las iniciales hacia afuera".

La parte demandante presentó como testigo a la Inspectora alterna, la Sra. María Vega Cubero. (TE del 10 de agosto de 1989 a la página 64 y ss). Testificó que los materiales electorales llegaron tarde y por eso el colegio abrió a eso de las 10:00 a.m. Había bastante gente fuera del salón. Fueron entrando de diez en diez. La función de la señora Vega se limitó a cotejar los dedos del elector con la lámpara. Señaló que no se dio instrucción grupal de tipo alguno. Declaró que la inspectora popular fue quien en todo momento entregó las dos papeletas y dio instrucciones individuales: "las doble en cuatro partes y ponga las iniciales hacia arriba".

La parte demandada, a su vez, presentó a la Sra. Nilda Berdeguez Figueroa, quien se desempeñara como Inspectora en propiedad por el PPD para este Colegio. (TE del 17 de agosto de 1989 a la página 22 y ss). Señaló que fue ella quien en todo momento dio las instrucciones tanto grupales como individuales. Ella entregó la papeleta estatal y la funcionaria PNP entregó la papeleta municipal. Declaró que la instrucción impartida fue de: "doblarla en cuatro, donde antes de echarla en la urna se vieran las iniciales de los funcionarios que habíamos iniciado las papeletas." Una y otra Inspectora en Propiedad estaban próximas en distancias; no hubo objeción alguna a la naturaleza de la instrucción vertida.

Precinto 003, Unidad 036, Colegio 001

13. Francisca Carmona O'Neill (Exhibit 158–Papeleta con FCO al dorso). (TE del 9 de agosto de 1989 a la página 114 y ss).

Fue acompañada al colegio electoral de su hermana Georgina Carmona O'Neill. Testificó que a pesar de que llegó temprano (8:30 a.m.), no fue sino hasta pasadas las 10:00 a.m. que logró entrar al salón. Entró un grupo de aproximadamente cuarenta personas y el salón se llenó. No recuerda quién dio las instrucciones pero las mismas fueron grupales: "cogieron las papeletas y entonces nos dijeron que votáramos, pusiéramos la cruz donde. . . y entonces, después que pusiéramos la cruz, dobláramos las papeletas en cuatro y entonces, por una esquina pusiéramos las iniciales. . ." "Pusiéramos las iniciales, que miraran para

arriba". Cabe señalar que las instrucciones vertidas fueron en voz alta mas ninguno de los funcionarios allá presentes objetaron las mismas.

Véase el número doce (12) de este Apéndice para el testimonio de los funcionarios de colegio.

Precinto 003, Unidad 036, Colegio 001

14. Georgina Carmona O'Neill (Exhibit 159–Papeleta con GCO al dorso). (TE del 9 de agosto de 1989 a la página 126 y ss).

Esta testigo confirmó lo expresado por su hermana en torno a las condiciones que encontraron al llegar al colegio electoral. Señaló que una funcionaria electoral fue quien dio las instrucciones grupales. La señora Carmona primero señaló que las instrucciones fueron de que: "Entonces doblen la papeleta y pongan sus iniciales para arriba. Que cuando doblen la papeleta eso quede para arriba y después se echa en la urna". A preguntas del licenciado Montalvo en torno a si la funcionaria tenía algo en las manos mientras daba la instrucción, la señora Carmona contestó: "Un papel que nos indica cómo lo vamos a hacer. Entonces se dobla en cuatro y entonces la parte de arriba entonces está con las iniciales." Durante el contrainterrogatorio del licenciado Rey, dijo que las instrucciones eran "de que doblara la papeleta y que pusiera las iniciales que quedaran para arriba." A pesar de ello, la electora escribió sus iniciales en la papeleta. Es de notar que en una parte del contrainterrogatorio la testigo aceptó ser "medio despistada".

Véase el número doce (12) de este Apéndice para el testimonio de los funcionarios de colegio.

Precinto 003, Unidad 036, Colegio 001

15. Vicente Altorán Ruiz (Exhibit 180–Papeleta con VAR al dorso). (TE del 14 de agosto de 1989 a la página 87 y ss).

Testificó que llegó a votar al colegio a eso de las 10:30 a.m. El salón estaba lleno, mas entró al mismo a empujones. Señaló que dentro del salón había mucha gente, algunos haciendo fila y otros

sentados. Se sentó un rato pero luego se "coló" en la fila para que los funcionarios le atendieran. Llegó a una mesa donde había tres o cuatro funcionarios electorales, uno de los cuales le dio las papeletas y otro le dio las instrucciones a los efectos de que: "No olvide poner las iniciales". A pesar de que esta instrucción se dio en voz audible a los otros funcionarios, ninguno la objetó. Aunque este elector había votado previamente y nunca se le había dicho que escribiera las iniciales, no hizo comparación de tipo alguna ni preguntó. "Yo hice lo que dijeron allí porque tenía ganas de irme para casa porque yo padezco de los pies y quería irme a acostarme."

Véase el número doce (12) de este Apéndice para el testimonio de los funcionarios de colegio.

Precinto 004, Unidad 004, Colegio 002

16. Josefina Olmo Domínguez (Exhibit 179–Papeleta con JOD al dorso). (TE del 14 de agosto de 1989 a la página 45 y ss).

Testificó que luego de llamar telefónicamente a alguien, (no recuerda a quién) señalándole que no tenía medio de transportación para llegar al colegio electoral, otra persona (a quien tampoco recuerda), la llevó en auto hasta el colegio. La octogenaria electora llegó directo al salón; no tuvo que hacer fila. Señaló que había tres funcionarias, una de las cuales le dio las papeletas. La señora Olmo testificó que en ese momento no se le dio ninguna instrucción de cómo doblar la papeleta, ya que ella sabía hacerlo. Sin embargo, luego señaló que la funcionaria al entregarle las papeletas: "Me dijo que las doblara, que se vieran las iniciales." Del testimonio confuso de esta electora se desprende que ésta malinterpretó las instrucciones ofrecidas por la funcionaria.

La parte demandante presentó como testigo a la Sra. Miriam Contreras Peralta, quien se desempeñara como Secretaria del PNP para el colegio en cuestión. (TE del 14 de agosto de 1989 a la página 98 y ss). Señaló que las instrucciones se dieron individualmente y de forma alternada. En momentos en que el cúmulo de votantes en el colegio acrecentó, la Presidenta del

Colegio (PPD), el Inspector en propiedad del PNP, y ella impartieron instrucciones. Esta testigo relató varias versiones en torno a las instrucciones impartidas: "cuando la persona iba a votar se le decía que había que doblarlas en cuatro y con las iniciales hacia afuera. Otras veces se le decía lo mismo y se le decía: Ponga las iniciales hacia afuera. Esas son las dos frases que se usaron. Posteriormente, la señora Contreras dijo: "O sea, le recordamos: "Recuerda que las iniciales son hacia afuera." En otras ocasiones dijo: "Recuerda que pongas las iniciales hacia afuera." Declaró que ella no señalaba las iniciales de los funcionarios al dar las instrucciones; no se fijó si los otros funcionarios lo hacían.

Testificó por la parte demandada la <u>Sra. Noelia Jiménez Serrano</u>, Inspectora en propiedad por el PPD y Presidenta de este colegio. (TE del 17 de agosto de 1989 a la página 35 y ss). Señaló que fue ella quien impartió las instrucciones. Las mismas se circunscribieron a: "Yo les decía que ellos podían poner una seña en el partido de su predilección y que chequiaran que detrás y les enseñaba las iniciales que tenían las papeletas de votación, que ellos tenían que doblar en cuatro partes y ponerlas hacia el frente cuando la echaran en la urna."

Precinto 004, Unidad 015, Colegio 003

17. <u>Jose Manuel Fernández Ramírez</u> (Exhibit 174–Papeleta con JMFR al dorso). (TE del 11 de agosto de 1989 a la página 91 y ss).

Este elector testificó que tuvo que hacer una larga fila previo a entrar al colegio electoral. Se dirigió a una mesa donde había cinco funcionarios. De éstos, uno de los que estaba de pie le entregó dos papeletas. El elector no recuerda si le dieron una o dos papeletas. Durante el testimonio mostró urgencia en decir de entrada cuáles fueron las instrucciones que este funcionario le dio: "Pon las iniciales por fuera." Luego señaló que las instrucciones fueron: "Ponga las iniciales por detrás." Atestiguó estar en "edad avanzada" y que "como las leyes cambian tanto, yo no sabía si eso era verdad lo que él me decía y les puse las iniciales y las doblé y las eché por ahí". Ninguno de los cuatro funcionarios que se encontraban allí protestaron la instrucción impartida.

La parte demandante presentó como testigo a José A. Rivera Ginorio, quien se desempeñó como Inspector en propiedad del PNP para este colegio. (TE del 14 de agosto de 1989 a la página 239 y ss). El testimonio de este funcionario pone en dudas el del elector al señalar: (1) que fue la Presidenta del colegio quien dio las instrucciones y, (2) que la Presidenta del colegio entregaba la papeleta estatal la mayoría de las veces y era a él quien entregaba la papeleta municipal. Con relación a las instrucciones, señaló que "lo más que se enfatizaba era cómo depositar sus votos en la urna." "Que estuviesen dobladas con las iniciales hacia afuera."

Por la parte demandada testificó Nilda López Rosado, quien se desempeñara como Inspectora en propiedad por el PPD para ese colegio. (TE del 16 de agosto de 1989 a la página 213 y ss). Señaló que previo a ella entregar la papeleta estatal, le enseñaba a cada elector tanto la papeleta como las iniciales al dorso: "Le decía a la persona cuando votara, doblara la papeleta en cuatro lados y que las iniciales que aparecían, cuando yo levantaba la papeleta, vamos a suponer que es esta la papeleta, que estas iniciales que estaban aquí se quedaran para afuera para que su voto no se viera." Declaró que el funcionario PNP, al entregar la papeleta municipal, impartía instrucciones que a su entender eran "básicamente iguales, más o menos" a las suyas. Hubo ocasiones en que debido al gentío en el salón escuchó que el funcionario PNP dijera "con las iniciales hacia afuera". Nadie inquirió en torno a las instrucciones; ni nadie allí las objetó.

Precinto 004, Unidad 004, Colegio 015

18. Luis Marcano Valentín (Exhibit 181–Papeleta con LMV al dorso). (TE del 14 de agosto de 1989 a la página 85).

El testimonio de este elector está plagado de lagunas e inconsistencias debido a su falta de memoria. Lo único que parece recordar con somera claridad fueron las instrucciones que recibió. No estaba muy seguro si residía cerca de la escuela en que votó; no estaba muy seguro a qué hora fue que llegó al colegio, cree que no había mucha gente porque votó rápidamente. Se dirigió a una mesa donde la última persona (que cree que era un hombre) fue

quien le entregó las dos papeletas y le instruyó: "que iniciara la papeleta y la doblara". Emitió su voto en la caseta electoral y cree que quien mismo le dio las instrucciones le indicó que echara las papeletas en las urnas. Señaló que las instrucciones fueron dirigidas a él y a los electores que se encontraban alrededor de la mesa donde estaban los funcionarios. Cuando el licenciado Rey pidió que precisara en torno a las instrucciones que recibió, el señor Marcano dijo: "Yo no le puedo decir, señor licenciado que lo único que yo sé, que me puedo acordar, yo no sé con la intención que fue, si fue que hubo un malentendido de mi parte, o de las personas..." Luego señaló que en voz alta se le dijo "que había que iniciarla y doblarla." Los funcionarios que estaban próximos podían escuchar la instrucción dada, más no la objetaron. El elector testificó que en elecciones pasadas aparentemente puso también sus iniciales por dentro de la papeleta.

La parte demandante presentó el testimonio de Yolanda Ordoñez Arias, quien se desempeñó como Secretaria del PNP para este colegio. (TE del 14 de agosto de 1989 a la página 164 y ss). Tuvo como función el cotejar una de las copias de las listas de electores. Señaló que la papeleta estatal la entregaba el Inspector en propiedad del PPD y la municipal el Inspector en propiedad del PNP; ambos funcionarios estaban de pie y se alternaban dando las instrucciones. Declaró que las mismas se circunscribían a: "Doblar la papeleta en cuatro y quedando o poniendo las iniciales hacia arriba, o sea que se vieran." Señaló que éstas fueron las instrucciones que ella recibió en las clases de adiestramiento que tomó.

La parte demandada presentó como testigo a Sylvia Toledo Alayón, Secretaria PPD para el colegio en cuestión. (TE del 17 de agosto de 1989 a la página 190 y ss). Testificó que las instrucciones se daban de forma alternada por los Inspectores en propiedad del PNP y PPD; las mismas no variaban. Mientras se daban las instrucciones se utilizaba una papeleta demostrando cómo el elector debía manejarla: "cómo la iban a doblar primero en una parte y luego la doblaban con las iniciales hacia afuera." Ninguno

de los funcionarios objetó estas instrucciones; ningún elector inquirió a esos efectos.

Precinto 004, Unidad 016, Colegio 004

19. Enrique A. Lugo Lugo (Exhibit 182–Papeleta con EALL al dorso). (TE del 14 de agosto de 1989 a la página 106 y ss).

Testificó que luego de hacer una larga fila entró al salón. Un funcionario que se encontraba sentado frente a una mesa le entregó la papeleta y le instruyó que entrara a la caseta y votara. Luego del señor Lugo emitió su voto mientras se dirigía a la urna, un funcionario joven que estaba al lado de ésta le digo "Iníciala." El elector alega que en ese momento él sacó su bolígrafo y escribió sus iniciales en la papeleta. Es de observar que la papeleta municipal, contrario a lo que dice el señor Lugo, contiene iniciales al dorso escritas a lápiz.

La parte demandante no presentó funcionario alguno para este colegio.

La parte demandada presentó el testimonio de la Sra. Marilina Lanza Amaro, quien se desempeñara como Inspector en propiedad por el PPD para este colegio. (TE del 16 de agosto de 1989 a la página 176 y ss). Señaló que ella repartía las papeletas estatales y el funcionario PNP (Inspector en propiedad) las municipales. Ambos impartieron instrucciones al electorado de forma individual, de modo que cada elector recibía instrucciones dos veces. La señora Lanza declaró que mientras ella daba las instrucciones señalaba con sus dedos a qué iniciales se refería: "Le indicaba que después de ejercer su voto, cogiera la papeleta y la doblara en cuatro partes y con las iniciales puestas de los inspectores en la parte superior izquierda, las mantuviera hacia afuera para echarlas en la tómbola." Testificó que las instrucciones vertidas por el Inspector PNP fueron exactas a las suyas. Ningún elector inquirió en torno a las mismas. La única irregularidad habida en ese colegio fue el incidente de un elector que por poco echa una papeleta en la urna incorrecta. No mencionó el incidente del señor Lugo.

Precinto 004, Unidad 017, Colegio 002

20. Daniel Martínez González (Exhibit 185–Papeleta con DMG al dorso). (TE del 14 de agosto de 1989 a la página 146 y ss).

Testificó que entró solo al salón y se dirigió a una mesa donde había varios funcionarios hablando entre sí. El último de ellos fue quien le dio una papeleta y le dijo: "que tenía que usar la papeleta y después que diera mi voto ponerle las iniciales hacia arriba. Que pusiera mis iniciales hacia arriba y la doblara en cuatro formas y la echara en la caja." El señor Martínez relató que el funcionario dio la instrucción en voz alta, de modo que tanto él como los cinco electores que se encontraban allí escucharon lo que dijo. Cabe señalar que de esos electores, únicamente el señor Martínez estampó sus iniciales en la papeleta. A preguntas del licenciado Rey para que precisara en torno a la instrucción que recibió, dijo: "Den su voto y ponga las iniciales hacia arriba." El elector malentendió que eran sus iniciales y las puso.

El testimonio de este elector fue refutado por la Funcionaria PNP de este colegio, Lidia Centeno Cruz. (TE del 14 de agosto de 1989 a la página 178 y ss). Testificó que el funcionario popular daba ambas papeletas al electorado identificando cada una de ellas y "le indicaba que una vez emitido el voto se debían doblar con las iniciales hacia afuera." Señaló que ella también dio instrucciones a los efectos de "Que se doblaran las papeletas, que se aseguraran que las iniciales que aparecen al dorso estuviesen hacia afuera."

El Sr. Angel Aponte Robles, quien se desempeñara como Inspector en propiedad por el PPD para este colegio, testificó por la parte demandada. (TE del 17 de agosto de 1989 a la página 113 y ss). Señaló que se impartieron instrucciones grupales e individuales de forma alternada. Corroboró el testimonio de la señora Centeno, a los efectos de la naturaleza de la instrucción ofrecida: "Las instrucciones que dimos fue que la papeleta se doblara en cuatro y que quedaran con las iniciales de los funcionarios, de los inspectores hacia el frente."

Precinto 004, Unidad 24, Colegio 002

21. <u>Wilma I. Merced Centeno</u> (Exhibit 187–Papeleta con WMC al dorso). (TE del 15 de agosto de 1989 a la página 10 y ss).

El testimonio contradictorio de esta electora le resta credibilidad. Señaló ir al colegio acompañada de su esposo, su suegro ciego y su bebé de ocho meses. A través del proceso electoral la señora Merced tuvo que cuidar de su suegro e hijo. Primero testificó que fue luego de salir de la caseta electoral que recibió la instrucción de: "Inícialas, dóblalas en cuatro partes con las iniciales hacia afuera y échalas en la urna;" que volvió a la caseta, puso las iniciales y luego echó las papeletas en la urna. Posteriormente, a preguntas del licenciado Rey, fue más precisa y cambió su versión, declarando que ésta última era lo que verdaderamente le había ocurrido: Una vez en el colegio, se dirigió a una mesa donde una de las dos funcionarias le entregó ambas papeletas y le instruyó, previo a entrar a la caseta electoral, en torno al manejo de la misma. La señora Merced testificó que mientras se le daba la instrucción ella estaba preocupada por el cuido de su suegro y su niño, los cuales estaban junto a ella. Las instrucciones se circunscribieron a: "vota y dobla en cuatro con las iniciales hacia afuera".

El testimonio de <u>Ana E. Figueroa</u>, Secretaria del PNP para este colegio, refuta el de su propio elector. (TE del 15 de agosto de 1989 a la página 21 y ss). Declaró que el Inspector en propiedad del PPD fue quien en todo momento dio las instrucciones generales e individuales. A pesar de que ella cotejaba las listas electorales, se percató de que el funcionario popular, al impartir las instrucciones, mostraba con una papeleta cómo debía doblarse, de modo que las iniciales quedasen hacia arriba. Las instrucciones una vez doblaba la papeleta fueron: "pongan las iniciales hacia arriba y con las iniciales hacia arriba las echan aquí en la urna".

Por la parte demandada testificó <u>Rafael Delgado Betancourt</u>, Inspector en propiedad para este colegio. (TE del 17 de agosto de 1989 a la página 90 y ss). Este funcionario corroboró lo relatado por la Secretaria del PNP con relación a la naturaleza y contenido de las instrucciones impartidas allí. Señaló que él dio las instruc-

ciones la mayoría de las veces, aunque en ocasiones la funcionaria PNP también las dio. Declaró que fueron de carácter individual; ningún elector preguntó en torno a las mismas y ningún funcionario electoral las objetó.

Precinto 004, Unidad 028, Colegio 002

22. <u>Wilfredo Núñez González</u> (Exhibit 184–Papeleta con WNG al dorso). (TE del 14 de agosto de 1989 a la página 136 y ss).

El testimonio de este elector carece de toda credibilidad. Señaló que había poca gente en el salón de modo que votó inmediatamente. Una funcionaria popular (joven) le entregó la papeleta y le instruyó que "luego de terminar el voto que la doblara y le pusiera mis iniciales a la parte superior." Declaró que entró a la caseta y votó, mas se le olvidó escribir sus iniciales al dorso. Cuando iba a depositar la papeleta en la urna preguntó si todo estaba bien. Una funcionaria mayor del PPD miró su papeleta y le dijo: "Tienes que ponerle las iniciales hacia afuera... pon las iniciales". El señor Núñez declaró haber colocado la papeleta sobre la mesa donde había tres funcionarios electorales y allí estampó sus iniciales. Estos vieron lo que él hacía y no hicieron ni dijeron nada. Mediante su ambivalente testimonio, señaló no estar seguro si su novia votó en ese colegio o en otro. En un momento dado, declaró que ella votó en ese colegio y cree que ella recibió las mismas instrucciones (mas no le puso sus iniciales a la papeleta).

Por la parte demandante testificó <u>Norma Soto Colón</u>, quien se desempeñó como Inspectora en propiedad del PNP para ese Colegio. (TE del 14 de agosto de 1989 a la página 185 y ss). Declaró que la funcionaria popular entregó la papeleta estatal y ella la municipal. Las instrucciones dadas fueron tanto grupales como individuales, dependiendo del cúmulo de electores que hubiera en el colegio. En torno a éstas señaló que se circunscribían a: "que doblaran las papeletas en cuatro de forma que cupieran en la urna con las iniciales hacia afuera." Las instrucciones las dieron los Inspectores en propiedad alternadamente. La señora Soto Colón demostró estar muy atenta a lo que sucedía en el colegio electoral; señaló como única

irregularidad el incidente de un joven que puso sus iniciales en su papeleta. La funcionaria, al escuchar la conversación de este joven (que votaba por primera vez) con su madre donde le decía que había puesto sus iniciales en la papeleta, rápidamente intercedió. Anuló la papeleta y le dio una nueva al elector. Esta funcionaria no recuerda el incidente del señor Núñez.

Por la parte demandada testificó <u>Félix Yamil Bravo</u>, Inspector suplente por el PPD para ese colegio. (TE del 17 de agosto de 1989 a la página 231 y ss). Cotejó que los electores no tuvieran el dedo entintado. Declaró que los funcionarios del colegio en cuestión se pusieron de acuerdo para escribir las instrucciones en la pizarra; el Inspector suplente del PNP fue quien se encargó de ello. Además de ésto, cuando los electores entraban al colegio ambos Inspectores en propiedad (PNP Y PPD) les daban las instrucciones dos veces. Señaló que ambos daban instruían: "que la papeleta tenía que ser doblada en cuatro pedazos"; mostrándole las iniciales de los funcionarios le decían: "con estas iniciales hacia afuera." Nadie cuestionó ni objetó las instrucciones impartidas.

Precinto 005, Unidad 004, Colegio 003

23. <u>Rosa María Márquez Rosado</u> (Exhibit 151–Papeleta con RMMR al dorso). (TE del 8 de agosto de 1989 a la página 68 y ss).

Esta electora declaró que fue al colegio de votación acompañada de su hija. Su testimonio fue un tanto errático y cambiante. Señaló entrar directamente al salón, por no haber fila; sin embargo, en el salón había mucha gente. Fue directo a una mesa donde había cuatro funcionarios, uno de los que estaba sentado fue quien le cotejó en la lista electoral, mas no le pidió que firmase la misma. Este mismo joven fue quien le entregó *una* papeleta (municipal) y el que a su vez le instruyó: "pon las iniciales detrás de la papeleta" o "pon las iniciales atrás." El testimonio de la señora Márquez reflejó que a través del proceso electoral su hija *no* cesó de hablarle y de distraerla, llamándole la atención sobre las amistades mutuas que se encontraban votando allí. "Entonces, cuando él me estaba buscando en la lista, yo estaba hablando con la nena, que me estaba indicando, mira, mami, mira zutano y yo

estaba mirando". "Es que no recuerdo, o sea, recuerdo en el momento la discusión de ellos, porque puse las iniciales mías al frente. Y andaba con la nena también, me estaba hablando." (Véase las páginas 85–86). Testificó que luego de emitir su voto, otro funcionario le comentó al funcionario joven que la papeleta de esta electora tenía sus iniciales y ello le anulaba. La señora Márquez señaló que el funcionario joven insistió en que eso no tenía nada que ver y echó la papeleta en la urna.

La parte demandante presentó el testimonio de <u>Jorge Luis Navarro Suárez</u>, quien se desempeñara como Inspector en propiedad por el PNP para este colegio (TE del 8 de agosto de 1989 a la página 127 y ss). Relató el proceso electoral habido en este colegio. El Inspector en propiedad del PPD entregaba la papeleta estatal y él la municipal. Las instrucciones fueron alternadas, aunque el Funcionario PPD fue quien las dio la mayor parte de las veces. Las instrucciones fueron de "doblar las papeletas con las iniciales hacia afuera." Indicó que el funcionario PPD le mostraba la papeleta al elector y a veces le decía "con las iniciales que están aquí . . . que estaban en la esquina." Las instrucciones que él dio fueron prácticamente las mismas.

La parte demandada no presentó funcionario PPD para este colegio.

En torno al incidente de la electora Márquez Rosado declaró: (1) que el Inspector popular fue quien le dio las instrucciones y el que se percató de las iniciales de la votante al dorso de su papeleta. El señor Navarro Suárez le propuso al Inspector PPD que se anulara esta papeleta y se le diera una nueva, pero el funcionario popular se negó, por temor a quedarse cortos de papeletas en el colegio. En consecuencia, la papeleta de la electora se echó en la urna. A pesar de que la misma se adjudicó en el colegio, fue protestada y no adjudicada en el Coliseo. Debemos adjudicar este voto, no porque las instrucciones fueran confusas, sino porque los funcionarios debieron anular y sustituir la papeleta dañada.

Precinto 005, Unidad 011, Colegio 005

24. José A. Pabón Ruiz (Exhibit 170–Papeleta con JPR al dorso). (TE del 11 de agosto de 1989 a la página 42 y ss).

El elector tiene un vago recuerdo de lo que aconteció en su colegio electoral el día de las elecciones. Señaló que no recuerda a qué hora fue a votar, mas dice que el procedimiento electoral duró como una hora. Entró al salón y se sentó a esperar a que le llamaran. Luego un funcionario popular le entregó las dos papeletas y en voz baja le instruyó "que doblara las papeletas en cuatro unidades y le pusiera las iniciales mías por la parte de atrás, que quedaran hacia el frente".

La parte demandante no presentó testimonio de funcionario PNP alguno para este colegio.

La parte demandada, por su parte, presentó el testimonio de José Enrique Jiménez, quien se desempeñó como Inspector en propiedad del PPD para el P005, U011, C005. (TE del 16 de agosto de 1989 a la página 196 y ss). El testimonio de este funcionario refutó lo declarado por el elector. Señaló que él entregaba la papeleta estatal y la funcionaria PNP la municipal; cada uno de ellos daba un juego de instrucciones individuales al elector. Las instrucciones ofrecidas por uno y otro eran iguales; ambos tomaban una papeleta como ejemplo e indicaban cómo doblar la papeleta de modo que las iniciales de los funcionarios quedaran hacia afuera. "Doble la papeleta en cuatro, con las iniciales hacia afuera y le mostrábamos las iniciales a que nos referíamos."

Precinto 005, Unidad 24, Colegio 003

25. Paulino Ibarra Resto (Exhibit 152–Papeleta con nombre escrito). (TE del 8 de agosto de 1989 a la página 88 y ss).

Testificó que llegó al colegio y se sentó a esperar su turno. Una funcionaria dio instrucciones grupales a las personas allí sentadas. Cuando le tocó su turno fue a la mesa y allí un funcionario popular le dio una papeleta y le instruyó cómo doblar la misma. Votó y cuando salió de la caseta electoral un funcionario popular le dijo: . . . "mire, tiene que ponerle el nombre completo." El señor

Ibarra regresó a la caseta, puso su nombre, echó la papeleta en la urna y como tenía el carro dañado se fue a arreglarlo.

El testimonio de este elector fue refutado por el funcionario del PNP, Isaac Martínez Pastrana, quien trabajó como Inspector en propiedad para ese colegio. (TE del 8 de agosto de 1989 a la página 174 y ss). Testificó que tanto él como el funcionario popular entregaron papeletas e impartieron instrucciones al electorado. Al inquirírsele sobre las instrucciones que dio, el señor Martínez, explicó que luego de entregar las papeletas y explicar que se podía votar por el partido de preferencia, procediera "a doblarlo en cuatro y siempre que las iniciales quedaran hacia arriba... Siempre que las iniciales quedaran hacia arriba, iniciales de los funcionarios".

La parte demandada presentó como su testigo a Carmen M. Rivera Medina, quien se desempeñó como Inspectora suplente por el PPD para este colegio (TE del 17 de agosto de 1989 a la página 183 y ss). Su testimonio corroboró lo explicado por el funcionario PNP en torno a la naturaleza de la instrucción dada: se señalaba la papeleta y las iniciales de los funcionarios.

Precinto 005, Unidad 033, Colegio 005

26. Luis F. Tirado Tirado (Exhibit 149–Papeleta con LFT al dorso). (TE del 8 de agosto de 1989 a la página 22 y ss).

Previo a su testimonio, el licenciado Montalvo nos hizo la siguiente salvedad: "El caballero, como verá su Señoría, tiene unos años y yo he hablado con él y tengo que gritarle. Usted ¿me va a permitir gritarle, para que él me pueda escuchar?

El señor Tirado testificó que votó el pasado 8 de noviembre de 1988 en la Universidad Metropolitana, Carretera de Cupey. Había mucha gente en el colegio electoral. La funcionaria Mercedes Portillo, le entregó las papeletas previo a él emitir su voto en la caseta electoral. Luego de votar cuando se dirigía a depositar las papeletas en las correspondientes urnas electorales, la funcionaria Portillo, con voz "fina, delicada y convincente", interceptó su paso y le dijo: "Don Luis, póngale las iniciales suyas al dorso". El, por no haber hecho ésto en elecciones previas, le preguntó en qué

parte las ponía, si arriba, abajo, o al dorso. "Me dice, al dorso, en la parte izquierda, donde hay unas iniciales, allí. Y yo entonces fui a la caseta electoral y puse mis iniciales LFT." Se observa que este elector dudó y se extrañó de lo que la funcionaria popular le dijo. Pensó inquirir a esos efectos, mas no se atrevió.

El Sr. Orlando Ray Rivera, Ingeniero Civil, fue Inspector del PNP en el Precinto 005, Unidad 033, Colegio 005 tuvo; como función cotejar la tarjeta del elector en las listas electorales. Estuvo al lado de la señora Portillo mientras ésta entregaba las dos papeletas y daba las instrucciones. El no dio instrucción alguna. En torno a las mismas nos señaló: "Entre otras cosas le decía que se le daban las instrucciones cuantas podían votar". "No sé exactamente las frases ahora, porque hace mucho tiempo, pero yo verifiqué y ella decía exactamente lo que decía el Reglamento. . . que doblara la papeleta de manera que al depositarlas en las urnas las iniciales quedaran por afuera." "Y después se aclaraba el asunto de las iniciales que se debían quedar hacia afuera". (TE 9 de agosto de 1989 a la página 162 y ss). El testimonio del señor Rivera no tan sólo confirma lo explicado por la funcionaria popular en torno a las instrucciones impartidas, sino que refuta lo declarado por el elector.

La Sra. Mercedes Portillo, Inspectora en propiedad del colegio del señor Tirado testificó ante este foro. (TE del 16 de agosto de 1989 a la página 49 y ss). La catedrática y letrada, con voz clara, precisa y audible, hizo un recuento del proceso electoral habido en el Precinto 005, Unidad 033, Colegio 005 el día de las elecciones. Declaró que ella entregaba la papeleta estatal y el funcionario PNP la municipal. Señaló que fue ella quien dio las instrucciones la mayoría de las veces; éstas se circunscribían a lo siguiente: "Mire, hay una papeleta amarilla y una blanca. Una para Alcalde y otra para Gobernador, etc. Usted, tenga cuidado con la papeleta. No la vaya a dañar. Cójase su tiempo. Y, cuando termine de votar, doble esa papeleta de forma tal, que las iniciales que están ahí, por detrás, se vean en la parte de afuera." Especificó que al dar estas instrucciones, generalmente ilustraba con sus manos cómo el elector debía doblar las papeletas. Recalcó

que al impartir las instrucciones le indicaba al votante que las papeletas tenían unas iniciales por detrás; no utilizaba el término al dorso para evitar confusión en el electorado.

Precinto 005, Unidad 033, Colegio 005

27. María Melania Quebec Irlandés de Rivera (Exhibit 150–Papeleta con MMQI al dorso). (TE del 8 de agosto de 1989 a la página 42 y ss).

Señaló que al llegar al colegio tuvo que hacer una fila larga y que luego de entrar al salón y estar sentada un rato, le tocó su turno. Fue a una mesa donde tres mujeres, la cotejaron en una lista. Una funcionaria le entregó dos papeletas y le dio las instrucciones previo a que ella entrara a la caseta electoral. Posteriormente, declaró que otro funcionario también le dio instrucciones individuales. La electora cuyo idioma vernáculo es el filipino y segundo idioma el inglés, testificó que las instrucciones fueron: "Cuando ellos dicen entrar, dijeron, firma atrás, y no olvides firmar." Seguidamente, especificó que se le dijo: "Ponga la inicial atrás de la papeleta." Señaló que escuchó que la instrucción de "Póngale su inicial atrás del papel" se le diera a otros electores. Al requerírsele por el licenciado Rey que especificara las instrucciones que recibiera, dijo: "Tiene que poner esa equis al lado de donde tiene que votar y no olvide poner la inicial después. Y ponga la inicial". De su testimonio se desprende que la señora Quebec no posee completo dominio del idioma español; factor que claramente nubló su entendimiento al recibir las instrucciones de los funcionarios.

Ver el número veintiseis (26) de este Apéndice para el resumen de los funcionarios de colegio.

Precinto 104, Unidad 004, Colegio 003

28. Eugenio Peña Aquino (Exhibit 169–Papeleta con EPA al dorso). (TE del 11 de agosto de 1989 a la página 25 y ss).

El elector llegó temprano al colegio electoral (8:00 AM), entró y se sentó a esperar su turno. Testificó que un funcionario

trigueño le entregó las papeletas y le instruyó que: "pusiera las iniciales en las papeletas, en la estatal y en la municipal. Entonces, que pusiera las iniciales, doblara las papeletas con las iniciales para afuera". El señor Peña relató que el funcionario le instruyó esto mismo a otro elector que estaba cerca. El elector declaró que ese día estaba medio dormido y cansado, porque trabajó la noche previa.

El Sr. Francisco Román, testificó por la parte demandante, quien se desempeñó como Inspector en propiedad del PNP para ese colegio. (TE del 14 de agosto de 1989 a la página 204 y ss). El y el funcionario popular dieron instrucciones de forma alternada. Su testimonio refuta el de su elector al decir que "las instrucciones generalmente estaban orientadas a cómo doblar la papeleta, en qué forma debía hacerse. Se les ilustraba también antes de que el elector procediera a emitir su voto, al entrar a la caseta. Siempre se repetía con las iniciales hacia afuera. Estas instrucciones se dieron de forma grupal y luego individualmente, previo a que el elector entrara a la caseta electoral.

La parte demandada no presentó funcionario PPD para este colegio.

Precinto 104, Unidad 006, Colegio 002

29. Edwin Ramos Hernández (Exhibit 168–Papeleta con ERH al dorso). (TE del 11 de agosto de 1989 a la página 15 y ss).

Señaló que recibió instrucciones de carácter general a los efectos de que se "cogiera la papeleta, la doblara y le pusiera las iniciales hacia la parte de al frente." El testimonio sobre la instrucción grupal que ofreciera el hijo del señor Ramos Vázquez es contraria a lo explicado por éste. Ello es reflejo de que el error cometido apunta únicamente al elector individual y no fue producto de las instrucciones impartidas por los funcionarios electorales.

La parte demandante no presentó funcionario PNP para este colegio.

La parte demandada presentó el testimonio de Ana E. Domínguez González, quien se desempeñara como Inspectora en

Propiedad por el PPD para el colegio en cuestión. (TE del 17 de agosto de 1989 a la página 71 y ss). Testificó que luego de ella impartir las instrucciones grupales y entregar la papeleta estatal, el Inspector PNP daba la municipal. Indicó que al dar las instrucciones utilizaba una papeleta para demostrar cómo doblarla y con sus manos apuntaba c[uá]les eran las iniciales que debían quedar visibles: "que después que ellos votaron tenían que doblar la papeleta en distintos pliegos y con estas iniciales que están aquí de los funcionarios hacia arriba."

Véase el número treintiuno (31) de este Apéndice para el testimonio de otra funcionaria de colegio

---

Precinto 104, Unidad 006, Colegio 002

30. <u>Alfonso Ramos Vázquez</u> (Exhibit 167–Papeleta con ARV al dorso). (TE del 11 de agosto de 1989 a la página 4 y ss).

Señaló llegar temprano al colegio electoral; había mucha gente (60–70 personas). Las instrucciones grupales fueron a los efectos de: "Doblen las papeletas y pongan las iniciales hacia arriba." Un funcionario electoral le entregó las papeletas al señor Ramos, votó, dobló la papeleta y al ver las iniciales de los funcionarios "me da con poner las mías."

Véase el número treintiuno (31) de este Apéndice.

Precinto 104, Unidad 006, Colegio 002

31. <u>Carmen Socorro López Rivera</u> (Exhibit 190–Papeleta con CSLR al dorso). (TE del 17 de agosto de 1989 a la página 144 y ss).

Testificó que al llegar al colegio electoral un funcionario PNP le entregó ambas papeletas y le instruyó de: "que entrara al cubículo, votara y doblara mi papeleta en cuatro con las iniciales hacia afuera." La electora entró a la caseta electoral pero dudó sobre las instrucciones recibidas. Sal[ió] de la caseta y le inquirió al mismo funcionario "si era con mis iniciales hacia afuera"; a lo que él le contestó "que era con las iniciales hacia afuera." La señora López Rivera entró nuevamente a la caseta electoral,

emitió su voto y estampó sus iniciales en las papeletas. Previo a depositarlas en la urna, le inquirió nuevamente al mismo funcionario PNP si estaban bien dobladas. En ese momento, el funcionario se percató de que la electora había estampado sus iniciales y le dijo que eso no se podía hacer. La electora pidió otra papeleta. El funcionario PNP habló con otros funcionarios, escribieron una nota explicando lo ocurrido con esta electora, le dijeron a la señora López que no perdería su voto y se depositó su papeleta en la urna.

La parte demandante no presentó funcionario PNP alguno para este colegio.

Por la parte demandada testificó <u>Ivonne Kuilan de Burgos</u>, quien se desempeñó como Inspectora en Propiedad por el PPD para este colegio. (TE del 17 de agosto de 1989 a la página 171 y ss). Ella entregaba la papeleta estatal y el Inspector en propiedad del PNP la municipal. Testificó que las instrucciones fueron mayormente de carácter individual y que se dieron alternadamente (aunque ella las dio la mayor parte del tiempo). Uno y otro funcionario daba la misma instrucción; ésta se circunscribía a: "doblarlas en dos veces, para que cupieran por la perforación de la urna, siempre con la instrucción de las iniciales de nosotros los funcionarios hacia afuera." Mostraban las papeletas e indicaban a qué iniciales se referían.

Señaló que el Funcionario PNP recusó la papeleta de una electora (Carmen Socorro López Rivera) porque tenía iniciales al dorso. Los funcionarios se reunieron y decidieron adjudicar ese voto. <u>No</u> se le dio una papeleta nueva. La señora Kuilan señaló que éste fue el único incidente irregular que ocurrió en el colegio. Aparentemente esta papeleta fue anulada en el Coliseo. Debemos adjudicar este voto, no por razón de las instrucciones, sino porque se debió anular la papeleta y entregar otra a la electora.

Véase el número veintinueve y treinta (29 y 30) de este Apéndice.

Precinto 104, Unidad 008, Colegio 002

32. <u>Sandra Carlo Pinto</u> (Exhibit 188–Papeleta con SCP al dorso). (TE del 15 de agosto de 1989 a la página 29 y ss).

El ambivalente testimonio de esta electora merece poco crédito. Lo único que recuerda con perfecta claridad de todo lo acontecido en el proceso eleccionario fueron las instrucciones que recibió: "dobla la papeleta, una vez que me la dieron, y pon las iniciales fuera." No recuerda la escuela en que votó; señaló que su colegio estaba vacío mas tuvo que esperar para votar; no está segura, pero cree que fue una funcionaria joven quien le dio las dos papeletas y la instrucción. Declaró no acordarse con precisión de lo allí ocurrido; era la primera vez que votaba pero "andaba un poco de prisa" y por eso no se acuerda de mucho.

La parte demandante no presentó testimonio de funcionario PNP para este colegio.

La parte demandada presentó a <u>Luis F. Matos Betancourt</u>, quien trabajó como Inspector en propiedad por el PPD para el colegio en cuestión. (TE del 17 de agosto de 1989 a la página 125). Señaló que fue él quien impartió las instrucciones en este colegio, mientras entregaba la papeleta estatal. La funcionaria del PNP no dio instrucción alguna; entregaba la papeleta municipal. Las instrucciones fueron de: "que doblara la papeleta en cuatro partes iguales, con las insignias hacia adentro, que las iniciales quedaran hacia afuera, para proteger el voto, que fuera secreto de esa persona." Declaró que mostraba cómo doblar la papeleta mientras daba las mismas.

Precinto 104, Unidad 008, Colegio 003

33. <u>Víctor M. Díaz Roig</u> (Exhibit 153–Papeleta con VMDR al dorso). (TE del 8 de agosto de 1989 a la página 119 y ss).

Luego de cotejarse en las listas electorales hizo turno para votar. Señaló que un funcionario le entregó la papeleta mas no le dio instrucción alguna de cómo votar. Procedió a la caseta electoral, votó, puso sus iniciales en la papeleta y la echó en la urna. Al ser interrogado por el licenciado Montalvo en torno a por qué estampó sus iniciales, el elector contestó: "Ahí sí, yo no le puedo decir. . .Pero no sé de dónde me salió firmar eso ahí, iniciarla".

La parte demandante no presentó testimonio alguno de funcionario PNP para este colegio.

El Sr. Concepción Pérez Pérez, Inspector en propiedad por el PPD, testificó por la parte demandada. (TE del 16 de agosto de 1989 a la página 23 y ss). Declaró que se dieron instrucciones grupales de forma alternada. Las instrucciones impartidas por uno y otro funcionario fueron consistentes entre sí. Las mismas se daban mostrando cómo doblar la papeleta y se aludía a las iniciales allí escritas: "que una vez ejercieran ese derecho, doblaran la papeleta asegurándose que las iniciales que aparecían al dorso de las respectivas papeletas quedaran por fuera, protegiendo la identi[da]d de su voto, la privacidad de su voto."

"Precinto 104, Unidad 009, Colegio 001

34. Raquel Adorno Lorán (Exhibit 172–Papeleta con RAL al dorso). (TE del 11 de agosto de 1989 a la página 62 y ss).

El entrecortado testimonio de esta electora en inglés y español reflejó que el error cometido fue producto única y exclusivamente de su falta de dominio del idioma español. Señaló que un funcionario electoral le dijo: "que después que pusiera la X a donde fuese que firmara debajo de otras dos firmas que había en la papeleta." Luego señaló que lo que el señor le dijo fue que escribiera sus iniciales. Durante el contrainterrogatorio, el licenciado Rey preguntó si lo que le dijeron fue de que doblara las papaletas con las iniciales hacia afuera–a lo que la electora contestó en la afirmativa.

El testimonio de esta electora fue controvertido por el Sr. Angel Alverio, quien se desempeñó como Inspector en propiedad del PNP para ese colegio. (TE del 14 de agosto de 1989 a la página 199 y ss). El entregaba la papeleta municipal y se alternó el impartir las instrucciones con el funcionario popular. Señaló que una y otra instrucción eran bastante similares; se circunscribían a: "Después que usted emita su voto doble esta papeleta en cuatro y que las iniciales queden para afuera. O, que después que usted emita su voto deposite la papeleta con las iniciales hacia afuera."

Por la parte demandada testificó el profesor universitario Genaro Baquero, quien se desempeñó como Inspector en propiedad del PPD para el colegio en cuestión. (TE del 16 de agosto de 1989 a la página 60 y ss). Señaló que fue el señor Alverio quien dio las instrucciones la mayor parte de las veces y tanto el funcionario PNP como él mostraban la papeleta y las iniciales de los funcionarios al dorso al impartir las mismas: "una vez haya votado en ambas papeletas las dobla en cuatro partes cerciorándose de que las iniciales, éstas de nosotros los inspectores, queden en la parte de afuera de la papeleta y vienen y las depositan en las urnas." Señaló que las instrucciones fueron claras en todo momento.

Precinto 104, Unidad 009, Colegio 001

35. Miguel H. Badillo Badillo (Exhibit 166–Papeleta con MHBB al dorso). (TE del 10 de agosto de 1989 a la página 55 y ss).

Votó en la escuela San Agustín; no tuvo que esperar. Una funcionaria le cotejó en las listas electorales; él las firmó. Señaló que un funcionario que estaba de pie fue quien le dio las instrucciones al entregarle ambas papeletas. El señor Badillo declaró que las instrucciones se circunscribieron a: "con las iniciales para afuera"; no se le mencionó nada de doblar las papeletas. Relató que para las elecciones de 1984 las instrucciones fueron grupales, explicándole al electorado que debían de doblar las papeletas con las iniciales hacia afuera. Ello refleja que este elector sabía que las aludidas iniciales eran las correspondientes a los funcionarios. Fue acompañado de su esposa; ésta no estampó sus iniciales en la papeleta. Al conversar posteriormente con ella sobre lo que hizo y percatarse de que dañó su papeleta, dijo ante este foro "No sé qu[é] me pasó, será que se está poniendo viejo uno."

El testimonio del elector fue refutado por ambos funcionarios. Las instrucciones impartidas no tan sólo fueron precisas y completas, sino que además se le demostraba al electorado cómo doblar la papeleta y se le indicaban las iniciales de los funcionarios al dorso.

Véase el número treinticinco (35) de este Apéndice, resumen de testimonio de los funcionarios de colegio.

Precinto 104, Unidad 009, Colegio 004

36. Erohilda Nieves Nieves (Exhibit 173–Papeleta con EN al dorso). (TE del 11 de agosto de 1989 a la página 72 y ss).

El precipitado e inverosímil testimonio de esta electora carece de todo crédito. Primero señaló que recibió instrucciones grupales de una funcionaria popular a los efectos de que "doblara la papeleta y pusiera mis iniciales encima." En el contrainterrogatorio corrigió esta versión y dijo que las instrucciones fueron: "que doblaran las papeletas y pusieran las iniciales... Y yo le entendí que eran mis iniciales." Nos señaló que luego de esta instrucción grupal, otra funcionaria popular (o tal vez la misma) le dijo: "Tienes que doblar la papeleta y pon tus iniciales." La electora tuvo dudas mas no preguntó. Los funcionarios electorales escucharon las instrucciones pero no las objetaron; ello reflejó que el error cometido fue atribu[i]ble únicamente a esta electora.

La parte demandante no presentó funcionario PNP para este colegio.

El Sr. José A. Molina Cacho, Inspector en propiedad por el PPD, testificó por la parte demandada. (TE del 16 de agosto de 1989 a la página 39 y ss). Señaló que fue él quien impartió las instrucciones la mayoría de las veces; el Inspector PNP las dio con menor frecuencia. Le indicaban al elector con la papeleta en mano cómo doblarla. Las instrucciones se circunscrib[ía]n a... "doblarla en cuatro, la papeleta dejando las iniciales, que ya tenían impresas las papeletas en la parte de afuera."

Precinto 104, Unidad 013, Colegio 007

37. Ana Rosa Ramos Figueroa (Exhibit 175–Papeleta con ARRF al dorso). (TE del 11 de agosto de 1989 a la página 100 y ss).

Testificó que el proceso electoral en ese colegio fue uno rápido. Recibió instrucciones individuales de uno de los funcionarios a los efectos de que "las doble con la firma por detrás." Posteriormente,

corrigió su testimonio y señaló que las instrucciones fueron que "las doblara con las iniciales por detrás." Declaró que al emitir su voto y doblar la papeleta vio las iniciales de los funcionarios y se cuestionó si las iniciales que debía de estampar eran las suyas; mas no preguntó a los funcionarios allá presentes.

La parte demandante estipuló el testimonio de la Inspectora en propiedad del PNP para ese colegio, <u>Lesbia Rey González</u>. (TE del 14 de agosto de 1989 a la página 134–135). La señora Rey entregó la papeleta municipal. Las instrucciones que dio fueron de: "Doble en cuatro la papeleta con las iniciales hacia arriba."

<u>Marisel Méndez Cardón</u> testificó por la parte demandada. (TE del 16 de agosto de 1989 a la página 229 y ss). En calidad de Inspectora en propiedad del PPD entregaba la papeleta estatal; el funcionario PNP la papeleta municipal. Dieron instrucciones grupales e individuales, dependiendo del cúmulo de electores en el colegio en determinado momento. Testificó que las instrucciones alternadas fueron de: "que tan pronto ejerciera su voto, favor de doblar las papeletas con las iniciales de los funcionarios hacia afuera, no hacia adentro." Mientras daban las instrucciones, ambos funcionarios mostraban la papeleta e indicaban a qué iniciales se referían.

Precinto 104, Unidad 013, Colegio 010

38. <u>Antonio Vélez Cabrera</u> (Exhibit 162–Papeleta con AVC al dorso). (TE del 10 de agosto de 1989).

Declaró llegar temprano al colegio electoral (8:05 a.m.). En el mismo, había tres funcionarios trabajando y aproximadamente tres electores. Las instrucciones fueron grupales; las dio uno de los funcionarios allá presentes, quien luego les entregó las papeletas. Las instrucciones fueron de doblar la papeleta: "Que iba a ser en cuatro partes y que detrás de ella, en la parte superior, se iba a iniciar la papeleta." El señor Vélez Cabrera señaló recordar que las instrucciones para el 1984 eran parecidas a éstas, salvo que no había que escribir las iniciales en las papeletas. Testificó que una vez votó, dobló la papeleta y al salir de la caseta, previo a echarla en la urna, se la enseñó al funcionario que le había dado

la instrucción. El testimonio de este elector demuestra que el error cometido fue producto de una mala interpretación que éste le diera a las instrucciones impartidas. Resulta contradictorio el que primeramente un funcionario electoral le instruyese de tener cuidado de no hacer marcas en la papeleta, para luego decirle que le pusiera sus iniciales.

Por la parte demandante testificó Luis E. García Curbelo, quien se desempeñó como Funcionario alterno del PNP para ese colegio (TE del 14 de agosto de 1989 a la página 228 y ss). Tuvo como función cotejar con la lámpara el entintado de la mano. Señaló que en este colegio el funcionario popular dio instrucciones grupales e individuales. Las mismas se circunscribían a: . . ."que doblaran las papeletas en cuatro y pusieran las iniciales hacia afuera..." "Dobla la papeleta en cuatro y pon las iniciales por fuera o hacia afuera."

El Sr. Cándido Rivera Feliciano, Inspector en propiedad del PPD, testificó por la parte demandada para este colegio (TE del 16 de agosto de 1989 a la página 256 y ss). Testificó que cuando se abrió el salón (poco después de las 8:00 de la mañana) entró un grupo de cuarenta personas. Impartieron instrucciones grupales o individuales, dependiendo del cúmulo de electores en el salón en determinado momento. Las instrucciones fueron alternadas entre él y el Inspector en propiedad del PNP; una y otra eran básicamente las mismas: "Se le enseñó que esa era la papeleta y se le enseñó que debían votar en la faz de la papeleta, que no debían hacer ninguna otra marca y que cuando terminaran debían de doblar la papeleta con las iniciales hacia afuera, señalándoles las iniciales, para que su voto permaneciera secreto."

Precinto 104, Unidad, 002, Colegio 014

39. Aida Luz Escalera Laureano (Exhibit 163–Papeleta con ALE al dorso) (TE del 10 de agosto de 1989 a la página 34 y ss).

Llegó al colegio temprano (9:30 a.m.), no tuvo que esperar, la cotejaron en las listas y le entregaron las papeletas electorales. No recuerda si cuando le entregaron las papeletas le dieron instrucción de tipo alguno. Mas luego de votar y estando en la

caseta electoral oyó la voz de un funcionario– . . ."cuando yo voté, ya iba a salir, cuando oí afuera que dijeron que la doblaran con la inicialización para afuera. Ahí fue mi confusión." La señora Escalera no preguntó a nadie al respecto y procedió a estampar sus iniciales al dorso de la papeleta.

La parte demandante no presentó testimonio de funcionario PNP para este colegio.

Por la parte demandada testificó <u>María de los Angeles Massanet Pastrana</u>, quien se desempeñó como Inspectora en propiedad del PPD para ese colegio. (TE del 16 de agosto de 1989 a la página 247 y ss). Señaló que ella y el Inspector en propiedad del PNP impartieron instrucciones individuales al electorado. Uno y otro daban la misma instrucción: "Se le enseñaba la papeleta estatal; se le explicaba que podían ejercer su derecho al voto. Al hacerlo, si tenían alguna duda, que eran tres maneras de votar, que por favor pidieran ayuda. Al ejercer su derecho al voto que por favor, lo doblaran en cuatro cuadrantes, con las iniciales que estaban en la parte posterior y se les indicaban las iniciales, que quedasen hacia afuera."

Precinto 104, Unidad 016, Colegio 001

40. <u>Carmen Báez Rosado</u> (Exhibit 165–Papeleta con CBR al dorso). (TE del 10 de agosto de 1989 a la página 50 y ss).

Lo único que esta electora parece recordar con meridiana claridad de todo el evento electoral fueron las palabras que le oyó decir a un funcionario popular cuando ella entró al colegio. No recuerda con precisión la escuela donde votó. Señaló que entró al colegio donde había un grupo de personas (menos de 15) y un señor le hablaba al grupo en general: "Pongan las iniciales afuera, hacia afuera." Señaló que cuando le entregaron las papeletas no le dieron ningún tipo de instrucción. Emitió su voto, puso sus iniciales y al salir de la caseta electoral, ese mismo funcionario le dijo: "Deposítela."

Por la parte demandante testificó <u>Jorge Astacio Figueroa</u>, quien se desempeñó como Inspector en propiedad por el PNP para este colegio. (TE del 14 de agosto de 1989 a la página 213 y

ss). Señaló que el funcionario popular, quien entregaba la papeleta estatal, impartió las instrucciones en todo momento. El entregaba la papeleta municipal y cuando algún elector le preguntaba, entonces él le explicaba los pasos a seguir. Las instrucciones fueron grupales e individuales, dependiendo del cúmulo de electores en el colegio electoral en determinado momento. Las mismas se circunscribieron a: "que había que doblarla en cuatro con las iniciales hacia arriba y depositarlas en la urna."

Por la parte demandada testificó Dairén Mary Ramírez, quien se desempeñó como Secretaria por el PPD para este colegio. (TE del 17 de agosto de 1989 a la página 103 y ss). Señaló que el Inspector en propiedad PPD dio instrucciones individuales mientras entregaba la papeleta estatal; el Inspector en Propiedad PNP a veces orientó y entregaba la papeleta municipal. Las instrucciones impartidas se circunscribieron a "que doblaran sus papeletas en cuatro partes y que las iniciales, o sea, de los inspectores, pues, quedaran hacia afuera y entonces las depositaran en la respectiva urna."

Precinto 104, Unidad 021, Colegio 001

41. Raquel Fanfán Román (Exhibit 189–Papeleta con RFR al dorso) (TE del 15 de agosto de 1989 a la página 39 y ss)

El testimonio de esta electora es uno inverosímil, muestra ello que el error cometido apunta únicamente al elector y no fue producto de las instrucciones allí impartidas. El recuerdo de la señora Fanfán Román de lo que ocurrió en su colegio electoral es uno vago e impreciso; nos señaló que "ese día tenía que ir a buscar a mi nena que había dado a luz y estaba por ir e irme rápido, votar e irme." Señaló que fue por la mañana al colegio; allí una funcionaria joven del PPD le entregó las papeletas y le explicó cómo doblar las mismas en ese momento. No le hizo mención alguna de iniciales. La señora Fanfán Román votó en la caseta electoral y previo a echar las papeletas en la urna, le preguntó a la misma funcionaria –quien se encontraba hablando con otras funcionarias electorales– si ya podía depositarlas. A renglón seguido y frente a las funcionarias la muchacha le instruyó: "No,

tieness que ponerle las iniciales hacia arriba . . ." (por detrás)"
Declaró que las funcionarias escucharon la instrucción mas no la
objetaron. La electora regresó a la caseta electoral, estampó sus
iniciales y echó las papeletas en la urna.

Véase el número cuarentidós (42) de este Apéndice para el
testimonio de la funcionaria de colegio.

Precinto 104, Unidad 021, Colegio 001

42. Elsie Bermúdez Almena (Exhibit 186–Papeleta con EBA al
dorso). (TE del 14 de agosto de 1989 a la página 154 y ss).

Testificó que cuando llegó había poca gente en el colegio
electoral. Se dirigió a una mesa donde una muchacha joven la
cotejó en las listas electorales y luego una funcionaria PPD joven
le entregó las dos papeletas y le instruyó: "que cogiera la
papeleta, la doblara por la mitad, hacia la otra mitad con mis
iniciales." Posteriormente, la señora Bermúdez Almena aclaró la
instrucción vertida a los efectos de: "que la doblara hacia la mitad,
otra vez, otra vez a la mitad con las iniciales hacia afuera. Yo creí
que eran mis iniciales".

La parte demandante presentó el testimonio de Enidza
Figueroa Reyes, quien se desempeñó como Inspectora en propie-
dad del PNP para el colegio en cuestión. (TE del 14 de agosto de
1989 a la página 160 y ss). Señaló que fue ella quien en todo
momento repartió las dos papeletas al electorado y dio las
instrucciones. Las mismas se papeletas al electorado y dio las
instrucciones. Las mismas se circunscribían a: "Yo cogía la
papeleta, les indicaba las iniciales. Si la persona me cuestionaba
qué iniciales se hablaban, yo les indicaba las iniciales de los
funcionarios que estaban detrás y doblaba la papeleta en la
forma". Al inquirirle el licenciado Montalvo en torno a lo que ella
decía cuando le daba la papeleta al elector, la testigo contestó:
"Que se fijaran todo el tiempo que las iniciales que estaban de los
funcionarios iban hacia afuera al depositarlas en las urnas".
Vemos que el testimonio de esta funcionaria refuta y controvierte

el de los electores presentados por el demandante; las instrucciones vertidas fueron claras y precisas.

La parte demandada no presentó funcionario PPD para este colegio.

# APENDICE 3

## FOTOCOPIA DE PAPELETA CON NOMINACION DIRECTA

APENDICE 3

| PARTIDO POPULAR DEMOCRATICO | PARTIDO NUEVO PROGRESISTA | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|
| ALCALDE Héctor Luis Acevedo | ALCALDE José Granados Navedo | ALCALDE Ana María (Iña) Corrada del Río | ALCALDE José Granados En |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 1 Thilda Alvarado | 1 Ramón "Pitín" Miranda Marzán | 1 Carlos Frontera | 1 Ramon "Tito" Mir... |
| 2 Manuel E. Andreu García | 2 Demaris Sifuentes Reyes | 2 Néstor Villariní | 2 |
| 3 Carmelo Betancourt Calo | 3 Miguel A. "Tito" González Rios | 3 José Cruz | 3 |
| 4 Eric Colón Rodríguez | 4 Enrique Ferreira Vélez | 4 Otilio Rumde | 4 Enrique Ferreira... |
| 5 Amadis Cruz Cáceres | 5 Nimildo Crespo Kortright | 5 Angel Ortega | 5 |
| 6 John Puello | 6 Samuel Méndez Cuesta | 6 Jesús Márquez | 6 |
| 7 Conrado Genatios | 7 Isidro Albino Serrano | 7 José T. Quiñones | 7 |
| 8 Roberto Pérez Santoni | 8 Myriam Bardman Barreno | 8 Gladys Cosme | 8 |
| 9 Francisco (Paco) Luis Rivera | 9 George McDougall | 9 Victor Andino | 9 |
| 10 Diana Rodríguez | 10 Rafael Ubarri Acosta | 10 Pablo Ortíz | 10 |
| 11 Dafne Rojo | 11 Sonia Pabón de Betancourt | 11 Diego Gerbán | 11 |
| 12 Awilda Saldaña | 12 Luis Rivera Brenes | 12 Domingo Elías Valdequez | 12 |
| 13 Arturo Silvagnoli | 13 Héctor L. Schmidt Figueroa | 13 Digna L. Osasio Rosario | 13 |
| 14 Zandra Vergne Colón | 14 Aida Ayala Colian | 14 Felipe (Pipo) Rivera | 14 Aida Ayala Colla... |

## INSTRUCCIONES SOBRE LA FORMA DE VOTAR LA PAPELETA ELECTORAL MUNICIPAL

En esta papeleta usted tiene derecho a votar por un candidato a Alcalde y por el número exacto de Asambleístas que aparecen en una de las columnas. Si usted vota por más del número de candidatos a que tiene derecho para cada posición, usted anula su voto para dicha posición.

**COMO VOTAR INTEGRO:**

Votar íntegro es votar por todos los candidatos del partido de su preferencia y por ninguno otro.

Para votar íntegro usted hace una sola cruz "X" o marca válida en el espacio en blanco bajo la insignia del partido de su preferencia. Esa sola marca vale para todos los candidatos bajo la columna.

**COMO VOTAR MIXTO:**

Si usted, además de votar bajo la insignia de un partido, tiene preferencia por uno o más candidatos de otros partidos para uno o más cargos, podrá hacer una cruz o marca válida al lado del nombre del candidato que prefiera fuera de la columna de su partido.

También puede votar por otras personas de su preferencia que no aparecen como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta si vale puede votar por un candidato para cada cargo. Cada voto así marcado contará únicamente para el candidato expresamente marcado.

**COMO VOTAR POR CANDIDATURA:**

Cuando el elector desea votar exclusivamente por uno o más candidatos y no tiene interés en votar bajo la insignia de ningún partido, hará una cruz al lado de los candidatos de su preferencia.

También puede votar por otras personas de su preferencia con su nombre como candidatos, escribiendo su nombre bajo el cargo correspondiente en la columna de Nominación Directa.

Tenga en cuenta que sólo puede votar por un candidato para cada cargo.

COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
# PAPELETA ELECTORAL MUNICIPAL
8 DE NOVIEMBRE DE 1988

Municipio de **SAN JUAN**

# APENDICE 4 (A)

## TABLA DE ELECTORES EXCLUIDOS POR RAZON DE DOMICILIO (ER)

214

ELECTORES AÑADIDOS A MANO: EXCLUIDOS POR DOMICILIO (ER)

| | Exhibit # | Elector | Abogado |
|-----|-----------|---------|---------|
| 1. | 077 | Del Rosario Mejía, María L. | Lcda. Quintana |
| 2. | 085 | Muñiz Vélez, Domingo | Lcdo. Canals |
| 3. | 086 | Hernández Monserrate, Pedro | Lcdo. Canals |
| 4. | 104 | Castro Avilés, Nilda | Lcdo. Canals |
| 5. | 131 | Prieto Rosa, José A. | Lcdo. Canals |
| 6. | 211 | Guzmán Vázquez, Katherine | Sin representación Legal |
| 7. | 214 | Sánchez García, Marta | Lcdo. Bray |
| 8. | 217 | Apolinaris López, Milagros | Lcdo. Bray |
| 9. | 224 | Acevedo Román, Pura | Lcdo. Bray |
| 10. | 226 | Ramos Otero, Rochelly | Lcdo. Bray |
| 11. | 228 | Cruz Rivera, Carmen | Lcdo. Bray |
| 12. | 229 | Rivera Viera, Consuelo | Lcdo. Bray |
| 13. | 230 | Betancourt Escobar, Oscar | Lcdo. Bray |
| 14. | 231 | Reyes Hernández, Ramón | Lcdo. Bray |
| 15. | 232 | Villegas Trinidad, Dolores | Lcdo. Bray |
| 16. | 240 | Otero Díaz, Alfredo | Sin representación Legal |
| 17. | 252 | Rivera Díaz, Juana | Lcdo. Bray |
| 18. | 256 | González Betancourt, Daniel | Lcdo. Bray |
| 19. | 257 | Laureano Santos, Miguel A. | Lcdo. Bray |
| 20. | 260 | Rivera Murphy, Leomarys | Lcdo. Bray |
| 21. | 261 | Aldea López, Miguel | Lcdo. Bray |
| 22. | 263 | Lorenzana Colón, Justino | Lcdo. Bray |
| 23. | 264 | Cruz Torres, Gloria | Lcdo. Bray |
| 24. | 268 | Maldonado Negrón, Ibis T. | Lcdo. Bray |
| 25. | 271 | González Villanueva, Miguel A. | Lcdo. Bray |
| 26. | 273 | Flores, Pedro | Lcdo. Bray |
| 27. | 274 | Pérez Rodríguez, María Luisa | Lcdo. Bray |
| 28. | 275 | Arana Hernández, Ana Celia | Lcdo. Bray |
| 29. | 276 | Ortiz Figueroa, Eleuteria | Lcdo. Bray |

| | Exhibit # | Elector | Abogado |
|------|-----------|---------|---------|
| 30. | 278 | Ortíz Alicea, Raúl | Lcdo. Bray |
| 31. | 279 | Santos Caballero, Agueda | Lcdo. Bray |
| 32. | 280 | Cerpa Cerpa, Carlos A. | Lcdo. Bray |
| 33. | 281 | Serpa Laureano, Carmen | Lcdo. Bray |
| 34. | 282 | Rodríguez Ramos, Lourdes | Lcdo. Bray |
| 35. | 283 | López Oquendo, Carmen | Lcdo. Bray |
| 36. | 284 | Báez Alicea, Isabelino | Lcdo. Bray |
| 37. | 289 | Cotto Ayala, Eva | Lcdo. Bray |
| 38. | 290 | Benítez Santiago, Andrea | Lcdo. Bray |
| 39. | 291 | Quiñones Aracil, Arturo | Lcdo. Bray |
| 40. | 292 | González Dávila, Ramón | Lcdo. Bray |
| 41. | 293 | Báez Andino, José | Lcdo. Bray |
| 42. | 294 | De León Saldaña, Damaris | Lcdo. Bray |
| 43. | 296 | Ocasio de Jesús, Pedro | Lcdo. Bray |
| 44. | 297 | González Quiñones, Nilda C. | Lcdo. Bray |
| 45. | 300 | Ramírez Morales, Antonio R. | Lcdo. Bray |
| 46. | 301 | García Santos, María T. | Lcdo. Bray |
| 47. | 304 | Maysonet Opio, Evelyn | Lcdo. Bray |
| 48. | 305 | Román Cruz, Constancia | Lcdo. Bray |
| 49. | 308 | Rodríguez Mejías, Nereida | Lcdo. Bray |
| 50. | 312 | Miranda Matta, Sixto | Lcdo. Bray |
| 51. | 313 | Rivera Rivera, Dolores | Lcdo. Bray |
| 52. | 315 | Torres Colón, Antonia | Lcdo. Bray |
| 53. | 317 | Nieves Torres, José | Lcdo. Bray |
| 54. | 319 | Mojica Ortíz, Ana M. | Lcdo. Bray |
| 55. | 320 | Rodríguez Valle, María | Lcdo. Bray |
| 56. | 321 | Meléndez Boria, Gladys | Lcdo. Bray |
| 57. | 322 | Rivera Otero, Gerardo | Sin representación Legal |
| 58. | 330 | Santos Caballero, Alejandro | Lcdo. Bray |

216

| | Exhibit # | Elector | Abogado |
|---|---|---|---|
| 59. | 331 | Ríos Cruz, Ramonita | Lcdo..Bray |
| 60. | 333 | Muñoz Reyes, Gloria | Lcdo. Bray |
| 61. | 334 | Cotto Castro, Víctor | Lcdo. Bray |
| 62. | 335 | Burgos González, Laura E. | Sin representación Legal |
| 63. | 336 | Colón Berríos, Carmen | Sin representación Legal |
| 64. | 337 | Avilés Marengo, Herminia | Sin representación Legal |
| 65. | 339 | Alomar Santiago, Herminio | Sin representación Legal |
| 66. | 341 | Pabón Vega, Gloria E. | Sin representación Legal |
| 67. | 342 | Olivera Ocasio, Rosa | Sin representación Legal |
| 68. | 343 | Méndez Ponce, Linda E. | Sin representación Legal |
| 69. | 344 | Núñez Vázquez, Guillermo | Sin representación Legal |
| 70. | 345 | Natal Rosario, Norma | Sin representación Legal |
| 71. | 346 | Negrón López, Jack | Sin representación Legal |
| 72. | 347 | Pabón Vega, Carmen M. | Sin representación Legal |
| 73. | 348 | Muñoz de Jesús, Beatriz | Sin representación Legal |
| 74. | 349 | Rivera Cáez, Petra | Sin representación Legal |
| 75. | 350 | Rivera Marrero, Sixto | Sin representación Legal |
| 76. | 351 | Serrano Vega, Rosa M. | Sin representación Legal |
| 77. | 352 | Reyes Molina, Hilda | Sin representación Legal |
| 78. | 353 | Saldaña Piñero, Jenaro | Sin representación Legal |
| 79. | 354 | Ramírez Santiago, Nancy | Sin representación Legal |
| 80. | 355 | Cruz Rodríguez, Carmen D. | Sin representación Legal |
| 81. | 356 | Reyes Del Valle, Linda | Sin representación Legal |
| 82. | 357 | Valentín Santiago, Angela | Sin representación Legal |
| 83. | 360 | Serrano Arroyo, Miguel | Sin representación Legal |
| 84. | 361 | Calderón Arroyo, Juanita | Lcdo. Bray |
| 85. | 362 | Gavillán, José A. | Lcdo. Bray |
| 86. | 368 | González González, Zoila | Lcdo. Bray |
| 87. | 371 | Cotto Rivera, Francisca | Lcdo. Bray |

| | Exhibit # | Elector | Abogado |
| --- | --------- | ------------------------ | ------------ |
| 88. | 372 | Torres Burgos, Ana | Lcdo. Bray |
| 89. | 373 | Vázquez Casillas, Aida | Lcdo. Bray |
| 90. | 914 | Ocasio Santana, Teresa | Lcdo. Canals |

# APENDICE 4 (B)

RESUMEN DE TESTIMONIO ELECTORES AÑADIDOS A
MANO (CASOS ATIPICOS)

## APENDICE 4 (B): AÑADIDOS A MANO (CASOS ATIPICOS)
Electores para los cuales la única prueba presentada fue la tie

Batista Martínez, Jesusa, Exhibit #068, status I2: La parte demandada entiende que esta electora no tiene derecho a votar para los comicios de 1988 por no haber efectuado ninguna gestión afirmativa ante la CEE para reactivar su status. Sin embargo, presentó a la Sra. Batista en la alternativa de que este Tribunal entendiese que este grupo de electores fueren hábiles.

Reyes Sánchez, Ana L., Exhibit #082, status I2: Votó añadido a mano en el P005 U024 C007, Escuela del Barrio Tortugo. Identificó su firma en la declaración jurada del sobre de añadidos a mano y su tie (1708596) perforada en los núms. 1, 2, 3. Testificó que en 1984 votó en el mismo lugar, mas no recuerda si firmó las listas. Existen dos números electorales para esta persona: 1) el primero, a nombre de Reyes Sánchez, Ana Leida –1727301– fue producto de una Petición de inscripción del 17 de agosto de 1975 y para el cual posee un status de I1; 2) el segundo, a nombre de Reyes Sánchez, Ana Leida –1708596– expedida el 7–2–79 y para el cual posee un status de I2. No se produjo ninguna lista electoral para esta electora para ninguno de estos dos números, no controvertiéndose con ello la determinación de electora no capacitada que hiciera la CEE.

Santini Rivera, Luis R., Exhibit #087, Status I2: El elector testificó que en 1984 votó ausente mientras cursaba estudios universitarios en el estado de Pensilvania; explicó el procedimiento que llevó a cabo para votar de dicha forma. El expediente electoral del Sr. Santini, sin embargo, está desprovisto de documentación que corrobore su testimonio. La parte demandada no produjo prueba de su "Solicitud de Voto Ausente" o documento similar que refutara la determinación que hiciere la CEE y en consecuencia, estableciere que era elector capacitado. Subsiste por lo tanto la determinación que hiciera la CEE de no adjudicar el voto de este elector.

Díaz Meléndez, José A., Exhibit #088, status I1: Testificó que para las elecciones del 1980 votó con otra tie; la prueba en su

220

expediente electoral, sin embargo, contiene una declaración jurada de 1980 que refleja que para esas elecciones votó sin tie. Señaló que para 1980 apareció en las listas electorales, mas no recuerda si las firmó. Para 1984 votó añadido a mano a las listas electorales. Como única transacción que hiciere previo a aquellas elecciones fue que se le expidió la tie 1679920 el 17 de octubre de 1984. En aquella ocasión el caso fue referido para investigación a la oficina del Secretario de la CEE, mas no se localizó allí documento alguno que activara el récord del elector. Declaró haberse enterado que no estaba en las listas electorales de 1988, pero no hizo ninguna gestión para habilitarse como elector. Ello unido a que la parte demandante no trajo prueba suficiente para refutar su status nos conducen a concluir que debe prevalecer la determinación que hiciere la CEE en torno a este elector.

Vázquez Méndez, Juanita, Exhibit #332, status I1: Señaló que para el 1988 y 1984 votó en la Escuela José Padilla; para 1980 votó (en otra escuela) en el área de Country Club. No recuerda si en 1984 y 1980 firmó las listas electorales. Ninguna lista electoral de 1984 se ofreció en evidencia – incumplió la parte con el peso de prueba exigídole para refutar el status que le diera la CEE a esta electora. Debe prevalecer en consecuencia la determinación hecha por la CEE. Declaró la Sra. Vázquez que previo a las elecciones de 1988 visitó las oficinas de la CEE (agosto o septiembre), allí le informaron que no había votado en el 1984. Llenó un formulario para corregir su status. Consta en su expediente una Solicitud de inclusión por omisión que presumiblemente es el documento señalado por la electora. Testificó la votante que regresó a las oficinas de la CEE el 19 de septiembre de 1988, única fecha que recuerda con claridad, y allí le informaron que el día de las elecciones votara añadido a mano. Curiosamente para el 19 de septiembre de 1988, aún no se había aprobado el mecanismo de añadidos a mano que le fuera recomendado utilizar a esta electora.

Colón Valderrama, Iván A., Exhibit #912, status I2: Testificó que no votó en las elecciones de 1984 debido a que cursaba estudios en los E.U. Señaló que en 1986–87 hizo gestiones en las oficinas de la

CEE (Río Piedras Heights) para poder votar en las elecciones de 1988. El récord electoral del Sr. Colón, sin embargo, está desprovisto de documentación alguna que refleje estos actos afirmativos del votante. No habiéndose rebatido la presunción de corrección de los actos de la CEE, actuó correctamente el organismo electoral al no adjudicar el voto de este elector.

APENDICE 4 (B): AÑADIDOS A MANO (CASOS ATIPICOS)
Electores para los cuales las partes produjeron prueba suficiente para refutar la determinación hecha por la CEE

Alvarado Morales, Manuel, Exhibit #064, status I2:

Díaz Burley, Marie, Exhibit #065, status I2:

Emitieron su voto añadido a mano en la Escuela Eugenio María de Hostos (P104 U018 C001). Ambos residen en el Edificio C del Condominio Montebello (Río Piedras) desde 1982. Para 1984 votaron en la Escuela Eugenio María de Hostos (P103 U008 C001); sus nombres estaban impresos en dicha lista (Exhibit #915). Consta en el expediente electoral de este matrimonio fotocopia de la Lista Oficial de Votantes (inclusiones) para el P104 U018 – I – C001 con el nombre impreso de ambos electores y en el encasillado correspondiente a sus firmas un "no voto". Ello explica la clasificación que recibieren de I2 producto de la depuración hecha posterior a las elecciones de 1984. Conforme a lo dispuesto en la CEE, para el 1984 algunos residentes del Condominio Montebello votaban en el municipio de Trujillo Alto y otros en el municipio de San Juan. Según se explicare en sala, parte del Condominio Montebello cae en el municipio de Trujillo Alto y parte cae en Río Piedras que pertenece al municipio de San Juan. La CEE debió hacer una transferencia administrativa en torno a la situación de estos electores, omisión que redundó en que quedaran exluidos de las listas electorales para 1988. (TE testimonio del Lcdo. José A. Valentín Rivera, Director de la Oficina de Planificación de la CEE). Son electores hábiles que quedaron excluidos por error de las listas electorales para 1988.

## APENDICE 4 (B): AÑADIDOS A MANO (CASOS ATIPICOS)

Electores para los cuales se ofreció la Lista Oficial de 1984 donde había un "no voto" al lado del nombre impreso del elector

Olmeda Cesani, Nydia, Exhibit #066, status I2: testificó haber votado en la Escuela Carmen Sanabria de Figueroa tanto en las elecciones de 1988, como en las de 1984 y 1980. Señaló que fue a la CEE previo a los pasados comicios; allí le informaron que no aparecía en las listas electorales. Declaró que regresó a la CEE tres días antes de las elecciones, llenó unos formularios y los funcionarios le dijeron que le habrían de informar la determinación a la que llegarían. El expediente electoral de la Sra. Olmeda, sin embargo, está desprovisto de documentación que corrobore su testimonio. Consta en el mismo su Petición de Inscripción (1975) y fotocopia de la Lista Electoral de 1984 del P005 U011 (Escuela Carmen Sanabria) donde al lado del nombre impreso de la electora hay un "no voto". Fue con esta lista que se depurara el nombre de la Sra. Olmeda del Registro de Electores. Obró correctamente la CEE al no adjudicar su voto.

Llinás Torres, José Antonio, Exhibit #129, status I2: este elector posee dos tie. Para la primera – 2900031 – (expedida el 4 de septiembre de 1983) posee un status electoral de A1; para la segunda – 2491548 – (expedida el 2 de septiembre de 1984) posee un status electoral de I2. Fue con esta segunda tie con la que votó en 1988. Consta como única otra prueba en su expediente electoral la Lista Suplementaria de 1984 de la Escuela Cesár[eo] Rosa Nieves con el nombre impreso de este elector y un "no votó" al lado. No habiéndose controvertido el status electoral que le asignara la CEE a esta persona, prevalece la determinación que hiciere el organismo electoral de no adjudicar su voto.

Vilar Burke, Patricia, Exhibit #740, status I2: señaló que tanto en el 1988 como en el 1984 votó en la Escuela de Lourdes. El Exhibit #907 – Lista Suplementaria del Colegio de Lourdes P003 U013 CS1 tiene un "no votó" al lado del nombre impreso de la Sra. Vilar Burke. Consta en el expediente electoral de esta persona una

Petición de Inscripción del 4 de septiembre de 1983 bajo el núm. 2897527, tie utilizada en los pasados comicios. Consta además un documento que refleja que dicha petición no se procesó por estar los trámites incompletos (había que hacer tarjeta de datos y volver a retratar). Aparentemente la electora tuvo conocimiento de tal irregularidad ya que declaró haber ido en innumerables ocasiones a la CEE previo a la elecciones de 1984. Aun así, su récord electoral está desprovisto de actos afirmativos en pro de su derecho. En aquella elección en el colegio electoral se le requirió dar el nombre de su madre, a lo cual esta electora se negó. Para 1988 no hizo gestión alguna porque a pesar de los alegados problemas, que tuvo en el 1984, entendía que no los tendría para 1988; además señaló que no había cambiado de residencia. Obró correctamente la CEE al no adjudicar el voto de esta electora.

González Cruz, Miguel Angel, Exhibit #833, status I2: el elector tramitó una Petición de transferencia el 29 de mayo de 1984 de Villa Carolina a Country Club. El Exhibit #905, Lista de Inclusiones del P003, U029 – I – C001 (Escuela Antonia Sáez Ext. Country Club), refleja tal trámite ya que tiene impreso el nombre del elector. El espacio correspondiente a su firma, sin embargo, está en blanco. Además, consta en su expediente electoral una Certificación negativa de una solicitud de inclusión por omisión del 5 de noviembre de 1988. El Sr. González Cruz debió (mas no lo hizo) tramitar oportunamente una Petición de inscripción especial. Actuó correctamente la CEE al no adjudicar su voto.

Medina Pellicier, Norberto, Exhibit #896, status I2:

Vecchini Lugo, María, Exhibit #898, status I2:

Ambos tramitaron una Solicitud de reubicación en el registro en julio de 1984 de College Park a Milaville. Declararon no haber tenido problemas para votar en aquella ocasión. Sin embargo, la Lista Oficial de Votantes (Suplementaria) de 1984 del P005 U CS1 correspondiente al Colegio Comunal de la Urb. Milaville refleja el nombre impreso de estos electores y un "no votó" al lado. No se produjo prueba suficiente por la parte para rebatir el status de

inactivo que les diera la CEE. Obró correctamente el organismo electoral al excluirlos de las listas y no adjudicar sus votos.

APENDICE 4 (B): AÑADIDOS A MANO (CASOS ATIPICOS)

Electores para los cuales las listas electorales de 1984 reflejan que votaron añadidos a mano

López Hernández, María E., Exhibit #099, status I1: posee dos tie. La primera corresponde al Núm. 1750179 expedida el 3 de junio de 1980 y para la cual posee un status electoral ED. La segunda corresponde al Núm. 1797187 expedida el 27 de enero de 1980 y para la cual posee un status de I1. La electora no hizo gestión afirmativa para activar su status bajo ninguna de las dos tie. Utilizó la tie #1750179 para votar en 1988.

Caraballo Reyes, Daniel, Exhibit #101, status I1: se presentaron dos impresos de computador para elector: uno bajo el #1781217 que clasifica a otra persona con el status de A1. Aparentemente ocurrió un error cuando el 14 de octubre de 1984 se le explidió a este elector una nueva tie. En vez de asignarle el número que le correspondía 1681211 – se le asignó el número 1681217. Ello así, bajo el número que le corresponde el elector está inactivo producto de la depuración que se hiciera de las listas de 1980. Para 1984 votó añadido a mano; (Exhibit #895), hecho que de por sí no lo rehabilita como elector. Obró correctamente la CEE al no adjudicar su voto.

Salich Martínez, Francisco, Exhibit #105, status I1:

Vera Vélez, Martha, Exhibit #106, status I1:

Ambos tramitaron una Solicitud de transferencia posterior a mudarse y previo a las elecciones de 1980. Ambos señalan haber votado en 1980 en el Colegio San Ignacio, mas no recuerdan si sus nombres aparecían impresos en las listas electorales para aquella ocasión. En el 1981 se mudaron dentro de la misma urbanización, sin embargo, no hicieron esta vez ninguna transferencia electoral ante la CEE. Declararon haber ido a votar en el 1984 al mismo colegio (San Ignacio). La única evidencia presentada por el demandante fue la Lista Oficial Suplementaria de 1984 de dicho

colegio (Exhibit #894) que demuestra que ambos votaron añadidos a mano; ello de por sí no restituye la capacidad electoral de estas personas. Obró correctamente la CEE al no adjudicar sus votos.

Borgos León, María V., Exhibit #134, status I1:

Señaló que en las elecciones de 1980 votó en el Colegio de Cupeyville sin tie y que su nombre aparecía impreso en las listas electorales. para 1984 votó en ese mismo colegio. El hecho de que no apareciere en las listas electorales en esa elección le pareció extraño y le preocupó, sin embargo, no hizo gestión alguna entre 1984 y 1988 para cotejar su status electoral. No fue sino hasta que un comisario de barrio de su partido le advirtió que tenía problemas ante la CEE y que debía ir a verificar su status que la Sra. Borgos, decidió visitar al organismo electoral. Su testimonio fue un tanto ambiguo. Primero señaló haber ido en varias ocasiones a la CEE, pero debido a que había mucha fila no hizo trámite efectivo alguno. Luego declaró que a pesar de ser advertida de su incapacidad electoral, no hizo nada a esos efectos. Bajo una u otra versión, la electora era consciente de su status problemático y optó por la inacción. La prueba aportada por la parte demandante , i. e., Lista Oficial (Suplementaria) de 1984 P005 V012 CS1 Colegio Cupeyville (Exhibit #900) nada aporta para habilitar el status de la Sra. María Borgos. Obró correctamente la CEE al no adjudicar este voto.

Borgos León, Laura, Exhibit #135, status I1: al igual que su hermana, en el 1980 votó en el Colegio Cupeyville sin tie. Señaló que previo a las elecciones de 1984 sacó su tie (expedida el 17 de octubre de 1984). Declaró que en el 1984 no tuvo problemas al votar, recuerda <u>con claridad</u> que su nombre estaba impreso en las listas. Testificó que en las elecciones de 1988 es cuando <u>único</u> ha tenido inconvenientes al votar. El Exhibit #900 refuta lo señalado por la testigo. Además, esta lista de por sí no constituye prueba suficiente para rehabilitar el status electoral de la Sra. Borgos. Obró correctamente la CEE al no adjudicar su voto.

<u>Maldonado Cotto, Jesús</u>, Exhibit #285, status I1:

Señaló que tanto en 1980 como en 1984 votó en la Escuela Sofía Rexach sin problema alguno ya que aparecía en las listas electorales. La prueba aportada para este elector refuta su testimonio, debido a que fue añadido a mano a las Listas de Votantes de 1984 (Exhibit #286). Tampoco aporta nada en beneficio de rehabilitar su derecho a votar para 1988. El Sr. Maldonado testificó no haber hecho gestión alguna entre 1984–1988 para reactivar su status. Obró correctamente la CEE al no adjudicar su voto.

<u>Hernández Ortíz, Jesús</u>, Exhibit #309, status I1:

Declaró que la primera vez que votó fue en el 1976. Cree haber votado en el 1980 y que de haberlo hecho, votó con su tie. Señaló no recordar si para las elecciones del 1984 su nombre estaba impreso en las listas, o si por el contrario, votó añadido a mano. Para aquella fecha él vivía con sus tres hermanos y su padre. Curiosamente las listas electorales de 1984 ofrecidas en evidencia (Exhibits 310 y 311) reflejan a <u>todos</u> los hermanos votando y firmando al lado de sus nombres impresos en las listas, mas el nombre del Sr. Hernández Ortíz está ausente de las mismas. Testificó no recordar si se enteró previo a las elecciones de 1988 que estaba excluido de las listas electorales; sin embargo, declaró que fue a la CEE varias veces a hacer gestiones. Sus alegadas gestiones <u>no</u> se reflejan <u>ni</u> en su expediente electoral <u>ni</u> en el impreso del computador bajo su nombre y número. Lo único que consta en su récord electoral es una relación de Solicitud de inclusión por omisión recibida en la secretar[í]a de la CEE bajo su nombre. Ello no es suficiente para convalidar su derecho al voto en los pasados comicios. Obró correctamente la CEE al no adjudicarle su voto.

<u>Cruz Carmona, Luz E.</u>, Exhibit #327, status I1:

Declaró que en las elecciones de 1980 apareció en las listas electorales, pero que en las de 1984 votó añadido a mano. Las partes estipularon la Lista electoral del 1984 (P104 U014 C51) en que aparece su nombre añadido a mano. Esta lista no constituye

evidencia suficiente para controvertir su status de electora inhábil. Cabe recalcar la falta de interés de esta persona que teniendo conocimiento de que tenía problemas con su voto, fue dos veces a la CEE previo a las elecciones de 1988: en la primera ocasión la CEE estaba muy llena, ella no quizo esperar y se fue; en la segunda ocasión, llegó tarde, el local estaba lleno, le dijeron que no la podrían atender de inmediato por haber otras personas en turno y le señalaron que volviera luego. La Sra. Cruz Carmona nunca regresó. Obró correctamente la CEE al no adjudicar su voto.

## APENDICE 4 (B): AÑADIDOS A MANO (CASOS ATIPICOS)
Electores que testificaron no haber votado en el 1984

England Colón, María de L., Exhibit #302, status I2: esta electora testificó que votó en las elecciones de 1980 sin problema alguno; su nombre estaba impreso en las listas electorales. Cabe señalar que la tie de la Sra. England no está perforada para esas elecciones. Declaró que no votó en las elecciones de 1984 por encontrarse en los E.U. La votante señaló que en el 1985 visitó las oficinas donde previamente se había retratado para inquirir donde tenía que votar en el 1988 y si podía votar. Señala que hizo tal gestión porque entre 1980 y 1985 se había mudado de residencia. Ella no le explicó al funcionario que no había votado en el 1984, por lo que él le indicó que podía votar en donde había votado previamente. Aparentemente por haber sido su visita en fecha tan cercana a las elecciones de 1984, aún las listas electorales no se habían depurado, por lo que la electora aparecía todavía en el Registro del Cuerpo Electoral. Al no alertar al funcionario de que no votó en 1984, no había manera de que éste se percatara de que era electora inactiva. No nos merece credibilidad la versión que relatara la testigo de que el funcionario le dijo que votara donde votó en 1980 y no donde votó en 1984, si verdaderamente ella no le dijo que no votó en el 1984. Posterior a ésto, no hizo ninguna otra gestión para habilitar su status electoral. Obró correctamente la CEE al excluir el voto de la Sra. England Colón.

# APENDICE 4 (C)

## CERTIFICACION DEL RESULTADO DE ESCRUTINIO AÑADIDOS A MANO

APENDICE 4(C)

CUADRE DE ESCRUTINIO POR LA COMISION

TOTAL DE PAPELETAS EN URNA: ................................... _66_

 1. VOTADAS A FAVOR DE HECTOR LUIS ACEVEDO: ......... _31_

 2. VOTADAS A FAVOR DE JOSE GRANADOS NAVEDO: ........ _33_

 3. VOTADAS A FAVOR DE ANA MARIA CORRADA DEL RIO: .... _2_

 4. VOTADAS A FAVOR DE OTROS: ....................... _0_

 5. TOTAL ADJUDICADAS POR UNANIMIDAD: .. _66_
 (1+2+3+4)

 6. PAPELETAS VOTADAS EN BLANCO: ....... _0_

 7. PAPELETAS ANULADAS: ................. _0_

 8. TOTAL DE PAPELETAS ESCRUTADAS POR
 UNANIMIDAD DE LA COMISION: ............. _66_
 (5+6+7)

 9. PAPELETAS EN DISPUTAS A SER RESUELTAS
 POR EL TRIBUNAL: ....................... _0_

TOTAL DE PAPELETAS VOTADAS: ................................... _66_
 (6+9)

Certificamos como correcto: Hoy _10_ de mayo de 1990.

_____ _____
Rubens Luis Pérez Víctor Fajardo
rep. Héctor Luis Acevedo rep. José Granados Navedo

_____ _____
Carlos Avilés Velázquez Benicio Carmona
rep. M. Rodríguez Orellana rep. M. Rodríguez Estrada

PAPELETAS ADJUDICADAS POR EL TRIBUNAL
POR NO HABER UNANIMIDAD EN LA COMISION

VOTADAS A FAVOR DE HECTOR LUIS ACEVEDO: .................... _____

VOTADAS A FAVOR DE JOSE GRANADOS NAVEDO: .................... _____

VOTADAS A FAVOR DE ANA MARIA CORRADA DEL RIO: .............. _____

PAPELETAS ANULADAS: ........................................ _____

 TOTAL DE PAPELETAS ADJUDICADAS POR EL TRIBUNAL: ........ _____

 En San Juan, Puerto Rico a ____ de mayo de 1990.

_____
CARLOS E. POLO
JUEZ SUPERIOR

APENDICE 4(C)

VOTOS A ESCRUTAR

| | Exhibit # | Nombre del Elector | Evento |
|-----|-----------|--------------------|--------|
| 1. | 061 | Godreau Pérez, José R. | Añadido a mano |
| 2. | 062 | Hernández Rodríguez, Crucita | " " |
| 3. | 063 | Collazo Mournier, Nidza | " " |
| 4. | 064 | Alvarado Morales, Manuel | " " |
| 5. | 065 | Díaz Burley, Marie | " " |
| 6. | 067 | Medero Concepción, Wilfredo | " " |
| 7. | 074 | Villanueva Tirado, Silveria | " " |
| 8. | 078 | González Rodríguez, Manuel A. | " " |
| 9. | 079 | Parrilla Castro, Ramón | " " |
| 10. | 081 | O'Farril Cartagena, Zoraida | " " |
| 11. | 083 | Soto Soto, Sotero | " " |
| 12. | 091 | Pizarro Rivera, Catalina | " " |
| 13. | 093 | Viruet Luna, Salvador | " " |
| 14. | 097 | García Rojas, Iris M. | " " |
| 15. | 098 | Hernández Batista, José R. | " " |
| 16. | 102 | Morales Rodríguez, Angel J. | " " |
| 17. | 103 | Maldonado Vélez, Georgina | " " |
| 18. | 109 | Benítez Rivera, Emilio | " " |
| 19. | 110 | Carrión Enjuto, Guillermo A. | " " |
| 20. | 111 | González Suárez, Francisca L. | " " |
| 21. | 115 | Nazario Santiago, José A. | " " |
| 22. | 117 | González Curet, José A. | " " |
| 23. | 118 | Rodríguez Rivera, Teresa | " " |
| 24. | 119 | Guzmán Ocasio, Enrique | " " |
| 25. | 120 | Otero Cortés, William | " " |
| 26. | 121 | García Rivera, Ivonne | " " |
| 27. | 124 | Rivera Mateo, Eugenia | " " |
| 28. | 126 | Carrillo Torres, María C. | " " |
| 29. | 127 | Rodríguez Calderón, Pedro | " " |
| 30. | 130 | Batista García, Justo | " " |
| 31. | 132 | Méndez Matta, Laura | " " |

APENDICE 4(C)

VOTOS A ESCRUTAR

| | Exhibit # | Nombre del Elector | Evento |
|---|---|---|---|
| 32. | 136 | Cruz Quiles, José A. | Añadido a mano |
| 33. | 138 | Rivera Nieves, Linda M. | " " |
| 34. | 139 | Alméztica Pizarro, Félix M. | " " |
| 35. | 140 | Coss Velázquez, Carlos L. | " " |
| 36. | 215 | Rodríguez Fontánez, Jorge | " " |
| 37. | 219 | Vázquez Orlandi, Lillian | " " |
| 38. | 221 | Muñiz Cancel, Aida E. | " " |
| 39. | 225 | Hernández Canales, Sonia | " " |
| 40. | 233 | Maduro Classen, Samuel L. | " " |
| 41. | 235 | Nieves Sánchez, Carmen | " " |
| 42. | 237 | Grajales Viera, Ramona | " " |
| 43. | 238 | Mondriguez Hernández, Virginia | " " |
| 44. | 241 | Rosa Díaz, Fernando | " " |
| 45. | 243 | Hernández Tirado, Israel | " " |
| 46. | 245 | Fuentes Ramos, Alicia | " " |
| 47. | 247 | Acosta Morales, Almena | " " |
| 48. | 255 | Torres Morales, Pedro A. | " " |
| 49. | 258 | Ortíz Morales, Rubén | " " |
| 50. | 262 | Irizarry Sorrentini, Rosa J. | " " |
| 51. | 269 | Negrón Miranda, Petronila | " " |
| 52. | 272 | León Rueda, José M. | " " |
| 53. | 306 | Rivera Reyes, Carmen | " " |
| 54. | 318 | Nazario Maldonado, Brenda E. | " " |
| 55. | 325 | Colón Rivera, Isabel | " " |
| 56. | 363 | Rivera Torres, Eloisa | " " |
| 57. | 374 | Paniagua Rodríguez, Rosa | " " |
| 58. | 395 | Romero Rivera, José | " " |
| 59. | 518 | Escalera Rodríguez, Rafaela | " " |
| 60. | 652 | Nishwitz Valencia, Patricia | " " |
| 61. | 684 | Quiñones Cruz, Mayra I. | " " |
| 62. | 888 | Díaz Del Toro, Gustavo A. | " " |

APENDICE 4(C)

VOTOS A ESCRUTAR

| | Exhibit # | Nombre del Elector | Evento |
|-----|-----------|--------------------|--------|
| 63. | 890 | Beltrán Berberena, Martín | Añadido a mano |
| 64. | 891 | Ayuso Walker, Luis | " " |
| 65. | 892 | Azcuy Díaz, Cirila | " " |
| 66. | 913 | Torres Valle, Marilyn | " " |

# APENDICE 5 (A)

## RESUMEN DE TESTIMONIO DE FUNCIONARIOS EN COLEGIOS CONTAMINADOS

APENDICE 5 (A)
ANALISIS DEL TESTIMONIO DE FUNCIONARIOS ELEC-
TORALES EN COLEGIOS "CONTAMINADOS"

Contaminados

Precinto 001, Unidad 010, Colegio 008

Testificó por la parte demandante la Sra. Carmen Muriel Santos, quien se desempeñó como Inspectora en propiedad por el PNP para este colegio. Señaló que por inadvertencia de los funcionarios electorales dos votantes, un joven y una señora, depositaron sus papeletas en la urna electoral, en vez de echarlas en el sobre especial de añadidos a mano que ya se les había cumplimentado. Los funcionarios conservaron los sobres vacíos de estos dos electores junto con sus TIE. Declaró que tal irregularidad se hizo constar en los sobres vacíos de estos electores. (TE del 21 de agosto de 1989 págs. 26–32).

Por la parte demandada testificó la Sra. Nancy Acosta Loubriel, quien se desempeñó como Inspectora en propiedad por el PPD para este colegio. Corroboró lo explicado por la Funcionaria del PNP a los efectos de que dos electores echaron inadvertidamente sus papeletas en la urna en vez de depositarlas en el sobre especial de añadidos a mano. Especificó que estos electores votaron, seguidamente los funcionarios se percataron de lo ocurrido e inmediatamente los detuvieron. Se cotejó con la Junta de Unidad y se decidió el hacer constar el incidente ocurrido tanto en el sobre de añadidos a mano como en el Acta de Incidencia y Acta de Escrutinio para ese colegio. La Funcionaria PPD fue quien hizo tales anotaciones. (TE del 28 de agosto de 1989 págs. 160–168).

Esta testigo identificó en corte abierta el Acta de Incidencia del Precinto 001, Unidad 010, Colegio 008 (Exhibit 1) el cual reflejó que: Lilliam M. García de la Noceda, #electoral 3166424 y Héctor M. Quiñones Negrón, #electoral 0298681, fueron los dos votantes que depositaron sus papeletas en la urna electoral. La testigo identificó además los Exhibits #852 y 853, sobres de añadidos a mano correspondientes a estos electores.

El Lic. Sigfredo Pons Fontana, Subsecretario de la CEE por el PIP, identificó el Exhibit 854, constitutivo de un listado Alfa-Unidad San Juan Precinto 001, Unidad 10 de electores activos al 8 de noviembre de 1988 y leyó del mismo (a las páginas 341 y 356) que Lillian García de la Noceda y Héctor M. Quiñones Negrón eran electores hábiles para votar en las pasadas elecciones.

Claramente, por la prueba desfilada ante este foro, la parte demandada subsanó la alegada "contaminación" en este colegio, al demostrar que las dos papeletas que fueron depositadas en las urnas correspondían a dos electores capacitados.

### Precinto 001, Unidad 013, Colegio 005

Por la parte demandante testificó el Sr. Ricardo Luis Soto Candelario, quien se desempeñó como Secretario por el PNP para este colegio. Señaló que hubo diecinueve (19) electores que votaron añadidos a mano en ese colegio. De éstos solamente a catorce (14) electores se les hizo sobre y se les retuvo la TIE; no así para los restantes cinco (5) votantes, cuyas papeletas se depositaron en la urna electoral. El señor Soto Candelario declaró que el error cometido se debió a una decisión que tomaran los Inspectores en Propiedad del PPD y PNP. (TE del 21 de agosto de 1989 a las págs. 45–49).

### Precinto 001, Unidad 020, Colegio 004

Testificó por la parte demandante el Lic. Angel R. Rosa Rosa, quien se desempeñó como Funcionario del PNP para el colegio en cuestión. A pesar de que se presentó a este testigo para demostrar la "contaminación" habida en dicho colegio, su testimonio reflejó todo lo contrario. Señaló que una vez se terminaron los sobres provistos por la CEE para votar mediante el procedimiento de añadidos a mano, los funcionarios utilizaron sobres improvisados. Una vez éstos se acabaron, el señor Rosa sugirió (y así se hizo) que las papeletas de cada elector junto a su TIE, boleto de autorización para votar, se adhirieran individualmente con cinta adhesiva para evitar la "contaminación". En este colegio votaron cuarenta (40) electores añadidos a mano y se pudo

separar e identificar cada papeleta con el elector que la emitió. No hubo ni "contaminación" ni "mezcla" de tipo alguno. El Exhibit #004 así lo demuestra.

### Precinto 002, Unidad 007, Colegio 007

Por la parte demandante testificó la Sra. Margarita Hernández López, quien se desempeñó como Funcionaria para el colegio en cuestión. Señaló que no vino ningún sobre para votar mediante el procedimiento de añadidos a mano en el maletín de la CEE. Por acuerdo de los tres (3) Inspectores en Propiedad de ese colegio, los primeros veinticinco (25) votos de personas añadidas a mano a las listas electorales se depositaron en la urna. Los restantes diez (10) votos de personas añadidas a mano se depositaron en sobres individuales que llegaron tardíamente al colegio, siguiéndose adecuadamente el procedimiento con éstos. (TE del 21 de agosto de 1989 a las páginas 40–43).

### Precinto 002, Unidad 025, Colegio 010

La Sra. Lydia Esther Santiago, quien trabajó como Inspectora en Propiedad por el PNP para este colegio testificó por la parte demandante. Señaló que alrededor de quince (15) electores votaron mediante el procedimiento de añadidos a mano. De éstos, un elector al cual ya se le había cumplimentado el sobre y retenido su TIE, echó sus papeletas en la urna. Adujo que esta irregularidad se hizo constar en el Acta de Incidencias para este colegio. (Véase el Exhibit #007). (TE del 21 de agosto de 1989 a las páginas 56–59).

### Precinto 002, Unidad 027, Colegio 004

Testificó por la parte demandante el Sr. Angel Antonio Santiago Torres, quien se desempeñó como Inspector en propiedad por el PNP para ese colegio. Declaró que votaron "ciento y pico" de electores añadidos a mano. Debido a que no llegaron los sobres especiales de añadidos a mano en el maletín de la CEE, los funcionarios acordaron conservar el boleto de autorización para votar y la TIE del elector en una casita aparte. El señor Santiago

señaló que las papeletas de los electores añadidos a mano fueron depositadas en las urnas electorales junto a las papeletas de electores capacitados. A preguntas del licenciado Escalera, sin embargo, este testigo dijo que en dicha casita pudieron haberse puesto también las papeletas de estos electores añadido[s] a mano adheridas con sus TIE y documentación electoral. (TE del 21 de agosto de 1989 a las páginas 22–26).

### Precinto 003, Unidad 002, Colegio 006

Testificó por la parte demandante el Sr. Pablo Ríos Lizaux, quien trabajó como Inspector en Propiedad por el PNP para este colegio. Señaló que votaron aproximadamente cuarenta (40) electores mediante el procedimiento de añadidos a mano. Una vez se terminaron los sobres, el señor Ríos sugirió envolver la papeleta del elector con su TIE y ponerle cinta adhesiva, previo a depositarlas en un sobre común con las de otros electores para evitar la "contaminación". Declaró que hubo dos instancias en que electores añadidos a mano depositaron sus papeletas en la urna electoral. Atestiguó que el Inspector por el PPD les inquirió por quién votaron y los electores señalaron que por el PNP. El señor Ríos declaró que al abrirse las urnas se extrajeron dos votos PNP y se anularon para cuadrar con el escrutinio. (TE del 21 de agosto de 1989 a las páginas 64–77).

Curiosamente el testigo no recuerda si se les retuvo TIE a estos dos votantes, o si se les cumplimentó el sobre de añadidos a mano. El Acta de Incidencia para este colegio no refleja la irregularidad señalada por este testigo (Exhibit #09). Carece de credibilidad el testimonio del señor Ríos Lizaux; por ello, hacemos caso omiso de la "irregularidad" mencionada.

### Precinto 003, Unidad 020, Colegio 008

Por la parte demandante testificó la Sra. Nereida Oyola Morales quien trabajó como Secretaria por el PNP para este colegio. Declaró que votaron treintiún (31) electores añadidos a mano. De éstos, las papeletas de seis (6) votantes se echaron en la urna electoral sin retenérseles TIE ni cumplimentárseles sobre alguno.

Con veinte (20) electores se sigu[i]ó el procedimiento de añadidos a mano correctamente y con los otros cinco (5), debido a que ya se habían terminado los sobres, se graparon individualmente las papeletas de cada elector con su TIE, boleto de autorización para votar y demás documentos. (TE del 21 de agosto de 1989 a las páginas 77–84).

### Precinto 005, Unidad 002, Colegio 010

El Sr. Néstor Santiago Arévalo, quien se desempeñó como Funcionario alterno PNP para este colegio, testificó por la parte demandante. Señaló que por error o inadvertencia de los funcionarios electorales, dos (2) votantes echaron sus papeletas en la urna, en vez de seguir el procedimiento de añadidos a mano. El juego de papeletas de uno de ellos se pudo identificar y rescatar de la urna electoral, ya que ambas papeletas (estatal y municipal) estaban dobladas la una dentro de la otra. A pesar de que el otro elector se llevó su TIE, los funcionarios conservaron el sobre de añadidos a mano vacío pero con toda la información del votante cumplimentada. (TE del 21 de agosto de 1989 a las páginas 34–39).

El Sr. Domingo Rocas Rivera, Inspector en propiedad por el PPD para este colegio, testificó por la parte demandada. Señaló que él estuvo a cargo del procedimiento de añadidos a mano en ese colegio. Declaró que por distracción de los funcionarios, una electora depositó sus dos papeletas en la urna en vez de echarlas en el sobre de añadidos a mano (ya cumplimentado). Este funcionario hizo constar la irregularidad en el sobre de la electora. Señaló que ese fue el único incidente de tal naturaleza ocurrido en el colegio. El señor Rojas identificó (1) el sobre de la electora Marta Kareh Gitane como el correspondiente al incidente (Exhibit #851) y (2) el Acta de Incidencias para este colegio (Exhibit #11), donde la Secretaria del Colegio había anotado esta irregularidad. (TE del 28 de agosto de 1989 a las páginas 173–180).

El Lic. Sigfredo Pons Fontana identificó el Exhibit #855, constitutivo de un listado Alfa Unidad San Juan Precinto 001, Unidad 013 de electores activos al 8 de noviembre de 1988. Del

mismo se desprende (a la página 49) que la electora Marta Kareh Gitane tiene un status electoral de A1, significando ello que era una electora hábil. (TE del 28 de agosto de 1989 a las páginas 180–183).

La prueba desfilada nos lleva a concluir que la parte demandada subsanó la alegada "contaminación" en este colegio, al probar que la única persona que echó su papeleta en la urna era elector capacitado.

### Precinto 005, Unidad 31, Colegio 006

La Sra. María Magdalena Vélez Colón, quien se desempeñó como Inspectora en Propiedad por el PNP para este colegio, testificó por la parte demandante. Señaló que una persona echó sus papeletas en la urna en vez de depositarlas en el sobre de añadidos a mano. (TE del 21 de agosto de 1989 a las páginas 60–63).

La parte demandada presentó el testimonio de Luz I. Vázquez Rojas, quien trabajó como Inspectora en propiedad por el PPD para el colegio en cuestión. Confirmó lo vertido por la funcionaria PNP, a los efectos de que una papeleta perteneciente a un elector añadido a mano fue depositada en la urna electoral. Señaló que dicha irregularidad se hizo constar o en el sobre del elector (Exhibit #857) o en el Acta de Incidencias del colegio. La funcionaria identificó el sobre de la Sra. Rafaela Quiñones Mercado (y la fotocopia de éste) como el correspondiente al elector que depositó sus papeletas en la urna. El sobre de la señora Quiñones Mercado posee una nota: "papeleta en urna."

El Lic. Sigfredo Pons Fontana, Subsecretario de la CEE por el PIP identificó el Exhibit #856, constitutivo de la Lista electoral Alfa Unidad del Precinto 005, Unidad 031. De dicha relación se desprende (a la página 983) que Rafaela Quiñones Mercado tiene un status electoral de A1, reflejando ello que era una electora hábil para votar en las elecciones de 1988. (TE del 28 de agosto de 1989 a las páginas 152 y ss).

La prueba presentada por la parte demandada subsanó la alegada "contaminación" del colegio en cuestión, debido a que

demostró que la papeleta depositada por error en la urna corresponda a un elector capacitado.

### Precinto 104, Unidad 015, Colegio 002

La Srta. Nilda Rodríguez, Inspectora suplente del PNP, testificó por la parte demandante para este colegio. Señaló que votaron alrededor de diez (10) electores mediante el procedimiento de añadidos a mano. Sin embargo, a pesar de que se les cumplimentó sobre, no se les retuvo la TIE y sus papeletas fueron depositadas en las urnas electorales. (TE del 21 de agosto de 1989 a las páginas 72 y ss).

# APENDICE 5 (B)

CORRELACION DEL TESTIMONIO DE ELECTORES EN
EL INCIDENTE DE "CONTAMINADOS"
CON EL TESTIMONIO DE LOS FUNCIONARIOS DE LA
CEE: LIC. SIGFREDO PONS FONTANA
Y ALFREDO MENDEZ

APENDICE 5 (B)

CORRELACION DEL TESTIMONIO DE ELECTORES EN EL INCIDENTE DE "CONTAMINADOS" CON EL TESTIMONIO
DE LOS FUNCIONARIOS DE LA CEE: LIC. SIGFREDO PONS FONTANA Y ALFREDO MENDEZ

| P/U/C | Elector (*representado por el Lic. Enrique Bray) | Número Electoral | Status Electoral | Exhibits | Transcrip. Evidencia testimonio Pedro |
|-------|--------------------------------------------------|------------------|------------------|----------|---------------------------------------|
| 1-13-5 | *Hilario Rodríguez Marrero | 0027903 | ER | 194; 835 | E: 31 ago: Pág. 17... / Pons: 31 ago: Pág. 0 |
| 1-17-2 | Aureo Pérez Alvarez | 0092332 | I2 | 876 | E: 31 ago: Pág. 10... / Pons: 31 ago; P -... |
| 1-17-2 | *Ada Luz Santana Arroyo | 0005299 | ER | 193; 835 | E: 29 ago (V); P 40 / Pons: 29 ago (V); P5- |
| 1-26-6 | Isidro Rivera Márquez | 0060138 | ER | 875; 882 | E: 31 ago; Pág. 100 / Pons: 31 ago; Pág. -1 / Méndez: 31 ago; P 96 |
| 2-20-3 | Carmen R. González Laureano | 0033437 | ER | 873; 883 | E: 31 ago; Pág. 17 / Pons: 31 ago; Pág. 3 / Méndez: 31 ago; P 94 |
| 2-27-4 | Juana Carmona Sierra | 0123068 | I2 | 835 | E: 29 ago (V); pág. / Pons: 29 ago (V) P 11 |
| 2-27-4 | Salvador E. Santos Fernández | 0123117 | I2 | 835 | E: 29 ago (V); P 95 / Pons: 29 ago (V); P11 |
| 2-27-4 | Lydia Candelario González | 0123022 | I2 | 835 | E: 30 ago; Pág. 55 / Pons: 30 ago; Pág. -. |
| 2-27-4 | *Félix Figueroa Rivera | 2860026 | ER | 196; 835 | E: 29 ago (M); P 55 / Pons: 29 ago (V); P11 |
| 2-27-4 | *Marcia Flores Fuentes | 0122313 | Al en Río Grande | 195; 835 | E: 29 ago (V); P 19 / Pons: 29 ago (V); P27 |
| 2-28-1 | María E. González García | 2672724 | ER | 881 Id. 866 | E: 31 ago; Pág. 113 / Pons: 31 ago; Pág. 17 / Méndez: 31 ag; P 92 |
| 02-28 S1 | *Jaime Rosario López | 2836584 | ER | 859 Id. 868 | E: 29 ago (V); P 136 / Pons: 29 ago (V); P57 / Méndez: 29 ago V P109 |
| 2-28-2 | *Iris Nereida Ortiz Cruz | 0121823 | ER | 863 Id. 867 | E: 29 ago (V); P 129 / Pons: 29 ago (V); P61 / Méndez: 29 ago V P107 |

| W/C | Elector (*representado por el Lic. Enrique Bray | Número Electoral | Status Electoral | Exhibits | Transcrip. Evidencia Testimonio: Fecha |
|---|---|---|---|---|---|
| 3-28-2 | *Carmen Santos Reyes | 0120444 | I1 | 880 Id. 867 | E: 31 ago; Pág. 13- Pons: 31 ago; Pág. -7 Méndez: 31 ago; P 92 |
| 3-28-2 | Carmen Pantojas Cabrera | 2872272 | ER | 860 Id. 867 | E: 29 ago (V); P 11- Pons: 29 ago V; P 39 Méndez: 29 ago V P10. |
| 3-28-2 | Ramonita Centeno Rodríguez | 2012269 | ER | 861 Id. 867 | E: 29 ago V; P 12. Pons: 29 ago V; P 3. Méndez: 29 ago V P10 |
| 3-28-2 | Olga Alvarez de Jesús | 2872181 | ER | 862 Id. 867 | E: 29 ago V; P 143 Pons: 29 ago V; P 60 Méndez: 29 ago V P10. |
| 3-28-2 | *Evelyn Rivera Surillo | 2863805 | ER | 874 Id. 867 | E: 31 ago; Pág. 108 Pons: 31 ago; Pág. 3. Méndez: 31 ago; P 92 |
| 3-20-8 | Sylvia E. Acosta Ureña | 2899925 | I2 | 835 | E: 31 ago; Pág. 83 Pons: 31 ago; Pág. 3- |
| 03-22 S1 | Evelyn López Rivera | 2900953 | ER | 869; 871 | E: 30 ago; Pág. 98 Pons: 30 ago; Pág. 57 Méndez: 30 ago; P 91 |
| 03-23 S1 | María A. Rivera Vázquez | 2666106 | I2 | 879; 884 | E: 31 ago; Pág. 111 Pons: 31 ago; Pág. -0 Méndez: 31 ago; P 97 |
| —27-5 | Angel Luis Vázquez Marrero | 2528693 | ER | 878; 372 | E: 31 ago; Pág. 142 Pons: 31 ago; Pág. -7 Méndez: 31 ago; P 93 |
| —27-5 | *Rosa Rodríguez Colón | 2528724 | ER | 870; 872 | E: 30 ago; Pág. 94 Pons: 30 ago; Pág. 30 Méndez: 30 ago; P 90 |
| —27-5 | María J. Marrero Sierra | 1702826 | I2 | 877; 872 | E: 31 ago; Pág. 124 Pons: 31 ago; Pág. 45 Méndez: 31 ago; P 93 |
| 10—15 2 | Reyes Padín Cuevas | 1655860 | ER | 835 | E: 29 ago (V); P 42 Pons: 29 ago (M); P39 |

# APENDICE 5 (C)

## TABLA DE REDUCCION PROPORCIONAL EN LOS COLEGIOS CONTAMINADOS

APENDICE 5(C)

TABLA DE REDUCCION PROPORCIONAL
COLEGIOS CONTAMINADOS

| PRECINTO UNIDAD+ | TOTAL VOTOS ILEGALES ADJUDICADOS | TOTAL VOTOS ADJUDICADOS | VOTOS POR ACEVEDO | REDUCCION PROPORCIONAL DE VOTOS ACEVEDO | VOTOS POR GRANADOS | REDUCCION PROPORCIONAL DE VOTOS GRANADOS | VOTOS POR OTROS CANDIDATOS | REDUCCION PROPORCIONAL DE VOTOS OTROS CANDIDA |
|---|---|---|---|---|---|---|---|---|
| 001/10 | 0 | 1547 | 692 | 0 | 785 | 0 | 70 | 0 |
| 001/13 | 3 | 968 | 422 | 1.31 | 506 | 1.57 | 40 | 0.12 |
| 001/17 | 0 | 416 | 193 | 0 | 197 | 0 | 26 | 0 |
| 001/20 | 0 | 761 | 361 | 0 | 371 | 0 | 29 | 0 |
| 002/07 | 11 | 1473 | 689 | 5.15 | 745 | 5.56 | 39 | 0.29 |
| 002/13 | 0 | 1112 | 522 | 0 | 563 | 0 | 27 | 0 |
| 002/25 | 1 | 2252 | 1650 | 0.73 | 564 | 0.25 | 38 | 0.02 |
| 002/27 | 8 | 802 | 434 | 4.33 | 348 | 3.47 | 20 | 0.2 |
| 003/02 | 0 | 1294 | 604 | 0 | 662 | 0 | 28 | 0 |
| 003/20 | 3 | 1678 | 843 | 1.51 | 788 | 1.41 | 47 | 0.08 |
| 005/02 | 0 | 2204 | 1164 | 0 | 952 | 0 | 88 | 0 |
| 005/31 | 0 | 1312 | 616 | 0 | 631 | 0 | 65 | 0 |
| 104/15 | 3 | 307 | 155 | 1.51 | 145 | 1.42 | 7 | 0.07 |
| TOTALES | 29 | 16128 | 8345 | 14.54 | 7259 | 13.68 | 524 | 0.78 |

+ El Artículo 1.03(55) de la Ley Electoral define unidad electoral como "la composición geográfica electoral mas pequena en que se han dividido los precintos para fines electorales."

1) 001/10/08 Las dos papeletas que fueron a la urna correspondían a electores hábiles; se subsana la alegada "contaminación" en este colegio.

2) 001/13/05 Se le descontó un voto a Granados.

3) 001/17/02 La parte demandante no ofreció testimonio de funcionario de colegio y desistió de su reclamación relacionada con la "contaminación" de este colegio (TE 21 de agosto de 1989, pp. 85 - 86 y TE 28 de agosto de 1989, p. 32). Sin embargo, la parte demandante incluye este colegio en su alegato como uno "contaminado". Se le descontaron dos votos a José Granados Navedo.

4) 001/20/04 El testimonio del Fiscal Angel E. Rosa, funcionario del PNP, demostró que no hubo la alegada "contaminación" en este colegio.

5) 002/07/07 Se le descontó un voto a Granados.

6) 002/13/06 La parte demandante no ofreció testimonio de funcionario de colegio, por lo que no se estableció la alegada "contaminación" de votos en las urnas.

7) 002/27/04 Se le descontaron 4 votos a Granados.

8) 003/02/06 De las actas (Exh. 9) se desprende que no hubo la alegada "contaminación" de votos en la urna.

9) 003/20/08 En este colegio se le descontó un voto a Granados. Asumiendo como cierto lo contenido en el memorando del demandante habría que adjudicar dos votos a Granados que quedaron "arrestados" para luego aplicar la reducción proporcional. De la prueba sometida es virtualmente imposible determinar a quiénes corresponden las dos papeletas "arrestadas".

10) 005/02/10 De las actas (Exh. 11) se desprende que en este colegio no se dio la alegada "contaminación en las urnas.

11) 005/31/06 Solamente se "mezcló" una papeleta en este colegio. Se demostró que correspondía a una electora hábil para votar, por lo que no hay "contaminación".

12) 104/15/02 Se le descontó un voto a Granados.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

PARA HACER CUMPLIDA JUSTICIA, AUNQUE MORTIFIQUE A ALGUNOS O PAREZCA QUIJOTESCO A OTROS, LAS VERDADES SIEMPRE HAY QUE EXPONERLAS. Reconocemos los términos vigorosos y críticos de este disenso. Dejamos, sin embargo, al buen discernimiento de los lectores y electores el determinar si los mismos están justificados a la luz de las excepciones vislumbradas por el decano Roscoe Pound y acogidas por la mayoría del Tribunal. Opinión mayoritaria, pág. 7. Y es que "cuando un juez percibe que una interpretación del texto se ha apartado tanto de su verdadero significado, UN DEBER CONSTITUCIONAL CON LA COMUNIDAD, DE MAYOR ENVERGADURA, lo obliga a exponer esa desviación y a señalar un derrotero distinto". (Traducción nuestra y énfasis suplido.) Juez Asociado Señor William W. Brennan, *Discurso pronunciado ante la Asociación de Abogados Criminalistas*, Nueva York, 1990.

Si resolvemos los méritos del presente recurso adhiriéndonos fielmente a nuestra doctrina jurisprudencial *liberal* en materia electoral —apuntalada en el mandato constitucional de que las leyes *garantizarán* el sufragio universal (Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1)— JOSÉ GRANADOS NAVEDO TRIUNFÓ POR UN MARGEN MAYOR DE CIEN (100) VOTOS EN LAS PASADAS ELECCIONES MUNICIPALES PARA LA ALCALDÍA DE SAN JUAN. Si los evaluamos de acuerdo con los pronunciamientos *restrictivos* adoptados por la mayoría de este Tribunal con posterioridad a *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988) —decisión que sostuvo la legalidad, razonabilidad y necesidad del sistema de votación de añadidos a mano— GRANADOS NAVEDO AÚN SERÍA EL VENCEDOR. Si los resolvemos siguiendo los criterios más *restrictivos* y *confiscatorios* del Tribunal Superior, Sala de San Juan (Hon. Carlos E. Polo), *refrendados y ampliados* hoy en la opinión mayoritaria suscrita por el Juez Asociado Señor Alonso

Alonso, que ignora la VERDAD PROCESAL Y SUSTANTIVA de que no se adjudicaron cincuenta y siete (57) votos válidos correspondientes a electores *recusados ilegalmente por domicilio (ER)*, treinta y nueve (39) votos de *papeletas con iniciales* puestas *bona fide* por electores hábiles que *malinterpretaron unas instrucciones*, que se descontaron veintitrés (23) votos mediante un trámite *inquisitorial e ilegal,* que se *mezclaron* en los colegios *contaminados arrestados* setenta y ocho (78) papeletas de electores hábiles con otras de electores *no cualificados* cuyos votos tampoco fueron contados y, además, que se contabilizaron varias papeletas de electores inhábiles en colegios *contaminados no arrestados*, NO PODRÍA SOSTENERSE LA FRÁGIL CONCLUSIÓN DE QUE ACEVEDO PÉREZ GANÓ POR CUARENTA Y NUEVE (49) VOTOS.

Bajo este último *supuesto,* a lo sumo, conforme la sentencia del propio tribunal de instancia, EN LA *ALTERNATIVA* EL ÚNICO REMEDIO JUDICIAL SERÍA UNA NUEVA ELECCIÓN. PERO CIERTAMENTE NUNCA PODRÍA MANTENERSE LA *PREMATURA* CERTIFICACIÓN DE ACEVEDO PÉREZ DE 7 DE DICIEMBRE DE 1988 EXPEDIDA POR EL PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES (COMISIÓN ESTATAL), LICENCIADO RODRÍGUEZ ESTRADA.

Como precedente, en su proyección inmediata y futura, es inquietante la postura mayoritaria de que en el caso de autos "[n]o nos compete autoproclamarnos una super C.E.E para desde este estrado hacer un recuento de votos y proclamar el vencedor y el vencido". (Énfasis suprimido.) Opinión mayoritaria, pág. 13. *¿Significa ello una nueva modalidad de abdicación judicial en materia electoral? ¿IMPLICA UNA DEFERENCIA ABSOLUTA HACIA LAS DETERMINACIONES DE LA COMISIÓN ESTATAL, ORGANISMO DOMINADO DESDE EL 1986 HASTA EL PRESENTE POR EL PARTIDO POPULAR DEMOCRÁTICO (P.P.D.) A TRAVÉS DE LAS DECISIONES DE SU AFILIADO, EL PRESIDENTE LICENCIADO RODRÍGUEZ ESTRADA?* ¿PARTIDOCRACIA O DEMOCRA-

CIA? Mediante ese prisma, la mayoría ha dejado sin efecto en pocos meses sus propias expresiones, por voz del ex Juez Asociado Señor Ortiz, en *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 19-20 (1989):

Tanto la dinámica organizacional de la Comisión Estatal —controlada por los partidos políticos— *como la forma particular en que se toman allí las decisiones exigen la aplicación del criterio de revisión judicial más riguroso.* LAS DECISIONES DE LA COMISIÓN ESTATAL ESTÁN SUJETAS A LAS *PRESIONES E INTERESES PARTIDISTAS.* Ello lo propicia la propia estructura del organismo. En estas circunstancias, la Legislatura tuvo fundamentos legítimos para disponer que en el escrutinio de las determinaciones tomadas *la revisión judicial sea abarcadora.* Véanse: L.L. Jaffe, *Judicial Control of Administrative Action*, Little, Brown and Company, 1965, págs. 621-623; L.L. Jaffe, *Judicial Review: Questions of Fact*, 69 Harv. L. Rev. 1020, 1054 (1956). Si la Asamblea Legislativa hace clara su intención de ampliar la revisión judicial, *los tribunales deben aceptar esta responsabilidad.* L.L. Jaffe y Nathanson, *Administrative Law: Cases and Materials*, 4ta ed., Little, Brown and Company, 1976, pág. 958. (Énfasis suplido.)

¿Cómo justificar que el Juez Polo pueda recontar y escrutar votos mientras se le niega esa facultad a este Tribunal? ¿Por qué razón? Si no es así, en trámites de revisión, ¿a quién entonces le corresponde? Con dolor vemos cómo ha quedado atrás el enfoque apropiado de revisión judicial proclamado en *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 227 (1981), expositivo de que "[l]a finalidad que la Ley Electoral reconoce a las determinaciones de[l tribunal de instancia] *no implica una obligada abstención por nuestra parte . . .".* (Énfasis suplido.)

Y es que, según veremos, ni el tribunal de instancia ni la mayoría de este Foro han evaluado con la profundidad necesaria los válidos reclamos de un sinnúmero de electores que impugnaron exitosamente sus recusaciones por domicilio (ER).

Vano es el empeño mayoritario de pretender hoy, bajo el manto de una revisión judicial limitada y una malentendida "presunción de corrección de los procedimientos administrativos" (opinión mayoritaria, pág. 13), ponerle punto final y legitimizar LA ESPÚREA CERTIFICACIÓN DE ACEVEDO PÉREZ. Real-

mente no comprendemos la renuencia a intervenir predicada en que se trata de una revisión sobre un "juicio *de novo*". En su esencia, ¿no constituye ello precisamente el ejercicio regular de nuestra función revisora? Aparentemente la mayoría sigue confundida en lo concerniente a los alcances y efectos del *juicio de novo*.

A fin de cuentas, una determinación fáctica no sostenida por la prueba *constituye una cuestión de derecho revisable*. Nos negamos, pues, a claudicar el ejercicio cabal de esa jurisdicción apelativa, en especial en casos como el presente saturados de intereses político-partidistas. Así lo exige nuestra *conciencia judicial y visión liberal* cristalizada en la jurisprudencia en materia electoral —"enfoque paternalista", al decir mayoritario (opinión mayoritaria, pág. 18 esc. 2)—, que nunca ha cambiado.

Es el Comisionado Electoral del P.P.D., licenciado Báez Galib, quien desde su comparecencia en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, pág. 524, ha insistido en modificarla, al sostener a ultranza —de lo cual ahora la mayoría finalmente se hace eco— de que "'existe una obligación del elector [de] asegurar su estado electoral previo al día de elecciones'", y que es "'[c]onocido por el elector que debe cotejarse y de cuándo son las fechas límites para corregir asientos[,] el no hacerlo implica una renuncia a un derecho renunciable. Implica que acepta [que] no esté su nombre en las listas electorales'".

Contra esa posición, allí en nuestra opinión concurrente ya habíamos advertido que el señalamiento no era novel, pues desde sus dos perspectivas contradictorias situacionales había sido planteado en *P.P.D. v. Admor. Gen. de Elecciones*, supra.[1] Al rechazar la propuesta del Comisionado Electoral Báez Galib

---

[1] Dijimos:

"En aquella ocasión, el Administrador General de Elecciones y el candidato del P.N.P. certificado, Osvaldo Molina, nos sostenían:

"'Los electores son adultos. Tienen, además, organismos que cooperan gratuitamente en ayudarle al trámite administrativo. Entre estos se encuentran la propia Comisión, la Junta Revisora, los Partidos y agrupaciones políticas, los medios noticiosos, etc. . . . . Pero el elector no puede tener unas expectativas utópicas de la realidad. *Se espera de él un esfuerzo razonable en cotejar si su inscripción tiene problemas y si su petición está correcta. También se espera que sea diligente y coteje en fecha cercana a las Elecciones*

invocamos, sin ambigüedades, la siguiente normativa aplicada anteriormente a favor del P.P.D.:

*si la petición de transferencia que llenó fue procesada y si no, por qué razones.* A tales efectos y para remediar casos con problemas, la Comisión[,] en ánimo también liberal, estableció Centros de Información Electoral con terminales de computadoras en forma permanente y que operaron el mes antes de las elecciones de 8:00 A.M. a 12 de la noche. La Junta Revisora Electoral, la Comisión Estatal de Elecciones y las Comisiones Locales se constituyeron en sesión permanente y se diseñó e implementó el Procedimiento de Inclusión de Electores que antes hemos mencionado. *Se le dio amplia publicidad por los medios noticiosos y se les exhortó encarecidamente a que todos los electores se cotejaran en las listas.'* (Énfasis suplido.) Caso Núm. O-81-27, Alegato de los recurridos, pág. 68.

"Y más adelante:

"'El elector tiene derechos, *pero también tiene deberes.* Precisamente el Artículo 2.002 de la Ley Electoral está concebido en término[s] del *deber del elector. Para cumplir con su deber tiene que ser diligente.* El Estado le proporciona los medios pero no puede pretender para con él un trato privilegiado y fuera de la realidad de nuestra sociedad de masas.' (Énfasis suplido.) Caso Núm. O-81-27, *supra,* pág. 71.

"'Por su parte, el *P.P.D. y el candidato Samuel Cepeda* nos ofrecieron los siguientes argumentos en contra:

"El Estado puede, sin lugar a dudas, establecer como requisito que el elector haga la gestión de inscribirse en el Registro Electoral, caso de *Ortiz Angleró v. Barreto [Pérez]*, 110 D.P.R. 84 (1980), o en el caso de electores ya previamente inscritos que hagan una transferencia para ejercer su derecho al voto en la comunidad a la que ahora pertenecen. *La consecuencia natural de esta gestión debe ser la presencia del elector en la lista de votación.* Cuando el elector no aparece por causas atribuibles a él —como el inscribirse dentro de un plazo razonable véase *Dunn v. Blumstein,* 405 U.S. 330 (1972); *Ort[i]z Angleró v. Barreto [Pérez],* supra; *Marston v. Lewis,* 410 U.S. 489 (1972); *Burns [v.] Fors[ton],* 410 U.S. 686 (1972); su exclusión del proceso electoral es constitucionalmente válida por cuanto la presencia en la lista electoral es un medio necesario para adelantar el interés apremiante en prevenir un fraude. *Cuando la ausencia del nombre en las listas no es atribu[i]ble al elector —como cuando la computadora desaparece el nombre o cuando los funcionarios de la C.E.E. no tienen tiempo para verificar el precinto de procedencia de un elector que desea la transferencia—* el interés de prevención por parte del Estado pierde su carácter apremiante frente al derecho al voto.' (Énfasis suplido.) Expediente Núm. O-81-27, Alegato de los recurrentes, pág. 30.

"Y subsiguientemente:

"'Desde el punto de vista sustantivo, no cabe duda de que el Estado puede requerir del elector la realización de una gestión afirmativa para poder ejercer su derecho al voto. Los requisitos procesales no pueden ser de tal forma onerosos que anulen el ejercicio de la franquicia electoral. [Cf.] *Williams v. Rhodes,* 393 U.S. 23 (1968); *Harper v. Virginia State Board of Elections,* 383 U.S. 663 (1966). La teoría de la Junta Revisora Electoral caería bajo esta descripción. Veamos.

"'*Bajo la teoría de la Junta Revisora Electoral un elector debe saber su número electoral y el de todos los precintos en que haya vivido. Debe conocer, además, las diferencias entre una solicitud de inscripción y de transferencia y advertir los errores que pueda cometer el escribiente al escoger el formulario. Debe también estar cont[i]nuamente pendiente a que las computadoras de la C.E.E. tengan a bien procesar su solicitud. Bajo las teorías de la J.R.E. es el elector —nunca el Estado—* el que tiene que velar po[r q]ue su interés en asegurar su derecho al voto se materialice en un asiento electoral en el precinto de su residencia.

"'También bajo esta teoría el desconocimiento de tales responsabilidades no tiene consecuencia cuando los funcionarios que llenan la solicitud del elector son más aptos o cuando éste tiene la fortuna de que su partido político, empeñado en labor detectivesca,

Los recurridos [Admor. Gen. de Elecciones, P.N.P. y Osvaldo Molina] alegan que los electores afectados por este procedimiento tuvieron amplia oportunidad de enterarse a tiempo de que sus solicitudes no habían sido procesadas, *ya que hubo una campaña publicitaria de orientación que debió despertar en cada elector que había solicitado una transferencia la curiosidad de averiguar su status electoral. Tal proposición es inaceptable*, pues colocaría siempre sobre el elector, y nunca sobre el Estado, la obligación de supervisar el trámite administrativo de la Comisión Estatal de Elecciones. (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 244.

Y es que, a fin de cuentas, "[a]unque la Ley Electoral fue enmendada, en lo pertinente, subsisten básicamente disposiciones análogas que validan esa interpretación. No existen, pues, razones de peso para modificar ese pronunciamiento. *La Constitución es la misma. Sólo han cambiado los protagonistas y sus posiciones partidistas*". (Énfasis suplido.) *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, pág. 527.

Nuestro enfoque *liberal*, o si se le quiere llamar *paternalista*, responde a la intención legislativa de hacer viable el voto como

---

percibe el error o cuando la C.E.E. tiene algún tiempo disponible para procesar la petición y suplir cualquier error u omisión.

"*'Esto es sencillamente insostenible.* Una Ley Electoral que imponga sobre el elector todas esas obligaciones, que lo sancione por imperfecciones técnicas y que haga depender el derecho al voto de circunstancias fortuitas, *no cumple con el mandato constitucional* de que las leyes garantizarán la libre expresión de la voluntad del pueblo mediante el ejercicio del sufragio universal, igual, directo y secreto. *Constitución del Estado Libre Asociado de Puerto Rico*, Artículo II, Sección 2. Tal esquema violenta el ideal de prevalecencia de los derechos electorales del ciudadano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas. Ley Electoral, Artículo 2.001(11). *Hace mucho tiempo que nuestro sistema jurídico se liberó del dominio de formas sacramentales que ahogaban la justicia. Con más razón y fuerza debe rechazarse la imposición de tecnicismos que tienen el efecto de anular la voluntad de un elector que depende de los organismos oficiales para que le ayuden a materializar su deseo de votar en el lugar en que vive y cuyo derecho al voto no puede estar sometido a los riesgos que representan las operaciones computarizadas, los formularios oficiales y la negligencia de los funcionarios.* La primacía del derecho al sufragio es de tal forma trascendental, véase *Wesbery v. Sanders*, 376 US 1; *Reynolds v. Sims*, 377 US 55, que ni tan siquiera errores de los electores que no tengan su base en intenciones fraudulentas deben dar lugar a la anulación de un voto.' (Énfasis suplido y en el original; escolio omitido.) Caso Núm. O-81-27, Alegato de los recurrentes, págs. 32–33." (Énfasis suplido y en el original.) *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490, 524–527 (1988).

expresión máxima de los derechos ciudadanos en una democracia, según consignado en la Declaración de Propósitos de la propia Ley Electoral, que prácticamente incorpora la garantía constitucional del sufragio. Ese espíritu de *liberalidad* ha sido constante, independientemente de que en su aplicación hayamos favorecido a determinado candidato del P.P.D., P.N.P. o P.I.P. *González v. Rodríguez Estrada I*, 124 D.P.R. 749 (1989), opinión disidente; *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989), opinión disidente; *Granados v. Rodríguez Estrada I*, supra, opinión disidente; *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, 123 D.P.R. 1 (1988), opinión disidente; *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, opinión concurrente; *P.P.D. v. Planadeball Poggy*, 121 D.P.R. 570 (1988), opinión disidente; *Calcador v. Ramírez Pantojas*, 121 D.P.R. 491 (1988), voto disidente; *Mundo Ríos v. Gobernador*, 121 D.P.R. 416 (1988), opinión concurrente; *Rodríguez Ramos v. C.E.E.*, 121 D.P.R. 342 (1988), voto disidente; *Grillasca Domenech v. C.E.E.*, 121 D.P.R. 186 (1988), voto disidente; *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988), opinión disidente; *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984); *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984); *González Reyes v. Romero Barceló*, 114 D.P.R. 406, 419 (1983), opinión disidente; *Santos v. Comisión Estatal de Elecciones*, 111 D.P.R. 351 (1981); *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 320, opinión concurrente; *P.P.D. v. Gobernador*, 111 D.P.R. 8 (1981), opinión disidente; *P.P.D. v. Gobernador*, 110 D.P.R. 783 (1981); *Esteves v. Srio. Cám. de Representantes*, 110 D.P.R. 585, 595 (1981), opinión disidente; *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980); *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980); *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313, 314 (1980), opinión concurrente; *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 287 (1980), opinión concurrente y disidente; *Santos v. P.P.D.*, 109 D.P.R. 798 (1980); *P.I.P. v. E.L.A.*, 109 D.P.R. 403, 414 (1980); *P.S.P. v. Tribunal Electoral*, 104 D.P.R. 230 (1975); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 1, 5 (1975).

"El derecho al sufragio, espina dorsal del cuerpo de la democracia, opera y se fortalece de aires y corrientes liberales."

*P.S.P. v. Com. Estatal de Elecciones,* supra, pág. 423. EN EL CASO DE AUTOS, ES OBVIO QUE EL ABANDONO TOTAL POR LA MAYORÍA DE ESTE ENFOQUE DE *LIBERALI-DAD* TIENE EL EFECTO INMEDIATO DE CONFISCARLE EL VOTO A UN SINNÚMERO DE ELECTORES IDÓNEOS Y, COMO RESULTADO DIRECTO, NEGARLE LA ALCAL-DÍA A GRANADOS NAVEDO.

## I

*Antecedentes judiciales*

En buena metodología adjudicativa[2] es menester exponer brevemente las decisiones *post* eleccionarias que este caso ha originado. En *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra,

---

[2] Subdividimos este disenso en los siguientes:

| | Temas | Páginas |
|---|---|---|
| I | – *Antecedentes judiciales* | 251 |
| II | – *Reclamo de electores excluidos por domicilio (ER)* | 256 |
| | A. *Trámite procesal y evidenciario* | 256 |
| | B. *Recusaciones nulas por razones procesales* | 291 |
| | C. *Recusaciones nulas por ser improcedentes en sus méritos* | 299 |
| | D. *Recusaciones nulas por falta de prueba y de notificación* | 309 |
| III | – *Papeletas con doble marca* | 312 |
| IV | – *El procedimiento de votar añadido a mano; normas probatorias; sus efectos* | 312 |
| V | – *Electores inactivos* | 316 |
| VI | – *Papeletas con iniciales al dorso* | 341 |
| VII | – *Inconstitucionalidad del trámite y de la decisión que decretó la ilegalidad del voto de veintitrés (23) electores* | 354 |
| VIII | – *Eerrores procesales y de derecho en cuanto a las papeletas contaminadas no arrestadas y las contaminadas arrestadas* | 370 |
| | A. *Consideraciones preliminares* | 371 |
| | B. *Los votos contaminados no arrestados* | 381 |
| | C. *En cuanto a los votos contaminados arrestados* | 382 |
| IX | – *Conclusiones* | 384 |

por voz del Juez Presidente Señor Pons Núñez, se confirmó la sentencia que desestimó un recurso de revisión instado por el P.N.P. Se impugnaba allí la decisión del Presidente de la Comisión Estatal durante el recuento de votos en el Municipio de San Juan, que anuló las papeletas con las iniciales del elector al dorso. En esa ocasión disentimos en unión al Juez Asociado Señor Rebollo López.

En *Granados v. Rodríguez Estrada I*, supra, se le reconoció capacidad a Granados Navedo para: (1) cuestionar las decisiones de la Comisión Estatal en relación con determinados votos; (2) invocar derechos de electores que no eran testigos ni partes, y (3) presentar toda la prueba relacionada con las papeletas con iniciales al dorso y las llamadas "papeletas contaminadas y arrestadas". *Otra vez disentimos por entender que las controversias pendientes no eran adjudicables rápidamente y procedía decretarse una nueva elección.* También disintió el Juez Asociado Señor Rebollo López.

Una vez el caso fue devuelto al tribunal de instancia, se suscitaron varios incidentes que culminaron con la decisión suscrita por el Juez Asociado Señor Hernández Denton: *Granados v. Rodríguez Estrada II*, supra. En síntesis, la mayoría ordenó la acumulación compulsoria como demandantes involuntarios de unos mil doscientos treinta y dos (1,232) electores. Éstos, que votaron bajo el sistema de añadidos a mano, no fueron notificados previamente por la Comisión Estatal. Dicha decisión reconoció que esos electores *podían incoar pleitos independientes para reclamar sus derechos*. Por economía procesal, cansolidaron esas acciones con la de *Francisca L. González Suárez v. Comisión Estatal y otros*, KPE 89–0274, acción que a su vez ya se había consolidado por el foro de instancia con el pleito especial de impugnación. Finalmente, dispusieron de un novedoso "emplazamiento judicial" de esos electores mediante edictos, *sin citación personal ni diligenciamiento negativo previo*, y con una notificación simultánea por correo certificado. Sin explicación ni fundamento, descartaron igual trámite en cuanto a otros electores *no notificados* por la Comisión Estatal, cuyos votos habían sido

anulados por tener iniciales en el dorso de las papeletas, y de aquellos relacionados con las papeletas contaminadas arrestadas anulados por el Presidente de la Comisión Estatal el 7 de diciembre de 1988, precisamente el día que certificó vencedor a Acevedo Pérez. Contra esa decisión suscribimos un disenso separado, igual que los Jueces Asociados Señores Rebollo López y Ortiz.

Por último, en *González v. Rodríguez Estrada I,* supra, pág. 752, mediante una simple *sentencia,* consecuencia de la decisión anterior, la mayoría ordenó la enmienda de la demanda y redactó las alegaciones que debía contener "para salvaguardar los derechos electorales y constitucionales de los electores cuyos votos no fueron adjudicados en las elecciones celebradas en el Municipio de San Juan". Según esta sentencia, de la cual disentimos vehementemente los Jueces Asociados Señores Rebollo López, Ortiz y el que suscribe, la enmienda redactada *sua sponte* por este Tribunal incluyó las alegaciones siguientes: "que *son electores cualificados*; que votaron en las pasadas elecciones del Municipio de San Juan; *que su voto no fue adjudicado en contravención a la ley y a nuestra Constitución*; que ello puede afectar el resultado de las elecciones de dicho municipio; que se cuente su voto, y que se dicte el remedio que en derecho corresponda. *Todo ello sin perjuicio de que las personas acumuladas que comparezcan hagan las alegaciones adicionales que estimen convenientes.*" (Énfasis suplido.) Íd., pág. 753.

Dieciocho (18) meses después de las elecciones, el tribunal de instancia finalmente dictó sentencia. Inconformes con la decisión, Granados Navedo y numerosos electores solicitaron revisión.

Aunque reiteramos los fundamentos de nuestros disensos anteriores, para fines de este recurso en muchos extremos presumiremos la corrección de las decisiones mayoritarias. Notamos que en *Granados v. Rodríguez Estrada II,* supra, pág. 606, la mayoría aceptó que esos "electores *no fueron notificados* por la C.E.E. de *que su voto no había sido adjudicado, aun cuando se conocían sus nombres y direcciones*", y que la Constitución y la Ley Electoral les "conced[ía] a estos electores un *remedio judi-*

*cial* para hacer valer su 'derecho a la libre emisión del voto y a que éste se cuente y se adjudique de la manera en que el elector lo emita'. Art. 2.001 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. sec. 3051(10)". En vista de que esos electores podían instar acciones independientes, en aras de evitar la proliferación de pleitos y ponerle punto final al pleito de impugnación, ordenaron su acumulación como demandantes involuntarios. En consecuencia, este Tribunal: (a) diseñó y autorizó un emplazamiento *judicial* sui géneris para los "mil doscientos treinta y dos (1,232) electores cuyos votos no fueron adjudicados y que no habían instado reclamación judicial alguna" (íd., pág. 610); (b) ordenó la notificación "por correo certificado a la dirección, según consta en los registros electorales del elector a ser acumulado como parte, de una copia de la demanda" (íd., pág. 611); (c) simultáneamente serían notificados mediante edictos "de la demanda incoada [según enmendada, de] su acumulación como partes y que en virtud de ello se ha[bría] de adjudicar *sus derechos* en este asunto". (Énfasis suplido.) Íd. Esa masiva acumulación se hizo con el propósito de "permitirles presentar las alegaciones sobre aquellas *violaciones constitucionales relacionados con la adjudicación de su[s] voto[s]* en la elección para Alcalde de la Ciudad Capital que estim[ar]en pertinente". (Énfasis suplido.) Íd., pág. 607 esc. 3. Repetimos, la *acumulación* de los electores fue predicada en que:

> La Ley Electoral específicamente le concede a los electores legitimación activa para defender judicialmente sus derechos: "A tal fin, se concede por este Subtítulo a los electores la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas ante el Tribunal de Primera Instancia que corresponda." 16 L.P.R.A. sec. 3051. *El derecho al voto igualmente podría ser defendido a través de una acción al amparo de nuestra Constitución. Si los electores que entiendan que se les ha privado de su derecho a la adjudicación de su voto pueden instar acciones independientes y obtener un remedio que afecte los resultados de esta elección, ¿por qué no acumularlos ahora como partes en el caso de la señora González Suárez y permitirles reclamar sus prerrogativas?* Ante la viabili-

dad de las acciones posteriores, de no acumularlos ahora como parte las decisiones en los casos de autos carecerán de finalidad. (Énfasis suplido.) *Granados v. Rodríguez Estrada II*, supra, pág. 607.

Aunque la mayoría señaló que su decisión "no imp[ediría] que el Tribunal [de instancia], de estimarlo necesario, pu[diera] acumular *otros electores*" —(énfasis suplido) *Granados v. Rodríguez Estrada II*, supra, pág. 611— según señalamos antes limitaron su dictamen a los mil doscientos treinta y dos (1,232) electores añadidos a mano. La razón era obvia. A la fecha de esa decisión —29 de septiembre de 1989— los trámites relativos al pleito de impugnación estaban adelantados. El 23 de agosto había terminado de desfilar la prueba de las causas de acción correspondientes a las papeletas de doble marca, a las papeletas con iniciales o marcas al dorso, y a las papeletas contaminadas arrestadas y no arrestadas. Sólo faltaba la prueba de Acevedo Pérez y la de ambas partes en torno a los electores rechazados que votaron bajo el sistema de añadidos a mano.

NO EXISTE DUDA DE QUE, SALVO CUARENTA Y UN (41) ELECTORES QUE COMPARECIERON A DECLARAR COMO TESTIGOS DE GRANADOS NAVEDO, TODAVÍA EXISTEN DOSCIENTOS SETENTA Y SEIS (276)(3) ELECTORES CUYAS PAPELETAS FUERON ANULADAS POR TENER INICIALES AL DORSO Y NUMEROSOS ELECTORES CUYOS VOTOS FUERON ARRESTADOS —AMBOS GRUPOS INCLUIDOS *ANTES* EN LA ORDEN DE CITACIÓN DEL JUEZ POLO DE 14 DE AGOSTO DE 1989— *QUE HASTA HOY NO FUERON NI HAN SIDO VÁLIDAMENTE NOTIFICADOS, DE ALGUNA FORMA, POR LA COMISIÓN ESTATAL O EL TRIBUNAL SUPERIOR.*

Es evidente que estos electores debieron ser citados para que comparecieran a defender sus votos. Eran y son acreedores a ello por el mismo fundamento —causa de acción y derecho constitucional a reclamar— que inspiró la decisión mayoritaria en

---

(3) Cifra obtenida del examen directo de los cinco (5) maletines de evidencia sometida y elevada a este Foro, según consta en nuestro disenso en *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989).

*Granados v. Rodríguez Estrada II,* supra, y la sentencia en *González v. Rodríguez Estrada I,* supra. NO EXISTE RAZÓN PARA UN TRATO DIFERENTE. LA LESIÓN AL DEBIDO PROCESO DE LEY CONTINÚA LATENTE Y ES UNA DE LAS MUCHAS CAUSAS QUE NOS IMPIDEN SUSCRIBIR EL CRITERIO MAYORITARIO CONFIRMATORIO.

Expuesta esa flagrante violación constitucional, veamos qué ocurrió. En cumplimiento del mandato de *Granados v. Rodríguez Estrada II,* supra, y de la Sentencia de 10 de noviembre de 1989, los edictos se publicaron en instancia los días 23, 24 y 25 de noviembre de 1989, y se cursaron por correo certificado los documentos aludidos. Específicamente, se les informó sobre el derecho a comparecer al tribunal acompañados por abogado el 18 de diciembre y a someter aquella prueba que estableciera su *status* de electores cualificados para votar en las pasadas elecciones generales.

Oportunamente, numerosos electores comparecieron como demandantes involuntarios representados por el Lcdo. Enrique Bray del Bufete *Domínguez & Totti.* Un número limitado compareció asistido por los Lcdos. José A. Andréu García y Miguel E. Sagardía De Jesús.

En vista de que la opinión mayoritaria no expone cabalmente el verdadero trámite procesal y sustantivo habido ante el Juez Polo, incurre en omisiones inexplicables y llega a conclusiones jurídicas erróneas, es menester una relación detallada del caso conforme un escrupuloso análisis de los autos originales y de la transcripción de evidencia. Sólo así logramos desenredar la maraña y confusión jurídica mayoritaria.

## II

*Reclamo de electores excluidos por domicilio (ER)*

A. *Trámite procesal y evidenciario*

Al comparecer el *18 de diciembre* mediante moción al efecto suscrita por el licenciado Bray, estos demandantes involuntarios hicieron suyas las alegaciones básicas de la sentencia de *González*

*v. Rodríguez Estrada I,* supra. Ahora bien, al hacerlo *ampliaron* el párrafo C a los fines de alegar específica y adicionalmente que sus votos no fueron adjudicados por la Comisión Estatal, no sólo en contravención de la Constitución y de la Ley Electoral, sino *también* en violación de *"sus reglamentos [y de la] jurisprudencia aplicable".* (Énfasis suplido.) A.O., págs. 174 y 226.

Ese mismo día, en horas de la tarde, el licenciado Bray comenzó a desfilar su prueba testifical. Declararon los electores Felícita Sánchez Otero (Caso Núm. CE-90-389, *Exhibit* 209), Juan Fonseca Meléndez (Caso Núm. CE-90-389, *Exhibit* 210), Katherine Guzmán Vázquez (Caso Núm. CE-90-389, *Exhibit* 211) y Zaida Chaparro Vázquez (Caso Núm. CE-90-389, *Exhibit* 212). Vol. 37, págs. 27–44. El Lcdo. José L. González Castañer se quejó de que el licenciado Bray no le expuso la "teoría en la cual se funda el alegado error de la Comisión Estatal . . .". Íd., pág. 28. El Juez Polo señaló que el "problema que tiene es de gente que ha llegado a última hora y el abogado [Bray] no está en condiciones de anticipar en muchos casos . . . si fuera uno de los [que él] representaba hace tiempo yo [se lo] podría exigir . . .". Íd., pág. 31.

Así las cosas, al *día siguiente* el licenciado Rey, abogado del demandado recurrido Báez Galib, le solicitó al Juez Polo que reconsiderara la forma en que se estaban conduciendo los procedimientos en relación con los demandantes involuntarios. Pidió que le exigiera al licenciado Bray que dijera en qué se fundaba el derecho de cada elector. Adujo que el trámite que se estaba siguiendo era "una expedición de pesca indefinida en los récords de la Comisión [Estatal] . . .". Vol. 38, págs. 12–16. Ante ese pedido, el Magistrado Polo resolvió que si se presentaban "casos frívolos" él adoptaría las sanciones correspondientes contra el abogado al amparo de la Regla 9 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Íd., pág. 17.

Seguidamente, el licenciado Bray objetó el planteamiento del licenciado Rey y expuso que los demandados, aquí recurridos, carecían de fuerza moral para hacerlo, salvo que estipularan aquellos casos de sus representados (los demandantes

involuntarios) que *"estaban recusados*[,] y de los *documentos* de la Comisión Estatal de Elecciones *surg*[*ían*] *las transferencias y las notificaciones que hicieron los electores . . ."*.(Énfasis suplido.) Íd., pág. 18. Indicó que presentaría —como lo hizo— una moción con los nombres y números electorales de sus representados *y una solicitud de producción de documentos a la Comisión Estatal.* Íd., págs. 21–22.

Después testificó la electora Marta Sánchez García (Caso Núm. CE-90-389, *Exhibit* 214), también de *status* ER. En lo pertinente, atestó que ni antes de las elecciones ni nunca recibió notificación alguna de la Comisión Estatal relacionada con su *status* electoral. Vol. 38, págs. 33 y 36–37. Oportunamente fue *contrainterrogada* por el licenciado González Castañer, a quien le indicó que se había mudado de la Urb. Extensión Alameda a la Urb. Villanova *en el mismo precinto.* Íd., págs. 41–42.

Posteriormente, declaró la electora Milagros Apolinaris López (Caso Núm. CE-90-389, *Exhibit* 217). Su testimonio versó sobre sus direcciones y mudanzas *en Cupey.* Vol. 38, págs. 51–74. Fue contrainterrogada. Al finalizar su testimonio, el licenciado González Castañer reiteró el planteamiento de que la "ausencia de una teoría específica" conllevaba una expedición de pesca y atrasaba innecesariamente el proceso. Íd., págs. 75–76. El licenciado Bray replicó que *de la prueba surgía* que "fue *recusada* y la *teoría* de nosotros es que fue *recusada injustamente. No se necesita mucho para llegar a esa conclusión".* (Énfasis suplido.) Íd. El Juez Polo reconoció "el planteamiento del [l]icenciado [González Castañer]. Ahora en este momento no vamos a exigirle que hagan un análisis de una *teoría,* porque no estamos nosotros ni siquiera en condiciones de pedirle eso". Íd., pág. 77. Entonces el licenciado González Castañer insistió en la necesidad de que se les dijera, cuando el testigo se sentara a declarar, la razón por la cual la Comisión Estatal se equivocó, para evitar el consumo innecesario de tiempo en el tribunal y en los alegatos. Íd., pág. 78.

Más adelante testificó la electora Pura Acevedo Román (Caso Núm. CE-90-389, *Exhibit* 224). Declaró que vivía en el Residencial Lloréns Torres y que nunca fue notificada por la Comisión

Estatal sobre su *status* electoral (ER). Tampoco persona alguna fue a emplazarla. Vol. 39, págs. 31–32. Luego del contrainterrogatorio aconteció el siguiente incidente, el cual es sumamente revelador:

LCDO. BRAY: Solicitaríamos de la Comisión [Estatal], una Certificación, a los efectos de que Llor[é]ns está dentro del mismo precinto. *O sea, Llor[é]ns Torres está todo dentro de un solo precinto.*

LCDO. REY: Es impertinente, Su Señoría.

LCDO. CANALS: Su Señoría, con la venia del Tribunal.

*CREEMOS QUE ES SUMAMENTE PERTINENTE, POR EL HECHO DE QUE EL REGLAMENTO DE RECUSACIONES APROBADO PARA LAS ELECCIONES DEL, PARA EL PERÍODO DE RECUSACIÓN DE 1984, ESTABLECE QUE NO PODRÁ RECUSARSE UNA PERSONA QUE VIVA DENTRO DE UN MISMO PRECINTO, POR LO QUE CONLLEVA UNA REUBICACIÓN. Y ESO ESTÁ CLARITO EN EL REGLA-MENTO,* QUE ES UN *EXHIBIT*, VUESTRO HONOR.

LCDO. GONZÁLEZ CASTAÑER: Su Señoría, *esto de nuevo es* la paradoja que indicaba anteriormente. *Es el mismo tipo de argumento de la situación anterior.*

Ahora, *un procedimiento de recusación, debidamente cumplimentado,* es la parte *demandante quien pretende traer de alguna forma, impugnarlo con algún planteamiento que nunca se había traído.*

Y entonces, en la situación anterior pretendían que no se hiciera un planteamiento análogo. *Esto es un procedimiento de recusación debidamente reglamentado.* En la Ley están los pasos y ya los compañeros también los conocen y como resultado de ese proceso, una electora, siguiendo ese procedimiento quedó fuera de las listas electorales.

LCDO. BRAY: *SU SEÑORÍA, DE QUE SE HAYA SEGUIDO EL PROCEDIMIENTO ES LA CONCLUSIÓN DEL COMPA-ÑERO. NOSOTROS LO DISPUTAMOS . . . .*

LCDO. CANALS: Su Señoría, queremos hacer constar, que es que el compañero no estuvo en una gran parte de este pleito al decir

este planteamiento, *está por esta parte,* es que el compañero no estuvo presente.

LCDO. GONZÁLEZ CASTAÑER: ¿Cuál es el planteamiento?

LCDO. CANALS: El planteamiento que acabo de hacer, Su Señoría, *está presente ante este Tribunal desde la primera etapa de este pleito.* Es que el compañero no estuvo presente aquí en ese entonces.

LCDO. GONZÁLEZ CASTAÑER: Bueno, Vuestro Honor, independientemente de si se hizo anteriormente o no, *es un planteamiento impertinente.*

HON. JUEZ POLO: El compañero entiende que es impertinente. El Tribunal lo resolverá cuando vaya a *adjudicar el derecho individual de cada elector, resolverá si tiene o no tiene derecho,* si se excluyó apropiadamente o no se excluyó apropiadamente, si cumplió el elector con su obligación cuando es excluído. *Todo eso lo resolveremos.* (Énfasis suplido.) Íd., págs. 37–39.

Luego declaró la electora Julia Rocheli Ramos (Caso Núm. CE-90-389, *Exhibit* 226). Demostró *residir toda la vida* en el Residencial César Cordero Dávila. Nunca fue notificada por la Comisión Estatal ni emplazada. Ningún partido político fue a su residencia a entregarle algún documento de la Comisión Estatal. Vol. 39, págs. 51 y 53.

En *igual sentido* declararon Carmen Cruz Rivera, del Residencial Ramos Antonini; Consuelo Rivera Viera, de Barrio Obrero; Ramón Reyes Hernández, y numerosos electores más. Íd., págs. 60–118.

ESTOS TESTIMONIOS PROBARON QUE LA MAYORÍA DE LOS DEMANDANTES INVOLUNTARIOS NO FUERON NOTIFICADOS PERSONALMENTE DE LAS SOLICITUDES DE RECUSACIÓN NI NOTIFICADOS POR CORREO DE LAS DECISIONES DE LAS JUNTAS LOCALES. LOS RECURRIDOS ACEVEDO PÉREZ Y BÁEZ GALIB NO OBJETARON LA ADMISIBILIDAD DE LA PRUEBA SOBRE FALTA DE CITACIÓN PERSONAL O NOTIFICACIÓN EN LOS TRÁMITES DE RECUSACIÓN.

A modo de paréntesis, repetimos, un examen de las transcripciones refleja únicamente una queja dirigida a la forma en que el

tribunal de instancia condujo sus trabajos en aras de evitar una dilación mayor, de superar la impresión pública de tardanza y de desanimar una expedición de pesca de los documentos de la Comisión Estatal. Excepto la objeción de "impertinencia" antes aludida levantada por el licenciado González Castañer —que no prosperó— *no hay constancia adicional de que los demandados, aquí recurridos, hayan objetado la evidencia producida por estos demandantes involuntarios en torno a la falta de citación personal o de notificación por correo de la decisión que los recusaba.* EN ESTAS CIRCUNSTANCIAS, SIN LUGAR A DUDAS, LA PRUEBA ENMENDÓ LAS ALEGACIONES. Regla 13.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

En la sesión correspondiente de 20 de diciembre —*o sea, a escasamente dos (2) días de iniciarse el desfile de esta prueba*— antes de declarar la electora Juana Rivera Díaz el licenciado Rey reformuló el planteamiento de que el procedimiento de añadidos a mano no estaba disponible para los recusados por domicilio (ER). *AL ARGUMENTAR EN CONTRA, CON NITIDEZ, EL LICENCIADO BRAY LE EXPLICÓ ASÍ SU TEORÍA DE DERECHO A BASE DE LA PRUEBA HASTA ENTONCES DESFILADA:*

> . . . *Segundo, para que aplique el argumento del compañero,* [*el licenciado Rey*] *presume que se siguió correctamente el procedimiento de recusación. O sea* . . . .
>
> HON. JUEZ: De exclusión, perdón.
>
> LCDO. BRAY: . . . *el procedimiento administrativo para las recusaciones. Hay un procedimiento administrativo y hay un reglamento que está en evidencia.*
>
> HON. JUEZ: *SÍ.*
>
> LCDO. BRAY: *EMPLAZAMIENTO, CITACIÓN, TODO ESE TIPO DE COSA.* SE PRESUME, LA ARGUMENTACIÓN DEL COMPAÑERO *PARTE DE LA PREMISA DE QUE ESE PROCEDIMIENTO SE SIGUIÓ SEGÚN ESTÁ ESTABLECIDO.*
>
> NOSOTROS *HEMOS PASADO PRUEBA* AQUÍ DE QUE HAY ELECTORES QUE HAN VIVIDO 26 AÑOS EN EL MISMO LUGAR, *NUNCA HA PASADO NADIE DE LA COMISIÓN* [*ESTATAL*], NO HAN SIDO EMPLAZADOS, NO HAN SIDO

*CITADOS, NO HAN RECIBIDO NINGÚN TIPO DE NOTIFI-
CACIÓN Y, CON TODO Y ESO, LOS EXCLUYERON.*

PUES, MIRE, *AHÍ HAY UNA CONTROVERSIA DE DERE-
CHO. SÍ, EN EFECTO, ESTUVO BIEN RECUSADO, PARA
EMPEZAR.*

HON. JUEZ: O sea, que *estamos ahora pasando sobre el
procedimiento de apelación que establece el propio procedimiento.*

LCDO. REY: Vamos a pasar juicio, Vuestro Honor, sobre los casos
de cada uno, que tuvieron la oportunidad . . . .

LCDO. BRAY: *No, que no tuvieron la oportunidad . . . .*

LCDO. REY: Que tuvieron oportunidad . . .

LCDO. BRAY: *. . . porque nunca se les notificó. Y ese es el
testimonio que ha pasado por aquí.*

HON. JUEZ: *Ha pasado de todo,* aquí ha pasado el que se enteró
y no hizo nada, *el que no se enteró,* el que lo vio en el periódico . . . .

LCDO. BRAY: Su Señoría, *pero si uno no se entera, si a uno la
Comisión [Estatal] no le dice, "Mira, te voy a recusar por
residencia", no tiene por qué aparecer a la Comisión.*

HAY UN CASO QUE DEFINE, QUE ESTABLECE *CUÁLES
SON LOS REQUISITOS PARA UNA RECUSACIÓN VÁLIDA Y
SE TIENEN QUE CUMPLIR, Y ESOS REQUISITOS ESTÁN
CONTENIDOS EN ESTE REGLAMENTO. Y NOSOTROS LO
QUE ESTAMOS DICIENDO, PRECISAMENTE, ES QUE SE
EMITIÓ UNA ORDEN DE RECUSACIÓN, SIN LA COMISIÓN
[ESTATAL] TENER JURISDICCIÓN PARA ELLO.*

*SI ESO ES ASÍ, LA RECUSACIÓN ES INVÁLIDA Y EL
ELECTOR TIENE DERECHO A VOTAR. Y ESE ES EL ARGU-
MENTO.*

LCDO. REY: Vuestro Honor, el Reglamento es completamente
claro. La persona que estuviera en cualquier circunstancia que
permitiera corregir el [*status*] de exclusión que le asignó la Comi-
sión [Estatal], *a base de una recusación, tuvo oportunidad de
acudir ante los tribunales de Puerto Rico,* hasta el último día, hasta
el mismo día de las elecciones, para que se incluyera su nombre en
las listas.

Precisamente, eso es lo que pretende *este Reglamento,* validar
que, en vista de que todas esas personas que habían *sido excluidas
por residencia, tuvieron un proceso legal necesario y con todos los
requisitos del debido proceso de ley y no acudieron a él,* esas
*personas no podían votar en las elecciones.*

Es un requisito indispensable que la persona presentara la
resolución del Tribunal, como hubo tantas personas y como hubo

tantos añadidos a mano que se adjudicaron en el mismo Coliseo y después, en todas las revisiones que hubo, porque tenían dentro de su sobre, las órdenes que llevaron. Porque a esas personas, de conformidad con el Reglamento, se les permitía votar en las elecciones, presentando la orden de un Tribunal de justicia que le hubiera acreditado su derecho.

Yo creo, Vuestro Honor, que no podemos buscarle vuelta a lo que dice claramente el Reglamento y le solicitamos a Vuestro Honor que lo aplique, en toda su extensión y con toda su fuerza, y que se excluya el testimonio de cualquier elector cuyo [*status*] sea excluido por residencia.

HON. JUEZ: *Le vamos a dar la oportunidad de escucharlo, vamos a oír la prueba y lo resolveremos . . . . .*

LCDO. CANALS: Con la venia del Tribunal, Vuestro Honor, si me permite, como parte demandante en el caso . . . .

HON. JUEZ: *Va a ser más cuestión de derecho, vamos a oír la prueba y cuando adjudiquemos, resolveremos eso, el caso individual.*

LCDO. CANALS: Cómo no, Su Señoría, pero simplemente era una cosa muy breve, Su Señoría. Es que me da la impresión de que la parte demandada aquí, la representación del compañero y amigo Báez Galib y de Héctor Luis Acevedo, están trayendo un planteamiento que no es la aplicación en este caso, porque ellos quisieran traer una cuestión como si fuera un pleito de clase, de que todos los que aparecen de tal forma, este Tribunal les puede eliminar su derecho a reclamar, contrario a lo que ordenó el Tribunal Supremo de Puerto Rico, que redactó, suscribió una demanda, hizo las alegaciones . . . .

HON. JUEZ: *Vamos analizarlo uno por uno y vamos a resolver el derecho individual, uno por uno.*

LCDO. CANALS: Cómo no, Vuestro Honor, muchas gracias.

HON. JUEZ: *En la medida en que le aplique o no le aplique el planteamiento de derecho.*

LCDO. REY: Si me permite Su Señoría, quisiéramos solicitar una *reconsideración,* por los motivos que le voy a explicar.

Vuestro Honor, en este momento, yo no sé cuántos, *he pedido esa información, cuántos excluidos por residencia hay entre los clientes del compañero Bray.* Pero de esos 150 que quedan, podría haber 125. Y nosotros podríamos ahorrarnos, todos los que estamos aquí, dos, tres semanas de juicio, si Su Señoría resuelve ese planteamiento, *que es una cuestión estricta de derecho, en este momento.*

266

HON. JUEZ: Vamos a escuchar a los 125 *y, si tienen derecho, le vamos a reconocer su[s] derechos a que se adjudique su[s] voto[s]. Si no tienen derecho, vamos a resolver que no tienen derecho a que se les adjudique su voto, pero los vamos a escuchar.*

LCDO. REY: Su Señoría, si me permite Vuestro Honor, en ese caso, quisiéramos pedirle a Vuestro Honor que . . . *nosotros nos proponemos solicitar certiorari del Tribunal Supremo* respecto a este punto, porque entiendo que sería de gran beneficio para todos los que estamos envueltos en este proceso, desde hace ya tanto tiempo, y que queremos verlo que termine.

HON. JUEZ: No hay problema. (Énfasis suplido.) Vol. 41, págs. 22-27.

*¿Qué sucedió después?* El 21 de diciembre el licenciado Rey informó que:

[L]*a parte demandada ha decidido acatar el fallo de Su Señoría de escuchar a todos los excluidos por residencia.*

Realmente, no pensamos que, en las circunstancias presentes de tiempo y de lugar, haya verdaderamente una oportunidad razonable de que el Tribunal pudiera resolver, sin que ya fuera académico, un recurso sobre ese fallo.

*Naturalmente, Vuestro Honor, nos reservaríamos el derecho de presentar ante el Tribunal cualquier prueba de refutación que pudiera ser necesaria en cuanto al testimonio de todos estos electores que, a nuestro juicio, su testimonio es inconsecuente, en torno a lo que ellos declaren sobre el proceso de . . . .*

LCDO. BRAY: Pero la prueba . . . *¿Cuándo va a ser esa prueba?* ¿En el turno del compañero?

LCDO. REY: Pues, la prueba de nosotros, normalmente, sigue ese orden. *La prueba sería cuando se termine la prueba de los excluidos por residencia.*

HON. JUEZ: *Sí, cuando termine la prueba suya. Pues, prueba de refutación, probablemente englobada, para todos los que están en la misma situación.*

LCDO. BRAY: Me imagino, entonces, que también recibiríamos, igual que nosotros les suministramos un listado de testigos, pues, un listado de . . . .

LCDO. REY: Va a recibirlo.

HON. JUEZ: *Sí, eso.* . . . (Énfasis suplido.) Vol. 42, págs. 25-26.

Y continuó el desfile de la prueba. Para el 27 de diciembre el licenciado Rey reconoció que habían "surgido nuevos [*issues*]

durante esta última etapa del juicio, que necesariamente requieren una discusión integrada con el alegato principal". Vol. 46, pág. 126.

El 29 de diciembre se desarrolló otro incidente en el que el licenciado Bray otra vez discutió y expuso, *in extenso, la teoría de la nulidad de las recusaciones.* Veamos:

LCDO. BRAY: Su señoría yo me opongo a la solicitud del compañero. *Hay un procedimiento para recusar electores en Puerto Rico. Parte de ese procedimiento cuando no se puede emplazar personalmente a un elector*[,] y aquí tenemos un elector que lleva cincuenta y pico de años viviendo en el mismo lugar, en la dirección que aparece en los récords de la Comisión Estatal de Elecciones[;] su señoría lleva cincuenta y pico de años viviendo ahí.

HON. JUEZ: No en la dirección que aparece en el récord, en el récord aparece una distinta a la que él dijo.

LCDO. BRAY: Antes de que progrese el planteamiento del compañero, tenemos que tener aquí el expediente de la Comisión Estatal de Elecciones para ver cuál es la dirección que aparece para ese elector en ese expediente.

Porque es ilógico que este señor, vive en el mismo lugar cincuenta y un años y aparezca una dirección aparentemente incorrecta en los récords de la Comisión Estatal de Elecciones. Ese es el primero.

HON. JUEZ: Aparece en, por lo menos en la consulta electoral que es el récord de la [C]omisión [Estatal], según está en el archivo maestro, que reside en el Kilómetro 1, hectómetro 8, de las Marinas de Monacillos.

LCDO. BRAY: Hay que ver el expediente de la Comisión para ver cuál es la dirección que aparece allí en ese expediente. Eso es lo primero.

*Lo segundo, hay un procedimiento donde, cuando una persona no puede ser emplazada personalmente, hay que publicar un edicto. Eso lo dice el reglamento. El testigo acaba de testificar que él*[,] *hay edicto y correo certificado con acuse de recibo. Acaba de testificar que nunca recibió ningún tipo de comunicación de correo de la Comisión Estatal de Elecciones.*

Tercero, cuando *se decide la exclusión*[,] *cuando la Junta que tome la decisión, decide esa exclusión, tiene que notificarle al elector.* Y esa notificación es, por *correo* certificado con acuse de recibo. *De acuerdo al reglamento. Acaba de testificar que él nunca recibió ningún tipo de comunicación de correo de la Comisión Estatal de Elecciones.*

268

*No hay la presunción de que este señor fue correctamente recusado. En estos momentos, no la hay. Es más[,] lo que existe es todo lo contrario, una presunción de que no fue válidamente recusado. El planteamiento de nosotros es . . . .*

HON. JUEZ: ¿Por qué existe la presunción de que no fue válidamente recusado, porque no hay constancia de que se le haya notificado . . . de por qué él no haya recibido la notificación por correo certificado?. . .

LCDO. BRAY: Esa notificación . . .

HON. JUEZ: Perdóname, no recibió tampoco la del Tribunal porque la dirección que aparece en los récords no es la que él reside, así es que lógicamente . . . .

LCDO. BRAY: *Por eso es que necesitamos el expediente de la Comisión,* porque si hubo algún tipo de comunicación, tiene que haber alguna evidencia en los récords de la Comisión Estatal de Elecciones. Esto es un requisito reglamentario. *Si se cumplen con los requisitos reglamentarios, tienen que surgir de los expedientes de la Comisión Estatal de Elecciones.* Por lo menos, la carta devuelta. Todas las cartas que no llegan, de alguna manera se devuelven, dicen no vive aquí, algo surge. En este momento no surge la presunción que está alegando el compañero . . . .

. . . . . . . . .

LCDO. BRAY: *SU SEÑORÍA ESTO ES UNA CUESTIÓN DE JURISDICCIÓN. SI SU SEÑORÍA TIENE UN PLEITO Y SU SEÑORÍA CARECE DE JURISDICCIÓN SOBRE LA PERSO-NA[,] Y SU SEÑORÍA DICTA UNA SENTENCIA, CATORCE MESES DESPUÉS, ESA SENTENCIA ES TAN INVÁLIDA COMO EL BIEN QUE SE DICTÓ.*

HON. JUEZ: Sí, pero se presume hasta que se traiga evidencia de que actuó sin jurisdicción, se presume que tenía jurisdicción. La *jurisdicción* se presume hasta tanto se demuestre que no y hasta que se determine que no.

LCDO. BRAY: Y para eso se necesita el expediente de la Comisión, que supuestamente iba a estar aquí hoy para eso.

LCDO. GONZÁLEZ: *Su señoría es que hay un acto judicial que, el reglamento le exige al juez que preside la [C]omisión [Estatal] que se cerciore de la publicación del edicto.*

HON. JUEZ: *Además hay un procedimiento para apelar de esa determinación, para impugnar.*

LCDO. BRAY: *Si el elector tiene conocimiento de la decisión . . . .*(Énfasis suplido.) Vol. 49, págs. 35–37 y 39–40.

En esa ocasión, *el licenciado Bray le pidió al tribunal que ordenara a la Comisión Estatal que las Juntas de Inscripción Permanentes (J.I.P.) produjeran los expedientes individuales de las recusaciones de estos electores.* Vol. 49, págs. 45–46. *NUNCA ESTOS EXPEDIENTES FUERON PRODUCIDOS POR LA COMISIÓN ESTATAL.*

Ante esta prueba y explicaciones del licenciado Bray, es claro que los demandados recurridos Acevedo Pérez y Báez Galib eran conscientes de las contenciones de los demandantes involuntarios. Siempre ejercitaron su derecho a contrainterrogar. Además, al finalizar el desfile de prueba de estos electores el licenciado Rey pidió, acorde con lo que había solicitado el 21 de diciembre, que se le permitiera presentar prueba de *refutación*. Así lo hizo el 4 de enero de 1990 con testigos y documentos. Declararon el propio Báez Galib, el Lcdo. Francisco Cruz Román, Comisionado del P.P.D. de la Comisión Local del Precinto 3, y otros funcionarios más. Vol. 53, págs. 87–124. Tan conscientes y notificados estaban de las alegaciones, y orientados en cuanto a la teoría de los demandantes involuntarios sobre falta de jurisdicción, que el licenciado Báez Galib *dedicó parte de su testimonio a explicar la génesis del Reglamento de Recusaciones y Exclusiones de 11 de diciembre de 1987.* Vol. 53, págs. 94–96. No hubo, pues, desconocimiento ni sorpresa. Tampoco ausencia de oportunidad para presentar prueba de refutación. Ellos optaron por descansar sólo en la tesis *absolutista* de que esos electores recusados por domicilio (ER) no tenían derecho a votar bajo el procedimiento de añadidos a mano y que "ahora" no podían reclamar. Curiosamente, se abstuvieron de preguntarle al licenciado Cruz Román, Comisionado del P.P.D. de la Comisión Local del Precinto 3, sobre la validez de los trámites de recusación seguidos por la Comisión Local de ese precinto.

Con esa prueba el caso quedó finalmente sometido por todas las partes. El Juez Polo concedió diez (10) días al licenciado Bray para "la relación de *teorías* en [los] casos". (Énfasis suplido.) Vol. 53, pág. 126. Ese término vencía el lunes 15 de enero.

Con fecha 16 de enero el licenciado Bray, mediante carta dirigida al licenciado González Castañer —con copia a los abogados Rey, David Rivé Rivera y Carlos Canals Mora— *ratificó* sus teorías en cuanto a los demandantes involuntarios excluidos de las listas por razón de domicilio.

El licenciado González Castañer objetó esa comunicación por ser "las razones esbozadas totalmente generales y no se identifican los fundamentos específicos en que se apoyan los reclamos *individuales de cada uno de los electores* . . . [lo] que constituye una violación a la orden de[l] . . . tribunal *que tiene como consecuencia retrasar la función adjudicativa* y que debe ser rechazada con vehemencia". (Énfasis suplido.) Pidió que se les impusiera un plazo fatal para que notificaran "los *hechos* y las *teorías* de derecho en que apoyan sus reclamaciones bajo apercibimiento de que el incumplimiento de esta disposición conllev[a] la desestimación de sus reclamaciones". A.O., págs. 2161–2162.

Mientras tanto, Granados Navedo, Acevedo Pérez y Báez Galib *estipularon* aplazar sus alegatos hasta el 29 de enero.

En cuanto al pedido del licenciado González Castañer, el 22 de enero el Juez Polo le concedió al licenciado Bray un plazo fatal de veinticuatro (24) horas para someter las teorías de sus representados, agrupando las partes que están en idénticas circunstancias e identificando los integrantes de cada grupo que tengan cuestiones comunes de hecho y de derecho, ello bajo apercibimiento de "imponer severas sanciones, *bien sea a los abogados*, a los demandantes involuntarios o a ambos". (Énfasis suplido.) A.O., pág. 2169.

Sobre el aplazamiento de los alegatos de Granados Navedo, Acevedo Pérez y Báez Galib, el 23 de enero el Juez Polo accedió debido a, entre otras circunstancias, "la falta de transcripciones y el número de demandantes involuntarios (134) que testifican[;] así como la ausencia de *teorías de derecho* en cuanto a un gran número de ellos (Véanse órdenes núms. 98, 99 y 100). . ." .

El mismo 23 de enero el licenciado Bray sometió sus listas con expresión de los acápites. Al otro día, el licenciado González

Castañer las objetó y pidió que se les impusieran sanciones. El 25 de enero el Juez Polo emitió la resolución siguiente:

Luego de examinar la moción informativa suscrita por el Lcdo. Enrique Bray el 23 de enero de 1990, *el Tribunal tiene por incumplida la orden dictada en corte abierta y reiterada en nuestras órdenes números 98 y 99.* Un somero examen de las listas sometidas, con parca indicación en sus acápites, demuestra que son repetitivas, incluyen nombres de personas que no son partes y de personas que desistieron de sus reclamos. Ello equivale a poner a las partes adversas y al Tribunal a hacer *una búsqueda* para determinar quién es parte, cuál es su causa de acción y su *teoría de derecho.* No es función ni del Tribunal ni de la parte demandada organizar las alegaciones y prueba de la parte demandante.

*No habremos de insistir más en cuanto a la forma en que el Lcdo. Bray debe descargar su responsabilidad profesional para con sus representados, el Tribunal y las demás partes.*

En estricta *equidad* nos vemos precisados a conceder a *la parte demandada plazo*(1) *de 10 días para replicar a las teorías que tenga a bien esbozar el Lcdo. Bray en su alegato.*

---

(1)A pesar de que esta solución la había sugerido el Lcdo. Bray, nuestro interés en acelerar la tramitación y resolución de este caso nos había movido a descartar la misma en aquel entonces. Al presente no tenemos otra alternativa rápida y viable debido a que la representación legal de los demandantes involuntarios no ha querido o no ha podido cumplir con nuestras órdenes y su compromiso en corte abierta.

El 14 de febrero de 1990 Acevedo Pérez y Báez Galib hábilmente alegaron que "no fue hasta la presentación del alegato de los demandantes [involuntarios] que sus oponentes *pudieron conocer,* a[u]n de forma imprecisa, las alegaciones y reclamos de estos electores". A.O., pág. 2619. Esta posición fue reiterada, precisamente en el aludido alegato de réplica, al consignar que el tribunal "entonces autorizó a estos demandantes a no definir sus alegaciones hasta la presentación de su alegato principal, a pesar de la protesta de la parte demandada". Íd., pág. 2622. Igualmente lo alegaron en su moción de 15 de febrero, al señalar que el tribunal les autorizó "la presentación de un alegato que contuviera esas alegaciones". Íd., pág. 28–29. Es interesante que esta moción

—que solicitaba la desestimación de esas alegaciones o que se les permitiera *por segunda vez la presentación de evidencia para refutarlas*— *no fue acogida por el Juez Polo*, quien la resolvió así:

> Hemos examinado la moción de los codemandados Eudaldo Báez Galib y Héctor Luis Acevedo *solicitando se reabra el caso para ofrecer prueba relacionada con los demandantes involuntarios representados por el Lcdo. Enrique Bray.*
>
> En este momento este juez está examinando y evaluando la prueba ofrecida relacionada con otras controversias, por lo que no hemos analizado con detenimiento los alegatos de las partes en torno a la controversia de los "añadidos y rechazados".
>
> Sería *prematuro decidir ahora si procede o no reabrir* el caso para dar oportunidad a los demandados a desfilar prueba en torno al derecho que puedan o no tener los demandantes involuntarios.
>
> Con el propósito de, en su momento, tener un cuadro más claro de lo que la solicitud de los demandados conlleva, deberán éstos someter una relación de los testigos que se propone utilizar de concederse la vista solicitada. (Énfasis suplido.) A.O., págs. 2833–2839.

Después, al dictar su sentencia, el Juez Polo resolvió que los demandantes involuntarios no podían atacar colateralmente los procedimientos de recusación de que fueron objeto. Como veremos, *partió de la premisa equivocada* de que las decisiones de las Juntas Locales que los recusaba se convirtieron en finales y firmes al transcurrir los términos para su apelación ante el Tribunal de Distrito. Y en cuanto a sanciones, se circunscribió a una tenue amonestación escrita. En su Sentencia de 10 de mayo de 1990, concluyó que los "actos del [licenciado Bray] estuvieron al margen de una violación [a] la Regla 9 de las de Procedimiento Civil, conducta merecedora de imposiciones de sanciones al abogado". Caso Núm. CE-90-389, Apéndice I, pág. 54 esc. 37a.

Ante esta realidad procesal y evidenciaria, en su comparecencia Acevedo Pérez y Báez Galib nos argumentan —en caso de que resolvamos que estos electores tenían derecho a votar añadidos a mano— que tendríamos entonces que devolver el caso al Tribunal Superior para que éste adjudique la situación individual de cada elector sobre los testimonios ya desfilados de los electores y la

prueba que ofrezcan la Comisión y los comparecientes en una nueva vista evidenciaria. Caso Núm. CE-90-391, Comparecencia, pág. 28 esc. 13.

Ese pedido es improcedente. En el caso de autos *no hubo sorpresa*. La teoría, las alegaciones y la prueba en torno a las violaciones al Reglamento de Recusaciones y Exclusiones, y la *falta de jurisdicción* de las Juntas Locales, estuvieron sobre el tapete judicial desde el principio del litigio. Ya desde el 7 de septiembre de 1989 Granados Navedo las había planteado mediante el testimonio del elector Pedro Hernández Monserrate, Vol. 24, págs. 29–44. Posteriormente, se puso de manifiesto desde el 18 de diciembre de 1989, cuando los demandantes involuntarios intervinieron por conducto del licenciado Bray y declararon. El 2 de enero de 1990 terminó el desfile de esa prueba. Como antes mencionamos, el 4 de enero los demandados recurridos Acevedo Pérez y Báez Galib *solicitaron y tuvieron la oportunidad de presentar prueba de refutación. Lo hicieron, pero no desvirtuaron la presentada por los demandantes involuntarios.*

Con vista a este trasfondo, la opinión mayoritaria incurre en serias afirmaciones incorrectas sin fundamento ni en los autos originales ni en la prueba. Nos dice que el foro de instancia evaluó "la evidencia presentada por cada elector en apoyo de sus contenciones . . ." . (Énfasis suprimido.) Opinión mayoritaria, pág. 32. Nada más lejos de la verdad. Los propios recurridos Acevedo Pérez y Báez Galib, en su comparecencia ante nos, consignan que el "Tribunal Superior *no* evaluó *individualmente* los casos de dichos electores . . .". (Énfasis suplido.) Caso Núm. CE-90-391, Comparecencia, pág. 27.

En *González v. Rodríguez Estrada I*, supra, pág. 755, comenzamos nuestra disidencia con el enjuiciamiento siguiente:

En todo su dramatismo jurídico, por primera vez en la historia, el Tribunal Supremo de Puerto Rico abandona su función de órgano adjudicador imparcial, por conducto de cuatro (4) Jueces, asume el papel que le corresponde propiamente a un demandante y procede, como medio coactivo, a redactar y a suscribir una demanda y sus alegaciones en contra de la voluntad de una legítima parte. Y todo

a nombre de salvaguardar el derecho de los electores, la rapidez y el interés público. Semejante atropello es inconcebible.

En aquel momento nos preocupaba legítimamente el proceder mayoritario. Les impusieron a un grupo de electores unas "alegaciones básicas", las cuales —según estimaban en aquel entonces— eran suficientes en derecho y exponían una reclamación justiciable. Aparentemente la historia era otra. En una continuación del curso decisorio errático e impreciso que ha caracterizado a la mayoría en estos casos, pretenden hoy echarse hacia atrás, limitar las alegaciones que ellos mismos redactaron y desestimarles unas causas de acción válidas bajo la tesis de que los electores recusados no podían votar a través del procedimiento de añadidos a mano.

Hemos demostrado cómo esa conclusión mayoritaria choca contra el anterior mandato y la realidad de que los demandantes involuntarios *ampliaron* el párrafo C de las alegaciones para exponer que sus votos no fueron adjudicados por la Comisión Estatal, no sólo en contravención a la Constitución y a la Ley Electoral, sino de *"sus reglamentos [y] jurisprudencia aplicable[s]"*. (Énfasis suplido.) A.O. págs. 174 y 226. Es incomprensible que puedan abstraerse de un lenguaje tan amplio y rico como el castellano y constreñir el reclamo invocado por estos electores durante todo el proceso.

Cuando analizamos las circunstancias comunes —excluidos por razón de residencia (ER)— como dice un refrán, *se cae del palo* que sus causas de acción se fundaban en la ilegalidad e improcedencia de sus respectivas recusaciones. Alrededor de este punto giró siempre toda la prueba que presentaron. Desde sus inicios, el licenciado Bray lo explicó. ¿En qué otra teoría podían hacer su reclamo? ¿No hemos establecido anteriormente que las alegaciones sólo tienen el propósito de bosquejar a grandes rasgos la controversia y así notificar y apercibir a la parte contraria de las contenciones y reclamaciones en su contra? ¿Es que un demandante tiene el deber de indicarle al juzgador cómo debe decidir, so pena de que su causa le sea desestimada? La mayoría de este Tribunal incurre nuevamente en el grave error de desvirtuar

doctrinas procesales de profundo arraigo en nuestra jurisdicción. *Granados v. Rodríguez Estrada II*, supra.

Es obvio que los demandados recurridos estuvieron informados en todo momento de las contenciones y reclamaciones en su contra. Durante el desfile de la prueba relativa a los electores con clasificación ER, tuvieron la oportunidad —como lo hicieron— de contrainterrogarlos. La teoría de los demandantes involuntarios saltaba a la vista si se atendía a la línea de interrogatorio, a la prueba que presentaron —que fueron indebidamente recusados— y a las explicaciones claras del licenciado Bray. También demuestra la improcedencia de la propuesta de Acevedo Pérez y de Báez Galib de que devolvamos el caso a instancia para una nueva vista evidenciaria. Como dato importante, el Juez Polo ya no está disponible, pues renunció a la Judicatura efectivo el pasado 31 de julio.

No es correcta la contención de Acevedo Pérez y de Báez Galib de que hubo sorpresa o que objetaran la evidencia. Sólo se opusieron a la forma en que el Juez Polo condujo sus labores. Desde el comienzo de la prueba fueron informados de las alegaciones. Así, en la vista de 19 de diciembre el licenciado Bray le mencionó al licenciado Rey los electores mal recusados, pues habían hecho transferencias (Vol. 38, pág. 18); al licenciado González Castañer le indicó que su teoría era que la electora Apolinaris López había sido injustamente recusada conforme la prueba (íd., págs. 75–76), y le explicó al licenciado Rey la pertinencia del Reglamento de Recusaciones y Exclusiones en lo concerniente a que no procedía recusar a quien se mudaba en el mismo precinto y, además, que ellos *disputaban* que se hubiera seguido el procedimiento reglado (Vol. 39, págs. 37–39). Al otro día, 20 de diciembre, el licenciado Bray nuevamente le explicó al licenciado Rey su teoría, a base de la prueba desfilada, de que no se había seguido bien el procedimiento administrativo de recusación, esto es, que los electores "no han sido emplazados, no han sido citados, no han recibido ningún tipo de notificación y, con todo eso, los excluyeron . . . [.] Y nosotros lo que estamos diciendo, precisamente, es que se emitió una orden de recusación *SIN LA*

*COMISIÓN [ESTATAL] TENER JURISDICCIÓN PARA ELLO".* Vol. 41, pág. 24.

El Juez Polo, al finalizar la prueba de los demandantes involuntarios, les concedió a Acevedo Pérez y a Báez Galib la oportunidad que habían pedido de producir prueba de refutación. Únicamente trajeron aquella que estimaron conveniente. ¿De qué se quejan?

Sin embargo, la mayoría adopta ciegamente los argumentos de los recurridos Acevedo Pérez, Báez Galib y Rodríguez Estrada. Pretenden así descartar la realidad de que la prueba reveló contundentemente que la Comisión Estatal careció de jurisdicción sobre la persona de numerosos electores cuando entendió en los procedimientos de recusación. También, que los recurridos tuvieron la oportunidad y no presentaron prueba para refutar los extremos procesales en torno a la falta de jurisdicción, improcedencia e ilegalidad de las recusaciones.

*La prueba desfilada rebatió la presunción de corrección de los procedimientos de recusación.* La Comisión Estatal nunca produjo los expedientes (actas y récord) de las Juntas Locales de estos electores, aun cuando el licenciado Bray los solicitó. T.E. 49; págs. 45–46. *Aplica, pues, el principio de que se trata de una evidencia voluntariamente suprimida que le era adversa.* Regla 16.5 de Evidencia, 32 L.P.R.A. Ap. IV. Nos preocupa, pues, que la mayoría haga caso omiso a este dato significativo y diga que los demandantes involuntarios tenían que producir esa prueba y no lo hicieron. Opinión mayoritaria, pág. 36. ¿EN PODER DE QUIÉN ESTABAN LOS EXPEDIENTES DE RECUSACIÓN? ¿CÓMO PUEDEN ENTONCES EXIGÍRSELOS A LOS DEMANDANTES INVOLUNTARIOS? Nunca debemos utilizar nuestro poder discrecional judicial abusivamente e imponer el peso de la prueba a quien no le corresponde. "Con marcha en retroceso en el ámbito procesal no se avanza hacia la superación de nuestra democracia." *Granados v. Rodríguez Estrada III*, 124 D.P.R. 716, 720 (1989), opinión disidente.

Esclarecido este extremo, veamos qué resolvió el foro de instancia. *EL JUEZ POLO ESCOGIÓ LA "VÍA PIADOSA" DEL*

*TECNICISMO Y LA MAYORÍA CULMINA HOY ESE CAMI-*
*NAR CON LA CRUCIFICCIÓN DE ESTOS ELECTORES.*
Aquél interpretó que el mecanismo especial de votación "añadidos
a mano" nunca se previó ni estaba disponible para los electores
excluidos por domicilio (ER). Se fundó en el texto "Procedimiento
para votar añadido a mano en las elecciones generales de 8 de
noviembre de 1988, aquellos electores que reclamen su derecho al
voto y no aparezcan en las Listas Oficiales de Votación", aprobado
por la Comisión Estatal, consignado en el Memorando de 29 de
octubre de 1988 (Caso Núm. CE-90-389, *Exhibit* 49),(4) y en los
testimonios prestados por el licenciado Báez Galib, Comisionado
Electoral del P.P.D., y varios funcionarios de nueve (9) colegios que
no autorizaron a algunos electores recusados a votar bajo ese
sistema. En consecuencia, excepto nueve (9) casos, confirmó *sin*
*ulterior elaboración* el dictamen de la Comisión Estatal de no
adjudicarle los votos a noventa (90) electores.

*ESA INTERPRETACIÓN RESTRICTIVA LA ACOGE LA*
*MAYORÍA DE ESTE TRIBUNAL COMO MEDIO DECISO-*
*RIO. TIENE EL EFECTO DE SOSTENER INJUSTAMENTE*
*LA CERTIFICACIÓN DE ACEVEDO PÉREZ.* En su fase
operacional, y a tenor con el referido memorando (Caso Núm.
CE-90-389, *Exhibit* 49, pág. 2), era deber de los miembros de las
Subjuntas de Unidad buscar el nombre y las demás circunstancias
personales del elector en las distintas listas preparadas por la
Comisión Estatal, incluso la lista de *exclusiones Alfa-Isla.* Si el
elector no aparecía en esas listas o presentaba una orden de un

---

(4) En lo pertinente, disponía:
"Podrán votar añadidos a mano, en el último colegio de cada unidad, los electores que
se presenten a votar y reclamen que no han sido incluidos en las listas electorales del
precinto y unidad en que tienen su domicilio *por error atribuible a la C[omisión Estatal*
*de Elecciones].* Disponiéndose que para *poder votar tiene[n] que poseer y entregar su*
*tarjeta de identificación electoral y no figurar en la lista de electores excluidos por*
*domicilio, edad, ciudadanía, doble inscripción, o por no ser la persona que dice ser.*

"*Los electores excluidos por domicilio[,] que figuren en el listado de excluidos[,] que*
*presenten una orden de un Tribunal de Justicia resolviendo el caso a favor del elector y*
*ordenando la inclusión del nombre del elector en las listas de votación, serán los únicos*
*excluidos por domicilio con derecho a votar por este procedimiento. Disponiéndose que el*
*elector tendrá que presentar y entregar tanto la tarjeta de identificación electoral como la*
*Orden del Tribunal debidamente sellada.*" (Énfasis suplido.)

tribunal que ordenara su inclusión, la Subjunta de Unidad expedía una "autorización" para que fuera "añadido a mano" en el último colegio y pudiera votar. Ese trámite de la Subjunta de Unidad constituyó una determinación administrativa imputable a la Comisión Estatal que abrió las urnas a esos electores. *Los recurridos Acevedo Pérez, Báez Galib y la Comisión Estatal están impedidos ahora de cerrarles abruptamente las puertas judiciales. Incidió, pues, el foro de instancia.* Debió juzgar los reclamos individuales de esos electores. ELLO CREA UN VACÍO ADJUDICATIVO QUE, POR LO NUMEROSO DE LOS VOTOS, POR SÍ SOLO IMPIDE CONFIRMAR LA SENTENCIA.

INDEPENDIENTEMENTE DE LO EXPUESTO, subsistió el deber del foro de instancia de evaluar los reclamos de estos electores recusados por domicilio (ER) como pleitos independientes *por efecto directo e inexorable* de la decisión mayoritaria emitida en *Granados v. Rodríguez Estrada II*, supra. Veamos.

Se recordará que en aquella ocasión todos esos electores fueron unidos como *partes indispensables* y se les reconoció el derecho a ejercer las acciones que pudieran poseer bajo la Constitución y la Ley Electoral. Esa fue la razón principal para consolidar sus acciones con el pleito de la señora González Suárez. Esta electora, al igual que los que aquí nos ocupan, utilizó el sistema de votación "añadido a mano", aun cuando también tenía un *"status" electoral* de ER. De hecho, el 7 de septiembre de 1989, al ella finalizar su testimonio, el licenciado Rey le señaló al Magistrado Polo que la señora González Suárez *no podía votar* mediante el sistema de "añadido a mano" debido a que era una electora que apareció en la lista de exclusión (ER). Vol. 24, págs. 23–24. Aun cuando esa prueba y postura estuvo ante nos, la tesis decisoria mayoritaria prevaleciente fue:

> Es evidente que tanto el caso de la señora González Suárez como el de la impugnación por el señor Granados Navedo tienen *el mismo objetivo —cuestionar el resultado electoral para el cargo de Alcalde de San Juan— y participan de un alto interés público que trasciende el de los litigantes propiamente.* La conclusión de estos pleitos debería ponerle punto final a la controversia, al menos en

nuestros tribunales. *Sin embargo, entendemos que sin la acumulación como parte de los electores cuyos votos no fueron adjudicados, el remedio que podrían obtener los demandantes estaría incompleto y trunco.* De no permitirse la acumulación, la sentencia en este caso *no podría oponérsele a los electores que posteriormente cuestionen la privación de su derecho al voto, ya que no fueron partes en el mismo.* (Énfasis suplido.) *Granados v. Rodríguez Estrada II*, supra, pág. 608.

Consciente el ilustrado tribunal de instancia de que, de acuerdo con la Constitución y la Ley Electoral, esos electores tenían causas de acción independientes, se enfrentó al asunto y optó por concluir que el mecanismo de votación "añadidos a mano" no era

. . . *sustitutivo de aquellos procedimientos taxativos que oportunamente, previo a los comicios, debió efectuar el elector excluido.* Tampoco es éste el mecanismo mediante el cual estos electores puedan ahora *"apelar" determinaciones de la CEE en torno a su derecho a votar. Para ello tenían otros procedimientos reglamentados en ley.* (Véase el Reglamento de Recusaciones y Exclusiones, 2.1 y ss.; [*Exhibit*] #887). Máxime cuando hubo una previa campaña publicitaria a través de los distintos medios noticiosos (radio, prensa y televisión) encaminada a orientar al electorado con problemas a visitar la Junta de Inscripción Permanente (JIP). ([*Exhibits*] #202, 203, 205, 207 y 377). Se publicaron además edictos en periódicos de circulación general que alertaban al electorado que aparecía en esas listas de hacer determinadas gestiones a tiempo porque de lo contrario corrían el peligro de perder su derecho al voto. ([*Exhibits*] #198–201). (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 53.

Al hacerlo, el foro de instancia se hizo eco de la teoría expuesta por Acevedo Pérez y Báez Galib. *Otra vez incidió.* Esa conclusión parte de la tajante premisa de que el procedimiento de recusación de electores y su posterior exclusión de las listas fue perfecto y que no era susceptible de errores atribuibles a la Comisión Estatal. Se fundaron en que dicho trámite era cuasijudicial y adversativo, originado ante las Juntas Locales, y al cual le fue aplicado rigurosamente todas las garantías del debido proceso de

ley, tales como citación adecuada, oportunidad de ser oídos y derecho a revisión judicial.

SE COLIGE, *A CONTRARIO SENSU*, QUE CUANDO EL TRÁMITE DE RECUSACIÓN PREVIO NO CUMPLIÓ CON EL DEBIDO PROCEDIMIENTO DE LEY, ESTARÍAMOS ANTE UN ERROR ATRIBUIBLE A LA COMISIÓN ESTATAL. DICHO DE OTRO MODO, SI CON LOS ELECTORES RECUSADOS (ER) NO SE SIGUIÓ FIELMENTE EL TRÁMITE ESTATUTARIO Y REGLAMENTARIO, *EN ÚLTIMO ANÁLISIS* NO CABE OTRA CONCLUSIÓN QUE LA DE QUE FUERON EXCLUIDOS DE LAS LISTAS "POR ERROR ATRIBUIBLE AL ORGANISMO ELECTORAL". POR ENDE, PODÍAN VOTAR AÑADIDOS A MANO.

DISTINTO A COMO CONCLUYE LA MAYORÍA, LA PRUEBA TESTIFICAL Y DOCUMENTAL ASÍ LO REVELA; *LOS DEMANDANTES INVOLUNTARIOS DEMOSTRARON QUE FUERON RECUSADOS INDEBIDA E ILEGALMENTE.*

*La acumulación* de esos electores como demandantes involuntarios en la demanda separada de la señora González Suárez —*electora igualmente excluida por recusación previa* (ER)— y la consolidación de sus acciones, le imponía al foro de instancia el *deber ineludible* de examinar individualmente si esos reclamos independientes —los cuales, según su propia conclusión, *no* estaban prescritos— *eran meritorios*. En esa encuesta lo primero que debió hacer —según se le planteó— fue pasar juicio sobre la validez desde el punto de vista *procesal* de las exclusiones de recusación por domicilio (ER) y posteriormente, de ser necesario, evaluarlas en lo *sustantivo*. Aunque en su sentencia aludió al derecho a "apelar" que tenían los electores recusados por domicilio (ER) y se remitió expresamente al Reglamento de Recusaciones y Exclusiones, *no profundizó* en cuanto a si los procedimientos que culminaron con esas recusaciones fueron válidos conforme a la ley y al reglamento. De haberlo hecho hubiese advertido que numerosas de esas recusaciones (ER) fueron nulas por diversas razones, incluso por falta de jurisdic-

ción. Por ende, esos electores, al *igual* que la señora González Suárez, podían "apelar ahora" las determinaciones previas de la Comisión Estatal que, a través de las Juntas Locales, motivaron sus exclusiones de las listas.

DEBE LA MAYORÍA DESPEJAR SU CONFUSIÓN. Opinión mayoritaria, págs. 35-37. LA SEÑORA GONZÁLEZ SUÁREZ FUE ORIGINALMENTE CLASIFICADA Y EXCLUIDA POR DOMICILIO (ER). DESPUÉS FUE QUE "DEMOSTRÓ" SU IMPROCEDENCIA. Y ELLO PORQUE SE LE DIO LA OPORTUNIDAD QUE AHORA SE LE NIEGA A LOS OTROS ELECTORES.

*PERO HAY MÁS*. El tribunal de instancia se expresó así:

Ante la preocupación de privar de su franquicia electoral a un ciudadano que a pesar de su [*status*] *ER hubiese hecho gestiones afirmativas y oportunas ante la CEE* en aras de advenir elector capacitado, pero que "por error atribuible al organismo electoral" no se incorporó a las listas, el tribunal cotejó *todos* los expedientes electorales de estas personas. Existen *nueve* electores en tales circunstancias. Todos ellos son electores hábiles y deben adjudicarse sus votos. Veamos:

*Unos quedaron excluidos a consecuencia de la proximidad en fechas entre sus solicitudes ante la CEE y los procedimientos de recusación ya comenzados ante la JIP o Comisiones [L]ocales.* ("Este trámite administrativo no debe ser obstáculo o barrera que impida a un elector el libre ejercicio del sufragio." . . . [*P.N.P. y P.I.P. v. Rodríguez Estrada*], 88 JTS 128, a la página 6334). Otros quedaron excluidos debido a que *formularon el documento incorrecto o a[u]n formulando el documento correcto, éste no se procesó en tiempo por el organismo electoral*. Ello no es motivo suficiente como para que se confisque el voto de estos electores; *no se les puede penalizar ni por ineficiencias en la CEE ni por errores de forma cometidos por funcionarios electorales* —personas con conocimiento especializado de los tr[á]mites a efectuarse. (Énfasis suplido y escolio omitido.) Caso Núm. CE-90-389, Apéndice I, pág. 55.

De estos nueve (9) casos, POR SU IMPACTO DECISORIO, destacamos el del elector José A. González Curet, en el cual el Juez Polo decidió de la forma siguiente:

. . . Exhibit #117, [*status*] ER: Consta una Resolución del Tribunal de Distrito (Hon. José Mendoza Vidal) (Civil Núm. R.A. 88-204) del 4 de noviembre de 1988 *mediante la cual se anuló el procedimiento de recusación efectuado en contra de este votante.* A consecuencia de tal decisión se le cumplimentó una *Petición de Inscripción* como elector el *5 de noviembre de 1988* y se le expidió allí la TIE (3291104) con la cual votó. Cabe destacar que el número electoral que aparece e[n l]a resolución al hacer referencia al Sr. González Curet *no* le corresponde a este votante. (Énfasis suplido y en el original.) Caso Núm. CE-90-389, Apéndice I, pág. 56.

Esta determinación del ilustrado foro de instancia sobre una decisión judicial que anuló el procedimiento de recusación de este elector ES TRASCENDENTAL E INTRODUCE UNA DI-MENSIÓN INEXPLORADA HASTA EL PRESENTE. Para ello tomamos *CONOCIMIENTO JUDICIAL* de los autos y de la resolución del Juez Mendoza Vidal en el referido caso Civil Núm. RA-88-204, y *de numerosos más.* DEL MISMO SURGEN UNOS HECHOS DRAMÁTICOS QUE ESTE ALTO FORO NO PUEDE IGNORAR. En síntesis, la decisión judicial del Juez Mendoza Vidal, cuatro (4) días *antes* de las elecciones, *REITERÓ SU DECRETO DE NULIDAD RADICAL* de la recusación contra este elector en la Comisión Local del Precinto 2 de San Juan. Su fundamento —avalado por los testimonios y admisiones en Sala de los miembros de la Comisión Local y de la J.I.P. del mismo precinto— fue que "[e]n ESTA vista, y EN *OTRAS ANTERIORES*, el Tribunal se percató de la *FALTA DE NOTI-FICACIÓN DE LA DECISIÓN DE EXCLUSIÓN POR DOMI-CILIO DE ESTE PRECINTO EN VIOLACIÓN A LA SEC-CIÓN 2.12 DEL REGLAMENTO DE RECUSACIONES Y EXCLUSIONES DE LA COMISIÓN ESTATAL DE ELECCIO-NES Y SE HA DETERMINADO POR ESTE TRIBUNAL LA NULIDAD DE TODAS LAS RECUSACIONES DE ESA CO-MISIÓN.* LA PRESENTE ES UNA DE *TANTAS RE-CUSACIONES NULAS".* (Énfasis suplido.)

Ese fallo correcto, como hemos visto, *FUE ACATADO POR LA COMISIÓN ESTATAL,* que inmediatamente le expidió a

González Curet una Petición de Inscripción Especial, aun *después* de vencido el término. *Ciertamente, la Sec. 2.12 del Reglamento de Recusaciones y Exclusiones, supra, en interacción con la Sec. 2.14 in fine, exigía que todo elector recusado fuera notificado por correo a la última dirección que surgiera del Registro General de Electores cuando fue citado originalmente mediante edictos y no compareció a la vista.* IGUALES DICTÁMENES se produjeron en innumerables casos, entre los cuales figuran *Zoraida Capacetti Rivera v. Comisión Local, Precinto 2* (Civil Núm. RA-88-187) de 14 de octubre de 1988; *Gerónimo Soto Arocho v. Comisión Local de Elecciones, Precinto 2* (Civil Núm. RA-88-180) de 19 de octubre de 1988; *Carmen M. Maldonado De Jesús v. Com. Local, Precinto 2* (Civil Núm. RA-88-194) de 27 de octubre de 1988; *Bladimiro Román Rosario v. Com. Local, Precinto 2* (Civil Núm. RA-88-192) de 27 de octubre de 1988, y los casos RA-88-208, 210, 222, 235, 237, 239, 240, 241, 242, 243, 245, 246, 249, 250, 252, 253, 254, 255, 263, 264, 267, 268, 271, 272, 273, 274, 275, 276, 281, 282, 285, 286, 287, 288, 289, 291, 292, 293, 294, 295, 296, 297, 298, 321, 358, 360, 362, 363, 364, 365, 366, 367, 369, 370, 371, 373, 374, 375, 378, 379, 381, 382, 389, 393, 397, 399, 400, 401, 402, 403, 404, 405, 406, 409 y 413.

Las minutas correspondientes a las vistas de estas apelaciones judiciales —de 31 de octubre y de 4 de noviembre de 1988— recogen, como *RAZÓN DE NULIDAD,* el que los "COMISIONADOS DE LOS DIFERENTES PARTIDOS ASÍ COMO LA JUNTA DE INSCRIPCIÓN PERMANENTE *ADMITIERON EN VISTAS ANTERIORES NO HABER NOTIFICADO DENTRO DEL TÉRMINO ESTATUTARIO LAS RECUSACIONES POR DOMICILIO".* (Énfasis suplido.)

*LA SITUACIÓN ES MÁS SERIA.* EL INCUMPLIMIENTO Y LA INOBSERVANCIA DE LOS TRÁMITES ESTRICTOS DE RECUSACIÓN POR LAS JUNTAS LOCALES Y LAS JUNTAS DE INSCRIPCIÓN *SE EXTENDIERON A TODOS LOS DEMÁS PRECINTOS DEL MUNICIPIO DE SAN JUAN.*

Así surge, en cuanto al PRECINTO 1, de las apelaciones *Elena Osorio Olivo v. Com. Local, Precinto 1* (Civil Núm. RA-88-335) de 2 de noviembre de 1988; *Asunción Pascual Vélez v. Com. Local, Precinto 1* (Civil Núm. RA-88-390) de 4 de noviembre de 1988, y *Yolanda Bigles Padial v. Com. Local, Precinto 1* (Civil Núm. RA-88-424) de 7 de noviembre de 1988.

En el *PRECINTO 3* prevaleció IGUAL DECRETO DE NULIDAD, conforme las apelaciones *Francisca Domínguez Pérez v. Com. Local 3* (Civil Núm. RA-88-256) de 31 de octubre de 1988; *Rosa M. Green Cañuelas v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-278); *Milagros Maldonado Centeno v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-279); *Juan Rivera Llados v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-299); *Teresa Rivera Quiñones v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-300); *Maritza López Rivera v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-301); *Francisca Morales Rivera v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-302); *Mariana Villalobos Otero v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-303); *Ramona Rivera Rivera v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-304).

Merece destacarse el dictamen emitido en la apelación de *Nicolás Crespo Kortright v. Com. Local,* [*Precinto*] *3* (Civil Núm. RA-88-45) de 11 de julio de 1988, expositivo de que:

La notificación a un elector en los procedimientos de recusaciones por domicilio *tiene el propósito de que la Comisión Local pueda actuar con jurisdicción*[,] que no es otra cosa que [é]sta posea la *autoridad* para adjudicar sobre el caso.

Por lo tanto sus normas tienen *que ser de cumplimiento estricto y específico*, de forma que no pueda caber la menor duda de que la parte objeto de la recusación *ha tenido, en forma clara, precisa e inequívoca, a su disposición para quedar informado de los procedimientos, todos y cada uno de los medios legales que el reglamento exige para la orientación del elector.* (Énfasis suplido y en el original.)

En el *PRECINTO 4* ocurrió la *MISMA* SITUACIÓN DE NULIDAD, según se desprende de las apelaciones siguientes: *Luis Aparicio Yejo v. Com. Local,* [*Precinto*] *4* (Civil Núm.

RA-88-290) de 31 de octubre de 1988; *Hiram Lugo Avilés v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-351); *Delia Murphy Collazo v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-380); *Jesús M. Morales Rivera v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-388); *Luz E. Martínez Diversé v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-394); *Norma Santiago Zayas v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-407); *Hermenegilda Román Alvino v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-408); *Milagros Benigarez Ramos v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-415); *Leonor Irizarry Santiago v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-433); *Rubén García Gómez v. Com. Local,* [*Precinto*] 4 (Civil Núm. RA-88-438).

En el *PRECINTO 5* EXISTIÓ EL MISMO *VICIO*. Así lo reflejan las apelaciones *Gregoria Rodríguez Vázquez v. Com. Local,* [*Precinto*] 5 (Civil Núm. RA-88-318); *Bruno Dávila Díaz v. Com. Local,* [*Precinto*] 5 (Civil Núm. RA-88-319); *Walsh Dávila Frances v. Com. Local,* [*Precinto*] 5 (Civil Núm. RA-88-372); *Antolín Romero Valderrama v. Com. Local,* [*Precinto*] 5 (Civil Núm. RA-88-412), y *Carmen Lidia Sánchez v. Com. Local,* [*Precinto*] 5 (Civil Núm. RA-88-423).

Cabe la mención especial a la resolución de la apelación promovida por la electora *Ketty González Simonet v. Com Local,* [*Precinto*] 5 (Civil Núm. RA-88-184) de 4 de octubre de 1988. En la misma, dicho magistrado resolvió:

Su residencia en la Urbanización de[l] Sagrado Corazón está en el *mismo Precinto 5* de San Juan de la dirección en que fue recusada, *por lo que de habérsele notificado en forma reglamentaria la decisión de su exclusión, ella hubiere podido apelar esa decisión con éxito, pues el propio reglamento prohibía la exclusión de electores del mismo precinto al tenor de la Sección 2.13(c)* [del Reglamento de Recusaciones y Exclusiones, *supra,*] referente a situaciones en que no procederá una recusación por domicilio[,] que lee como sigue:

"Cuando el elector está debidamente ubicado *en su precinto, pero su dirección es incorrecta.* En este caso se ordenará que el error sea corregido *administrativamente.*"

[Y] la [Sec. 2.13](a):

"Por estar ubicados fuera de la unidad electoral que les corresponde, pero dentro del precinto."

Su caso cae dentro *de esas exclusiones.* La determinación de la Comisión Local es *nula de toda nulidad y la exclusión de la apelante fue contra derecho y no puede privarla de su derecho constitucional a votar en las elecciones de 1988.* (Énfasis suplido.)

Finalmente, idénticas irregularidades —y por ende NULI-DAD ABSOLUTA— ocurrieron en el PRECINTO 104, según lo acreditan las apelaciones *José E. Rodríguez Suárez v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-257) de 31 de octubre de 1988; *María L. Muñiz Vélez v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-258); *Cándido Fortier Méndez v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-259); *Alfonsa Rodríguez Serrano v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-260); *María T. Ortiz Rodríguez v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-261); *Carmen Ocasio Calo v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-384); *María C. Castellano O'Reilly v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-395); *Ricardo García Lugo v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-396); *Andrea Román Rodríguez v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-398); *Noemí Sabat Bruno v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-432), y *Juanita Rivera Torres v. Com. Local, [Precinto] 104* (Civil Núm. RA-88-454).

LA MAYORÍA DE ESTE ALTO FORO NO PUEDE PASAR POR ALTO QUE EN ESTAS APELACIONES EL DECRETO DEL JUEZ MENDOZA VIDAL FUE EL MISMO QUE EL *DEL CASO DE GONZÁLEZ CURET*: "DE NULIDAD DE *TODAS LAS RECUSACIONES* DE ESA[S] COMISION[ES]." ESTAMOS, PUES, ANTE UNOS DECRETOS JUDICIALES *DEPURADOS* FUNDADOS EN LOS TESTIMONIOS DE LOS MIEMBROS DE LAS JUNTAS LOCALES Y DE LAS JUN-TAS DE INSCRIPCIÓN PERMANENTES.

DISTINTO A LA CONCLUSIÓN MAYORITARIA, A TRA-VÉS DE ESOS CASOS "CONTAMOS CON EL BENEFICIO DEL TESTIMONIO DE LOS MIEMBROS DE LAS JUNTAS LOCALES" QUIENES ADMITIERON EL INCUMPLI-

MIENTO Y LA FALTA DE NOTIFICACIÓN POR CORREO. Opinión mayoritaria, pág. 37. LA COMISIÓN ESTATAL CONO-CIÓ DE ESTA GRAVE INOBSERVANCIA DEL DEBIDO PROCESO DE LEY —FALTA DE NOTIFICACIÓN— RE-QUISITO IMPRESCINDIBLE PARA QUE *COMENZARA* A CORRER *EL TÉRMINO PARA QUE EL ELECTOR RECU-SADO PUDIERA APELAR AL TRIBUNAL.* RESPETO LAS CIENTOS DE DECISIONES DE NULIDAD DICTADAS POR EL JUEZ MENDOZA VIDAL. SI LOS DEMANDANTES INVOLUNTARIOS, COMO AFECTADOS, *NO FUERON NO-TIFICADOS POR CORREO* DE LAS DECISIONES DE LAS JUNTAS LOCALES QUE LOS RECUSABAN, ¿CÓMO IMPO-NERLES EL DEBER DE HABER APELADO PREVIA-MENTE?

Los edictos *genéricos* publicados los días 1, 8 y 9 de julio, y 12 y 17 de septiembre de 1988 (*Exhibits* 198, 199, 200 y 201) *NO SUBSANARON EL INCUMPLIMIENTO SUSTANCIAL DEL REQUISITO DE NOTIFICACIÓN POR CORREO DE LA REGLA 2.12 DEL REGLAMENTO DE RECUSACIONES Y EXCLUSIONES ANTES ALUDIDA.* TAMPOCO PODÍAN ES-TIMARSE COMO UNA FORMA VÁLIDA DE NOTIFICA-CIÓN MEDIANTE EDICTOS. La razón es sencilla. Los textos de estas listas partieron de la premisa de que las órdenes de exclusión eran ya un asunto consumado e irreversible (*fait accompli*), firme e inapelable. Informaban que "la Comisión Estatal de Elecciones anuncia[ba] que de conformidad con el [A]rt. 2.023 de la Ley Electoral de Puerto Rico, [16 L.P.R.A. sec. 3073,] *ha recibido órdenes de exclusión de las Comisiones Locales* para *eliminar* de las listas electorales del Municipio o precinto indicado a los siguientes electores que *fueron* recusados por haberse mudado de residencia (domicilio)". (Énfasis suplido.) Se les indicaba a los electores afectados que lo único que podían hacer era *acudir* a las juntas de inscripciones "y solicitar trans-ferencia o reubicación". NO SE HIZO mención alguna del dere-cho a apelar a los tribunales. DE ESTE MODO FUE OBLITERADO EL DERECHO A APELAR RECONOCIDO

EXPRESAMENTE EN LA LEY ELECTORAL. ¿Cómo puede argumentarse seriamente, como lo hace la mayoría, que estos avisos constituyeron notificación suficiente? LA PRIMERA OPORTUNIDAD DE APELAR QUE TUVIERON ESTOS ELECTORES FUE ANTE EL JUEZ POLO QUIEN, AL IGUAL QUE LA MAYORÍA, LES CERRÓ LAS VÍAS APELATIVAS.

Es principio fundamental del Derecho en todos sus ámbitos, incluso la rama del derecho electoral, que los actos nulos no pueden ser utilizados para conferir o quitar derechos y que un organismo administrativo que nunca adquirió jurisdicción jamás podrá adquirirla *mientras subsista el acto nulo* que no pudo conferírsela. Esa había sido la norma tradicional hasta que hoy la mayoría la cambia abruptamente.

Para comprender cabalmente el espíritu reparador que animó los decretos del Juez Mendoza Vidal frente a la gravedad de las violaciones incurridas por las Juntas Locales —con el conocimiento de la Comisión Estatal— en cuanto a los electores excluidos por ER, debemos primeramente efectuar un análisis somero de las disposiciones pertinentes del procedimiento dispuesto en el referido Reglamento de Recusaciones y Exclusiones, aprobado el 11 de diciembre de 1987 por la Comisión Estatal. Acometamos la tarea.

La Sec. 1.4(2) de dicho reglamento, pág. 2, define *diligenciamiento* como la "acción de *ENTREGARLE* la notificación de la recusación *a la persona recusada*". (Énfasis suplido.) Y en su inciso (4) define *notificación de recusación* como la "acción de dar aviso por escrito o por medio de edicto[s] a la persona recusada *PARA QUE LA COMISIÓN LOCAL PUEDA ADQUIRIR JURISDICCIÓN SOBRE ÉSTA*". (Énfasis suplido.) Íd. Con vista a estas definiciones notamos que la Sec. 2.5 le imponía la obligación al recusador de diligenciar y notificar *PERSONALMENTE* al recusado, y así *ACREDITARLO* bajo juramento. En la alternativa, ante un diligenciamiento negativo debería notificarlo mediante edictos. *ESE TRÁMITE ESTABA CUALIFICADO*. El recusador estaba obligado a notificar dentro de los siete (7) días

calendarios siguientes a la presentación de la recusación ante la J.I.P., organismo que actuaba como Secretaría de la Junta Local. Después tenía que devolver la recusación diligenciada en o antes de los próximos tres (3) días laborables posteriores al diligenciamiento (Sec. 2.6).

Si el recusador, después de haber "realizado las *diligencias pertinentes*", en siete (7) días no lograba notificarlo personalmente y así lo "*comproba[ba]* ante el Presidente de la Comisión Local mediante declaración jurada *con expresión de dichas diligencias*" (énfasis suplido), éste autorizaba la notificación mediante edicto dentro de los próximos siete (7) días a partir de la fecha de la autorización (Sec. 2.7, pág. 6). Publicado el edicto, el recusador tenía que acreditar la notificación "mediante la *presentación de la página del periódico donde se hubiere publicado o mediante la certificación expedida por el periódico donde se h[izo] constar día, fecha, y página de la publicación del edicto*". (Énfasis suplido.) Íd.

En todas sus etapas este trámite era tan *riguroso* que, si pasaban diez (10) días desde la autorización de la publicación del edicto y el recusador no acreditaba esa publicación, "se entend[ía] *desistida* la recusación . . .". (Énfasis suplido.) Sec. 2.7, *supra*. Para iniciar otra tenía que aducir justa causa.

Cumplido a cabalidad ese trámite, se celebraba la vista administrativa ante la Comisión Local para decidir los *méritos* de la solicitud de recusación. La citación para esa vista se tenía que hacer por correo certificado si el elector había comparecido. UNA VEZ RESUELTA, LA NOTIFICACIÓN DE LA *DECISIÓN* DE RECUSACIÓN DE LA COMISIÓN LOCAL AL ELECTOR QUE HABÍA SIDO NOTIFICADO MEDIANTE EDICTO Y NO HABÍA COMPARECIDO SE *ENTENDERÍA CUMPLIDA AL DEPOSITARSE ÉSTA EN EL CORREO, DIRIGIDA A LA ÚLTIMA DIRECCIÓN QUE SURGÍA DEL REGISTRO GENERAL DE ELECTORES (Sec. 2.14)*. Los electores recusados por residencia tenían diez (10) días, contados a partir de la fecha de esa notificación de la decisión, para presentar una *apelación* ante el Tribunal de Distrito.

Finalmente, la Sec. 3.3, pág. 11, impone a la Comisión Estatal la *obligación* de publicar en dos (2) periódicos, "por lo *menos* quince (15) días *antes* del cierre del Registro del Cuerpo Electoral" (énfasis suplido), una lista de todas "las exclusiones de carácter *firme*" —(énfasis suplido) Sec. 7.1, pág. 16— de los electores excluidos *durante el período de recusación.* Sobre esta publicación debemos señalar dos (2) puntos cruciales. El primero, que la misma no constituía —ni podría constituirlo— "un edicto" o forma supletoria de notificar válidamente la orden de exclusión al elector. Nótese que las listas serían "contentivas de las exclusiones de carácter *firme* . . .". (Énfasis suplido.) Íd. Y es que, en el orden procesal, el vocablo *firme* implica que ha transcurrido todo término apelativo. Y segundo, que EN LA CRONOLOGÍA DE 1988 ESE LISTADO DEBIÓ PUBLICARSE, A MÁS TARDAR, EL 4 DE SEPTIEMBRE. EN EL CASO DE AUTOS LA *PRUEBA DEMOSTRÓ* QUE LA COMISIÓN ESTATAL *LO HIZO PARCIAL Y TARDÍAMENTE* LOS DÍAS 12 Y 17 DE SEPTIEMBRE DE 1989.

Observamos que este reglamento se nutre necesariamente de nuestros previos pronunciamientos jurisprudenciales aplicables. Antes de su aprobación en 1987 no existía ninguno. Regía únicamente el Art. 11.2 contenido en el *Manual de Procedimientos para las Comisiones Locales y las Juntas de Inscripción Permanentes* de agosto de 1983 (Caso Núm. CE-90-389, *Exhibit* 366), que imponía a los miembros de la Junta el deber de hacer el diligenciamiento de la citación de una recusación del modo siguiente:

El diligenciamiento deberá ser hecho *en la persona concernida,* pero de no encontrarse presente, se podrá cumplimentar *dejándolo* con alguna persona mayor de edad en la residencia registrada del ciudadano haciendo constar en el formulario de diligenciamiento a quién se la entregó. De no haber persona mayor deberá gestionar el diligenciamiento *nuevamente. Después de haber tratado sin resultado alguno en más de una ocasión la JIP levantará un acta y se acompañará al récord.* (Énfasis suplido.)

Ciertamente esta forma de diligenciar no cubría todos los trámites *mínimos* necesarios exigibles por el debido proceso de ley. Surge del testimonio del propio demandado recurrido Báez Galib que el Reglamento de Recusaciones y Exclusiones intentó superar esas fallas al incorporar unas reglas esenciales y mínimas que dan vida y contenido al debido proceso de ley constitucional ("notificación, emplazamiento, etc."), según fue sugerido por la Asociación de la Judicatura Puertorriqueña. Vol. 53, págs. 95-96.

Al examinarlo notamos que recoge las guías de *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981), que por su aplicabilidad al caso de autos merecen reproducirse. *Primero*, los procedimientos dispuestos por ley y por los reglamentos que gobiernan los trámites de recusación *son de estricto cumplimiento. Su inobservancia anula la recusación.* Íd., págs. 229 y 232. Y *segundo*, la suficiencia y validez de un diligenciamiento *negativo* implica y requiere que se haga un *esfuerzo razonable para hacer llegar la citación al elector,* de manera que éste pueda defender su voto *antes de ser citado mediante edictos.*

El trámite de recusación no podía ser concebido de otro modo. Es axioma elemental de debido proceso de ley que todo aquel que pueda verse afectado por alguna determinación de un organismo electoral tenga una legítima oportunidad de defenderse. De ahí que el diligenciamiento personal de la notificación deba satisfacer unas garantías mínimas para que pueda reconocerse su validez. El prestigio, la validez y la fuerza moral intrínsecos de una decisión administrativa o judicial no sólo depende de sus razonamientos, sino de darle oportunidad de enfrentarla por quien viene obligado a acatarla.

Sobre este último extremo, establecimos la norma de que un elector impugnado por una recusación, "en armonía con el mandato constitucional . . . debe tener derecho a contradecir la recusación, Art. 5.034 (16 L.P.R.A. sec. 3234), y *a comparecer y ser oído en la vista en que se examine y pueda adjudicarse la procedencia de la recusación.* A ese fin, debe ser citado con suficiente antelación y *de manera efectiva. No debe bastar, a este efecto, un mero diligenciamiento negativo de una citación. Debe*

*quedar demostrado que se hicieron esfuerzos razonables para notificarle. El valor de un voto no puede hacerse depender de unas diligencias incompletas que en ocasiones son hechas por personas que pudieran tener mucho interés en que dicho voto no se cuente".* (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones,* supra, págs. 232-233.

Esa norma fue aplicada allí en la situación siguiente:

El Partido Popular impugna la citación por ser *insuficiente. Estamos de acuerdo. No puede bastar un diligenciamiento negativo para privar a una persona del derecho a vista y de ser oída, cuando se trata de anularle un derecho fundamental. Si no pudo localizarse a la persona en la dirección en que se esperaba que estuviese, deben hacerse diligencias para averiguar el sitio donde puede ser citada y demostrarse satisfactoriamente que se ha hecho un esfuerzo por localizarla. En caso negativo, la citación mediante edicto no puede descartarse.* . . . En el caso que ahora consideramos, la prueba transcrita *no revela esfuerzo alguno* por localizar y notificar de la citación a la electora, *aparte de un diligenciamiento negativo.* Al ser informado el diligenciante de la citación, que la electora "vive en Puerto Rico", según hizo constar en la citación, *no especificó qué gestiones realizó para informarse de en qué dirección en Puerto Rico se le podía localizar.*

*Las gestiones mínimas hechas en este caso no cumplen con el debido proceso de ley. Al no dar una notificación adecuada, se privó a la electora de su oportunidad de comparecer y defender su voto.* (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones,* supra, págs. 293-294.

Si la norma fue entonces buena y justa para el P.P.D., ¿por qué no seguirla ahora? Recuérdese, según declaró el Comisionado Electoral de ese partido, licenciado Báez Galib, que en ese Reglamento de Recusaciones y Exclusiones "se dan *todos* los pasos procesales ['notificación, emplazamientos, etc.'] que ellos [la Asociación de la Judicatura Puertorriqueña] entienden que cumplen con los requisitos constitucionales". Vol. 53, págs. 96-97. ¿Cómo puede la mayoría sostener —a base de su aserto de que el "estado de derecho y los hechos ante nos son totalmente distintos" (énfasis suprimido) opinión mayoritaria, pág. 36— que no son

aplicables estas normas jurisdiccionales al caso de autos? ¿Qué valor, entonces, tuvo la aprobación de este Reglamento de Recusaciones y Exclusiones? La única respuesta judicial es *acatarlo y aplicarlo*, como justicieramente lo hizo el Juez Mendoza Vidal. Veamos.

B. *Recusaciones nulas por razones procesales*

Al confrontar esta doctrina con el caso de autos es forzoso concluir la *nulidad radical de las recusaciones* (ER) de un numeroso grupo de electores que comparecieron como demandantes involuntarios. Sus citaciones mediante edictos estuvieron fundadas en unos *diligenciamientos negativos insuficientes en derecho* para conceder jurisdicción a las Juntas Locales para recusarlos y excluirlos válidamente. Aunque algunos recusadores visitaron las residencias de los electores o el área, al no encontrarlos no hicieron esfuerzos razonables ni realizaron gestiones para citarlos personalmente.

Conforme los *"exhibits" presentados en evidencia* por estos demandantes involuntarios, los diligenciamientos negativos detallados adelante *de su faz son insuficientes* y no revelan esfuerzo legítimo para citarlos. Esta conclusión se impone en interacción con la prueba testifical desfilada —más adelante analizada— de varios electores que demostraron que *nunca se mudaron de sus residencias*, otros que *notificaron* a la Comisión Estatal de *cambios* en sus residencias en el *mismo* precinto y de otros que, de haber sido válidamente notificados del trámite de recusación, hubiesen comparecido ante la Comisión Local y que *por tratarse sólo de dirección incorrecta* no hubiesen podido ser excluidos. Como veremos, se trata de casos en que los *efectos acumulativos* de las irregularidades procesales y sustantivas habidas nos llevan a esa inescapable conclusión. *Hay situaciones en que sobre un mismo elector inciden varias irregularidades*. Ello explica por qué repetimos sus nombres al analizar separadamente las distintas infracciones procesales. Advertimos, no obstante, que la suma total se circunscribe a cincuenta y ocho (58) electores, según lo

acreditamos en el Anejo 1 contentivo de sólo sus nombres exactos, *no repetidos*.

La realidad antes relacionada y la que exponemos ·más adelante es una realidad que la mayoría del Tribunal se niega a reconocer cuando resuelve que "[l]uego de examinar toda la evidencia presentada por estos electores en el foro de instancia, concluimos que la misma es insuficiente para rebatir las referidas. presunciones". (Énfasis suprimido.) Opinión mayoritaria, pág. 36. ES MALA TÉCNICA ADJUDICATIVA NO EXPONER LOS FUNDAMENTOS ESPECÍFICOS E INDIVIDUALES PARA UNA CONCLUSIÓN TAN IMPORTANTE. ¿CUÁLES SON? NO LO SABEMOS. ESA FORMA MISTERIOSA DE *NO ADJUDICAR* "CONSTITUYE UNA PELIGROSA ALTERNA-TIVA NO COMPROMETIDA DE RESOLUCIÓN JUDICIAL". (Énfasis en el original.) *Granados v. Rodríguez Estrada I*, supra, pág. 292, opinión disidente. LA FALTA DE EXPOSICIÓN DE LOS CRITERIOS USADOS NOS DIFICULTA EL ANÁLISIS, MÁXIME CUANDO LA SENTENCIA DEL TRIBUNAL DE ORIGEN TAMPOCO CONTIENE DETERMINACIONES FÁCTICAS NI JURÍDICAS AL EFECTO.

REALMENTE, LA MAYORÍA EVADE PASAR JUICIO SOBRE LOS RECLAMOS MERITORIOS DE ESTOS DE-MANDANTES INVOLUNTARIOS. *Al hacerlo, otra vez yerra.* Toda su argumentación olvida que ellos abrieron esta "caja de Pandora" en *Granados v. Rodríguez Estrada II*, supra. *SOBRE TODO, PIERDEN DE VISTA QUE LA ALEGACIÓN DE FALTA DE JURISDICCIÓN DE LA COMISIÓN ESTATAL FUE DEBIDAMENTE PROBADA.* Aun bajo el enfoque técnico mayoritario, el trastoque procesal subsiste. ¿Qué otra oportuni-dad pretenden tener Acevedo Pérez y Báez Galib? ¿No sometie-ron ya su caso? Consideramos un absurdo la decisión mayoritaria de aprisionar los reclamos de estos electores a las "teorías de derecho" incorporadas en la demanda que redactó este Tribunal en la Sentencia de 10 de noviembre de 1989. También a un itinerario comprimido de escasamente unos días, mientras los recurridos Acevedo Pérez y Báez Galib tuvieron más de un (1) año

para examinar la documentación de los electores excluidos por ER antes de que fueran acumulados y citados.

Cumplamos, pues, con nuestra misión rectora de hacer justicia. La *prueba* indubitadamente estableció que las decisiones de las Juntas Locales que excluyen por domicilio (ER) *fueron nulas de su faz* por insuficiencia documental en los diligenciamientos negativos —avalada por los testimonios de los electores— en los casos siguientes:

| Exhibit | Elector | Gestiones | Precinto |
|---|---|---|---|
| 1. 86 | Pedro Hernández Monserrate | "Visitar." | 4 |
| 2. 224 | Pura Acevedo Román | *No* hay constancia de diligenciamiento negativo. | 1 |
| 3. 226 | Julia Rocheli Ramos | "Visité el *área* y consulté con los vecinos." | 3 |
| 4. 264 | Gloria Cruz Torres | "Visita." | 4 |
| 5. 271 | Miguel González Villanueva | El diligenciamiento está en *blanco* y no contiene expresión de gestión alguna realizada. | 104 |
| 6. 276 | Eleuteria Ortiz Figueroa | *"Negativo."* | 1 |
| 7. 279 | Águeda Santos Caballero | El diligenciamiento está en *blanco* y no contiene expresión de gestión alguna realizada. | 4 |
| 8. 280 | Carlos A. Serpa Serpa | "Visitar." | 4 |
| 9. 281 | Carmen Serpa Laureano | "Visitar." | 4 |

| Exhibit | Elector | Gestiones | Precinto |
|---|---|---|---|
| 10. 283 | Carmen López Oquendo | *No* existe copia ni constancia del diligenciamiento negativo. | 5 |
| 11. 297 | Nilda Consuelo González | No hay constancia de diligenciamiento ni de recusación. | 5 |
| 12. 321 | Gladys Meléndez Boria | *No* aparece diligenciamiento negativo. | 2 |
| 13. 322 | Gerardo Rivera Otero | "Visita." | 4 |
| 14. 333 | Gloria Muñoz Reyes | "Visita." | 4 |
| 15. 368 | Zoila González González | "Visita." | 4 |

Véase Caso Núm. CE-90-389, Certificación.

Aparte de estos diligenciamientos, nulos de su faz, hay otros que no cumplen con las normas jurisprudenciales mínimas sobre el debido proceso de ley. Como sentenciamos en *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 295, "[n]o puede considerarse citada a una electora a base de un diligenciamiento negativo y *nada más*". (Énfasis suplido.) Desde sus inicios las gestiones fueron insuficientes. Advertimos, sin dificultad, que los recusadores simplemente *se limitaron* a averiguar si dichos electores vivían en las direcciones que supuestamente aparecían en el Registro General de Electores. Quedó demostrado que "[no] se hicieron esfuerzos razonables para notificarle[s]". Íd., pág. 233. Expresiones tales como "no reside", "no lo pude localizar", se "desconoce su dirección actual", sin indicarse las diligencias desplegadas para obtener la nueva dirección, son esfuerzos que no bastan.

De las expresiones de las personas que intentaron diligenciar la notificación de la recusación podemos derivar varias categorías: (1) no realizó ninguna gestión; (2) visitó el área residencial del

elector recusado; (3) visitó solamente la presunta residencia del elector recusado, y (4) visitó y consultó con los vecinos o nuevos residentes.

Sin embargo, en ninguno de los casos ante nos los diligenciantes informan sobre *gestiones adicionales* que salvaran la validez de la notificación y hubiesen presuntamente conferido jurisdicción al organismo administrativo. No hay prueba de alguna gestión *convincente* para obtener *información adicional de los posibles lugares* donde podía localizárseles y notificarles personalmente de la recusación interpuesta. Así ocurre en múltiples casos de *residenciales públicos*, en que la persona se mudó de un apartamento a otro en el *mismo* edificio o proyecto, y que una simple visita al administrador hubiese revelado la nueva dirección y permitido su diligenciamiento personal. En los residenciales Nemesio R. Canales y Luis Lloréns Torres muchos de los electores recusados fueron *obligados* a mudarse, temporera o permanentemente, por las remodelaciones que hizo el Departamento de la Vivienda o por razón de cambios en el tamaño de sus unidades familiares.

Hay otros casos en que antes de iniciarse las recusaciones evidentemente los recusadores no cotejaron los expedientes electorales de los electores para cerciorarse si éstos habían hecho algún tipo de notificación oficial del cambio de domicilio y que por razones desconocidas la Comisión Estatal no la procesó.

La prueba desfilada en torno a estas circunstancias corrobora la insuficiencia de los diligenciamientos negativos y la invalidez de los procedimientos de recusación en los casos siguientes:

| Exhibit | Elector | Gestiones | Precinto |
|---|---|---|---|
| 1. 214 | Marta Sánchez García | "Visité la residencia y se me informó que no vive ahí. Vive otra gente — Ricardo Rodríguez." | 5 |

| Exhibit | | Elector | Gestiones | Precinto |
|---|---|---|---|---|
| 2. | 217 | Milagros Apolinaris López | "Visité esta dirección y se me informó que se mudó. Reside Gladys Díaz." | 5 |
| 3. | 228 | Carmen Cruz Rivera | "Visité la vivienda y consulté con los vecinos." | 3 |
| 4. | 229 | Consuelo Rivera Vega | "Visité 704 William, Barrio Obrero." | 2 |
| 5. | 231 | Ramón Reyes Hernández | "Visité esta residencia y no vive, según me informaron." | 4 |
| 6. | 252 | Juana Rivera Díaz | "Visité R. Las Margaritas, Edif. 18, Apt. 181." | 2 |
| 7. | 256 | Daniel A. González Betancourt | "Vecino dijo no vive ahí." | 1 |
| 8. | 257 | Miguel A. Laureano Santos | "Visité Cortijo #608, Barrio Obrero, Santurce." | 2 |
| 9. | 263 | Justino Lorenzana Colón | "No reside en esta dirección." | 4 |
| 10. | 273 | Pedro Flores | "Visité esta dirección, elector no reside informó Olga Santiago, vive Doña Ana." | 5 |
| 11. | 274 | María L. Pérez Rodríguez | "Con visitas a C/Rafael Lamar #522." | 2 |
| 12. | 275 | Ana Celia Arana Hernández | "Visité 402 Fernando Calder Roosevelt." | 2 |
| 13. | 282 | Lourdes M. Rodríguez Ramos | "No vive en esta dirección." | 4 |
| 14. | 284 | Isabelino Báez Alicea | "Visité Calle 1 #76, Bo. Tokyo, Hato Rey." | 2 |

| Exhibit | Elector | Gestiones | Precinto |
|---------|---------|-----------|----------|
| 15. 289 | Eva Cotto Ayala | "Visité la residencia y se me informó que no vive actualmente Santa Cotto, su papá." | 5 |
| 16. 290 | Andrea Benítez Santiago | "No la pude localizar en esta dirección." | 3 |
| 17. 291 | Arturo Quiñones Aracil | "Visité casa y consulté vecinos y no viven ahí." | 3 |
| 18. 292 | Ramón González Dávila | "Visité Calle 1 #136, Buena Vista, Hato Rey." | 2 |
| 19. 293 | José Andino Báez | "Visité 2309 C/C Barrio Buena Vista." | 2 |
| 20. 294 | Damaris De León Saldaña | "Visité casa y consulté vecinos." | 3 |
| 21. 296 | Pedro J. Ocasio De Jesús | "Inf. vecinos que no vive." | 4 |
| 22. 300 | Antonio Ramírez Morales | "Visité C/Webb 705, Buena Vista, Barrio Obrero." | 2 |
| 23. 301 | María T. García Santos | "Visité casa y la Sra. Deogracia Ramos, actual residente, informa no conocer a esta persona." | 1 |
| 24. 305 | Constancia Román Cruz | "Visité a la residencia del elector, consulté vecinos, no vive ahí." | 3 |
| 25. 308 | Nereida Rodríguez Mejías | "Visité esta residencia y me informaron que no vive aquí." | 4 |

| Exhibit | | Elector | Gestiones | Precinto |
|---|---|---|---|---|
| 26. | 312 | Sixto Miranda Matta | "Visité la calle Caracas #723, Barrio Obrero, Santurce." | 2 |
| 27. | 315 | Antonia Torres Colón | "No vive en esa dirección." | 4 |
| 28. | 319 | Ana Mojica Ortiz | "Visité Edif. F19, Apt. 17, [R.] Manuel A. Pérez." | 2 |
| 29. | 320 | María Rodríguez Valle | "Visité Edif. J17, Apt. 170[, R.] Manuel A. Pérez." | 2 |
| 30. | 322 | Gerardo Rivera Otero | "Visita." | 4 |
| 31. | 331 | Ramonita Ríos Cruz | "Visité la Calle Jarandilla 450, Urb. San José, R.P." | 2 |
| 32. | 334 | Víctor Cotto Castro | "Visité y no vive." | 4 |
| 33. | 361 | Juanita Calderón Arroyo | "Hablé con Guillermo Hernández, nuevo residente, y me dijo que la recusada no vive." | 104 |
| 34. | 371 | Francisca Cotto Rivera | "Visité el Edif. J-13, Apt. 113 de[l R.] Manuel A. Pérez." | 2 |
| 35. | 372 | Ana Torres Burgos | "Visité Apt. y consulté vecino." | 3 |

Véase Certificación, *supra*.

Para los siguientes electores no existe constancia alguna de que el Presidente de la Comisión Local *autorizara* la publicación de edictos. Se incumplió, pues, con el requisito de la Sec. 2.7 del Reglamento de Recusaciones y Exclusiones, *supra*.

*En ausencia de prueba en contrario, la única inferencia razonable es la visualizada en el propio reglamento*: que el recusador no pudo comprobar ni expresar a satisfacción del

Presidente de la Comisión Local las diligencias negativas realizadas para localizar al elector y, en consecuencia, la Comisión Estatal tampoco *adquirió jurisdicción sobre estos electores*:

| Exhibit | Elector | Precinto |
|---|---|---|
| 1. 264 | Gloria Cruz Torres | 4 |
| 2. 268 | Ibis J. Maldonado Negrón | 4 |
| 3. 279 | Águeda Santos Caballero | 4 |
| 4. 280 | Carlos A. Serpa Serpa | 4 |
| 5. 281 | Carmen Serpa Laureano | 4 |
| 6. 296 | Pedro J. Ocasio De Jesús | 4 |
| 7. 308 | Nereida Rodríguez Mejías | 4 |
| 8. 315 | Antonia Torres Colón | 4 |
| 9. 317 | José Nieves Toro | 4 |
| 10. 322 | Gerardo Rivera Otero | 4 |
| 11. 333 | Gloria Muñoz Reyes | 4 |

Véase Certificación, *supra*.

C. *Recusaciones nulas por ser improcedentes en sus méritos*

Debido a la negativa del tribunal de instancia a evaluar en sus MÉRITOS el reclamo de los electores recusados y excluidos de las listas por ER, no hizo determinaciones de hechos en varios casos de electores cuyos *TESTIMONIOS NO CONTRADICHOS ESTABLECIERON QUE NUNCA SE MUDARON NI CAMBIARON SU DOMICILIO ELECTORAL*. A base de una esmerada evaluación de la transcripción, lo hacemos ahora. Bajo esta situación, los siguientes electores *tenían derecho a votar* y a que se les adjudicara sus votos:

| Exhibit | Elector | Precinto |
|---|---|---|
| 1. 86 | Pedro Hernández Monserrate | 4 |
| 2. 226 | Julia Rocheli Ramos | 3 |
| 3. 228 | Carmen Cruz Rivera | 3 |
| 4. 229 | Consuelo Rivera Vega | 2 |
| 5. 257 | Miguel A. Laureano Santos | 2 |
| 6. 271 | Miguel González Villanueva | 104 |

| Exhibit | Elector | Precinto |
|---|---|---|
| 7. 274 | María Luisa Pérez Rodríguez | 2 |
| 8. 275 | Ana Celia Arana Hernández | 2 |
| 9. 279 | Águeda Santos Caballero | 4 |
| 10. 289 | Eva Cotto Ayala | 5 |
| 11. 297 | Nilda Consuelo González | 5 |
| 12. 300 | Antonio Ramírez Morales | 2 |
| 13. 301 | María T. García Santos | 1 |
| 14. 313 | Dolores Guzmán Rivera | 2 |
| 15. 330 | Alejandro Santos Caballero | 4 |
| 16. 331 | Ramonita Ríos Cruz | 2 |
| 17. 333 | Gloria Muñoz Reyes | 4 |
| 18. 334 | Víctor Cotto Castro | 4 |
| 19. 362 | José A. Gavillán Meléndez | 5 |

Véase Certificación, *supra.*

IGUAL *CONCLUSIÓN* SE IMPONE EN LOS CASOS DE LOS ELECTORES QUE LA PRUEBA DEMOSTRÓ QUE, SI BIEN CAMBIARON DE RESIDENCIA, *CONTINUARON VIVIENDO EN EL MISMO PRECINTO* O SE MUDARON *DENTRO DE LA MISMA UNIDAD ELECTORAL*, O DE UNA UNIDAD ELECTORAL A OTRA DEL *MISMO* PRECINTO.

A esos efectos, el Art. 2.002 de la Ley Electoral, 16 L.P.R.A. sec. 3052, exige que:

Asimismo todo elector, de ejercer su derecho al voto, deberá hacerlo el día de las elecciones en *el precinto y unidad electoral al cual pertenece su inscripción.* (Énfasis suplido.)

El requisito es que el elector vote en la unidad y precinto electoral donde está *inscrito*, que debe corresponder a aquel en que tiene su *domicilio*, concepto que gira donde tiene establecida su *residencia* fija y regular. Art. 2.004 de la Ley Electoral, 16 L.P.R.A. sec. 3054.

Y es que conforme la Sec. 2.13(c) del propio Reglamento de Recusaciones y Exclusiones, *supra*, pág. 9, se *prohibía la exclusión* por razón de domicilio (ER) "[c]uando el elector esta[ba] debidamente ubicado en su precinto, pero su dirección e[ra]

incorrecta. En este caso se ordenar[ía] que el error [fuera] corregido administrativamente".

En estas circunstancias la Comisión Local debió proveer ese remedio y no la exclusión. Claro está, las insuficiencias en los diligenciamientos negativos antes expuestas fueron *la causa directa* de que esos organismos incurrieran en dicho error. *No cabe duda que de haber sido estos electores válidamente notificados y de haber comparecido se hubiese evitado sus exclusiones por errores atribuibles a la Comisión Estatal.* Los electores cuyos derechos fueron de este modo violados son:

| Exhibit | Elector | Precinto |
|---|---|---|
| 1. 214 | Marta Sánchez García | 5 |
| 2. 224 | Pura Acevedo Román | 1 |
| 3. 231 | Ramón Reyes Hernández | 4 |
| 4. 256 | Daniel A. González Betancourt | 1 |
| 5. 260 | Leomarys Rivera Murphy | 4 |
| 6. 263 | Justino Lorenzana Colón | 4 |
| 7. 273 | Pedro Flores | 5 |
| 8. 276 | Eleuteria Ortiz Figueroa | 1 |
| 9. 282 | Lourdes M. Rodríguez Ramos | 4 |
| 10. 283 | Carmen López Oquendo | 5 |
| 11. 284 | Isabelino Báez Alicea | 2 |
| 12. 290 | Andrea Benítez Santiago | 3 |
| 13. 291 | Arturo Quiñones Aracil | 3 |
| 14. 292 | Ramón González Dávila | 2 |
| 15. 294 | Damaris De León Saldaña | 3 |
| 16. 296 | Pedro J. Ocasio De Jesús | 4 |
| 17. 305 | Constancia Román Cruz | 3 |
| 18. 312 | Sixto Miranda Matta | 2 |
| 19. 315 | Antonia Torres Colón | 4 |
| 20. 317 | José Nieves Toro | 4 |
| 21. 320 | María Rodríguez Valle | 2 |
| 22. 321 | Gladys Meléndez Boria | 2 |
| 23. 322 | Gerardo Rivera Otero | 4 |
| 24. 361 | Juanita Calderón Arroyo | 104 |
| 25. 368 | Zoila González González | 4 |

| Exhibit | Elector | Precinto |
|---------|---------|----------|
| 26. 371 | Francisca Cotto Rivera | 2 |
| 27. 372 | Ana Torres Burgos | 3 |
| 28. 373 | Aida Vázquez Casillas | 5 |

Véase Certificación, *supra*.

La prueba, además, demostró que el tribunal de instancia incidió al no ordenar la adjudicación de los votos emitidos por varios ELECTORES QUE HABÍAN NOTIFICADO CAMBIO DE SUS DIRECCIONES O QUE LAS RECUSACIONES CONTENÍAN DIRECCIONES INCOMPATIBLES. La mayoría de los casos versan sobre discrepancias sustanciales entre las diversas direcciones obrantes en los expedientes electorales y las utilizadas para realizar el diligenciamiento negativo, cuyo resultado es que éste sea *nulo* y, por ende, invalidante la causal de recusación.

En algunos casos el recusador diligenció en la dirección *original* del elector, a pesar de que en el expediente electoral existían documentos oficiales de la Comisión Estatal acreditativos de la nueva dirección. Estos casos, junto a otros, reflejan situaciones de inobservancia e irregularidades de CARÁCTER ACUMULATIVO.

1. *NILDA CASTRO AVILÉS* (*Exhibit* 104).

ESTE CASO EJEMPLARIZA EL CRITERIO RESTRICTIVO MAYORITARIO. Esta electora fue recusada y excluida de las listas electorales (ER) por no residir en la Calle Sol 270, Apt. 413, San Juan, según la Decisión de la Comisión Local de abril de 1988. Sin embargo, la prueba reveló que *ella había notificado un cambio de dirección desde el 21 de julio de 1979*, esto es, nueve (9) años antes de ser recusada, al Condominio La Puntilla D-2, Apt. 32. El formulario oficial, *Autorización para Corrección de otros Datos Pertinentes*, debió ser suficiente para reubicarla dentro del mismo precinto. La única limitación y advertencia que surgía de ese formulario era la posibilidad de que el cambio pudiera "requerir una transferencia". Ello en su caso era inaplicable, pues se mudó dentro del mismo precinto. El error recae sobre los

funcionarios de la Comisión Estatal y no puede ser fundamento para anularle el derecho al voto. Este caso ilustra también cómo el diligenciamiento negativo y la recusación fueron nulos. Su voto debió adjudicarse.

2. *JULIA ROCHELI RAMOS* (*Exhibit* 226).

Surge de la Solicitud de Recusación y de la Decisión de la Comisión Local que fue recusada y excluida de las listas electorales por no residir en el "*Res. Quintana*", Edif. 13, Apt. 147, Hato Rey, Puerto Rico. Advertimos, sin embargo, que la dirección suministrada por la electora en su Petición de Inscripción fue "Ed. 13, Apt. 147, *Res. César Cordero Dávila*, Hato Rey". Se trata de dos (2) residenciales *diferentes*. Razonablemente se puede concluir que el recusador conocía ese dato, pues en la solicitud de recusación indicó como su propia residencia el Residencial Cordero Dávila. Ello prueba que el diligenciamiento negativo fue nulo y que la Comisión Local y la Comisión Estatal carecían de jurisdicción para adjudicar la recusación. La causal de recusación también es inválida, pues la electora nunca se inscribió en la dirección indicada en la recusación. Su voto debió adjudicarse.

3. *DANIEL A. GONZÁLEZ BETANCOURT* (*Exhibit* 256).

Del expediente electoral surge que aparecía inscrito, y fue recusado, en el Callejón Amparo, Villa Palmeras. Su nueva dirección es la Calle República, del mismo sector, la cual aparece en una inscripción de partido de *1983* que *obra en su expediente electoral*. El dato de su nueva dirección no fue utilizado para nada en las gestiones realizadas para diligenciar la recusación. Con esa sencilla gestión hubiese sido citado personalmente.

4. *IBIS J. MALDONADO NEGRÓN* (*Exhibit* 268).

Según sus declaraciones no controvertidas surge que aun cuando presentó una nueva inscripción electoral y se le expidió la correspondiente Tarjeta de Identificación Electoral (T.I.E.) nueva el *19 de septiembre de 1988*, esta electora fue excluida por residencia. La Comisión Estatal no procesó la *segunda* inscripción. *Resulta interesante llamar la atención al caso de esta electora*. Mientras el Juez Polo se negó a contarle el voto, se lo adjudicó a su madre, Petronila Negrón Maldonado. *Ambas elec-*

*toras estaban en igualdad de condiciones y habían realizado las mismas gestiones.*

5. *EVA COTTO AYALA (Exhibit 289).*

*ESTE CASO ES DRAMÁTICO.* Primeramente, la dirección en la Solicitud de Recusación y en la Decisión de la Comisión Local *está incompleta.* No corresponde a la dirección indicada por la electora en su Petición de Inscripción, a saber, el buzón rural "BN56KK". De ordinario, los buzones rurales están localizados en grupos en un sólo lugar. Por ello es necesario diferenciar entre los distintos buzones. Y segundo, el recusador indicó que en esa dirección vivía su padre y no informa *esfuerzo alguno hecho* para conseguir la dirección y citarla personalmente. ¿Cómo sostenerse que el padre de esa electora desconociera la nueva dirección de su hija? Si el recusador lo inquirió, y esa era la realidad, debió consignarlo así. *P.P.D. v. Admor. Gen. de Elecciones,* supra, págs. 293–294. Estamos ante un diligenciamiento negativo insuficiente en derecho.

6. *MARÍA T. GARCÍA SANTOS (Exhibit 301).*

Fue recusada y excluida de las listas por no residir en la "Calle Fajardo #3, Villa Palmeras, Santurce", aun cuando de su Petición de Inscripción de mayo de 1984 y de su Declaración Jurada de agosto de 1986 surgía como dirección correcta "Calle Fajardo #313, Villa Palmeras, Santurce". El diligenciamiento negativo y la causal de recusación fueron inválidas y su voto debió adjudicarse.

7. *CONSTANCIA ROMÁN CRUZ (Exhibit 305).*

*ESTE CASO ES PATÉTICO.* De su expediente electoral surge que fue recusada en abril de 1988 y excluida de listas electorales por la Comisión Local en mayo de 1989 por no residir en la Calle Capitán Amézquita #1171, Buen Consejo, Río Piedras. Sin embargo, desde el 11 de julio de de 1984 había suscrito una Declaración Jurada en un formulario *oficial* ante la J.I.P. donde solicitaba a la Comisión Estatal la expedición de una T.I.E. duplicada para sustituir la que perdió en un robo. *Allí indicaba como su nueva dirección a esa fecha* el Condominio Villa Panamericana, Edif. K, Apt. 203, Río Piedras. *Su solicitud fue procesada.* Sin embargo, esta información *no fue utilizada por la*

*Comisión Estatal para actualizar su nueva dirección*, dato que lógicamente dicho organismo tenía que verificar para determinar si era o no una electora inscrita. La omisión de la Comisión Estatal no puede ser razón para penalizarla. Más aún, no puede ser excusa para sostener una recusación nula fundada en un diligenciamiento que de su faz es insuficiente. Con un simple examen de su expediente, el recusador muy bien pudo haberla citado personalmente. No lo hizo y, claro está, logró de ese modo ilegal excluirla de las listas.

8. *DOLORES GUZMÁN RIVERA* (*Exhibit* 313).

Fue recusada y excluida de las listas electorales por no residir en la "Calle Principal *2208*, Buena Vista, Santurce". Conforme su Petición de Inscripción y su testimonio, su dirección correcta era "*2258* Calle Principal, interior Buena Vista, Santurce". El diligenciamiento negativo y la causal de recusación son·inválidas y su voto debió adjudicarse.

9. *ANA MOJICA ORTIZ* (*Exhibit* 319).

Esta electora fue recusada y excluida por alegadamente no residir en el Edif. 19, Apt. 17, Residencial Manuel A. Pérez. El diligenciamiento negativo consigna que el recusador visitó el "Edif. *F19*, Apt. 17, Manuel A. Pérez". Esa dirección visitada es incompatible con la dirección *obrante en los récord de la Comisión Estatal*. El diligenciamiento negativo y la causa de recusación son nulos y debió adjudicarse su voto.

10. *ALEJANDRO SANTOS CABALLERO* (*Exhibit* 330).

Fue excluido por no vivir en "La Marina, Carr. #19, *KO*, H.M. 8". Sin embargo, su Solicitud de Inscripción indicaba como dirección correcta la "Carr. 19, *K.M. 1*, H.M. 8", donde reside hace décadas. El diligenciamiento y la causal de recusación fueron nulos y su voto debió adjudicarse.

11. *GLORIA MUÑOZ REYES* (*Exhibit* 333).

Fue recusada y excluida por no residir en la "Ave. Américo Miranda, Reparto Metropolitano, Río Piedras, P.R.", aun cuando su dirección completa —según la Petición de Inscripción— era "Ave. Américo Miranda *#1182*, Reparto Metropolitano". El dili-

genciamiento negativo y la causal de recusación son nulos, y su voto debió adjudicarse.

12. *JUANITA CALDERÓN ARROYO* (*Exhibit* 361).

Fue recusada y excluida por no residir en la "Calle 6, No. 377, Ext. San Agustín, Río Piedras, P.R.". Su expediente electoral reflejaba que la dirección en su Petición de Inscripción era "Calle Villacastín, Edif. 8, Apt. 657, San José". Sin otra explicación, el diligenciamiento negativo y la causal de recusación no pueden prevalecer y su voto debió adjudicarse.

Hemos visto cómo el descuido y la ligereza fueron la orden del día al momento de diligenciar y procesar algunas de las recusaciones por razón de residencia (ER). En ocasiones se recusó a electores que continuaban viviendo en la *misma dirección* en que estaban inscritos. Por otro lado, se pretendió diligenciar otras recusaciones sin que se realizaran gestiones suficientes para notificar personalmente al elector. En varios casos la prueba no contradicha demostró que si bien era cierto que ya el elector no residía en la dirección originalmente consignada en la Petición de Inscripción, su actual residente conocía su paradero y la nueva dirección, pues era un familiar inmediato, amigo o persona conocida. En otros, específicamente cuando el elector aparecía inscrito con dirección en un *residencial público* y éste demostró que se mudó *dentro* del mismo residencial, brilla por su ausencia alguna gestión con el administrador, persona a cargo de la asignación y *reubicación* de los residentes en el proyecto. Veamos una muestra característica de estos casos.

1. *RAMÓN REYES HERNÁNDEZ* (*Exhibit* 231).

Su declaración no controvertida y la prueba demostraron que para la fecha de las elecciones de 1988 vivía *temporeramente* en la Calle 25 #508, Puerto Nuevo. Sin embargo, aparecía inscrito en la Calle Bogotá #106, Puerto Nuevo. Fue recusado en la dirección de la Calle Bogotá al señalar el recusador que "[v]isit[ó] esta residencia y no vive, según [l]e informaron". Dado el hecho que la hija del elector residía en esa dirección en aquel entonces, resulta inconcebible e inaceptable la suficiencia de tal gestión.

2. *GLORIA CRUZ TORRES* (*Exhibit* 264).

Se mudó de la Calle 42 #1204, Reparto Metropolitano, donde aparecía inscrita y fue recusada. La única gestión realizada por el recusador fue "visitar". A pesar de ello, tanto su mamá como sus hermanos y su cuñado continuaban residiendo en su antigua dirección. Con una simple pregunta el recusador lo hubiese averiguado y podido notificarle personalmente.

3. *PEDRO FLORES* (*Exhibit* 273).

La prueba demostró que para la fecha de las elecciones de 1988 vivía en el Edif. 8, Apto. #117, Residencial Brisas de Cupey, Río Piedras, pero aparecía inscrito en el Edif. 6, Apto. 85 del *mismo* residencial. La recusación fue diligenciada en esta última dirección. El recusador consignó la gestión siguiente: "Visité esta dirección, elector no reside informó Olga Santiago, vive Doña Ana." Sin embargo, se probó que esta "Doña Ana" resultó ser Ana Colón, a quien el elector en *cuestión conocía personalmente* y quien tenía conocimiento de su nueva dirección.

4. *MARÍA LUISA PÉREZ RODRÍGUEZ* (*Exhibit* 274).

Con su declaración no contradicha y evidencia documental probó que para noviembre de 1988, y durante treinta y siete (37) años, ha residido en la Calle Rafael Lamar Núm. 522, Ext. Roosevelt, Hato Rey. Así aparecía inscrita y allí fue recusada. A pesar de ello, el recusador consignó haber realizado las gestiones siguientes: "con visitas a c/Rafael Lamar #522."

5. *ANA CELIA ARANA HERNÁNDEZ* (*Exhibit* 275).

Probó que para noviembre de 1988, y durante cuarentiocho (48) años, residía en la Calle Fernando Calder #402, Roosevelt, Hato Rey. Allí aparecía inscrita y fue recusada. Aun así, el recusador señaló que visitó "402 Fernando Calder, Roosevelt."

6. *ELEUTERIA ORTIZ FIGUEROA* (*Exhibit* 276).

Se inscribió y fue recusada en el Edif. 38, Apto. 777 del Residencial Luis Lloréns Torres. Para 1983 se mudó al Edif. 119, Apto. 2213 del mismo residencial. El diligenciamiento sólo dice "negativo". Obviamente el recusador no hizo gestión alguna con el administrador del proyecto para conocer su nueva dirección. De haberlo hecho, hubiese podido citarla personalmente.

7. *ÁGUEDA SANTOS CABALLERO* (*Exhibit* 279).

Demostró que durante cincuentiocho (58) años ha residido en el Barrio Monacillos, La Marina, incluso para 'la fecha ·de las elecciones de 1988. Aparentemente fue recusada allí mismo. El diligenciamiento está en *blanco* y no contiene expresión de gestión alguna realizada.

8. *CARMEN LÓPEZ OQUENDO* (*Exhibit* 283).

Su declaración no controvertida y la prueba demostraron que se mudó del Edif. 6, Apto. 53 del Residencial Jardines de Cupey —donde aparecía inscrita y fue recusada— al Edif. 4, Apto. 36 del *mismo* residencial. No existe copia ni constancia de diligenciamiento negativo.

9. *ANDREA BENÍTEZ SANTIAGO* (*Exhibit* 290).

Ha vivido en el Residencial César Cordero Dávila, aproximadamente, por los últimos diecinueve (19) años. Sólo se mudó del Edif. 10, Apto. 77, donde aparecía inscrita y fue recusada, al Edif. 13, Apto. 136. El recusador no hizo gestión alguna con el administrador del residencial, por lo que consignó que "[n]o le pud[o] localizar en esta dirección".

10. *NILDA C. GONZÁLEZ QUIÑONES* (*Exhibit* 297).

Declaró y desfiló prueba de que para noviembre de 1988 residía y aparecía inscrita en la Calle Modena #1897, College Park. Vive en esa dirección hace aproximadamente veintiséis (26) años. Aun así, se le recusó ilegalmente en esta dirección. En su expediente electoral no aparece trámite alguno de recusación o exclusión.

11. *ANTONIA TORRES COLÓN* (*Exhibit* 315).

Su testimonio no contradicho y la prueba desfilada establecieron que, a pesar de que aparecía inscrita en la Calle 54 SE #1149, Reparto Metropolitano, se había mudado a la Calle 42 SE #1221. Se le recusó en su antigua dirección y el recusador alegó que ésta "[n]o vive en esa dirección". Tal gestión resulta insuficiente, pues su hijo era quien permanecía viviendo en la residencia de la Calle 54 SE y fácilmente, de haberlo preguntado el recusador, le pudo haber informado.

12. *GLADYS MELÉNDEZ BORIA* (*Exhibit* 321).

Aparecía inscrita en la Calle Cortijo, Barrio Obrero. Ello a pesar de residir en el Mirador Las Casas para la fecha de las elecciones. Aparentemente fue recusada en la dirección de la Calle Cortijo. Su madre continuaba viviendo en esa dirección y allí la electora recibía toda su correspondencia. No aparece en su expediente electoral diligenciamiento negativo alguno de la recusación.

13. *GERARDO RIVERA OTERO* (*Exhibit* 322).

Su declaración no controvertida y la prueba presentada estableció que se mudó del Edif. 9, Apto. 160, al Edif. 10, Apto. 180 del Residencial Nemesio R. Canales. Se le requirió mudarse de unidad debido a los trabajos de remodelación que se llevaban a cabo en el proyecto. El recusador sólo consignó haber hecho una "visita", sin embargo, no entrevistó al administrador del residencial.

14. *GLORIA MUÑOZ REYES* (*Exhibit* 333).

La prueba y su testimonio reflejaron que para noviembre de 1988, y por treintinueve (39) años, ha residido en la Ave. Américo Miranda #1182, Reparto Metropolitano. Aun así, se le pretendió recusar allí al señalar el recusador que realizó una "visita" a la Ave. Américo Miranda. La ilegalidad de su exclusión es evidente.

15. *ANA TORRES BURGOS* (*Exhibit* 372).

La prueba demostró que para la fecha de las elecciones de 1988 vivía en el Edif. 81, Apto. 832 del Residencial Ernesto Ramos Antonini. Constaba inscrita y fue recusada en el Edif. 16, Apto. 153 del *mismo* residencial. El diligenciamiento negativo señala que el recusador "[v]isit[ó el] Apt. y consult[ó] vecino". Sin embargo, no preguntó al administrador del residencial dónde residía.

D. *Recusaciones nulas por falta de prueba y de notificación*

Además de estos casos, erró el tribunal de instancia al negarse a adjudicar los votos emitidos por varios electores en cuyos expedientes electorales *no existió evidencia alguna del trámite de recusación.*

Los expedientes electorales huérfanos de esta crucial prueba corresponden a los siguientes tres (3) electores:

| Exhibit | Elector | Precinto |
|---|---|---|
| 1. 263 | Justino Lorenzana Colón | 4 |
| 2. 297 | Nilda Consuelo González | 5 |
| 3. 362 | José A. Gavillán Meléndez | 5 |

Ausente esta prueba, el tribunal debió adjudicar estos votos por no existir fundamento alguno en qué sostener presunción sobre corrección administrativa.

Aparte de que *no fueron notificados por correo* de la orden de recusación de la Comisión Local, según disponía la Sec. 2.12 del Reglamento de Recusaciones y Exclusiones, *supra*, los siguientes electores *tampoco fueron incluidos en los edictos* que debieron publicarse acorde con la Sec. 7.1 del susodicho reglamento:

| Exhibit | Elector | Precinto |
|---|---|---|
| 1. 263 | Justino Lorenzana Colón | 4 |
| 2. 276 | Eleuteria Ortiz Figueroa | 1 |
| 3. 279 | Águeda Santos Caballero | 4 |
| 4. 282 | Lourdes M. Rodríguez Ramos | 4 |
| 5. 283 | Carmen López Oquendo | 5 |
| 6. 292 | Ramón González Dávila | 2 |
| 7. 313 | Dolores Guzmán Rivera | 2 |
| 8. 321 | Gladys Meléndez Boria | 2 |
| 9. 330 | Alejandro Santos Caballero | 4 |
| 10. 334 | Víctor Cotto Castro | 4 |
| 11. 373 | Aida Vázquez Casillas | 5 |

Otros electores fueron incluidos *sólo* en el listado del periódico *El Nuevo Día* de 12 de septiembre de 1988, en *violación* a la Sec. 7.1 del mismo reglamento, *supra*:

| Exhibit | Elector | Precinto |
|---|---|---|
| 1. 231 | Ramón Reyes Hernández | 4 |
| 2. 257 | Miguel A. Laureano Santos | 2 |

| Exhibit | Elector | Precinto |
|---------|---------|----------|
| 3. 260 | Leomarys Rivera Murphy | 4 |
| 4. 264 | Gloria Cruz Torres | 4 |
| 5. 271 | Miguel González Villanueva | 104 |
| 6. 289 | Eva Cotto Ayala | 5 |
| 7. 293 | José Andino Báez | 2 |
| 8. 308 | Nereida Rodríguez Mejías | 4 |
| 9. 317 | José Nieves Toro | 4 |
| 10. 322 | Gerardo Rivera Otero | 4 |
| 11. 333 | Gloria Muñoz Reyes | 4 |

Finalmente, *en igual situación* —por haber sido incluidos *únicamente* en el periódico *El Mundo* de 17 de septiembre— se encuentran los electores siguientes:

| Exhibit | Elector | Precinto |
|---------|---------|----------|
| 1. 217 | Milagros Apolinaris López | 5 |
| 2. 229 | Consuelo Rivera Vega | 2 |
| 3. 273 | Pedro Flores | 5 |
| 4. 274 | María Luisa Pérez Rodríguez | 2 |
| 5. 275 | Ana Celia Arana Hernández | 2 |
| 6. 312 | Sixto Miranda Matta | 2 |
| 7. 368 | Zoila González González | 4 |

EN RESUMEN, SEGÚN HEMOS DEMOSTRADO, POR GRAVES OMISIONES, INOBSERVANCIAS E IRREGULARIDADES —EN LA MAYORÍA DE LOS CASOS ACUMULATIVAS— LOS TRÁMITES Y LAS ÓRDENES DE RECUSACIÓN DE LOS ELECTORES QUE ANTECEDEN SON RADICALMENTE NULAS. EL TRIBUNAL DE INSTANCIA INCURRIÓ EN UN INSUBSANABLE ERROR AL NEGARSE A RECONOCERLO ASÍ Y ADJUDICAR EL VOTO DE ESTOS GRUPOS DE ELECTORES, QUE POR SER TAN NUMEROSOS Y FAVORECER A GRANADOS NAVEDO —ASCIENDEN A CINCUENTA Y SIETE (57) VOTOS— HUBIESEN PUESTO FIN, SIN MARGEN DE DUDAS, AL PRESENTE PLEITO DE IMPUGNACIÓN. ANEJO 1.

314

FRENTE A ESTA *REALIDAD EVIDENCIARIA NO CON-TRADICHA*, ¿CÓMO PUEDE LA MAYORÍA TODAVÍA SOSTENER QUE ESTOS ELECTORES NO "PRESENTARON PRUEBA SUFICIENTE ANTE EL FORO DE INSTANCIA PARA REBATIR LA PRESUNCIÓN DE JURISDICCIÓN DE LA C.E.E. EN EL TRÁMITE DE SUS RECUSACIONES, DE REGULARIDAD EN DICHO TRÁMITE Y DE CORRECCIÓN DE SUS DETERMINACIONES DE EXCLUIRLOS DE LAS LISTAS ELECTORALES"? (Énfasis suplido.) Opinión mayoritaria, pág. 36. ANTE ESA INCOMPRENSIBLE CONCLUSIÓN, ESTAMOS CONVENCIDOS QUE TODO EL ESQUEMA DECISORIO EN QUE SE FUNDAMENTÓ *Granados v. Rodríguez Estrada II*, supra, FUE MÁS BIEN PRO FORMA Y UNA FARSA JUDICIAL (*SHAM*). LA OPINIÓN MAYORITARIA DEJA A ESTOS ELECTORES DEMANDANTES INVOLUNTARIOS EN UN "LIMBO JURÍDICO", SIN OPORTUNIDAD ALGUNA DE REDENCIÓN, Y LOS JUZGA CON UNOS CRITERIOS PROCESALES RITUALISTAS Y UNAS EXIGENCIAS PROBATORIAS DOGMÁTICAS NUNCA ANTES VISTA EN LOS TRIBUNALES.

III

*Papeletas con doble marca*

Reafirmamos la posición adoptada en nuestro disenso en *Granados v. Rodríguez Estrada I*, supra. Allí, luego de un análisis riguroso, concluimos que de las quince (15) papeletas con doble marca, trece (13) debían adjudicársele a Acevedo Pérez. Las dos (2) papeletas restantes debieron adjudicársele a Granados Navedo por representar ejemplos clásicos del voto mixto.

El Juez Polo *erró* al adjudicárselas todas a Acevedo Pérez, fundándose en un estudio de patrones de votación en el Municipio de San Juan. No podemos convenir con el criterio mayoritario. LAS CONTIENDAS ELECTORALES SE GANAN Y SE RESUELVEN A BASE DE VOTOS, Y *NO DE ESTADÍSTICAS*.

# IV

*El procedimiento de votar añadidos a mano; normas probatorias; sus efectos*

En cuanto a los electores añadidos a mano, el Juez Polo rechazó la defensa de prescripción levantada por Acevedo Pérez y Báez Galib. Acto seguido, dividió estos casos en categorías y los analizó fáctica y jurídicamente. Luego determinó quiénes tenían derecho a votar. Para fines decisorios, al evaluar las distintas causas de acción, seguiremos en lo posible las mismas categorías.

El procedimiento establecido para votar mediante el sistema de "añadidos a mano" exigía que la persona suscribiera una declaración jurada en la que expresara ser elector con derecho a votar; que fue excluido de las listas "por error atr[i]buible al organismo electoral", y que no había votado antes en esa elección ni lo haría posteriormente. El tribunal de instancia, como expusimos en nuestro disenso en *Granados v. Rodríguez Estrada I*, supra, sostuvo que el trámite de la declaración jurada era de estricto cumplimiento y que su no suscripción impedía la adjudicación del voto. Ciertamente esa omisión es fatal y, debido a la naturaleza estricta del procedimiento, procede que confirmemos en cuanto a ese extremo.(5)

Ahora bien, el Magistrado Polo falló contra la contención de los demandantes involuntarios de que *la omisión de recusar*, esta vez por los funcionarios electorales, convalidaba el voto. Resolvió que no existía un paralelismo entre esta recusación especial y la recusación de carácter general prevista en el Art. 5.031 de la Ley

---

(5) Los electores que *no* suscribieron la declaración jurada fueron:

| Exhibit | Nombre | Precinto |
|---------|--------|----------|
| 1. 080 | Hilda E. Sánchez Alicea | 2 |
| 2. 123 | Gladys Otero Martínez | 1 |
| 3. 250 | Hilda López Malavé | 1 |
| 4. 254 | Adanivia Torres Heredia | 1 |
| 5. 298 | Eduardo Pantojas Betances | 1 |
| 6. 314 | Gloria Ortiz Vázquez | 1 |
| 7. 367 | Olga Hernández Rodríguez | 4 |

Electoral, 16 L.P.R.A. sec. 3234. Razonó que a los electores que votaron añadidos a mano —distinto a aquellos cuyos nombres constaban en las listas— les acompañaba *"una presunción de votantes no hábiles"* por haber sido excluidos de esas listas electorales antes de las elecciones, las que a su juicio constituían la "mejor evidencia". A tal efecto expuso que la "recusación que aquí ocurre, por lo tanto, *no pone en entredicho ni controvierte la presunción* de elector hábil de la persona que iba a emitir su voto añadido a mano, ya que a ésta no le acompañaba la *presunción en ese momento"*. Debido a que el trámite salvaguardaba la acreditación del voto y que "de las propias listas y documentos ante la CEE se desprende la incapacidad del elector que pretende usar el mecanismo", dictaminó que esa recusación era "inconsecuente y supérflua", un acto de "mera formalidad".

Para arribar a la "presunción de votantes no hábiles" —ancla en su análisis— reprodujo y acogió los siguientes pronunciamientos de nuestro disenso:

> Se imponen unas expresiones en materia probatoria. *La ausencia* ("no existe récord") *del nombre de un ciudadano en los impresos del terminal del computador (printout) y demás récord de la Comisión Estatal establece la presunción de que no es un elector cualificado. Igualmente ocurre cuando los récord arrojan un status I (elector inactivo) o cuando no existe evidencia de que se hubiese gestionado una transferencia de precinto o reubicación de unidad electoral.* Definitivamente, el computador genera evidencia susceptible de utilizarse para probar que ocurrió determinado evento como la inscripción, transferencia del elector o solicitud para que se le reactivara o excluyera por recusación u otras razones. También puede considerarse como prueba de que no ocurrió el evento. Regla 65(F), (H) y (J) de Evidencia, 32 L.P.R.A. Ap. IV (Récord del negocio o actividad; Récord e informes oficiales; Ausencia de récord público).
>
> Establecido así el hecho básico de no aparecer en los impresos de los terminales del computador ("no existe récord") o como elector *inactivo* o inscrito en otro lugar, *sería mandatorio inferir que no era un elector cualificado.* Ahora bien, estas presunciones *son controvertibles*. Puede presentarse evidencia —como se hizo en el caso de autos— para refutar o rebatir ese hecho presumido. *Esa*

*evidencia tendría el efecto de evitar que el juzgador hiciera tal inferencia* —Chiesa, *op. cit.*, págs. 39–48— e incluso probar sus cualificaciones como elector con derecho a votar. (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I*, supra, págs. 171–172.

Erró otra vez el ilustrado foro sentenciador. Su análisis debió tomar en consideración, además de la cita transcrita, el lenguaje que a *renglón seguido* explicaba así *la evidencia que refutaba y rebatía la presunción de votantes no hábiles*:

La más sobresaliente es la tarjeta de identificación electoral, documento *oficial* expedido por la Comisión Estatal en virtud de una petición de inscripción. Se introdujo en Puerto Rico como salvaguarda contra la impostura para "implementar, fiscalizar y garantizar el sistema de colegio abierto . . .". *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 288 (1980), opinión concurrente y disidente. *Constituye un requisito indispensable para ejercer el voto.* Es de material plástico. Aparte del nombre y de la fotografía del ciudadano, como datos personales contiene —para la identificación fácil y precisa de su poseedor— la fecha de nacimiento, sexo, color de ojos y estatura. Indica asimismo las fechas de expedición y de expiración, al igual que un número de control y las firmas del Presidente de la Comisión Estatal y del elector. Art. 2.009 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3059. *Conjuntamente con la expedición de esa tarjeta, la Comisión Estatal "preparará una tarjeta de archivo con la fotografía del elector, la cual contendrá por lo menos, los mismos datos que la tarjeta de identificación".* Íd. *Cuando se expide un duplicado de la tarjeta, así ésta lo indica.*

*Además de acreditar fehacientemente la capacidad potencial del ciudadano para votar, es igualmente evidencia de que el elector ha ejercitado antes el derecho al voto*, pues así mandatoriamente se consigna en la perforación de los números 1 y subsiguientes que aparecen en su extremo inferior correspondientes a cada evento comicial. Dicha perforación produce en el material plástico una forma gráfica o figura distinta que identifica por separado cada una de las votaciones en las que su poseedor participó.

Tomamos *conocimiento judicial* de las distintas figuras con que se han perforado los números 1, 2 y 3 en las tarjetas de identificación electoral en las últimas tres (3) elecciones: (1) 1980, un trébol de cuatro hojas; (2) 1984, un corazón, y (3) 1988, un diamante. En síntesis, aunque la posesión de la tarjeta de identificación electoral

no da necesariamente derecho a votar, *si es evidencia prima facie de que su poseedor goza de esa capacidad y que ha ejercido ese derecho en determinados eventos comiciales.* (Énfasis suplido, en el original y escolio omitido.) *Granados v. Rodríguez Estrada, I,* supra, págs. 172–173.

Fueron claros nuestros pronunciamientos y hoy los reafirmamos. Ya desde el 20 de octubre de 1988, en nuestra opinión concurrente en *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra, págs. 521–522, habíamos indicado que las "listas electorales debidamente depuradas *son meramente un instrumento fehaciente más* —útil y principal— para canalizar y hacer viable administrativamente el desarrollo del complicado proceso eleccionario en todo el país. Por imperativo de la magnitud y complejidades del evento son imprescindibles". (Énfasis suplido.) Allí, al rechazar la posición del Presidente de la Comisión Estatal de que un elector que "no está en la lista, no puede votar", dijimos: *"La interpretación es irrazonablemente incompleta.* Eleva a categoría sacramental un *medio* documental. Convierte las listas en *sinónimo* de inscripción y cualificación electoral. El enfoque es erróneo. No hay equivalencia conceptual ni valorativa en qué sostener ese restrictivo razonamiento." (Énfasis suplido y en el original.) Íd., pág. 522. Igual sucede con la interpretación del ilustrado foro de instancia: *es incompleta.* Como veremos, la extendió erróneamente al evaluar los casos de los electores inactivos.

El sistema de "añadidos a mano" requería la presentación de la T.I.E. y su incautación por los funcionarios de colegio. Por esta razón, si un elector no la poseía no podía acogerse al mismo. Si la poseía, la entregaba y suscribía la declaración jurada y votaba. De ese modo, la "presunción de votantes no hábiles" configurada por el tribunal de instancia —basada sólo en que el nombre del elector no aparecía en la lista oficial preimpresa— quedaba *rebatida* en ese momento en virtud de dicha tarjeta, por ser ésta "evidencia *prima facie* de que su poseedor goza[ba] de esa capacidad [derecho a votar] y que ha[bía] ejercido ese derecho en determinados eventos comiciales". Si añadimos que la declaración exponía afirmativamente, bajo juramento y so pena de perjurio, que era un elector cualificado, cualesquiera dudas al respecto se desvanecían.

De ahí la necesidad de que el funcionario suscribiera *una recusación*. Contrario a la conclusión del foro de instancia, ese trámite era esencial y necesario, y no "inconsecuente y supérfluo". Esta realidad nos obliga con mayor vehemencia a examinar los méritos de los reclamos de los electores clasificados como inactivos.

## V

*Electores inactivos*

Esta clasificación de electores se descompone en los que no votaron en el 1980 (I1) y los que no votaron en el 1984 (I2). Para evaluar sus derechos, el tribunal de instancia nuevamente se fundó en la existencia de una "presunción de corrección" de la determinación administrativa de la Comisión Estatal. Se fundamentó en que "[t]oda persona que reúna las condiciones para ser elector y que interese ejercitar sus derechos electorales tiene la obligación de *inscribirse* y *adquirir una tarjeta de identificación electoral* conforme lo dispuesto en est[a ley]". (Énfasis suplido.) Art. 2.002 de la Ley Electoral, *supra*. Expuso correctamente que, conforme nuestra jurisprudencia, el requisito de inscripción era necesario y razonable, compatible con la celebración de una elección pura y libre de fraude. Como límite a ese requisito declaró que el Estado no podía imponerle al elector *"condiciones de difícil cumplimiento o exigencias que menoscaben su derecho al voto o desalienten su ejercicio"*. (Énfasis suplido.)

Como contraparte de esa obligación ciudadana, señaló el deber de la Comisión Estatal de crear un "procedimiento de depuración de las listas electorales posterior a todo evento electoral". Advertimos, pues, que el hecho básico en que descansó la presunción de corrección de las listas electorales impresas fue el *proceso de depuración* efectuado por la Comisión Estatal con posterioridad a las elecciones de 1984. Es ineludible, pues, que describamos ese proceso administrativo.

Al respecto, la prueba en instancia reflejó que "si el nombre de un votante estaba *impreso* en las listas electorales [de 1984], pero

el encasillado correspondiente a su firma estaba en blanco, por no haberlo firmado, o tenía consignada la expresión 'no votó' escrita por un funcionario electoral del [c]olegio concernido, *automáticamente* la Comisión Estatal *excluía* dicho nombre del Registro del Cuerpo Electoral y subsiguientemente le daba el *status* de *inactivo*. Esta eliminación *rutinaria* respondía a su vez, al supuesto prescrito en el Art. 2.012 de la Ley Electoral, 16 L.P.R.A. sec. 3062, de que '[s]*i un elector dej*[*a*] *de votar en una elección general su nombre será excluido de las listas electorales*'". (Énfasis suplido.)

El proceso de depuración de 1984 comenzó en la J.I.P. con las listas impresas utilizadas en los colegios el día de las elecciones. En esa junta se identificaban quiénes no habían votado, utilizando como fundamento la omisión de la firma o la expresión "no votó" en el encasillado correspondiente. Esa información se vaciaba en unos formularios y se remitía a la Oficina de Sistema de Información y Procesamiento Electoral (O.S.I.P.E.) de la Comisión Estatal. Allí se archivaba inicialmente. Una vez eran investigados, se confecciona la lista ALPHA-ISLA de los que *no votaron*.

Subsiguientemente, se identificaban los electores que votaron añadidos a mano, se cotejaban contra la lista Alpha-Isla anterior *preimpresa* y, si aparecían en esta última, se dejaban en el Registro General de Electores. De lo contrario, se les eliminaba. Surge, pues, que la Comisión Estatal partió de la premisa de que el elector que votaba añadido a mano, con tarjeta electoral, si su nombre no apareció en las listas *no estaba legalmente inscrito*. A su vez, esa premisa estaba predicada en que las listas preimpresas eran perfectas.

ESE TRÁMITE FUE ILEGAL: EL ART. 2.012 DE LA LEY ELECTORAL, 16 L.P.R.A. sec. 3062, SÓLO AUTORIZABA LA EXCLUSIÓN DE LAS LISTAS *"SI UN ELECTOR DEJABA DE VOTAR"*. Lógicamente, quienes votaron en las elecciones de 1980 y 1984 AÑADIDOS A MANO, Y SE LES CONVALIDÓ EL VOTO, NO PODÍAN SER EXCLUIDOS. EL ASERTO MAYORITARIO de que en esos casos "la Ley Electoral dispone la inscripción o reinscripción del elector en tal *status*" (opinión

mayoritaria, pág. 41) es totalmente incorrecto. ¿DÓNDE ASÍ SE DISPONE?

Además, el trámite seguido por la Comisión Estatal CONS-TITUYE *UN EVIDENTE CÍRCULO VICIOSO*, ya que igual trámite se siguió con los electores que votaron añadidos a mano en las elecciones del 1980. EL RESULTADO DE ESTE PROCESO ES QUE A SUS ESPALDAS SE CLASIFICÓ I1 E I2 A NUMEROSOS ELECTORES Y, *SIN NOTIFICACIÓN DE CLASE ALGUNA*, SE LES IMPUSO EL DEBER DE QUE REALIZARAN UNA INSCRIPCIÓN ESPECIAL. Ello contrario a lo resuelto en *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 244, en que rechazamos como inaceptable la tesis de imponer al elector, como deber, la "curiosidad de averiguar" su *status* electoral, "pues colocaría siempre sobre el elector, y nunca sobre el Estado, la obligación de supervisar el trámite administrativo de la Comisión Estatal de Elecciones".

Para salvar esta flagrante violación constitucional, la mayoría ha tenido que articular la tesis de "notificación *implícita*". Bajo la misma, la circunstancia de haber tenido que votar añadido a mano fue "suficiente para alertarlo de su obligación de reactivar su *status* electoral mediante los trámites disponibles para ello". Opinión mayoritaria, pág. 41. En su verdadero sustrato, la teoría de "notificación *implícita*" no es otra cosa que una modalidad de la tesis desacreditada en *P.P.D. v. Admor. Gen. de Elecciones*, supra, sobre el deber de "curiosidad de averiguar" un elector su *status*. ES INACEPTABLE.

Y es que, debido a esa falta de notificación, para estos electores DE NADA VALIÓ que la Comisión Estatal creara el 6 de octubre de 1988 la *Solicitud de Inclusión por Omisión*, la cual estuvo en vigor hasta el 4 de noviembre de 1988. De acuerdo con la misma, el elector era incluido en las listas si demostraba que había llevado a cabo una transacción electoral dentro del cuatrienio. Además, si figuraba como I2 y mostraba su tarjeta de identificación electoral perforada en el Núm. 2, se realizaba una nueva búsqueda en las listas de votación de 1984. Si aparecía que había votado según la lista preimpresa o la lista de electores

añadidos a mano —y su nombre figuraba impreso en las listas oficiales o su nombre y demás circunstancias estaban en las listas oficiales de votación de 1984— se tramitaba su ingreso en la Lista de Inclusión por Omisión y se remitía copia del expediente de investigación a la J.I.P.

A BASE DE LA PREMISA ERRÓNEA ANTES REFERIDA, EN AUSENCIA DE OTRA EVIDENCIA LA COMISIÓN ESTATAL LE MANTUVO LA CLASIFICACIÓN DE I2 A LOS ELECTORES CUYA SOLA EVIDENCIA FUE LA T.I.E. COMO RESULTADO DE ESE PROCEDER, SE DIÓ LA SITUACIÓN DE QUE PERSONAS QUE VOTARON BAJO EL PROCEDIMIENTO DE "AÑADIDOS A MANO" DURANTE LAS ELECCIONES DE 1980 Ó 1984, Y CUYOS VOTOS FUERON ADJUDICADOS EN TALES COMICIOS —POR HABER SIDO EXCLUIDOS ERRÓNEAMENTE DE LAS LISTAS PREIMPRESAS CORRESPONDIENTES A ESAS DOS ELECCIONES— TAMBIÉN QUEDARON FUERA DE LAS LISTAS DE 1988.

NO HUBO NINGÚN TIPO DE NOTIFICACIÓN, FUERA PERSONAL, POR CORREO O POR PRENSA, A LOS ELECTORES ASÍ EXCLUIDOS. Véase *Exhibit* 202, 207 y 377. La exclusión del elector y su clasificación como inactivo fue adoptada por la Comisión Estatal tomando solamente como criterio que el encasillado del elector estuviera en *blanco* o contuviera la expresión *no votó* en las *listas preimpresas*. Dicho organismo no tomó en cuenta ni confirmó por otro medio, incluso al citar al elector, si en realidad había votado válidamente mediante el sistema de "añadidos a mano" que se implantó para las elecciones de *1980* en los Colegios Especiales denominados "F1". Éstos fueron creados por la propia Comisión Estatal para superar las exclusiones indebidas en las listas preimpresas de aquella época. Véase *P.S.P. v. Com. Estatal de Elecciones*, supra. Se recordará que esos Colegios Especiales se autorizaron por la Comisión Estatal para superar "la falla técnica, *aceptándose la presentación de la tarjeta de identificación electoral* o copia de una petición de inscripción

*como indicativo de la idoneidad del elector".* (Énfasis suplido.)
*P.S.P. v. Com. Estatal de Elecciones,* supra, pág. 424.

Es obvio que en la depuración de las listas para el 1988 la Comisión Estatal no consideró que en las elecciones de 1984 *también se les permitió votar añadidos a mano a los electores que no aparecían en las listas electorales preimpresas.* En este aspecto es orientadora la Resolución de 7 de octubre de 1988 del Presidente de la Comisión Estatal, licenciado Rodríguez Estrada (CE-88-026), que en lo pertinente concluyó:

> Para el cuatrienio de 1984, la C.E.E. permitió *adicionar en manuscrito los nombres de electores,* a las listas electorales *cuando éstos no aparecían en las mismas.* Según los datos que se nos han suministrado, se *adicionaron* a las listas electorales aproximadamente *5,324 electores.* Posteriormente se encontró que, de la cifra mencionada, 5,224 electores estaban en las listas electorales, así como, de los restantes 124 electores, *cien (100) no tenían asiento electoral asignado, por lo que presumiblemente ejercieron el derecho al voto sin estar cualificados para ello lo cual, de haber ocurrido, es impropio y afecta la pureza del proceso electoral.* (Énfasis suplido y escolio omitido.) Págs. 5–6.

Las autorizaciones para votar a los electores que no aparecían en las listas de las elecciones de 1980, 1984 y 1988 han respondido a la innegable realidad de que siempre se ha reconocido que no existe un Registro General de Electores perfecto. *LAMENTABLEMENTE, POR DIVERSAS RAZONES ATRIBUIBLES A LA COMISIÓN ESTATAL, SE HAN EXCLUIDO ELECTORES CUALIFICADOS DE LAS LISTAS OFICIALES PREIMPRESAS.*

Las cifras oficiales aludidas en la transcrita resolución nos indican claramente que en las elecciones de 1984 unos cinco mil doscientos veinticuatro (5,224) electores votaron añadidos a mano con su T.I.E. perforada, porque no aparecieron en las listas oficiales *preimpresas.* Sólo el reducido número de cien (100) no tenían un asiento electoral asignado. No obstante, se les excluyó sin que se diseñara un procedimiento de notificación previa. La depuración de las listas se fundamentó en el cuestionable y poco confiable criterio de que no aparecía firmado el encasillado del

elector en las listas preimpresas de 1980 y 1984. Aun ante un sistema tan poco confiable, el tribunal de instancia sostuvo que esos electores excluidos de las listas tenían el deber de inscribirse nuevamente mediante una Petición de Inscripción Especial, oportunidad que se extendió hasta el 19 de septiembre de 1988. Esa obligación supuestamente descansó en la campaña publicitaria y los edictos publicados por la Comisión Estatal antes de las elecciones.

Hemos examinado meticulosamente el contenido de la costosa campaña de orientación desplegada por la Comisión Estatal en radio, prensa y televisión para las elecciones de 1988. Surge claramente del texto de los anuncios que la campaña perseguía que se inscribieran las personas que no votaron en 1984, los que se mudaron de residencia, los que fueron recusados y excluidos por domicilio y no hicieron transferencia a tiempo, y los nuevos electores. Además, orientaba sobre el voto ausente y los colegios de fácil acceso. EN NINGÚN MOMENTO HEMOS PODIDO DETECTAR QUE LA *CAMPAÑA DE INSCRIPCIÓN* ESTUVIERA TAMBIÉN DIRIGIDA A ORIENTAR EXPRESAMENTE A LAS PERSONAS QUE EN 1984 VOTARON MEDIANTE EL PROCEDIMIENTO DE ELECTORES "AÑADIDOS A MANO", A LOS EFECTOS DE QUE TENÍAN QUE INSCRIBIRSE POR HABER SIDO EXCLUIDOS DE LAS LISTAS ELECTORALES.

*LA SITUACIÓN ES CRÍTICA.* No fue hasta el 12 de septiembre de 1988 que la Comisión Estatal publicó en un periódico de circulación general "el listado [sic] final de los electores excluidos de las listas durante el cuatrienio [1984–1988]", esto es, escasamente una *semana antes de que venciera el término para inscribirse.* Más aún, publicó una lista adicional el 17 de septiembre —cuarenta y ocho (48) *horas antes*— *Y NO INCLUYÓ EN ELLA A ESTOS ELECTORES.*

A pesar de la falta de notificación personal o de algún otro modo, una vez estableció tan frágil "presunción de corrección", el Juez Polo concluyó que para refutarla la tarjeta electoral, contrario a las listas preimpresas, no constituía la mejor evidencia.

Plasmó su criterio de que las perforaciones indicativas de una participación en las elecciones de 1980 y 1984 *no eran confiables*, pues las perforadoras, con diseños idénticos, estaban disponibles en el mercado y, además, existían como material sobrante oficial después de cada elección. En otras palabras, el tribunal de instancia devaluó el valor probatorio de la T.I.E. y sugirió que las perforaciones en las tarjetas oficiales pertenecientes a los electores-testigos y demandantes eran fraudulentas. *Y TODO ELLO SIN DESFILARSE UN ÁPICE DE PRUEBA INDICATIVA DE QUE ESOS ELECTORES LAS POSEYERAN ILEGAL-MENTE O LAS HUBIERAN PERFORADO ILÍCITAMENTE.*

*MEDIANTE ESTE RAZONAMIENTO EL TRIBUNAL DE INSTANCIA Y AHORA LA MAYORÍA DE ESTE TRIBU-NAL OLVIDAN QUE EL FRAUDE NO SE PRESUME.* Ade-más, no toman en cuenta el hecho *no* contradicho de que la emisión de una T.I.E. *antes* de 1985, o sea, las emitidas por la Comisión Estatal para las elecciones de 1980 y 1984, sólo se expedían cuando la petición de inscripción del elector era "vali-dada por la Comisión Local". Véase Comparecencia del Comisio-nado P.P.D. licenciado Báez Galib, Caso Núm. AC-88-571, *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra. Conforme a esta admisión, a lo sumo, el razonamiento del ilustrado foro de instancia de que la tarjeta electoral era prueba secundaria tenía que limitarse a aquellas expedidas a partir de 1985. En cuanto a las anteriores, repetimos, las mismas fueron expedidas al *validarse la petición de inscripción.* Además, debemos añadir que las listas electorales de 1980 no estuvieron disponibles como prueba para los electores demandantes, pues fueron *decomisadas* por la Comisión Estatal.

En conclusión, cometió un grave error el tribunal de instancia al resolver que la T.I.E. perforada en los espacios correspondien-tes a 1980 y 1984, no era evidencia para acreditar si un elector había votado en cualquiera de esos dos pasados eventos. La razón dada de que en el mercado existían perforadores con diseños idénticos y que, además, éstos siempre faltaban después de utilizarse en los colegios electorales, constituyó una inferencia

irrazonable de fraude, sin fundamento alguna en la prueba, impuesta sobre todos esos electores.

Insistimos, la apreciación del Juez Polo es errónea, porque no tomó en cuenta que las listas electorales de 1980 no estaban accesibles como evidencia, pues fueron decomisadas por la propia Comisión Estatal. Por lo tanto, para determinar si una persona había votado o no en ese año, *no podía exigir esa prueba*. Para hacer cumplida justicia tenía que descansar en la T.I.E. y en el testimonio del propio elector. Para esos fines la tarjeta tenía un valor probatorio mayor que el conferido. *DE HECHO, HASTA EL 1985 LA TARJETA SÓLO SE ENTREGABA UNA VEZ LA COMISIÓN LOCAL VALIDABA LA PETICIÓN DE INSCRIP-CIÓN*. Fue a partir de 1985 que la propia Comisión Estatal adoptó la norma de entregársela al elector al instante de inscribirse. En consecuencia, las T.I.E. expedidas *antes* de 1985 presuponen una petición de inscripción válidamente aceptada por la Comisión Local. A MENOS QUE SE DESFILARA PRUEBA DE QUE LA TARJETA PRESENTADA POR EL ELECTOR FUE FAL-SIFICADA O QUE ESTABA ILEGALMENTE PERFORADA, EL TRIBUNAL ESTABA IMPEDIDO DE DESCARTARLA Y RELEGARLA A UN SEGUNDO PLANO PROBATORIO. Los demandados Acevedo Pérez y Báez Galib no presentaron eviden-cia para demostrar estos extremos. *SUBSISTE, PUES, LA PRESUNCIÓN DE QUE LAS TARJETAS EXPEDIDAS EN O ANTES DE 1984 FUERON EN VIRTUD DE UNAS INSCRIP-CIONES VALIDADAS Y QUE LOS ELECTORES VOTARON EN LAS ELECCIONES QUE GRÁFICAMENTE INDICABAN SUS TARJETAS.*

Incurrió en un *error fundamental* el tribunal de instancia —y la mayoría de este Foro— al no tomar en cuenta, en ausencia de prueba de falsificación, alteración o uso fraudulento, la T.I.E. debidamente perforada. La misma constituía prueba con sufi-ciente valor probatorio como para destruir la presunción de corrección de las listas electorales, cuya depuración, según indi-camos antes, estuvo limitada simplemente a la ausencia de la firma del elector en las listas preimpresas de 1980 y 1984.

Hemos de recalcar que las tarjetas expedidas *antes* de 1985 conllevaban simultáneamente una validación de la Petición de Inscripción del elector. El error de la ilustrada sala de instancia equivale, a modo de analogía, a negarle existencia a una persona real y viva, nacida en Puerto Rico y poseedora de un certificado de nacimiento que consta en un documento antiguo, por no aparecer inscrita en el Registro Demográfico.

Aclarados estos extremos, analicemos detenidamente los casos de electores clasificados como *Inactivos* por la Comisión Estatal y a los cuales el tribunal de instancia y la mayoría de este Foro se han negado a reconocerles sus votos por el simple hecho de que en las listas electorales de 1984 apareció consignado "no votó" (I1), aun cuando sus testimonios no contradichos fueron a los efectos de que habían votado en esos comicios y en 1980 (I2), y sus T.I.E. estaban *debidamente perforadas*.

*EN AUSENCIA DE FALSIFICACIÓN O FRAUDE DICHA TARJETA, UNIDA A SUS TESTIMONIOS, CONSTITUYE PRUEBA ROBUSTA Y CONVINCENTE EN ABONO DE SUS RESPECTIVOS RECLAMOS, SUFICIENTE PARA DERROTAR UNA "PRESUNCIÓN DE CORRECCIÓN ADMINISTRATIVA".* ADEMÁS, NO HAY EVIDENCIA DE QUE ESTOS ELECTORES FUERAN OFICIALMENTE NOTIFICADOS POR LA COMISIÓN ESTATAL DE ESAS CLASIFICACIONES ADMINISTRATIVAS.

También, incluimos los casos de varios electores que el tribunal sentenciador se negó a adjudicar sus votos por el fundamento de que no tenían récord (NR) en la Comisión Estatal. En total ascienden a treinta (30) electores. Expongámoslos.

1. *JOSÉ A. DÍAZ MELÉNDEZ (Exhibit 88).*

El tribunal determinó:

Testificó que para las elecciones del 1980 votó con otra tie; la prueba en su expediente electoral, sin embargo, contiene una declaración jurada de 1980 que refleja que para esas elecciones votó sin tie. Señaló que para 1980 apareció en las listas electorales, mas no recuerda si las firmó. Para 1984 votó añadido a mano a las listas electorales. Como única transacción que hiciere previo a aquellas

elecciones fue que se le expidió la tie 1679920 el 17 de octubre de 1984. En aquella ocasión el caso fue referido para investigación a la oficina del Secretario de la CEE, mas no se localizó allí documento alguno que activara el récord del elector. Declaró haberse enterado que no estaba en las listas electorales de 1988, pero no hizo ninguna gestión para habilitarse como elector. Ello unido a que la parte demandante no trajo prueba suficiente para refutar su [*status*] nos conducen a concluir que debe prevalecer la determinación que hiciere la CEE en torno a este elector. Caso Núm. CE-90-389, Apéndice I, pág. 207.

Erró el tribunal. Este elector prestó testimonio. Al votar bajo el procedimiento de "añadidos a mano" en el Precinto 5, Unidad 19, suscribió la declaración jurada y entregó su T.I.E. perforada en el lugar correspondiente para las elecciones de 1984 y 1988. La Junta Especial no adjudicó su voto, porque el impreso del computador (*printout*) reflejaba un *status* I1, esto es, que *no había votado en las elecciones de 1980.*

Sin embargo, entre los documentos sometidos como evidencia hay una declaración jurada para votar, según fue autorizado, sin T.I.E. suscrita el 4 de noviembre de *1980* y refrendada por los funcionarios del colegio al cual acudió a votar en ese año. Posteriormente compareció ante la Comisión Estatal, la cual le expidió una T.I.E. para las elecciones de 1984. En la hoja de trabajo relacionada con el contenido del expediente de este elector, al lado de la foto y el año "1984", se indica que "[n]o se localizó documento activando el récord del elector. Sí aparece foto del 1984 lo que indica que debe existir un documento oficial" para ese año. Debe adjudicarse su voto.

2. *FUNDADOR MORALES MONTAÑEZ (Exhibit 89).*

ESTE CASO ILUSTRA ELOCUENTEMENTE EL CRITERIO RESTRICTIVO DEL JUEZ POLO Y EL DE LA MAYORÍA. La prueba documental y testifical demostró que era un ELECTOR CUALIFICADO (A1) con derecho a VOTAR.

Por estar recluido unos días en presidio, había sido autorizado a votar como confinado, pero a la fecha de las elecciones había salido. Se le explicó que debía ir a votar antes a determinado sitio. No lo hizo, pues se le pasó la fecha "por esta[r] *trabajando y . . .*

ten[er] 'problemas en la calle'". (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 91. Acudió entonces a votar al colegio *donde siempre había votado*. Allí, aunque los funcionarios que le atendieron le indicaron que aparecía que debía haber votado *como confinado*, lo *autorizaron* a ejercerlo mediante el sistema de "añadidos a mano".

No obstante su *idoneidad* como elector A1, el Juez Polo y la mayoría del Tribunal se niegan a reconocerle el derecho al voto. El único fundamento consignado de que el procedimiento de "añadido a mano" no estaba disponible para ese elector es absurdo. EN OTRAS PALABRAS, LO PENALIZAN Y LE EXIGEN QUE DEBIÓ REGRESAR AL ESQUEMA DE VOTACIÓN PROPIO DE LOS CONFINADOS. NO PODEMOS CONCURRIR CON SEMEJANTE CONCLUSIÓN. ¿DÉ QUE LE VALIÓ SU LIBERTAD? LA PRUEBA DEMOSTRÓ QUE MORALES MONTAÑEZ NO VOTÓ EN NINGÚN OTRO SITIO. ¿POR QUÉ CASTIGARLO DE ESE MODO? DEBE ADJUDICARSE SU VOTO.

3. *MARÍA M. VEGA RIVERA (Exhibit 90).*

El tribunal determinó:

El expediente electoral de la Sra. Vega Rivera refleja que posee dos números electorales. Para el primero, #1988024, suscrito mediante Petición de [I]nscripción del 24 de junio de 1979, tiene un [*status*] electoral de I1. El testimonio de la electora corroboró dicho dato al señalar que no votó en las elecciones de 1980. El segundo número electoral, #2965184, (y con el que votó), corresponde a una Petición de [I]nscripción del 18 de septiembre de 1983 que no se procesó por la *incongruencia* habida entre el nombre en el encasillado del documento (Milagros) y la firma de la peticionaria (María M. Vega).

*Aparentemente* la Sra. Vega Rivera fue notificada de dicho error ya que se le expidió la TIE bajo ese número el 6 de noviembre de 1984, el mismo día de aquellas elecciones. La electora testificó haber votado *sin* tarjeta electoral para esos comicios; testimonio que nos resulta increíble. Refuta su testimonio el que su TIE no esté perforada en el número 2 —correspondiente al año 1984 y el que la parte demandante *no* proveyó la lista oficial de votantes de 1984 que reflejara que la Sra. Vega Rivera ejerció su franquicia electoral.

(Poseería pues un [*status*] de I2). Aparte y además de ésto, el hecho de que esta electora *adviniere en conocimiento* previo a las elecciones de 1988 de que *no* estaba inscrita en las listas (por visita que hiciera a la JIP) mas no hiciera nada para subsanar su [*status*], demuestra que de una u otra forma no era electoral [sic] hábil para participar en los pasados comicios. La CEE actuó correctamente al no adjudicar su voto. (Énfasis suplido y en el original.) Caso Núm. CE-90-389, Apéndice, pág. 81.

La inferencia del tribunal de que "aparentemente" a esta electora se le notificó de alguna deficiencia en su *status* electoral no tiene fundamento en la prueba. *Esa notificación no surge del propio récord de la Comisión Estatal.* Ella poseía una T.I.E., documento oficial expedido por la propia Comisión Estatal cuando un elector acude ante dicho organismo para activar o comenzar su historial electoral. Ello es totalmente incompatible con la clasificación "no récord" (NR). Debe adjudicarse su voto.

4. *MARÍA E. LÓPEZ HERNÁNDEZ (Exhibit 99).*

Conforme su expediente electoral y su testimonio, se inscribió originalmente en 1978 con dirección en la Calle Nueva, Bda. Israel, y se le expidió la T.I.E. Núm. 1750179. Después, gestionó otra petición de inscripción el 21 de enero de 1980 con nueva dirección (Calle Nueva, Núm. 177, Bda. Israel) y se le expidió *otra* tarjeta el 11 de agosto de 1980. Fue con esta última tarjeta que votó en las elecciones de 1980, 1984 y 1988. Se presentó como evidencia la lista de electores del Precinto 2, Unidad 25, Colegio S-1 de 1984 —única disponible— en que aparece que votó añadida a mano con el número electoral 1750179. Testificó a esos efectos y que votó en la Escuela Israel.

Esta prueba revela que la señora López Hernández votó en las elecciones de 1980 y 1984 en la Escuela Israel, por lo que su *status* electoral no podía ser I1 ni I2. La Comisión Estatal erró al excluirla por estar *duplicado* el número electoral 1750179. Bajo este número fue que votó en el 1984. En consecuencia, tenía pleno derecho de votar en las elecciones de 1988 y su voto debió ser adjudicado.

5. *DANIEL CARABALLO REYES* (*Exhibits* 101 y 895).

Este elector compareció a prestar testimonio. Votó en el Precinto 5, Unidad 19, mediante el procedimiento de "añadidos a mano", debido a que para las elecciones de 1984 no aparecía en listas electorales. Sin embargo, su *testimonio* demostró que había votado el 1980 y 1984. La declaración jurada suscrita por este elector el 4 de noviembre de 1980, fecha en que se celebraron las elecciones generales en este año, es evidencia fehaciente de que votó en el 1980. Esa declaración jurada se complementaba el día de las elecciones en el colegio o unidad donde el elector estaba inscrito para votar. Es incompatible, pues, con el *status* de I1.

Demostró que el 14 de octubre de 1984 se le expidió una nueva tarjeta, lo cual constituyó una nueva inscripción que lo habilitó para votar en el 1984. Aun si asumimos que para octubre de 1984 estaba válidamente excluido de las listas electorales por no haber votado en el 1980, la nueva tarjeta constituyó una transacción electoral que lo rehabilitó.

*El hecho de que la Comisión Estatal hubiera asignado su número electoral erróneamente a otra electora, no debió privarle de su legítimo derecho al voto.* En ausencia de una exclusión posterior, su voto es válido y debe adjudicarse. Al votar en 1988, suscribió una declaración jurada e incluyó sus papeletas y la T.I.E. debidamente perforada en el 1984 y 1988, y expedida por la Comisión Estatal el 14 de octubre de 1984. Se sometió la lista electoral correspondiente al colegio donde participó en las elecciones de 1984 e identificó su firma. Es incomprensible el hecho de que haya acudido en octubre de 1984 ante la Comisión Estatal y que ésta no le haya mantenido su *status* como elector activo. Erró el tribunal de instancia al no reconocerle su derecho al voto.

6 y 7. *FRANCISCO SALICH MARTÍNEZ* (*Exhibit* 105), y *MARTHA VERA VÉLEZ* (*Exhibit* 106).

Sobre estos dos electores el tribunal determinó:

Ambos tramitaron una Solicitud de [T]ransferencia posterior a mudarse y previo a las elecciones de 1980. Ambos señalan haber votado en 1980 en el Colegio San Ignacio, mas no recuerdan si sus nombres aparecían impresos en las listas electorales para aquella

ocasión. En el 1981 se mudaron dentro de la misma urbanización, sin embargo, no hicieron esta vez ninguna transferencia electoral ante la CEE. Declararon haber ido a votar en el 1984 al mismo colegio (San Ignacio). La única evidencia presentada por el demandante fue la Lista Oficial Suplementaria de 1984 de dicho colegio (*[Exhibit]* #894) que demuestra que ambos votaron añadidos a mano; ello de por sí no restituye la capacidad electoral de estas personas. Obró correctamente la CEE al no adjudicar sus votos. Caso Núm. CE-90-389, Apéndice I, pág. 212.

Erró el foro sentenciador. Nos explicamos. Francisco Salich Martínez prestó testimonio. Votó en las pasadas elecciones de 1988 mediante el procedimiento de "añadidos a mano", pues su nombre no aparecía en las listas electorales. Suscribió la declaración jurada y depositó su T.I.E. y la autorización. La Junta le denegó su derecho al voto porque, aparentemente, era un elector clasificado como I1, esto es, que no había votado en las elecciones de 1980.

Testificó que votó en las elecciones de 1980 y 1984, lo que fue corroborado con la T.I.E. perforada en los espacios correspondientes. Se presentó como evidencia la lista de 1984 para el Precinto 5, Unidad 28, Colegio Suplementario, y el elector identificó su firma. Se trata de un elector cualificado cuyo voto debe adjudicarse.

Por su parte, Martha Vera Vélez también compareció a declarar. Al igual que el caso anterior, votó bajo el procedimiento de "añadidos a mano", firmó su declaración jurada y depositó su T.I.E. La Comisión Estatal denegó su derecho al voto, porque aparecía como electora clasificada I1 (o sea, que no había votado en las elecciones de 1980). Declaró que participó en las elecciones de 1980 y 1984. Ofreció como evidencia la lista correspondiente a las elecciones de 1984, Precinto 5, Unidad 28, Colegio Núm. S–1, e identificó su firma. Su T.I.E. aparece debidamente perforada en los espacios correspondientes a las elecciones de 1980, 1984 y 1988. Probó que es una electora cualificada cuyo voto debió adjudicarse.

Valga aclarar que en ausencia de una recusación válida por residencia (ER), el haberse mudado dentro de la misma urbanización no constituyó impedimento para votar.

8. *MARÍA A. LORENZO ALONSO (Exhibit 107).*

En 1980 fue a la Comisión Estatal a gestionar el voto. El expediente de la Comisión Estatal dice: "Copia tarjeta de datos. Se encontró documentos en casos problemas del 1984. *Estas transacciones nunca entraron al sistema.*" Nacida en España de padre puertorriqueño, no tenía que naturalizarse, pues recibió la ciudadanía EE.UU. por derecho propio. Tiene el mismo nombre que su hermana, pero ella es *María Aracelis* Lorenzo Alonso. No se procesó la solicitud de inscripción, porque se creía que faltaban documentos de naturalización. En las elecciones de 1984 votó y presentó documentos. No se le notificó la exclusión. *Demostró ser electora idónea.*

9. *LUIS ROSARIO VÉLEZ (Exhibit 108).*

Su T.I.E. aparece perforada en los Núms. 1, 2 y 3, lo que demuestra que votó en las últimas tres (3) elecciones. Para 1984 y 1988 votó en la misma escuela. Su *status* es I1 por aparentemente no haber votado en 1980. Aparece una Petición de Inscripción de 6 de julio de 1980 con todos los datos llenos, incluso la correspondiente certificación de funcionarios. No obra la notificación de exclusión en su expediente. *Se debe adjudicar su voto.*

10. *JOSÉ ANTONIO LLINÁS TORRES (Exhibit 129).*

Este elector posee dos (2) clasificaciones electorales, una como I2 (esto es, que no votó en las elecciones de 1984) y la otra A1 (esto es, elector hábil para votar). Estas dos (2) clasificaciones responden a que el 4 de septiembre de 1983 le fue expedida una T.I.E. (Núm. 2900031) con *status* A1, y la segunda (Núm. 2491548) expedida el 2 de septiembre de 1984. La tarjeta Núm. 2900031 aparece perforada para el 1984 y la segunda para el 1988.

Esta prueba rebatió la presunción de corrección administrativa en que se fundamentó el tribunal de instancia para negarle su derecho al voto.

## 11. *MARÍA V. BORGOS LEÓN* (*Exhibit* 134).
El tribunal determinó:

Señaló que en las elecciones de 1980 votó en el Colegio de Cupeyville sin tie y que su nombre aparecía impreso en las listas electorales. [P]ara 1984 votó en ese mismo colegio. El hecho de que no apareciere en las listas electorales en esa elección le pareció extraño y le preocupó, sin embargo, no hizo gestión alguna entre 1984 y 1988 para cotejar su [*status*] electoral. No fue sino hasta que un comisario de barrio de su partido le advirtió que tenía problemas ante la CEE y que debía ir a verificar su [*status*] que la Sra. Borgos, decidió visitar al organismo electoral. Su testimonio fue un tanto ambiguo. Primero señaló haber ido en varias ocasiones a la CEE, pero debido a que había mucha fila no hizo trámite efectivo alguno. Luego declaró que a pesar de ser advertida de su incapacidad electoral, no hizo nada a esos efectos. Bajo una u otra versión, la electora era consciente de su [*status*] problemático y optó por la inacción. La prueba aportada por la parte demandante, i. e., Lista Oficial (Suplementaria) de 1984 P005 V012 CS1 Colegio Cupeyville ([*Exhibit*] #900) nada aporta para habilitar el [*status*] de la Sra. María Borgos. Obró correctamente la CEE al no adjudicar este voto. Caso Núm. CE-90-389, Apéndice I, pág. 212.

Erró el foro de instancia. El testimonio de la señora Borgos León demostró que votó en las pasadas elecciones de 8 de noviembre de 1988 en el Precinto 5, Unidad 12, mediante el procedimiento de electores "añadidos a mano", debido a que su nombre no aparecía en la lista electoral. La Comisión Estatal rechazó su voto por el fundamento de que aparecía con una clasificación I1, esto es, que no había votado aparentemente en 1980 y que no aparecía con récord de foto, o sea, con T.I.E. Sin embargo, produjo evidencia de la lista electoral correspondiente a las elecciones de 1984 donde había firmado.

De igual forma, presentó evidencia de que obtuvo su T.I.E. el 17 de octubre de 1984 en la Comisión Estatal (Núm. de Control 0421604). Esta electora participó en las elecciones de 1984 y acudió ante la Comisión Estatal a mantener activo su *status* electoral. Es una electora cualificada cuyo voto debió adjudicarse.

12. *LAURA BORGOS LEÓN* (*Exhibit* 135).

El tribunal determinó:

[A]l igual que su hermana, en el 1980 votó en el Colegio Cupeyville sin tie. Señaló que previo a las elecciones de 1984 sacó su tie (expedida el 17 de octubre de 1984). Declaró que en el 1984 no tuvo problemas al votar, recuerda con *claridad* que su nombre estaba impreso en las listas. Testificó que en las elecciones de 1988 es cuando *único* ha tenido inconvenientes al votar. El [*Exhibit*] #900 refuta lo señalado por la testigo. Además, esta lista de por sí no constituye prueba suficiente para rehabilitar el [*status*] electoral de la Sra. Borgos. Obró correctamente la CEE al no adjudicar su voto. (Énfasis en el original.) Caso Núm. CE-90-389, Apéndice I, págs. 212–213.

Incidió el tribunal sentenciador. Esta electora declaró y demostró que también votó en las pasadas elecciones de noviembre de 1988 en el Precinto 5, Unidad 12, cumpliendo con el procedimiento para votar "añadidos a mano". La Comisión Estatal denegó su voto debido a que aparecía como electora con clasificación I1, o sea, que no había votado en las elecciones de 1980 y no aparecía con T.I.E. Produjo evidencia de que para el 1984 acudió ante la Comisión Estatal, donde le expidieron una T.I.E., y que participó en las elecciones de 1984. Identificó su firma en la lista. Su tarjeta aparece perforada en los espacios correspondientes a las elecciones de 1984 y 1988.

Igual que el caso anterior, la Comisión Estatal informó que las listas electorales de 1980 no estaban disponibles porque habían sido decomisadas. De los propios documentos de la Comisión Estatal se desprende que esta electora acudió en 1984 ante dicho organismo y se le expidió, como señaláramos anteriormente, la T.I.E. Obviamente, esta electora realizó las gestiones para mantenerse activa y su voto debió adjudicarse.

13. *HILDA M. GONZÁLEZ HERRERA* (*Exhibit* 137).

La T.I.E. aparece perforada en el espacio correspondiente a las elecciones de 1984 y votó añadida a mano. No recordó cómo votó en 1980. En 1984 se inscribió en la J.I.P. situada en el San José Shopping Center y le enviaron la tarjeta. Su expediente tiene una nota que dice "TIE expedida 16 oct. 1984". No le fue notificada la exclusión. *Se debe adjudicar su voto.*

14. *ARMANDO CANTINO CASTELLUCCIO* (*Exhibit* 223).

Este elector tiene *status* I2. Declaró que votó en 1980 y 1984 en la misma escuela. Al votar en 1988 entregó una Solicitud de Inclusión por Omisión. Aunque el original no está en su expediente de la Comisión Estatal, hay una referencia a dicho documento. Su tarjeta no fue perforada. *Se debe adjudicar su voto.*

15. *HILDA M. LÓPEZ MALAVÉ (Exhibit* 250).

Tiene un *status* I1. Aparecía en la lista de inclusiones. La T.I.E. aparece perforada tres (3) veces. En 1984 votó añadida a mano. Existe una discrepancia en el número de su T.I.E. expedida el 23 de octubre de 1979 y la lista. En su expediente no hay notificación de que fue excluida. Erró la Comisión Estatal.

16. *OMAIRA GIANNILIVIGNI* (*Exhibit* 266).

Aparecía con *status* NR. En 1984 no pudo votar. Aparece inscrita con la dirección: Ponce de León 1416. Su nombre estaba incorrecto en la T.I.E. y en la lista electoral. Fue a la J.I.P. más o menos tres (3) veces antes de las elecciones para cerciorarse de que no iba a tener problemas para votar en 1988 como los tuvo en 1984.

Surge que su Petición de Inscripción de 7 de septiembre de 1984 no se procesó al aparecer otro elector con el número que le asignaron a ella. No le permitieron votar en 1984. El expediente refleja un error administrativo, pues se le asignó el mismo número electoral a otra persona.

17. *JUAN NORIEGA HERNÁNDEZ* (*Exhibit* 267).

El tribunal determinó:

Este elector posee una TIE #0903521 que corresponde a una Petición de [I]nscripción suscrita el 9 de septiembre de 1983. Se observa que el encasillado referente a la fecha y sitio de naturalización de dicho documento está incompleto. Ni del expediente electoral ni del testimonio del Sr. Noriega Hernández se desprende que la CEE notificara tal omisión. Es por ello que para las elecciones de 1984 tuvo que votar añadido a mano en las listas oficiales del P003 U003 de San Juan. ([*Exhibit*] #270). En esta lista, a su vez, se observa que el elector es oriundo de Cuba, lo que nos induce a concluir también que fue la falta de documentos acreditativos de su ciudadanía americana lo que causó que su

Petición *no* fuera tramitada. A[u]n así, este elector se mudó previo a las elecciones sin tramitar una solicitud de transferencia o reubicación. No visitó las oficinas de la CEE entre 1984–88. Es un elector ER que no tenía a su alcance el procedimiento para votar añadido a mano en las elecciones pasadas. Actuó correctamente la CEE al no adjudicar su voto. (Énfasis en el original.) Caso Núm. CE-90-389, Apéndice I, pág. 83.

Incidió el foro de instancia. Aun cuando según la Comisión Estatal este elector no tenía récord electoral, él tramitó una Petición de Inscripción el 4 de septiembre de 1983 (Núm. 2903521) y se le expidió una T.I.E. Esa realidad objetiva es incompatible con la certificación de la Comisión Estatal. En ausencia de un procedimiento válido de recusación en su contra, no podía el tribunal, postelecciones de 1988, excluirlo por razón de residencia (ER). Su voto debe adjudicarse.

18. *JESÚS MALDONADO COTTO* (*Exhibit* 285).

El tribunal determinó:

Señaló que tanto en 1980 como en 1984 votó en la Escuela Sofía Rexach sin problema alguno ya que aparecía en las listas electorales. La prueba aportada para este elector refuta su testimonio, debido a que *fue añadido a mano a las Listas de Votantes* de 1984 ([*Exhibit*] #286). Tampoco aporta nada en beneficio de rehabilitar su derecho a votar para 1988. El Sr. Maldonado testificó no haber hecho gestión alguna entre 1984–1988 para reactivar su [*status*]. Obró correctamente la CEE al no adjudicar su voto. (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 213.

Este elector fue eliminado de las listas electorales por supuestamente no haber votado en 1980. Sin embargo, su tarjeta está perforada en los espacios correspondientes a 1980, 1984 y 1988. Testificó a esos efectos. Su voto también debió adjudicarse.

19. *IRIS M. CÁCERES ÁLVAREZ* (*Exhibit* 288).

Fue eliminada de las listas electorales por supuestamente no haber votado en 1984. No obstante, su tarjeta está perforada en los espacios correspondientes a 1984 y 1988. Ella testificó que votó en las elecciones de 1984 y, además, en las Primarias Presidenciales de 1988. Su voto debió adjudicarse.

20. *ALTAGRACIA DE LOS SANTOS RODRÍGUEZ* (*Exhibit* 295).

Tiene *status* I1. Actuó como funcionaria de colegio en 1980 y 1984. No recuerda si votó en los mismos colegios donde trabajaba. Su tarjeta fue expedida el 10 de octubre de 1979 y está perforada en los espacios correspondientes a 1980, 1984 y 1988. No hay evidencia en su expediente de notificación oficial de exclusión. Su voto debe adjudicarse.

21. *MARÍA DE L. ENGLAND COLÓN* (*Exhibit* 362).

El ilustrado tribunal de instancia, con criterio restrictivo, determinó:

> [E]sta electora testificó que votó en las elecciones de 1980 sin problema alguno; su nombre estaba impreso en las listas electorales. Cabe señalar que la tie de la Sra. England *no* está perforada para esas elecciones. Declaró que no votó en la elecciones de 1984 por encontrarse en los E.U. La votante señaló que en el 1985 visitó las oficinas donde previamente se había retratado para inquirir donde tenía que votar en el 1988 y si podía votar. Señala que hizo tal gestión porque entre 1980 y 1985 se había mudado de residencia. Ella no le explicó al funcionario que *no* había votado en el 1984, por lo que él le indicó que podía votar en donde había votado previamente. Aparentemente por haber sido su visita en fecha tan cercana a las elecciones de 1984, aún las listas electorales *no* se habían depurado, por lo que la electora aparecía todavía en el Registro del Cuerpo Electoral. Al no alertar al funcionario de que no votó en 1984, no había manera de que éste se percatara de que era electora inactiva. No nos merece credibilidad la versión que relatara la testigo de que el funcionario le dijo que votara donde votó en *1980* y no donde votó en *1984*, si verdaderamente ella *no* le dijo que *no* votó en el 1984. Posterior a ésto, no hizo ninguna otra gestión para habilitar su [*status*] electoral. Obró correctamente la CEE al excluir el voto de la Sra. England Colón. (Énfasis en el original.) Caso Núm. CE-90-389, Apéndice I, pág. 214.

Esta determinación no tiene apoyo en la prueba. La electora demostró que, si bien no votó en 1984, hizo gestiones afirmativas posteriores para actualizar su *status* electoral. De manera no contradicha declaró:

P. Doña María, ¿usted no votó en el 1984?

R. No señor.

P. ¿Por qué usted no votó en el 1984?

R. Porque yo tuve que salir para Estados Unidos en una emergencia de un hijo mío que tuvo un accidente de carro.

P. Oh. ¿Cuándo fue que usted estuvo fuera?

R. En el transcurso de junio del 84' y vine en el 85'.

P. ¿Cuándo en el 85'?

R. En julio . . . .junio del 85'.

P. Entre junio del 85' y noviembre del 1988, ¿usted fue a la Comisión Estatal d[e] Elecciones? ¿Fue a una Junta de Inscripción Permanente?

R. Yo fui donde saqué la foto para ver dónde me tocaba votar en las próximas elecciones.

P. ¿Cuándo fue eso?

R. Eso fue en el 85' para 86'.

P. Del 85' para el 86'. ¿Y usted fue dónde?

R. Ahí, en el centro donde me saqué la foto.

P. ¿Dónde es eso?

R. En Barrio Obrero.

P. ¿Y qué le dijeron? ¿Le dijeron algo?

R. Yo les expliqu[é] el porqu[é]. Ellos me preguntaron si había votado; yo les dije que no y les expliqué el porqu[é]. Entonces me dijo que fuera donde me tocara votar donde había votado anteriormente en el 80'.

P. ¿Y quién le dijo eso?

R. El nombre no lo recuerdo. Un señor allí en las oficinas.

P. ¿El estaba trabajando ahí?

R. Sí señor.

P. ¿Cómo usted sabe que estaba trabajando ahí?

R. Pues, porque estaba en su escritorio.

P. ¿Y tenía una computadora en el escritorio?

R. Sí señor.

P. ¿Y [é]l buscó su nombre en esa computadora?

R. El simplemente me dijo eso y me fui.

P. ¿Y le dijo que fuera a votar . . .?

R. Donde había votado en las pasadas elecciones del 80'.

P. ¿Dónde fue que usted votó en el 80'?

R. En la Escuela Federico Asenjo de Barrio Obrero. Vol. 45, págs. 152–153.

Obviamente esta electora cumplió con su obligación de ir a la J.I.P. a informar que no había votado en 1984. Una vez ella brindó

esa información a los funcionarios, éstos tenían la obligación de tramitarle una nueva inscripción. Ese requisito, por ellos conocido, era el único compatible con el deseo de ella de poder votar en las elecciones de 1988. Si los representantes de la J.I.P. no la orientaron debidamente ni le tramitaron una nueva inscripción, no puede ser razón válida en derecho para confiscarle su voto. Debe adjudicársele.

22. *JESÚS HERNÁNDEZ ORTIZ (Exhibit 309).*
El tribunal determinó:

Declaró que la primera vez que votó fue en el 1976. Cree haber votado en el 1980 y que de haberlo hecho, votó con su tie. Señaló no recordar si para las elecciones del 1984 su nombre estaba impreso en las listas, o si por el contrario, votó añadido a mano. Para aquella fecha él vivía con sus tres hermanos y su padre. Curiosamente las listas electorales de 1984 ofrecidas en evidencia (*[Exhibits]* 310 y 311) reflejan a *todos* los hermanos votando y firmando al lado de sus nombres impresos en las listas, mas el nombre del Sr. Hernández Ortiz está ausente de las mismas. Testificó no recordar si se enteró previo a las elecciones de 1988 que estaba excluido de las listas electorales; sin embargo, declaró que fue a la CEE varias veces a hacer gestiones. Sus alegadas gestiones *no* se reflejan *ni* en su expediente electoral *ni* en el impreso del computador bajo su nombre y número. *Lo único que consta en su récord electoral es una relación de Solicitud de [I]nclusión por [O]misión recibida en la secretar[í]a de la CEE bajo su nombre.* Ello no es suficiente para convalidar su derecho al voto en los pasados comicios. Obró correctamente la CEE al no adjudicarle su voto. (Énfasis suplido y en el original.) Caso Núm. CE-90-389, Apéndice I, pág. 213.

La prueba revela que su tarjeta, con el número electoral 1626035, fue expedida el 29 de agosto de 1984 y está perforada en los espacios correspondientes a 1984 y 1988. Ello constituye evidencia de que desde esa fecha en adelante estaba hábil para votar. Testificó, además, que votó en 1980. Se trata de un elector cuyo voto debió adjudicarse.

23. *LUZ E. CRUZ CARMONA (Exhibit 327).*
El tribunal determinó:

Declaró que en las elecciones de 1980 apareció en las listas electorales, pero que en las de 1984 votó añadido a mano. Las partes

estipularon la Lista electoral del 1984 (P104 U014 C51) en que aparece su nombre añadido a mano. Esta lista no constituye evidencia suficiente para controvertir su [*status*] de electora inhábil. Cabe recalcar la falta de interés de esta persona que teniendo conocimiento de que tenía problemas con su voto, fue dos veces a la CEE previo a las elecciones de 1988: en la primera ocasión la CEE estaba muy *llena,* ella no quizo esperar y se fue; en la segunda ocasión, llegó tarde, *el local estaba lleno,* le dijeron que no la podrían atender de inmediato por haber otras personas en turno y le señalaron que volviera luego. La Sra. Cruz Carmona nunca regresó. Obró correctamente la CEE al no adjudicar su voto. (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 213.

Esta electora fue excluida de las listas electorales por la Comisión Estatal por no haber votado en 1980. Sin embargo, su tarjeta está perforada en los espacios correspondientes a 1980, 1984 y 1988. Testificó haber votado en 1980. La electora estaba hábil para votar en 1988 y su voto debió adjudicarse.

24. *MARÍA MALDONADO VÉLEZ (Exhibit* 328).

Aparecía con *status* I2. Declaró que votó en 1984. No recuerda haber hecho gestión alguna antes de las elecciones de 1988. En la lista de 1984 está preimpreso su nombre, pero no aparece su firma. Hay una nota que dice que no votó. La inscripción data de 1975 y su tarjeta de 1980. Su T.I.E. está perforada para las elecciones correspondientes a 1980, 1984 y 1988. *Debe adjudicarse su* voto.

25. *JUANITA VÁZQUEZ MÉNDEZ (Exhibit* 332).

El tribunal determinó:

Señaló que para el 1988 y 1984 votó en la Escuela José Padilla; para 1980 votó (en otra escuela) en el área de Country Club. No recuerda si en 1984 y 1980 firmó las listas electorales. Ninguna lista electoral de 1984 se ofreció en evidencia —incumplió la parte con el peso de prueba exigídole para refutar el [*status*] que le diera la CEE a esta electora. Debe prevalecer en consecuencia la determinación hecha por la CEE. Declaró la Sra. Vázquez que previo a las elecciones de 1988 visitó las oficinas de la CEE (agosto o septiembre); allí le informaron que no había votado en el 1984. *Llenó un formulario para corregir su status.* Consta en su expediente una Solicitud de [I]nclusión por [O]misión que presumiblemente es el

documento señalado por la electora. Testificó la votante que regresó a las oficinas de la CEE el 19 de septiembre de 1988, única fecha que recuerda con claridad, y allí le informaron que el día de las elecciones votara añadido a mano. Curiosamente para el 19 de septiembre de 1988, aún no se había aprobado el mecanismo de añadidos a mano que le fuera recomendado utilizar a esta electora. (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 207.

Es evidente que el tribunal de instancia, a pesar de reconocer que esta electora gestionó a tiempo su inclusión, se negó a darle crédito. Se fundamentó en que el 19 de septiembre de 1988 en la Comisión Estatal le indicaron que votara añadida a mano, fecha en que todavía no se había aprobado dicho sistema.

Al hacerlo, el ilustrado foro pasó por alto que ese procedimiento, si bien no estaba aprobado oficialmente a esa fecha, había sido utilizado en las primarias presidenciales previas. No desmerece, pues, su testimonio la posibilidad de que fuera orientada de ese modo al acudir a la Comisión Estatal. Debió adjudicarle su voto.

26. *PROVIDENCIA HERNÁNDEZ ACEVEDO* (*Exhibit* 640).

Según el tribunal, su *status* era I2.

Señaló que en las últimas 2 elecciones (1980 y 1984) había votado en la Escuela Gautier Benítez; no recuerda si para el 1984 firmó las listas electorales. Se presentó en evidencia el [*Exhibit*] #909 — Lista oficial de votantes (suplementaria) de 1984 para el P002 (Bo. Obrero) que refleja al lado del nombre impreso del elector un "no votó". La electora acudió *una semana* antes de las elecciones a "la Placita" porque aparecía como que no había votado. *No la atendieron y se cansó de esperar*. Señala, sin embargo, que cuando llevó *dos retratos le hicieron firmar unos papeles*. Consta en su expediente electoral una Solicitud de [I]nclusión por [O]misión del 2 de noviembre de 1988. Debió tramitar una Petición de [I]nscripción especial cuya fecha límite ya había pasado. (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 86 esc. 53.

Nuevamente el foro de instancia incidió al no reconocer el derecho al voto a esta electora. Ella acudió una semana antes (1ro de noviembre) a gestionar su derecho al voto. "No la atendieron."

Regresó, llevó los retratos, le expedieron la tarjeta y la incluyeron en la lista.

27. *RAMÓN D. ÁLVAREZ SANTIAGO (Exhibit 893).*

El Juez Polo excluyó a este elector por haber realizado el trámite tardíamente. Indicó:

> Posee un [*status*] de ER (0164621), recusado en el 1984. Consta en su expediente electoral una Petición de [I]nscripción —del 3 de noviembre de 1988—; fecha en la cual se le expidió la TIE (3288711) con la cual votó. El [*Exhibit*] #048, documento que contiene al lado del nombre del Sr. Santiago escrita la siguiente nota: "aparece en listado inclusión a mano de la Unidad y Precinto 104 y también en listado de inclusión de secretaría". Ello de por sí no refleja nada ni nos conduce a acreditar el derecho al sufragio de este elector. Caso Núm. CE-90-389, Apéndice I, págs. 86–87 esc. 53.

Erró. Hay prueba de que Álvarez Santiago fue autorizado a votar por el Presidente de la Comisión Local del Precinto 104 en la Unidad 4. En su expediente obran cuatro (4) consultas electorales con *status* A3, esto es, ingresado por nueva inscripción. Debió adjudicarse su voto.

28 y 29. *NORBERTO MEDINA PELLICIER (Exhibit 896),* y *MARÍA VECCHINI LUGO (Exhibit 898).*

A ambos electores la Comisión Estatal y el ilustrado tribunal los descalificó por no haber votado en las elecciones de 1984 (I2). Al respecto dicho foro determinó:

> Ambos tramitaron una Solicitud de [R]eubicación en el registro en julio de 1984 de College Park a Mil[l]aville. Declararon *no* haber tenido problemas para votar en aquella ocasión. Sin embargo, la Lista Oficial de Votantes (Suplementaria) de 1984 del P005 U CS1 correspondiente al Colegio Comunal de la Urb. Millaville refleja el nombre impreso de estos electores y un "no votó" al lado. No se produjo prueba suficiente por la parte para rebatir el [*status*] de inactivo que les diera la CEE. Obró correctamente el organismo electoral al excluirlos de las listas y no adjudicar sus votos. (Énfasis en el original.) Caso Núm. CE-90-389, Apéndice I, pág. 211.

Erró. Estos dos (2) electores testificaron que votaron en 1984 en el Colegio de College Park porque así lo indicaron. El hecho de votar quedó confirmado con sus tarjetas debidamente perforadas.

En ausencia de fraude sobre la perforación ilegal de dichas tarjetas, debió el tribunal de instancia reconocerles sus votos.

30. *CARLOS BUDET FERRER (Exhibit* 904).

Este elector, con *status* I2, no votó en 1984. Sin embargo, desde octubre de 1988 solicitó, y el día 5 de noviembre de 1988 tramitó, una *Solicitud de Cambios en el Registro* (Núm. 543819). Se le expidió una T.I.E. nueva Núm. 1622875. Era un elector hábil y su voto debió adjudicarse.

## VI

*Papeletas con iniciales al dorso*

El Juez Polo confirmó la nulidad decretada por el Presidente de la Comisión Estatal de las papeletas con iniciales al dorso de treinta y nueve (39) electores-testigos, bajo el fundamento de que las instrucciones impartidas en los colegios por los funcionarios del P.P.D. y P.N.P. fueron correctas y claras, y que no les indujeron a error. Se apuntaló en el valor del voto secreto y en las directrices mayoritarias expuestas en *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra. Allí la mayoría resolvió que, como de la papeleta surgía la irregularidad (iniciales), recaía sobre el elector el peso de demostrar que *actuó de buena fe y que fue inducido a error por orientación confusa de los funcionarios de colegio. Incidió.*

Igual error comete la mayoría del Tribunal que también reduce su análisis a una simple ecuación jurídica ajena al elemento humano e impone un criterio de rigor absoluto. Opinión mayoritaria, págs. 23–27. "Nunca hay que alejar la vida de la ley, de la ley de la vida. El sentido de justicia es el sustento permanente de las actividades humanas." N. Amílcar Cipriano, *El sentido de justicia y la vida,* 1986-D Rev. Jur. Arg. La Ley 953 (1986). Olvidan que el carácter secreto del voto tiene como único propósito asegurar la inviolabilidad del libre albedrío del elector. Dicho de otro modo, es para protegerlo de las influencias extrañas. *¿Cuáles fueron esas aquí? Ninguna.* También advertimos que el marco teórico en el que descansó la determinación de nulidad del tribunal de instancia, al igual que los fundamentos esgrimidos, fue y es inadecuado,

erróneo y poco justiciero. Y es "que interpretar la ley en suma, es analizar la vida misma". Amílcar Cipriano, *supra*, pág. 954. Nos explicamos.

EN PRIMER LUGAR, EN TÉRMINOS DEL DEBIDO PROCESO DE LEY, EL MAL DE FONDO ADMINISTRATIVO DE LOS COMICIOS NUNCA FUE CURADO. NI *ANTES* DE LAS ELECCIONES NI *DURANTE* EL PROCESO DE VOTACIÓN ESTOS ELECTORES FUERON ADVERTIDOS DE LAS CONSECUENCIAS DE NULIDAD QUE CONLLEVABA *PONER SUS INICIALES* EN LAS PAPELETAS. De hecho, el Art. 1.003(36) de la Ley Electoral, 16 L.P.R.A. sec. 3003(36), sólo clasificaba ese tipo de marca como papeleta *protestada*, a distinción de una papeleta nula *ab initio. DESPUÉS* de las elecciones, cientos de estos electores nunca fueron formal y oficialmente notificados —por ningún modo— de la nulidad decretada por la Comisión Estatal ni tuvieron la oportunidad de defender sus votos. ES INCONCEBIBLE, PUES, QUE LA MAYORÍA ADUZCA QUE "TAMPOCO ESTOS ELECTORES SOLICITARON INTERVENIR COMO PARTES EN EL PLEITO". (Énfasis suplido.) Opinión mayoritaria, pág. 27. Ese estado de indefensión subsistió ante el tribunal de instancia. También injustificadamente este Tribunal lo ha mantenido. No siguió con ellos el mismo esquema de "emplazamiento judicial" delineado en *Granados v. Rodríguez Estrada II*, supra, aunque fuera reducido al mínimo de una convocatoria general mediante edictos en los periódicos del país.

Es por ello que no tiene valor persuasivo la conclusión del juez de instancia fundamentada en que le pareció inexplicable que sólo cuarentiún (41) electores que pusieron sus iniciales en el dorso de la papeleta comparecieran a testificar. Aparte de otras posibles razones atribuibles a cada caso en particular, *PASÓ POR ALTO QUE A ESOS ELECTORES NUNCA SE LES NOTIFICÓ LA ANULACIÓN DE SUS VOTOS NI SE LES CONVOCÓ.* Es lógico suponer que tal desconocimiento fue decisivo. Repetimos, este Tribunal no incluyó a esos electores en el mecanismo de notificación mediante avisos periodísticos. El mandato de

*Granados v. Rodríguez Estrada II*, supra, sólo estuvo dirigido a los mil doscientos treinta y dos (1,232) electores "añadidos a mano". Nada se hizo para remediar esta situación. ¿Por qué la diferencia en el trato?

Ahora bien, aun partiendo de la premisa de la corrección de la norma adoptada mayoritariamente por este Tribunal en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, tendríamos que concluir que el Juez Polo erró al aplicarla. Veamos.

A la luz de la prueba desfilada, el tribunal de instancia coincidió con Granados Navedo en que estos electores-testigos "*actuar[o]n de buena fe*, entendiéndose este concepto como la 'creencia o persuasión de que el *acto realizado es lícito y justo*'". (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 22. Al respecto afirmó que "[l]o cierto es que el testimonio de la mayoría de los electores no demostró que éstos al estampar sus iniciales en la papeleta, *actuaran de mala fe con el ánimo de violar la secretividad del voto . . .*". (Énfasis suplido.) Íd., pág. 23. ESTA CONCLUSIÓN SIGNIFICA, COMO *VERDAD COMPRO-BADA*, QUE LOS ELECTORES AL PONER SUS INICIALES LO HICIERON *POR ERROR SIN INTENCIÓN ALGUNA DE IDENTIFICARSE NI VIOLAR LA SECRETIVIDAD DE SUS VOTOS.*

No obstante esta prueba, confirmó la nulidad de treinta y nueve (39) votos al determinar que no fueron "inducidos" a error por la orientación confusa de los funcionarios al impartir las instrucciones. Para ello se apoyó en los testimonios de los mismos votantes, los funcionarios electorales del P.N.P. y P.P.D. de los colegios donde ocurrió el problema, y de treinta y un (31) funcionarios del P.P.D. de colegios donde no hubo esta anomalía. Dictaminó "que las instrucciones impartidas en este incidente fueron claras y no confusas" y que "los *errores* cometidos por los electores fueron producto única y exclusivamente de problemas latentes atribuibles a cada uno de los votantes". Caso Núm. CE-90-389, Apéndice I, pág. 24.

En abono de esa apreciación citó casos específicos de electores que no escucharon, que malinterpretaron o que no entendieron las

instrucciones: (1) por su *condición* (sordera relativa); (2) por no tener completo dominio y entendimiento del idioma español; (3) por no atender las instrucciones individuales o grupales, bien por ser distraídos o debido a circunstancias particulares tales como actuar con prisa, tener pendientes responsabilidades, preocupaciones, compromisos u obligaciones; (4) por indiferencia o poca importancia que prestaron al proceso, y (5) por falta de entendimiento o sentido común inherente a cada elector.

Se apoyó en unos cómputos para demostrar la corrección de las miles de instrucciones brindadas en los colegios. Su argumento de mayor peso fue que de un universo tan grande de 215,977 electores en San Juan, sólo un .166047% incurrió en ese error en la papeleta municipal.

Para sustentar su posición recurrió, además, a un somero análisis del verbo *inducir*, atribuyéndole únicamente la acepción que lo define como la acción de instigar o persuadir, que por su significado contiene un elemento volitivo o querido. Al así razonar, descartó la acepción —admitida en la definición de María Moliner—(6) carente del elemento intencional. Y es que la acción de "[h]acer incurrir a alguien en un error" no necesariamente implica un acto engañoso o doloso, deliberado o premeditado. M. Moliner, *Diccionario de Uso del Español*, Madrid, Ed. Gredos, 1967, T. II, pág. 122. Así lo confirma el propio *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 768, expositivo de que *inducir* también significa "mover a uno" a realizar determinada cosa o acción.

Sin lugar a dudas el lenguaje utilizado por los funcionarios, por no ser uniforme y totalmente claro, causó confusión en un número limitado de electores. El propio juez sentenciador aceptó que "las instrucciones impartidas no fueron un dechado de

---

(6) "Tiene, a diferencia de 'incitar', significado perfectivo, es decir, que la acción termina con el logro de su objeto. (1) Hacer con *consejos*, promesas, amenazas, etc., que alguien realice cierta acción: 'La falta de trabajo le indujo a emigrar'. (V.: 'Poner en el caso de, EMPUJAR, IMPELER, LLEVAR, MOVER. GANCHO. ACONSEJAR. ANIMAR. AZUZAR. CONVENCER. IMPULSAR. INCITAR.) (2) Hacer incurrir a alguien en un error, engaño, pecado, tentación o cosa semejante: 'Eso puede inducir a error'." M. Moliner, *Diccionario de Uso del Español*, Madrid, Ed. Gredos, 1967, T. II, pág. 122.

uniformidad". Caso Núm. CE-90-389, Apéndice I, pág. 36. Como resultado, se infringió la norma establecida en la Regla 25 del Reglamento Oficial de las Elecciones Generales de 1988, pág. 15 (en adelante Reglamento de Elecciones de 1988), preceptiva de que la Comisión Local tenía la responsabilidad de que el adiestramiento de los funcionarios fuera "uniforme". ¿A qué se debió esta lamentable situación? La evidencia demuestra que la fuerza que movió al elector a escribir sus iniciales al dorso de la papeleta fue la utilización de un lenguaje inapropiado.

La misma sentencia lo explica. El magistrado Polo señaló que la Regla 36 del Reglamento Oficial de las Elecciones Generales de 1984, pág. 33 (en adelante Reglamento de Elecciones de 1984) —precursora de la de 1988— exponía que los funcionarios debían brindar al elector la siguiente *instrucción específica*:

> Al doblar la papeleta en la caseta de votación asegúrese que *las iniciales al dorso de las mismas* queden hacia fuera en forma visible. (Énfasis suplido.)

SE OBSERVA QUE ESTA INSTRUCCIÓN NO CUALIFICABA NI ACLARABA *CUÁLES* INICIALES AL DORSO DEBÍAN QUEDAR VISIBLES. ESA INSTRUCCIÓN *SE OMITIÓ* EN LAS ELECCIONES DE 1988. *TAMPOCO SE APROBÓ OTRA INSTRUCCIÓN OFICIALMENTE*. La forma de cómo el elector debería doblar la papeleta quedó sólo plasmada en la Regla 41B(6) del Reglamento de Elecciones de 1988, como parte de las obligaciones que tenían que velar los funcionarios de colegio. Esta obligación quedó así configurada:

> *Una vez haya votado, pero antes de salir de la caseta de votación, el elector doblará las papeletas electorales con varios dobleces de manera que ninguna parte del frente de ellas quede expuesta a la vista, asegurándose que las iniciales de los inspectores del colegio al dorso de éstas queden visibles.* Inmediatamente después de terminar con esta operación, saldrá de la caseta y *en presencia de los inspectores del colegio procederá a mostrar las iniciales al dorso de las papeletas y depositará la papeleta estatal* y municipal en las urnas debidamente identificadas a estos fines. (Énfasis suplido.) Regla 41B(6) del Reglamento de Elecciones de 1988, pág. 41.

Confrontado con la falta de esta instrucción, el Juez Polo concluyó que "[l]os funcionarios electorales, *muchos de los cuales tenían la experiencia previa de haber trabajado en otros comicios, se vieron precisados a ofrecer aquellas instrucciones que a su mejor entender llenaban el vacío creado por la enmienda a la Regla 36".* (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, págs. 35–36.

Ya en nuestra opinión disidente en *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, págs. 22–23, habíamos anticipado:

[E]s materia susceptible de conocimiento judicial que en estas elecciones —en un número no determinado de colegios de votación— los funcionarios instruyeron a los electores sobre la forma de doblar las papeletas antes de depositarlas en las urnas. Básicamente, las referidas instrucciones fueron a los efectos de que los votantes, al doblar las papeletas, se aseguraran de que las iniciales quedaran en la parte exterior de las mismas. Ello se debió a que ni en el reglamento, como tampoco en el Manual se incluyó una instrucción específica sobre este particular. Tampoco se consignaron en las papeletas de votación tales instrucciones. Menos, se hicieron advertencias a los electores de que no escribieran nombres o iniciales en las papeletas, bajo pena de nulidad.

Obviamente, la *instrucción no fue uniforme.* Al brindarse un lenguaje distinto correspondiente a cientos de inspectores de colegios, *ad hoc, el potencial de desinformación y confusión se incrementó. Es razonable concluir que en un universo tan amplio de electores —de diversa extracción social y cultural, en ciertos casos con limitaciones físicas y mentales, y algunos nerviosos— un número indeterminado las malinterpretaran y creyeran que debían iniciar las papeletas antes de depositarlas en las urnas.* (Énfasis en el original suprimido y énfasis suplido.)

Con el beneficio de un examen cuidadoso de la prueba, la cuestión amerita un análisis judicial *sereno y objetivo.*

*SABIDO ES QUE EL IDIOMA POSEE, ENTRE SUS MÚLTIPLES ELEMENTOS, LA POSIBILIDAD DE RESULTAR AMBIGUO.* Esto es, las palabras no siempre informan directa e inequívocamente. En esos casos ocurre entonces un resultado que niega la esencia misma de la lengua: *UN PROBLEMA DE INCOMUNICACIÓN.* Igual sucede con los *gestos y señas manuales. Así aconteció en el caso de autos.*

Ilustra la situación el verbo *poner*, utilizado invariablemente en las directrices e instrucciones brindadas. Cualquier diccionario da fe del significado *múltiple* de este vocablo. Ahora bien, más allá de sus numerosas acepciones de la academia, hay que tener en cuenta el uso oral, que suma a los significados establecidos, y pertenece a la categoría del empleo popular. En esa categoría, *poner* comunica la idea de *escribir*, como cuando en la lengua viva del pueblo se dice: "No dejes de *ponerme* en el papel lo que quieres que te traiga", "¿qué *pusiste* tú en la carta que le mandaste?", "*pon* allí tus iniciales" o "*pongan* las iniciales al dorso".

De hecho, en la obra citada, María Moliner admite así esa acepción: "Escribir o incluir cierta cosa en un escrito." Moliner, *op. cit.*, pág. 801. Más aún, el propio Reglamento de Elecciones de 1988 recogió este significado en la Regla 41A(b), pág. 39, al ordenar que antes de abrirse el colegio los inspectores "*pondrán* sus iniciales en el ángulo superior izquierdo del *dorso* de un número de papeletas . . .". (Énfasis suplido.)

ANTE ESTA REALIDAD, NO CABE DUDA DE QUE EL USO DE LA EXPRESIÓN "PONER LAS INICIALES" EN LAS CIENTOS DE INSTRUCCIONES GRUPALES E INDI-VIDUALES DE LOS DISTINTOS FUNCIONARIOS RAZO-NABLEMENTE INDUJO, AUNQUE ININTENCIONAL-MENTE, Y LLEVÓ A LA MENTE DE ESTOS Y OTROS ELECTORES LA IDEA DE QUE DEBÍAN *ESCRIBIR LAS INICIALES* EN LA PAPELETA.

Ello queda confirmado en virtud del testimonio de los siguientes electores que escucharon a los funcionarios de colegio que utilizaron el verbo *poner* al impartir las instrucciones siguientes: *Carlos Víctor Wheeler,* "*'ponga* las iniciales por fuera'", (énfasis suplido) Caso Núm. CE-90-389, Apéndice I, pág. 146; *Carlos A. Calo Barreto,* "*'ponga* las iniciales al dorso'", (énfasis suplido) íd., pág. 148; *Ivette Sailé Ramírez Medina,* "'me dijo que tenía que entrar y *poner* las iniciales otra vez'", (énfasis suplido) íd., pág. 154; *Daisy Raldiris Robles,* "'[e]lla me entregó dos papeletas y me dijo claramente, que una vez la llenara, la doblara en cuatro

dobleces· y *pusiera* mis iniciales por fuera'", (énfasis suplido) íd.,
pág. 155; *Francisca Carmona O'Neill,* "'[p]usiéramos las inicia-
les, que miraran para arriba'", (énfasis suplido) íd., pág. 159;
*Georgina Carmona O'Neill,* "'[e]ntonces doblen la papeleta y
*pongan* sus iniciales para arriba'", (énfasis suplido) íd., pág. 160;
*Vicente Altorán Ruiz,* "'[n]o olvide *poner* las iniciales'", (énfasis
suplido) íd., pág. 161; *José Manuel Fernández Ramírez,* "'[p]on
las iniciales por fuera'", (énfasis suplido) íd., pág. 164; *Daniel
Martínez González,* "'*ponga* las iniciales hacia arriba'", (énfasis
suplido) íd., pág. 169; *Wilfredo Núñez González,* "'luego de
terminar el voto que la doblara y le *pusiera* mis iniciales a la parte
superior' . . . '[t]ienes que *ponerle* las iniciales hacia afuera . . .
*pon* las iniciales'", (énfasis suplido) íd., pág. 173; *Rosa María
Márquez Rosado,* "'*pon* las iniciales detrás de la papeleta' o '*pon*
las iniciales atrás'", (énfasis suplido) íd., pág. 175; *José A. Pabón
Ruiz,* "'que doblara las papeletas en cuatro unidades y le *pusiera*
las iniciales mías por la parte de atrás, que quedaran hacia el
frente'", (énfasis suplido) íd., pág. 177; *Paulino Ibarra Resto,*
"'mire, tiene que *ponerle* el nombre completo'", (énfasis suplido)
íd., pág. 178; *Luis F. Tirado Tirado,* "'Don Luis, *póngale* las
iniciales suyas al dorso'", (énfasis suplido) íd., pág. 179; *María
Melania Quebec Irlandés de Rivera,* "'[p]onga la inicial atrás de
la papeleta'", (énfasis suplido) íd., pág. 181; *Eugenio Peña
Aquino,* "'*pusiera* las iniciales en las papeletas'", (énfasis suplido)
íd., pág. 182; *Edwin Ramos Hernández,* "'*cogiera la papeleta, la
doblara y le pusiera* las iniciales hacia la parte de al frente'",
(énfasis suplido) íd., pág. 183; *Alfonso Ramos Vázquez,* "'[d]oblen
las papeletas y *pongan* las iniciales hacia arriba'", (énfasis
suplido) íd., pág. 184; *Sandra Carlo Pinto,* "'dobla la papeleta, una
vez que me la dieron, y *pon* las iniciales fuera'", (énfasis suplido)
íd., pág. 187; *Erohilda Nieves Nieves,* "'[t]ienes que doblar la
papeleta y *pon* tus iniciales'", (énfasis suplido) íd., pág. 191;
*Carmen Báez Rosado,* "'[p]ongan las iniciales afuera, hacia
afuera'", (énfasis suplido) íd., pág. 196; *Raquel Fanfán Román,·*
"'[n]o, tienes que *ponerle* las iniciales hacia arriba . . .'", (énfasis
suplido) íd., pág. 197.

Estos testimonios fueron corroborados por algunos funcionarios de colegio: *Julia Ortega Arroyo* (P.P.D.), "'doblase las papeletas y *pusieran* las iniciales hacia afuera'", (énfasis suplido) Caso Núm. CE-90-389, Apéndice I, pág. 144; *Frances M. Cruz Rosado* (P.N.P.), "'*ponga* las iniciales para afuera'" (énfasis suplido) íd., pág. 155; *María Vega Cubero* (P.N.P.), "'las doble en cuatro partes y *ponga* las iniciales hacia arriba'", (énfasis suplido) íd., pág. 157; *Miriam Contreras Peralta* (P.N.P.), "'[p]onga las inciales hacia afuera'", (énfasis suplido) íd., pág. 162; *Noelia Jiménez Serrano* (P.P.D.), "'[y]o les decía que ellos podían *poner* una seña en el partido de su predilección y que chequiaran [sic] que detrás y les enseñaba las iniciales que tenían las papeletas de votación, que ellos tenían que doblar en cuatro partes y *ponerlas* hacia el frente cuando la echaran en la urna'", (énfasis suplido) íd., pág. 163; *Yolanda Ordoñez Arias* (P.N.P.), "'*poniendo* las iniciales hacia arriba'", (énfasis suplido) íd., pág. 167; *Ana E. Figueroa* (P.N.P.), "'*pongan* las iniciales hacia arriba y con las iniciales hacia arriba las echan aquí en la urna'", (énfasis suplido) íd., pág. 172; *Luis E. García Curbelo* (P.N.P.), "'que doblaran las papeletas en cuatro y *pusieran* las iniciales hacia afuera'", (énfasis suplido) íd., pág.193.

Los testimonios de estos funcionarios demuestran que esas instrucciones fueron variadas y no del todo claras, y que en estos casos los gestos e indicaciones con las manos de los funcionarios no salvaron la ausencia de una adecuada instrucción reglamentaria. Los electores fueron llevados a poner sus iniciales por la *imprecisión* de las instrucciones. Así lo intimó el Juez Polo al concluir que aquí "'hubo honestas discrepancias'". Caso Núm. CE-90-389, Apéndice I, pág. 41.

Ahora bien, si aceptamos para fines de argumentación que las instrucciones no fueron confusas, aún subsistiría el error del tribunal de instancia. SEGÚN ANTES FUE EXPUESTO, DICHO FORO CONCLUYÓ QUE LOS ELECTORES ACTUARON *BONA FIDE*, SIN INTENCIÓN DE IDENTIFICARSE NI VIOLAR EL CARÁCTER SECRETO DEL VOTO, ESTO ES, *NO HUBO FRAUDE*. En conformidad con sus determinaciones, todo se debió a que ellos malinterpretaron las instruccio-

nes por un sinnúmero de razones. Estamos, pues, ante unos *errores bona fide* de estos electores. Por otro lado, el trámite de la Regla 41B(6) del Reglamento de Elecciones de 1988 exigía que los funcionarios de colegio velaran que los electores doblaran las papeletas con el propósito de asegurar que sus iniciales quedaran visibles y fueran mostradas *a los inspectores del colegio*. Es claro, pues, que de haber estado atentos los inspectores de los colegios, sin dificultad alguna pudieron haberse percatado del error de buena fe en que incurrieron los electores al poner las iniciales *e impedir que dichas papeletas fueran depositadas en las urnas*. Ese era su deber y aquél el momento para que los inspectores llamaran la atención al elector del error y sus consecuencias. En otras palabras, la obligación del elector de *"mostrar las iniciales al dorso de las papeletas"* —(énfasis suplido) íd.— *a los inspectores del colegio*, necesariamente imponía a éstos el *deber recíproco de evitar que las papeletas que contenían otras iniciales* —potencialmente protestables— fueran depositadas en las urnas.

Después de todo, la ley y el reglamento visualizaban que los inspectores de colegio supervisaran y velaran para que los procedimientos sean conducidos apropiadamente. Regla 36 del Reglamento de Elecciones de 1988. Además, visualizaba la posibilidad de que un elector dañara, "por accidente o *equivocación*" (énfasis suplido), cualquiera de las papeletas y se les reconocía el derecho a sustituirla. Art. 5.029 de la Ley Electoral, 16 L.P.R.A. sec. 3232; Regla 43 del Reglamento de Elecciones de 1988, pág. 41.

LA OMISIÓN DE LOS FUNCIONARIOS AL PERMITIR QUE LAS PAPELETAS DE ESTOS ELECTORES *BONA FIDE* SE DEPOSITARAN EN LAS URNAS —SIN INTENCIÓN DE FRAUDE ALGUNO; POR MALINTERPRETACIÓN DE LAS INSTRUCCIONES— FUE FATAL Y CONSTITUYÓ LA *CAUSA DIRECTA DE QUE SUS VOTOS FUERAN ANULADOS*. ASÍ LO RECONOCIÓ EL PROPIO FORO DE INSTANCIA AL DARLE VALIDEZ A DOS (2) ELECTORES QUE INCURRIERON EN EL *MISMO ERROR* Y PUSIERON EN SUS PAPELETAS SUS INICIALES AL MALINTERPRETAR LAS INSTRUCCIONES. *La única dife-*

*rencia detectable* entre éstos y los otros treinta y nueve (39) electores, según el tribunal, fue que en esos dos casos precisamente los inspectores "se percat[aron] del error cometido". Advertidos los electores de su error por los funcionarios, aunque éstos no les proveyeron una nueva papeleta, hicieron la salvedad y posteriormente adjudicaron sus votos en los colegios.

Nos referimos a los votos de las electoras Carmen Socorro López Rivera (*Exhibit* 190) y Rosa María Márquez Rosado (*Exhibit* 151). El tribunal se expresó así:

> De sus testimonios se desprende que ambas estamparon sus iniciales en la papeleta municipal y uno(s) de *los funcionarios electorales se percató(aron) del error cometido.* Al elector solicitar una nueva papeleta (como en Ley le correspond[e— A]rt. 5.032, Ley Electoral, 16 LPRA 3232), el funcionario electoral (o los funcionarios electorales), en vez de acceder a lo solicitado, optó(aron) por hacer la salvedad de lo acontecido y adjudicaron el voto de este elector en el colegio. Posteriormente, sin embargo, ambos votos fueron anulados en el Coliseo durante el escrutinio general. Este Tribunal entiende que debe adjudicarse el voto de estas dos electoras: *la causa próxima de la anulación de sus votos fue a consecuencia de la negativa de los funcionarios electorales de sus respectivos colegios a proveerles nuevas papeletas.* (Énfasis suplido.) Caso Núm. CE-90-389, Apéndice I, pág. 43.

De estas afirmaciones surge claramente que si los funcionarios electorales no se hubiesen percatado del error *bona fide* ambas papeletas también se hubiesen anulado. SE PONE DE MANIFIESTO QUE LA *VERDADERA CAUSA PRÓXIMA* DE LA NO ANULACIÓN FUE EL CUMPLIMIENTO DE LOS INSPECTORES CON EL DEBER DE ADVERTIR A LOS ELECTORES. La psicogénesis del razonamiento del tribunal de instancia descansa en que los funcionarios electorales tenían la encomienda de velar por que las papeletas fueran dobladas con las iniciales expuestas y, por ende, la oportunidad y el deber de verificar que no tuvieran otras iniciales que no fueran las suyas.

Al contrastarse este razonamiento con el brindado en los casos de los otros treinta y nueve (39) electores, *notamos un tratamiento diferente e injusto*. Repetimos:

A su vez, la obligación del elector de *"mostrar las iniciales al dorso de las papeletas"* —(énfasis suplido) Regla 41B(6) del Reglamento de Elecciones de 1988, pág. 41— *a los inspectores del colegio* necesariamente imponía a éstos el deber recíproco de evitar que las papeletas que contenían otras iniciales —potencialmente protestables— fueran así depositadas en las urnas. *Ese era el momento para llamar la atención al elector de las consecuencias de tales iniciales.* Cabe señalar que la ley y el reglamento visualizan que los inspectores de colegio supervisen y velen por que los procedimientos se conduzcan apropiadamente. Regla 36(a) del Reglamento de Elecciones de 1988. Además, se prev[é] la posibilidad de que un elector dañe, "por accidente o equivocación", cualesquiera de las papeletas y se le reconoce el derecho entonces a sustituirla. Art. 5.029 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3232. (Énfasis en el original) *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra, pág. 64.

EN RESUMEN, EL TRIBUNAL DE INSTANCIA RECONOCIÓ QUE *TODOS* ESTOS ELECTORES, *SIN INTENCIÓN DE FRAUDE,* POR DISTINTAS RAZONES MALINTERPRETARON LAS INSTRUCCIONES Y, POR *ERROR BONA FIDE*, PUSIERON SUS INICIALES EN LAS PAPELETAS. SIN EMBARGO, EN LAS OCASIONES EN QUE LOS FUNCIONARIOS DE COLEGIO, EN EL DESCARGO DE SUS DEBERES, SE PERCATARON DEL ERROR, *LES CONTÓ EL VOTO.* CUANDO LOS FUNCIONARIOS INCUMPLIERON SU DEBER Y NO SE PERCATARON DE LAS INICIALES NI ADVIRTIERON A LOS ELECTORES, *LES ANULARON SUS VOTOS.* ¿CABE SEMEJANTE TRATO DIFERENTE? ¿SE JUSTIFICA LA DECISIÓN DE ANULARLOS CUANDO LOS FUNCIONARIOS DE COLEGIO NO CUMPLIERON CON SU OBLIGACIÓN? ¿PUEDE CONSTITUCIONALMENTE SOSTENERSE UNA NORMA DE NULIDAD QUE DEPENDE DE LOS CRITERIOS Y ACCIONES

DE ESOS FUNCIONARIOS LOCALES? ¿NO ESTABAN TO-
DOS ESTOS ELECTORES, HASTA EL MOMENTO EN QUE
MOSTRARON SUS PAPELETAS CON LAS INICIALES, EN
IGUAL SITUACIÓN DE ERROR? ¿NO ES LO VERDADERA-
MENTE DETERMINANTE LA INTENCIÓN DEL ELEC-
TOR? *P.S.P. y P.P.D. v. Comisión Estatal de Elecciones*, supra.

Finalmente, la decisión del tribunal de instancia demuestra un *trato desigual e inconstitucional* contra los electores del Munici-pio de San Juan al compararlo con el trato brindado en el recuento del Municipio de Toa Baja. Allí, en el Precinto 12, Unidad 7, Colegio 1, las *instrucciones brindadas por los funcionarios de colegios a los electores también fueron malinterpretadas. Un número sustancial de ellos —de veinte (20) a veinticinco (25)— pusieron sus iniciales al dorso de las papeletas.* Cuando los funcionarios se percataron de la situación, fueron más específicos y cuidadosos, y aclararon sus instrucciones. *Ante esa situación, acordaron unánimemente adjudicar las papeletas como válidas.* De la Identificación 68, demandante (T.E. Comisión, págs. 33–38), se desprende que los funcionarios del colegio *fueron entrenados para dar tales instrucciones.* T.E. *Comisión*, págs. 39–41.

Ante esa evidencia, la Comisión Estatal se negó a anularlas y *confirmó la validez de esas papeletas con iniciales.* Curiosamente el Presidente, licenciado Rodríguez Estrada, presente en la reunión de la Comisión Estatal, aceptó que los *instructores seguían el patrón tradicional de 1984. Granados v. Rodríguez Estrada I*, supra.

Ahora, la sentencia del tribunal de instancia y la de la mayoría aplican arbitrariamente *a situaciones iguales trámites distintos y criterios sustantivos disímiles.* En su aplicación, ello es inconsti-tucional y atenta contra la norma jurídica de que no pueden producirse soluciones contradictorias para situaciones fundamen-talmente idénticas. SUBSISTE LA GRAN INJUSTICIA. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.*, supra.

## VII

*Inconstitucionalidad del trámite y de la decisión que decretó la ilegalidad del voto de veintitrés (23) electores.*

Granados Navedo señala como error del tribunal de instancia el no haber garantizado el debido proceso de ley a los veinticinco (25) electores citados por los demandados Acevedo Pérez y Báez Galib, y haber descontado el voto de veintitrés (23) de ellos. Igual señalamiento levantan nueve (9) de estos electores en el Recurso CE-90-391. Tienen razón. Veamos.

La opinión mayoritaria en *Granados v. Rodríguez Estrada I,* supra, pág. 59, sentó las bases para la invalidación de esos votos:

A tenor con lo dispuesto en dicha [Regla 29 de Evidencia, 32 L.P.R.A. Ap. IV,] ningún elector que haya emitido su voto legalmente puede ser obligado a testificar en corte con relación al contenido de su voto. *Ahora bien, si el elector emitió su voto de manera ilegal,* dicho privilegio no le es de aplicación, por lo que sí podría presentarse prueba en cuanto al contenido de su voto. Por lo tanto, en un caso como el de autos, en que se impugna la certificación de un candidato por irregularidades en el proceso —que incluyen la adjudicación de votos emitidos ilegalmente— sería admisible *el testimonio de los electores que votaron ilegalmente para probar a favor de quién se emitieron dichos votos ilegales. Esto siempre y cuando el elector no reclame válidamente el privilegio a la no autoincriminación.* (Énfasis suplido.)

Apoyándose en esa directriz y en la Regla 40.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III —expedición ministerial de citaciones— los demandados Acevedo Pérez y Báez Galib citaron a veinticinco (25) electores. EL CUADRO QUE EMERGE DE ESTE INCIDENTE ES UNO DE LOS MÁS TRISTES Y LAMENTABLES EN LOS ANALES JUDICIALES DEL PAÍS.

En primer término, *a estos electores nadie les informó la razón específica por la cual fueron citados.* De los *autos originales* y de la *transcripción de evidencia* surge que *fueron citados sorpresivamente,* un día antes de la fecha de su comparecencia.

Durante el proceso judicial, por sus contestaciones y dudas, *muchos dieron muestra y manifestaron no comprender realmente lo que ocurría.* El Juez Polo *no* permitió a los representantes legales de Granados Navedo contrainterrogarlos ni aclarar varios extremos importantes y pertinentes. Aún así, *algunos* de estos electores declararon: (*a*) que habían sido entrevistados en sus residencias por personas que en ocasiones se identificaron como del P.P.D. y en otras dieron la impresión de que eran de la Comisión Estatal; (*b*) que en esas gestiones se les preguntó por quién habían votado, esto es, se les violó el privilegio constitucional del voto secreto, y (*c*) que se les tomó algún tipo de declaración escrita.

Cuando los demandados Acevedo Pérez y Báez Galib fueron requeridos por la representación legal de Granados Navedo para que produjeran esas declaraciones escritas, aquéllos se negaron y el tribunal los sostuvo bajo el fundamento de que se trataba de una materia privilegiada producto del trabajo del abogado (*work product*), aun cuando estos electores no eran representados por los abogados de los primeros. Tampoco permitió *contrainterrogar* a estos electores sobre el motivo de sus comparecencias.

El día de la vista, sin advertencias de clase alguna, el Juez Polo ordenó que se les tomara juramento a estos electores (T.E. 16, pág. 3), los puso *bajo* las reglas del tribunal y los *RECLUYÓ* en el salón de testigos. Íd. pág. 5. En su *AUSENCIA*, los demandados desfilaron prueba en contra de ellos. Como veremos, para propósitos de probar la ilegalidad de sus votos, *la misma fue insuficiente.* Consistió de una consulta electoral (*Exhibit* 835 y 858) y unos impresos (*printouts*) del computador de la Comisión Estatal, expositivo del *status* de algunos electores en trece (13) de los colegios contaminados no arrestados correspondientes a la causa de acción de Granados Navedo. También presentaron copias de las listas electorales de ocho (8) colegios *distintos* donde aparecían votando algunos de estos electores. Aunque el tribunal ordenó la producción de los originales de esas listas, inexplicablemente la Comisión Estatal nunca las produjo.

En cuanto a este aspecto, al comenzar a declarar en el directo el Lcdo. Sigfrido Pons Fontana, testigo de los demandados Acevedo Pérez y Báez Galib, identificó en la lista (*Exhibit* 835) a la electora Juana Carmona Sierra, que aparecía votando añadida a mano en el Precinto 2, Unidad 27, Colegio 4. T.E. 16, pág. 11. También un impreso (*printout*) que la clasificaba I2. Íd., págs. 11–12.

Al someterse en evidencia dicho impreso con el propósito de probar que esa electora no tenía derecho a votar, surgió una objeción del Lcdo. Alex González —abogado de Granados Navedo— y se suscitó el diálogo siguiente:

LCDO. GONZALEZ: Su Señoría, yo creo que Doña Juana Carmona Sierra *que se encuentra . . . debe estar aquí*, para que *oiga la prueba* que está *pasando* la parte demandante (*sic*) sobre su derecho a votar o no.

Porque ahora *ya no estamos en un juicio entre Granados y Acevedo*, ahora *estamos en un juicio*, donde le están *imputando a Doña Juana Carmona Sierra la comisión de un delito*.

HON. JUEZ POLO: Si *fuera parte, tendría derecho a estar presente*.

LCDO. GONZALEZ: Sí, pero fíjese Su Señoría, aquí hay *un mini juicio de Juana Carmona Sierra*. Ya usted va a tener que juzgar si ella tenía o no tenía derecho *en ausencia de ella*, si tenía derecho o no.

HON. JUEZ POLO: *Precisamente*, por eso era *mi insistencia*, Licenciado, *de que todo aquel que estuviera en las mismas condiciones, fuera parte en este caso*, que es lo que *está ante la consideración del Tribunal Supremo*. Porque si no es parte, no tiene derecho a estar presente.

LCDO. GONZALEZ: Limitadamente. Porque en el listado que usted nos dio no aparece Juana Carmona Sierra.

HON. JUEZ POLO: Pero fíjese, que en los anejos 1, 2, y 3, *iban dirigidos a todos los que estuvieran o con iniciales o añadidos, que votaran añadidos a mano*.

LCDO. GONZALEZ: Bueno, pero ahí estaba la presentación del edicto que se preparó *y no se ha notificado*.

Yo creo, que a Doña Juana Carmona Sierra, a la que *están juzgando aquí ahora*, tiene derecho a estar *aquí*, sea o no sea parte, *porque esto es un mini juicio*.

*Este es un testigo que está declarando en contra de los derechos de Juana Carmona Sierra, sin ella poder estar presente para defenderse, sin tener abogado, sin haber sido confrontada con la prueba que están pasando.*

HON. JUEZ POLO: Si no es parte y *no ha querido intervenir, y no se le ha notificado y ha habido oposición a que se haga parte a todos los que están en esas condiciones, pues no tiene derecho a estar presente, porque es testigo y está bajo la Regla del Tribunal.*

LCDO. GONZÁLEZ: Pero es que eso ya, Su Señoría, *sale del conflicto que estamos viendo aquí. Aquí ahora le están imputando la comisión de un delito a Doña Juana.* Y Doña Juana, *usted que es el que protege los derechos de los ciudadanos puertorriqueños, tiene la obligación de traer a Doña Juana aquí, sea o no sea parte, porque le están pasando prueba en su contra.*

HON. JUEZ POLO: *No estamos de acuerdo con el compañero.* (Énfasis suplido.) T.E. 16, págs. 17–19.

Más adelante, el Juez Polo aclaró: "Si se cometió o no un delito no lo vamos a resolver nosotros, ni con las alegaciones de uno ni otro. *Eso le corresponde a un caso criminal que no es el que se está ventilando . . . .*" (Énfasis suplido.) T.E. 16, págs. 21–22. Expuso que, una vez se desfilase esa prueba y se sentara a la electora Juana Carmona Sierra, él le haría la advertencia de que votó ilegalmente en contravención al Art. 8.025 de la Ley Electoral, 16 L.P.R.A. sec. 3375. Íd., pág. 22. El licenciado González le señaló que esa advertencia, "después que hayan pasado la prueba", era en "vano". El Juez Polo aceptó que esa "prueba no esta[ba] en manos de un fiscal". Íd. Subsiguientemente, el licenciado Montalvo, coabogado de Granados Navedo, le expuso al Juez Polo que no podía dar inmunidad. Íd., pág. 25. El Juez Polo insistió en que tenía esa facultad, aun cuando "[a]*quí no se está juzgando criminalmente.* Aquí hay una prueba a [*prima facie*], nada más". Íd., págs. 25–26.

Posteriormente, el Juez Polo reiteró su criterio de que los *testigos de las partes* debieron *acumularse* al pleito y entonces "tendrían derecho a comparecer y a estar representado[s] por abogado". T.E. 16, págs. 26–27.

A base de esa cuestionable prueba documental, y en los testimonios del licenciado Pons Fontana y del Sr. Alfredo Méndez

Nazario, el Juez Polo hizo la determinación previa de que estos electores —que en ese instante figuraban como "testigos"— no eran hábiles para votar. *TODO ELLO SIN DARLES EN ESA ETAPA LA MÁS MÍNIMA OPORTUNIDAD DE CONSULTAR ABOGADOS, DE ESTAR PRESENTES NI DE REFUTAR LA PRUEBA. Después,* los llamó a testificar, les explicó su determinación previa de electores ilegales y los apercibió de una posible acusación criminal. Les informó que en quince (15) días podían intervenir con abogado en el pleito y presentar evidencia para refutar su determinación judicial de electores ilegales. Seguidamente, a solicitud de Acevedo Pérez y de Báez Galib, les concedió *inmunidad* y, sin advertencias adicionales en cuanto a otros derechos, los sujetó a preguntas. Inmediatamente estos electores fueron *compelidos* a renunciar al privilegio de la secretividad de sus votos y *obligados* a testificar por quién habían votado.

LA ATMÓSFERA JUDICIAL CREADA FAVORECIÓ TOTALMENTE A LOS DEMANDADOS ACEVEDO PEREZ Y BÁEZ GALIB EN DETRIMENTO DE LOS DERECHOS CONSTITUCIONALES DE ESTOS ELECTORES. EL PATRÓN PROCESAL Y EVIDENCIARIO REPETITIVO QUE SIGUIÓ FUE OPRESIVO. LA SECUENCIA DE PREGUNTAS Y RESPUESTAS, CAPCIOSA. Se implantó el *ritual* siguiente: una vez el Juez Polo advertía al elector que la prueba desfilada a sus espaldas establecía que no era hábil para votar y que ello podía constituir un delito menos grave, le pedía que en "ánimo de recibir toda la prueba posible *nos ayude* a resolver esta controversia [y que] ha[bía] decidido concederle inmunidad[,] cosa de que usted no pueda ser procesado si se entendiera que ha cometido la violación de ley el pasado 9 de noviembre". Después que le señalaba la oportunidad de comparecer para demostrar que era elector hábil, el licenciado Rey, abogado de los demandados, intervenía y se dirigía al elector y le pedía "ayuda" para que el juez pudiera decidir. Le preguntaba, y el elector "voluntariamente" atestaba por quién votó. ESTE TRÁMITE ES INCONSTITUCIONAL Y ADOLECE DE VARIOS ERRORES SUSTANCIALES E INCURABLES.

*Primero,* no obstante sostener el Juez Polo el criterio correcto de que todos los electores debían acumularse como *partes indispensables,* rehusó así ordenarlo o, desde esa etapa, reconocerles los derechos dimanantes y compatibles con esa condición. Los consideró simplemente *testigos,* aun cuando desde sus inicios en Sala pudo apreciarse la naturaleza de sus citaciones: determinar la ilegalidad de sus votos adjudicados por la Comisión Estatal. En su esencia, el trámite habido constituyó una *recusación judicial* promovida por Acevedo Pérez y Báez Galib. *LO PEOR DEL CASO FUE SU CARÁCTER SUMARIO, SIN OBSERVANCIA DE LAS NORMAS CONSTITUCIONALES MÍNIMAS DEL DEBIDO PROCEDIMIENTO DE LEY.* Acevedo Pérez y Báez Galib nunca les notificaron a estos electores de demanda alguna en su contra. Ni siquiera al citarlos les apercibieron del *propósito real detrás* del requerimiento de sus comparecencias mediante unas simples citaciones.

EL TRIBUNAL DE INSTANCIA ININTENCIONAL-MENTE COLABORÓ EN LA CREACIÓN DE ESTE LA-MENTABLE ESTADO DE *TOTAL INDEFENSIÓN PROCE-SAL.* No les informó previamente que sus votos estaban en entredicho. Tampoco les ofreció la oportunidad de obtener representación legal antes de obligarlos a testificar. Algunos de estos electores atestaron "sentirse nerviosos" y contestaron de manera confusa. Aquellos que el tribunal de instancia permitió que fueran contrainterrogados limitadamente declararon tener la creencia de que habían sido citados para "defender sus votos". Otros dieron muestras de poca escolaridad y expresaron que carecían de dinero para pagar los servicios de un abogado. EN RESUMEN, REINÓ UNA AUSENCIA *TOTAL* DE GARANTÍAS SOBRE UN DE-RECHO TAN SAGRADO COMO LO ES EL VOTO SECRETO. Art. II, Sec. 2, Const. E.L.A., *supra.* ANTE SEMEJANTE ATROPELLO Y ATMÓSFERA, ES UN EUFEMISMO QUE LA MAYORÍA DEL TRIBUNAL ADUZCA COMO ARGU-MENTO QUE "NINGUNO DE ESTOS ELECTORES SE NEGÓ A DECLARAR O LEVANTÓ EL PRIVILEGIO CON-

TRA LA AUTOINCRIMINACIÓN . . .". (Énfasis suplido.) Opinión mayoritaria, pág. 16.

Recuérdese que, en cuanto a *estos* electores, este Foro apelativo en *Granados v. Rodríguez Estrada II,* supra, *no* dispuso que fueran previamente emplazados ni que se les remitiera una demanda. Si a los otros mil doscientos treinta y dos (1,232) electores que votaron añadidos a mano (I1 e I2), incluso los que estaban excluidos por domicilio (ER) y que fueron citados mediante edictos y notificados de la demanda por correo certificado, se les dio la oportunidad de comparecer con abogado a defender sus votos, ¿cómo justificar un trato diferente a estos electores en una etapa tan crítica? Estamos ante una "justicia" un tanto irónica. A los electores que la Comisión Estatal no les contó el voto les brindaron todas esas garantías, mientras que a los que la Comisión Estatal les adjudicó el voto y, posteriormente, se les anuló (*disenfranchized*) judicialmente, los dejaron huérfanos de toda protección.

COMETE ESTE TRIBUNAL LA GRAN INJUSTICIA DE SOSTENER QUE ESTOS "ELECTORES TESTIFICARON EN CALIDAD DE *TESTIGOS* Y NO DE PARTES, POR LO CUAL NO LES APLICA LOS DERECHOS RECONOCIDOS A LAS PARTES". (Énfasis suplido.) Opinión mayoritaria, pág. 16. En otras palabras, para fines de hacer viable y permitir la violación del derecho constitucional a mantener secretos sus votos, *primero* eran testigos y no tenían derechos. *Después,* una vez consumada esa violación, podían convertirse en "parte" con derechos. *ESA METAMORFOSIS SÚBITA DE TESTIGO-PARTE ES REALMENTE INCREÍBLE.* Culminado el proceso inquisitorial y obligado el elector a "testificar" por quién votó, la academicidad de la transformación instantánea a "parte" es evidente.

Ante este tipo de fundamento poco podemos aducir. Ciertamente, la conclusión mayoritaria está en sintonía con el enfoque restrictivo y confiscatorio que discurre a todo lo largo de la opinión, aun ante variantes situacionales. Se manifiesta con la interpretación rigurosa que hacen sobre las treinta y nueve (39)

papeletas con iniciales —donde para *anularlas* invocan *contra* los electores la importancia del precepto constitucional sobre la secretividad del sufragio— y el *desmerecimiento* ahora de esa cualidad o protección constitucional para sostener la validez del procedimiento contra estos veintitrés (23) electores y *también anularles sus votos*. Bajo ambas interpretaciones el resultado es el mismo: no se cuentan sesenta y dos (62) votos en favor de Granados Navedo.

*Segundo*, el Juez Polo los *obligó* a testificar fundándose en una simple determinación *preliminar* de ilegalidad del voto, que en la mayoría de los casos fue errónea. No hay otra forma de caracterizar esa determinación. Si no era *preliminar*, ¿por qué razón les advirtió que tenían derecho a intervenir y a comparecer *después* a refutar su determinación previa de electores ilegales?

La gravedad del error se acentúa, pues ante el mismo Magistrado Polo ya se había desfilado abundante prueba de la existencia de ciertas fallas e ineficiencias del propio sistema electoral. Estas fallas, no atribuibles a los electores, habían motivado que los llamados impresos del computador (*printouts*) y demás documentos oficiales no siempre reflejaran la realidad. Dicho magistrado había tenido ante sí múltiples casos, no explicados adecuadamente por la Comisión Estatal, de electores cualificados y con tarjeta electoral que votaron en las elecciones anteriores y habían realizado otras gestiones, y aun así fueron excluidos erróneamente de las listas y clasificados como inactivos (I1 ó I2), sin récord (NR) o recusados por domicilio (ER).

Como dijimos en nuestro disenso en *Granados v. Rodríguez Estrada I*, supra, págs. 170–171:

> Existe la idea generalizada de que toda información producida por un computador es exacta y precisa. Esta verdad es relativa. Los computadores no son panacea que todo lo resuelven. Como criaturas del género humano, arrastran también sus limitaciones. En términos generales, un computador está programado para realizar innumerables operaciones ordenadamente. En cuanto a eficiencia, se diferencian del ser humano en lo concerniente a la fantástica velocidad con que realiza su cometido. Acepta, almacena, procesa e

integra datos, y los devuelve por medio de una pantalla o de manera impresa (*printout*). Sin embargo, sólo es capaz de generar información que se le haya suministrado anteriormente. Sigue fielmente las instrucciones o programas que se le ha brindado con gran precisión y, esencialmente, sin errores. Esto no garantiza la validez de los resultados. Como *no crea hechos*, pues meramente procesa datos, si la información con que se le alimenta es deficiente, incompleta o incorrecta, su incapacidad para producir y discriminar conllevará que sus resultados sean igualmente deficientes, erróneos o inexactos. Así también arrastrará todos los errores humanos cometidos en su operación. M.A. Dombroff, *Dombroff on Demonstrative Evidence*, Nueva York, John Wiley & Sons, 1983, pág. 186; G.P. Joseph, *Modern Visual Evidence*, Nueva York, Law Journal Seminars-Press, 1988, Cap. 7. (Énfasis en el original.)

A lo sumo, "[e]stablecido así el hecho básico de no aparecer en los impresos de los terminales del computador ('no existe récord') o como elector *inactivo* o inscrito en otro lugar, sería mandatorio inferir que no era un elector cualificado. Ahora bien, estas presunciones son controvertibles. Puede presentarse evidencia —como se hizo en el caso de autos— para refutar o rebatir ese hecho presumido. Esa evidencia tendría el efecto de evitar que el juzgador hiciera tal inferencia —Chiesa, *op. cit.*, págs. 39–48— e incluso probar sus cualificaciones como elector con derecho a votar". (Énfasis en el original.) *Granados v. Rodríguez Estrada I*, supra, pág. 172. ESA OPORTUNIDAD LE FUE NEGADA A ESTOS ELECTORES ANTES DEL JUEZ POLO ARRIBAR A LA CONCLUSIÓN SOBRE LA ILEGALIDAD DE SUS VOTOS.

EL PROCEDIMIENTO UTILIZADO POR EL JUEZ DE INSTANCIA, INCONSTITUCIONAL E ILEGAL, CONSTITUYÓ UNA DETERMINACIÓN *ULTRA VIRES* DE CAUSA PROBABLE ANÁLOGA AL PROCEDIMIENTO CRIMINAL. SE FUNDÓ EN LA "POSIBILIDAD" DE QUE EL HABER EJERCIDO EL VOTO ESTOS ELECTORES FUERA UN ACTO PUNIBLE EN EL ORDENAMIENTO PENAL. DICHO MAGISTRADO INVOCÓ EL ART. 8.026 DE LA LEY ELECTORAL, 16 L.P.R.A. sec. 3376, QUE CONFIGURA COMO

DELITO GRAVE EL VOTAR ILEGALMENTE. Y TODO ELLO SIN PREVIA NOTIFICACIÓN DE CARGOS, OPORTUNIDAD DE OBTENER REPRESENTACIÓN LEGAL NI DERECHO A PRESENTAR PRUEBA Y A CONTRAINTERROGAR.

En el orden evidenciario civil, no bastaba que los demandados sometieran la consulta y, en algunos casos, el impreso del computador (*printout*). El expediente electoral de cada uno de los electores era prueba necesaria susceptible de establecer *inicialmente* la validez del resultado consignado en las consultas y en los impresos del computador (*printouts*). Era menester que el elector estuviese presente, debidamente representado, desde que *comenzó* el desfile de prueba en su contra, de modo que pudiera ejercitar en ese momento su *derecho* a contrainterrogar. Además, debió tener derecho y oportunidad de controvertir la prueba *desde esa etapa* y someter aquella prueba favorable que refutaba la presentada por Acevedo Pérez y Báez Galib. Cumplido ese trámite, entonces el tribunal podía dirimir y evaluar la prueba, y determinar en sus méritos si el elector tenía o no derecho a votar. A fin de cuentas, para invalidar un voto es necesario "prueba clara, robusta y convincente". *P.P.D. v. Admor. Gen. de Elecciones*, supra, págs. 225–226.

La seriedad de este error se aprecia mejor si nos percatamos de que dieciséis (16) de estos electores fueron recusados por razón de domicilio (ER). A la luz del análisis en este disenso de otros casos de electores con esta misma clasificación, ¿puede afirmarse que las Juntas Locales cumplieron con los trámites esenciales de debida citación personal, diligenciamiento negativo y notificación a sus últimas direcciones según prescrito en el Reglamento de Recusaciones y Exclusiones?

*Tercero*, esa determinación de ilegalidad fue superficial, incorrecta y festinada. El propio Juez Polo, después de oír al primero de estos electores, Félix Figueroa Rivera —quien declaró "que en ningún momento la Comisión electoral [le] notificó . . . que estaba fuera de la[s listas]" y que, al votar, lo hizo entendiendo que tenía

derecho (T.E. 16, pág. 83)— y próxima a declarar la segunda electora Juana E. Carmona Sierra, manifestó:

> · Del testimonio del testigo primero [Félix Figueroa Rivera] *yo tengo mis serias dudas de que se le pueda siquiera imputar la [comisión] de un delito.*
>
> Una persona que tiene la convicción de que está votando según su derecho y de que no hay razón alguna para que no pueda votar[, v]a y se persona a votar, *Entendemos que no comete el delito establecido en la Ley Electoral.*
>
> Creemos, que requiere *el conocimiento y la intención de votar a sabiendas de que no tenía derecho.* Y ante esa posibilidad de que surja eso en todos los casos, vamos a invitar a las personas que vengan en este momento, a que de ellos tener alguna evidencia de que haya un error en el [*status*] certificado por la Comisión, darles la oportunidad que intervengan y traigan la prueba.
>
> Ese ha sido mi interés desde hace tiempo. Y ha habido objeciones a que se haga. (Énfasis suplido.) T.E. 17, págs. 5-6.

Planteada y despejada desde el comienzo la duda del Juez Polo y convencido de que el delito dispuesto en el Art. 8.026 de la Ley Electoral, *supra,* no se configuraba como de responsabilidad *absoluta,* sino que precisaba de los elementos de conocimiento e intención, ¿cómo es posible que ante los testimonios de estos electores de que creían y estaban convencidos de que podían votar insistiera en así tipificarlo y concluyera que "existía la posibilidad de que lo hubiesen cometido"?

*Cuarto,* corolario de lo anterior, como VERDAD PROCESAL, la violación del debido proceso por parte del propio tribunal *a quo* no le permitió examinar *objetivamente* si esas recusaciones ER y las clasificaciones I1 e I2 fueron correctas. De haberlo hecho, hubiese advertido que no podía aplicar la "presunción de corrección" para arribar a una "determinación preliminar de votación ilegal". En este sentido incidió al igual que la mayoría del Tribunal. Nos explicamos.

En cuanto a los electores Juana Carmona Sierra, Salvador E. Santos Fernández, Lydia Candelario González, Carmen D. Santos Reyes, Sylvia E. Acosta Ureña y María A. Rivera Vázquez,

clasificados como I2, el tribunal de instancia no podía descansar sólo en las consultas e impresos del computador (*printouts*) según interpretados por el licenciado Pons Fontana y el señor Méndez Nazario. Ya hemos señalado previamente los defectos jurídicos de esas clasificaciones. RECUÉRDESE QUE A ESOS ELECTORES NUNCA SE LES NOTIFICÓ DE ESE *STATUS* Y SU NECESIDAD DE UNA NUEVA INSCRIPCIÓN. ¿Cómo determinar, entonces, que posiblemente votaron de manera ilegal *con intención criminal*?

Respecto a los electores excluidos por residencia (ER), a saber, Hilario Rodríguez Marrero, Ada Luz Santana Arroyo, Isidro Rivera Márquez, Carmen R. González Laureano, Félix Figueroa Rivera, María E. González García, Jaime Rosario López, Ina Nereida Ortiz Cruz, Carmen Pantojas Cabrera, Ramonita Centeno Cabrera, Olga Álvarez De Jesús, Evelyn Rivera Surrillo, Evelyn López Rivera, Ángel L. Vázquez Marrero, Rosa Rodríguez Colón y Reyes Padín Cuevas, *LA PROPIA PRUEBA TESTIFICAL, AUNQUE LIMITADA, DESTRUYÓ LA PRESUNCIÓN EN QUE DESCANSARON SUS RECUSACIONES ER*. Aparte de la omisión reglamentaria en cuanto a la notificación por correo, sus testimonios demostraron: (*a*) que algunos *nunca se mudaron*; (*b*) que otros notificaron a la Comisión Estatal *oficialmente* sus cambios *de dirección*, y (*c*) que la mayoría lo hizo en el mismo precinto, en particular dentro de los residenciales públicos Manuel A. Pérez y San Fernando. No comprendemos cómo la mayoría ha podido concluir que se estableció presuntivamente la ilegalidad de sus votos.

*Finalmente,* el error *más grave* del foro de instancia fue acceder sin ponderar adecuadamente las objeciones al trámite levantadas por Granados Navedo en torno a la solicitud de los demandados Acevedo Pérez y Báez Galib de concederle inmunidad a estos electores. En su comparecencia, Acevedo Pérez y Báez Galib nos dicen que el "tribunal de instancia *no le prestó atención a* este planteamiento ya que su falta de méritos es patente. Tampoco es necesario detenernos a discutirlo en este momento". (Énfasis suplido.) Caso Núm. CE-90-391, Compare-

cencia, pág. 61 esc. 41. Así también lo ha entendido la mayoría del Tribunal al concluir escuetamente que el Juez Polo tenía esa facultad. Opinión mayoritaria, pág. 17. OBVIAMENTE, ESTAS EXPRESIONES SÓLO PUEDEN SER HIJAS DE LA IRRE-FLEXIÓN Y DE LA FALTA DE UN ADECUADO ESTUDIO. *EL TRIBUNAL DE INSTANCIA NO TENÍA ESA FACUL-TAD.*

De haberse estudiado detenidamente el planteamiento, se hubiesen percatado de que el *único* funcionario facultado por la Constitución y por las leyes vigentes para investigar y autorizar la tramitación de procesos criminales "de naturaleza electoral ante los tribunales" es el Secretario de Justicia, sólo cuando un "juez ha[ya] determinado causa probable en dichos procesos". Art. 8.027 de la Ley Electoral, 16 L.P.R.A. sec. 3378.(7) El instrumento de la *inmunidad y su concesión* es una determinación que corresponde a ese funcionario o al fiscal designado, *o a un magistrado sólo en investigaciones, procedimientos o procesos criminales.* Y ello sujeto al fiel acatamiento de unos trámites, en particular, consagrados en la ley especial que regula expresamente la materia. Una vez se concede válidamente es que se puede obligar judicialmente a un testigo a declarar bajo juramento, aun cuando reclame el privilegio contra la autoincriminación. *AQUÍ ESTOS ELECTORES NO TUVIE-RON NUNCA NI EN SU MÍNIMA EXPRESIÓN ESA OPOR-TUNIDAD.*

---

(7) En lo concerniente, dispone: "Los procesos por infracciones a este Subtítulo se ventilarán originalmente ante la Sala del Tribunal Superior [en] cuya demarcación radique el precinto en que se cometió la infracción.

"El Secretario de Justicia de Puerto Rico, a solicitud de cualquier Comisionado Electoral, miembro de la Comisión Estatal de Elecciones, designará a un (1) abogado o fiscal; según la solicitud del Comisionado concernido, para que actúe como Fiscal Especial *en los procesos criminales de naturaleza electoral ante los tribunales que surjan al amparo de este Subtítulo, una vez el juez ha determinado causa probable en dichos procesos.* El partido político que solicite dicha designación de Fiscal Especial, habrá de sufragar los gastos y honorarios en que incurra dicho Fiscal Especial. Entendiéndose que ningún partido político podrá tener más de un (1) Fiscal Especial simultáneamente. Lo anterior no constituye limitación alguna para que el partido político pueda sustituir a su Fiscal Especial de considerarlo necesario." (Énfasis suplido.) 16 L.P.R.A. sec. 3378.

En el caso de autos, en una actuación *ultra vires*, el Magistrado Polo abandonó su papel de juez civilista y se convirtió en *juez-fiscal* al hacer una típica determinación de "causa probable" contra estos electores y luego concederles inmunidad en un trámite promovido por los abogados de Acevedo Pérez y Báez Galib, sin éstos tampoco tener facultad para actuar —como lo hicieron— más bien como asistentes del Juez-Fiscal Polo. Y TODO ELLO SIN EXISTIR AUTORIDAD EN LEY PARA OTORGAR INMUNIDAD A ESTOS ELECTORES TESTIGOS EN ESTE CASO. Nos explicamos.

La Ley Núm. 3 de 18 de marzo de 1954, conocida como Ley de Inmunidad de Testigos, 34 L.P.R.A. secs. 1476–1479,(8) por mandato *expreso* contenido en su sección primera, *in fine*, sólo cubre "cualquier investigación, procedimiento o proceso *criminal*" conducidos por el Secretario de Justicia o sus fiscales. 34 L.P.R.A. sec. 1476. No incluye investigaciones relacionadas por otros litigantes en casos civiles o de impugnación electoral. Del historial legislativo de esta ley surge prístinamente que el estatuto dispone que

---

(8) En lo pertinente, dispone:

"LEY

"Para obligar la producción de evidencia por parte de ciertas personas *en procedimientos criminales*; para concederles inmunidad contra *acusación* a dichas personas y para derogar la Ley Núm. 13 de 9 de abril de 1941.

"*Decrétase por la Asamblea Legislativa de Puerto Rico*:

"Sección 1.—Toda persona citada como testigo por cualquier fiscal o magistrado estará obligada a comparecer y a testificar o a presentar libros, archivos, correspondencia, documentos u otra evidencia que se le requiera *en cualquier investigación, procedimiento o proceso criminal.*

"Sección 2.—Si habiendo comparecido, dicha persona rehusare contestar una pregunta o producir la evidencia solicitada *alegando* que ello puede incriminarle, el *magistrado motu proprio* o a *solicitud del fiscal* levantará un acta de los procedimientos y *después de oír y consignar en el acta la alegación del testigo* le ordenará que conteste la pregunta o produzca la evidencia requerida y la persona estará obligada a cumplir con dicha orden.

"Sección 3.—Cuando una persona hubiere cumplido con una orden así dictada no será procesada ni estará sujeta a penalidad o confiscación alguna por cualquier transacción, materia o cosa acerca de la cual haya declarado o producido evidencia si de dicha declaración o evidencia realmente resultare que la persona tenía derecho a ampararse en el privilegio de no declarar o producir evidencia para no incriminarse. Dicha persona podrá, sin embargo, ser acusada y estará expuesta a penalidad por cualquier perjurio, contestación falsa o desacato en que incurriere al contestar, dejar de contestar, producir o dejar de producir evidencia, de acuerdo con la orden dictada por el magistrado." (Énfasis suplido.) 1954 Leyes de Puerto Rico 109.

sea aplicable *únicamente* a investigaciones criminales llevadas a cabo por fiscales. Así quedó claramente consignado en el Informe de la Comisión de lo Jurídico de la Cámara sobre el P. del S. 442, 4 (Núm. 49) Diario de Sesiones de la Asamblea Legislativa, T. II, págs. 734–757 (1954), y su amplia discusión.

Sobre este aspecto, es *revelador* que el Presidente de dicha comisión, Lcdo. Santiago Polanco Abreu, a preguntas de uno de los delegados de la entonces representación independentista, Lcdo. Marcos A. Ramírez Irizarry, aclaró que el concepto "investigación forma[ba] parte del *proceso criminal*". Diario de Sesiones, *supra*, pág. 742. Todo el extenso debate de este proyecto de ley giró en torno al ámbito de "investigaciones, procedimientos o procesos *criminales*". Íd., págs. 743–746, 748, 752, 754 y 756. El propio delegado Ramírez Irizarry, a la luz de la discusión habida, expuso: "[T]al y como yo entiendo esto, dice aquí en *cualquier investigación o sea procedimiento o proceso criminal*. De acuerdo a la contestación del compañero Polanco Abreu, *las tres cosas quieren decir lo mismo*, porque la única distinción que yo veo es que la investigación es el acto a virtud del cual se está investigando un *delito*; y un procedimiento, no está muy claro en mi mente, *qué es lo que técnicamente puede entenderse un procedimiento criminal*. Ahora, *proceso criminal*, no a base de la definición que está ahí en el código. Ahí no dice que esa definición será la que aceptará, a diferencia de investigación, pues tiene que ser la *celebración del juicio criminal* . . . . *Aquí 'cualquier investigación criminal por fiscal o magistrado'*. Esas son las únicas limitaciones. *Ahora, si 'proceso criminal' no quiere decir eso pues entonces todo es investigación. Se trata de investigar.* Cuando se está investigando, *el fiscal cita una persona,* pues entonces esa persona está obligada a declarar. Así es como yo lo entiendo." (Énfasis suplido.) Íd., pág. 747.

La visión de la Asamblea Legislativa plasmada en la actual Ley de Inmunidad de Testigos y en su antecesora, a los efectos de que sólo rige en el ámbito investigativo penal, ha sido consistentemente reconocida en nuestra jurisprudencia. *Frattallone Di Gangi v. Tribunal Superior*, 94 D.P.R. 104 (1967); *Suárez Sánchez*

*v. Tribunal Superior*, 92 D.P.R. 507 (1965); *Zapata v. Tribunal Superior*, 79 D.P.R. 414 (1956); *Pueblo v. Ortiz*, 78 D.P.R. 843 (1955); *Pueblo v. Vázquez*, 77 D.P.R. 933 (1955); *Batalla v. Tribunal de Distrito*, 74 D.P.R. 289 (1953); *Pueblo v. Muñiz*, 73 D.P.R. 312 (1952); *Pueblo v. Quiñones;* 69 D.P.R. 731 (1949).

ANTE EL HISTORIAL LEGISLATIVO, EL TEXTO LEGAL Y LA JURISPRUDENCIA, *ESTAMOS PERPLEJOS* DE QUE LA MAYORÍA DE ESTE TRIBUNAL PUEDA SERIAMENTE SOSTENER QUE EL JUEZ POLO TENÍA ESA FACULTAD.

PARA RECAPITULAR, EL TRIBUNAL DE INSTANCIA COMETIÓ GRAVES ERRORES PROCESALES Y SUSTANTIVOS EN ESE INCIDENTE. EN ESENCIA, ACOGIÓ UN PROCEDIMIENTO DE RECUSACIÓN JUDICIAL PROMOVIDO POR LOS DEMANDADOS ACEVEDO PÉREZ Y BÁEZ GALIB, SIN OFRECERLES A LOS ELECTORES LA OPORTUNIDAD DE CONOCER LA RECUSACIÓN, DE ESTAR REPRESENTADOS POR ABOGADO, DE PRESENTAR PRUEBA Y DE CONTRAINTERROGAR. SE FUNDÓ EN PRUEBA INSUFICIENTE PRESENTADA A SUS ESPALDAS PARA LLEGAR A UNA DETERMINACIÓN PREVIA DE ILEGALIDAD, QUE POR SU PROPÓSITO EQUIVALIÓ A UNA DETERMINACIÓN *ULTRA VIRES* DE "CAUSA PROBABLE" CRIMINAL. POR ÚLTIMO, *SIN AUTORIDAD ALGUNA*, LE *CONCEDIÓ* INMUNIDAD Y *LOS OBLIGÓ* A DIVULGAR SUS VOTOS SECRETOS E IDENTIDAD DE SU CANDIDATO.

NUNCA EN LA HISTORIA CONTEMPORÁNEA DE NUESTRO PAÍS UN JUEZ DE INSTANCIA, CON LA APROBACIÓN DE UNA MAYORÍA DE ESTE TRIBUNAL, HABÍA CONSUMADO TAN FLAGRANTE VIOLACIÓN AL DEBIDO PROCESO DE LEY Y AL CARÁCTER SECRETO DEL DERECHO AL SUFRAGIO. EL DAÑO, AUNQUE IRREPARABLE, SÓLO ES REMEDIABLE MEDIANTE EL ANTÍDOTO DE UNA INMEDIATA REVOCACIÓN Y REINSTALACÍON DE ESTOS VOTOS.

## VIII

*Errores procesales y de derecho en cuanto a las papeletas contaminadas no arrestadas y las contaminadas arrestadas*

DURANTE EL PROCEDIMIENTO PARA VOTAR AÑADIDO A MANO, SURGIERON CIERTAS IRREGULARIDADES QUE PROVOCARON QUE LA ADJUDICACIÓN NORMAL DE NUMEROSAS PAPELETAS SE VIERA AFECTADA. De un lado, papeletas emitidas por electores que aparecían en las listas oficiales y estaban debidamente cualificados se contaminaron en las urnas con las papeletas de electores que votaron mediante el sistema de "añadidos a mano". Desde el comienzo de esta cabalgata judicial, nos hemos referido a estas papeletas como *"contaminadas no arrestadas"*. Estas fueron escrutadas por la Comisión Estatal.

De igual forma, surgió otro grupo de papeletas de votantes que sostenían estar cualificados para votar. Sin embargo, éstas fueron agrupadas sin identificación alguna, por lo que su debida adjudicación resultó *imposible* al no poder constatarse cuáles de estas papeletas pertenecían a electores hábiles. Estas las conocemos como *"contaminadas arrestadas"*.

A. *Consideraciones preliminares*

En *Granados v. Rodríguez Estrada I*, supra, este Tribunal adoptó unos criterios probatorios distintos que regirían cada clase de estas papeletas. Para las *contaminadas no arrestadas*, le impuso a Granados Navedo como candidato impugnador demostrar la presencia de votos ilegalmente emitidos en las urnas contabilizadas y probar, además, a favor de quién se emitieron. Sin embargo, en cuanto a la anulación de votos de electores hábiles, por encontrarse entre los *contaminados arrestados*, le exigió un "criterio de prueba menos riguroso". *Granados Navedo sólo tendría que demostrar que el total de los votos legalmente emitidos y no contabilizados eran suficientes para alterar el resultado de los comicios presumiendo que todos ellos fueron emitidos a su favor.*

REITERAMOS QUE ESTE TRATO DISPAR FUE IN-JUSTO E IRRAZONABLE. SE TRATABA DE SITUACIONES BÁSICAMENTE SIMILARES: LA MEZCLA DE VOTOS LE-GALMENTE EMITIDOS CON VOTOS ILEGALES. El enfoque mayoritario trastocó sustancialmente el *quantum* de prueba por el mero hecho de que la Comisión Estatal escrutó unos y otros no. No debemos olvidar que todos estos votos añadidos a mano *nunca debieron depositarse en las urnas.* Se hizo por descuido o inadvertencia de los funcionarios electorales. Justo y razonable resultaba, por lo tanto, someter ambos incidentes a los mismos criterios analíticos. A PESAR DE ELLO, PARA FINES ADJUDICATIVOS, PARTIREMOS DE ESA TESIS MAYORI-TARIA Y DEMOSTRAREMOS QUE, AUN BAJO LA APLICA-CIÓN CORRECTA DE ESOS CRITERIOS, LA CERTIFICA-CIÓN DE ACEVEDO PÉREZ ESTÁ VICIADA Y ES IMPROCEDENTE.

Enfrentado el tribunal con esta situación, comenzó su incursión determinando si en efecto se habían dado tales irregularidades. En esa tarea pudo identificar algunos colegios electorales donde la contaminación quedó subsanada al probarse la idoneidad de los electores cuyos votos contaminaron las urnas.

DESGRACIADAMENTE, EL ALTO NÚMERO DE INCI-DENTES EN EL PROCESO ELECCIONARIO NO PUDO SER OBVIADO DADO EL ESCASO MARGEN DE VICTORIA POR EL CUAL FUE CERTIFICADO ACEVEDO PÉREZ. SI BIEN RESULTA QUE ESTOS DOS (2) GRUPOS DE VOTOS REPRESENTAN SÓLO UN GRUPO ÍNFIMO DENTRO DE LA TOTAL FRANQUICIA ELECTORAL DE SAN JUAN, SUBSISTEN LAS CONSECUENCIAS NUMÉRICAS CAUSA-DAS POR LAS IRREGULARIDADES, LAS CUALES AFEC-TAN LA VALIDEZ DE LA CERTIFICACIÓN. ELLO ES ASÍ AUN SIN TOMAR EN CONSIDERACIÓN CUALQUIER ALEGADO ERROR EN LAS DETERMINACIONES DEL FORO DE INSTANCIA EN CUANTO A LOS VOTOS EX-CLUIDOS POR INICIALES Y RECUSACIONES POR DOMI-CILIO (ER) E INACTIViDAD (I1 E I2), YA QUE EXISTE UN

NÚMERO DE VOTOS *CONTAMINADOS NO ARRESTADOS* Y *CONTAMINADOS ARRESTADOS* SUFICIENTEMENTE ALTO COMO PARA CAMBIARLO. Veamos.

Según determinara el tribunal de instancia, si bien sólo hay veintinueve (29) papeletas ilegalmente emitidas dentro de unas dos mil quinientas cincuenta y siete (2,557) adjudicadas, no debemos pasar por alto que el grupo de las *contaminadas arrestadas* no adjudicadas suman unas setenta y ocho (78). Ante un margen de victoria tan reducido, incapaz de absorber esa irregularidad, se confrontó dicho foro con cuatro (4) posibles caminos: (1) invalidar la elección; (2) rechazar los votos del precinto o colegio donde ocurrió la irregularidad; (3) reducir prorrateadamente los votos ilegales —o añadir los legales— de acuerdo con el número de votos adjudicados a los respectivos candidatos en ese distrito electoral, y (4) ignorar completamente la ilegalidad. *Granados v. Rodríguez Estrada I*, supra, opinión disidente.

El derecho fundamental que cobija a cada ciudadano de que el voto emitido libremente sea secreto y debidamente contado nos obliga a adoptar la solución más certera y constitucionalmente correcta. Ciertamente, invalidar todos los votos *contaminados arrestados* o ignorar completamente las irregularidades habidas y contabilizarlos son interpretaciones heroicas que variarían drásticamente el resultado de la elección. Por tal razón, debemos acudir en primer término a la solución que nos brinda la Ley Electoral. Su Art. 6.015, en lo pertinente, dispone:

> En el caso de una elección de candidato a cargos que no fuesen de Senador o de Representante, si se suscitare una impugnación parcial o total de la votación entre dos o más candidatos para algún cargo o cargos, *y el Tribunal no pudiera decidir cuál de ellos resultó electo*, ordenará una nueva elección en el precinto o precintos afectados, la cual se celebrará de acuerdo a las normas reglamentarias que a tales efectos se prescriban. (Énfasis suplido.) 16 L.P.R.A. sec. 3275.

Este mandato legislativo es claro y patente. Encarna la solución rápida y certera del enigma electoral que está ante los

tribunales desde diciembre de 1988. Nos impone el deber de ordenar una nueva elección cuando no "pudiéramos decidir". Esa imposibilidad es relativa, acorde con una aplicación razonable de los sanos principios electorales vigentes. A fin de cuentas, a ultranza, siempre se puede "decidir". La diferencia estriba en cuánto y qué valores estamos dispuestos a sacrificar antes de acudir a la alternativa de una nueva elección.

NI LA CONSTITUCIÓN NI LA LEY ELECTORAL AUTORIZAN MÉTODO ALGUNO FUNDADO EN PROYECCIONES ESTADÍSTICAS COMO FORMA DE ADJUDICAR VOTOS. POR EL CONTRARIO, ÉSTAS EXPRESAMENTE DISPONEN LA APLICACIÓN DE UNA ESTRICTA SUMA MATEMÁTICA, DONDE CADA VOTO CUENTA UN TANTO. Nuestra Ley Fundamental —la cual reconoce expresamente en su Art. II, Sec. 2, Const. E.L.A., *supra*, pág. 261, el derecho al "sufragio universal, *igual, directo* y *secreto*"— ordena que "se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo". Art. VI, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 367–368. La única ocasión en que nuestra Constitución y nuestro sistema electoral se apartan de esta norma es en cuanto a la fórmula de representación minoritaria. La misma entra en acción cuando un mismo partido político obtiene el control de más de dos terceras partes de los miembros en cualquiera de las cámaras legislativas. Art. III, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

En el caso de autos, la renuencia mayoritaria de acatar el mandato legislativo de una nueva elección es tan intensa que llega al extremo de derogarla, al concluir que "[e]xistiría la dilución si se dejara de contar votos válidamente emitidos *o si se ordenara una nueva elección con efecto anulante sobre los votos válidamente emitidos y adjudicados*". (Énfasis en el original.) Opinión mayoritaria, pág. 22. Nos preguntamos, ¿cuándo una nueva elección, por imperativo, no conlleva un "efecto anulante sobre los votos válidamente emitidos y adjudicados"? Confesamos dificultad para comprender el argumento y su razonamiento.

NO ES LÍCITO NI JURÍDICO, PUES, RECURRIR A PRÁCTICAS ESTADÍSTICAS RESULTANTES DE UN PRORRATEO DE LOS VOTOS ADJUDICADOS. AL HACERLO, LA MAYORÍA DE ESTE TRIBUNAL ATENTA CONTRA NUESTRA DEMOCRACIA Y CONSAGRA UNA NORMA ELECTORAL SUMAMENTE PELIGROSA: LA CONTABILIZACIÓN DE VOTOS DEBIDAMENTE EMITIDOS DE ACUERDO CON LAS INCLINACIONES DE UN GRUPO DE ELECTORES —VÁLIDOS O NO— SIN TOMAR EN CUENTA DE MANERA EFECTIVA —O DE FORMA ALGUNA— LA VERDADERA INTENCIÓN Y VOLUNTAD DEL EMISOR CAPACITADO. A LA PAR, DILUYEN SUS EFECTOS E INFRINGEN LA NORMA CONSTITUCIONAL UNITARIA DE "UN HOMBRE, UN VOTO" (*ONE MAN, ONE VOTE*). NO DEBEMOS IGNORAR EL MANDATO CONSTITUCIONAL Y LEGAL QUE OBLIGA A LA COMISIÓN ESTATAL A "CONTAR CADA VOTO EN LA FORMA Y MANERA EN QUE [FUE] EMITIDO". (Énfasis suplido.) Art. 1.002 de la Ley Electoral, 16 L.P.R.A. sec. 3002. Véase *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra.

La efectividad de cualquier voto, en virtud de la fórmula de "reducción proporcional" practicada por el tribunal de instancia y secundada por la mayoría de este Foro, con los votos *contaminados no arrestados*, significa para cada elector el riesgo de que su voto no cuente como *uno* (1), ya que su peso en la votación es *relativo* a como votó la *muestra* utilizada como base. Ejemplo vivo de ello fue que la aplicación de este método resultó en el fraccionamiento de votos. Según determinó el mismo tribunal de instancia, se le restarían a Acevedo Pérez 14.54 votos, a Granados Navedo 13.68 votos y a los "otros candidatos" 0.78 votos. EN LA MEDIDA EN QUE UN SOLO ELECTOR VIO SU VOTO DIVIDIDO EN FRACCIONES PARA APOYAR UN CANDIDATO POR EL CUAL NO VOTÓ, O PARA RESTÁRSELE AL DE SU PREDILECCIÓN, ESTAMOS ANTE UNA FLAGRANTE VIOLACIÓN AL DERECHO UNITARIO DEL SUFRAGIO. EL QUE ESE ELECTOR SEA UN INNOMINADO

NO LE PRIVA DEL RECONOCIMIENTO PLENO DE SU DERECHO.

La violación es más patente cuando se pretende contabilizar votos arrestados mediante la fórmula novel de "adición o suma a prorrata". El tribunal de instancia la aplicó al incidente de los votos *contaminados arrestados*. De inmediato surgen las interrogantes siguientes: ¿Qué fundamento debió utilizarse para tomar el porcentaje atribuible a cada candidato: los votos legalmente emitidos en ese colegio, en la unidad electoral, en el precinto electoral o, tal vez, en todo el municipio? ¿Debió tomarse en consideración el resultado dentro del grupo de *contaminados arrestados*, en particular en cada unidad? Según tomemos como base un colegio, precinto o unidad, el resultado de la "adición a prorrata" variará. LA INCERTIDUMBRE INHERENTE A ESTA INVENTIVA JUDICIAL, EXTRAÑA A NUESTRO ESQUEMA CONSTITUCIONAL, NOS IMPIDE REFRENDAR DICHO ENFOQUE.

EL JUEZ POLO ENGENDRÓ UNA FÓRMULA, DE DUDOSA VALIDEZ CONSTITUCIONAL, PARA ADJUDICAR UNOS VOTOS LEGALMENTE EMITIDOS. LA ADJUDICACIÓN DE LOS VOTOS *CONTAMINADOS ARRESTADOS* LA HIZO TOMANDO COMO FUNDAMENTO EL ESCRUTINIO HABIDO EN CADA UNIDAD CON COLEGIOS ARRESTADOS. SALTA A LA VISTA EL HECHO DE QUE PRETENDIÓ CONTABILIZAR ESTOS VOTOS SIN TOMAR EN CONSIDERACIÓN, DE FORMA ALGUNA, POR QUIÉN CADA UNO DE ÉSTOS FUE EMITIDO; POR ENDE, LA EFECTIVIDAD DE CADA VOTO DE ESTE GRUPO EN SU ADJUDICACIÓN FUE *CERO* (0). EL RESULTADO FUE QUE VOTOS LEGALMENTE EMITIDOS —NO CONTABILIZADOS ANTERIORMENTE— FUERON ADJUDICADOS UTILIZÁNDOSE COMO CRITERIO RECTOR LA FORMA EN QUE VOTÓ *OTRO* GRUPO DE ELECTORES. ¿ES QUE EL ELECTORADO DE SAN JUAN SIGUE PATRONES DEFINIBLES EN SU FORMA DE VOTAR? *LA HISTORIA RECIENTE NOS SEÑALA LO CONTRARIO.*

De igual forma, este tratamiento singular de "adición a prorrata" es irreconciliable con la norma adoptada por este Foro apelativo en cuanto al trato que debe dársele a votos anulados de electores cualificados según *Granados v. Rodríguez Estrada I*, supra. Específicamente allí se señaló:

> En estas situaciones sólo se exige que el candidato derrotado demuestre que el número de votos anulados es suficiente para variar el resultado de la elección de haberse emitido éstos a su favor. Es decir, cuando de estos casos se trata, *no es necesario que el candidato impugnador demuestre afirmativamente a favor de quién dichos votos fueron emitidos*. Sólo se requiere que pruebe que de haberse adjudicado los mismos el resultado *pudo haber sido diferente*. Obviamente ello presupone que dichos votos fueron indebidamente anulados. (Énfasis suplido.) *Granados v. Rodríguez Estrada I*, supra, págs. 60–61.

¿QUÉ GARANTÍAS OFRECEN ESTAS FÓRMULAS ELECTORALES QUE NO TOMAN EN CUENTA LA VERDADERA *INTENCIÓN* DEL ELECTOR SI, AL CONTARSE SU VOTO, SU PARTICIPACIÓN EN LA CONTABILIZACIÓN EN EL PROCESO ELECCIONARIO QUEDA DILUIDO, COMO MUCHO, A UNA ÍNFIMA FRACCIÓN? *EL EFECTO ES MULTIPLICADOR: SE PRIVA DE SU FRANQUICIA ELECTORAL A TODO ESTE GRUPO DE ELECTORES.* ¿QUÉ "CERTEZA, PRECISIÓN Y LÓGICA" REFLEJA ESTE MÉTODO ESTADÍSTICO DE DUDOSA Y DESCONFIABLE PROCEDENCIA CONSTITUCIONAL? NO DEBEMOS OLVIDAR QUE LA LÓGICA JUDICIAL SÓLO SE DA EN FUNCIÓN DE LA JUSTICIA, Y NO HAY FORMA DE LOGRAR CERTEZA CUANDO IMPUTAMOS A UN ELECTOR —A MANERA DE INFERENCIA— EL HABER EMITIDO SU VOTO DE CIERTA FORMA POR EL HECHO DE QUE UN GRUPO ASÍ LO HIZO.

Resulta pertinente señalar cómo el tribunal sentenciador y la mayoría de este Foro incurren en dos (2) graves errores. El *primero*, apoyar la validez de fórmulas estadísticas en *Estevez v. Srio. Cám. de Representantes*, supra, y *Santos v. Comisión Estatal de Elecciones*, 111 D.P.R. 351, 356 (1981) —opinión

mayoritaria, pág. 20— *SIN DARSE CUENTA* de que los pronunciamientos al respecto en AMBOS CASOS FUERON CON RELACIÓN A LA SUFICIENCIA DE LAS ALEGACIONES DE UNA *DEMANDA DE IMPUGNACIÓN EN LA ETAPA INICIAL DEL PLEITO.* Ninguno de esos casos son autoridad —ni podrían serlo por razones constitucionales— para avalar la proposición de que los méritos de un pleito de impugnación en su etapa *final* puede ser decidido a base de la "probabilidad del resultado". *A POCO SE PROFUNDICE, LA VIGENCIA DE LA NORMA DE PROBABILIDAD MATEMÁTICA SÓLO ES VÁLIDA EN LA ETAPA DE LAS ALEGACIONES.* ANTE EL MANDATO LEGISLATIVO DISPUESTO EN EL ART. 6.015 DE LA LEY ELECTORAL, *SUPRA* —QUE ORDENA UNA NUEVA ELECCIÓN CUANDO EL TRIBUNAL NO PUDIERE DECIDIR QUIÉN RESULTÓ ELECTO— ES *ABSURDO* Y ANTIJURÍDICO INVOCAR DICHA NORMA.

Y el *segundo*, para justificar la imposición de la adición y reducción proporcional, el Juez Polo y la mayoría —al incorporar su sentencia— han tenido que recurrir a jurisprudencia *ajena a Puerto Rico*, parte de la cual ha sido *revocada*, posteriormente *restringida* o representa un enfoque *minoritario en decadencia.* Por ejemplo, el Tribunal Supremo de Nebraska, en *McMaster v. Wilkinson*, 15 N.W.2d 348 (1944), aprobó el uso de la regla de proporcionalidad; sin embargo, en *State v. Boehner*, 119 N.W.2d 147 (1963), revocó expresamente su aprobación anterior. Al citar a *McCrary on Elections*, dicho Foro indicó que la regla de proporcionalidad *sólo aplica "donde no hay facultad para ordenar una nueva elección".* (Traducción nuestra.) *State v. Boehner*, supra, pág. 152. Concluyó:

> No creemos que los tribunales debemos adoptar y aplicar *reglas arbitrarias las cuales determinarán unas elecciones a base de probabilidades.* Este Tribunal no sustituirá su juicio por aquél del electorado como lo declaren las propias autoridades excepto que el récord claramente demuestre cuál debe ser el resultado de la elección. (Traducción y énfasis nuestros.) *State v. Boehner*, supra, pág. 153.

Adhiriéndose a esta corriente reconocedora de la preeminencia e integridad del derecho al sufragio, otras jurisdicciones han restringido el uso de la regla de proporcionalidad. En *Emery v. Robertson County Election Com'n*, 586 S.W.2d 103, 109–110 (1979), el Tribunal Supremo de Tennessee alteró el razonamiento que adoptara en *Ingram v. Burnette*, 316 S.W.2d 31 (1958). Sin hacer mención a esta regla de contabilización de votos determinó que, donde hay fraude en el proceso eleccionario *o existen irregularidades de tal grado o magnitud que hacen imposible determinar la intención libre y justa de los electores cualificados, procede anular la elección (parcialmente) y ordenar otra.* Posteriormente, con meridiana claridad y sin tomar en consideración la regla de proporcionalidad, incorporó el criterio de que procede una nueva elección, entre otras razones, si: (1) algunos votos resultan ilegales y (2) el número de éstos es igual a, o excede, el margen de victoria del candidato ganador. *Millar v. Thomas*, 657 S.W.2d 750, 751 (1983).

Por otro lado, el Tribunal Supremo de Arizona, en su última expresión al respecto (que data de 1948), adoptó la regla de proporcionalidad, *pero la sujetó a la salvedad de que sólo procede cuando se carece de facultad para ordenar una nueva elección. Grounds v. Lawe*, 193 P. 2d 447, 451 (D. Ariz. 1948). Mientras, en Illinois su uso se permite cuando "han ocurrido serias irregularidades en la votación y es imposible obtener 'un cálculo exacto de los votos válidos e inválidos'". *Jordan v. Officer*, 525 N.E.2d 1067 (Ill. 1988).

EL USO SIN TRABAS NI CONDICIONES MAYORES DE LA REGLA DE PROPORCIONALIDAD SE DA EN JURISDICCIONES DONDE LAS PROPIAS LEYES ELECTORALES AUTORIZAN EL USO DE PROCEDIMIENTOS ANÁLOGOS FUNDADOS EN LAS PROBABILIDADES. Así, en Michigan la Ley Electoral autoriza la sustracción al azar de votos de urnas que se han contaminado con papeletas ilegalmente emitidas y proceder así con su destrucción. M.C.L.A. Sec. 168.802 (1989). Por ello, el esquema estatutario permite la aplicación del proceso de reducción proporcional, *sujeto a que el margen de*

*victoria sea mayor que el número total de votos ilegalmente emitidos. Attorney General v. Miller,* 253 N.W. 241, 248 (1934). Véase, además, *Ellis v. May,* 58 N.W. 483 (1894).

Por su parte, hay jurisdicciones que *estatutariamente establecen* los criterios a cumplirse para que proceda una impugnación electoral. La Sec. 20024 del Código Electoral de California expresamente requiere que el impugnador pruebe cuántos votos ilegales fueron adjudicados y por quién fueron emitidos específicamente. *Singletary v. Kelley,* 51 Cal. Rptr. 682 (1966). Resulta notorio, pues, que procede la aplicación de la regla de proporcionalidad ante expresiones legislativas compatibles.

Ciertamente, la regla de proporcionalidad o de reducción (y adición) proporcional es minoritaria. En las escasas jurisdicciones donde aún los tribunales no han desaprobado su uso —que la mayoría invoca, a saber, Mississippi, New Jersey, Kansas, Texas y Rhode Island— tuvo su génesis en *circunstancias claramente ajenas a nuestra realidad estatutaria y constitucional.*(9) Por un

---

(9) Esa jurisprudencia carece de valor persuasivo toda vez que alberga una visión amplia del derecho al voto y de la integridad de los procesos electorales —óptica rechazada hoy por la mayoría— o porque es totalmente impertinente al punto que pretende apoyar. Veamos.

En *Rizzo v. Bizzell,* 530 So. 2d 121 (1988), el Tribunal Supremo de Mississippi determinó que ante una acción que impugne los resultados de una elección sólo era necesario determinar si las irregularidades acaecidas eran de tal magnitud que requerían la celebración de una elección especial, ya que la anulación de cualquier voto ilegal no alteraba el resultado de la elección. Por lo tanto, adujo el Tribunal, era necesario tomar en consideración *"los hechos y las circunstancias de cada caso en particular, incluyendo la naturaleza de los requisitos procesales violados, el ámbito de las violaciones, y la proporción de votos ilegales respecto al total de votos emitidos".* (Traducción y énfasis nuestros.) Íd., pág. 128.

Por otro lado, si bien el Tribunal Supremo de Rhode Island, al advertir que una elección no puede descartarse ante una mera posibilidad matemática de que el resultado varíe, requiere que se demuestre que las irregularidades habidas en unas elecciones fueron suficientes para establecer una probabilidad de que el resultado sería distinto en ausencia de éstas, no debemos pasar por alto que esta probabilidad no se computa exclusivamente a base del número de votos. Es necesario tomar en consideración las circunstancias en que surgieron todas las irregularidades. Así, en *Bounanno v. DiStefano,* 430 A.2d 765 (1981), el Tribunal encontró esta *probabilidad* donde seis (6) máquinas de votación defectuosas arrojaron una victoria de noventiún (91) votos a favor de un candidato, por lo que ordenó una nueva elección. Resulta evidente que la "doctrina de la probabilidad" no puede quedar ajena a las circunstancias del proceso eleccionario, limitando su determinación a un simple cómputo matemático. Es menester considerar el ambiente que reinó durante los comicios.

El resto de la jurisprudencia citada hoy por la mayoría en apoyo de la doctrina de la proporcionalidad y del criterio de probabilidad resulta claramente inaplicable a este

lado, como regla general, su aplicación no procede cuando hay facultad para ordenar una nueva elección, como tampoco cuando el margen de victoria es menor o igual al número de votos ilegales adjudicados. Finalmente, su uso ha surgido en jurisdicciones donde no resulta incompatible con el esquema estatutario y constitucional vigente. ES EVIDENTE, PUES, QUE LA REGLA DE PROPORCIONALIDAD ESGRIMIDA POR LA MAYORÍA ESTÁ DESACREDITADA Y ES MINORITARIA Y TOTALMENTE INCOMPATIBLE CON NUESTRO ESQUEMA ELECTORAL, EL CUAL ESTÁ SUJETO A CLAROS DICTÁMENES CONSTITUCIONALES, ESTATUTARIOS Y REGLAMENTARIOS.

A la luz de estos señalamientos, analicemos detenidamente los errores de *derecho* presentes en la sentencia del foro de instancia, tomando como correctas —para fines argumentativos— sus determinaciones fácticas.

## B. *Los votos contaminados no arrestados*

Según señalamos anteriormente, el trámite seguido por el tribunal de instancia que culminó en la reducción de veintitrés (23) votos al candidato Granados Navedo —del incidente de los veinticinco (25) electores que citaron los demandados Acevedo Pérez y Báez Galib como prueba en el pleito de impugnación— es ILEGAL E INCONSTITUCIONAL. Por ello, de inmediato procede sumarle a Granados Navedo estos veintitrés (23) votos y añadirlos al grupo de las papeletas *contaminadas no arrestadas*. Como resultado, tendríamos el siguiente inventario electoral:

---

asunto. Todas ellas hablan del criterio de prueba aplicable a la impugnación de los resultados de una elección ante la contabilización de votos ilegalmente emitidos, o de votos legalmente emitidos pero no contabilizados. *Matter of Levens*, 702 P.2d 320 (Kan. 1985); *Miller v. Hill*, 698 S.W.2d 372 (1985); *Application of Murphy*, 243 A.2d 832 (1968); *In re 1984 Maple Shade General Election*, 457 A.2d 577 (1985).

| Acevedo Pérez | Granados Navedo | Ventaja | |
|---|---|---|---|
| 100,557 | 100,508 | 49 | Según determinado por el tribunal de instancia. Caso Núm. CE-90-389, Apéndice I, pág. 109. |
| | 23 | (23) | Adición de votos ilegalmente restados. |
| 100,557 | 100,531 | 26 | |

Corolario de lo anterior, el número de votos *contaminados no arrestados* en el Municipio de San Juan queda alterado. El total de estos votos aumentó a cincuenta y tres (53). Anejo (2), Tabla I.

En virtud de la Tabla I, y si presumimos como correcta la determinación del tribunal de instancia de que Granados Navedo no cumplió con el peso de la prueba requerida por este Foro —de señalar específicamente cuáles de estos cincuentaitrés (53) votos ilegales habían sido emitidos a favor del candidato certificado Acevedo Pérez— procede adentrarnos a analizar el grupo de las papeletas *contaminadas arrestadas*. Éstas, aún sin adjudicar, son *cruciales* para determinar la necesidad de celebrar una nueva elección. Ello resultado del minúsculo margen de victoria con que contaría Acevedo Pérez, a saber, sólo veintiséis (26) votos.

C. *En cuanto a los votos contaminados arrestados*

Según el foro de instancia, la situación de los colegios arrestados se resume así:

## VOTOS HÁBILES

| Adjudicables por el tribunal | No Adjudicables por el tribunal | Pérez Acevedo | Granados Navedo |
|---|---|---|---|
| 20 | 78 | 14 | 6 |

Anejo (2), Tabla II.

Notamos, pues, que la contabilización de los votos anulados adjudicables arrojaría una mayoría neta para Acevedo Pérez de treinta y cuatro (34) votos sobre Granados Navedo.

| Acevedo Pérez | Granados Navedo | Ventaja |
|---|---|---|
| 100,557 | 100,531 | 26 |
| 14 | 6 | 8 |
| 100,571 | 100,537 | 34 |

Sin embargo, ello no representa la aplicación *correcta* y final de las normas de derecho. Según pautara diáfanamente este Foro en *Granados v. Rodríguez Estrada I*, supra, pág. 60, todo lo que se le requirió a Granados Navedo fue "[demostrar] que el número de votos anulados [era] suficiente para variar el resultado de la elección *de haberse emitido éstos a su favor*". (Énfasis suplido.) No era "necesario que . . . dem[ostrara] afirmativamente a *favor de quién* dichos votos fueron emitidos". (Énfasis suplido.) Íd., págs. 60–61. Ante unos criterios tan claros y precisos, no podemos *comprender* cómo entendió *el magistrado de instancia* "que el remedio judicial más certero y justo, representativo de la voluntad del electorado, [era] la distribución prorrata" de estos votos anulados. Caso Núm. CE-90-389, pág. 121. Dicho magistrado debió rechazar esa propuesta de Acevedo Pérez y de Báez Galib, pues venía obligado a aplicar la norma adoptada por este Tribunal.

La interpretación de este criterio, "por ser compatible con nuestro derecho electoral", la expone claramente el Tribunal Superior de Nueva Jersey en el caso de *In re 1984 Maple Shade General Election*, supra, cuya norma adoptó la mayoría de este Tribunal explícitamente. Respecto a la anulación de votos de electores hábiles, entre los *contaminados arrestados*, dijo este Tribunal que "no es necesario demostrar cómo los electores rechazados votaron", mientras que "lo contrario es cierto respecto a votos emitidos que son ilegales", o sea, los contaminantes entre los *contaminados no arrestados*. (Traducción nuestra.) Íd., pág. 591. RESULTA INCONCEBIBLE, PUES, QUE ANTE LA ADOPCIÓN NO CUALIFICADA DE UNAS NORMAS SE LE PRETENDA REQUERIR A POSTERIORI AL CANDIDATO IMPUGNADOR QUE DEMUESTRE UNA *"PROBABILIDAD RAZONABLE* DE ALTERAR EL RESULTADO". AL CAMBIAR LAS REGLAS DE JUEGO PARA INTERPRETAR LOS

RESULTADOS, UNA VEZ CULMINARON LOS PROCEDIMIENTOS EVIDENCIARIOS, INCURRE HOY LA MAYORÍA EN UN PATENTE ABUSO DE DISCRECIÓN DEL PODER JUDICIAL.

LO EXPUESTO PONE DE MANIFIESTO LA NECESIDAD QUE TENÍA EL JUEZ POLO DE APLICAR FIELMENTE ESTA NORMA. LA VENTAJA DE TREINTICUATRO (34) VOTOS DE ACEVEDO PÉREZ ERA Y ES *INSUFICIENTE* PARA ABSORBER LA TOTALIDAD DE LOS VOTOS *CONTAMINADOS ARRESTADOS* HÁBILES Y ANULADOS. ÉSTOS ASCIENDEN A SETENTA Y OCHO (78), NÚMERO SUFICIENTE PARA SUPERAR AMPLIAMENTE LA VENTAJA DE ACEVEDO PÉREZ, *POR LO QUE EVIDENTEMENTE, EN LA ALTERNATIVA, PROCEDERÍA UNA NUEVA ELECCIÓN.*

Aun si consideramos que la renuencia de los electores del Precinto 004, Unidad 008, Colegio 003 a entregar la T.I.E. a los funcionarios de colegio constituyera una irregularidad que requiriera la anulación de sus votos, notamos que tras los ajustes pertinentes la ventaja de Acevedo Pérez sobre Granados Navedo se reduce a treintidós (32) votos.[10] Bajo esta alternativa, también resulta evidente que esta ventaja tampoco es suficiente para contrarrestar los treintiséis (36) votos anulados en los otros colegios arrestados emitidos por electores hábiles.

EN RESUMEN, LA UTILIZACIÓN DE LA FÓRMULA DE PROPORCIONALIDAD ES INCONSTITUCIONAL Y ATENTA CONTRA NUESTRO SISTEMA DEMOCRÁTICO DE GOBIERNO. SI EN LA DISYUNTIVA FUÉRAMOS A APLICARLA, A SU AMPARO *GRANADOS NAVEDO DEMOSTRÓ* LA PROBABILIDAD DE QUE LOS VOTOS ARRESTADOS ALTERABAN *A SU FAVOR* EL RESULTADO. MÁS ALLÁ DE ESA CONCLUSIÓN, EN SU APLICACIÓN, EL TRIBUNAL DE INSTANCIA INCURRIÓ EN UNOS ERRORES FUNDA-

---

[10] Se llega a este resultado al restarle a Acevedo Pérez los dos (2) votos que se adjudicaron a su favor de los contaminados arrestados en este colegio. Véase Anejo (2), Tabla II.

MENTALES, SUSCEPTIBLES ÚNICAMENTE DE SER SUPERADOS MEDIANTE UNA NUEVA ELECCIÓN.

## IX

*Conclusiones*

EN LAS PASADAS ELECCIONES, GRANADOS NAVEDO *PREVALECIÓ* POR MÁS DE CIEN (100) VOTOS. LA CERTIFICACIÓN DE ACEVEDO PÉREZ SÓLO HA SIDO POSIBLE MEDIANTE UNA INTERPRETACIÓN JUDICIAL CONFISCATORIA Y OPRESIVA QUE NO ADJUDICA LOS VOTOS SIGUIENTES: CINCUENTA Y SIETE (57) PAPELETAS CORRESPONDIENTES A ELECTORES RECUSADOS ILEGALMENTE POR DOMICILIO (ER); TREINTA (30) PAPELETAS DE ELECTORES IDÓNEOS EXCLUIDOS INDEBIDAMENTE DE LAS LISTAS; TREINTAINUEVE (39) PAPELETAS CON INICIALES PUESTAS *BONA FIDE* POR ELECTORES HÁBILES QUE MALINTERPRETARON UNAS INSTRUCCIONES; DOS (2) PAPELETAS VÁLIDAS MIXTAS, Y VEINTITRÉS (23) VOTOS INCONSTITUCIONALMENTE DESCONTADOS MEDIANTE UN TRÁMITE INQUISITORIAL E ILEGAL.

Una ALTERNATIVA remedial de origen legislativo se mantiene inalterable: la procedencia, aun en esta etapa, de una nueva elección. Las contingencias expuestas contra esa nueva elección, a saber, que afectaría a los que no podrían ahora votar por razón de fallecimiento, cambio de domicilio,[11] precinto o municipio, mudanza de Puerto Rico o incapacidad física (opinión mayoritaria, pág. 45), realmente dan al traste a considerar seriamente ese remedio legislativo *en cualesquiera otras circunstancias.* Aparte de su *incorrección,*[12] bajo las mismas NUNCA PODRÍA DECRETARSE UNA NUEVA ELECCIÓN.

---

[11] Se destaca la preocupación mayoritaria por los electores que cambiaron "de domicilio". Alegadamente, éstos no podrían votar en una nueva elección. Lástima que no tengan igual preocupación con los demandantes involuntarios, aquí recurrentes, indebidamente recusados por domicilio.

[12] Al respecto, remitimos a la mayoría del Tribunal a una lectura sosegada de la Parte XXIII, *Parámetros de la nueva elección; descertificación de Acevedo Pérez;*

Lo mismo podemos decir respecto a las otras razones adelantadas, a saber, que "[r]equeriría la actualización de las listas electorales" (opinión mayoritaria, pág. 45), y generaría el debate político típico de toda campaña. En las circunstancias del caso de autos son simples excusas, no fundamentos jurídicos. Aludir a lo "sobrecargada que *dentro de los próximos dos (2) años* estará de labores la C.E.E. con probablemente cinco (5) eventos electorales" —(énfasis suplido) íd., pág. 46— y a la futura redistribución electoral de 1992 es sencillamente invocar a destiempo como determinante el factor tiempo. Siempre, en las anteriores instancias judiciales, sostuvimos la necesidad de acelerar los trámites para evitar precisamente que ese factor afectara la posibilidad remedial de una nueva elección. No nos hicieron caso. Invocarlo la mayoría ahora es chocante.

La nueva elección sigue siendo un remedio alterno jurídico, correcto y apropiado aun en este momento. Ni el tiempo ni el enmarañamiento sustantivo y la pereza procesal han cerrado la vía que sabiamente visualizó el legislador. Sin embargo, la mayoría de este Tribunal ignora esa realidad y, a ultranza, ha tratado de mantener por todos los medios *LA CERTIFICACIÓN PREMATURA Y ANTIJURÍDICA DE ACEVEDO PÉREZ.*[13]

COMO LE OCURRIÓ AL PATRÓN RELIGIOSO CUYO NOMBRE LLEVA LA CAPITAL, LA PRÉDICA HA SIDO EN EL DESIERTO. CON ESTE DISENSO CERRAMOS UNO DE LOS CAPÍTULOS MÁS ACIAGOS DE NUESTRA HISTORIA JURÍDICO-ELECTORAL. LO MÁS DESGRACIADO DE

---

*candidatos y electores a participar*, expuesta en nuestro disenso en *Granados v. Rodríguez Estrada I*, supra, pág. 281.

[13] La mayoría del Tribunal destaca que el Comisionado Electoral del P.P.D., Báez Galib, se opuso a la enmienda que permitió el sistema de "añadidos a mano", según fue refrendado en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra. Cualesquiera que sean las dificultades que pudiera haber originado este sistema, no son comparables con sus virtudes. En su testimonio, el propio Báez Galib aceptó que en San Juan más de tres mil (3,000) electores pudieron votar mediante el mismo, pues por error de la Comisión Estatal no aparecían en las listas. Vol. 53, pág. 101.

No se necesita mucho esfuerzo intelectual para entender que sin ese sistema los resultados de las elecciones no sólo en nuestra capital sino en la Isla, hubiesen sido nulos ab initio, por no ser representativos del verdadero cuerpo electoral y por haber excluido inconstitucionalmente de las urnas a priori, a miles de electores.

ESTA TRAGEDIA, O COMEDIA HUMANA (DEPENDE DE LA SENSIBILIDAD, LA CONCIENCIA HISTÓRICA Y LA ESCALA VALORATIVA DE QUIENES LA ESCRUTEN) ES QUE, DESPUÉS DE ESTE LARGO VÍA CRUCIS JUDICIAL, *AÚN TENEMOS UN ALCALDE CON ASTERISCO.*

LA DUDA SUBSISTE. LA VISIÓN QUE EMERGE DEL PROCESO DECISORIO MAYORITARIO ES APOCALÍP-TICA. Dejaron sin efecto innumerables principios electorales y sanas normas jurisprudenciales que tomaron largo tiempo en asentarse y que fueron de gran utilidad hasta muy reciente.

Al cumplirse *ESA PROFECÍA*, el catálogo de precedentes judiciales tirados por la borda es *ESPANTOSO*, a saber: (1) no se actuó con la premura que amerita una impugnación electoral; (2) se revocó el enfoque de interpretación judicial liberal en materia electoral; (3) se le imputó al elector errores atribuibles única-mente al organismo electoral; (4) SE ELEVÓ A CATEGORÍA DE PRESUNCIÓN INCONTROVERTIBLE LAS DETERMI-NACIONES DE LA COMISIÓN ESTATAL; (5) se utilizaron reglas de adjudicación distintas para situaciones esencialmente iguales (falta de uniformidad en cuanto a las papeletas con iniciales y electores inactivos); (6) se descartó el valor probatorio de evidencia documental y real pertinente (tarjeta electoral válida expedida después de una inscripción); (7) se subvirtieron drásticamente las normas básicas sobre acumulación; (8) se trastocaron principios elementales sobre citación personal y em-plazamiento (a los electores que habían reclamado ante el foro federal se les emplazó y citó personalmente, mientras que a los restantes sólo por correo y mediante edicto); (9) se confundieron los conceptos de "testigos" y "partes"; (10) se aquilató arbitraria-mente la prueba pericial; (11) se ignoró la regla de mejor evidencia (*best evidence rule*); (12) se invirtió indebidamente el peso de la prueba; (13) se transformaron las presunciones (se presumió la mala fe y el fraude); (14) no se garantizaron los privilegios constitucionales contra la autoincriminación y la secretividad del voto; (15) se atribuyeron prerrogativas sin auto-ridad estatutaria (concesión de inmunidad criminal en casos

inapropiados de otra naturaleza); (16) se lesionó el debido proceso de ley a innumerables electores; (17) se adoptaron normas revocadas o minoritarias de otras jurisdicciones; (18) se utilizaron principios estadísticos inapropiadamente y sin rigor científico; (19) no se contaron todos los votos válidos; (20) se infringió el principio constitucional de "un hombre, un voto", y (21) se desatendió el mandato legislativo de una nueva elección.

Una NOTA FINAL en cuanto a la incorporación a la opinión mayoritaria de la opinión, sentencia y sus apéndices del Juez Polo. Realmente el propósito anunciado de "complemento" no convence. Opinión mayoritaria, pág. 10 esc. 4. Aparte de *HACER BULTO* (es lo único que logra), como técnica adjudicativa es criticable y tiende a confundir. La justicia amorfa, que no establece con la precisión necesaria cuáles fueron los criterios judiciales institucionales determinantes, genera una sensación pública de inseguridad y desconfianza. ¡AY BENDITO! "Este Tribunal no debería ser imagen de unos valores procesales en crisis." *Granados v. Rodríguez Estrada I*, supra, *opinión disidente.*

## ANEJO (1)

ELECTORES EXCLUIDOS ILEGALMENTE POR RAZÓN DE DOMICILIO (ER) POR LA COMISIÓN ESTATAL Y CUYOS VOTOS DEBEN ADJUDICARSE

| | Exhibit | Elector |
|---|---|---|
| 1. | 86 | Pedro Hernández Monserrate |
| 2. | 104 | Nilda Castro Avilés |
| 3. | 214 | Marta Sánchez García |
| 4. | 217 | Milagros Apolinaris López |
| 5. | 224 | Pura Acevedo Román |
| 6. | 226 | Julia Rocheli Ramos |
| 7. | 228 | Carmen Cruz Rivera |
| 8. | 229 | Consuelo Rivera Vega |
| 9. | 231 | Ramón Reyes Hernández |

| | Exhibit | Elector |
|---|---|---|
| 10. | 252 | Juana Rivera Díaz |
| 11. | 256 | Daniel A. González Betancourt |
| 12. | 257 | Miguel A. Laureano Santos |
| 13. | 260 | Leomarys Rivera Murphy |
| 14. | 263 | Justiniano Lorenzana Colón |
| 15. | 264 | Gloria Cruz Torres |
| 16. | 268 | Ibis J. Maldonado Negrón |
| 17. | 271 | Miguel González Villanueva |
| 18. | 273 | Pedro Flores |
| 19. | 274 | María L. Pérez Rodríguez |
| 20. | 275 | Ana Celia Arana Hernández |
| 21. | 276 | Eleuteria Ortiz Figueroa |
| 22. | 278 | Raúl Ortiz Alicea |
| 23. | 279 | Águeda Santos Caballero |
| 24. | 280 | Carlos A. Serpa Serpa |
| 25. | 281 | Carmen Serpa Laureano |
| 26. | 282 | Lourdes M. Rodríguez Ramos |
| 27. | 283 | Carmen López Oquendo |
| 28. | 284 | Isabelino Báez Alicea |
| 29. | 289 | Eva Cotto Ayala |
| 30. | 290 | Andrea Benítez Santiago |
| 31. | 291 | Arturo Quiñones Aracil |
| 32. | 292 | Ramón González Dávila |
| 33. | 293 | José Andino Báez |
| 34. | 294 | Damaris De León Saldaña |
| 35. | 296 | Pedro J. Ocasio de Jesús |
| 36. | 297 | Nilda Consuelo González |
| 37. | 300 | Antonio Ramírez Morales |
| 38. | 301 | María T. García Santos |
| 39. | 305 | Constancia Román Cruz |
| 40. | 308 | Nereida Rodríguez Mejías |
| 41. | 312 | Sixto Miranda Matta |

| | Exhibit | Elector |
|---|---|---|
| 42. | 313 | Dolores Guzmán Rivera |
| 43. | 315 | Antonia Torres Colón |
| 44. | 317 | José Nieves Toro |
| 45. | 319 | Ana Mojica Ortiz |
| 46. | 320 | María Rodríguez Valle |
| 47. | 321 | Gladys Meléndez Boria |
| 48. | 322 | Gerardo Rivera Otero |
| 49. | 330 | Alejandro Santos Caballero |
| 50. | 331 | Ramonita Ríos Cruz |
| 51. | 333 | Gloria Muñoz Reyes |
| 52. | 334 | Víctor Cotto Castro |
| 53. | 361 | Juanita Calderón Arroyo |
| 54. | 362 | José A. Gavillán Martínez |
| 55. | 368 | Zoila González González |
| 56. | 371 | Francisca Cotto Rivera |
| 57. | 372 | Ana Torres Burgos |
| 58. | 373 | Aida Vázquez Casillas |

A favor de Granados Navedo 57

A favor de Acevedo Pérez 1

## ANEJO (2)

### TABLA I: PAPELETAS ILEGALES EN CONTAMINADAS NO ARRESTADAS

| PREC. | UNI. | COL. | VOTOS ILEGALES ADJUDICADOS POR LA C.E.E. | EXPLICACIÓN |
|-------|------|------|------|------|
| 001 | 010 | 008 | 0 | Según el tribunal de instancia, cualquier irregularidad fue subsanada. Caso Núm. CE-90-389, Apéndice I, pág. 99. |
| 001 | 013 | 005 | 4 | Por el análisis y resultado relacionado con el incidente de los veinticinco (25) electores, traemos y computamos el voto de Hilario Rodríguez Marrero como parte de los votos *contaminados no arrestados* de este colegio. Íd., pág. 107. |
| 001 | 017 | 002 | 2 | El tribunal de instancia señaló, sin elaborar, que Granados Navedo renunció a sus reclamos de contaminación en este colegio. Erró. Notamos que los votos emitidos por Áureo Pérez Álvarez y por Ada Luz Santana Arroyo tienen que tomarse en cuenta como votos *contaminados no arrestados* de este colegio. Íd., pág. 235. |
| 001 | 020 | 004 | 0 | Según el tribunal de instancia, no hubo contaminación alguna. Íd., pág. 98. |
| 001 | 026 | 006 | 1 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que el voto emitido por Isidro Rivera Márquez tiene que tomarse en cuenta como voto *contaminado no arrestado* de este colegio. Íd., pág. 235. |

TABLA I (cont.)

| PREC. | UNI. | COL. | VOTOS ILEGALES ADJUDICADOS POR LA C.E.E. | EXPLICACIÓN |
|---|---|---|---|---|
| 002 | 007 | 007 | 12 | Por el análisis y resultado relacionado con el incidente de los veinticinco (25) electores, traemos y computamos el voto de Félix Figueroa Rivera como parte de los votos *contaminados no arrestados* de este colegio. Íd., págs. 107–108. |
| 002 | 013 | 006 | 0 | El tribunal de instancia señaló, sin elaborar, que Granados Navedo renunció a sus reclamos de contaminación en este colegio. Íd., pág. 98. |
| 002 | 020 | 003 | 1 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que el voto emitido por Carmen R. González Laureano tiene que tomarse en cuenta como voto *contaminado no arrestado* de este colegio. Íd., pág. 235. |
| 002 | 025 | 010 | 1 | El tribunal de instancia llegó a este resultado. Íd., pág. 108. |
| 002 | 027 | 004 | 12 | Por el análisis y resultado relacionado con el incidente de los veinticinco (25) electores, traemos y computamos los votos de Lydia Candelaria González, Juana Carmona Sierra, Marcia Flores Fuentes y Salvador Santos Fernández como parte de los votos *contaminados no arrestados* de este colegio. Íd., pág. 108. |
| 002 | 028 | 001 | 2 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que los votos emitidos por María E. González García y Jaime Rosario López tienen que tomarse en cuenta como votos *contaminados no arrestados* de este colegio. Íd., pág. 235. |

| PREC. | UNI. | COL. | VOTOS ILEGALES ADJUDICADOS POR LA C.E.E. | EXPLICACIÓN |
|---|---|---|---|---|
| 002 | 028 | 002 | 6 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que los votos emitidos por Luz Nereida Ortiz Cruz, Carmen Santos Reyes, Carmen Pantojas Cabrera, Ramonita Centeno Rodríguez, Olga Álvarez de Jesús y Evelyn Rivera Surillo tienen que tomarse en cuenta como votos *contaminados no arrestados* de este colegio. Íd., págs. 235–236. |
| 003 | 002 | 006 | 0 | Según el tribunal de instancia, no hubo contaminación alguna. Íd., pág. 98. |
| 003 | 020 | 008 | 4 | Por el análisis y resultado relacionado con el incidente de los veinticinco (25) electores, traemos y computamos el voto de Sylvia Acosta Ureña como parte de los votos *contaminados no arrestados* de este colegio. Íd, pág. 108. |
| 003 | 022 | 001 | 1 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que el voto emitido por Evelyn López Rivera tiene que tomarse en cuenta como voto *contaminado no arrestado* de este colegio. Íd., pág. 236. |
| 003 | 023 | 001 | 1 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que el voto emitido por María A. Rivera Vázquez tiene que tomarse en cuenta como voto *contaminado no arrestado* de este colegio. Íd. |

TABLA I (cont.)

| PREC. | UNI. | COL. | VOTOS ILEGALES ADJUDICADOS POR LA C.E.E. | EXPLICACIÓN |
|---|---|---|---|---|
| 004 | 027 | 005 | 2 | El tribunal de instancia no hizo determinación alguna en cuanto a la contaminación de las urnas en este colegio. Erró. Notamos que los votos emitidos por Ángel Luis Vázquez Marrero y Rosa Rodríguez Colón tienen que tomarse en cuenta como votos *contaminados no arrestados* de este colegio. Íd. |
| 005 | 002 | 010 | 0 | Según el tribunal de instancia, cualquier irregularidad fue subsanada. Íd., pág. 99. |
| 005 | 031 | 006 | 0 | Según el tribunal de instancia, cualquier irregularidad fue subsanada. Íd., |
| 104 | 015 | 002 | 4 | Por el análisis y resultado relacionado con el incidente de los veinticinco (25) electores, traemos y computamos el voto de Reyes Padín Cuevas como parte de los votos *contaminados no arrestados* de este colegio. Íd., pág. 107. |

TOTAL DE VOTOS
CONTAMINADOS NO ARRESTADOS 53

## TABLA II: PAPELETAS LEGALES EN CONTAMINADAS ARRESTADAS

| PREC. | UNI. | COL. | NO ADJUDICADOS POR LA C.E.E. | VOTOS HÁBILES IDENTIFICABLES ADJUDICABLES | NO ADJUDICABLES POR EL TRIBUNAL | ACEVEDO PÉREZ | GRANADOS NAVEDO | EXPLICACIÓN |
|---|---|---|---|---|---|---|---|---|
| 001 | 026 | 008 | 18 | 4 | 14 | 4 | 0 | Los cuatro (4) votos asignados a Acevedo Pérez corresponden a electores hábiles que declararon haber votado por éste. |
| 002 | 006 | 004 | 19 | 2 | 17 | 2 | 0 | Los dos (2) votos asignados a Acevedo Pérez corresponden a electores hábiles que declararon haber votado por éste. |
| 002 | 029 | 005 | 10 | 10 | 0 | 6 | 4 | Los diez (10) votos adjudicables corresponden a electores hábiles cuyas papeletas son identificables, seis (6) votaron a favor de Acevedo Pérez y cuatro (4) por Granados Navedo. |
| 003 | 020 | 008 | 2 | 2 | 0 | 0 | 2 | Los dos (2) votos asignados a Granados Navedo corresponden a electores hábiles que votaron por éste. |
| 003 | 033 | 005 | 5 | 0 | 5 | 0 | 0 | Los dos (2) votos asignados a Acevedo Pérez corresponden a electores hábiles que declararon haber votado por éste. |
| 004 | 008 | 003 | 44 | 2 | 42 | 2 | 0 | Los dos (2) votos asignados a Granados Navedo corresponden a electores hábiles que votaron por éste. |
| TOTALES | | | 98 | 20 | 78 | 14 | 6 | |

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

"La capacidad del hombre para la justicia hace la democracia posible, pero la inclinación del hombre por la injusticia hace la democracia necesaria." (Traducción nuestra.)[1]

I

En un momento único en la historia mundial en el cual los aires de la democracia arropan al mundo, y mientras se celebran elecciones libres en pueblos de Europa y América hasta ayer víctimas de la opresión, *resulta irónico y deprimente que el más alto tribunal de un país con una rica tradición democrática como el nuestro resuelva, por fíat judicial, una contienda electoral, la cual debe ser dilucidada en las urnas electorales.*

En el día de hoy este Tribunal —so pretexto de salvaguardar los derechos de los ciudadanos de este País— le asesta un golpe mortal a uno de los principios fundamentales sobre los cuales descansa nuestro sistema democrático de gobierno: *el derecho al voto*. Al así hacerlo impide que los que gobiernen y dirijan nuestro destino sean aquellos que el pueblo elija *en un proceso eleccionario libre de sombras e interrogantes.*

El precedente hoy establecido por la mayoría del Tribunal resulta ser alarmante y desconcertante. Los antes mencionados derechos quedan, llana y sencillamente, subordinados a una acomodaticia norma de "deferencia judicial" hacia las actuaciones de un organismo administrativo altamente politizado, como lo es la Comisión Estatal de Elecciones —controlada, de ordinario, por el partido político de turno en el poder— y las de un juez de instancia cuya trayectoria decisoria, durante aproximadamente

---

[1] Reinold Neibuhur, *The Children of Light and The Children of Darkness*, 1944, citado en Barlets, Familiar Quotations, 1980, pág. 823.

dos largos años de litigio, ha sido una errática.(2) *Incomprensiblemente, "deferencia" y "revisión" se han convertido en sinónimos indistinguibles en la solución del presente caso para una mayoría de los miembros de este Foro.*

Desde los comienzos de esta odisea judicial —la cual estoicamente han tenido que soportar y resistir no sólo las partes y los residentes de San Juan, sino que el pueblo de Puerto Rico en *general*— hemos sostenido que, *dada la singular y particular situación de hechos que presenta este caso, este Tribunal debió haber ordenado la celebración de una nueva elección en la ciudad capital de Puerto Rico en lugar de intentar solucionar judicialmente el mismo.* Véase la opinión concurrente y disidente que emitiéramos el 2 de junio de 1989 en *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989).

El transcurso del tiempo nos ha dado la razón. Tras la celebración de innumerables vistas por el Tribunal Superior de San Juan que tomaron meses, la emisión de varias decisiones por dicho foro y cientos de páginas escritas por todos y cada uno de los integrantes de este Tribunal —donde parecen haberse agotado hasta el máximo todas las posibles alternativas jurídicas respecto a la adjudicación de las papeletas emitidas por los electores en controversia— *la frustrante e inescapable conclusión resulta ser la anticipada y vislumbrada por nosotros en la antes mencionada opinión concurrente y disidente, a los efectos de que la adjudicación judicial de las controversias planteadas depende de las cualidades y atributos, personales y profesionales, del adjudicador o los adjudicadores.* Las diferentes e irreconciliables posiciones asumidas en el presente caso por los distintos magistrados —respecto a unos hechos comunes— constituyen prueba irrefutable de ello.(3)

---

(2) Este Tribunal ha entendido necesario revocar y/o modificar sustancialmente decisiones emitidas en el presente caso por el Hon. Juez Polo en tres ocasiones distintas en el período de un año. Véanse: *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989); *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989); *González v. Rodríguez Estrada II*, 124 D.P.R. 783 (1989).

(3) Una lectura de la bien fundamentada opinión disidente suscrita por el compañero Juez Asociado Señor Negrón García es todo lo que se necesita para que surjan serias dudas

Jamás en la historia judicial de Puerto Rico la trayectoria procesal de un caso ha resultado tan predecible como el proceso de impugnación de la certificación del Lcdo. Héctor Luis Acevedo como Alcalde de la ciudad de San Juan. Al igual que la conocida obra literaria titulada "Crónica de una muerte anunciada", la decisión hoy emitida por una mayoría de los integrantes del Tribunal no debe constituir sorpresa para nadie; sobre todo cuando consideramos el hecho de que el magistrado que presidió los procedimientos a nivel de instancia a lo largo de los pasados dos años, Lcdo. Carlos E. Polo, renunció a su cargo de juez durante el pasado mes de junio, renuncia que fue aceptada por el Hon. Gobernador de Puerto Rico previa la autorización, o endoso, a esos efectos del señor Juez Presidente de este Tribunal. *Ese hecho, naturalmente, tuvo la consecuencia de prácticamente anular desde ese preciso momento cualquier posibilidad de que la sentencia que hoy se confirma fuera revocada y de que el caso pudiera ser devuelto al foro de instancia, afectándose de esa forma los derechos del recurrente Granados Navedo.*(4)

---

en la mente *de una persona objetiva, imparcial y razonable* respecto a la corrección jurídica de la determinación del Tribunal de que el Lcdo. Héctor Luis Acevedo recibió el endoso de una mayoría de los electores de San Juan.

Dicha opinión disidente resulta ser tan convincente que hace que recordemos unas expresiones que *al disentir* —en *Ocasio v. Díaz,* 88 D.P.R. 676, 775 (1963)— hiciera hace veintisiete años el Hon. Pedro Pérez Pimentel, ex Juez Presidente de este Tribunal, a los efectos de que:

"Pecaríamos de ingenuos si creyéramos que toda sentencia judicial se funda en la verdad de los hechos en controversia. Algún comentarista del Derecho ha dicho, con razón, que algunas sentencias se explican porque los atracos no solamente se cometen en las encrucijadas, sino también en los tribunales de justicia."

(4) Tenemos, a manera de ejemplo, que mediante el tercer señalamiento de error, el recurrente José Granados Navedo le imputa al foro de instancia haber errado "al no reconocerle el derecho al voto a un número de electores de los denominados 'añadidos a mano'". Dicho señalamiento es uno de vital importancia para el recurrente Granados Navedo por cuanto de asistirle la razón en el mismo, el número de votos que podrían serle adjudicados tendrían el efecto de variar el resultado de la elección según éste fue certificado por la Comisión Estatal de Elecciones.

Respecto a ello resulta pertinente resaltar que los recurridos Héctor Luis Acevedo y Eudaldo Baéz Galib señalan —en el "memorando en apoyo de la confirmación de la sentencia" que ellos radicaran en el presente recurso— que de este Tribunal entender que dicho error en efecto fue cometido lo procedente sería *"devolver el caso al Tribunal Superior* para que éste evaluara individualmente el derecho de cada elector excluido por residencia, *a la luz de los testimonios que ya recibió* y del resto de la prueba que puedan

El obstinado empeño por parte de una mayoría de los integrantes de este Tribunal en resolver judicialmente el presente caso tendrá, desafortunadamente para Puerto Rico, la inevitable consecuencia de no ponerle fin jamás a la controversia planteada. La duda, la sospecha, las interrogantes y las recriminaciones que tendrá el pueblo respecto a la decisión mayoritaria hoy emitida serán parte integrante de la misma y desgraciadamente pasarán a la historia junto a ésta.

No podemos refrendar con nuestro voto tan desatinada actuación. La misma impide, una vez más, que permanezcamos en silencio ante una decisión emitida por la mayoría de los integrantes de este Tribunal. Dicha situación, en nuestra opinión, es una que amerita que se hagan los señalamientos antes mencionados, no importa cuán fuertes puedan ser éstos. *Después de todo, nuestro pueblo tiene derecho a saber la calidad de la justicia que dispensan los funcionarios a quienes se les ha encomendado tan delicada misión.*

Como hemos ya expresado en ocasiones anteriores, *la verdad puede ser dulce o amarga —inclusive severa— pero nunca es ofensiva ni injusta.* Conforme expresara el Hon. Marco A. Rigau, ex Juez de este Tribunal, los integrantes de esta institución deben "evitar dar la impresión, aunque ésta sea errónea, *de que decimos unas cosas* en nuestros discursos y escritos *y hacemos otras en la*

aportar las partes en una nueva vista evidenciaria que habría que celebrar . . .". (Énfasis suplido.) Véase pág. 28 esc. 13, del referido Memorando.

*La renuncia del Juez Polo prácticamente eliminó esa alternativa;* ello por razón de que se requeriría la designación de un *nuevo* magistrado para entender en el caso, *lo cual representaría comenzar de nuevo el procedimiento ya celebrado ante el tribunal de instancia, curso de acción que nos hubiera llevado prácticamente a la antesala de las próximas elecciones generales del año 1992 sin que todavía se hubiera resuelto el caso.*

Es por ello que francamente no alcanzamos a entender la acción de autorizar, y aceptar, la renuncia del Lcdo. Carlos E. Polo como Juez del Tribunal Superior *con anterioridad* al momento en que este Tribunal resolviera en definitiva el recurso radicado por José Granados Navedo; sobre todo cuando consideramos el hecho de que —como expresáramos en el esc. 2, ante— este caso había sido devuelto anteriormente en tres ocasiones al tribunal de instancia y esa alternativa, como hemos visto, era una latente en el mismo.

La pertinencia, importancia y significado del "escueto" hecho de haberse tramitado la renuncia del ex Juez Polo *antes* de que este Tribunal emitiera su dictamen final en el caso y las conclusiones e inferencias, lógicas y razonables, que de dicho hecho se pueden hacer, *las dejamos al buen juicio, inteligencia y sentido común del lector.*

*práctica*"; ello por razón de que este "Tribunal no solamente decide casos *sino que da el ejemplo y educa . . .*". (Énfasis suplido.)(5) *En otras palabras, la ecuanimidad, la mesura y la objetividad judicial son virtudes que no sólo se profesan sino que se practican.*

## II

Lo verdaderamente lamentable de toda esta situación lo constituye el hecho de que todo este desafortunado proceso pudo ser evitado. Ello así por cuanto la vigente Ley Electoral(6) nos brinda —*podría decirse, inclusive, que nos obliga a*— una solución que no sólo es la jurídicamente procedente sino que resulta ser la más justa para los dos candidatos y para los electores de San Juan.

El Art. 6.015 de la citada Ley Electoral, 16 L.P.R.A. sec. 3275, dispone, en lo pertinente, que:

> En el caso de una elección de candidato a cargos que no fuesen de Senador o de Representante, si se suscitare una impugnación parcial o total de la votación entre dos o más candidatos para algún cargo o cargos, *y el Tribunal no pudiera decidir cu[á]l de ellos resultó electo, ordenará una nueva elección en el precinto o precintos afectados,* la cual se celebrará de acuerdo a las normas reglamentarias que a tales efectos se prescriban. (Énfasis suplido.)

*¿Qué tuvo en mente, qué quiso decir, la Asamblea Legislativa al promulgar la antes transcrita disposición legal?* Dicho de otra forma, ¿*en qué situaciones es de aplicación el referido precepto legal?*

Si se interpreta el mismo literalmente —como lo hace la opinión mayoritaria emitida— *se llega al absurdo de que el citado precepto legal jamás tendría que ser aplicado.* Ello así por razón de que un juez, un tribunal, *siempre puede resolver una controversia de una forma u otra.* En lo específico, no hay duda que

---

(5) Veáse la opinión concurrente del Juez Rigau en *García Cruz v. El Mundo, Inc.,* 108 D.P.R. 174, 191 (1978).

(6) Ley Núm. 4 de 20 de junio de 1988 (16 L.P.R.A. sec. 3001 *et seq.*).

cualquiera de los señores jueces del tribunal de primera instancia, así como cada uno de los integrantes de este Tribunal, *siempre* está en condiciones de adjudicar un voto y, por lo tanto, de "decidir" una elección.

Resulta, en consecuencia, obvia la conclusión de que el citado Art. 6.015 de la vigente Ley Electoral *no* puede ser interpretado en forma literal, por cuanto sabido es que hemos rechazado, en reiteradas ocasiones, atribuirle a la Asamblea Legislativa la realización de un acto inútil como en efecto equivaldría la interpretación literal del referido artículo de ley. *Talcott Inter-Amer. Corp. v. Registrador*, 104 D.P.R. 254, 262 (1975); *Ortiz Morales v. A.C.A.A.*, 116 D.P.R. 387, 391 (1985); *Passalacqua v. Mun. de San Juan*, 116 D.P.R. 618, 623 (1985); *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884, 887 (1975).

Es en relación con situaciones como las que presenta el caso de autos que el foro judicial viene obligado, *si es que interesa cumplir con el propósito o intención legislativa del citado Art. 6.015*, a decretar la celebración de una nueva elección. El presente caso plantea una situación en donde la adjudicación de quién resultó electo resulta altamente debatible *debido al estrecho margen de votos que separa a los candidatos y en la cual las cuestiones planteadas, respecto al número de votos en controversia que pueden fácilmente cambiar el resultado certificado, son susceptibles de múltiples interpretaciones por mentes razonables.*

El citado precepto legal necesariamente tiene que ser interpretado de forma tal que garantice y salvaguarde la voluntad de quienes acudieron a las urnas, en el ejercicio de su derecho constitucional al voto, con el propósito de seleccionar las personas que ellos entienden deben dirigir los destinos de nuestro País. *Ello así por cuanto corresponde a nuestro electorado, y no a este Tribunal, determinar cuál fue su verdadera voluntad. La razón para lo antes expuesto es sorprendentemente sencilla: los gober-*

*nantes de un país los debe elegir el propio pueblo y no los tribunales.*(7)

## III

En conclusión, y en vista de las particulares circunstancias del caso ante nuestra consideración, somos del criterio que la única solución jurídicamente correcta a la controversia central planteada en el mismo lo es el decretar la celebración de una nueva elección en la ciudad de San Juan.(8)

Paradógica e irónicamente, la mejor evidencia de que no procede que este Tribunal, ni ningún otro,(9) sea el que adjudique y determine el ganador de la contienda por la Alcaldía de San Juan lo constituye precisamente las numerosas y extensas ponencias que los integrantes de este Tribunal han redactado a lo largo de dos años del estéril y defectuoso procedimiento judicial que se ha llevado a cabo a insistencia de una mayoría de los miembros de este Foro.

De dichas voluminosas ponencias claramente surgen diferencias —no sólo de criterio sino que de interpretación y aplicación de normas, las cuales llevan a resultados distintos e irreconciliables entre sí— que definitivamente confirman la incapacidad del foro judicial para determinar quién resultó electo Alcalde de San Juan.

De momento, sin embargo, la ciudad de San Juan cuenta con un Alcalde: el Lcdo. Héctor Luis Acevedo. Desafortunadamente

---

(7) En las jurisdicciones estatales norteamericanas existe abundante jurisprudencia a esos efectos. Reiteradamente se ha resuelto que cuando un tribunal no puede determinar con *razonable certeza* quién resultó electo, el remedio adecuado lo constituye el ordenar la celebración de una nueva elección. A manera de ejemplo, véanse: *Hardeman v. Thomas,* 256 Cal. Rptr. 158 (1988); *Ippolito v. Power,* 241 N.E.2d 232 (1968); *McCavitt v. Registrars of Voters of Brockton,* 434 N.E.2d 620, 631 (1982); *Santucci v. Power,* 304 N.Y.S.2d 926 (1969); *Merola v. Power,* 303 N.Y.S.2d 229 (1969); *Application of Moffat,* 361 A.2d 74, 78 (1976).

(8) Al sopesar el derecho del electorado de San Juan a tener un alcalde electo democráticamente en las urnas en contraposición con las cinco razones, de "índole práctico", aducidas en la opinión mayoritaria como fundamento para descartar la celebración de una nueva elección, consideramos que las mismas no son lo apremiante y meritorias como para anular un derecho de tan alto rango en nuestra sociedad, como lo es el derecho al voto.

(9) No debe perderse de vista que una vez termine la contienda a nivel local, con toda probabilidad comenzará una nueva odisea en el foro federal.

para él y para nuestro sistema democrático de gobierno, *el licenciado Acevedo ha sido judicialmente electo a dicho cargo por una mayoría —de cuatro contra dos— de los integrantes de este Tribunal.*

A nuestra manera de ver las cosas, el Alcalde de la ciudad de San Juan *debe ser electo como tal en las urnas de votación por una mayoría de los residentes de dicha ciudad capital en unos sufragios, repetimos, libres de sombras e interrogantes.*